## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

|  |  |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>Plaintiff, )<br><br>vs. )<br><br>GENERAL ELECTRIC COMPANY, )<br><br>Defendant. ) | Case No.: 06-CV-00354-PB<br><br>Judge Paul J. Barbadoro |

MEMORANDUM IN SUPPORT OF
UNITED STATES' MOTION IN LIMINE TO EXCLUDE THE PROPOSED TESTIMONY
OF GENERAL ELECTRIC COMPANY'S EXPERT WITNESS NEIL SHIFRIN

The United States submits this memorandum in support of its Motion in Limine to

Exclude the Proposed Testimony of General Electric Company's Expert Witness Neil Shifrin.

The government seeks to exclude the testimony pursuant to Fed. R. Evid. 702. The proposed

expert, Neil Shifrin, is an engineer who offers three separate opinions in support of defendant

General Electric Company's purported "useful product" defense. For the reasons detailed below,

Shifrin is not qualified to offer these opinions: the opinions are not based upon reliable

methodology; they are not relevant; and they would not assist the Court to understand the

evidence or to determine any fact in issue.

## BACKGROUND

In this action, the United States seeks reimbursement of its costs of responding to

environmental contamination at the Fletcher's Paint Works Superfund Site ("the Site"). GE

asserts that it did not arrange for the disposal of scrap Pyranol – a hazardous substance that was a

waste by-product of its manufacturing operations – at the Site. Rather, GE claims that it sold

scrap Pyranol to Frederic Fletcher's companies ("Fletcher's") as a "useful product."[1/]

GE has submitted an expert report from Neil Shifrin. Report, Exhibit ("Ex.") 1, attached

---

[1/]  Additional background information is available in the United States' Memorandum in Support of Its Motion for
Partial Summary Judgment as to Liability ("Memorandum on Liability"), Doc. No. 33-2.

along with all other exhibits hereto.  A civil environmental engineer by training, Shifrin received a Ph.D. in environmental engineering, with a concentration in water quality and chemical biosynthesis, from the Massachusetts Institute of Technology.  Shifrin C.V. attached to Report, Ex. 1.  Shifrin presently serves as president of Gradient Corporation, a consulting firm that specializes in the "fate of and risk of chemicals in the environment from contaminated sites." Report at 2, Ex. 1.  Shifrin appears to have extensive experience testifying as an expert witness on that subject.

GE is *not*, however, proffering Shifrin as an expert on the fate and risk of chemicals released into the environment.  Instead, Shifrin is being proffered as an expert on the purported "historical context" in which transactions between GE and Fletcher's took place.  Report at 1, Ex. 1.  Shifrin has admitted that he has never taken a course, or received any training, in regulatory law, legal history, economics, or the manufacture and sale of paints, coatings, or any commercial product.  See Deposition of Neil Shifrin on July 26, 2007 ("Dep.") at 36:14-40:9, Ex. 2.  He has no work experience in those fields.  Id.  He did not conduct any legal research specifically for this assignment.  Dep. at 11:5-12:13, Ex. 2.  Although he opined that scrap Pyranol could be used in the manufacture of paint and roof coatings, he admitted that he did not consult with chemists who specialize in polymer chemistry or polymer physics, or with anyone in the paint manufacturing and roof coating industry.  Dep. at 26:11-26:23, Ex. 2.  Moreover, he saw no reason to draw any distinctions in potential commercial uses between Aroclors (a virgin PCB product manufactured by Monsanto), and scrap Pyranol (a waste material including an unpredictable collection of contaminants, any drum of which might vary from liquid to semi-solid state).  Report at 10-12, Ex. 1.

For the reasons set forth below, Shifrin's opinions should be excluded under Rule 702.

ARGUMENT

I.      Legal Standard for Admissibility of Expert Testimony Under Rule 702.

The basic standard for the admissibility of expert testimony is set forth in Fed. R. Evid.

- 2 -

702, which incorporates the standard first articulated in Daubert v. Merrell Dow

Pharmaceuticals, Inc., 509 U.S. 578 (1993).[2/]  Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact  to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The Rule codifies the Daubert line of cases, under which the trial court performs a "gatekeeping"

function concerning the admissibility of expert testimony.  United States v. Diaz, 300 F.3d 66,

73 (1st Cir. 2002) (citing Daubert, 509 U.S. at 589-95; Kumho Tire Co. v. Carmichael, 526 U.S.

