UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

_____
                                    )
United States of America,           )
                                    )
    Plaintiff,                      )
                                    )      Case No.:  06-CV-00354-PB
        v.                          )
                                    )      Judge Paul J. Barbadoro
General Electric Company,           )
                                    )
    Defendant.                      )
_____)

**DEFENDANT GENERAL ELECTRIC COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE
THE EXPERT TESTIMONY OF DR. NEIL SHIFRIN**

The Government challenges Dr. Neil Shifrin's testimony on four grounds -- some of which may be fair fodder for cross-examination, but none of which should preclude him from assisting this Court by offering three amply supported conclusions about the regulatory and commercial contexts in which General Electric Company ("GE") sold so-called "scrap Pyranol" to Fletcher's Paint Works over 40 years ago:

- Governmental regulations of the disposal of industrial waste (including [PCBs]) were virtually non-existent during the period 1953-1967;

- The transportation of NEQ Pyranol[1] over long distances at Fletcher's expense was not consistent with the means for disposal of industrial wastes readily available to GE at the time, when the disposal of such wastes, including those containing PCBs, was effectively unregulated; and

- The nature of the transaction between GE and Fletcher was consistent with the sale (GE) and purchase (Fletcher) of a useful product, NEQ Pyranol.

---

[1]   NEQ Pyranol, as used in Dr. Shifrin's report and in his testimony, is what the Government refers to as "scrap Pyranol."

First, the Government argues that Dr. Shifrin's conclusion as to the virtual absence of waste disposal regulations is not relevant, even though the Government plainly intends to argue that GE had some reason to seek to avoid regulatory obligations regarding waste disposal at the time of its sales to Fletcher Paint.  Second, the Government argues that Dr. Shifrin is not qualified to testify about the regulatory and industry contexts in which GE's sales to Fletcher Paint took place, but dismisses Dr. Shifrin's deep experience and extensive research regarding historical industrial waste management practices, PCB uses, and PCB waste management.  Third, the Government broadly attacks Dr. Shifrin's methodology in ways belied by his careful testimony at deposition -- the sound research and analysis he employed here meet all of the standards imposed by Daubert.  Finally, the Government claims that Dr. Shifrin impermissibly will opine that, as a matter of law, GE sold a useful product to Fletcher Paint, but viewed accurately, Dr. Shifrin offers only technical, market and historical analyses of PCB uses and regulation.

In any inquiry under Fed. R. Evid. 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 594-595 (1993), the Supreme Court has emphasized that the "focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."  Thus, at this juncture, GE need not establish that its expert's assessment of the relevant facts is undisputedly correct.  Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77, 85 (1st Cir. 1998).  As long as Dr. Shifrin's testimony rests on "good grounds, based on what is known," his testimony should be tested through "competing expert testimony and active cross-examination." Id. (citing Daubert, 509 U.S. at 590).  Moreover, both the Supreme Court and the First Circuit Court of Appeals have recognized that Fed. R. Evid. 702 has been interpreted liberally in favor of admitting expert testimony.  Levin v. Dalva Bros., Inc., 459 F.3d

2

68, 78 (1st Cir. 2006) (citing Daubert, 509 U.S. at 588). This is all the more true where, as here, the trial court is both the gatekeeper under Daubert and the fact-finder at trial. Warford v. Indus. Power Sys., Inc., 553 F.Supp.2d 28, 31 (D.N.H. 2008). As explained below, because Dr. Shifrin's proffered testimony is relevant and rests on sound methodology and "good grounds," the Government's Motion to Exclude that testimony should be denied.

