**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

_____
                                    )
**UNITED STATES OF AMERICA,**          )
                                    )
      **Plaintiff,**                    )
                                    )      **Case No.: 06-CV-00354-PB**
**v.**                                 )
                                    )      **Judge Paul J. Barbadoro**
**GENERAL ELECTRIC COMPANY,**          )
                                    )
      **Defendant.**                   )
_____)


# UNITED STATES' PRETRIAL MEMORANDUM

<u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    I.)      Brief Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    II.)     Procedural History and Brief Summary of the Parties' Positions  . . . . . . . . . . . 5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    I.)      CERCLA Is a Strict Liability Statute With Four Elements Of Liability . . . . . . . 7

    II.)     GE Cannot Establish A Useful Product Defense at Trial  . . . . . . . . . . . . . . . . . . 8

        A.)    The Legal Standard for Establishing an Arrangement for Disposal
               or Treatment Considers the Totality of Circumstances . . . . . . . . . . . . . . 9

        B.)    The Totality of the Circumstances Demonstrate that GE Arranged
               for the Treatment or Disposal of Scrap Pyranol at Fletcher's  . . . . . . . . 11

            1.)    Scrap Pyranol was a waste material . . . . . . . . . . . . . . . . . . . . . . . 12

            a.)    Scrap Pyranol contained a random collection of
                  varying contaminants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

            b.)    GE frequently disposed of scrap Pyranol like a waste . . . . . . . . 14

            c.)    There was no established commercial market
                  or accepted use for scrap Pyranol  . . . . . . . . . . . . . . . . . . . . . . . 15

            2.)    Getting rid of scrap Pyranol was a significant problem for GE . . 16

            3.)    GE's transfers of scrap Pyranol to Fletcher's were
                often for dirt cheap or free . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

i

<u>TABLE OF CONTENTS</u> (cont'd.)

<u>Page</u>

4.)     GE knew or should have known that Fletcher's was likely to dispose of some of the scrap Pyranol . . . . . . . . . . . 18

5.)     GE never learned what Fletcher's was doing with the scrap Pyranol because GE did not care . . . . . . . . . . . . . 22

6.)     The fate of scrap Pyranol at Fletcher's . . . . . . . . . . . . . . . . . . . 22

7.)     Fletcher's treated the scrap Pyranol during a filtering/blending operation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

III.)     GE is Jointly and Severally Liable for All Clean Up Costs at the Site . . . . . . . . 25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

TABLE OF AUTHORITIES

CASES:                                                                                    Page

*A & W Smelter and Refiners, Inc. v. Clinton*, 146 F.3d 1107 (9th Cir. 1998) . . . . . . . 9, 11, 13, 14

*Acme Printing Ink Co. v. Menard, Inc.*, 881 F. Supp. 1237 (E.D. Wis. 1995) . . . . . . . . . . . . . 11

*Cadillac Fairview/California, Inc. v. United States*, 41 F.3d 562 (9th Cir. 1994) . . . . . . . 8, 9, 11

*California Dept. of Toxic Substances Control v. Interstate Non-Ferrous Corp.*,
    298 F. Supp. 2d 930 (E.D. Ca. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 22

*California Dept. of Toxic Substances Control v. Alco Pacific, Inc.*,
    508 F.3d 930 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Catellus Dev. Corp. v. United States*, 34 F.3d 748 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . 9

*Chatham Steel Corp. v. Brown*, 858 F. Supp. 1130 (N.D. Fla. 1994) . . . . . . . . . . . . . . . . . . . . 9

*Chesapeake and Potomac Tel. Co. v. Peck Iron & Metal Co., Inc.*,
    814 F. Supp. 1269 (E.D. Va. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Cooper Indus., Inc. v. Agway, Inc.*, 987 F. Supp. 92 (N.D. N.Y. 1997) . . . . . . . . . . . . . . . . 9, 19

*CP Holdings, Inc. v. Goldberg-Zoino & Assocs., Inc.*,
    769 F. Supp. 432 (D.N.H. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Dedham Water Co. v. Cumberland Farms Dairy, Inc.* 805 F.2d 1074 (1st Cir. 1986) . . . . . . . . . 7

*Ekotek Site PRP Comm. v. Self*, 881 F. Supp. 1516 (D. Utah 1995) . . . . . . . . . . . . . . . . . . . 9, 11

*Louisiana-Pacific Corp. v. ASARCO, Inc.,* 24 F.3d 1565 (9th Cir. 1994) . . . . . . . . . . 9, 11, 13, 14

*New York v. General Elec. Co.*, 592 F. Supp. 291 (N.D. N.Y. 1984) . . . . . . . . . . . . . . . . . 7, 8, 11

*O'Neil v. Picillo*, 883 F.2d 176 (1st Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Pneumo Abex Corp. v. High Point, Thomasville and Denton R. Co.*,
    142 F.3d 769 (4th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*RSR Corp. v. Avanti Dev.*, 68 F. Supp. 2d 1037 (S.D. Ind. 1999) . . . . . . . . . . . . . . . . . . . . . . 14

*Sanford Street Local Dev. Corp. v. Textron, Inc.*, 768 F. Supp. 1218 (W.D. Mich. 1991) . . . . . 15

iii

*State of California v. Summer del Caribe, Inc.*, 821 F. Supp. 574 (N.D. Cal. 1993)  . . . . 9, 12, 22

*State of New York v. General Elec. Co.*, 592 F. Supp. 291 (N.D. N.Y. 1984)  . . . . . . . . 11, 13, 20

*United States v. A&F Materials Co.*, 582 F. Supp. 842 (S.D. Ill. 1984) . . . . . . . . . . . 9, 11, 13, 14

*United States v. Aceto Agric. Chems. Corp.*, 872 F.2d 1373 (8th Cir. 1989) . . . . . . . . . . . . . . . . . 8

*United States v. American Cyanamid Co., Inc., et. al.,* 1997 LEXIS 4413
    (S.D. W. Va. Jan.27, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

*United States v. Atlas Lederer Co.*, 282 F. Supp. 2d 687 (S.D. Ohio 2001) . . . . . . . . . . . 9, 10, 11

*United States v. B & D Electric, Inc.* 844 F. Supp. 1328 (S.D. Ind. 1994) . . . . . . . . . . . . . . . . 14

*United States v. Burlington Northern & Santa Fe Ry. Co.*,
    479 F.3d 1113 (9th Cir.), *opinion amended and superseded*,
    502 F.3d 781 (9th Cir. 2007), *superseded on denial of rehearing en banc*,
    520 F.3d 918 (9th Cir. 2008), *cert. granted*, No. 07-1601, 2008 WL 2540604
    (S. Ct.) and *cert. granted sub nom.*, *Shell Oil Co. v. United States*,
    No. 07-1607, 2008 WL 2540627 (S. Ct. Oct. 1, 2008) . . . . . . . . . . . . . . . . . . . . . 10, 17, 21

*United States v. Cello-Foil Products, Inc.*, 100 F.3d 1227 (6th Cir. 1996) . . . . . . . . . . 10, 16, 20

*United States v. Kayser-Roth Corp. Inc.*, 910 F.2d 24 (1st Cir. 1990)  . . . . . . . . . . . . . . . . . . . . 7

*United States v. Mallinckrodt*, 343 F. Supp. 2d 809 (E.D. Mo. 2004)  . . . . . . . . . . . . . . . 8, 9, 17

*United States v. Maryland Sand, Gravel & Stone Co.*,
    1994 WL 541069, (D. Md. Aug. 12, 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11

*United States v. Mottolo*, 26 F.3d 261 (1st Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Pesses*, 794 F. Supp. 151 (W.D. Pa. 1992)  . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. R.W. Meyer*, 889 F.2d 1497 (6th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Summit Equip. & Supplies, Inc.*,
    805 F. Supp. 1422 (N.D. Ohio 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 17, 19

*United States v. Ward*, 618 F. Supp. 884 (E.D.N.C. 1985) . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 19

<u>STATUTES:</u>                                                                                  <u>Page</u>

Comprehensive Environmental Response, Compensation, and Liability Act of 1980
  (CERCLA) as amended by Superfund Amendments and Reauthorization Act
  of 1986, Pub. L. No. 99-499, 100 Stat. 1618 (Oct. 17, 1986)

     Section 101, 42 U.S.C. § 9601 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

     Section 107(a), 42 U.S.C. § 9607(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8