137, 141, 147-49 (1999)).  This gatekeeping function requires a preliminary evaluation of both

the relevancy and the reliability of proffered expert testimony.  Id.  All expert testimony must

meet that standard, whether technical, scientific, or based upon other specialized knowledge.

Kumho Tire, 526 U.S. at 152.

        As with any expert, the testimony of experts who do not testify on scientific or technical

subjects must be scrutinized carefully.  Id. at 150-153.  Because testimony based on experience

or independent research has not been tested by scientific method or through statistical analysis,

the Court must be certain that an expert with "specialized knowledge" possesses genuine

expertise in the field, and that the testimony adheres to the same standard of intellectual rigor

that applies to the practice of an expert in that field.  Id. at 156-157.

        II.      Shifrin's Testimony on Regulation of Waste Disposal Should Be Excluded.

        Shifrin's first opinion is as follows:

> Governmental regulations of the disposal of industrial waste (including [PCBs]) were virtually non-existent during the period 1953-1967.  Report at 13, Ex. 1.

        Shifrin thus seeks to offer a legal or historical analysis of government regulation of PCBs

between 1953 and 1967.  Report at 1, 7, 13, Ex. 1.  He does not, however, possess the specialized

---

[2/] It is the burden of the party seeking to introduce the evidence to establish admissibility. See Apostol v. United States, 838 F. 2d 595, 599 (1st Cir. 1998); Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77, 85 (1st Cir. 1998).

knowledge and qualifications required to render that opinion.  More fundamentally, his opinion is not relevant to any issue in this case, and he did not employ a reliable methodology as required by Rule 702.

     A.   <u>Shifrin is Not Qualified to Testify on Government Regulation of Waste Disposal.</u>

     Under Rule 702, only witnesses who are qualified by "knowledge, skill, experience, training, or education" may provide expert testimony.  <u>Diefenbach v. Sheridan Transp.</u>, 229 F.3d 27, 30 (1st Cir. 2000).  Shifrin is simply not qualified to render an opinion on historic governmental regulations in New York, where the waste was generated, and where some of it was disposed.  He is not a lawyer or historian, and it is unclear whether he ever undertook any specific legal research of the laws of New York, or how these laws were applied to the disposal of industrial waste at the time.  Dep. at 11:5-6; 40:10-43:22, Ex. 2.

     B.   <u>Shifrin's Opinion Is Not Relevant.</u>

     In addition, Shifrin's opinion on government regulations of landfill disposal is irrelevant. To be admissible, expert testimony must be relevant – "not only in the sense that all evidence must be relevant, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." <u>Ruiz Trocha v. Pepsi Cola of Puerto Rico Bottling Co.</u>, 161 F. 3d 77, 81 (1st Cir. 1998).  In other words, Rule 702 "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." <u>Id.</u>

     The United States does not claim in this proceeding that GE violated any landfill disposal laws or regulations that were in place during the 1950s and 1960s.  Because this action arises under CERCLA, a strict and retroactive liability statute, it is irrelevant whether industrial waste landfill regulations were "virtually nonexistent" during the period 1953-1967.

     Reduced to its essence, Shifrin's reasoning appears to be as follows:  (1) in the alleged absence of any regulation, GE could dispose of its scrap PCBs freely and easily;  (2) GE therefore had no incentive to store scrap Pyranol for later removal by Fletcher's; and (3) because

GE did so, scrap Pyranol therefore must have been a "useful product."  This argument fails completely, unless Shifrin can claim that landfill disposal was both unregulated *and* free, a point he concedes is not there.  Report at 9, Ex. 1; Dep. at 152:14-19; 157:6-9, Ex. 2.  Because the United States and GE agree that GE could not legally dispose of scrap Pyranol for *free* in local landfills, Shifrin's opinion as to the lack of regulation is not relevant and should be excluded.

C.   Shifrin's Opinion is Not Based on Reliable Methodology.

Shifrin's conclusion regarding the regulation of industrial waste in New York is not based upon a reliable methodology.  Where a proffered expert fails to show that his reasoning or technique would satisfy the professional standards in the relevant field, that his methods are used by others in the industry, or that relevant publications validate his approach, his testimony should be excluded.  Kumho Tire, 526 U.S. at 157.  Here, the methodology underlying Shifrin's opinion lacks any objective measure of reliability.