**I.     Dr. Shifrin's Testimony Is Relevant.**

The Government challenges the relevance of Dr. Shifrin's opinion that "[g]overnmental regulations of the disposal of industrial waste (including [PCBs]) were virtually non-existent during the period 1953-1967." Report of Neil S. Shifrin ("Shifrin Report"), Doc. No. 59-3, p. 15 of 35. In support, the Government narrowly concedes that it is not claiming that GE violated any "*landfill* disposal" regulations, and therefore argues that Dr. Shifrin need not testify on *that* subject. Memorandum in Support of United States' Motion in Limine ("US Memorandum"), p. 4 (emphasis added). But in truth, the Government *does* intend to argue that GE's disposal of PCBs in the 1950s and 1960s *did* violate then-existing waterway disposal regulations and a purported duty to warn.[2] To make this argument, the Government conflates the discharge of effluents (PCBs or otherwise) in wastewater with the "disposal" of garbage into landfills. Nonetheless, GE sought to avoid dispute over this irrelevant issue altogether by proposing, pursuant to Local Rule 7.1, stipulations designed to resolve it and streamline the upcoming trial.[3]

---

[2]     See e.g., Memorandum in Support of the United States' Motion for Partial Summary Judgment as to Liability, Doc. No. 33-2, pp. 27-28 (claiming, "GE's disposal of [NEQ Pyranol] into the Hudson River from at least 1959 through 1968 violated then existing New York laws and regulations . . . [and] GE's failure to warn Fletcher's of the potential health hazards of PCBs or to provide safe handling procedures exposed GE to potential liability under both New York and New Hampshire law.")

[3]     In an effort to eliminate this irrelevant issue and further streamline trial, and pursuant to Local Rule 7.1(c), GE proposed to withdraw Dr. Shifrin as a testifying expert if the Government would stipulate that: (1) during the 1950s and 1960s, there were no state or federal regulations in place that precluded the lawful disposal of PCBs into landfills or waterways; and (2) during the 1950s and 1960s, GE had all necessary permits, as issued by federal and state authorities, to discharge effluent containing PCBs into the

3

That proposal was rejected by the Government. As a result, the Government apparently will contend that GE's alleged awareness of such liability informed whether GE "chose not to dispose of all of its [NEQ Pyranol] in the Hudson River . . . ." US Memorandum, p. 7.

In the wake of all this deflection by the Government, it bears repeating that this case is about whether GE arranged for disposal or treatment of PCBs *at the Fletcher Paint site*, not whether GE disposed of NEQ Pyranol in the Hudson River.[4/] For that reason, Dr. Shifrin did not specifically address disposal into waterways in his report, and he addressed that disposal at his deposition only to rebut the mistaken inferences on which many of the Government's questions were based. Shifrin Depo., Ex. A, pp. 111:15-127:20. Moreover, the Government is flat-wrong in its claims about GE's discharges into the Hudson, but if this Court deems them relevant, then GE should be allowed to rebut by, among other things, calling Dr. Shifrin to set out the *full* and accurate contexts of historical industrial waste regulation, PCB disposal, and accepted waste management practices.

The Government next supports its lack-of-relevance argument by assuming "reasoning" which Dr. Shifrin has never espoused. Dr. Shifrin's analysis does not assume that "landfill disposal was . . . free" in the 1950s and 1960s. US Memorandum, pp. 4-5. Rather, as he has made clear, Dr. Shifrin has relied on record evidence that GE sought and secured the benefits of selling NEQ Pyranol to Fletcher rather than disposing of it either for free *or* by paying its employees or others to haul and discard it. Shifrin Depo., Ex. A, pp. 59:16-60:12, 79:13-80:8, 82:13-18; see e.g., Affidavit of Jill Siebels, Doc. No. 35-15, ¶ 5 (testifying that GE "paid Caputo

---

Hudson River. The Government rejected the offer, consistent with its apparent intent to argue at trial that GE's disposal of PCBs in the 1950s and 1960s violated then-existing regulations and exposed GE to potential liability.

[4/]     The Government conceded as much in its Complaint, alleging only that, "[d]uring the relevant time period, [GE] arranged for disposal or treatment at the [Fletcher Paint] Site of hazardous substances from its capacitor manufacturing operations." Complaint, Doc. No. 1, ¶ 10.