     Section 107(a)(3), 42 U.S.C. § 9607(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4

Solid Waste  Disposal Act (SWDA)

     Section 1004(3), 42 U.S.C. § 6903(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

     Section 1004(34), 42 U.S.C. § 6903(34) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 22

CONGRESSIONAL MATERIAL:

S. Rep. No. 848, 96th Cong. 2d Sess. 13, <u>reprinted</u> <u>in</u>
     1 Congressional Research Service, 97th Cong., 2d Sess.,
     <u>A Legislative History of the Comprehensive Environmental Response,</u>
     <u>Compensation and Liability Act of 1980 (Superfund)</u> at 320 (1980) . . . . . . . . . . . . . . . 6

## UNITED STATES' PRETRIAL MEMORANDUM

The United States submits this Pretrial Memorandum pursuant to Fed. R. Civ. P. 26(a)(3) and Local Rule 16.2(b)(2).  The evidence at trial will show that General Electric Company ("GE") is liable under Section 107(a)(3) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), § 9607(a)(3), as a person who arranged for the disposal or treatment of a hazardous substance, scrap Pyranol,[1] at the Fletcher's Superfund Site in Milford, New Hampshire ("the Site"), and that GE is not entitled to the judicially crafted "useful product" defense.

## BACKGROUND

## I.    Brief Factual Background.

GE manufactured capacitors at two New York facilities, one located in Hudson Falls and the other in Fort Edwards.  GE purchased Aroclors, a pure PCB product from Monsanto, for use as a stable dielectric fluid in its capacitors.  GE added certain chemicals and refined the Aroclors and renamed this formulation Pyranol.  The capacitors were then filled or impregnated with Pyranol, sealed, cleaned, and tested.  During these operations, Pyranol spilled on the floor or otherwise became contaminated with dirt or other dielectric fluids, and was placed in 55 gallon drums labeled "scrap Pyranol."  When Pyranol contained small amounts of impurities that rendered it unacceptable for its dielectric purposes, it would also be declared scrap.  This unwanted Pyranol was also placed into 55 gallon drums labeled "scrap Pyranol."

GE treated all scrap Pyranol the same and placed it all into the same 55 gallon drums, whether heavily contaminated or not.  For the Court's convenience, attached as United States

---

[1] Scrap Pyranol contained polychlorinated biphenyls ("PCBs"), and often contained, *inter alia,* trichloroethylene ("TCE"), and trichlorobenzene ("TCB"), each of which is a hazardous substance within the meaning of Section 101 of CERCLA, 42 U.S.C. § 9601.

Demonstrative Exhibit ("US Dem. Ex.") 4 is a diagram depicting the capacitor manufacturing process, and the generation and collection of scrap Pyranol during that process.[7]  As shown on this diagram, scrap Pyranol often contained a variety of contaminants, including TCE, dirt, Fuller's Earth, Speedi-Dry, pump oil, magnesia, soda, solder, several dialectric fluids, and debris.  Because scrap Pyranol was collected as the result of spills and accidents, the amount of the contaminants varied from drum to drum.  It was an unpredictable collection of waste material.

Scrap Pyranol was by far GE's largest volume of waste.  GE disposed of it by dumping significant quantities in the Hudson River, sending it to landfills for disposal, transferring it to municipalities for use as a dust suppressant, or giving it away for free to its employees.  One internal GE memo explained that it was also picked up by "scavengers" without regard for proper disposal in an "out of sight, out of mind" manner.  For the Court's convenience, attached as US Dem. Ex. 2 is a diagram depicting the various destinations of scrap Pyranol from the GE facilities.

From approximately 1953-1967, GE transferred scrap Pyranol to Frederic Fletcher, or companies owned and operated by him (collectively referred to as "Fletcher's").  For the Court's convenience, attached as US Dem. Ex. 1 is a chronological summary of GE's relationship with Fletcher's and as US Dem. Ex. 7 is a chart identifying various witnesses in this matter.  During the GE/Fletcher's relationship, GE transferred approximately 200,000 gallons of scrap Pyranol to Fletcher's.

---

[7] Attached to this Pretrial Memorandum are several demonstrative exhibits that were created based on evidence to be presented at trial.  Each demonstrative exhibit is accompanied by a list of supporting citations to this evidence.  These demonstrative exhibits are listed alphabetically in Attachment A.

When Fletcher's paid for scrap Pyranol, GE charged Fletcher's approximately 4.5 cents per gallon (not including the value of the drum).  The price GE charged Fletcher's for scrap Pyranol was approximately 1/75th the price GE paid Monsanto for pure PCBs.  But GE also gave scrap Pyranol to Fletcher's for free.  By the end of the relationship, Fletcher's paid GE for only approximately half the scrap Pyranol (100,000 gallons) at the cost of approximately $7,000.  Fletcher's also received approximately half of the scrap Pyranol (100,000 gallons) for free.  For the Court's convenience, attached as US Dem. Ex. 3 is a chart depicting the volume of scrap Pyranol transferred to Fletcher's for free.

GE gave Fletcher's the first load of scrap Pyranol for free.  Later, GE's scrap and salvage department manager, Tony Metevier, gave free loads to Fletcher's to compensate for poor quality, or thinned out, scrap Pyranol that Fletcher's did not want.  ("Thinned-out" scrap Pyranol contained other unwanted materials that made the scrap Pyranol runny or less viscous).  And finally, GE gave scrap Pyranol to Fletcher's for two years, even though Fletcher's was supposed to be a cash in advance only customer.[3]  By the end of GE's relationship with Fletcher's, GE had given at least half the scrap Pyranol to Fletcher's for free.  <u>See</u> US Dem. Ex. 3.

No one at GE knew what Fletcher's was doing with scrap Pyranol, and no senior GE

---

[3] When GE tried to collect on the two-year debt of almost $7,000, Fletcher's complained about the quality of the scrap Pyranol in his possession.  He claimed GE had been sending him poor quality material by independent truck.  Fletcher's offered to pay for the balance of the good quality material Fletcher's wanted in exchange for GE's payment of freight, including return, of the poor quality material Fletcher's could not use.  Instead GE had similar material tested by Monsanto, and agreed with Fletcher's that the material was contaminated "and should have been disposed of."  GE decided to give all the scrap Pyranol to Fletcher's for free – whether it could be used or not – leaving responsibility for its disposal with Fletcher's.

3

employee ever asked Mr. Fletcher what he was doing with it.[4]  Some employees suspected Fletcher's was using at least some of it as a dust suppressant or weed killer, the only commonly known or understood applications for scrap Pyranol.  For the Court's convenience, attached as US Dem. Ex. 6 is a summary of various GE employee testimony regarding their beliefs regarding potential "uses" or applications for scrap Pyranol.  One senior GE official testifies that he did not think it was plausible for a small paint manufacturing company to utilize such huge volumes of scrap Pyranol to manufacture paint.

Fletcher's added minute amounts (approximately 2% at most) of the scrap Pyranol to only one type of paint, rubber-based swimming pool paint.  One Fletcher's employee believed Fletcher's only used the good thick scrap Pyranol for this type of paint as a substitute for Aroclor (a plasticizer).  For the Court's convenience, attached as US Dem. Ex. 5 is a chart demonstrating Fletcher's use of no more than 2% of the scrap Pyranol as an additive to only one type of paint.  During summer months, significant quantities of scrap Pyranol were applied at the Site as a dust suppressant, spread from a 55-gallon drum poked with holes, by fork-lift truck around the dirt yard.

Some scrap Pyranol was also transferred by Fletcher's to a third party, Webster, for an unknown purpose.  Webster, however, stopped picking it up from Fletcher's by 1968, at which time, Fletcher's had accumulated approximately 1800 drums of scrap Pyranol.  Those drums remained on the Site for many years, and many of them were leaking.  See US Dem. Ex. 2.

Hazardous substances, including PCBs, TCE, and TCB, have been detected at the Site.

---

[4] The one employee who did ask, Mr. Metevier, (who was the manager of the scrap and salvage department), was told that it was used by Fletcher's to apply to fire lanes or as a defoliant.

EPA is currently overseeing clean up of the Site.