When asked how he formed his opinion on governmental regulation of PCBs, Shifrin referred to a 1998 paper that he co-authored entitled "A Historical Perspective on PCBs."  Ex. 3; Dep. at 42:21-43:22, Ex. 2; see also a similar Shifrin article, Ex. 4.  Significantly, the Supreme Court has cautioned that journal publication "is not a *sine qua non* of admissibility; it does not necessarily correlate with reliability."  Daubert, 509 U.S. at 593-94.  Shifrin also stated that he has read "500 to 1,000 articles" on the history of waste management.  Dep. at 97:8-97:18, Ex. 2.  However, for this assignment, he did not undertake any legal research of the laws, regulations, or case law in existence in the 1950-60s, Dep. at 11:5-12:13, Ex. 2, and none of his prior writings specifically address the state laws, regulations, or case law of this relevant time period.[3]  General research on the general history of PCBs fails to support an expert opinion on laws and

---

[3] His article, "Pollution Management in the Twentieth Century," contains passing references to the federal laws in effect from 1953-1967 that governed industrial discharge to waterway including the Rivers and Harbors Act, Oil Pollution Act, Federal Water Pollution Control Act, and the Water Quality Act.  Ex. 4 at 681.  However, his report does not even mention any of these laws or discuss any New York laws and regulations that also regulated or limited discharge of industrial waste to waterways during this time period.  See footnote 4 below.

regulations that may have been in place in New York during the relevant time period.  His

reliance on his own largely irrelevant articles does not correlate to reliability under Rule 702.

His opinion suffers from an additional methodological weakness.  Although Shifrin's

report addresses disposal in landfills, it contains no evaluation of the regulation of industrial

discharge into waterways.  Under any reliable methodology, if the question being addressed is

the "practice" and "regulation" of disposal of industrial waste, *all* disposal practices and

regulations would have to be evaluated.  While purporting to evaluate government regulations of

all the "means of disposal" available to GE, he omits any discussion of a significant disposal

method *actually* used by GE, namely its discharge of large volumes of scrap Pyranol to the

Hudson River.  Indeed, he concedes that his "report is not about disposal to the Hudson River."

Dep. at 78:24-79:1, Ex. 2.

Shifrin thus simply ignores any statutes, regulations, and case law of the time period

concerning discharge of industrial waste to the Hudson River.[4]  He also fails to consider the

growing social and scientific consensus during that time period regarding the hazards of PCBs –

and the fact that GE was aware of these developments.[5]  For example, while Robert Abbe was

---

[4] See New York's Water Pollution Control Act of 1949 ("Water Pollution Control Act"), N.Y. Public Health L. 1949 c. 666, Article 6, Title III, § 115, Ex. 5 ("It shall be unlawful for any person, directly or indirectly to … discharge into any of the waters of this state…organic or inorganic matter that shall cause or contribute to a condition in contravention of the standards adopted by the [Water Control] board pursuant to Section [109] of this Article"); see also Refuse Act of 1899, 33 U.S.C. § 407; ("It shall not be lawful to…discharge...from or out of any manufacturing establishment ... any refuse matter of any kind or description whatever…into any navigable water of the United States, or into any tributary of any navigable water from which the same shall float...").

In addition, by 1965, pursuant to the Water Pollution Control Act, Ex. 5, New York's Water Pollution Control Board passed regulations governing industrial discharge into the Upper Hudson River Basin, where GE's plants at Fort Edward and Hudson Falls were located.  6 NYCRR § 941, Ex. 6.  Eventually GE was sued by the New York State Department of Environmental Conservation for its gross discharges of PCBs dating back to 1966:  In the Matter of Alleged Violation of Sections 17-0501, 17-0511 and 11-0503 of the Environmental Conservation Law of the State of New York, Interim Opinion and Order, File No 2833, February 9, 1976, Doc. No. 34-16  (see pages 27-28 for a historic overview of the law and regulations governing the Hudson River and pages 19-26 for a discussion of GE's historic PCB disposal to the Hudson River).

Common law doctrine, such as nuisance, would also have affected a company's disposal decisions.  See Application of City of Johnstown, 209 N.Y.S. 2d 982 (1961) (discharging pollutants into New York State's public waterways prohibited if such disposal resulted in a public nuisance).