$3.00 per barrel to haul away [NEQ Pyranol and] [Fletcher Paint] agreed to purchase [NEQ Pyranol] for $4.00 per barrel.") The regulatory and market contexts for that decision -- which Dr. Shifrin's testimony will illuminate -- are relevant to substantiate GE's intent, which in turn is a pivotal factor in the "useful product" inquiry. See New York v. Solvent Chem. Co., Inc., 225 F.Supp.2d 270, 282-83 (W.D.N.Y. 2002); In re Solutia, Inc., 2001 WL 1549338 (E.A.B. 2001).

Similarly, Dr. Shifrin's analysis is relevant to assessing Fletcher's intent, and to evaluating what this Court rightly pointed to as "evidence to suggest that Fletcher was agreeing to pay for this material . . . and to use it in his painting business, [and] that GE might have inferred that that was so based on their relationship."[5/] Dr. Shifrin's market analysis will rebut the Government's suggestion that Fletcher Paint paid its employees to drive 200 miles across three states to acquire NEQ Pyranol that Fletcher allegedly intended to discard. Shifrin Depo., Ex. A, pp. 54:9-20, 86:9-88:20. The fact that Fletcher Paint was willing to go to such lengths to buy NEQ Pyranol -- and that GE witnessed as much -- reinforces the inference that GE intended to sell NEQ Pyranol to Fletcher Paint for productive use, not to arrange for its disposal.

In sum, the Government's lack-of-relevance arguments are misdirected, but even to the extent that they bear on Dr. Shifrin's actual conclusions, they are to be weighed by this Court as fact-finder rather than precluding Dr. Shifrin's testimony altogether. Marshall v. Perez Arzuaga, 828 F.2d 845, 852 (1st Cir. 1987) (arguments going to the "logic, coherence, and weight of the expert's testimony" not sufficient to preclude testimony). If the Government is allowed to argue that regulatory or other liability somehow informed GE's intent in dealing with Fletcher Paint,

---

[5/]  Transcript of Oral Argument, April 16, 2008, p. 128; see also cases cited in GE Opposition, Doc. No. 39-1, pp. 19-20, and GE's Reply, Doc. No. 48-1, pp. 8-10. See e.g., RSR Corp. v. Avanti Dev., Inc., 68 F.Supp.2d 1037, 1044 (S.D. Ind. 1999) ("to properly characterize the transaction" with respect to its purpose, "it is helpful to look at the intent of [the buyer], as a party to the arrangement with [the seller].")

5

then Dr. Shifrin must be allowed to accurately set out for this Court the full extent of the then-prevailing regulatory and market environment.

## II. Dr. Shifrin Is Demonstrably Qualified As An Expert In Historical Waste Disposal Practices And The Regulatory Context.

The Government challenges Dr. Shifrin's qualifications on the grounds that he is not a lawyer or historian, or a designer or manufacturer of paints or roof coatings. US Memorandum, pp. 4, 10. Such specialization is not necessary here, particularly given Dr. Shifrin's undisputed professional expertise in the subjects specified in his report and anticipated in his focused testimony at trial. See Warford, 553 F.Supp.2d at 33-34 (quoting Levin, 459 F.3d at 78) (allowing expert to testify based on experience in accident investigation, noting that he had testified at trial in three reported cases). After earning his degree in chemical engineering and his doctorate in environmental engineering, Dr. Shifrin has gained hands-on technical experience and devoted 25 years to research on historical industrial waste management practices, PCB uses and waste management, including the regulatory context surrounding such uses and practices. Shifrin Report, Doc. No. 59-3, p. 4 of 35.