## II.      Procedural History and Brief Summary of the Parties' Positions.

In 2006, the United States filed its CERCLA complaint in this action against GE under Section 107(a)(3), 42 U.S.C. § 9607(a)(3), to recover the past and future costs of addressing hazardous substances at the Site.  This statutory provision imposes joint and several liability for the costs of responding to releases of hazardous substances into the environment on any person who arranges for the disposal or treatment of hazardous substances at a site.  The United States alleges that GE arranged for the disposal or treatment of hazardous substances at the Fletcher's Site through GE's transfers of scrap Pyranol, a hazardous substance, to Fletcher's.

In its answer, GE raises the judicially crafted "useful product defense."  GE avers that it did not arrange for the "disposal or treatment" of scrap Pyranol, because GE claims it was "selling" scrap Pyranol to Fletcher's and that it was a "useful product."  GE's argument relies on the fact that from 1953-1967 Fletcher's paid for some (but only approximately half) of the shipments of scrap Pyranol.  GE further claims that it believed, at the time, that Fletcher's, a small paint manufacturing company, was using the large volumes of scrap Pyranol (a random collection of varying materials) as an additive to Fletcher's products, which they assumed to be paint.  No senior GE employee ever asked Mr. Fletcher what he was doing with it, or ever tried to sell or market scrap Pyranol to make paint, and Fletcher's only used 2% at most to make paint. At the time the only commonly understood application for scrap Pyranol was as a dust suppressant, insecticide, or weed killer, and Fletcher's used some of the scrap Pyranol as a dust suppressant on the Site.  GE also frequently disposed of large quantities of scrap Pyranol in the Hudson River and local landfills.

Pursuant to an agreed upon, and Court approved, Discovery Plan, the parties engaged in limited discovery on the question of GE's "useful product defense."  This agreement was reached because discovery had already been taken in two related matters, United States v. General Electric et al., CA No. 91-467(D. N.H.), and General Electric v. American Annuity Group, Inc. et al., CA No. 00-69 (D. N.H.), and because at least one of those previous actions placed limits on the extent of discovery in this case.  For example, the Consent Decree that resolved the United States' 1991 litigation provided that:

> all discovery conducted in this action will be usable in such future action to the same degree that it would be usable in this action.  The parties covenant that should any future action be instituted between the Parties regarding the Site, no further discovery will be conducted with respect to whether [GE] arranged for the disposal or treatment of hazardous substances that have been found at the Site unless the Court determines that good cause exists for such discovery to be had.

See Consent Decree, June 15, 1994, Civil Action No. 91-467-M (Docket No. 37).

Accordingly, the United States and GE agreed that the record was sufficiently developed to support a decision on the merits of GE's "useful product defense" on cross-motions for summary judgment and that the resolution of this issue would likely facilitate resolution of all remaining issues in this matter.  On October 26, 2007, the parties filed cross motions for summary judgment, with oral argument on April 16, 2008.  This Court denied both motions on April 16, 2008.[5]

Pursuant to the Proposed Case Management Plan (Docket No. 54), jointly submitted by the parties, and entered by the Court on May 5, 2008, this case is bifurcated into discrete phases.

---

[5] After that Court hearing, the parties agreed to, and the Court approved, additional limited discovery, including several video depositions on the question of GE's "useful product defense," which were taken in June 2008.

The bench trial currently scheduled for November 4, 2008 concerns the liability phase of this case, specifically, whether GE arranged for disposal or treatment of hazardous substances at the Site.  If not resolved by adjudication or settlement, the second phase will resolve all other disputes between the parties, including consistency of response actions with the National Contingency Plan, the recoverability of response costs and/or damages from GE, and the merits of GE's counterclaim.

## ARGUMENT

## I.      CERCLA Is A Strict Liability Statute With Four Elements Of Liability.

In passing CERCLA, Congress intended "that those responsible for any damage, environmental harm, or injury from chemical poisons bear the costs of their actions," not the general public.[6]  To meet this objective, Congress imposed strict liability under Section 107(a) of CERCLA,[7] upon proof of the following four elements: (1) the site of contamination is a "facility;" (2) a "release" or "threatened release" of a "hazardous substance" from the facility has occurred; (3) the release or threatened release has caused response costs to be incurred; and (4) the defendant is an owner, operator, transporter or "arranger." 42 U.S.C. § 9607(a).  These provisions are to be construed liberally to further CERCLA's remedial purposes.[8]

---

[6] S. Rep. No. 848, 96th Cong. 2d Sess. 13, 98, reprinted in 1 Congressional Research Service, 97th Cong., 2d Sess., A Legislative History of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (Superfund), at 320, 405 (1980).

[7] See, e.g., United States v. Mottolo, 26 F.3d 261, 263 (1st Cir. 1994) (affirming summary judgment under strict liability statute).

[8] Dedham Water Co. v. Cumberland Farms Dairy, Inc. 805 F.2d 1074, 1081 (1st Cir. 1986) ("CERCLA is essentially a remedial statute designed by Congress to protect and preserve public health and the environment . . . . We are therefore obligated to construe its provisions liberally to avoid frustration of the beneficial legislative purposes."); United States v. Kayser-Roth Corp. Inc., 910 F.2d 24, 26 (1st Cir. 1990) (same).  See also United States v. Pesses, 794 F. Supp. 151, n.21 (W.D. Pa. 1992) (finding

GE has admitted three of these four elements: that the Site is a "facility," that there has

been a release or threatened release of a "hazardous substance" at the Site, and that the United

States has incurred response costs at the Site.[9]  GE also stipulates that GE is a "person," and

admits that PCBs, TCE, and TCB are "hazardous substances," within the meaning of CERCLA.

Although GE disputes only the final element, the applicable facts establish that GE arranged for

the disposal or treatment of its waste, scrap Pyranol, containing hazardous substances by

transferring its scrap Pyranol to Fletcher's.  Therefore, GE is liable as an "arranger."[10]

GE claims, however, it was not arranging for the treatment or disposal of a hazardous

substance because it was "selling" scrap Pyranol, a "useful product," to Fletcher's:  this

argument is known as the "useful product defense."  Accordingly, under CERCLA's joint and

several liability scheme, the only issue this Court must decide is whether *all* the scrap Pyranol

that was provided to Fletcher's qualifies as the "*sale of a useful product*."

## II.   GE Cannot Establish A Useful Product Defense at Trial.

At trial, GE will not be able to rebut the United States' evidence that GE arranged for the

disposal or treatment of scrap Pyranol when it transferred this hazardous waste to Fletcher's.  GE

cannot possibly establish that every transaction for scrap Pyranol, and that every drum of scrap

Pyranol transferred to Fletcher's, constituted a "sale" of a "useful product."

---

"arranger liability" based upon a liberal judicial interpretation of the statute which is required to meet
CERCLA's "overwhelmingly" remedial statutory scheme) (citations omitted).

[9] The United States is not seeking to establish the amount of response costs for which GE is liable in this
stage of the proceedings.  That issue, pursuant to the Case Management Plan, will be addressed in the
next phase (if the matter is not resolved through settlement or adjudication before such time).

[10] United States v. Ward, 618 F. Supp. 884, 895-96 (E.D.N.C. 1985) (arranger liability for the transfer of
PCB oil); New York v. General Elec. Co., 592 F. Supp. 291, 297 (N.D.N.Y. 1984) (denying motion to
dismiss complaint based upon the transfer of used oil to a drag-strip for dust suppression).

A.   **The Legal Standard for Establishing an Arrangement for Disposal or Treatment Considers the Totality of Circumstances.**

An arrangement for disposal or treatment of a hazardous substance under Section 107(a)(3) is established by a totality of the circumstances.[11]   The totality of circumstances apply to whether the following terms of CERCLA Section 107(a)(3) are met:

> any person who *by contract, agreement, or otherwise arranged for disposal or treatment*, or arranged with a transporter for transport for disposal or treatment, of *hazardous substances* owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances . . . .

42 U.S.C. § 9607(a)(3) (emphasis added).[12]

In evaluating the totality of the circumstances, courts routinely and properly look beyond the defendant's characterization of the transaction as a "sale."[13]   The mere fact that the arranger

---

[11] Cadillac Fairview/California, Inc. v. United States, 41 F.3d 562, 566 (9th Cir. 1994) (liability is determined when "in light of all the circumstances, the transaction involved an arrangement for disposal or treatment of a hazardous waste.").