[5] GE has acknowledged the existence of an "extensive body of publicly-available literature on PCBs which dated back to the 1930s and which included suggested exposure limits for PCBs," and GE has also acknowledged the "wealth of public information [available in the 1950s and 60s] on the potential hazards of PCBs and the precautions

GE's Manager of Indirect Materials in the early 1960s, he believed scrap Pyranol "poisoned the ground."  See Deposition of Robert Abbe on June 19, 2008 at 23:1-23:14, Ex. 7.  Shifrin thus simply avoids any factors tending to contradict his theory that GE's disposal options for PCBs were "readily available" and relatively "inexpensive."  Report at 9, Ex. 1.

During the relevant time period, it is undisputed that GE both discharged scrap Pyranol to the Hudson River and sent it to a local New York landfill at rates of up to $3.00 per drum.  See Affidavit of Jill Siebels ¶5, Doc. No. 35-14 ¶ 5; Dep. at 76:8-77:24, Ex. 2.  Whether GE chose not to dispose of all of its scrap Pyranol in the Hudson River because of emerging social and environmental awareness of the hazards of PCBs, or because of potential liability under existing laws and regulations, or some combination of both factors, is a question Shifrin cannot answer and did not even consider.

> Q:  Why do you think GE would dispose of scrap Pyranol in a local landfill if they could dispose of it in the Hudson River?
>
> A:  I don't know.  Dep. at 151:11-18, Ex. 2.

Shifrin simply ignores a critical set of facts – the potentially costly legal and social consequences of disposal of PCBs into the Hudson River – that contradict his thesis of readily available and inexpensive disposal methods.  His methodology is clearly unreliable and unsound, and his opinions, accordingly, should be excluded.

---

necessary to avoid those hazards."  See Doc. No. 34-14 at page 9 of 14 (GE's memorandum in support of motion for summary judgment on defendant's failure to warn claim).  In addition, GE was providing warnings to its electrical equipment customers at this time about exposure to PCBs.  See Doc. No. 34-14 at pages 11-12 of 14 (GE's statement of material facts not in dispute in support of motion for summary judgment on defendant's failure to warn claim).  These warnings comported with New York and New Hampshire law requiring reasonable warnings of known latent dangers associated with a product.  He also avoids analysis of GE's actual cost of disposing of PCBs in local landfills, as discussed on p. 9, below. See McLaughlin v. Mine Safety Appliances Co., 11 N.Y.2d 62, 68-69 (1962) (citing Lenz v. Standard Oil Co. of N.Y., 88 N.H. 212 (1936)).

III.        Shifrin's Opinion on the Relationship Between Fletcher's Transportation of Scrap Pyranol and the Means for Disposal Available To GE Should be Excluded.

Shifrin's second opinion is as follows:

> The transportation of NEQ [scrap] Pyranol[6] over long distances at Fletcher's expense was not consistent with the means for disposal of industrial wastes readily available to GE at the time, when the disposal of such wastes, including those containing PCBs, was effectively unregulated.  Report at 13, Ex. 1.

Shifrin's opinion purporting to connect the "means of disposal readily available to GE" and Fletcher's transportation "expense" is not based upon his expertise, accurate factual data, or even a logical syllogism.  Fletcher's transportation expenses have no bearing at all on *GE's* decisions about how to dispose of scrap Pyranol.  Shifrin's opinion is based upon a faulty syllogism:  he seems to suggest that (1) because Fletcher's expenses were a factor that *GE* would have considered in evaluating how to dispose of scrap Pyranol; and (2) because other means were presumably available to GE for disposal that did not include cost to Fletcher's, therefore: (3) GE's transfers of scrap Pyranol to Fletcher's must have been for a "useful product."  This argument simply makes no sense.  Fletcher's expenses were irrelevant to GE in formulating its waste management storage and disposal practices.[7]  Whatever conclusions may be inferred from Fletcher's transportation expenses, GE's choice of disposal method is not one of them.