Girded by that career in research, Dr. Shifrin has been qualified as a scientific expert and testified at trial in nine cases in just the last four years, all regarding industrial waste management practices within the context of historical laws and regulations. Shifrin Report, Doc. No. 59-3, pp. 31-32 of 35. Also during that time, Dr. Shifrin has provided deposition testimony in four additional cases regarding historical laws, regulations and standards of care pertaining to PCBs. Shifrin Report., Doc. No. 59-3, pp. 33-35 of 35. His broad knowledge of PCBs includes the analytical methods used to measure PCBs, toxicity of PCBs to the extent known in the 1960s, and the evolving governmental regulation of PCBs. See "*Historical Perspective on PCBs*," Doc. No. 59-5. Finally, Dr. Shifrin recently has worked as an environmental engineering expert on

the Montana Fish Hatchery project, researching both the evolution of regulations regarding PCBs and PCB "fate," i.e., the persistence and ultimate disposition of PCBs from their use in paint, and on the Monsanto Anniston PCB Site, in which Dr. Shifrin evaluated industrial waste disposal practices and the related evolution of environmental regulations.  Id., pp. 27, 28 of 35.  And significantly, the Government does not point to a single case in which Dr. Shifrin's testimony has been excluded for lack of qualification, and Dr. Shifrin has confirmed that he has never been "disqualified" on such grounds.  Deposition of Neil S. Shifrin, July 26, 2007 ("Shifrin Depo."), p. 44:14-19, attached hereto as Exhibit A.

      Bereft of legitimate challenges to Dr. Shifrin's extensive knowledge and experience, the Government next argues for disqualification by claiming that it is "unclear" whether Dr. Shifrin undertook any additional research for this case.  US Memorandum, pp. 2, 4.  Dr. Shifrin explained at deposition, however, that the research on which he has relied in this litigation is much broader than the Government's truncation, including the review of between 500 and 1,000 articles on waste management:

> I had already done a tremendous amount of that kind of research, the regulatory framework of PCBs, and used much of that in this report. . . . This report represents research I have done on PCBs in general.  But this report got the benefit of that prior research.  For this particular report, maybe 20 hours [referring to research time personally spent]. . . . I would imagine more than 100 hours . . . [referring to research time spent by Dr. Shifrin's team]

Shifrin Depo., Ex. A, p. 11:12-19, 29:15-30:4, 97:15-18.  More specifically, Dr. Shifrin conducted extensive research for his two peer-reviewed journal articles, "*Historical Perspective on PCBs*," and "*Pollution Management in the Twentieth Century*," each referenced in and attached to Dr. Shifrin's report.  As Dr. Shifrin summed up his accumulating research regarding "PCBs in commerce":

7

> I have performed a tremendous amount of research about all angles of PCBs in commerce, all of its uses, the types of applications, the types of customers, the amounts of PCBs used in various elements of commerce and the time period of use and the time period of shutting down that use. . . . I have worked on about 15 or 20 PCB cases, and each case adds to my knowledge about PCBs in commerce.

Id., pp. 40:15-20, 41:3-5.

Finally, contrary to the Government's most pointed mischaracterization, US Memorandum, pp. 4, 5, Dr. Shifrin *has* researched historical New York regulations. As just one example, for his 2005 peer-reviewed article, "*Pollution Management in the Twentieth Century*," Dr. Shifrin's research included analysis of six principal studies referenced therein, all of which included New York-specific regulations and historical waste management. See Doc. No. 59-6, pp. 687-91. That paper, together with Dr. Shifrin's other squarely relevant survey, "*Historical Perspective on PCBs*," were specifically referenced in his Report in this case. Doc. No. 59-3, p. 9 of 35. Moreover, Dr. Shifrin has researched and testified regarding pertinent New York state law and regulations in New York State Elec. & Gas Corp. v. FirstEnergy Corp., Brooklyn Union Gas Co. v. American Home Assur. Co., and ConEd Co. of NY, Inc. v. American Home Assur. Co. -- all as referenced in his Report., Doc. No. 59-3, pp. 33-35 of 35.