[12] CERCLA adopts the definitions of disposal and treatment used in the Solid Waste Disposal Act:

"Disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or consistent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.  Section 1004(3), 42 U.S.C. § 6903(3); and

"Treatment" means any method, technique or process, including neutralization, designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste or so as to render such waste nonhazardous, safer for transport, amenable for recovery, amenable for storage, or reduced in volume.  Section 1004(34), 42 U.S.C. § 6903(34).

[13] United States v. Mallinckrodt, 343 F. Supp. 2d 809, 815 (E.D. Mo. 2004) (quoting United States v. Aceto Agric. Chems. Corp., 872 F.2d 1373, 1381 (8th Cir. 1989) (where court found potential arranger liability)); see also United States v. Summit Equip. & Supplies, Inc., 805 F. Supp. 1422, 1431 (N.D. Ohio 1992) (same); New York v. Gen. Elec. Co., 592 F. Supp. 291, 297 (N.D.N.Y. 1984) (looking behind characterization of sales to deny motion to dismiss complaint based upon the arrangement for disposal of used transformer oil to a drag-strip for use in dust suppression); Ward, 618 F. Supp. at 895-96 (looking beyond "characterization" and imposing liability for the transfer of PCB oil).

is paid some amount of money for the hazardous substances does not insulate the arranger from liability. At least ten courts have held that arranger liability is appropriate even when the arranger received compensation from the recipient (sometimes even over a period of many years) for a waste with residual economic value or potential utility.[14]  In doing so, courts look at the totality of circumstances, including the nature of the material (and whether it resembled garbage or waste in contrast to a viable commercial product),[15] the extent of any commercial market for the material,[16] and what the arranger knew or should have known about the likely use of the material based upon objective criteria,[17] and other relevant considerations.

_____

[14] E.g., finding arranger liability for the following transactions: Louisiana-Pacific v. ASARCO, Inc., 24 F.3d 1565, 1575 (9th Cir. 1994) (sale of slag for $3.50 per ton); Cadillac Fairview/California, Inc. v. United States, 41 F.3d 562, 566 (9th Cir. 1994) (denying summary judgment for defendant even though contaminated styrene was worth 7 cents a pound); United States v. Maryland Sand, Gravel & Stone Co., 1994 WL 541069, at *4 & n.18 (D. Md. Aug. 12, 1994) (recipients paid for industrial wastes); United States v. A&F Materials Co., 582 F. Supp 842, 844-45 (S.D. Ill. 1984) (sale of spent caustic solution for 7.2 cents per gallon); United States v. Atlas Lederer Co., 282 F. Supp. 2d 687, 747-750 (S.D. Ohio 2001) (sale of spent batteries to recycler); Cooper Indus., Inc. v. Agway, Inc., 987 F. Supp. 92, 107 (N.D.N.Y. 1997) (sale of scrap metal to storage facility before resale to recycler); Chatham Steel Corp. v. Brown, 858 F. Supp. 1130, 1144 (N.D. Fla. 1994) (sale of spent batteries to recycler); California v. Summer del Caribe, Inc., 821 F. Supp. 574, 581-82 (N.D. Cal. 1993) (sale of solder dross to reclamation facility for many years); United States v. Summit Equip. & Supplies, Inc., 805 F. Supp. 1422, 1431-32 (N.D. Ohio 1992) (sale of used industrial equipment at blind auction sale to scrap metal processor); Ekotek Site PRP Comm. v. Self, 881 F. Supp. 1516, 1526-27 (D. Utah 1995) (sale of used oil); United States v. Mallinckrodt, 343 F. Supp. 2d 809, 816-17 (E.D. Mo. 2004) (sale of drums covered in lead paint was not a useful product with respect to the paint).

[15] See, e.g., California Dept. of Toxic Substances Control v. Alco Pacific, Inc., 508 F.3d 930, 934 (9th Cir. 2007) (comparing ore to slag and dross, and noting that arranger liability attaches "only if the material in question constitutes 'waste' rather than a 'useful product.'").

[16] A & W Smelter and Refiners, Inc. v. Clinton, 146 F.3d 1107, 1113 (9th Cir. 1998) (whether there is a market for the material is relevant to determining whether it is a waste or a "useful product").

[17] For example, courts properly evaluate the logical or known consequences of the transaction in terms of what the generator's words, actions, and the totality of circumstances, reveal about what the generator knew, should have known, or chose not to know, about whether disposal or treatment was a likely result of the arrangement.  United States v. Summit Equipment & Supplies, Inc., 805 F. Supp. 1422, 1432 (N.D. Ohio 1992) (looking at objective factors and holding that turning a blind eye as to the purchasers' intentions does not excuse the defendant from liability); Catellus Development Corp. v. United States, 34

Moreover, "an arrangement for disposal or treatment" under CERCLA need not be for the sole purpose of disposal or treatment:  Disposal or treatment need not be the only purpose of a transaction for liability to apply.[18]  The point is that courts do and should look to all factors that might be relevant to determining whether the plaintiff has established its prima facie case of arranger liability.  Once the plaintiff has set forth sufficient evidence to show an arrangement for disposal or treatment, the defendant may offer evidence during its defense that the transaction was not an arrangement for disposal or treatment, but the sale of a useful product.  Such proof is based upon an analysis of the same factors relevant to establishing a prima facie case of arranger liability – the totality of the circumstances.[19]

Here, the overwhelming evidence establishes that GE arranged for the disposal and/or treatment of scrap Pyranol, a predominantly used-PCB and used-TCE waste mix.

B.    **The Totality of the Circumstances Demonstrate that GE Arranged for the Treatment or Disposal of Scrap Pyranol at Fletcher's**.

In light of the relevant facts and the totality of circumstances, the admissible evidence

---

F.3d 748, 752 (9th Cir. 1994) (when the disposal of a hazardous substance is a consequence of the transaction, such that the seller knew or should have known that disposal would occur, liability attaches, in this case, for disposal of whole batteries); United States v. Atlas Lederer Co., 282 F. Supp. 2d 687, 746-501 (S.D. Ohio 2001) (same); CP Holdings, Inc. v. Goldberg-Zoino & Assocs., Inc., 769 F. Supp. 432, 438 (D.N.H. 1991) (sale of building containing asbestos with knowledge it would be destroyed was sufficient to create liability).

[18] United States v. Cello-Foil Products, Inc., 100 F.3d 1227, 1233 (6th Cir. 1996) (remanded to determine if arrangement for drum return included secondary purpose of waste disposal); United States v. Burlington Northern & Santa Fe Ry. Co., 479 F.3d 1113 (9th Cir.), *opinion amended and superseded*, 502 F.3d 781 (9th Cir. 2007), *superseded on denial of rehearing en banc*, 520 F.3d 918 (9th Cir. 2008), *cert. granted*, No. 07-1601, 2008 WL 2540604 (S. Ct.) and *cert. granted sub nom*., Shell Oil Co. v. United States, No. 07-1607, 2008 WL 2540627 (S.Ct. Oct. 1, 2008) (Cases are consolidated) (liability attaches if disposal is a logical consequence of the transaction, even if it was not intended).

[19] A & W Smelter, 146 F.3d at 1112; California Dept. of Toxic Substances Control, 508 F.3d at 938 (9th Cir. 2007).

11

will show at trial that none of GE's transfers of scrap Pyranol to Fletcher's were a "sale of a useful product:"  They were all arrangements for the disposal or treatment of GE's unwanted hazardous waste.

**1.  Scrap Pyranol was a waste material**.

One significant consideration in determining whether a generator of a hazardous substance has arranged for its disposal is the underlying nature of the material itself.[20]  The more akin to garbage or waste the more likely the transaction is an arrangement for disposal.[21]  This analysis requires evaluation of objective considerations, not self-serving, after-the-fact claims of what the generator thinks about the material.  As one court explained,

> If a defendant could avoid liability simply by averring that it did not 'consider' its product to be unwanted hazardous waste, successful cost-recovery actions under CERCLA likely would disappear.  In the Court's view, it is the actual nature of the substance at issue, not a defendant's perception of it, that must control.

United States v. Atlas Lederer Co., 282 F. Supp. 2d 687, 743 n.41.

**a.  Scrap Pyranol contained a random collection of varying contaminants**.

Courts have developed several short-hand tests for addressing the question of whether the

---

[20] United States v. American Cyanamid Co., Inc., et al., 1997 U.S. Dist. LEXIS 4413 *17 (S.D.W. Va. Jan. 27, 1997) (finding liability after questioning "whether the substance had a productive use or was more properly characterized as waste to be gotten rid of.").