Shifrin also ignores, or grossly underestimates, GE's difficulties disposing of scrap Pyranol.  To be admissible, expert testimony must be predicated on adequate factual data. Pelletier v. Main Street Textiles, LP, 470 F.3d 48, 55 (1st Cir. 2006) (expert testimony excluded because expert did not conduct an inspection of the facility and, therefore, had insufficient information upon which to base his opinion); Irvine v. Murad Skin Research Laboratories, Inc., 194 F.3d 313, 320-321 (1st Cir. 1999) (ordering a new proceeding to determine money damages

---

[6] NEQ Pyranol is a term that one of GE's consultants developed in preparation for this litigation to describe scrap Pyranol.  Dep. at 47:4-48:7, Ex. 2.  No GE witness ever used the term NEQ Pyranol during the relevant time period. It was called "scrap" Pyranol.  Dep. at 48:10-18, Ex. 2.

[7] While the price Fletcher's paid for scrap Pyranol might be a factor in GE's disposal decisions, that is not a factor upon which Shifrin offers any opinion.

where the previous estimate was based on expert's incorrect factual assumption); <u>Schubert v. Nissan Motor Corp., USA</u>, 148 F.3d 25, 31 (1st Cir. 1998).  Here, Shifrin is mistaken on at least two fronts in his opinions on the means of waste disposal available to GE between 1953 and 1967.

First, as discussed in Section II, pp. 3-7 above, Shifrin simply ignored significant legal and social prohibitions against disposing of industrial wastes, including PCBs, into the Hudson River.  Clearly GE had legal and/or social reasons not to dispose of all its PCBs in the Hudson River, otherwise it would never have paid to dispose of scrap Pyranol in landfills.

Second, Shifrin describes disposal in landfills as both readily available and relatively "inexpensive," based upon an estimate of "approximately $0.03 for 55 gallons (e.g. the size of a typical drum)" of scrap Pyranol.  Report at 9, Ex. 1.  According to GE's own witness, however, GE actually paid up to $3.00 per drum to dispose of scrap Pyranol in a landfill between 1953 and 1967.  <u>See</u> Affidavit of Jill Siebels ¶ 5, Doc. No. 35-14 ¶ 5. Shifrin thus underestimates the cost of disposal by a factor of up to one hundred.  Far from being "inexpensive," disposing of PCBs in landfills was a costly endeavor that GE consistently sought to avoid by multiple means, including efforts to develop a secondary PCB market (such as sales to municipalities for use as a dust suppressant on roads);  a "gate passing" system, whereby GE employees could take scrap Pyranol home without charge; and by extensively disposing of scrap Pyranol into the Hudson River.  <u>See</u> Memorandum on Liability at 5-6, Doc. No. 33-2 at 5-6.  Clearly, GE had a financial incentive to store its scrap Pyranol for removal by Fletcher's.

Shifrin's reliance on incorrect legal and factual assumptions and flawed methodology leads him to an erroneous conclusion that GE had no incentive to hold scrap Pyranol for removal by Fletcher's.  His opinion is particularly unreasonable given the evidence regarding GE's actual landfill disposal costs and the potential legal or social consequences for discharge of PCBs to the Hudson River.  Accordingly, Shifrin's testimony should be excluded under Rule 702 as irrelevant, unhelpful, and based on a flawed methodology.

IV.     Shifrin's Testimony on Uses or Sales of Scrap Pyranol Should Be Excluded.

Shifrin's third opinion is as follows:

> The nature of the transaction between GE and Fletcher was consistent with the sale (GE) and purchase (Fletcher) of a useful product, NEQ [scrap] Pyranol. Report at 13, Ex. 1.

Shifrin's opinion characterizing the GE/Fletcher's transactions as the sale of a "useful product" is not based upon his expertise, accurate factual data,[9] or reliable methodology. Furthermore, his opinion is simply a legal conclusion that will not assist the Court in evaluating the evidence.

A.     Shifrin is Not Qualified to Testify on Uses or Sales of Scrap Pyranol, and His Opinion is Not Supported by Any Accepted Methodology.

Shifrin is an environmental engineer.  He is not, and never has been, a designer or manufacturer of paints or roof coatings.  He therefore lacks any qualifications to testify on uses or the nature of sales of scrap Pyranol in this case.  An expert's specialized knowledge on one subject does not qualify him to testify on another.  Wilson v. Bradlees of New England, Inc., 250 F.3d 10, 17-18 (1st Cir. 2001) (upholding exclusion of testimony where witness, a chemist and authority on flammability, was permitted to testify on matters involving chemistry and

---

[9]  As discussed above, admissible expert testimony must be predicated on adequate factual data that provides a reasonable basis for an expert's conclusion.  Schubert v. Nissan Motor Corp., USA, 148 F.3d 25, 31 (1st Cir. 1998).  Here, Shifrin's opinion is based on at least two additional factual premises that are not correct.