In sum, Dr. Shifrin is neither a lawyer nor an academic trained in "regulatory law, legal history, economics, or the manufacture and sale of . . .", US Memorandum, pp. 2, 10-11, but he is not offering legal conclusions, and he need not have completed specific course work to be qualified to testify in this case. Dr. Shifrin's decades of research and practical experience relating to historical waste management practices and historical PCB uses and waste management, including the regulatory context surrounding such uses and practices, amply qualify him.[6]

---

[6] The Government misleadingly cites to Wilson v. Bradlees of New England, Inc., 250 F. 3d 10, 17-18 (1st Cir. 2001), but there the expert's testimony was struck because his only knowledge of flame-

8

### III. Dr. Shifrin's Methodology Is Reliable.

#### A. Dr. Shifrin Ignored Neither New York Waste Disposal Laws Nor The Application of Those Laws to GE.

The Government claims that Dr. Shifrin so ignored applicable New York statutes and regulations regarding "discharge of industrial waste to the Hudson River" that his methodology is "clearly unreliable and unsound." US Memorandum, pp. 6-7. Even if this case were about waste discharges into the Hudson River -- *which it is not* -- Dr. Shifrin's research did not ignore such statutes or regulations. Supra at pp. 7-8. But as significant, Dr. Shifrin was careful to accommodate arguably applicable laws by specifying that "regulations of the disposal of industrial waste (including [PCBs]) were *virtually* non-existent during the period 1953-1967," and that such disposal was "*effectively* unregulated." Shifrin Report, Doc. No. 59-3, p. 15 of 35 (emphasis added). As Dr. Shifrin explained at length at his deposition, he used these adverbs because there were some existing regulations aimed at "gross safety issues" and other regulations regarding industrial waste in water that were "very few" and were "very rudimentary" at the time.[7/] Shifrin Depo., Ex. A, pp. 98:8-99:10.

With specific regard to New York, Dr. Shifrin noted that it had proposed tentative water quality standards for the first time in 1950/1951. See Doc. No. 59-6, p. 678. Under questioning about how these water quality standards were characterized in an article written by Craig E. Colten, Dr. Shifrin explained that he disagreed with Mr. Colten for telling only "half of the

---

retardant ink came from a single telephone conversation with an ink vendor. 250 F.3d at 18. As demonstrated here, Dr. Shifrin's knowledge is based on far more than a single call.

[7/] For instance, starting in the 1950s, some local ordinances were "aimed primarily at . . . keeping the rats out the backyard and keeping mosquitoes down. Shifrin Depo., Ex. A., p. 98:13-18. Dr. Shifrin further explained that during the 1950s, there were some environmental regulations regarding disposal of industrial waste to water, but they were applied "very irregularly . . . by geography as well as by industry as well as by factory as well as within a given city " and would have been aimed at regulating acid discharges or suspended solids discharges. Id., p. 99:11-24. Dr. Shifrin concluded that "[t]hey never would have aimed at regulating something like a PCB discharge." Id., pp. 99:24-100:1.

9

story." Shifrin Depo., Ex. A, pp. 111:15-113:7. Dr. Shifrin then quoted from his own article, *Pollution Management in the Twentieth Century*, to demonstrate that New York regulators at the time believed that "disposal of wastes is one of the recognized best usages for waters in New York State." Id., pp. 113:7-114:18. Similarly, Dr. Shifrin acknowledged that the New York Water Pollution Control Act created a Water Pollution Control Board in 1949 with the authority to enforce the statute and promulgate regulations. Shifrin Depo., Ex. A, pp. 108:17-111:14, but as he went on to explain:

> All this [Act] did was to empower the state to start passing regulations to control pollution. . . . And it is a very complex thing, and it started in the 1950s, but you can't say that that was a bright line . . . because it in no way was. It was the beginning of the modern era of environmental regulations, nowhere near the bright line of actual regulation.

Id., pp. 114:20-115:19, see also pp. 99:11-100:5; 120:13-121:15 (any regulations that were in effect were "applied irregularly" and the phrase "'noxious, offensive or poisonous," as used in the 1881 New York statutory prohibition against discharge of such substances into any public waters, "was generally interpreted to mean something that might stain the hull of a boat or something like ammonia that might suffocate fish, but not the way we define 'poisonous' today'").