[21] Id. at *55-57.  A related issue is whether a material is used or new.  At least six federal courts, in a variety of procedural contexts, have concluded that the sale of used oils, chemicals, or solvents fails to prove the "useful product" defense. Ekotek Site PRP Comm. v. Self, 881 F. Supp. 1516, 1526-27 (D. Utah 1995) (sale of used oil was arrangement for disposal); United States v. A & F Materials Co. Inc., 582 F. Supp. 842, 844 (S.D. Ill. 1984) (sale of used aluminum etch caustic solution constitutes an arrangement for disposal); Acme Printing Ink Co. v. Menard, Inc., 881 F. Supp. 1237, 1250 (E.D. Wis. 1995) (sale of used hydraulic oil was likely an arrangement for disposal); Cadillac Fairview/California, Inc., 41 F.3d at 565-66 (sale of used styrene was likely an arrangement for treatment of a hazardous waste); New York v. Gen. Elec. Co., 592 F. Supp. 291, 297 (N.D.N.Y. 1984) (used oil); United States v. Maryland Sand, Gravel and Stone Co., 1994 WL 541069, at *4 & n.18 (D. Md. 1994) (sale of used solvents an arrangement for disposal of "industrial wastes").

underlying material is a waste or a "useful product." For example, the Ninth Circuit has

consistently held that whether a material is merely a byproduct, compared to a principle product,

of the party's main business is critical to determining if there has been an arrangement for

disposal.[22] Other courts consider whether the material is still useful for its originally intended

purpose.[23]

Here, the evidence at trial will show that scrap Pyranol was not blended, formulated, or

manufactured by GE for the purpose of selling it to others. It was generated and collected during

the process of manufacturing electrical equipment at two manufacturing plants. GE's electrical

products were impregnated with Pyranol (a refined Aroclor material), sealed, transported via

conveyer belts, degreased, and quality tested. Every step of this manufacturing process

generated spills, drips, or overflows of Pyranol that GE could no longer use and did not want. It

was all collected and gathered into a 55 gallon drum labeled "scrap Pyranol" or "waste Pyranol."

Scrap Pyranol was generated as the result of sometimes daily accidents or mistakes,

---

[22] See Louisiana-Pacific Corp. v. ASARCO Inc., 24 F.3d 1565, 1575 (9th Cir. 1994) (arranger liability established for slag that was "at best a by-product," with only nominal commercial value Also see, A&F Materials Co., 582 F. Supp. at 844 (liability for sale of spent caustic solution generated during manufacture of aircraft); Maryland Sand, at *5 (liability for transfer of "industrial wastes" by-product); American Cyanamid, 1997 U.S. Dist. LEXIS 4413 *16 (S.D.W. Va. Jan. 27, 1997) (useful product defense inapplicable when product is waste and of no further use to the seller); California, 508 F.3d at 934 (comparing ore to slag and dross, and noting that arranger liability attaches "only if the material in question constitutes 'waste' rather than a 'useful product.'"); A & W Smelter, 146 F.3d at 1113 (if the material sold was mixed with enough waste or contamination that it was no longer usable for the purchaser's principal business then the material is waste).

[23] American Cyanamid, 1997 U.S. Dist. LEXIS 4413 *16-17 (S.D.W. Va. Jan. 27, 1997) ("the focus of the useful product defense is whether, at the time of sale, the product remains fit for its original purpose"); California Dept. of Toxic Substances Control v. Interstate Non-Ferrous Corp., 298 F. Supp. 2d 930, 963 (E.D. Cal. 2003) ("The test for the "useful product" defense is whether the commodity being sold will continue to be used for its originally intended purpose."); State of California v. Summer del Caribe, Inc., 821 F. Supp. 574, 581 (N.D. Cal. 1993) ("the 'sale of a useful product' defense applies when the sale is of a new product, manufactured specifically for the purpose of sale, or of a product that remains useful for its normal purpose in its existing state").

including spills on the floor, accidental overflows of tanks, drips or leaks, and from draining

rejected or failed capacitors.  It contained unpredictable quantities of random ingredients,

including other waste materials such as used TCE (a cleaning and degreasing agent), Speedi-Dri,

and dirt, that were also dumped into drums labeled "scrap Pyranol."  See US Dem. Ex. 4.  Some

scrap Pyranol contained up to 22% TCE, and some contained only 25-30% PCBs.  It was a

waste, and GE estimated in 1970 that it generated approximately 1,400,000 lbs/year of it.

Some scrap Pyranol may fortuitously have consisted of relatively pure Pyranol.  But the

evidence will show none of it was intentionally blended, formulated, or produced and none of it

was still useful to GE for its original purpose.  From drum to drum, GE made no effort to

distinguish among grades or types of scrap Pyranol, nor did it keep other contaminants and trash

out of the drums.  GE imposed no quality control over the scrap Pyranol as would be expected

had GE's primary purpose been to sell it.

**b.  GE frequently disposed of scrap Pyranol like a waste**.

Courts also properly look to the manner of disposal in determining that a material is a

waste.  For example, in New York v. General Elec. Co., 592 F. Supp. 291 (N.D.N.Y. 1984), the

court denied GE's motion to dismiss the arranger liability complaint because GE had sold its

used oil for use as a dust suppressant.  Similarly, if the material is sometimes discarded like

garbage or waste, the claim that a separate arrangement is allegedly for the "sale of a useful

product" is justifiably viewed with skepticism:  such transactions are most likely and properly

viewed as similar arrangements for disposal.[24]

---

[24] See, Louisiana-Pacific v. ASARCO, 24 F.3d 1565, 1575 (9th Cir. 1994) (liability attached for selling slag that had been previously disposed of in a local bay); A&W Smelter, 146 F.3d at 1112 (extent of past disposal of ore in a landfill relevant to establishing liability); United States v. A & F Materials Co. Inc., 582 F. Supp. 842, 844 (S.D. Ill. 1984) (liability established where used aluminum etch caustic solution

Here, GE frequently disposed of large volumes of scrap Pyranol like any waste material. For example, during the relevant time period, GE discharged large volumes of it into the Hudson River, and paid up to $3.00 per drum to dispose of at least 150 tons at local landfills.  During the 1970's, GE continued to pay to remove it to landfills or through incineration.  During the relevant time period, GE also transferred some of it to municipalities for use as a dust suppressant, gave some to its employees who wanted it for use as a dust suppressant or weed-killer, and finally, as explained in an internal GE Memorandum, scrap Pyranol was removed by "scavengers" who disposed of it in an "out of sight, out of mind" manner with little consideration given to "proper disposal of hazardous wastes."  <u>See</u> US Dem. Ex. 2.

### c.  There was no established commercial market or accepted use for scrap Pyranol.

Whether there is a commercial market for the material also serves as a critical measure of whether it is a "useful product" or a waste.  If no one wants to buy the material, that is a strong indicator that the material is not generally useful and more like garbage or worthless.[25]

There was no "useful product" market for scrap Pyranol.  GE thought scrap Pyranol was a waste just like almost everyone else.  There was simply no commercial market for it with willing buyers and sellers (except Fletcher's – and even Fletcher's sometimes did not pay for it). GE manufactured paint or other coatings during the relevant time period that included Aroclor,

---

was sometimes discarded).

[25]  <u>A & W Smelter</u>, 146 F.3d at 1113 (noting that the market value of the material is relevant to whether it is a useful product).  Conversely, other courts have frequently found no liability where a market existed for a product.  *See, e.g.,* <u>Pneumo Abex Corp. v. High Point, Thomasville and Denton R. Co.</u>, 142 F.3d 769, 775 (4th Cir. 1998); <u>United States v. B & D Electric, Inc.</u> 844 F. Supp. 1328, 1335-36 (S.D. Ind. 1994) (sale of new capacitors not disposal); <u>RSR Corp. v. Avanti Dev.</u>, 68 F. Supp. 2d 1037, 1045 (S.D. Ind. 1999) (considering "usefulness that involves looking at the product's marketability and the consumer demand for the good, in addition to its functionality," and finding recycled lead plates to be a commercially-valuable product at the time of sale).

but apparently did not want its own scrap Pyranol for this purpose (or any other).  When GE executives approached Monsanto with the question of what to do with all the scrap Pyranol (contaminated Aroclor), Monsanto explained, "it's a common problem."  There was no known and accepted use for it, and no one, except Fred Fletcher, was willing to acquire it on speculation.  No one except Fletcher's ever tried to use scrap Pyranol to make paint, before or since.[26]  And there is no evidence that anyone other than Fletcher's ever purchased scrap Pyranol from GE, except possibly for dust suppression.