First, Shifrin's report suggests that Fletcher's paid for each load of scrap Pyranol it received between 1953 and 1967.  Report at 3, Ex. 1.  At his deposition, however, Shifrin was confronted with evidence that Fletcher's consistently received free loads of scrap Pyranol and that, for two full years, Fletcher's did not pay for it at all.  Dep. at 81:3-83:7, Ex. 2.  At his deposition, Shifrin back-tracked, and claimed that the word "purchase," as used in his report, does not necessarily involve a money transaction.  Id. at 58:7-59:21.  Instead, Shifrin indicated that his use of the word "purchase" reflects only an intent to be paid, rather than actual payment.  Id.

Second, his report states that "[scrap] Pyranol did not leave the GE plant site without being tagged with its contents, identified on a purchase order and shipping notice, and signed for by a foreman." Report at 6, Ex. 1.  Again, Shifrin was confronted with evidence of the inaccuracy of his statement, specifically information on GE's extensive disposal of scrap Pyranol into the Hudson River, its "gate-passing" system whereby employees could take it home, without charge, and GE's transfer of scrap Pyranol to municipalities for road oiling purposes.  When asked whether he still contended that this scrap Pyranol was tagged, identified and signed for before leaving a GE plant, Shifrin responded "No. That's not really what the sentence is talking about." Dep. at 78:1-5, Ex. 2.

Shifrin's defenses regarding the inaccuracies underlying his opinion, such as "that's not really what the sentence is talking about" and his unusual explanation for his use of the word "purchase," are insufficient.  His report contains more than poor word choice; it contains incorrect factual information and significant omissions that render his opinion unreliable and inadmissible.

flammability, but not on usages and practices in the ink manufacturing process).  Shifrin lacks

any expertise to testify on the utility of scrap Pyranol as an additive to any commercial product.

He has not taken any courses in the manufacturing of commercial products, such as paint,  and

he has no work experience, training, or skill in these fields.  Dep. at 38:8-40:9, Ex. 2.

Shifrin does not even attempt to support his opinion through his background as a civil

engineer, or by the use of any scientific or technical methodology.  He did not contact any

persons who specialize in polymer chemistry or physics, and did not consult with representatives

of the paint and roof coating industries to validate any aspect of his opinion.  Dep. at 26:11-23,

Ex. 2.  Instead, his conclusion on the utility of scrap Pyranol relies entirely on information

concerning Monsanto's sales of its manufactured PCB commercial product known as Aroclor,

and Monsanto's adverting bulletins for use of Aroclor as a plasticizer.  Report at 10-12, Ex. 1;

Dep. at 89, Ex. 2.  The United States is willing to stipulate that Monsanto advertised pure

Aroclor for use as a plasticizer, and that virgin Aroclor was sold for use as a plasticizer.[9]

Shifrin's opinion, however, fails to acknowledge, much less address, the dramatic

differences between virgin Aroclors (a pure PCB product manufactured by Monsanto) and scrap

Pyranol (a random collection of unwanted contaminants and PCBs).  His report contains no

discussion of how unpredictable quantities of water, trichloroethylene ("TCE"), dirt and other

waste additives commonly found in scrap Pyranol (but not in Aroclor) would impact the quality

and potential commercial use of the scrap Pyranol, including the varying viscosity of the waste

from semi-solid to liquid.  At his deposition, he acknowledged that if such byproducts were

incompatible with resins, the scrap Pyranol would not be an effective plasticizer.  Dep. at 140:4 -

141:11, Ex. 2.  But his report treats pure PCBs and scrap Pyranol as though they were the same

product with the same potential and uses.  Any expert with experience in commercial

manufacturing would recognize this distinction as vital to a qualified, technical opinion on the

utility of scrap Pyranol as a commercial additive.

[9] Accordingly, the Court does not require an expert to testify to this stipulated and accepted fact about Aroclors.

In short, Shifrin's opinion is not based upon his technical background in civil environmental engineering. No matter how impressive his engineering credentials, Rule 702 does not permit an expert to substitute his subjective belief for genuine science. Daubert, 509 U.S. at 590. For this reason, his proposed testimony on the uses and sale of scrap Pyranol should be excluded.