On the federal side, Dr. Shifrin acknowledged the existence of some regulations promulgated in the 1950s and 1960s, but explained that they relate to biological oxygen demand and dissolved oxygen and nutrients, none of which had anything to do with PCBs. Shifrin Depo., Ex. A, pp. 124:21-125:15. Lastly, when asked about the potential applicability of the Refuse Act of 1899, 33 U.S.C. § 407, Dr. Shifrin acknowledged the existence of the Act, but did not definitively conclude on whether the Act applied at the relevant time to that portion of the

10

Hudson River near GE's plants at Hudson Falls and Ft. Edward -- a matter not relevant to the instant proceeding. Id., pp. 118:3-18.

Far from reflecting flawed research, Dr. Shifrin's careful responses here underscore his expertise in the historical regulatory context and the precision with which he honed his opinions. Should it decide to challenge the scope of Dr. Shifrin's conclusions, the Government may explore what "virtually" means by way of the "[v]igorous cross-examination [and] presentation of contrary evidence," envisioned by the Daubert court as the "appropriate means of attacking" a qualified expert. 509 U.S. at 596.

In its most baseless swipe, the Government next claims -- as it wrongly did on summary judgment -- that GE violated regulations governing industrial discharge into the Upper Hudson River Basin by citing to a 1976 *Interim* Opinion and Order in a proceeding brought against GE by the New York State Department of Environmental Conservation ("NYSDEC") for purported discharges of PCBs. US Memorandum, p. 6, n.4. The Government fails to inform this Court that that proceeding was resolved six months *after* the Interim Report issued, by an Agreement in which NYSDEC acknowledged that such resolution "shall not constitute or be construed as an adjudication or finding on any issue of fact or law . . . or be construed as, or operate as, an admission that [GE] has violated any law or regulation or otherwise committed a breach of duty at any time, and shall not constitute, in this proceeding or any other proceeding or litigation or otherwise, any evidence or implication of any such violation or breach of duty." Doc. No. 39-5, p. A-5. Equally telling, insofar as it further corroborates Dr. Shifrin's conclusions about the regulatory context in which GE operated in the 1950s and 1960s, is that a hearing officer recommended that the Commissioner of NYSDEC sign the Agreement based in part on findings that:

11

> (1) "[w]hen GE began using PCBs, the chemical's dangers were unknown";
>
> (2) "GE requested *and obtained a permit* from the federal and state governments to discharge up to 30 pounds per day of PCBs into the Hudson River";
>
> (3) "until just before this proceeding was commenced [in 1975], no one had ever claimed that GE's PCB discharges violated state water quality standards";
>
> (4) "[n]o argument is made that GE's PCB discharges exceeded the effluent limitation established in its permits"; and
>
> (5) "[g]overnment personnel gave GE officials little reason to believe that any of their PCB discharges were violating state law until very recently". Recommendation of Settlement by Abraham Sofaer, Hearing Officer, p. 11 (attached hereto as Exhibit B).

In sum, even though this case is not about GE's discharges into the Hudson River, Dr. Shifrin did not impermissibly ignore any regulations of such discharges or the alleged application of those regulations to GE. The Government's challenges on this score -- if they are deemed relevant at all -- are fodder for cross-examination, not grounds for preclusion. See United States v. Shea, 211 F.3d 658, 668 (1st Cir. 2000) (any flaws in an otherwise reliable methodology go to weight and credibility, not admissibility).

> B. The Government's Remaining Factual Challenges to Dr. Shifrin's Opinions May Be Addressed On Cross-Examination.