### 2.  Getting Rid of Scrap Pyranol was a Significant Problem for GE.

If a generator views the material as a problem, and treats it like a waste, courts correctly find an arrangement for disposal.  For example, in <u>Louisiana-Pacific Corp. v. ASARCO</u>, liability attached for selling slag that had been previously disposed of in a local bay.  24 F.3d 1565, 1575 (9th Cir. 1994).  The court noted an employee's comment that "'[i]f you can't get rid of the slag, you are out of business,'" and concluded liability attaches to "materials [a producer] wants to get rid of," whether it can be sold or not.[27]  When motivation to remove waste is strong enough, the generator's actions are more likely to be driven by that desire than any other concern.  In other words, when a major, if not the sole, purpose of the transaction is to solve a waste disposal problem, an arrangement for disposal is properly inferred.

Here, scrap Pyranol was by far GE's greatest volume of waste.  GE had a real waste

---

[26] And even Fletcher's did not obtain scrap Pyranol because he wanted to use it to make paint – he thought he could sell it to someone else for some other purpose.  According to one Fletcher's employee, Mr. Fletcher wanted to make a dime, but not by making paint with scrap Pyranol.

[27] <u>Id</u>. at 1575 n.6.  <u>Also</u> <u>see</u>, <u>A&W Smelter</u>, 146 F.3d at 1112 (remanded for further factual development, including efforts to dispose of the ore in a landfill); <u>A & F Materials Co.</u>, 582 F. Supp. at 844 (sale of used aluminum etch caustic solution (which was sometimes discarded) constitutes an arrangement for disposal).

disposal problem.  After Fletcher's stopped taking the material, GE was "burying itself in drums of scrap Pyranol."  If Fletcher's did not remove it, GE had to get rid of the waste somewhere else, like the Hudson River or local landfills.  The need for GE to remove scrap Pyranol was so great, GE continued to dispose of it in the Hudson River, even when it risked potential legal consequences for doing so.  GE did not care what Fletcher's did with the scrap Pyranol because any removal helped solve GE's problem.  As one GE internal memorandum explained, "out of sight, out of mind."

### 3.  GE's transfers of scrap Pyranol to Fletcher's were often for dirt cheap or free.

In some cases discounted sales prices are appropriately viewed as a reflection of an underlying motivation to just get rid of hazardous substances, knowing that disposal is a likely possibility.[28]  Thus price discounts are relevant in assessing a useful product defense, especially where the reduced price is linked to an arrangement for disposal.[29]  This is especially true when the material is simply given away.

GE more often than not transferred scrap Pyranol to Fletcher's without receiving *any* compensation.  In 1953, GE used its own trucks to transfer approximately 5,500-27,000 gallons of scrap Pyranol to Fletcher's for free.  In 1956, Fletcher's sent its first truck to pick up scrap Pyranol.  GE charged Fletcher's approximately $3.75 per 55 gallon drum, assigning a value to the drum itself of $1.25 and to its scrap Pyranol content approximately 4.5 cents per gallon.  That price, the price Fletcher's paid per gallon for scrap Pyranol, was a fraction (approximately

---

[28] Sanford Street Local Dev. Corp. v. Textron, Inc., 768 F. Supp. 1218, 1222 (W.D. Mich. 1991) (selling property with hazardous substances at discounted price could be arrangement for disposal).

[29] California Dept. of Toxic Substances Control, 508 F.3d at 938.

1/75th) of the $3.00-$3.50 per gallon price GE paid for virgin Aroclor.

From approximately 1961-1964, the head of GE's scrap and salvage department, Tony Metevier, gave free loads of scrap Pyranol to Fletcher's to compensate for poor quality shipments that he knew Fletcher's did not want or could not use.  GE never distinguished between types or quality of scrap Pyranol.

From 1966 through 1967, Fletcher's did not pay for approximately 102,575 gallons of scrap Pyranol.[30]  During this two year period, GE continued to transfer scrap Pyranol to Fletcher's even though Fletcher's was not paying his bills, and even though Fletcher's had been designated a CIA, or Cash-In-Advance customer.  GE violated its own internal practices and policies in electing to continue to give Fletcher's scrap Pyranol without payment.  Eventually in 1968, GE wrote off Fletcher's $6,993.75 debt, the total amount billed Fletcher's for all of 1966 and 1967.  For the Court's convenience, attached as US Dem. Ex. 3 is a chart depicting the relative volumes of GE's scrap Pyranol given to, and purchased by, Fletcher's.

That GE gave away scrap Pyranol for nothing or next to nothing, reflects the fact that GE frequently disposed of it and knew that Fletcher's would likely dispose of or treat it, because scrap Pyranol in its current condition was "unusable," unless for dust suppression.

4.  **GE knew or should have known that Fletcher's was likely to dispose of some of the scrap Pyranol**.

To find arranger liability, courts properly consider not just a generator's after-the-fact claims and justifications for its actions, but what the generator knew or should have known at the

---

[30] GE's reconciliation of sales to Fletcher's reflects alleged "sales" during 1966 and 1967 of $6,993.75 or approximately 102,575 gallons ($6,993.75 / $3.75 [the price GE assumed was charged Fletcher's] = 1865 drums x 55 gallons = 102,575 gallons).  Because GE actually wrote off the debt in 1968, the graph attached as US Dem. Ex. 3 reflects this write-off and correction to GE's reconciliation of alleged "sales" by not including as "sales" any scrap Pyranol for which Fletcher's never actually paid.

time and how the generator behaved.  As the Sixth Circuit explained in <u>United States v. Cello-Foil Products, Inc.</u>, knowledge of likely disposal can be properly inferred from action and its logical consequences.[31/]  Indeed, arranger liability evaluation should be based upon objective factors, where ignorance is no excuse.[32/]

The evidence is overwhelming that GE had no objective basis for believing that Fletcher's, a small paint manufacturing company, could use hundreds of thousands of gallons of contaminated scrap Pyranol to make paint.  GE itself manufactured paint or coatings that included Aroclor, but GE apparently never considered using scrap Pyranol as a substitute for Aroclor.  The only commonly known applications for scrap Pyranol were as a dust suppressant, pesticide, or weed killer.  No one at GE could imagine how scrap Pyranol could even be used to make paint because its constituents varied from drum to drum -- as one senior level GE employee explains, "it was a difficult product."  No one at GE had ever before heard of using scrap Pyranol to make paint.

In fact, GE employees concede that they speculated that Fletcher's might have been using some of it as a pesticide, to spread on fire lanes (as a dust suppressant), or as a weed killer.  For the Court's convenience attached is a chart depicting the various beliefs GE employees claim to

---

[31/] 100 F.3d 1227, 1233 (6th Cir. 1996) (Actor presumed to intend natural consequences of his deed).  <u>See also</u>, <u>United States v. Mallinckrodt, Inc.</u>, 343 F. Supp. 2d 809, 818 (E.D. Mo. 2004) (specific intent to dispose not required if logical consequence of reconditioning drums resulted in disposal); <u>United States v. Burlington Northern & Santa Fe Ry. Co.</u>, 479 F.3d 1113 (9th Cir.), *opinion amended and superseded*, 502 F.3d 781 (9th Cir. 2007), *superseded on denial of rehearing en banc*, 520 F.3d 918 (9th Cir. 2008), *cert. granted*, No. 07-1601, 2008 WL 2540604 (S. Ct.) and *cert. granted sub nom.*, <u>Shell Oil Co. v. United States</u>, No. 07-1607, 2008 WL 2540627 (S.Ct. Oct. 1, 2008) (Cases are consolidated) (liability attaches if disposal is a logical consequence of the transaction, even if it was not intended).