## B. Shifrin's Opinion That Scrap Pyranol is a Useful Product is an Inadmissible Legal Conclusion.

Pursuant to Rule 702, expert opinion testimony is admissible only if it will "assist the trier of fact" either "to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 100 (1st Cir. 1997); United States v. Newman, 49 F.3d 1, 7 (1st Cir. 1995). "Expert testimony that consists of legal conclusions cannot properly assist the trier of fact in either respect," and thus is inadmissible. Burkart v. Washington Metro. Area Transit Author., 112 F.3d 1207, 1212 (D.C. Cir. 1997); Pelletier v. Main Street Textiles, LP, 470 F.3d 48, 54-55 (1st Cir. 2006).

Shifrin opines that GE sold scrap Pyranol to Fletcher's as a "useful product." He claims that he is merely offering this opinion in his capacity as an environmental engineer, and is not offering a legal opinion. Dep. at 25:22-26:10; 46:22-47:3; 160:3-6, Ex. 2. He further claims that his focus is simply on "utility." Dep. at 159:14-22, Ex. 2. Nonetheless, it is clear that Shifrin has ventured well beyond his expertise as an environmental engineer when he opines on "the nature of the transaction."

In forming his opinion that the nature of the transactions between GE and Fletcher's was consistent with the sale of a useful product, Shifrin has merely undertaken an inadequate replica of the exercise that the Court will presumably undertake to resolve this legal issue. Shifrin was instructed by GE's counsel on the legal concept associated with the term "useful product," Dep. at 24:9-14, Ex. 2, and then, while adding no expertise to the analysis, he erroneously and

incompletely applied select facts to that concept.[10]  Where an expert reaches a conclusion that the Court is capable of reaching without assistance, that expert's testimony fails to meet Rule 702's requirement that it assist the trier of fact.  Nieves-Villanueva, 133 F. 3d 92, 98-99; City of Tuscaloos v. Harcors Chemicals Inc., 158 F. 3d 548, 565 (11th Cir. 1998) (excluding "expert" testimony because the trier of fact was capable of determining whether to draw such conclusions without technical assistance).  Accordingly, Shifrin's conclusion regarding the nature of the transaction between GE and Fletcher's will not assist this Court's understanding of the evidence or a factual determination at issue, and should be excluded under Rule 702.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court exclude Shifrin's proposed testimony.

Respectfully Submitted,

RONALD J. TENPAS
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
Washington, D.C.  20530

Dated: 08/01/2008                  /s/ C.A. Fiske
                                   Catherine Adams Fiske, Trial Attorney
                                   Environmental Enforcement Section
                                   United States Department of Justice
                                   One Gateway Center, Suite 616
                                   Newton, MA 02458
                                   addie.fiske@usdoj.gov
                                   (617) 450-0444

---

[10] For example, Shifrin concedes that several factors considered by the courts in their "totality of circumstances" analysis of a "useful product defense" were unimportant to his analysis, such as whether scrap Pyranol was removed by Fletcher's from a scrap and salvage area or a production line, Dep. 68:20-69:3, Ex. 2; or whether GE disposed of it in the Hudson River, Dep. at 78:24-79:1, Ex. 2; or whether it was legal to do so at the time, see p. 6, above; or whether Fletcher's actually paid for the scrap Pyranol, see footnote 9, above.  In addition, he grossly underestimates the cost of disposing of PCBs in local landfills.  See  p. 8, above.  Finally, he provides no discussion of the need to treat scrap Pyranol prior to incorporating it into any type of standardized product, and knows of no specific uses of used or contaminated PCBs, only virgin Aroclors.  Dep. at  139:6-141:2, Ex. 2.

Peter M. Flynn, Senior Attorney
Laura J. Rowley, Trial Attorney
Environmental Enforcement Section
United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611


THOMAS P. COLANTUONO
United States Attorney
District of New Hampshire

Gretchen Leah Witt
Chief, Civil Division
Office of the United States Attorney
53 Pleasant Street, Fourth Floor
Concord, NH  03301-3904


OF COUNSEL:

RuthAnn Sherman
United States Environmental Protection Agency
Region 1
One Congress Street, Suite 1100 (SES)
Boston, MA  02114