The more peripheral factual challenges posed by the Government also go to the weight of Dr. Shifrin's proffered testimony; they do not establish deficiencies so gaping as to warrant exclusion of that testimony.[8] Briefly:

---

[8] The Government's cited cases are all distinguishable on this ground. See US Memorandum, pp. 8-9, 10, n.8. In Irvine v. Murad Skin Research Lab., Inc., 194 F.3d 313, 321 (1st Cir. 1999), the First Circuit ordered a new trial because there was *no* support in the record for the expert's opinion on damages. Likewise, in Schubert v. Nissan Motor Corp. in U.S.A., 148 F.3d 25, 30-31 (1st Cir. 1998), the First Circuit affirmed the exclusion of an expert's affidavit because it had *no* factual basis and offered only conclusory assertions. Finally, in Pelletier v. Main Street Textiles, LP, 470 F.3d 48, 55 (1st Cir. 2006), the trial court had excluded expert testimony because the expert opined as to safety practices at the particular facility at

(1) The Government claims that Dr. Shifrin "underestimates" the cost of landfill disposal between 1953 and 1967. US Memorandum, p. 9. Dr. Shifrin noted, however, that the estimate at issue reflected a survey of waste disposal costs in New York during the 1940s; it was not offered as a definitive estimate of GE's own costs in the 1950s and 1960s. Shifrin Report, Doc. No. 59-3, p. 11 of 35.

(2) The Government claims that Dr. Shifrin wrongly ignored the differences between virgin Aroclors and NEQ Pyranol, and "acknowledged" that if certain byproducts in NEQ Pyranol were incompatible with resins, NEQ Pyranol would not be an effective plasticizer. US Memorandum, p. 11. At deposition, however, Dr. Shifrin made clear that he had referred to virgin Aroclors only to illustrate that "property of Aroclors mak[ing] them suitable for these kinds of applications," namely, their compatibility with resins in plasticizing applications. Shifrin Depo., Ex. A, pp. 140:16-141:2. Indeed, Dr. Shifrin further noted in his report that Montars -- a PCB source of lesser quality than Aroclors -- were also marketed by Monsanto for use in asphalt sealants, thereby showing that high-purity Aroclors were not required in these applications, and he confirmed at deposition that Montars were actually used in such sealants. Shifrin Report, Doc. No. 59-3, p. 14 of 35; Shifrin Depo., Ex. A., pp. 144:20-148:6.

(3) The Government misleadingly quotes GE's statements in unrelated litigation regarding the state of its knowledge of PCBs. US Memorandum, p. 6, n.5. In full context, GE also stated, "[t]he consensus of the scientific and medical community from the 1930s forward was that, while PCBs had some degree of toxicity, they could be used safely in industry so long as proper handling procedures were followed." Excerpts from GE's Motion for Summary Judgment in Nevada Power v. Monsanto litigation, Doc. No. 34-14, p. 6, n.2.

(4) The Government claims that Dr. Shifrin's opinion is infected by an "unusual explanation for his use of the word 'purchase.'" US Memorandum, p. 10, n.8. Dr. Shifrin fully explained, however, that he had used "purchase" to describe any transaction in which "GE gave, sent or released those PCBs to Fletcher with the understanding that Fletcher was going to pay for them." Shifrin Depo., Ex. A, p. 58:7-14. This usage is consistent with applicable definitions of the words "purchase" and "sale." See, e.g., Eastman v. Clark, 53 N.H. 276, 1872 WL 4393 at * 13 (N.H. 1872) ("[a] purchase of goods is a sale; and a sale . . . includes payment made, *promised* or in some way provided for . . .") (emphasis added); Black's Law Dict. (8th ed. 2004) (defining "sale" as agreement for the transfer of title for a price, one of the elements of which is "a price in money paid *or promised*") (emphasis added); and

---

issue yet had not inspected the facility itself. Here, the Government cannot plausibly argue that Dr. Shifrin should have visited either of the GE plants or the Fletcher Paint site.