[32/] <u>United States v. Summit Equip. & Supplies, Inc.</u>, 805 F. Supp. 1422, 1431-32 (N.D. Ohio 1992) (liability cannot be avoided simply by "keeping blinders on during the transaction.").

have held about possible uses or applications for scrap Pyranol. And one senior GE official admitted he was curious about what Fletcher's was really doing with it, and did not think that Fletcher's could have been using it all to make paint.[33]

GE's belief that scrap Pyranol was not a useful product for making paint is reflected by its actions. Instead of using any of it in its own paint or coatings-manufacturing operations, GE dumped it in the Hudson, paid to send it to landfills, transferred it to municipalities for use as a dust suppressant, and gave it away to employees and "scavengers." GE searched for various outlets for scrap Pyranol, but never thought to contact or market the material to paint manufacturers because GE did not think it would be a "useful product" to make paint.

GE did not treat scrap Pyranol as a valuable marketable commodity: GE never marketed the material, stored it in secure containers in a climate controlled area,[34] tried to improve the product, or provided PCB warnings as it did for its electrical products. GE arranged for its transfer to landfills and to Fletcher's from the same location – namely the scrap and salvage area. GE made no effort to keep other waste chemicals, trash and debris out of the scrap Pyranol so it would be more marketable. It was easier for GE to simply dispose of it than to try to improve the quality of scrap Pyranol to make it a useful commercial product.

One of GE's most telling acts about its true understanding of the utility of scrap Pyranol is reflected in a series of letters and internal memorandum regarding a debt of approximately $7000 that Fletcher's had accrued over two years for scrap Pyranol. After Fletcher's complained

---

[33] Moreover, two GE managers admitted that they either never thought about, or were not sure, whether Fletcher's could use scrap Pyranol without treating it first.

[34] GE often stored scrap Pyranol in drums outside. Moreover, GE's drums of scrap Pyranol were delivered to Fletcher's with missing bungs or gaskets causing leakage. The drums were often second-hand and could include varying quantities of their prior contents.

in a February 1968 letter about the quality of approximately 1800 drums of scrap Pyranol, GE had similar material tested by Monsanto.  Monsanto found the material highly contaminated and had no interest in reclaiming the material.  After receiving the test results, GE concluded the material was garbage that should have been properly disposed of.  This represents approximately half the material GE ever transferred to Fletcher's.  <u>See</u> US Dem. Ex. 3.

At this point, GE knew Fletcher's had accumulated a considerable quantity of scrap Pyranol it could not use, but that Fletcher's was interested in keeping some of the better quality drums.  Fletcher's asked GE to pay the freight for the unwanted scrap Pyranol (including its return) in exchange for payment for the better quality scrap Pyranol in Fletcher's possession.  Instead, GE decided in August 1968 to abandon it all by leaving it all with Fletcher's, whether he could use it or not.  GE's decision to avoid the cost of freight and to instead leave the unusable scrap Pyranol with Fletcher's clearly represents an arrangement for disposal.  Indeed, one GE official indicated he hoped Fletcher's would continue to remove more scrap Pyranol.

Moreover, Fred Fletcher claimed in the February 1968 letter that GE was responsible for loading material onto a contract truck for delivery to Fletcher's that Fletcher's could not use.[35] At the time, Mr. Varnum was the head of GE's scrap and salvage department and was familiar with Fletcher's practice of testing drums with a hydrometer to determine acceptable density.  He knew or should have known that certain drums were unacceptable to Fletcher's.  Yet GE never contradicted any of Fletcher's claims.  Instead GE simply forgave his debt, a concession that GE knew it was, and had been, arranging for the disposal of scrap Pyranol that no one, not even Fletcher's, wanted or could use.

---

[35] Fletcher's occasionally had contract trucks deliver scrap Pyranol for him.

### 5. GE never learned what Fletcher's was doing with the scrap Pyranol because GE did not care.

Courts correctly do not consider claims of ignorance of disposal a defense to liability when disposal is a likely result of the transaction.[36]   To find otherwise would provide a false defense to every generator and undermine the remedial purpose of the statute.[37]

The two most senior GE officials with knowledge of the Fletcher's relationship never asked Fletcher's what he was doing with the scrap Pyranol.  Even though they thought Fletcher's was a small paint manufacturer, they never asked exactly how he used so much scrap Pyranol:  it simply did not matter to GE what Fletcher's did with it.  GE would have authorized the transfers to Fletcher's even if he were going to use all the scrap Pyranol as a dust suppressant, insecticide, or weed killer – for applications this Court (and others) acknowledge would be an arrangement for disposal.[38]  Because GE did not care about Fletcher's use of scrap Pyranol, GE never learned what Fletcher's did with most of it.[39]

### 6. The fate of scrap Pyranol at Fletcher's.

An arrangement for disposal or treatment may be found where there is more than one

---

[36] Summit Equip., 805 F. Supp. at 1431-32 (liability attaches to blind auction sale of used, but working, industrial equipment).  See also, Cooper Indus., Inc. v. Agway, Inc., 987 F. Supp. 92, 107 (N.D.N.Y. 1997) (rejecting defendant's claim that he only sent the scrap steel to the site for temporary "storage" and re-sale, not disposal).

[37] United States v. Ward, 618 F. Supp. 884, 895 (E.D.N.C. 1985) (knowledge of the specifics of the disposal is not required – otherwise generators could escape liability by "closing their eyes to the method by which their hazardous wastes were disposed of.")

[38] New York v. Gen. Elec. Co., 592 F. Supp. 291, 297 (N.D.N.Y. 1984); April 16, 2008 Transcript of Oral Argument at 71:7-10.

[39] However, by August 1968, GE knew for certain that Fletcher's could not use and did not want some of the 1800 drums of scrap Pyranol that Fletcher's wanted to return to GE in exchange for Fletcher's payment of scrap Pyranol that he was willing to keep.

purpose or consequence to the transaction.  As explained by the Ninth Circuit, "arranger liability encompasses not only transactions in which the central purpose is the disposal of hazardous waste but also 'transactions that contemplate disposal as a part of, but not the focus of the transaction.'"[40]  Even if GE claims its purpose in transferring scrap Pyranol to Fletcher's was for use in making paint, clearly the transactions presented a far broader range of predictable or foreseeable consequences.  Indeed, the predictable and foreseeable came to pass.

When Fletcher's first acquired the scrap Pyranol in 1953, he did not know what he would do with it.  Fletcher's was also a scrap dealer, always trying to make a dime.  The scrap Pyranol sat on the Site for several years while Fletcher's searched for a third party interested in it.

In about 1956, Webster Cement ("Webster") started making regular pick ups of scrap Pyranol for an unknown purpose.[41]  After Webster returned a load of scrap Pyranol that was too thin, Fletcher's began to filter and blend scrap Pyranol in the early 1960s to obtain a specific gravity, or density, desirable to Webster.  This filter/blending operation caused spills of scrap Pyranol on the Site.[42]

---

[40] California Dept. of Toxic Substances Control, 508 F.3d at 934; See also, Cello-Foil Prods., Inc., 100 F.3d at 1233 (noting that liability may attach where a transaction has more than one purpose or result).

[41] There is no witness with any personal knowledge of what Webster did with the scrap Pyranol.  In addition, *there is no evidence that anyone at GE even knew that Fletcher's was transferring any material to Webster.*  Accordingly, the United States has filed a motion to limit testimony on what Webster might have been doing with scrap Pyranol.  Docket No. 57.  Even if Webster were adding scrap Pyranol to its roof coatings, as GE will likely try to argue at trial, scrap Pyranol would have imparted no beneficial property to the coating.  It might only serve as a cheap extender.

[42] Spills of scrap Pyranol on Site were also caused when Fletcher's trucks were washed out after drums of scrap Pyranol leaked inside the trucks on the trip back from GE's plants.  GE's transfer of scrap Pyranol in drums that sometimes leaked constitutes an arrangement for disposal of hazardous waste because it was foreseeable to GE that scrap Pyranol from these leaking drums would leak or spill onto the Site.  Burlington Northern, 479 F.3d at 1140 ("The useful product cases have no applicability where, as here, the sale of a useful product necessarily and immediately results in the leakage of hazardous substances.

Webster stopped picking up scrap Pyranol sometime in 1967, or earlier.  By this time, Fletcher's had accumulated approximately 1800 drums of scrap Pyranol, with no known use for it.  Fletcher's never found a known use for most of the remaining scrap Pyranol, and many of those hundreds of drums remained on the Site unused and leaking for over a decade.

 Fletcher's only included a small amount of scrap Pyranol in its rubber-based pool paint, and never added it to any other type of paint.  Fletcher's also never used thinned out scrap Pyranol in the pool paint.  And the rubber-based swimming pool paint was only 5%, at most, of Fletcher's product line.  In the end, Fletcher's only added between 1% and 2% – at most – of the scrap Pyranol to its paint.  <u>See</u> US Dem. Ex. 5.