(5)     The Government criticizes Dr. Shifrin for ignoring certain shipments of NEQ Pyranol -- to employees and municipalities -- which may have left the GE plant without being tagged, identified on a purchase order and shipping notice, or signed for by a foreman.  US Memorandum, p. 10, n.8.  As Dr. Shifrin clarified at deposition, this litigation is not about those shipments of NEQ Pyranol, it is about GE's sales of NEQ Pyranol to Fletcher Paint.  Shifrin Depo., Ex. A, pp. 78:1-79:1.  And as to those sales, the Government cites no instance in which NEQ Pyranol was not tagged, identified or signed for.

At most, then, the Government's challenges nip at the edges of constituent facts of attenuated -- or no -- relevance to the heart of Dr. Shifrin's opinions.  If the Court allows them, these challenges are properly the stuff of cross-examination and rebuttal.  Crowe v. Marchand, 506 F.3d 13, 18 (1st Cir. 2007); Int'l Adhesive Coating Co., Inc. v. Bolton Emerson Int'l, Inc., 851 F.2d 540, 544 (1st Cir. 1988) ("burden is on opposing counsel through cross-examination to explore and expose any weaknesses in the underpinnings of the expert's opinion").

## IV.    Dr. Shifrin's Third Opinion Is A Permissible Fact-Based Conclusion, Not A Legal One

The Government wrongly claims that Dr. Shifrin's opinion that the GE/Fletcher transactions were "consistent with the sale and purchase of a useful product" is an impermissible legal conclusion.  US Memorandum, p. 12.  But again, Dr. Shifrin has made clear that he did not use -- and will not opine on -- "useful product" as "a legal term;" instead, he looked at the notion of a "useful product" from a "technical standpoint" as "a material that might be sold under the conditions of being used somehow as a raw material or as a resale product," or as "something Fletcher was willing to pay for or at least purchase."  Id., pp. 25:3-10, 159:2-6.  See Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 100 (1st Cir. 1997) (citing example of allowing expert's testimony that defendants engaged in "fraud" and "deceit" because those terms were used in layman's sense).  From this perspective, Dr. Shifrin analyzed the facts of this case against the historical context, and reached an opinion, amply supported by the record, that the GE/Fletcher

14

transactions were "consistent with" -- not that they constituted as a matter of law -- the purchase and sale of a useful product. That opinion is not offered to displace this Court's role, but to provide technical background and historical context for this Court's assessment of the record. By lending that expertise, Dr. Shifrin properly will "assist the trier of fact to understand the evidence" offered on intent and usefulness. Fed. R. Evid. 702.

For these reasons as well, the Government's Motion to Exclude should be denied.

>Respectfully submitted,
>
>GENERAL ELECTRIC COMPANY,
>
>By its counsel,
>
>*/s/ Peter A. Biagetti*
>Bret A. Cohen, BNH No. 15989
>Jeffrey R. Porter, MA BBO No. 552520
>Peter A. Biagetti, MA BBO No. 042310
>William M. Cowan, MA BBO No. 566940
>MINTZ, LEVIN, COHN, FERRIS,
>GLOVSKY AND POPEO, P.C.
>One Financial Center
>Boston, Massachusetts 02111
>Dated: August 18, 2008
>(617) 542-6000

## CERTIFICATE OF SERVICE

I, Peter A. Biagetti, do hereby certify that on the 18th day of August, 2008, I caused a true and accurate copy of DEFENDANT GENERAL ELECTRIC COMPANY'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DR. NEIL SHIFRIN to be served as indicated below to all parties on the attached Service List.

*/s/ Peter A. Biagetti*
Peter A. Biagetti

## SERVICE LIST

| | |
|---|---|
| Catherine Adams Fiske, Esq. | Laura J. Rowley, Esq. |
| Environmental Enforcement Section | US Department of Justice (#7611) |
| United States Department of Justice | Environmental Enforcement Section |
| Boston Field Office | PO Box 7611 |
| One Gateway Center, Suite 616 | Washington, DC 20044-7611 |
| Newton, MA 02458 | |
| | (by electronic mail at |
| (by electronic mail at | Laura.Rowley@usdoj.gov) |
| Addie.Fiske@usdoj.gov) | |

4397824v.3