While Fletcher's only used a fraction of the scrap Pyranol to make paint, he used significant quantities of scrap Pyranol as a dust suppressant on his own Site.  During summer months, holes would be poked in a 55 gallon drum of scrap Pyranol and a fork lift truck would drive it around the dirt yard to empty its contents on the ground.  Shortly after Mr. Fletcher died in 1983, Mr. Kamiewiki removed many of the remaining drums of scrap Pyranol for an unknown purpose.  Fletcher's Site is contaminated with PCBs, TCE, and TCB.

### 7. Fletcher's treated the scrap Pyranol during a filtering/blending operation.

CERCLA imposes liability on anyone who arranges for the *treatment* of a hazardous substance.[43]  Under the statute, treatment includes any process designed to change the physical

_____

In that circumstance, the leaked portions of the hazardous substances are *never* used for their intended purpose.").

[43] <u>See</u> <u>California Depart. of Toxic Substances Control v. Interstate Non-Ferrous Corp.</u>, 298 F. Supp. 2d 930, 963-965 (E.D. Cal. 2003) (liability for arranging for treatment of batteries); <u>Chesapeake and Potomac Telephone Co. v. Peck Iron & Metal Co., Inc.</u>, 814 F. Supp. 1269, 1275-76 (E.D. Va. 1992); <u>See</u> <u>generally</u> <u>id.</u>; <u>California v. Summer del Caribe, Inc.</u>, 821 F. Supp. 574, 581-82 (N.D. Cal. 1993) (finding arrangement for disposal and treatment where company sold waste solder dross to third party that

or chemical character or composition of a waste to render it amenable for recovery.  Section

1004(34), 42. U.S.C. § 6903(34).  Here, GE could foresee that scrap Pyranol would be treated by

Fletcher's because it was a random collection of contaminated material.

Starting in approximately 1961, Fletcher's blended and filtered some of the drums of

scrap Pyranol for three or four days to meet Webster's requirement that the scrap Pyranol be rid

of "black specks" and have a density of approximately ten pounds/gallon, a process that changed

its physical and/or chemical composition or characteristics.  It was foreseeable to GE that scrap

Pyranol would require some form of treatment before it could be successfully added into any of

Fletcher's products.  For example, at least one GE employee speculated that it might be difficult

to add scrap Pyranol to paint unless it were clean.  GE either knew, or should have known, that

before all the scrap Pyranol transferred to Fletcher's could be added successfully to Fletcher's

products that some of it would require some type of treatment.  As such, GE is liable for

arranging for the treatment of scrap Pyranol through its transfers of this hazardous waste to

Fletcher's.

III.     **<u>GE is Jointly and Severally Liable for All Clean Up Costs at the Site</u>**.

As long as this Court finds that *any* of the scrap Pyranol sent to Fletcher's was an

arrangement for disposal or treatment, GE is jointly and severally liable under CERCLA for the

costs of cleaning up the hazardous substances at the Site that are found in scrap Pyranol.  Even if

assuming *arguendo* that some of the transfers might have been sales of a useful product (which

they were not), if GE transferred *any* scrap Pyranol to Fletcher's that constituted an arrangement

for disposal or treatment, then GE is liable jointly and severally for the cost of cleaning up the

_____

heated it to remove impurities and then kept unusable material in leaking drums on site).

25

hazardous substances at the Site that are found in scrap Pyranol.  This is true unless GE proves

that the environmental harm resulting from the release or threatened release at the Site is

divisible and reasonably capable of apportionment (an issue for a later phase of this

proceeding).[44]

Here it is undeniable that many of the transfers of GE's scrap Pyranol to Fletcher's were

not "sales" in any sense of the word, because GE did not get paid for them.  For example,

consider the arrangements made by the manager of the scrap and salvage department, Mr.

Metevier, with Fletcher's.  He gave free loads of scrap Pyranol to Fletcher's to compensate for

poor quality material he knew Fletcher's did not want or could not use.  Similarly, consider GE's

write off of Fletcher's two year debt of approximately $7,000 in August, 1968.  In that instance,

GE forgave payment for two prior years of material (1800 drums of scrap Pyranol).  When GE

tried to collect its debt, Fletcher's complained about the poor quality scrap Pyranol and offered

to pay for just the better material in its possession – but only if GE agreed to pay the return

freight for the material Fletcher's did not want and could not use.  Because GE did not want to

pay for the return of those drums, GE decided to give it all to Fletcher's for free, whether it could

be used or not.  GE reached this decision after analyzing the material and determining it was of

such poor quality that it should have been disposed of.  It was this decision in August 1968 when

Fletcher's offered to return the material, but GE instead gave it to Fletcher's, that so clearly

constitutes an arrangement for disposal of those 1800 drums.  See US Dem. Ex. 3.  In other

words, the free loads given by Metevier to Fletcher's and GE's August 1968 decision to give

---

[44] United States v. R.W. Meyer, Inc., 889 F.2d 1497, 1507-08 (6th Cir. 1989); O'Neil v. Picillo, 883 F.2d
176, 178-79 (1st Cir. 1989).

1800 drums of scrap Pyranol to Fletcher's can only be described as arrangements for GE to get rid of or dispose of its waste, not as "sales."

Similarly, it is undeniable that many of the transfers of GE's scrap Pyranol to Fletcher's were not for "useful products," because the transfers included "thinned-out" scrap Pyranol. Fletcher's never intended to add thinned-out scrap Pyranol to its paint, and never did so.  Indeed, Fletcher's applied thinned-out scrap Pyranol on the Site as a dust suppressant, and this was foreseeable.  GE knew or should have known that Fletcher's was likely to apply thinned out-scrap Pyranol to the Site as a dust suppressant.  These transactions for thinned-out scrap Pyranol can only be described as arrangements for GE to get rid of or dispose of it, not as sales of a "useful product."

Obviously, these arrangements to transfer thinned-out scrap Pyranol to Fletcher's for free are not "sales" of a "useful product."  Regardless of whether the Court finds that all transfers of scrap Pyranol from GE to Fletcher's were an arrangement for disposal or treatment of a hazardous substance, for these particular transactions, the evidence is overwhelming that these transactions subject GE to joint and several liability for arranging for the disposal or treatment of a hazardous substance under CERCLA.

## CONCLUSION

As set forth above, the evidence at trial will show that GE arranged for the disposal or treatment of a hazardous substance, when it transferred scrap Pyranol, a waste material containing hazardous substances that it had to remove from its plants, to Fletcher's for an unknown or uncertain purpose.  Because the totality of circumstances surrounding each of these transactions fail to support a "useful product defense," GE is jointly and severally liable under

CERCLA for the costs of cleaning up the hazardous substances found in scrap Pyranol at the

Fletcher's Site.

                              Respectfully submitted,

                              RONALD J. TENPAS
                              Assistant Attorney General
                              Environment and Natural Resources Division
                              United States Department of Justice
                              Washington, D.C. 20530

                              */s/* Catherine Adams Fiske
Dated: 10/03/2008             Catherine Adams Fiske, Trial Attorney
                              Environmental Enforcement Section
                              United States Department of Justice
                              One Gateway Center, Suite 616
                              Newton, MA 02458
                              (617) 450-0444

                              Laura J. Rowley, Trial Attorney
                              Peter M. Flynn, Senior Attorney
                              Environmental Enforcement Section
                              United States Department of Justice
                              P.O. Box 7611
                              Washington, D.C. 20044-7611

28

THOMAS P. COLANTUONO
United States Attorney
District of New Hampshire

Gretchen Leah Witt
Chief, Civil Division
Office of the United States Attorney
53 Pleasant Street, Fourth Floor
Concord, NH 03301-3904

OF COUNSEL:

RuthAnn Sherman
United States Environmental Protection Agency, Region 1
One Congress Street, Suite 1100 (SES)
Boston, MA 02114

<u>Certificate of Service</u>

     I, Catherine Adams Fiske, certify that the foregoing United States' Pretrial Memorandum was filed and served electronically through ECF on Peter Biagetti and William "Mo" Cowan, counsel to the General Electric Company, on October 3, 2008.

/s/ *C. A. Fiske*
Catherine A. Fiske