**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 5/4/09

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * *
                         *
                         *
UNITED STATES OF AMERICA  *
                         *
        v.               *  06-CV-354-PB
                         *  November 6, 2008
GENERAL ELECTRIC COMPANY  *  9:10 a.m.
                         *
* * * * * * * * * * * * * *
```

Day 3 - Morning Session
TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE PAUL J. BARBADORO

Appearances:

For the Government:    Catherine A. Fiske, Esq.
                       Peter M. Flynn, Esq.
                       Laura J. Rowley, Esq.
                       Donald G. Frankel, Esq.
                       U.S. Department of Justice

For the Defendant:     Peter A. Biagetti, Esq.
                       William M. Cowan, Esq.
                       Mintz, Levin, Cohen, Ferris,
                         Glovsky & Popeo, PC

                       Ignacia Moreno, Esq.
                       Thomas H. Hill, Esq.
                       General Electric Company

Court Reporter:        Diane M. Churas, CSR, CRR
                       Official Court Reporter
                       U.S. District Court
                       55 Pleasant Street
                       Concord, NH   03301
                       (603) 225-1442

2

1                          I N D E X

2

3
    WITNESS:          DIRECT    CROSS    REDIRECT     RECROSS
4
    ALBERT C. CLARKE
5
    By Mr. Biagetti    49
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                       BEFORE THE COURT

 2              THE CLERK:  Court's in session and has for

 3    consideration a Bench Trial Day 3 in the United States

 4    of America versus General Electric Company, Civil Case

 5    No. 06-cv-354-PB.

 6              THE COURT:  Let's talk about Exhibit 36.

 7              MS. FISKE:  Yes, your Honor.

 8              THE COURT:  The Siebels affidavit supplements

 9    the deposition that she gave; right?

10              MS. FISKE:  Yes.

11              THE COURT:  And the supplemental information

12    is oriented towards certain topics.  One topic is

13    Siebels Exhibit 5.

14              MS. FISKE:  Yes.

15              THE COURT:  The topic we are most interested

16    in is information from employee interviews.

17              MS. FISKE:  Yes.

18              THE COURT:  I assume therefore that she gave

19    testimony in the deposition about employee interviews.

20              MS. FISKE:  Yes, she did, your Honor.

21              THE COURT:  Okay.  I also am assuming that in

22    paragraph -- the portion of the Siebels affidavit that

23    the parties are fighting about is paragraph five.

24              MS. FISKE:  Yes, your Honor.

25              THE COURT:  And I'm assuming that the
```

1  principal statement in there is the statement:  He,

2  Metevier, was told by Fletcher that Milford used Pyranol

3  as a defoliant and/or that it was spread on fire lines.

4  That's the key statement; right?

5            MS. FISKE:  Correct.

6            THE COURT:  And that's what the parties are

7  fighting about; right?

8            MS. FISKE:  I believe that's it.

9            THE COURT:  You say that statement is

10  inadmissible hearsay.

11            MR. COWAN:  Yes, your Honor.

12            THE COURT:  You say it's not inadmissible

13  hearsay.

14            MS. FISKE:  Correct.

15            THE COURT:  Okay.  So we know what the focus

16  of the analysis is.  Okay.  Now, I am going to try to

17  diagram this out for you so that we can try to analyze

18  the problem in a way that's meaningful.

19            If we follow this back to the beginning, what

20  happened was -- I'm going to do it chronologically.

21  What you have is Fletcher allegedly said something;

22  right?

23            MS. FISKE:  Yes.

24            MR. COWAN:  Respectfully, Judge, it's unclear

25  who --

```
 1              THE COURT:  All right.  During an interview.
 2    I'm going to put in Fletcher was told during the
 3    interview by somebody, okay?  And it was told to
 4    Metevier; right?
 5              MS. FISKE:  Yes.
 6              MR. COWAN:  Yes.
 7              THE COURT:  Okay.  Metevier told it to an
 8    interviewer; right?
 9              MR. COWAN:  Yes, your Honor.
10              THE COURT:  Interviewer through a report
11    probably told it to Siebels; right?
12              MR. COWAN:  Your Honor, you're close.
13    Apparently there were two interviews.  Between Metevier
14    and Ms. Siebels, there were two other out-of-court
15    declarants involved.
16              THE COURT:  Who were they?
17              MR. COWAN:  They were a lawyer for General
18    Electric, who had the first conversation with Mr.
19    Metevier, and then a second lawyer who reviewed
20    information from the first lawyer.
21              THE COURT:  And prepared a memo, and that's
22    what Siebels reviewed?
23              MR. COWAN:  That's correct, your Honor.  Well,
24    I apologize for not being clear for the record.  I'm not
25    sure Ms. Siebels reviewed that memo either.  I can only
```

6

1   attest, as we all can --

2           THE COURT:  Well, you put her forward and had

3   her testify about it in the form of a supplemental

4   statement; right?  So let's take it -- what you're

5   saying to me is this may be in two steps.  You're saying

6   this part of the chain --

7           MR. COWAN:  Judge, I am telling you there are

8   two steps between -- after Mr. Metevier.

9           THE COURT:  But I'm not sure I understand why.

10  The lawyer who actually interviewed him told some other

11  person who put it into a memo, and that's how Siebels

12  learned of it?

13          MR. COWAN:  Your Honor, what I now

14  understand -- and your Honor asked a very good question

15  yesterday that I think we all thought was a good

16  question.  I now understand that there was a lawyer who

17  interviewed Mr. Metevier who prepared a report.  A

18  second lawyer reviewed that lawyer's report.

19          THE COURT:  Okay.

20          MR. COWAN:  And eventually we get to the

21  affidavit that's the subject of our disagreement.

22          THE COURT:  Why do you say that it --

23  eventually we get to?  Your position is that the Siebels

24  statement in the exhibit was based on not the person who

25  actually interviewed Metevier's report, but the report

1   of someone who's reviewed the report that the original

2   interviewer prepared.

3           MR. COWAN:  That's correct.

4           THE COURT:  Okay.  I will add that to the

5   list.  Do we agree that that's the chain?

6           MR. COWAN:  So the alleged statement by

7   Fletcher, Judge, to Mr. Metevier.

8           THE COURT:  Yes.  I'm saying Fletcher Paint

9   Works could be anybody.  We don't know in your view.

10          MR. COWAN:  Very well.

11          THE COURT:  Acquired during the course of

12  the -- in tour of Fletcher.  That's what you're saying

13  is all we know.

14          MR. COWAN:  Yes.

15          THE COURT:  They told that to Metevier.

16          MR. COWAN:  Yes, that's allegedly, sure.

17          THE COURT:  Metevier told it to lawyer one.

18          MR. COWAN:  Correct, Judge.

19          THE COURT:  Lawyer one prepares a report which

20  is reviewed and summarized in a report by lawyer two.

21          MR. COWAN:  That's correct, Judge.

22          THE COURT:  Lawyer two prepares a report which

23  Siebels is somehow informed of to the extent she's

24  willing to make a statement under oath that that, in

25  fact, happened.

1          MS. FISKE:  And just to clarify, she read the

2     report three or four times according to her deposition

3     testimony.

4          THE COURT:  Doesn't matter.  I don't really

5     care.

6          MS. FISKE:  And it's introduced in her

7     deposition.

8          THE COURT:  I don't really care.  Do we agree

9     that we have the chain?

10          MR. COWAN:  That appears to be the chain as I

11     understand it, Judge.

12          THE COURT:  Now, Siebels is a 30(b)(6)

13     witness; right?

14          MR. COWAN:  Yes, sir.

15          THE COURT:  She is speaking on behalf of

16     General Electric in that capacity; right?

17          MR. COWAN:  That's correct, your Honor.

18          THE COURT:  Whatever she says is vicariously

19     attributable to GE.  It would be the same as if GE

20     itself could speak.

21          MR. COWAN:  That's right, Judge.

22          THE COURT:  So that step of the analysis is --

23     because you could potentially argue that, well, the

24     ultimate party is GE, but we don't have a problem --

25     nobody doubts Siebels' capacity to make admissions on

1    behalf of GE; right?

2            MR. COWAN:  The company designated her as a

3    30(b)(6) witness.

4            THE COURT:  Do you agree therefore that

5    because of that, they are designating her as an agent

6    who's authorized to speak on GE's behalf about matters

7    that she's going to be talking about; right?

8            MR. COWAN:  Yes, as reflected in the notice of

9    deposition and stipulations of the parties.

10           THE COURT:  So we don't have a potential

11   hearsay problem at that stage between GE and Siebels.

12   We have though potential hearsay problems at each of

13   these stages that have to be overcome; right?

14           MR. COWAN:  Yes, Judge.

15           THE COURT:  And that's -- your problem is that

16   they can't -- some or all of these stages they cannot

17   overcome; right?

18           MR. COWAN:  Yes, Judge.  One other thing if I

19   may, Judge, and I think you raised this issue.  There's

20   also the ultimate issue once you get to Ms. Siebels.

21   Regardless of whether or how -- if the government can't

22   overcome all those hearsay problems, whether Ms. Siebels

23   offered this information as his Honor said yesterday as

24   an adoption of what Mr. Metevier allegedly said or

25   simply a summary or representation of what was said.

1           THE COURT:  I want to just go through this

2   step by step now in the reverse order in which I've

3   diagrammed it and find out whether you have a problem or

4   don't have a problem, okay?  This first step between

5   Siebels and lawyer two, do you agree that Siebels can on

6   behalf of GE admit that there was an interview conducted

7   of Metevier by lawyers for GE?

8           MR. COWAN:  That fact, Judge, yes.

9           THE COURT:  That's an admission that's binding

10  on GE; right?

11          MR. COWAN:  That there was an interview, yes.

12          THE COURT:  And that then covers both step one

13  and step two.  There's not a hearsay problem.  Siebels

14  can testify and did testify in a summary form in that

15  supplemental affidavit that lawyer two -- you didn't

16  break this out, but you are now agreeing that this is

17  what happened.  Lawyer two prepared a report summarizing

18  an interview of lawyer one that was conducted of

19  Metevier, and I admit that all those things are true on

20  behalf of GE.

21          MR. COWAN:  That those events occurred?  Yes,

22  Judge.

23          THE COURT:  So the problem then becomes not at

24  this stage.  You agree that those are admissions that

25  are vicariously made by GE that are not hearsay, and

1    therefore there's nothing wrong with her providing that

2    statement in a 30(b)(6) deposition.  It would be

3    admissible against GE.  Even though she had no personal

4    knowledge that Metevier was interviewed, but she can

5    speak in a way that is an admission by GE about the fact

6    that there was an interview of Metevier.  Do you agree

7    with that?

8             MR. COWAN:  Yes.  Ms. Siebels is predicted to

9    say I can attest that there was an interview of Tony

10   Metevier.

11            THE COURT:  That in fact is what she admitted

12   in that affidavit, that there was, in fact, an interview

13   of Metevier by GE; right?

14            MR. COWAN:  Yes, Judge.

15            THE COURT:  Now, the next step in the process

16   is what did Metevier tell lawyer one?  Not whether what

17   Metevier said was true, but the proposition to be

18   established is Metevier told the interviewer A, B, and

19   C.  And that's the only thing we're trying to prove; not

20   the truth of A, B, and C, but that Metevier told the

21   lawyer A, B, and C.  That, too, is an admission by GE

22   that Ms. Siebels made that's binding and not hearsay.

23   Metevier was interviewed and he said the following

24   things.  If that's all you're trying to prove, not the

25   truth of what Metevier said, you don't have a hearsay

1   problem.  Do you agree?

2              MR. COWAN:  I agree.

3              THE COURT:  Okay.  So we've worked our way

4   down to what did Metevier say, and we all agree that

5   that is not hearsay.  The problem comes in the last

6   stage of the chain here, and it is therefore the

7   question -- and there are two potential truth values in

8   what Metevier was told.  One truth value is did, in

9   fact, Fletcher's use this as a defoliant?  And it's not

10  admissible for that purpose; do you agree?

11             MS. FISKE:  Yes, absolutely.

12             THE COURT:  So we can rule that out.  It won't

13  be considered to establish the truth of the proposition

14  that, in fact, Fletcher's used Pyranol as a defoliant,

15  okay?  So we are left with one other truth statement

16  that is potentially relevant, and that is, that Metevier

17  believed that Fletcher's was using it as a defoliant.

18  Are you with me on that?

19             MS. FISKE:  Yes.

20             THE COURT:  Everybody agree with my analysis

21  so far?  That's the course of dispute.  You say that

22  cannot be admitted against GE based on this statement in

23  the supplemental affidavit.

24             MR. COWAN:  Yes, and I'd be happy to be heard

25  as to why --

1          THE COURT:  Well, I'm going to give you a

2     chance.  I'm defining the problem, okay?  Because this

3     is a multilevel potentially complicated hearsay problem,

4     and I'm showing you the way a law professor would go

5     about analyzing this so we can get down to the kernel of

6     what the problem is.  And I think we have all agreed

7     that the kernel of the problem concerns the

8     admissibility of a statement of belief by Metevier that

9     he made to someone, and everything else in the chain

10    either the government is disclaiming any intent to use

11    it to establish that, in fact, Fletcher did use it as a

12    defoliant; so that's out, and we've all taken out by

13    agreement all the other stages of the analysis.  She

14    properly made those admissions.

15         MR. COWAN:  Respectfully, Judge, I agree to

16    your hypothesis, although when you give me an

17    opportunity, I'd like to expound on that.

18         THE COURT:  Yeah.  But I want to know -- I

19    only want to hear from you now is if you disagree with

20    anything I've said to date tell me and tell me why I've

21    gotten it wrong.  To date.  I don't want to hear the

22    argument about why what Metevier told the interviewer he

23    believed is not admissible.  I'm going to give you a

24    chance to talk about that in a minute.  I'm trying to

25    clarify the problem.  I understand this is now --

1    everybody agrees is not hearsay, shouldn't be considered

2    in the hearsay analysis, and the question here is

3    Metevier's statement of belief to the interviewer.

4    That's the only issue that's up for grabs.

5         MR. COWAN:  If I may, within the box you've

6    drawn, Judge, may I just bring to the Court's attention,

7    I don't agree to the extent -- I'm just following the

8    graphic here.  Mr. Metevier tells lawyer one A.  Lawyer

9    one -- lawyer two reviewing lawyer one's notes

10   interprets that as A plus B, and then that ends up being

11   presented to Ms. Siebels as A plus B.  There are

12   problems that I think --

13        THE COURT:  I'm having trouble with that

14   because if I had Ms. Siebels in the deposition and I

15   asked her the following questions:  Ms. Siebels, prior

16   to this deposition did you review the records of GE to

17   determine whether there are any interview reports of

18   interviews of Mr. Metevier?  I did do that, sir.  And

19   tell me what those reports said.  And she then tells me

20   what those reports said.  There is no hearsay objection

21   to her -- what, I'm trying to prove what the report

22   said, for her to say the report said X.

23        And then the next step is, do those reports

24   reflect an actual interview of Mr. Metevier?  And the

25   answer is yes, they do, sir.  They reflect an interview.

1    According to the interview reports what did -- or,

2    excuse me, not asked that way.  What did Metevier tell

3    the interviewer?  He told the interviewer that he went

4    on a tour to Fletcher's and was told when he was there

5    that Fletcher's was -- used Pyranol as a defoliant.

6    Objection, hearsay, can't be admitted to prove that

7    Fletcher's did use it as a defoliant.  I agree.

8    Sustained.  Can't be used for that purpose.  Okay.

9    Objection.  It shouldn't be admitted at all as to what

10   he believed at the time even if his belief is relevant

11   because his statement of belief at the time is

12   inadmissible hearsay.

13           The fact that it went through two levels of

14   lawyers before it got there is irrelevant because Ms.

15   Siebels is admitting on behalf of GE that this interview

16   was conducted and this is what Metevier said.  She's

17   admitting that, and that she learned that on the basis

18   of hearsay is not itself hearsay because if you look at

19   the rule, a statement by a party opponent is not

20   hearsay.  Even if it's based on hearsay it is not

21   hearsay.  So the statement that she made there is that

22   an interview was conducted and Metevier said that in the

23   interview.  She admits that.

24           MR. COWAN:  Judge, I respectfully -- and I'm

25   happy to take this up with his Honor.  I don't think

1    that is the record, a couple of points you made, Judge.

2            THE COURT:  Go ahead.

3            MR. COWAN:  You said that Ms. Siebels, if she

4    were at her deposition and she was asked did she review

5    the interview, let the record be clear, Judge, and I

6    don't think his Honor is aware of this, Ms. Siebels was

7    asked a question about Mr. Metevier at her deposition

8    and said she knew nothing about his dealings with

9    Fletcher Paint Works.

10           THE COURT:  Yeah.  And because she knew she

11   would be potentially -- you guys are potentially subject

12   to sanctions, you didn't tell the full truth, went back

13   and disclosed the full truth in a supplemental affidavit

14   which, in fact, there was, and she would not have been

15   acting in her capacity as a 30(b)(6) person if she had

16   concealed the information in a supplemental affidavit,

17   and that's why she disclosed it; right?

18           MR. COWAN:  Well, Judge, I would back it out

19   this way, respectfully.  This is not our case.  This is

20   another case.  And admittedly, GE was a party in that

21   case, and we are talking about GE in this affidavit

22   here.  Leading up to this deposition, the parties in

23   that case issued notice of depositions for 30(b)(6) and

24   entered a stipulation concerning those depositions.

25               In that stipulation, which Ms. Fiske presented

1   to the Court yesterday, on page one there is an

2   agreement among the parties that they will share, as

3   part of the 30(b)(6) share with each other other

4   undisclosed information that had not otherwise been

5   disclosed as a result of document requests, depositions,

6   or interrogatories.  At no point does it say and we also

7   embrace, adopt, or otherwise grab hold of that

8   information.  This is just information relating to --

9          THE COURT:  I understand that.  But she did

10   admit -- show me the actual questions in the deposition

11   where she was asked about employee interviews.

12          MS. FISKE:  Maybe I can cut this short.

13          THE COURT:  No, no, no.  I run things.  Okay?

14   You don't run things.  I'm trying to solve a problem.

15   I'm going to solve the problem the way I think I need to

16   solve the problem.  You are here to help me solve the

17   problem.  Do what I tell you.  Show me where the

18   interviews are, the questions in the deposition about

19   employee interviews.

20          MS. FISKE:  Turn to slide two, please.  And

21   topic 31 says regardless in the stipulation, you are

22   going to provide all the information GE has contrary to

23   what --

24          THE COURT:  I don't really care.  I'm asking a

25   question.  Answer my question.

1          MS. FISKE:  Slide two, please.  Do you know

2   whether the lawyers interviewed any individuals in

3   connection with preparing these deposition notebooks?  I

4   assume any available information regarding interviews or

5   depositions with any of these individuals was used to

6   prepare the document behind this information.

7          That is Siebels' deposition on October 10th,

8   page 24, line 20, to page 25, line 22.

9          THE COURT:  Is she asked anything else about

10  the employee interviews in that deposition?

11         MS. FISKE:  Yes, she is.  Turn to slide three.

12  On October 10th, continuing on, page 109, line 3, do you

13  know whether GE interviewed Mr. Metevier?  Objection.

14  At any time in connection with the sales of scrap

15  Pyranol to Fletcher's?  Answer, I am personally aware of

16  information pertaining to other sites, but I am not

17  aware of information that was collected from Metevier

18  for this site.  Does that answer the question you asked?

19         THE COURT:  Okay.  Anything else from that

20  deposition that bears on the specific question that I've

21  asked you?

22         MS. FISKE:  Yes.  On page 86, the following

23  day, she's asked a question about what information has

24  been reviewed, and on page 86, line 7, I believe there

25  is going to be additional information provided to you

1    from GE's outside counsel regarding everything that is

2    included behind Tab 31.

3            THE COURT:  Okay.  It seems to me clear that

4    this supplement, which was confusing to me when I saw

5    it, now in context I understand.  After reviewing the

6    deposition, the GE lawyers, who well knew what -- these

7    interviews, recognized that her answer was at best

8    incomplete and misleading if not supplemented, and they

9    determined that in order to comply with her obligations

10   as a 30(b)(6) deponent, that they needed to provide

11   additional information.  This additional information is

12   stated under oath and is the equivalent as if she had

13   given it as an answer to the questions that are asked,

14   and they are admissions by GE of whatever it is she

15   admitted.

16           In my view what she admitted was there were

17   interviews of Metevier and this is what they said.  She

18   didn't admit that what was said in the interviews by

19   Metevier was true, and the admissions that come by her

20   status as a party opponent ends there.  Does everybody

21   agree with that?  She did not admit whether what

22   Metevier said in the interviews was true, and therefore

23   you can't rely on admission by a party opponent to

24   establish the truth of what Metevier said in the

25   interviews.

1          And he said one thing that the government is

2     not trying to offer it for.  That is, I was told that

3     Fletcher used these things as a defoliant, because you

4     are relying on the statement of mental state or belief

5     exception to the hearsay rule, and that would go beyond

6     that exception to justify the admission of the document;

7     right.

8               MS. FISKE:  Yes.

9               THE COURT:  The statement.  Okay.  So what you

10    are arguing is that Metevier -- that statement is

11    admissible not to prove that Fletcher did, in fact, do

12    this, but to prove that Metevier believed that he did.

13    Right?

14              MS. FISKE:  Yes.

15              THE COURT:  Okay.  So we are focusing on the

16    mental state exception to the hearsay rule and whether

17    your statement is admissible under that exception or

18    not.

19              MS. FISKE:  That is correct.

20              THE COURT:  Do you have -- and that's where I

21    think we should be focusing our discussion.  Do you have

22    some argument as to why the analysis should not be

23    focused on that stage of the discussion; that it should

24    not be focused on whether this statement is admissible

25    under that exception to the hearsay rule?

1          MR. COWAN:  I don't have an argument of why we

2    should focus on that, Judge, absolutely not.  I just

3    don't want to lose sight of when we still get back to

4    Ms. Siebels what that representation in that affidavit

5    means beyond an admission that the company was aware of

6    this interview.

7          THE COURT:  And this is what it said.

8          MS. COWAN:  And this is what it said.

9          THE COURT:  No, it goes one step further.

10   That, in fact, an interview was conducted and, in fact,

11   this is what Metevier said.  Because it's possible that

12   somebody in the company could have made up an interview

13   that didn't occur, but she's representing that, in fact,

14   there was an interview with Metevier and this is what

15   Metevier said.  And that is an admission by GE, that

16   there was an interview and this is what he said.

17          Now, what he said is not relevant unless you

18   can establish that it's relevant to establish his mental

19   state or to establish the ultimate truth of what he said

20   happened.  You're not offering it for the latter.  You

21   are focusing on the former.  So our discussion boils

22   down to a consideration of is this statement admissible

23   under the mental state exception to the hearsay rule.

24   Okay?  Everybody with me on that?

25          All right.  Now we can go back up and analyze

1    that problem, which is itself I think a relatively

2    simple problem.  The problem was getting there because

3    of the many layers of potential hearsay that we have to

4    deal with.

5            Okay.  Now, here's the problem I have with the

6    government's analysis.  And you can tell me where I'm

7    off the track here.

8            MS. FISKE:  Your Honor, there's another way to

9    look at it besides --

10           THE COURT:  Let's look at it this way first

11   because you are arguing that; right?  Are you arguing

12   that way?  If you're not, I will just go on.  Are you

13   arguing it that way?  If you are, let me address that,

14   and if you're not and abandoning that, I will go on to

15   the other argument.

16           MS. FISKE:  I'm not addressing that, your

17   Honor.

18           THE COURT:  So you're not arguing mental

19   state.

20           MS. FISKE:  I'm arguing that it's not hearsay

21   at all because it's not being admitted for the truth of

22   the matter asserted.  It's not even hearsay.  It's not

23   an exception to hearsay.

24           THE COURT:  What are you admitting it for?

25           MS. FISKE:  Not the truth of the matter.

1           THE COURT:  I'm not asking you what you are

2    not admitting it for.  I'm asking what are you admitting

3    it for?  It's relevant because it tends to prove --

4    answer that sentence.  Finish that sentence.

5           MS. FISKE:  What he was thinking.

6           THE COURT:  That's being admitted for the

7    truth of what he says he was thinking.  Otherwise, it's

8    clearly being admitted for the truth.  So that argument

9    is wrong.  That's so basic.  They wouldn't need a mental

10   state exception to the hearsay rule if people's

11   statements about what they believed were not admitted

12   for the truth.  That's why you have an exception to the

13   hearsay rule for then existing emotional or physical

14   condition; mental, emotional, physical condition.

15          MS. FISKE:  Right.

16          THE COURT:  You're trying to prove that at

17   that time Metevier believed something; right?  Otherwise

18   we've wasted a lot of time here.  You're trying to show

19   because he was engaged in an agreement with Fletcher

20   about transferring Pyranol, you want to try to prove

21   that it was an agreement for disposal, and you want to

22   prove that at the time he believed that they were

23   putting it into the ground, because if he believed that,

24   it supports your claim that the arrangement was an

25   arrangement for disposal because putting it on the

1   ground is clearly disposal as defined in the statute.

2          So you're trying to prove what Metevier

3   believed at the time, and the truth of his statement to

4   the interviewer about what he believed at the time is an

5   issue, and ordinarily they would be entitled to have

6   Metevier in here to be cross-examined about whether he,

7   in fact, believed that or not.  Is it possible you

8   acquired that belief way later?  Are you sure you aren't

9   confusing it with another company?  Are you lying

10  because you have some incentive, some grudge against GE?

11  There are a million reasons why they would want to be

12  able to have the truth of that statement tested through

13  cross-examination, and you have to demonstrate a reason

14  why it doesn't have to be.  And the reason that appears

15  to me -- I thought you were arguing -- is 803(3), then

16  existing mental, emotional, or physical condition.

17         And I mean, the idea that admitting a

18  statement for a proposition, the truth of which is in

19  dispute, what did Metevier believe at the time, and then

20  telling me I'm not admitting it for the truth.  I'm

21  admitting it trying to show what Metevier believed.

22  Where what Metevier believed is the truth proposition

23  that is in dispute, see, that's classic hearsay, and it

24  has to come within an exception, and the potential

25  exception is 803(3).  But there's a problem with 803(3),

1    I think.  My law clerk's read your stuff.  I didn't read

2    it yet, so I'm doing this all on my own.

3           But it seems to me the problem is that it is

4    true that there is an exception to the hearsay rule, a

5    statement of the declarant's then existing state of

6    mind, but it's qualified, but not including a statement

7    of memory or belief to prove the fact remembered or

8    believed.  And what Metevier at the time of the

9    interview was testifying about his state of knowledge at

10   the time is a statement about what he remembers or

11   believed at the time, and it doesn't appear to qualify

12   to me under 803(3).  That's what I think.

13          MS. FISKE:  What about looking at -- I

14   understand what you're saying.  So we can set that

15   aside.  What about looking at simply --

16          THE COURT:  If they had asked her, for

17   example, in the deposition, if they had asked Siebels,

18   I'm asking you as a 30(b)(6) deponent what did Metevier

19   understand at the time?  If she had said Metevier

20   understood at the time that this was going to be used

21   for defoliant, that would be an admission by GE because

22   you can have -- I've asked my clerk to give me a case

23   because I haven't done the research on this, but it is

24   my belief -- if I'm wrong, you should correct me because

25   you don't want me to make an erroneous ruling here that

1  might lead you to appellate ground.

2          It's my belief if you look at the language of

3  the admissions rule, a statement by a party is defined

4  as not being hearsay, and it is a statement by a party

5  even if the statement is itself based on hearsay.  And

6  since she was speaking as a party, if somebody had

7  gotten her to say Metevier believed that this was used

8  as a defoliant, that would be an admission.  But

9  paragraph five does not do that.  Paragraph five simply

10  says there was an interview.  It was conducted of

11  Metevier.  This is what Metevier said.  And I don't

12  think she goes so far as to say, and what Metevier said

13  was accurate.

14          And therefore, it's not an admission by her of

15  what Metevier said was accurate.  It's a statement about

16  what Metevier believed at the time, and that statement

17  of belief has to qualify under an exception to the

18  hearsay rule because it's being admitted for the truth,

19  what Metevier believed, and it's a statement he made

20  about a belief he had in the past.  And a statement

21  about what you believed in the past is not a statement

22  of -- a statement of mental or emotional or physical

23  condition.  And therefore I don't see another exception

24  to the hearsay rule under which it's admissible.

25          MS. FISKE:  Thank you for your thoughtful

1    consideration of the issue.  I have nothing further to

2    say on that.

3            THE COURT:  All right.  It's a complicated

4    problem because it's so multilevel.  I think when you

5    get down to it, that's what it boils down to and that's

6    what the problem is.

7            MR. COWAN:  I agree, Judge.  Thank you.

8            MS. FISKE:  There's another related document

9    -- I move to admit that portion of the Siebels exhibit,

10   paragraph two.

11           THE COURT:  I don't think there's objection to

12   two, is there?

13           MR. COWAN:  No, your Honor.  At this point

14   with respect to the Siebels exhibit, we were objecting

15   to --

16           THE COURT:  Paragraph five.

17           MR. COWAN:  Relating to the Metevier

18   statement.  I believe at the close of yesterday Ms.

19   Fiske raised the issue of the reconciliation, and we

20   have no objection to that.

21           THE COURT:  So that will be admitted.  What

22   won't be admitted is paragraph five.

23           MS. FISKE:  Well, there are portions of

24   paragraph five.

25           THE COURT:  That would be admissible if they

1    are relevant, but he was interviewed and -- but the rest

2    of it doesn't seem to be really in dispute.  I mean,

3    what GE paid for this and who they paid for that, I

4    don't know that there is any real dispute about that, is

5    there?  I don't think there is.

6              MS. FISKE:  No, there isn't.

7              MR. COWAN:  No.

8              THE COURT:  That can come in because it's not

9    really disputed.  The disputed statement is the

10   statement about what Metevier believed after he left his

11   interview -- his tour of the Fletcher Paint Works.

12             MS. FISKE:  I'd also like to introduce a

13   related exhibit, which is Exhibit 35.

14             THE COURT:  All right.  Is there objection to

15   that?

16             MR. COWAN:  Yes, there is, Judge.  And just to

17   make it real, real brief for his Honor, our objection

18   here is his Honor raised the issue yesterday at the

19   close of day two --

20             THE COURT:  Excuse me.  Could you tell them to

21   do something with the heat in this room here?

22             MR. COWAN:  Thank you, your Honor.  I thought

23   it was me.

24             THE COURT:  No, it's like 90 degrees in here.

25             THE CLERK:  It's in all the courtrooms.

1          THE COURT:  Call down to the clerk and tell

2     the clerk I can't work in this environment.  I'm soaked

3     with sweat.  I'm not a physical laborer.  Go ahead.

4          MR. COWAN:  Very briefly, Judge, our objection

5     here is -- and I will take his Honor back to the end of

6     day two when we first began to broach these topics when

7     you asked a question specifically about Siebels'

8     affidavit, which we've now dealt with, when a 30(b)(6)

9     offers information, is a 30(b)(6) offering it as an

10    adoption or just as a summary?

11          Exhibit 35 is on its face a summary of witness

12    depositions and interviews over the course of many

13    years.

14          THE COURT:  What was it?  What is it?

15          MR. COWAN:  It is a document as best as we all

16    know I think -- and we sort of all assumed together was

17    prepared by prior counsel for my client in relation to

18    what I think is known as the contribution action, a

19    dispute between private parties related to this site,

20    and it does reflect a lawyer's take on deposition and

21    witness interviews over the course of a number of years.

22          THE COURT:  Did they make the tragic mistake

23    of sharing this with a witness and therefore it came

24    into evidence because they shared it with a witness?

25          MR. COWAN:  Well, I cast no aspersion on --

1            THE COURT:  I don't know when this was.  Years

2    ago people did make that mistake.  I don't think they

3    make it now because they know they lose the work product

4    privilege if things are used to prepare somebody for a

5    deposition.

6            Just because it comes in, it's marked as you

7    reviewed this in connection with your deposition, they

8    need more to show me that it would be adoption by her.

9    So is there some kind of statement where she was

10   presented it and said is this -- what's in this summary

11   true and correct as far as you know?  Is there anything

12   like that?

13           MS. FISKE:  Yes.

14           THE COURT:  Let's hear the questions and

15   answers that bear on that and then I will hear you.

16           MR. COWAN:  Thank you, Judge.

17           MS. FISKE:  Your Honor, there's a citation in

18   the memo.  The pleading I filed, Docket 78, to the

19   citation where this memo is sponsored by Jill Siebels,

20   the 30(b)(6) deponent, and my recommendation would be

21   that this come in -- it's a lengthy memo.  It's 30

22   pages.  It's a summary of GE's position on the history

23   and that you take it and apply the same principles to it

24   that you've applied today.

25           THE COURT:  Showing me that there is this

1   document in existence doesn't show me anything.  I need

2   you to take me through the chain by which you say it

3   qualifies as an admission by GE.

4            MS. FISKE:  Absolutely, your Honor.  Okay.

5   Let's start with Exhibit 64 which is the -- this is the

6   notice of the deposition, and can we go to page two, and

7   the stipulation regarding the topics that will be

8   discussed at the deposition.

9            THE COURT:  Is there a set of questions where

10  this was asked?

11           THE CLERK:  What volume is 64?

12           THE COURT:  Exhibit 64?

13           THE CLERK:  It's four books.

14           MR. COWAN:  Judge, Exhibit 64 is 2,200 pages.

15           MS. FISKE:  There is a complete set right

16  there.  That's a replica of the way it was presented.

17  All those exhibits were introduced during her

18  deposition.

19           THE COURT:  Does anybody think the finder of

20  fact should review those 2,200 pages and be familiar

21  with them before they decide the case?

22           MS. FISKE:  No.

23           THE COURT:  Then it shouldn't be an exhibit,

24  so it's not coming in.

25           MS. FISKE:  I just brought that for

1   demonstrative purposes.

2           MR. BIAGETTI:  Judge, I'm not going to give

3   you the weekend to do it.

4           MS. FISKE:  I'm not asking you to do it, your

5   Honor.

6           THE COURT:  I understand.  It's within the

7   things that were produced in response to the 30(b)(6)

8   notice.  That's what you are telling me.

9           MS. FISKE:  Exactly.

10          THE COURT:  Was she questioned about it?

11          MS. FISKE:  Extensively.

12          THE COURT:  Show me the question that you

13  think best qualifies as a statement by her that what is

14  in here is true.  Not that it is what it is, but what is

15  true because her merely saying is that a document that

16  was in the GE files?  Yes.  That might help you as a

17  predicate to get it in as a business record or some

18  other means by which you get it in as an admission, but

19  that it came from GE by itself doesn't mean that it's

20  admissible.

21          MS. FISKE:  Correct.  She was asked to testify

22  on this topic, which is 31, which is the topic that I

23  have on the screen now.  What material was transferred,

24  sold, or disposed from any GE plant to Fletcher's?

25              And that information ultimately is contained

1      in what is known as Tab 31E of her deposition, and she

2      is prepared to testified regarding all the information

3      behind Tab E, and she comes to sponsor that information.

4      She has no personal knowledge.  She's only reviewed this

5      memo which was prepared by Ropes & Gray for her to

6      testify.  She reviews it three times.  She spends a day

7      with her lawyers going through it and is prepared to

8      testify on this information contained in this one memo

9      that they call the preparatory memo behind Tab 31E.  And

10     the lawyers say repeatedly throughout the deposition she

11     has no personal knowledge of it, but she's prepared to

12     sponsor it as the information that GE has available on

13     the topic that I have here on the screen, which is, you

14     know, what material --

15              THE COURT:  Show me something where she says

16     what's here is true rather than this is in our files.

17     Because I would expect Ropes & Gray would carefully

18     prepare her to say I don't know whether that's true or

19     not.  I don't have any personal knowledge of it.  I can

20     only tell you that you asked me to bring what was in our

21     files on these topics and these are the things in our

22     files.

23              MS. FISKE:  It's exactly the analysis that you

24     went through.  It's everyplace in the memo where it

25     says:  Scrap Pyranol was generated in the process of

1   making capacitors as opposed to Metevier heard scrap

2   Pyranol was generated in the process.

3        THE COURT:  Show me where she adopted it

4   though.  Producing a summary volume -- can I ask her did

5   she produce this document as her initial response, or

6   did somebody ask her what did you review in preparing

7   this deposition, and they forced out of her this thing

8   that the lawyers thought was work product.

9        MR. COWAN:  Your Honor, I believe in the

10  course of her deposition that they've designated, which

11  I'm sure counsel will provide or has provided already,

12  but my understanding of what happened on that day, this

13  witness sat at the deposition.  Questions were asked of

14  her, and they said what is GE's knowledge or information

15  about the following topics?  And she said I don't have

16  personal knowledge, but I have a document that says

17  these people have been deposed, these people have been

18  interviewed, and this is what they say.

19       THE COURT:  Show me the question and answer.

20  It depends on the question and answer.  It's one thing

21  to say I have the following records.  I don't know

22  whether they are true or not.  I'm not representing that

23  they are true on behalf of GE.  I'm just representing

24  that we have these things.  And it's another thing to

25  say as GE's representative I assert that the following

1    things are true.

2         MR. COWAN:  To his Honor's point, and,

3    respectfully, I think this is where Ms. Fiske is

4    struggling with here, the question you called for is not

5    in this deposition.  At various times this witness is

6    asked questions and she says this is what I know based

7    on what I have been told in preparation for this

8    deposition.

9         She does not say I accept it or I adopt it as

10   truth.  She says this is what the company has learned,

11   acquired, or come to know as a result of depositions.

12        By the way, Judge, many of those same

13   depositions are before his Honor in the way of

14   deposition designations.  Some portions of which are

15   reflected in this memo, I don't believe the government

16   has actually designated for the purposes of this trial.

17   So there are a number of issues here.

18        But to Ms. Fiske's point, yes, at this

19   deposition this witness said, I offer this to answer

20   these questions of what the company knows, the

21   undisclosed information or what we know about these

22   topics.  I don't adopt them.  I don't accept them as

23   truth.  She says, I have no personal knowledge.  This is

24   what I understand we know today about these topics.

25        THE COURT:  This is really weird.  Again, I

1    don't understand -- it's hard for me to understand this.

2    I assume when I see this that this was something that a

3    lawyer would have prepared and ordinarily thought of as

4    work product, and ordinarily in today's world would

5    never show it to a witness but would instead hold it in

6    his hand and ask the witness a lot of questions about it

7    so that the witness would never be able to say that I

8    reviewed that document and therefore waived the work

9    product privilege when I took my deposition.  And

10   certainly you wouldn't see a 30(b)(6) deponent coming in

11   before being asked any questions and saying let me give

12   you a document which constitutes my views on this

13   subject.

14           If it is that, then maybe it is admissible,

15   but I need somebody to show me the point in the

16   deposition where they behave in that kind of irrational

17   way.

18           MS. FISKE:  Can you go to the deposition on

19   October 10th, page 94.  There's an extensive discussion

20   of this on the record.  Start at line 8.  Mr. Storer is

21   the lawyer for GE.

22           (Pause.)

23           THE COURT:  All right.  She is sponsoring the

24   information, and in that sense it is more like a

25   response to an interrogatory, which is an admission,

1    than a response to document request, which is only an

2    admission that I have the document.  This is an unusual

3    circumstance, but she is being offered as a sponsor of

4    this information on behalf of GE according to that

5    excerpt, and unlike the other case where she was not

6    purporting to testify that Metevier was told this thing,

7    here she's being told I want to be as helpful as I can,

8    and on behalf of GE I'm sponsoring this information even

9    though I have no information -- no knowledge of the

10   truth of the information myself, and GE as a company

11   worked hard to put this all together and give it to me

12   so that I can be the sponsor of it.  And that looks like

13   an admission of what is in the document.  So where am I

14   wrong in that?

15            MR. COWAN:  Well, your Honor, to the extent

16   it's an admission, if your Honor is there, it's an

17   admission of what is in the document, which is that

18   these individuals were deposed.  This is what they said

19   in the deposition.

20            THE COURT:  I see it as qualitatively

21   different when she talks about being not the sponsor of

22   the documents, but the sponsor of the information.  And

23   this is a document that was not a preexisting document.

24   The document itself was created to aid her in providing

25   information to the litigants, and it looks to me -- I

1    think a way to think about it is is it -- is she making

2    a response to documents, in which case everybody agrees

3    -- the person who produces documents is not making an

4    agreement that everything in the documents is true.  Or

5    is she responding to information?  What happened?  You

6    put all kinds of things in interrogatory answers that

7    are based on hearsay, but they are admissible against

8    you.  They are admissions by you.  Do you agree with

9    that?  An interrogatory response is an admission.

10            MR. COWAN:  I agree, Judge.

11            THE COURT:  Okay.  So this looks like an

12   interrogatory response given in a deposition that we

13   prepared this information and are giving it to you.

14            MS. FISKE:  And, your Honor, I completely

15   agree with you.  I think this does contain a mixture,

16   this memo, of both types of information according to the

17   principles that you've outlined earlier with respect to

18   Siebels where some of it you are going to find

19   admissible and some of it you will find hearsay.

20            THE COURT:  Tell me what things you want me to

21   credit in this document because first -- if you want me

22   to read it all, it's going to take me half an hour to do

23   that.

24            MS. FISKE:  Well, I've given you 35A, which is

25   a highlighted version, to direct you to the portions of

1    the document that I think are most relevant, and I don't

2    think --

3              THE COURT:  Where is that?

4              MS. FISKE:  You can sort of flip through it to

5    show him.

6              MR. COWAN:  Your Honor, I'd object to that on

7    the same grounds, respectfully.

8              MS. FISKE:  The relevant portions that I think

9    you will find interesting, and my recommendation would

10   be that you take it under advisement and admit those

11   portions of what you find to be a binding 30(b)(6)

12   admission as compared to those portions of it that you

13   may find fall more within the principles of the reasons

14   why you excluded the statement from Mr. Metevier on

15   behalf of it.

16             MR. COWAN:  Your Honor, if I may, I'm at a

17   disadvantage here.  I don't have a highlighted version.

18   I'm not sure what Ms. Fiske is suggesting to you is

19   relevant as not admissible in the document.  Thank you.

20             MS. FISKE:  I'm not suggesting that the entire

21   thing --

22             THE COURT:  It will take you 15 or 20 minutes

23   to read through this and it would take me that long,

24   too; so I will have to deal with it at the next break

25   and you can read it and we can talk about it.  But my

1    inclination is to say that when a witness is produced in

2    a 30(b)(6) deposition, and in the unusual circumstances

3    provided here, the company to aid her testimony prepares

4    a summary of facts and she is presented as a sponsor of

5    that document, she is representing to the parties that

6    these facts are true and they are admissions by the

7    company in the same sense as if she had made these

8    responses to an interrogatory.

9            Now, it's possible in an interrogatory to

10   refer to a document and not admit the contents of the

11   document, but in the context of that question and

12   answer, it appeared that this is a representation by her

13   that these are GE's beliefs as to what the facts are,

14   not these are GE's belief as to what the documents are

15   because it's not simply a reference to documents.  It's

16   a narrative discussion of facts.

17           MS. FISKE:  Yes, your Honor, we agree with

18   that.

19           MR. COWAN:  Your Honor, if I may, as you

20   consider this issue, can I direct you to another portion

21   of the same deposition which I think may bring this

22   issue into clarity for his Honor and perhaps moves us in

23   a different direction, respectfully.  And that is, on

24   page 20 where the witness herself has been asked a

25   question about what this document is and she answers, as

1  opposed to Ms. Fiske's testimony which are lawyers

2  talking to each other.

3         In this case the question starting at line 6

4  on page 20 of that deposition, question, what is your

5  understanding of what the memo is supposed to represent?

6  The witness answers, my understanding is that it

7  represents all the information that GE has available

8  regarding Issue No. 31 which pertains to transportation

9  and disposal of material at Fletcher's Paint site,

10 period.

11        Nothing therein suggests that we believe this

12 information to be truth.  It's simply the information

13 that we have available on this topic, no more, no less,

14 Judge.

15        THE COURT:  This is so weird.  It is so weird.

16 Geez, I'm getting up on 30 years of practicing law.

17 I've never seen anything like this.

18        MR. COWAN:  I haven't been at it quite that

19 long, Judge, but I have to admit, I'm with you on this

20 one.  But, again, this has been offered by this witness

21 as simply the information available to a company and not

22 an adoption of that information or acceptance of the

23 truth of any of it.

24        And finally I will say this, Judge, because I

25 know you wish to move on.  The document is replete with

1   lawyer summary deposition testimony, most of which will

2   be presented to his Honor in the form of designation and

3   some of which I respectfully suggest are not being

4   presented by the government, and this document may be

5   the means by which they are trying to get through the

6   back door evidence they otherwise can't.

7           THE COURT:  Well, I don't want to hear anymore

8   about it.  What I want you to do is by the next break

9   give me, each of you, just the excerpts of her

10  deposition that purportedly refer to this document

11  because I will try to understand what it is.  If you

12  read it, it looks to me like GE prepared it because it

13  wants to win a coverage claim and -- its insurance

14  coverage case.

15          MS. FISKE:  I think it's that as well as a

16  contribution case against ABS and Sprague.

17          THE COURT:  They brought both insurers and

18  contributions?

19          MR. COWAN:  I understood it to be a

20  contribution case.  I'm not sure about the insurance.

21          THE COURT:  Not insurance coverage, it's a

22  contribution action?  I used to do a lot of those.  I

23  did CERCLA contribution actions and I did environmental

24  insurance coverage cases, and I did them for years

25  before I came to the court.  That was my principal

1   practice area.  I would never have done anything like

2   this, but I think that what lawyers are trying to do in

3   those circumstances is they are trying to deal with a

4   problem almost unique to environmental cases where quite

5   often you're trying to prove things that happened many,

6   many years ago where the sources of evidence are very

7   difficult to identify, and it looks like what the

8   company did here was instead of providing answers to

9   interrogatories, GE tried to put together a narrative

10  description of the facts as it understood them so that

11  it could advance the ball in the contribution action and

12  present it.

13          There would be no purpose for GE to just say

14  here's what we think about the facts, but we don't know

15  whether what we think is right or wrong.  That's not

16  what litigants do.  Litigants either present, here are

17  the documents, and we are not telling you whether they

18  are truthful or not, or they present here's what we

19  think happened in which they are making representations

20  about what happened.

21          You're saying this is kind of a hybrid thing

22  where they tried to produce documents and then gave a

23  nice, helpful, annotated, narrative discussion of what

24  the documents all say.  That's something lawyers never

25  do for the other side unless they are trying to

44

1    represent what their view of the case is.

2              MR. COWAN:  Your Honor, I agree with you, it's

3    an unusual situation.

4              THE COURT:  It might be used in a settlement

5    brochure or something, but to produce it in a 30(b)(6)

6    deposition, it's difficult to understand what it could

7    be other than an admission.

8              MR. COWAN:  Other than the witness's

9    respectful testimony is simply a presentation of the

10   information known, and your Honor with the passage of

11   Ms. Fiske pointed you to, even there the lawyer --

12             THE COURT:  I will tell you what you are going

13   to do.  First of all, I will only admit the portions

14   that are highlighted.  Second, I'm going to tell you to

15   go through the highlighted portions at the lunch break

16   and identify every portion of the highlighted portions

17   that you really dispute because I suspect that most of

18   them you won't really dispute.  But I suspect that

19   embedded in this twenty pages of analysis, there are

20   probably three or four things that are really

21   problematic to you that you don't want me to admit.

22             And at least we can focus on what the real

23   problems are because I suspect you won't disagree with a

24   lot of this stuff and -- because I don't know why GE

25   would put it together, take the time to put it together

1   and produce it to the other side, unless it wanted the

2   other side to believe this is what happened.  Why else

3   do you do it?  To try to mislead them?  You collect all

4   this information, produce this narrative description,

5   and then say we are throwing it out there, but you

6   decide whether it's good or bad.  I can't think of any

7   case in which a lawyer would behave that way.

8          MR. COWAN:  Your Honor, now with the

9   highlighted version, I agree, I think we may get there a

10  lot quicker.  Thank you.

11         THE COURT:  All right.  Let's focus on that.

12  All right.  What else are we going to do?

13         MR. FLYNN:  Your Honor, I have three exhibits

14  that I'd like to talk to you about.

15         THE COURT:  All right.

16         MR. FLYNN:  And I'm just bringing these up

17  because these three exhibits have been objected to by

18  General Electric on relevancy grounds.  And the first

19  one is Government Exhibit 10.  This is a memo prepared

20  by GE dated October 29, 1970, that discusses what

21  happened over the past two years as far as their

22  arrangements with Monsanto trying to return scrap

23  Pyranol, and there is a list of four different items,

24  what it would cost to send it back to Monsanto and a

25  couple of ways to get it back to Monsanto, storage at

1   their site, and also shipping it off for incineration.

2   And the relevance of this is it goes again to this rough

3   time period, the problems and the options that GE had

4   the same material that it was shipping to Fletcher's.

5           THE COURT:  All right.  Do you want to say

6   something?

7           MR. BIAGETTI:  Just that the operative word

8   there is rough time period even if you believe it's a

9   full two years from when written.  That gets you back to

10  October of 1968.  That's after all of our time in

11  question.

12          THE COURT:  I agree, it's minimally relevant.

13  I don't think it will play a role in my analysis.  Your

14  objection is overruled.  What's next?

15          MR. FLYNN:  Next documents are two related

16  documents, your Honor.  One is Document No. 48.  This is

17  a certified complaint from the New York State Department

18  of Environmental Conservation for an action against GE.

19  I believe it was filed in 1975, and turning to page

20  FTR000061, the fourth paragraph, this is a complaint

21  that was basically alleging that GE --

22          THE COURT:  There's no dispute about that, is

23  there?

24          MR. FLYNN:  Well, I think the dispute is

25  that -- and it's really sort of an inferential issue,

1  your Honor.  This is not a major issue in the case, that

2  GE's -- between their expert and some of their

3  inferences is that they had such low cost or no cost

4  alternatives that the material really -- giving it to

5  Fletcher was a useful product such as they could

6  discharge it into the Hudson without risk, and even

7  though this was filed in '75, our position is that there

8  were some laws on the books as alleged by New York

9  State --

10          THE COURT:  I don't think it's proved.  So

11  you're offering it to try to prove that GE couldn't

12  lawfully dispose of it in the river and therefore had an

13  incentive to have it go to Fletcher.

14          MR. FLYNN:  Not exactly that strong a

15  statement.  There was at least a risk that they were

16  violating then existing environmental laws as reflected

17  in the complaint that was filed in '75.

18          THE COURT:  I don't think -- that somebody

19  complained against them doesn't prove that they were.

20  That somebody complained against them in '75 doesn't say

21  anything about whether they would have complained

22  against him in '65.  The way to prove that is more to

23  establish what the legal requirements were at the time

24  and that they would have been in violation of them, and

25  that's not established by this.  It's established by

1  showing me the laws on the books at the time, and as a

2  matter of law I can conclude that.  I also think it's a

3  waste of my time.  That's not the theory under which you

4  are going to prevail.  It's one of those, again, sort of

5  esoteric --

6          MR. FLYNN:  It's more of a counter theory.

7          THE COURT:  Yeah, I know.  It's so far down

8  the line in importance, that it's not worth my time to

9  struggle over.  I wouldn't decide in your favor on the

10  basis of that argument.  So your request for admission,

11  their objection to it is sustained.  The document won't

12  be admitted, and I'm telling you, if I did admit it, I

13  wouldn't credit that argument and rely on it and rule in

14  your favor in any event.  So my ruling I think is

15  inconsequential.  Okay.  What else?

16          MR. FLYNN:  Well, I guess the second document

17  is related to that which is actually an internal opinion

18  by the Administrative Court finding.

19          THE COURT:  Same ruling.

20          MR. FLYNN:  All right, your Honor.  Thank you.

21          THE COURT:  What's next?  Any other documents,

22  government, before it rests its case?

23          MR. FLYNN:  No, your Honor.  I believe all the

24  documents have already been admitted or --

25          THE COURT:  Have you offered and gotten into

1    evidence by agreement all the exhibits you intend to get

2    in, or have you had me rule on any objections to

3    exhibits that you wanted to get in but are objecting to?

4              MR. FLYNN:  Other than the one that your Honor

5    spent a significant amount of time with, I think that's

6    the only remaining document.

7              THE COURT:  I will reserve judgment on that

8    until after the lunch break to give the parties a chance

9    to try to focus the analysis on it.  With that, the

10   government rests.

11             MR. FLYNN:  Yes, your Honor.

12             THE COURT:  Anything else?  Ready to go?

13             MR. BIAGETTI:  We're ready to go.  GE calls

14   Albert Clark.

15                      ALBERT C. CLARK

16        having been duly sworn, testified as follows:

17             THE CLERK:  You may be seated.  Please state

18   your name and spell your last name for the record.

19             THE WITNESS:  Albert C. Clark.  Last name is

20   C-L-A-R-K.  And that's Albert with an A.

21                    DIRECT EXAMINATION

22   BY MR. BIAGETTI:

23             MR. BIAGETTI:  Good morning, Mr. Clark.

24             THE WITNESS:  Good morning, Mr. Biagetti.  How

25   are you?

1          MR. BIAGETTI:  I'm fine, thank you.  We've

2    met.  I'm advised that the microphones are directional;

3    so if you can get your voice pointed towards the

4    microphone, I think that will help everybody.  And very

5    seriously, I know that this is not your first encounter

6    with the case; so we all thank you for your time.

7          THE WITNESS:  You're certainly welcome.

8    Q.    What was your first encounter with litigation

9    involving Fletcher Paint?

10   A.    First I heard of it was in 1991.  I was

11   working for General Electric in Syracuse, New York, and

12   I was invited for an interview right there at the GE

13   plant in Syracuse, New York.  It was in regard to my

14   analogy of what had happened at Hudson Falls dealing

15   with Fletcher Paint Company.

16   Q.    And did you participate in that interview?

17   A.    I did.

18   Q.    What was it?

19   A.    I had no preparation for it, so I was

20   interviewed for what I knew of the arrangement between

21   Hudson Falls and Fletcher Paint Company.

22   Q.    Did you come to understand at some point that

23   that's what we called a deposition?

24   A.    Yes.

25   Q.    Under oath?

1        A.    At the time I didn't know it was a deposition.

2    I called it an interview.   I was very confused as far as

3    what the objective of the interview was, and then

4    afterward I realized that they would actually use it as

5    a deposition.

6        Q.    Did you review any documents to prepare you

7    for it?

8        A.    There were nothing to review ahead of time.

9    There were no documents and there were no discussions

10   with anyone beforehand.

11       Q.    Other than being invited --

12       A.    I went in cold you might say.

13       Q.    Did you have any preparation with anybody from

14   GE prior to that?

15       A.    No, I did not.

16       Q.    When, if at all, was the next time that you

17   encountered lawsuits involving Fletcher Paint?

18       A.    About a year later.   The first one was October

19   of 1991.   In November of 1992 I was invited -- requested

20   to appear for a deposition in the GE plant located in

21   Ft. Edward, New York, which is part of the capacitor

22   department, and that was a deposition.

23       Q.    How is it that you can remember it was

24   November 1992?

25       A.    I'm sorry?

52

1       Q.   How can you remember that it was

2   November 1992?

3       A.   Documents that have refreshed my memory.

4       Q.   Since then?

5       A.   Since then, absolutely.

6       Q.   Have you seen the transcript of the

7   deposition?

8       A.   I saw the transcript of that deposition in

9   2007.

10      Q.   Did you review any documents about Fletcher's

11  Paint prior to that deposition?

12      A.   No, none.

13      Q.   Did any lawyers or others from GE help to

14  prepare you for that deposition?

15      A.   No, none.

16      Q.   Did you see any documents regarding Fletcher

17  Paint at the deposition?

18      A.   Yes, I did.

19      Q.   Were they of any help to you?

20      A.   Yes, they did.  The documents at that time

21  dealt with ledgers, documents of sales of material to

22  Fletcher's Paint Company by Hudson Falls-GE.

23      Q.   And after the 1992 deposition, when, if any,

24  was your next encounter with lawyers for the litigation

25  involving Fletcher Paint?

1      A.   I was still working at the Syracuse plant.  At

2   the time our division had been purchased by

3   Lockheed-Martin.  So I was a Lockheed-Martin employee at

4   that time, and I was requested to go to a review meeting

5   in Syracuse in a conference room, and at that meeting

6   there was a lawyer for GE environmental programs.  Her

7   name was Bonnie Harrington, and she had some documents

8   that had been discovered and she wanted to make sure

9   that I knew about them and asked me if they were -- if I

10   recognized these documents.

11      Q.   And do you remember about when that meeting

12   with Bonnie Harrington was?

13      A.   It was 2001.  It was close to May.  It was

14   close to May of 2001 because I saw some other dates on

15   documents that backed that up.  So I would say mid-2001.

16      Q.   Do you remember what documents -- just

17   generally, could you tell the Court what documents you

18   remember, if any, that you saw at that time.

19      A.   I do remember them.  There were four letters.

20   They were correspondence -- they were internal memos

21   written by GE's accounting people.  A lot of those were

22   in the 1967 time period.  There was a letter from

23   Fletcher, who was the president of Fletcher's Paint

24   Company, and there was a letter that I had authored

25   pertaining to the case that I wrote in 1968.

1      Q.    After that encounter, when, if ever, was the

2  next time you met with lawyers or had anything else to

3  do with the litigation involving Fletcher Paint?

4      A.    In 2006 I was contacted by a lawyer from St.

5  Louis representing GE.  His name was Eric Barry and he

6  wanted to review the case.  He wanted to do it by a

7  telephone interview.  He sent me the transcripts of the

8  1992 deposition, not the 1991 document, but the 1992

9  document, highlighting several paragraphs, sentences

10  that he had questions about.  So I had time to prepare

11  by reviewing that document, and we had about a one-hour

12  telephone interview to bring him up to date and clarify

13  some questions that he had.

14      Q.    And other than that conversation with Mr.

15  Barry and until your arrival here, any other encounters

16  with GE lawyers?

17      A.    Yes.  About a year after that in 2007, the

18  same Mr. Barry called me and informed me that the

19  responsibility for the case is being transferred from

20  one legal firm to a second legal firm, and he wanted to

21  meet with me with a representative for the new legal

22  firm, which was your firm, and Ms. Levin, and that was

23  Jeffrey Porter.  So Jeffrey Porter and Eric Barry came

24  to my home in Manlius, New York, and we talked about the

25  case.  We talked about the deposition and facts of the

1    case as we knew them at that point.

2         Q.    Between the meeting with Mr. Porter and your

3    arrival here, any other meetings with lawyers or any

4    other encounters regarding the Fletcher litigation?

5         A.    This year, 2008, I had got a telephone call

6    from a person -- her name was Addy Fiske, F-I-S-K-E, and

7    this was a telephone message.  I didn't speak with her.

8    I got a telephone message on my answering machine.  And

9    she wanted me to call her to set up a deposition about

10   what I knew about the case dealing with Fletcher's and

11   GE and Hudson Falls.

12            As I was requested to do, I put in a call to

13   Jeff Porter and informed him of that call, and Jeff told

14   me not to return the call, that the legal firm would

15   take care of it.  And so that was my next involvement

16   with the case.

17        Q.    After that, I understand there was one more

18   deposition; is that right?

19        A.    Yes, right.

20        Q.    And prior to that deposition, did you review

21   any documents or meet with anybody in preparation?

22        A.    Yes, I did.  I met with you, Peter Biagetti.

23        Q.    What documents did you see then?

24        A.    We saw all the documents.  Most of them I had

25   seen at some time, but we were able to put all the

56

1    documents together for the first time, and in the

2    process that I was going through in all this time is to

3    refresh my memory of all these things that had happened

4    over the 40-year time from 1968 to 2008.  So it was a

5    relearning process and putting things in perspective.

6         Q.   And then I think you were deposed sometime

7    after that in 2008?

8         A.   June 24th in Syracuse I was deposed.

9         Q.   Have you been -- where do you live?

10        A.   Manlius, New York.

11        Q.   And have you been reimbursed for your travel

12   and your time spent in the efforts you just talked

13   about?

14        A.   Minimal payments for lost time, and any direct

15   out-of-pocket costs I was reimbursed for.

16        Q.   Any portion of that payment influencing your

17   testimony here today, sir?

18        A.   Absolutely no way at all.

19        Q.   Or at the three depositions you gave?

20        A.   The last ones have not been influenced, nor

21   has this one this morning.

22        Q.   Between the time that you talked about that

23   first interview in 1991 until today, have you had any

24   conversations with GE employees about Fletcher's Paint?

25        A.   No one.  No GE employee have I had a

1  conversation.

2      Q.    How many years did you work at GE?

3      A.    Total time between General Electric and the

4  successor company, Lockheed-Martin, 38 years.

5      Q.    And can you briefly give the Court a sense of

6  the jobs you held?

7      A.    Yes, I can.  I graduated from high school in

8  Pittsfield, Massachusetts.  That was my hometown.  I was

9  accepted on the GE apprentice drafting training program,

10  which is one of the better training programs.  That was

11  a four-year program, which was a combination of

12  classroom, engineering subjects, and on-the-job training

13  actually on -- in drafting rooms doing drafting

14  training.  That's four years.  Graduated in 1957 from

15  that.

16              I worked as a draftsman for about a year doing

17  drafting, detail drafting, checking for their production

18  drafting department.  I had an opportunity in 1960 --

19  right around 1960 or '61 I had an opportunity to take a

20  position -- a temp position as a facility planner in

21  plant engineering for that same department in

22  Pittsfield, and we planned construction work,

23  rearrangements and scheduling and all the detail work

24  that has to go into supporting that department's

25  program.

1            After I was on that job for two years, there

2    was an opening in the purchasing department for a

3    construction buyer, and with my background in

4    construction planning in plant engineering, I was able

5    to get a promotion to the construction buyer's job,

6    again, still at the same ordinance department in

7    Pittsfield, Massachusetts.  It was because I was

8    experienced with construction work, when GE got a

9    contract with NASA to develop and support NASA's Saturn

10   rocket program in Mississippi, they assigned people from

11   General Electric to that operation called the

12   Mississippi Test Support Operation, and I was one of the

13   individuals transferred down there.  It was a start-up

14   kind of position just to get the thing started.  I did

15   transfer to that department, moved the family.  I was on

16   that job two years.

17        Q.   So what year are we up to now roughly?

18        A.   It started in 1963 and ended in 1965.

19        Q.   What was your next job?

20        A.   In 1965 I had an opportunity to take a senior

21   buyer's job in Hudson Falls, New York, with the

22   capacitor department, and I started on that job December

23   of 1965.  It was understood that that would be about a

24   two-year job assignment.  The manager of materials used

25   that position to bring new employees into the department

1   and with a plan to transfer different sections within

2   that department.  So I knew when I started the job that

3   it would be about a two-year job.  As it turned out, it

4   went a little bit longer than that.  It went two years

5   and eight months.  I left that job in August of 1968.

6       Q.    You mentioned a manager of materials in that

7   job?

8       A.    Mr. Abbe.

9       Q.    Was he your boss?

10      A.    He was my boss, A-B-B-E.

11      Q.    We'll come back to that stint, but very

12  briefly, why don't you just finish up and tell us about

13  the jobs, if any, you had at GE after that one.

14      A.    Okay.  After the senior buyer, indirect

15  material, I changed functions, still at Hudson Falls.  I

16  went into the manufacturing information systems

17  organization and I worked as a specialist planning

18  systems information, manufacturing information systems,

19  finding requirements and actually implementing the

20  systems, and that was another two-year kind of thing.

21          While I was in that position, an opening came

22  up in Waynesboro, Virginia, GE and they were looking to

23  hire a manager of manufacturing information systems.  I

24  was interviewed for that job and I did get that job.  I

25  transferred again, staying within GE, but now moving to

1    Virginia, Waynesboro, Virginia, to get that -- a new

2    function established down there in manufacturing

3    information systems.  By this time we were now in 1973

4    starting down there.

5           And in 1977 they had a reduction in forces and

6    basically eliminated what I had been doing there, and I

7    ended up leaving the company for three years.  When I

8    came back to GE, it was in 1981, and my former boss in

9    Hudson Falls knew of an opening in Syracuse, New York,

10   in the military electronics department.

11          I came back to work in 1981 as a manager of

12   manufacturing information systems.  Between 1981 and

13   when I retired from Lockheed-Martin in January 1995, I

14   had several jobs, all of which were in the area of

15   materials management, either for systems or for

16   stockroom operations or for inventory control, and

17   basically when I retired from Lockheed-Martin, I was in

18   a manufacturing information systems position as a

19   specialist.  And that was the end of my 38 years.

20       Q.   Thank you.  You know that our focus today is

21   going to be on that time from '65 to '68 when you were

22   the indirect buyer at Hudson Falls.

23       A.   I understand that.

24       Q.   Can you briefly describe what your job

25   responsibilities were as an indirect buyer?

1       A.   Yes, I can.  The easiest way to understand the

2  responsibilities is to picture the division of all the

3  material services, subcontracts that were required for

4  that whole department, to break it down between indirect

5  and direct.  So first I will tell you what I was not

6  responsible for.

7            I was not responsible for the procurement of

8  any direct material; that is, material that goes into

9  the capacitor products.  I was responsible for all of

10  the procurements, maintenance repair, operating

11  supplies, and services for the Hudson Falls/Ft. Edward

12  operations of the capacitor department.  That was my

13  responsibility, and the list of things that I purchased

14  is too long to get into.  It was everything.

15            THE COURT:  What years again were you at

16  Hudson Falls?

17            THE WITNESS:  I started in Hudson Falls in

18  1965, December of '65, and I left there in 1973.

19            THE COURT:  Where in Hudson Falls is the

20  plant?

21            THE WITNESS:  It's right on Main Street.  It's

22  down the falls -- the falls of -- Hudson Falls on the

23  Hudson River.

24            THE COURT:  So it's right on the river?

25            THE WITNESS:  Yes, it is.

1          THE COURT:  During that period of time was the

2     area built up or rural?  What was the area like?

3          THE WITNESS:  It was an old established

4     village.

5          THE COURT:  So you say a village.  Where do

6     you live now?

7          THE WITNESS:  Manlius Village, out near

8     Syracuse.

9          THE COURT:  I don't know your area; you don't

10    know mine.  When you say a village, a small community of

11    houses with maybe a few stores and then the plant down

12    there by the falls itself?

13         THE WITNESS:  That's correct.

14         THE COURT:  I'm trying to think.  I was

15    through Hudson Falls in the last couple weeks.  I'm

16    trying to remember.  There's a Main Street and then

17    there's a street you go sort of down below the Main

18    Street.  Is that where the plant was?

19         THE WITNESS:  Yes, that's exactly where it

20    was.  That's where I worked.

21         THE COURT:  Okay.

22         THE WITNESS:  My office was there.  Even

23    though I was responsible for the operation in Hudson

24    Falls, and if you take -- south of Hudson Falls is Ft.

25    Edward North.  That was the other plant I was

1    responsible for operations.

2           THE COURT:  Okay.

3      Q.   BY MR. BIAGETTI:  Back to job responsibilities

4    for a minute.  Did you have a staff?

5      A.   I had a small staff.  I had a junior buyer, I

6    had an expediter, and I had a clerk, and the work was

7    divided among the four of us.  Typically the more

8    routine tasks were handled by the buyer and the

9    expediter.  Clerical work was handled by my clerk.  The

10   major purchases and subcontracts I handled myself

11   personally.

12     Q.   When you say you handled them, what do you

13   mean?

14     A.   I was responsible for getting competitive bids

15   and placing purchase orders, negotiating contract

16   prices, etc.

17     Q.   Can you talk a little bit about the paperwork

18   that fell within your department, please?

19     A.   Well, obviously the volume of paper was

20   processing of vendor invoices, reviewing them, getting

21   them approved, and passing them on to accounts payable

22   to pay the vendors for material that we purchased.  We

23   also placed purchase orders.  So you talk about

24   paperwork, all our purchase orders at that time were

25   paper purchase orders that were typed up and sent to

1   suppliers.

2       Q.   Did your department do any actual billing?

3       A.   No, we never did any billing.  We prepared

4   paperwork for our accounts payable, accounts receivable

5   organization which is part of general accounting.

6   Actually it's interesting you mention billing.  The

7   majority of what our activity involves invoicing -- not

8   invoicing, but receiving invoices from our suppliers and

9   processing those for accounts payable to pay our

10  vendors.  A small portion of it was, because we dealt

11  with outside vendors and outside customers, if we bought

12  things from an outside customer or if we sold things to

13  an outside customer, that paperwork also went through

14  our office and passed on to accounts receivable portion

15  of general accounting.

16      Q.   And among that paperwork that passed through

17  during the time that you were in charge of the

18  department, was there any paperwork regarding Fletcher

19  Paint?

20      A.   Yes, there was.

21      Q.   Can you explain what that was?

22      A.   Yes.  Part of the responsibility for the

23  senior buyer of indirect material was to do the

24  administrative work to maintain agreements, contracts,

25  with the sale or disposal of scrap material, surplus

1   material, any materials that had out used its useful

2   life to GE, and one of the reasons that was set up quite

3   a ways before I got there, several years before I got

4   there, was with Fletcher's Paint.  The person that I

5   succeeded, the buyer, Mr. Robert Keeney, explained to me

6   the arrangements that had been ongoing for several

7   years.

8       Q.   And what did you understand the arrangements

9   with Fletcher Paint to be?

10      A.   There was an agreed upon price, and at the

11  time I had no need to know what it was, but it was all

12  documented in a contract that was at my disposal if I

13  needed to look at it.  We had an open-ended contract

14  with Fletcher's Paint for a fixed price per drum.  We'll

15  talk about that, what is a drum, later, but we had a

16  longstanding agreement that he would purchase this

17  material from us; not only purchased it, but actually

18  come and pick it up himself, to take as much of it as he

19  could use, as much of it as he needed, and as much as we

20  were able to provide what -- the quantities that he

21  needed.  So there was nothing in the agreement as far as

22  any maximum quantities, any minimum quantities, or how

23  much he agreed to take over time.  It was whatever was

24  usually available and required by Fletcher's Paint.

25      Q.   You said it was documented in an agreement.

1  Did you ever see the agreement?

2       A.   I never saw it because I never had reason to

3  look at it.  I knew where it was.  There was a filing

4  cabinet and I remember it being pointed out to me that

5  it had many agreements in it, and Fletcher's agreement

6  was in there.  It was a document -- at the time I knew

7  it had been in existence for several years.  I've

8  subsequently learned that actually the agreement was

9  made and was executed starting in 1956, which was --

10  again, that was ten years, nine or ten years before I

11  was there.

12       Q.   And did you have any understanding of what the

13  history of the arrangement with Fletcher had been quite

14  aside from the terms of the agreement?

15       A.   Oh, yes.  Even though our department was

16  responsible for administering the agreement and the

17  paperwork and making sure that all the T's were crossed

18  and I's were dotted, etc., I was in constant contact

19  with our scrap yard foreman supervisor, Mr. Varnum, Ed

20  Varnum, and it was his -- either Mr. Varnum himself or

21  one of the employees who worked for him communicated

22  with Fletcher as far as we've got some more, can you use

23  it, can you come get it.

24            And if they could come get it, they would send

25  their truck.  Fletcher would send their truck, their

1   driver, and pick up the material that he could take on

2   his truck, get a receipt for it.  He'd need that receipt

3   to take the material off the property, and a copy of the

4   receipt is the piece of paper that our clerk would

5   process to request billing for a bill to be sent to

6   Fletcher.  There was no pattern to the timing of when

7   they would come and get it.  It was strictly worked out

8   between Fletcher's people and our foreman of scrap and

9   salvage.

10      Q.    You mentioned these receipts that got copied

11  to your department?

12      A.    Yes.

13      Q.    Did Fletcher's truck need a copy of the

14  receipt to get off of the premises?

15      A.    That's the only way he could leave the plant.

16  He had to have a receipt for what he had on the truck.

17      Q.    Was there ever a time that you were a buyer

18  that you understood that Mr. Fletcher or his crew had

19  taken Pyranol away for free?

20      A.    No, absolutely not.

21      Q.    Or without one of those receipts?

22      A.    Couldn't do it.

23      Q.    You mentioned Ed Varnum.  What kind of contact

24  did you have with Mr. Varnum during your time?

25      A.    During the two and a half years, there were

1   many things that were his responsibility that he and I

2   worked on together.  Mr. Varnum reported to Mr. Abbe, as

3   did I report to Mr. Abbe.  So anything that had to do

4   with scrap or salvage material movement, it was Mr.

5   Varnum and myself who would discuss the situation.  If

6   there were any problems, it was always my responsibility

7   to be informed of the problems and contact the vendor or

8   the customer or whatever the case may be to try to

9   resolve it.

10       Q.   Did you ever hear any such problems with

11   Fletcher Paint in 1966, sir?

12       A.   1966 things were going very smoothly.  I

13   really can't recall any need to get involved in 1966.

14            THE COURT:  Can I ask you, during the entire

15   time that you were there, did GE have an arrangement

16   with any other purchaser of scrap Pyranol other than

17   Fletcher's?

18            THE WITNESS:  No.

19            THE COURT:  Would you have known about it if

20   there were such an arrangement?

21            THE WITNESS:  Yes, I would.

22            THE COURT:  So it's safe to say that during

23   the entire time you were there, the only person that

24   bought scrap Pyranol from GE was Fletcher.

25            THE WITNESS:  Was Fletcher, yes, sir.

1      Q.   BY MR. BIAGETTI:  Do you recall whether GE

2   during the time you were there had any other

3   arrangements to sell scrap to folks?

4      A.   Oh, yes.

5      Q.   Can you give an example?

6      A.   I can't give you the names of the dealers, but

7   one of the most common sale of scrap or surplus would be

8   scrap metal that we would always get reimbursed for

9   scrap value for:  Aluminum, copper, steel, material that

10   was typically remnants of what we needed to make

11   capacitors out of.

12           THE COURT:  Can I ask you, to your knowledge

13   or if you know about this, was the entire inventory of

14   scrap Pyranol of GE during the period you were there

15   acquired by Fletcher, or was there some of it that was

16   not acquired by Fletcher?

17           THE WITNESS:  There were quantities that he

18   had not taken when I was there.

19           THE COURT:  Do you have any knowledge about

20   what happened to that Pyranol --

21           THE WITNESS:  No, I don't.

22           THE COURT:  -- that he did not take?

23           THE WITNESS:  No, I don't.

24           THE COURT:  It's fair to say it wasn't sold by

25   GE.

 1            THE WITNESS:  I can't answer that question
 2    either way.
 3            THE COURT:  I think you just told me earlier
 4    if there was a customer for it and there was an
 5    arrangement by which it was sold to somebody other that
 6    Fletcher, you would know about it, and you have no
 7    knowledge of that.
 8            THE WITNESS:  I have no knowledge of that.
 9        Q.   BY MR. BIAGETTI:  Did you have any knowledge
10    what kind of customer Fletcher was?
11        A.   He was a good customer.
12            THE COURT:  Excuse me.  Sorry to keep asking
13    back and forth, but as things occur to me, I want to ask
14    you.  Did you know what GE paid for Aroclor?
15            THE WITNESS:  No.  That was a direct material
16    buyer.
17            THE COURT:  I see.  So you would just have no
18    knowledge.
19            THE WITNESS:  I have no idea.
20            THE COURT:  Do you remember how much -- I
21    think you answered this, but I'm not being sure, but I
22    want to be clear.  Do you know how much Fletcher was
23    paying for the scrap Pyranol it was acquiring from GE?
24            THE WITNESS:  At the time while I was on the
25    job, I honestly didn't know -- need to know what was

1    being charged.  The documentations that I saw more

2    recently showed the price that he was buying it at.  So

3    I do know what the price was.

4              THE COURT:  So based on records that were

5    shown to you in preparing for the case but not based on

6    your personal knowledge?

7              THE WITNESS:  Right, yes.

8         Q.   BY MR. BIAGETTI:  Given your general

9    responsibilities at the time, Mr. Clark, why do you say

10   you didn't need to know how much GE was charging

11   Fletcher?

12        A.   It was an ongoing process.  The material was

13   being sold, and as long as the process was working and

14   nothing went wrong with it, there was no need to get

15   involved in an understanding.  If there was a need to

16   know, all I had to do was look in the folder, but I

17   probably would have just checked with the clerk and said

18   how much are we selling this for?  She could have told

19   me because she sees the receipts.  She would have told

20   me it's $3.75 a drum.  But I didn't have any need to

21   know that.

22        Q.   You mentioned Fletcher was a good customer.

23   Why do you say that?

24        A.   Oh, yes.  Along the time of ten years,

25   twelve years of material being sold, picked up, a good

1    relationship with Mr. Varnum's organization, Mr. Varnum

2    many times commented how good it was to work with

3    Fletcher as far as his reliability and trouble-free

4    dealings with the company.

5         Q.   You mentioned working with Mr. Varnum and I

6    think you said -- one more question about Fletcher as a

7    customer.   There's a term that's come out in the case

8    earlier called "cash in advance."   Were you familiar

9    with cash in advance relationships that GE had at the

10   time?

11        A.   Not at the time.   Again, documents that were

12   discovered included a company-wide policy advice, if you

13   will, of payment terms for different contractors, and it

14   would say certain customers are okay to pay and bill.

15   Other customers they advised cash in advance.   Fletcher

16   Paint happened to be on that list where they recommended

17   to have them pay in advance, cash in advance, CIA.

18        Q.   At the time, however, do you recall knowing

19   what the terms were for Fletcher Paint?

20        A.   No, I don't; no, I don't.

21        Q.   Fair enough.   You mentioned Varnum, and I

22   think you said he was in the scrap department?

23        A.   Scrap and transportation.

24        Q.   Thank you.   Had you any dealings during your

25   time in indirect buying with the facilities department?

1      A.   Oh, yes.

2      Q.   What did they do?

3      A.   They did all the maintenance.  They are

4  responsible for all of the scrap -- trash removal,

5  garbage removal, all the services that we end up having

6  to pay for, and our involvement was to work with

7  facilities so that we understood what scrap dealers,

8  trash dealers, garbage haulers that we were dealing

9  with, that the amounts of monies that we paid for the

10  service were the lowest possible for our business.

11      Q.   And did you during your time in indirect

12  buying have some dealings with the facilities

13  department?

14      A.   Oh, yes.  If we had -- give you an example.

15  If we had something that came up that was a new item or

16  new service required, our department would work with

17  facilities to try to find the best vendor to provide

18  that disposal service.

19      Q.   Let me show you a document that the government

20  showed his Honor I believe yesterday.

21          MR. BIAGETTI:  Can we turn on the overhead?

22  Mr. Clark, if you would prefer to have old-fashioned

23  paper, we can get you that, too.

24          THE WITNESS:  No, this is fine.  I'm adapting

25  very nicely to the electronic age.

1          MR. BIAGETTI:  I have no doubt that you are.

2    Your Honor, this is Exhibit 16.  I believe it's already

3    entered, Defendant's Exhibit 16.

4          Q.   Mr. Clark, it's a document that has General

5    Electric at the top and it's dated March 13th, 1968.

6    It's from R.T. Abbe to C.R. Zecchini at quality control

7    with a couple of copies noted to other people in the

8    right-hand corner.  You've seen this document before?

9          A.   Yes, I have.

10         Q.   I'm trying to zoom in on a bit of it where Mr.

11   Abbe says at the first paragraph, we are quietly burying

12   overselves in scrap Pyranol.  Do you see that?

13         A.   I see that.

14         Q.   Then he goes on to ask Mr. Zecchini for advice

15   regarding the dangers of this material into a landfill

16   dump.  He talks about that this would be accomplished

17   via a normal dumpster operation.  Do you see that?

18         A.   I see that.

19         Q.   Did you see this letter, first of all, at

20   about the time it was written in March of '68?

21         A.   No.  I saw this in 2008, June 24th, at the

22   deposition in Syracuse.

23         Q.   I appreciate that, but at the time did you see

24   it?

25         A.   No, I did not see it.

1      Q.    Was it sent to you, a copy to you?

2      A.    No, it was not.

3      Q.    It was copied I notice to a Mr. or Ms. Bramer,

4   Dewart, and Moss.  Do you see those names?

5      A.    I know the people.  Kurt Bramer was the

6   manager of facilities at the time, and Mr. Moss, Jim

7   Moss, was the supervisor of maintenance facilities.

8      Q.    The department you talked about before?

9      A.    That's right.

10      Q.    So here's a memo during the time that you are

11   in indirect buying dealing with the sale of scrap

12   Pyranol, and it's talking about scrap Pyranol, in

13   particular, the landfill dumping of it.  Why weren't you

14   copied on it, do you know?

15      A.    It was not my responsibility at all.  Going

16   back to what I had mentioned before as far as what my

17   responsibilities, if we are selling something and

18   receive funds for that something, whatever it is, I

19   would be involved.  Purchasing would be involved in

20   that.  If we are just disposing of materials, that is,

21   scrap in the case of trash or garbage, and in this case

22   Mr. Abbe was just trying to investigate possible

23   alternatives to selling Pyranol.  If we weren't selling

24   the scrap Pyranol, he was just trying to -- from what I

25   read in the letter, he was trying to get information and

1    advice from our manager of quality assurance, Mr.

2    Zecchini, as far as what are the rules and regulations

3    for disposal.

4         Q.   You just mentioned what the responsibilities

5    of the indirect buying department were at the time.  At

6    the time did the department have business goals?

7         A.   Yes.

8         Q.   What were they?

9         A.   We were charged with maintaining the highest

10   level of profitability for the department by minimizing

11   the costs to the department for an acceptable level of

12   quality, and that had to do with whether we were buying

13   something for the department or selling something to

14   some other customer.  We were always involved in bottom

15   line profitability of the department, and we made

16   significant contributions to that.

17        Q.   Any responsibility for customer relationships?

18        A.   Absolutely, customer relationships.

19        Q.   And when you say absolutely, what do you mean?

20        A.   That's always a consideration on everything we

21   did.

22             MR. BIAGETTI:  I'm on to a new area, Judge.

23   I'm happy to keep going.

24             THE COURT:  My reporter needs a break.  We'll

25   take a 15-minute break.

1           (Recess taken.)

2           THE COURT:  Go ahead.

3      Q.   Mr. Clark, did you ever see a drum of scrap

4  Pyranol during the time you were at Hudson Falls?

5      A.   Please repeat the question.

6      Q.   Did you ever see a drum of scrap Pyranol

7  during the time that you were at Hudson Falls?

8      A.   I saw drums that contained scrap Pyranol.

9      Q.   Can you tell us about what you understood

10  about how scrap Pyranol was generated?

11     A.   Yes, I can.

12          THE COURT:  Did you ever go into the parts of

13  the building where Pyranol was being used?

14          THE WITNESS:  I was in the part of the

15  building.  You can't get to the process area where

16  Pyranol is being used because the use is in ovens.

17          THE COURT:  So you can get to the area where

18  the ovens are that Pyranol is being used in.

19          THE WITNESS:  Ask me the question again.

20          THE COURT:  Look, I'm not playing games here,

21  okay?  I know there was a facility where you were making

22  capacitors, and I know you were using Pyranol to infuse

23  the capacitors for its use as a dielectric fluid.  There

24  were people who were very familiar with that process and

25  people who were involved in actually working in

1    connection with that process.  You were not intimately

2    involved in those things, and so I'm asking you though,

3    even though you weren't involved in doing it, were you

4    in the area where those people were working and could

5    see what was happening?

6              THE WITNESS:  I was in the general area, yes.

7              THE COURT:  I've heard discussions about there

8    being drip pans where capacitors that had Pyranol in

9    them that were coming through the production process

10   where drips of Pyranol would be collected.  Do you know

11   anything about that?

12             THE WITNESS:  I've heard about it.  I've never

13   seen it.

14             THE COURT:  You didn't see it, okay.  I'm just

15   trying to know what kind of detail -- it sounds like he

16   doesn't really know a lot that's useful.  I would love

17   to know from somebody who can tell me about that, but it

18   doesn't appear that he's the one that can do it.

19             THE WITNESS:  I never had access to any of the

20   actual process areas.

21        Q.   BY MR. BIAGETTI:  Did you know anything about

22   GE's specifications for the use of Pyranol?

23        A.   No.

24             THE COURT:  I've heard some or read some

25   things that suggested that at one point at least GE had

1   a scrap Pyranol tank that was a big thousand-gallon

2   tank.  Do you know anything about that?

3           THE WITNESS:  No, I don't.

4           THE COURT:  So that would be complete news to

5   you.

6           THE WITNESS:  That's news to me.

7           THE COURT:  Do you know there was a scrap area

8   where 55-gallon drums --

9           THE WITNESS:  I am familiar with that, yes.

10          THE COURT:  You were out there?  You saw that?

11          THE WITNESS:  Yes.  As I would drive to work

12  in the morning, I could see it, yes.

13          THE COURT:  All right.  So you can tell me

14  about that part.

15          THE WITNESS:  I can tell you about that.

16      Q.   BY MR. BIAGETTI:  I think that's what we

17  should talk about then.  Before we get to where they

18  were stored in just one minute, you said you had seen

19  the drums themselves?

20      A.   The 55-gallon drums, oh, yes.

21      Q.   Did your department have any involvement in

22  buying those?

23      A.   Some of them we did.

24          THE COURT:  I'm confused.  Do you remember

25  seeing 55-gallon drums of Aroclor that would actually be

1   purchased, according to you, not by you but by some

2   directive?

3           THE WITNESS:  The other buyer, yes.

4           THE COURT:  Because I've read something that

5   suggested that it would come in like tanker truck

6   shipments of thousands of gallons, but I've also heard

7   testimony that it came in in 55-gallon drums.  Do you

8   know about that?

9           THE WITNESS:  I do know about that.  There may

10  have been -- to address your comment about big tanker

11  trucks of Pyranol, there could have been for some of our

12  larger contracts some large quantities of Aroclor, which

13  was named Pyranol for GE's brand name, but the normal

14  day-to-day low quantity orders for capacitors -- power

15  capacitors we're talking about now as opposed to small

16  industrial capacitors or electronic capacitors.  We are

17  talking about power capacitors which are typically cans,

18  cases if you will, yay big.  That material was delivered

19  to GE from Monsanto in 55-gallon drums.  They were

20  distinctive in color, and I can remember seeing the

21  drums that the new material came in.  It was our process

22  to utilize those same drums.

23          After they were empty and Pyranol was used in

24  our process, it was our practice to take the scrap

25  Pyranol and put it back into these 55-gallon drums to

1    save the cost of having to go out and purchase new drums

2    ourselves.  So that was just an economic -- the deposit

3    that we had put down for that drum from Monsanto was

4    what it cost us to store the material so -- until it was

5    purchased by Fletcher.

6           THE COURT:  I have an impression that Aroclor

7    went through some kind of a process at GE to become

8    Pyranol, that there was perhaps filtration, in certain

9    cases additives, that would make Aroclor such that it

10   was -- it complied with the specifications that GE had

11   for its capacitors.  Do you know anything about that?

12          THE WITNESS:  I don't know any of the details

13   for certain, no.  Yes, I have the same impression that

14   something was happening in the process.

15          THE COURT:  But you don't know whether, for

16   example, that processing occurred in -- within a drum of

17   Aroclor or whether it would be -- many drums of Aroclor

18   would be put into a tank, and whatever was done would be

19   mixed.  Because I don't have a good handle on that and

20   you can't help me with that.

21          THE WITNESS:  I can't help you on that.  I

22   wish I could.  I can't.  I can talk to the issue that

23   Mr. Biagetti asked about, what do I know about the

24   processes that result in having scrap Pyranol, and this

25   information has passed on to me from my predecessor, Mr.

1   Keeney, and also conversations with our facilities

2   people who are involved -- who were the people who were

3   actually involved in handling the material that became

4   quality-wise no longer valid for our capacitor

5   manufacturing process, and this is where we get into the

6   chemical analysis, constant monitoring of the chemical

7   makeup of the Pyranol during the treat process.

8           THE COURT:  This would be knowledge you

9   acquired by talking to people who were the people

10  responsible.

11          THE WITNESS:  Hands-on people; right.

12          THE COURT:  You don't have personal knowledge?

13          THE WITNESS:  I don't have personal knowledge.

14          THE COURT:  You heard other people tell you

15  this is the way.

16          THE WITNESS:  That's exactly right.

17          MR. BIAGETTI:  It's up to you, your Honor.  If

18  you want it --

19          THE COURT:  It seems like hearsay to me; so I

20  don't think we can get into it.

21          MR. BIAGETTI:  Let's move on.

22     Q.   Let's move on to something which I think you

23  did say you had personal knowledge of.  The drums

24  themselves, not the contents.

25     A.   Right.

1       Q.    You said something about the Monsanto drums

2   being used?

3       A.    Yes.

4       Q.    Explain for the Court what you meant by that.

5       A.    The material came to us from Monsanto,

6   Aroclor.  It was taken out of the Monsanto drums and put

7   in these process tanks for submersion into impregnating

8   the capacitors.  And the empty drum would be saved, not

9   discarded and not returned to cover our deposit on the

10  drums.  We would save those and collect scrap Pyranol

11  and put it in these very same drums, relabel the drum as

12  scrap Pyranol, so there was never any question that it

13  was not the Aroclor, and it was stored in a section of

14  our storage yard separate from -- separated by quite a

15  distance from where Aroclor drums from Monsanto would be

16  stored.

17      Q.    Before I get to storage, one more question

18  about those Monsanto drums that were then refilled and

19  labeled for scrap Pyranol.  What was their condition

20  1965 to 1968, if you remember?

21      A.    Excellent.  They were in very good condition.

22      Q.    Did you ever have occasion to use drums other

23  than the Aroclor drums to drum up scrap Pyranol?

24      A.    At times the amount of scrap Pyranol being

25  generated was more than we could get back into

84

1    Monsanto's drums, and when that would happen, the

2    facility organization -- this would be Mr. Moss, Mr.

3    Bramer, that group, would actually request us to

4    purchase used 55-gallon drums.  These would have to be

5    drums that we would buy from a scrap dealer that were in

6    good condition.  They couldn't be rusted, they couldn't

7    be leaking, they couldn't have damage to them.  They had

8    to be in very good condition, and my buyer handled that

9    procurement routinely.

10        Q.   And rough order of magnitude if you can

11   recall.  If not, don't guess, Mr. Clark.  During the

12   time that you were an indirect buyer and had occasion to

13   observe the drums, what proportion were the Monsanto

14   drums being reused versus the drums from another vendor?

15        A.   I can answer that fairly reliably.  It would

16   be an estimate on my part, but knowing what was

17   happening at the time, I would say that the ratio was

18   probably 70 percent Monsanto drums, 30 percent used

19   drums.  That's an educated guess, my best.

20             THE COURT:  Do you know how much Pyranol would

21   remain in a capacitor if it was properly constructed?

22             THE WITNESS:  No, I don't.  No.  I know the

23   question you asked, and I don't know the answer.

24             THE COURT:  Because I'm just doing a

25   quantitative assessment.  What you are saying is more

1    scrap Pyranol comes out of the process than clean

2    Pyranol went into the process you are telling me.

3         THE WITNESS:  Yeah, yeah, in a different stage

4    of the capacitor.

5         THE COURT:  And certainly a significant

6    portion of Pyranol remains with the product.

7         THE WITNESS:  Oh, absolutely.  It's a

8    dielectric, yes.

9         THE COURT:  So a significant portion of the

10   scrap Pyranol by definition would have to include

11   materials other than Pyranol.  It's just a matter of

12   physics; right?  You take a 55-gallon drum, you make

13   your capacitor, you collect your scrap Pyranol, there's

14   some Pyranol in the capacitor, there's more volume of

15   waste than there was Pyranol to start.  So you figure

16   out the amount of waste, how much more do you have, plus

17   how much went into the capacitor, and you can figure out

18   how much waste is in each barrel.  That makes -- I think

19   it makes quite clear the point that the scrap Pyranol

20   contained significant amounts of materials other than

21   Pyranol.  Just a matter of physics; right?

22        MR. BIAGETTI:  Significant amounts is in the

23   eye of the beholder, Judge, yes.

24        THE COURT:  He's saying 30 percent of the

25   barrels are used barrels because there are not enough

1    Pyranol barrels left to capture all the scrap Pyranol.

2    You see the mechanics of it.  You start out with ten

3    barrels of Pyranol.  You need at the end

4    thirteen barrels to collect the waste -- the scrap

5    Pyranol.  You subtract out the amount of Pyranol that

6    was actually in the capacitors, and you take those --

7    that amount and say, wow, at least three barrels out of

8    the thirteen mixed together is not Pyranol, and in fact

9    more than that is not Pyranol because we know that the

10   purpose of using this dielectric fluid is to put it into

11   the capacitor.  It's not like you soak it in it like a

12   degreaser.  The capacitor uses the Pyranol; right?

13           THE WITNESS:  It retains a portion of it.

14           THE COURT:  Yeah, that's why you put it in, so

15   that it will be retained.  It's not like it's a paint

16   coating where you put paint on the outside or it's not

17   like a degreaser where you're trying to get all the

18   degreaser off the product before you sell it.  It's a

19   product, the manufacturing of which requires a certain

20   amount of Pyranol.

21           That's what I'm taking from this testimony,

22   which is evidence that there was a significant amount of

23   non-Pyranol in the scrap Pyranol drums since as many as

24   30 percent of the barrels needed to capture it were not

25   Pyranol barrels, and GE being a careful money-making

1   company isn't going to buy barrels it doesn't need, and

2   if they could capture all of the used Pyranol in the

3   existing barrels, they would have certainly done that.

4   Okay.

5           MR. BIAGETTI:  Do you want me to comment on

6   that?

7           THE COURT:  Comment if you want, sure.

8           MR. BIAGETTI:  The only thing that analysis

9   leaves out is the evidence of the tanker trucks of

10  Aroclor that came to GE.

11          THE COURT:  Yeah, that's why I was asking

12  about that, but I got the answer, sort of rarely, not

13  from what we were principally doing there.

14          THE WITNESS:  Not from my analogy, no.

15          THE COURT:  So tanker trucks would be a rare

16  event, not the usual event; correct?  So I think that's

17  the problem with that.

18          THE WITNESS:  I want to make one more comment

19  about the purchases of used drums to augment the

20  Monsanto drums.  It was not an ongoing thing every day,

21  every week, every month.  There would be times when we

22  would have to go out and buy a quantity of empty drums,

23  used drums, okay?

24          THE COURT:  All right.

25          Q.   BY MR. BIAGETTI:  The condition of the used

1  drums that you would go out and buy during the time you

2  were there was what?  The condition of the used drums

3  that you would buy, do you remember?

4       A.    Good.  They had to be good.  That was a

5  requirement placed on our purchasing buyer by the

6  facilities people.

7       Q.    You mentioned I believe that you saw these

8  drums of scrap Pyranol stored in the yard storage; is

9  that what you said?

10       A.    Yes.

11       Q.    Can you give us a picture of what that area

12  looked like?

13       A.    Yes, I can.

14       Q.    Please do.

15       A.    There was a storage yard between our main

16  building and the Hudson River fenced in that we used to

17  store materials, incoming and outgoing.  There was a

18  section of this yard that was assigned for storage of

19  scrap Pyranol.  There were so many barrels on a pallet,

20  and it was in this one section, and everything in that

21  section was clearly marked as scrap Pyranol.  That area

22  was not fenced in separate from other areas, but it was

23  in a designated section of the yard, and that's where

24  the material always was put, and that's where our

25  purchaser would always take material from that area.

1    Q.    How did you observe that it was a designated

2    section, Mr. Clark?

3    A.    Observation.

4    Q.    What caused you to think that it was

5    designated for that purpose?

6    A.    That's where it was.  In talking to Mr. Varnum

7    I said where is your scrap Pyranol, and he said we keep

8    it right here.

9    Q.    Was that area physically separated somehow?

10    A.    By distance.

11    Q.    How much distance?

12    A.    Oh, fifty yards, a hundred yards, whatever,

13    order of magnitude.

14    Q.    You said it was -- the area where the scrap

15    Pyranol was stored was fifty to a hundred yards from

16    what?

17    A.    Any of the other barrels of either Aroclor

18    coming from Monsanto, any other chemicals; such as,

19    trichloroethylene, any of the metals that were used in

20    our process.

21    Q.    So trichloroethylene was stored on that dock

22    as well during the time you were there?

23    A.    In a separate part of the storage yard, yes.

24    Q.    Did you see it there?

25    A.    Yes, I did.

1        Q.    Did you see the drums it was stored in?

2        A.    Yes, I did.

3        Q.    What color were they?

4        A.    They were not black.  They were typically a

5    light-colored drum from my recollection, and I have

6    nothing that I can go to to refresh my memory any better

7    than that.  My impression was if they weren't yellow

8    drums, it was a color drum -- a lighter color drum than

9    Pyranol or color.

10        Q.    And what was the color of the Pyranol drums?

11        A.    Black.

12        Q.    And what was the label on the Pyranol drums?

13        A.    The original label would have been Aroclor

14    from Monsanto.  It would have been relabeled scrap

15    Pyranol by our own people.

16        Q.    And when you say it would have been, I don't

17    want you to guess.  Do you remember seeing scrap Pyranol

18    drums labeled scrap Pyranol from 1965 to 1968?

19        A.    Yes, I did.

20        Q.    What, if anything, did you know of Fletcher --

21    did you call it Fletcher Paint or Milford Paint Works?

22    What did you know it as?

23        A.    Both.

24        Q.    What did you know of the Fletcher Milford

25    business?

1      A.   That's the best identification for the

2  company.  Fletcher's Milford Paint Works.

3      Q.   What did you know of their business, 1965 to

4  1968?

5      A.   What did I know of it?

6      Q.   Yeah, what did they do?

7      A.   They manufactured paint.  I knew nothing more

8  than that.

9      Q.   Did you know what kind of paint?

10      A.   No, I did not.

11      Q.   Did you know how much paint?

12      A.   No, I did not.

13      Q.   Did you know whether or not they made

14  rubber-based paint?

15      A.   No, I did not.

16      Q.   Did you know whether they used scrap Pyranol

17  in the paint?

18      A.   Yes, I did.

19      Q.   How did you know that?

20      A.   Because all the conversations that I had with

21  the buyer that I succeeded and all of the people who had

22  hands-on experience with it who dealt with the Monsanto

23  truck driver always said he uses it in his process.

24      Q.   You said the Monsanto truck driver.

25      A.   Fletcher's truck driver.  Correction.

1    Fletcher's truck driver was always taking it to be used

2    in their process.  My conversations with Mr. Fletcher

3    himself, he always talked as we can't use any more right

4    now.

5           MS. ROWLEY:  Your Honor, we move to strike his

6    response as hearsay.

7           THE COURT:  Well, he said a lot of different

8    things there; so you have to break it out, okay?  What

9    other employees at the company told him they understood

10   it was for, there are some statements he made about

11   that, and then at the end he talked about Mr. Fletcher

12   told me that he could not use any more than that.  Are

13   you seeking to strike all of those statements?

14          MS. ROWLEY:  I believe the response he gave

15   directly to Mr. Biagetti's statements, did you know what

16   Fletcher's was doing, and he said yes, he was using it,

17   and that that was based on information he was told by

18   other people.

19          THE COURT:  Strike all of that testimony and

20   go through it again and break down what the source of

21   his knowledge is as to -- he says he knew that they were

22   using it.  Let's try to establish specifically how he

23   knew that Fletcher was using it.  There is a difference

24   between that Fletcher was using it and that Fletcher was

25   using it in paint.  In fact, we know he wasn't using it

1   in paint except in rubber-based paint products.  There's

2   testimony -- Abbe at one time said Fletcher told him

3   they used it for a defoliant.  He later backed away from

4   that statement.

5           So we've got to understand more clearly what

6   he says he knew and how he came to know what he knew

7   because there's all kinds of different testimony about

8   it.

9           MR. BIAGETTI:  Sure.

10      Q.   1965 to 1968 did you ever have an

11  understanding that Mr. Fletcher was using scrap Pyranol

12  in paint?

13      A.   Yes, I did.

14      Q.   What was your basis for that understanding,

15  just your basis?

16      A.   Statements from Bob Keeney, the buyer that I

17  succeeded.

18      Q.   Anyone else besides Mr. Keeney?

19          THE COURT:  When did Mr. Keeney tell you?

20          THE WITNESS:  December of 1965.

21          THE COURT:  So at the time he was -- he had

22  formed this belief is when he was telling you about it.

23  I'm trying to understand.  You are testifying that --

24  what's this guy's name?

25          THE WITNESS:  Bob Keeney.

1          THE COURT:  Mr. Keeney told you in the 1960s

2     that at that time it was his belief that Fletcher was

3     using it in paint.

4          THE WITNESS:  That's correct.

5          THE COURT:  Okay.  That seems to be a version

6     of the same kind of argument that you are making for

7     things that you want a statement of belief in except

8     it's different in that it's not a remembered belief but

9     a current belief.

10          MR. BIAGETTI:  Exactly.

11          THE COURT:  I'm going to overrule the

12     government's objection and admit it not for the truth of

13     what Fletcher was using it for, but because this witness

14     is testifying that Mr. Keeney had a then existing belief

15     that he relayed to this witness as to what it was being

16     used for.  So for that limited purpose, I will allow it.

17     I distinguish my prior ruling about your effort to get

18     in something by a statement of belief because that was a

19     remembered statement of belief as I saw it.  That's why

20     this one is admissible and the other one isn't.  All

21     right?

22        Q.  BY MR. BIAGETTI:  What did Mr. Keeney tell

23     you?

24          THE COURT:  I think he covered it, that he

25     believed they were using it in paint.

1       A.   He told me that Fletcher and Milford Paint

2  used the Pyranol in his business.

3       Q.   Did Mr. Keeney tell you that Mr. Fletcher was

4  using it in paint for anything else besides paint?

5       A.   No, absolutely not.

6       Q.   Any other colleague at GE who at the time told

7  you anything about Fletcher's use of Pyranol that you

8  can remember?

9       A.   Not specifically about what his use was, no.

10      Q.   Anybody outside of GE who at the time told you

11  anything about Fletcher's use about scrap Pyranol as

12  paint?

13      A.   No.

14           MS. ROWLEY:  Objection.

15           THE COURT:  Overruled.

16      Q.   Did you ever have any conversation with Mr.

17  Fletcher himself?

18      A.   Yes, I did.

19      Q.   Did he say anything to you on that subject?

20      A.   Yes, he did.

21      Q.   What did he say?

22      A.   Conversation was in January of 1968.  I had

23  called him with our concern over him stopping the sale

24  of Pyranol, from buying scrap Pyranol from us.  His

25  statement to me, I can remember he said,  I can't use

1    any more of it at this time.  I would like to use it --

2    I would like to buy more -- keep the door open and buy

3    more later, but I can't use it right now.  My inventory

4    is quite high.

5        Q.   We'll go back to that conversation later.

6             THE COURT:  While we're on the subject of what

7    people told you, I have a report, the admissibility of

8    which is subject to objection at this point, but in that

9    report prepared by GE, it reflects that Abbe told the

10   people preparing the report that he had also heard that

11   Fletcher was using scrap Pyranol as a weed killer.  To

12   your knowledge did Abbe ever tell you that at the time?

13            THE WITNESS:  No.

14       Q.   Did anybody ever tell you that Mr. Fletcher

15   was using Pyranol for anything other than in paint?

16       A.   Just paint.

17       Q.   And my colleagues remind me that I misspoke a

18   few questions ago for I'm sure not the first time.  Did

19   Mr. Keeney ever tell you that Mr. Fletcher was using

20   Pyranol in anything other than paint?  Mr. Keeney, did

21   he ever tell you that?

22       A.   No.

23       Q.   Thank you.  Do you recall GE ever shipping

24   scrap Pyranol to Mr. Fletcher?  Did GE ever send it out?

25       A.   During my time there, no other shipments were

1   made other than Fletcher's truck picking up material.

2       Q.   How would it come about that Fletcher would

3   come to the plant to pick up, do you know?

4       A.   That was a flexible arrangement.  It changed

5   from time to time.  Typically Fletcher would have a

6   pretty good idea how much Pyranol we were generating and

7   how many drums we would probably have.  So he would work

8   it out with his truck driver.  The truck driver would

9   verify with Mr. Varnum that they had at least 70 drums,

10  and when they had at least 70 drums ready for sale,

11  Fletcher's truck driver would come to Hudson Falls and

12  purchase 70 drums' worth.  Seventy drums' worth I found

13  out from Mr. Varnum is how many would get on Fletcher's

14  truck in one shipment.

15            THE COURT:  Seventy?

16            THE WITNESS: Seventy, 7-0.

17            THE COURT:  Most of the testimony I've heard

18  suggested that it would take 18 or 20 drums at a time.

19            THE WITNESS:  No, 70 is the number.

20            THE COURT:  You never saw the drums being

21  loaded on the truck?

22            THE WITNESS:  They're 55-gallon drums.

23            THE COURT:  No, I've had the drivers testify

24  what they would load, and one said 18, one said 20.

25  Have I got that wrong, counsel?

1        MS. ROWLEY:  That's correct, and Mr. Whitney

2   testified about a tractor-trailer truck yesterday that

3   would hold 70 drums.

4        THE COURT:  Yes, there was testimony about a

5   tractor-trailer truck, but in terms of the drivers from

6   Fletcher picking it up, they would go with a truck that

7   would be 18 or 20.

8        MR. COWAN:  I think the testimony also is that

9   they would make multiple trips.

10       THE COURT:  I didn't hear a lot of consecutive

11  day-to-day, but yeah, they'd go up there and get it.

12  Whenever they wanted it, they would go up and get it.

13       Q.   BY MR. BIAGETTI:  Did anybody ever tell you

14  that Fletcher was reselling the Pyranol he was buying

15  from GE?

16       A.   No.

17       Q.   Did anybody ever tell you that Fletcher was

18  disposing of the Pyranol he was buying from GE?

19       A.   No.

20       Q.   Mr. Clark, I want to show you up on the screen

21  I hope another document.

22       THE COURT:  You want the document camera or

23  the computer?

24       MR. BIAGETTI:  The document camera, please.

25       Q.   This is Defendant's Exhibit 13, a GE memo from

1    E.E. Cozzens to Mr. Fletcher dated August 31, 1967.  Mr.

2    Clark, have you seen this document before?

3         A.   Yes, I have.

4         Q.   And at around that time, August of 1967, do

5    you remember ever seeing the document?

6         A.   I recall it now, now that I've seen it.

7         Q.   Do you recall receiving it at around the time

8    of August of '67?

9         A.   Yes, absolutely.

10        Q.   There's a note which I'm going to zoom in on

11   on the left-hand side.

12        A.   November 20, 1967.

13        Q.   The copying chopped a bit of it, but I think

14   it says, gave to Al Clark for follow-up on 11/20/67.  Do

15   you see that?

16        A.   Yes, I see that.

17        Q.   Did you know who E.E. Cozzens was?

18        A.   Yes, I do.

19        Q.   Who was he or she?

20        A.   It was Elmer Cozzens.  He worked for Earl

21   Jones, and he was the accounts receivable/accounts

22   payable administrator.

23        Q.   And do you recall whether or not he gave you

24   this document around November of 1967?

25        A.   Probably did.

1      Q.    Don't guess.

2      A.    It was too long to say for certain that I

3  received it on that date.

4            THE COURT:  I appreciate your being candid

5  about it, but practically speaking, I'm going to infer

6  that you did get it.

7            THE WITNESS:  I would, too.  That's safe.

8            THE COURT:  I mean, I'm allowed to make the

9  inference.  You're not.  I'm inferring it, whether you

10  remember it or not.

11            THE WITNESS:  Yes.  Agreed.

12      Q.    In the memo Mr. Cozzens says to Mr. Fletcher,

13  we find several old past-due debt amounts in your

14  account.  He says he's enclosing copies.  He asks for a

15  check for $6,206.  Had you ever heard up until this

16  time, August of 1967, that Mr. Fletcher was behind on

17  his account?

18      A.    This was my first knowledge of it.

19      Q.    And what was your reaction to it, if you

20  remember?

21      A.    It needed to be attended to, but at that time

22  it was between the collection people for GE, Mr. Cozzens

23  and Mr. Jones, dealing with Mr. Fletcher's company.

24  There was no -- before that I was never asked to get

25  involved and try to help resolve this.

1    Q.   So from any source did you know --

2    A.   Any source.

3    Q.   -- prior to this that Mr. Fletcher was

4    delinquent?

5    A.   No, I knew nothing of the problem before this.

6    Q.   What, if anything, did you do in response to

7    learning that?

8    A.   We didn't immediately react to it because we

9    had other situations with the scrap Pyranol.  We wanted

10   to make sure we understood if there were other things

11   going wrong with the process.  What were the reasons why

12   -- we didn't know the reasons why he wasn't paying,

13   okay?  So -- but on the other hand he'd also stopped

14   picking up material.

15            There is another document that we'll get to

16   later you will see the similarity in the timing.  Middle

17   of November 1967, that's when he stopped picking up

18   material also.  And so there was too many questions,

19   there was too many unknowns to take any action at this

20   particular time.  So we deferred acting on it until we

21   had more information on what was going on with Fletcher.

22   Q.   Did you talk to your boss about it?

23   A.   Absolutely.

24   Q.   What did you say to him?

25   A.   I'm confused.  We've got to do something about

1   it, but not right now.

2        Q.   Why did you say not right now?

3        A.   Because of the dual objectives of selling the

4   used Pyranol.  We didn't want to jeopardize that.  We

5   wanted to make sure that -- find out if this was a

6   temporary situation in his cash flow for Fletcher as

7   opposed to a more serious problem with Fletcher's

8   ability to pay.  We wanted to make sure we didn't do

9   anything that would jeopardize the customer relations

10  that we had set up between GE and Fletcher's, and so we

11  said we will proceed but proceed with caution.

12       Q.   Did you have a view at the time of whether a

13  $6,000 debt was a big one, a small one, a medium one for

14  GE?

15       A.   At the time it didn't sound like a large

16  amount, but also at the same time I had no idea

17  historically how much we had been selling to Fletcher in

18  the past.  So I couldn't say if it was 15 percent or

19  50 percent or 75 percent of the total business with

20  Fletcher.  It sounded like it was a small amount of

21  money to me.

22       Q.   Did you eventually follow up on Mr. Cozzens'

23  request?

24       A.   Eventually I did, yes.

25       Q.   What did you do?

1      A.   We were getting -- as I said, the last sales

2   to Fletcher occurred middle part of November 1967.  We

3   were continuing to generate scrap Pyranol, and it was

4   actually building up at a steady rate, and that means

5   purchased by Fletcher.  In probably I can pretty well

6   conclude that it was January of 1968 that the problems

7   of selling future sales to Fletcher and the unpaid

8   shipping memos, I had talked to Mr. Fletcher about these

9   two problems together.  I called Mr. Fletcher January --

10  sometime during January of 1968, and I talked about the

11  fact that he hadn't been picking up, buying from us --

12  picking up and buying from us any Pyranol since the

13  middle of November and was curious as to whether there

14  was a problem with his taking this material and buying

15  more of it.  And it was at that time that he mentioned,

16  I've got -- my inventory is quite high.  I can't use any

17  more at the present time.

18       On the same conversation though I said -- I

19  reminded him, I said, now, you've been contacted by our

20  accounting people informing you of -- do you know about

21  your unpaid bills approaching $7,000, and he said, yes,

22  I know about that.  And I said, well, we need a

23  resolution on both of those issues, and he said he would

24  get back to us.  He had no immediate response.  He

25  didn't have any course of action that he could share

1   with me.  He said, I will think about it and I will get

2   back to you.  That was the conversation in January 1968.

3       Q.   Do you remember -- you said you were

4   addressing really two issues with him.  Do you remember

5   the sequence?  Did you talk about the fact that he owed

6   money first or later?

7       A.   No, just the opposite.  I talked about his

8   buying more Pyranol first.

9       Q.   Why is that?

10      A.   To us, my manager, myself, the most urgent

11  item to address was resuming the sale of Pyranol.

12      Q.   Why?

13      A.   It was building up.  We were running out of

14  room.  We needed the room, and it was a method of

15  generating some additional money, but it was really the

16  space as the business pressure to have him come and buy

17  more material.

18          THE COURT:  Let me just run by you my take on

19  this and tell me whether you think I'm off base, okay?

20  At the Hudson Falls plant and the other plant, GE was in

21  the business of making capacitors.  The profit it was

22  going to make from that business was through the sale of

23  capacitors.

24          THE WITNESS:  Correct.

25          THE COURT:  While it's good to make money

1    selling scrap Pyranol, the amount of money that GE can

2    make selling scrap Pyranol is a tiny, tiny fraction of

3    the money it makes selling capacitors.

4          THE WITNESS:  Very low.

5          THE COURT:  The business of GE is going to be

6    best furthered by making sure that an inventory of scrap

7    Pyranol doesn't continue to build up.  So GE's primary

8    motivation there is to get rid of the scrap Pyranol, and

9    to the extent they can make money doing so, great.

10         THE WITNESS:  That was just a byproduct.  That

11   was nice.

12         THE COURT:  Is my take on that about right?

13         THE WITNESS:  Perfect, perfect, exactly right.

14   And the discussion on the $7,000 was at the end of our

15   telephone conversation.  It was a sort of a, oh, and by

16   the way, we can't forget about it, you know.

17     Q.   BY MR. BIAGETTI:  What was the benefit to GE

18   of the arrangement with Mr. Fletcher, the benefits?

19     A.   The benefits of the arrangement?

20     Q.   Yeah.

21     A.   Both companies benefitted by it.  It was an

22   economical way of disposing -- and I will use that word

23   not to be confused with throwing away, but disposing of

24   it and moving it off our premises to a company who had a

25   use for it.

 1          THE COURT:  Your use of disposal is the way

 2     most people understand disposal.  From GE's perspective

 3     you wanted to get rid of it.  It wasn't that you

 4     necessarily wanted to put it in the ground.

 5          THE WITNESS:  Right.

 6          THE COURT:  In fact, if you could sell it for

 7     use, that would be all the better, but your primary

 8     motivation was to get rid of it.

 9          THE WITNESS:  Get rid of it, move it off our

10     premises so that we could get on with the business of

11     manufacturing capacitors.  But the arrangement that was

12     set up in 1954, '55, and '56 was perfect because he

13     could use that material, and he was willing to pay $3.75

14     for every drum that he purchased.

15     Q.   BY MR. BIAGETTI:  Do you remember having any

16     understanding that Mr. Fletcher was going to dispose of,

17     discard the material?

18     A.   No.  He would never have -- logically he would

19     not have paid to buy material and then throw it away.

20          MS. ROWLEY:  Objection.

21     A.   So logically it didn't make any sense to even

22     consider it.  Never even thought about it.

23          THE COURT:  I will take the testimony for what

24     it's worth, okay?  I think there is a different logical

25     calculus that I'm inclined to engage in based on what

1   I've heard so far, but I will certainly hear the

2   witness's interpretation.

3       Q.   I'm interested, Mr. Clark, in what you recall

4   of your analysis at the time.  Is that what it was, what

5   you just explained?

6       A.   Yes.

7       Q.   You told us a little bit already about the

8   call to Fletcher and the conversation with Fletcher and

9   what he said.  Did he in the conversation ever complain

10  about the quality of any of the Pyranol he had gotten?

11      A.   He never said anything about any concerns

12  about the quality.

13      Q.   Have you ever heard a concern from him

14  directly or indirectly before that?

15      A.   None.

16      Q.   Did you ever hear from Mr. Fletcher after that

17  call?

18      A.   I received a letter that he wrote to me.  The

19  date of the letter was --

20      Q.   We'll show it to you.

21      A.   -- February 16th.  Yes, that's the letter.

22      Q.   This is a letter from Fletcher's Milford Paint

23  Works.  On page two we have a signature that appears to

24  be that of Frederic Fletcher to Mr. Clark here of the

25  salvage department.  Is this the letter you are talking

1  about?

2        A.   This is the letter.

3        Q.   Were you in the salvage department?

4        A.   No, I was not, but the letter got to me

5  because my name was on it and it was received in

6  purchasing.

7        Q.   Do you remember reading it?

8        A.   I read it.  At the time I read it -- received

9  it and read it and -- yes, I read it.

10       Q.   Do you remember what your immediate reaction

11 to it was?

12       A.   Disbelief, part of it.  The setting up of the

13 history of the relationship between Fletcher's Paint and

14 General Electric was -- as I had been told from Mr.

15 Keeney, that we did have a long-term good relationship

16 with the sale of this material to Fletcher's Paint.

17            THE COURT:  Let's be clear about this.  Your

18 knowledge about that is secondhand.  It's what other

19 employees told you about this long-term relationship.

20 Did you work with Mr. Metevier, for example?

21            THE WITNESS:  No.

22            THE COURT:  Mr. Metevier was the one that had

23 the relationship with Fletcher's and, for example, I've

24 heard testimony that the relationship was good because

25 Mr. Metevier would make adjustments and not charge

1    Fletcher for barrels that would not be usable by

2    Fletcher.  You don't have any personal knowledge of

3    that; right?

4            THE WITNESS:  No.

5            THE COURT:  You don't know whether that's true

6    or not true.

7            THE WITNESS:  I can't say.

8            THE COURT:  Okay.

9       Q.   BY MR. BIAGETTI:  Any other reasons that you

10   say your immediate reaction was disbelief?

11      A.   Because as we talked about before and as I

12   testified, there had been no indications of any problem

13   from a quality point of view for this material.  This is

14   the very first time that any of the quality issues have

15   been raised and communicated to anyone from GE.

16      Q.   Well, he says in the second paragraph to you,

17   about two or three years ago something happened or shall

18   we say a variety of things happened.  That's from 1965

19   to 1968, the time you were there.  Do you recall

20   anything happening to the scrap Pyranol?

21      A.   No, just the opposite.  The processes during

22   all that time remained exactly the same as they had for

23   the ten years before that.

24           THE COURT:  Do you know the difference between

25   Pyranol 1 and Pyranol 2?

1          THE WITNESS:  No, I don't.

2          THE COURT:  Well, they did change the Pyranol

3   during that period from Pyranol 1 to Pyranol 2, which

4   did change the formulation of it.  But you don't have

5   any knowledge of it.

6          THE WITNESS:  I have no knowledge of it.  To

7   me it was scrap Pyranol.

8     Q.   BY MR. BIAGETTI:  One of the things that Mr.

9   Fletcher says here is that the drums the Pyranol was

10  shipped in were reasonably clean and not badly

11  contaminated, but that one of the things that happened

12  was that you put the Pyranol in badly contaminated

13  drums.  Do you remember any change in the drums during

14  the time that you were at the indirect buying

15  department?

16     A.   Not in the drums that I knew that we were

17  providing, no.

18     Q.   He mentions drums one-quarter and one-half

19  full.  Do you remember anything on that subject prior to

20  this?

21     A.   No.

22     Q.   Or drums that were more than half water?

23     A.   No.

24          THE COURT:  If there were a problem -- because

25  you weren't out there inspecting the scrap Pyranol;

1   right?

2           THE WITNESS:  No, I wasn't.

3           THE COURT:  So you don't know anything about

4   the scrap Pyranol based on personal knowledge as to

5   whether it was pure, high grade, contaminated.  You have

6   no knowledge of that.

7           THE WITNESS:  It was scrap.  It had gone below

8   the acceptable level of chemical composition that would

9   make a capacitor work.  That's all I knew.

10          THE COURT:  And you wouldn't be out there at

11  the loading dock when Fletcher's people would come to

12  get it.

13          THE WITNESS:  I never was.

14          THE COURT:  So if there's testimony about them

15  coming out at some point testing -- actually sampling

16  drums to determine -- with a hydrometer to determine the

17  specific gravity, you don't have any knowledge of that?

18          THE WITNESS:  No, I don't.

19          THE COURT:  And if there were a person who

20  Fletcher would complain to directly about a problem,

21  would that be you or would he talk to Mr. Varnum or

22  before Mr. Varnum, Mr. Metevier?

23          THE WITNESS:  He would talk to Mr. Fletcher

24  about it.  Mr. Fletcher would call me.

25          THE COURT:  So your practice was it was not

1   Mr. Varnum who talked to Fletcher.

2          THE WITNESS:  If he calls Mr. Varnum and

3   talked about a problem, Mr. Varnum would have to get me

4   involved immediately because that was the role that I

5   played, was making sure that that contract, the

6   agreement, was administered fairly between the two

7   companies.

8          THE COURT:  And so your position is that

9   during the entire time you worked there until this

10  letter came to your attention, not one complaint was

11  made to you by Mr. Fletcher, and Mr. Varnum did not

12  relay any complaints to you?

13         THE WITNESS:  That's the statement.

14         THE COURT:  And that's what you know.

15         THE WITNESS:  That's what I know.

16         THE COURT:  Okay.

17     Q.   BY MR. BIAGETTI:  And given the course of your

18  job responsibilities at the time, if there had been such

19  a problem connected to payment, would you have heard

20  about it?

21     A.   Yes, I would have.

22     Q.   Mr. Fletcher also says to you in this letter

23  that some other trucker who you evidently called has

24  been hauling to us.  Do you recall that ever happening

25  1965 to 1968?

1       A.   It never happened.  I never did it.

2       Q.   Did you have a belief at that time as to why

3   Mr. Fletcher was saying these things in this letter?

4       A.   To avoid paying $7,000.

5       Q.   On the second page of the letter he makes a

6   proposal to you.  He says, we are willing to negotiate a

7   settlement of what is owed or we are willing to go

8   through all these drums with your chemist present.  Did

9   you see that?

10       A.   I see that.

11       Q.   Did you have a reaction to that proposal?

12       A.   Yes, I did.

13       Q.   What was it?

14       A.   Without knowing how much a chemist's time was

15   worth or not knowing how much other work would have to

16   be put on hold to get a chemist to come up to Milford,

17   my reaction was it would be more, more expensive to us

18   to go along with this proposed settlement than to just

19   not collect the $7,000.

20       Q.   Did you have any idea at the time of how long

21   it would take a chemist to go through what Mr. Fletcher

22   says was 1,800 to 2,000 drums?

23       A.   I talked with Abbe about this letter and we

24   sort of concluded in our conversation -- we were

25   probably talking a week's time, travel up there, a few

1    day's working with Fletcher's people, and in return we

2    saw a week of lost time for the chemist at least.

3        Q.    And on this same page, Mr. Fletcher says since

4    your man has been hauling, you have apparently been

5    loading everything on God's green earth on the truck.

6    Did you see that?

7        A.    I see it.

8        Q.    Did you believe that to be true at that time?

9        A.    Absolutely not.  I did not believe that could

10   be happening.

11       Q.    What, if anything, was your belief about the

12   quality of the Pyranol that had been sent to Mr.

13   Fletcher?

14       A.    It was the same as he had been buying right

15   along.  None of our processes changed.  The drums that

16   the material was put in were either the Monsanto very

17   good drums or our very good drums that we bought used.

18             THE COURT:  Can we break for lunch now, and

19   why don't we start up again at 1:30.  So you can take a

20   break now, and if you could just walk out of the

21   courtroom for a minute, I wanted to talk to the parties

22   about something.  Thank you, sir.  Come back at 1:30,

23   please.

24             (Witness left courtroom.)

25             THE COURT:  I'm not sure what conclusion you

1   want me to draw from this.  I think you're asking me to

2   say, to think that this letter is posturing to try to

3   receive a favorable settlement of the debt that was owed

4   to GE; right?

5           MR. BIAGETTI:  At least that was GE's

6   understanding at the time.

7           THE COURT:  And I understand that that would

8   be posturing, but it's hard for me to figure out -- I

9   mean are you saying that he made up a totally false

10  claim that GE was sending stuff to Fletcher?  Because he

11  would have to be the most irrational negotiator in the

12  world to try to settle a debt by making such an

13  outrageously false claim.  He would be much better off

14  making a claim:  The stuff you are giving me is junk and

15  you've changed your practice.

16          I can see him making that kind of totally

17  false claim, but I can't see him making up a claim about

18  a verifiable fact that the parties could not possibly

19  dispute about whether or not the stuff was getting to

20  Fletcher by a Fletcher driver or by somebody else.  I

21  mean, put yourself in Fletcher's position and say, okay,

22  I'm doing what counsel says.  I'm trying to cook up a

23  plan to force GE to write off this debt.  So what I'm

24  going to do is, even though we have been picking the

25  stuff up, I'm going to lie about that.  I'm going to say

1   GE has been sending it to us.

2            That's just insane.  He would never say that;

3   right?  Is it reasonable to assume that rational people

4   don't act in an insane way?  I think that's -- when I

5   try to find facts, that's what I assume.  Mr. Fletcher

6   didn't appear to be insane as far as I know, rational

7   businessman.  Okay?  I can see him, I can picture him

8   doing what you're saying.  I've got to get this debt

9   written down.  I'm going to do whatever it takes to get

10   the debt written down.  But I see him doing rational

11   things like making a claim, even if it's exaggerated,

12   that this is all junk.  I don't see him making a claim

13   that you've been sending us this stuff when, in fact,

14   he's been sending his man up to pick it up.  And that's

15   what you're asking me to believe, and that sort of

16   defies reality.  This guy is clearly wrong about it.

17            MR. BIAGETTI:  No, I'm not asking you -- it's

18   not irrational to make a mistake, Judge.  He could have

19   been mistaken about which drums of Pyranol he was

20   talking about.

21            THE COURT:  No, no, I'm talking about the

22   letter says -- I don't have it in front of me.

23            MR. BIAGETTI:  Yeah, your man was hauling.  He

24   could be mistaken about that.  He says in the next

25   sentence, unknown to me.  This has been going on for a

1    long time.  This man -- the evidence from Mr. Hooper is

2    that this man was buying Pyranol from several sources.

3    So he could well be mistaken.

4            THE COURT:  Okay.  Not lying then, not lying

5    for leverage purposes, just mistaken.

6            MR. BIAGETTI:  Just mistaken, of course.

7            THE COURT:  That's at least theoretically

8    possible, but given the nature of the Fletcher

9    operations where he had four or five employees, he knows

10   if he's sending his man up there to get stuff from GE or

11   not.

12           On the other hand, do you have evidence that

13   GE was sending stuff at this time?

14           MS. ROWLEY:  Your Honor, it's evidence that a

15   separate independent contract truck, not a Fletcher's

16   truck, was driving to get the material from GE and

17   delivered.

18           THE COURT:  Is that this bigger truck that you

19   were talking about?

20           MS. ROWLEY:  That Mr. Whitney spoke of, that

21   Mr. Racicot spoke of.

22           THE COURT:  It was not a Fletcher truck, but

23   that Fletcher was paying for it?

24           MS. ROWLEY:  I believe that's the evidence.

25           THE COURT:  Well, then why would Fletcher make

1    a statement that your man was delivering it?

2         MS. ROWLEY:  We just don't know.  I mean, this

3    is the only statement we have about this in the record.

4    I mean, it's possible both things happened.

5         MR. COWAN:  I'm not sure that the record will

6    reflect that, Judge.  We have now had testimony from Mr.

7    Hooper and Mr. Whitney.  I believe both testified about

8    a gentlemen by the name of Ted Madsen; both believed

9    that he was hired by Fletcher to transport materials to

10   Fletcher.  That's in the record in this case from the

11   mouths of those very gentlemen who were at there.

12        THE COURT:  Do you dispute that?

13        MS. ROWLEY:  No.

14        THE COURT:  So the best evidence is that it

15   was not Fletcher and it was not GE.  It was a contractor

16   hired by Fletcher, and what you want me to assume is

17   that that statement is a mistake by Fletcher.

18        MR. BIAGETTI:  You may draw that inference,

19   sure.

20        THE COURT:  But I'm asking -- normally you

21   want me to draw inferences from facts.  That's why you

22   elicit them.  Just tell me what you want me to conclude.

23   I want you to conclude, Judge, that this was all

24   posturing and that there was no problem with the drums

25   and that everything in here is false or mistaken.

1    That's the addition which I wasn't gathering and you

2    asking me to say that that statement was mistaken on

3    Fletcher.

4            MR. BIAGETTI:  We, again, your Honor --

5            THE COURT:  And the evidence would tend to

6    support the view that it is mistaken.  That's what I'm

7    trying to find out.

8            MR. BIAGETTI:  Yes, that's what I'm urging.

9    And, again, Judge, all for the purpose that the

10   burden -- there's no burden on GE of any kind, but

11   certainly there is no burden to figure out what was true

12   back at Fletcher.  It's to understand what GE's state of

13   mind was once they received this letter.  He says

14   disbelief --

15           THE COURT:  If you think that's all that's

16   useful for, you are not seeing the case the same way I

17   do.  It's highly useful in trying to make an assessment

18   of what was the nature of the scrap Pyranol that was

19   going from GE to Fletcher, because that's a very

20   important fact in determining what GE knew and intended

21   when it entered into this arrangement.

22           I guess I haven't made any secret of the model

23   that I'm trying to falsify here.  My approach is you

24   make an assertion about what happened.  You make an

25   assertion about what happened.  I say there's a possible

1    middle ground about what happened, and when I try to go

2    through the evidence and I try to falsify every possible

3    explanation, that's the way I go about finding facts is.

4    People say something happened, and I start from the

5    premise that it didn't, and I see if I can demonstrate

6    that it didn't.  And if I can demonstrate that it

7    didn't, then I've falsified it and I can rule that out.

8    If I can't demonstrate that it didn't, then I possibly

9    have to accept it as a fact.  Then I have to weigh what

10   are the other possible interpretations of the facts?

11         So I've gone about looking at this in the way

12   what I think of as the three models of how the evidence

13   could be interpreted, and I'm trying to determine -- I'm

14   trying to falsify any of those models.

15         To the extent the government started telling

16   me that there was no market for this material, it was

17   never used, it was all junk from the beginning, I think

18   I've falsified that model.  It's not true.  There was a

19   market for this stuff.  It was a limited market.  He did

20   use some of it.  He used a little of it.  He did sell

21   some of it.  It was small in proportion to what he took

22   into the site.  So the government's contention otherwise

23   is false.

24         Your argument that it was an arrangement for

25   use of the entire quantity of Pyranol shipped and that

1    was how it was understood by GE remains a potentially

2    viable model, and it has to be tested against the

3    alternative model which is that this was a case in which

4    GE well understood and intended that this stuff would be

5    gotten rid of through an arrangement in which large

6    quantities of it would be taken and only certain

7    quantities of it could be used in another product, and

8    the balance would be disposed of and that that's what

9    they understood and intended.

10          Those seem to be the two remaining viable

11   models, and I'm trying to look at that, and on

12   determining which of those two models is right, it's

13   very important to me to know what was the quality of the

14   Pyranol being shipped.  Because if it was very highly

15   contaminated Pyranol -- because, again, here's how I'm

16   thinking of it tentatively.  To the extent there was a

17   market for Pyranol for a use that didn't involve

18   disposal, because there might have been a market for use

19   as a dust suppressant or a defoliant, but those are

20   disposed of within the meaning of CERCLA.  You use it as

21   a defoliant.  You put it on the ground as a dust

22   suppressant.  You are disposing of it.  So those -- what

23   may have been a use for those purposes, but those are

24   disposal uses.

25          There was a market for the use of Pyranol and

1    it was as an Aroclor substitute.  An Aroclor

2    substitute -- it couldn't be substituted for use as a

3    dielectric fluid because if it could, GE would have done

4    it, and the fact that it didn't suggests that there

5    isn't a market for that.  So then you ask what is the

6    market for this?  It is a market as an additive to

7    certain kinds of paint and paint-like products as an

8    elasticizer or an extender, and the market for that is

9    when it can substitute for Aroclor.

10           Aroclor sells for between 3 and $4 a gallon.

11   Pyranol is being acquired by Mr. Fletcher for 1/50th of

12   the price of Aroclor, less than 1/50th of the price, and

13   so what can we say about that, about the understanding

14   about what GE understood about this product?  That's an

15   important fact to me.

16           MR. BIAGETTI:  Yes.

17           THE COURT:  It's an important fact to know

18   something about how contaminated was this product?  It's

19   important to know what was the market for Pyranol as an

20   Aroclor substitute?  It's important to know what did GE

21   do with the other Pyranol that it didn't give to Mr.

22   Fletcher?  Because if there were any kind of significant

23   market for this product and GE -- GE, because they are a

24   sophisticated business company, can understand -- if

25   there's no one else who's willing to buy Aroclor

1    contaminated into Pyranol, Aroclor-contaminated Pyranol

2    -- excuse me, Pyranol contaminated, for anything more

3    than 1/50th of the price, and even at that price we

4    aren't able to find anybody other than Fletcher, the

5    market for this is pretty limited?  And why is it?

6           If you are able to sell Aroclor at 3.94 a

7    gallon, but you can only sell the contaminated Pyranol

8    at less than 1/50th of the price, it's because it can't

9    all be used.  Only some small amount of it can

10   potentially be productively sold as an Aroclor

11   substitute, otherwise the price that GE would be able to

12   charge for the Pyranol would be much higher.  It's just

13   a matter of basic economics.  Or there would have to be

14   some kind of substantial treatment of the Pyranol in

15   order to make it viable as an Aroclor substitute,

16   otherwise the price would be different. It's basic

17   economics.

18          MR. BIAGETTI:  I respectfully disagree, or the

19   testimony of the GE witnesses is true.  You heard Mr.

20   Abbe say yesterday, I thought it was wonderful that we

21   found an exceptional situation, somebody who had figured

22   out a way to use scrap Pyranol.  This was -- they tried

23   to find out this.  This was the only one they found.

24   And if that is true, and whatever the fancy word is

25   monopsony, you know, market of one buyer, then it was a

1    great price that GE was getting because they didn't have

2    anybody else to buy it.

3         THE COURT:  Yeah, but there are two competing

4    interpretations.  One is that GE understood exactly from

5    that deposition excerpt I had, that he would use some of

6    it and get rid of the rest of it.  That's what one of

7    those witnesses testified to he understood, and your

8    view is they understood they would use all of it.  And

9    that's what I'm trying to evaluate, those two competing

10   models, because I've rejected the government's model

11   that he never intended to use any of it.  It was just a

12   crazy thing where he tried to buy it and maybe he hoped

13   he had some use for it.  The government's own evidence

14   undermines that view.  He was clearly using it for some

15   purpose, some of it, and the question is did GE

16   understand and intend at the time of the transaction

17   that he was going to use all of it, or did GE understand

18   and intend, as one of the witnesses testified, they'd

19   use some of it and the rest of it they would dispose of.

20        MR. BIAGETTI:  He said it could be disposed

21   of.  Could I make just two points about the letter and

22   your comments and then I realize we need to take a

23   break.  If you are going to, Judge, infer from the

24   letter, Defendant's 15, anything about the quality of

25   the Pyranol that was actually shipped to Fletcher,

1    that -- I don't need Mr. Clark for that.  That's defined

2    by Fletcher's own actions.  Remember the three years

3    that Fletcher is talking about here are the Varnum

4    years, the years when Mr. Hooper says we were testing at

5    Fletcher because we knew Varnum was going to say if you

6    take it you are testing at GE.

7              THE COURT:  See if you can help me with this.

8    I may have the sequencing of this wrong.  What we had

9    was the Metevier years; right?

10             MR. BIAGETTI:  Until '64.

11             THE COURT:  And Hooper's testimony on that was

12   we took it all and Metevier made allowances for the bad

13   barrels.

14             MR. BIAGETTI:  Occasionally bad barrel.

15             THE COURT:  I don't know about occasional but

16   Hooper testified quite a lot of it was quite low

17   quality.  That's my recollection.

18             MR. BIAGETTI:  But some was thin, which we

19   knew Fletcher could sell to Webtex.  Go ahead.

20             THE COURT:  In any event, I will get into that

21   in the closing argument part.

22             And then there were the Varnum years, and a

23   problem started developing because Varnum wouldn't cut

24   deals and made him pay for every barrel, which caused

25   him to stop paying, which caused this letter to be

1   generated, which caused testing at Monsanto, which

2   confirmed that a lot of the stuff was junk, and then the

3   relationship of the testing went on after that.  Do I

4   have the sequence wrong?

5           MR. COWAN:  Yes, your Honor, you do,

6   respectfully.

7           THE COURT:  Okay.  That's what I want to know.

8   You're saying that before this letter was written, there

9   was testing.

10          MR. BIAGETTI:  Oh, yes.

11          THE COURT:  That doesn't make sense to me

12  because then why would he take -- if he was looking at

13  it and taking it, why wouldn't he just disclaim the

14  barrels right at the site?

15          MR. BIAGETTI:  And that's why he's lying.

16  That part he is lying about it.

17          THE COURT:  Wait, wait.  Just tell me, do you

18  agree with them that I have the sequencing wrong and

19  that the hydrometer testing all occurred before this

20  letter was written?

21          MR. FLYNN:  I agree, yes.  When Varnum took

22  over, the testing started.  Varnum retired in '66, and

23  what we have here is we have testimony that non-

24  Fletcher drivers were picking it up.  Whether they were

25  hired by GE or Fletcher, I admit is a confusing point,

1  but they were non-Fletcher drivers.  We have that pretty

2  clear.

3            THE COURT:  Wait, wait.  I got the Metevier

4  part down.

5            Varnum, what I thought happened was we had

6  non-Fletcher drivers taking.  There was no testing of

7  what we were getting.  We were getting a lot of junk.

8  We wrote a letter and didn't pay and wrote a letter to

9  complain about it.  Then we started sending our own

10  people there, and when we did, we tested it.

11            MR. FLYNN:  The sequence is a little different

12  in our understanding.  During the Metevier years our

13  understanding is the same as your Honor's.  The bad

14  stuff was compensated by better stuff.  Then Varnum took

15  over and he said no more of that.  So at that point

16  Fletcher drivers went in and did the testing.

17            THE COURT:  When were the non-Fletcher drivers

18  coming?

19            MR. FLYNN:  That's what we are coming to, your

20  Honor.

21            THE COURT:  You're saying that came after the

22  Fletcher drivers?

23            MR. FLYNN:  Yes.  Fletcher drivers started

24  testing.  Varnum retired in '66.  This letter is '68.

25  It talks about the preceding --

```
 1              THE COURT:  Oh, okay.  That makes sense.

 2              MR. FLYNN:  This paragraph makes perfect sense

 3    if you --

 4              THE COURT:  Wait.  Let me speak it back to you

 5    to save time.  If I understand your position, it is then

 6    that Fletcher was correct that insofar as he was saying

 7    that our drivers aren't bringing the stuff anymore.  He

 8    was wrong that it was your guy when in fact it was his

 9    independent contractor who wasn't doing testing and

10    therefore was taking everything that was submitted.

11              MR. FLYNN:  That's our view.

12              THE COURT:  So there are three periods that

13    matter prior to this letter.  Period one is Metevier.

14    Period two is Varnum in which there was hydrometer

15    testing.  Period three is post-Varnum, independent

16    contractor trucker, no testing, taking everything.  Do

17    you agree or disagree with that sequence?

18              MR. COWAN:  If I may, Judge?

19              THE COURT:  Yes.

20              MR. COWAN:  Respectfully, I disagree for this

21    simple evidentiary fact.  There's no evidence of that.

22    What the evidence is is that, if his Honor believes Mr.

23    Hooper, that in the Metevier years where there were thin

24    drums, his description, and occasionally some drums he

25    didn't know what was in them, and we don't know either.
```

1    Mr. Metevier would, as a good customer does, make up for

2    it.  Then Mr. Hooper told us uncontroverted, when Mr.

3    Varnum took over that stopped.  We had to test every

4    drum.

5              THE COURT:  I think they agree with that.  So

6    far you are in agreement with them.

7              MR. COWAN:  We agree with them, but then the

8    government has made a leap that there is no evidence in

9    this case that they can point to.  They suggest that

10   that has changed when Mr. Varnum left, but Mr. Hooper

11   said that became the new policy and practice.

12             THE COURT:  All right.  I will go back and

13   read the testimony.  I will ask my reporter to e-mail me

14   an unedited transcript of Hooper's testimony.  I will

15   read it this afternoon, and the other witness -- what

16   was the witness's name?

17             MR. FLYNN:  Whitney.  Actually this witness,

18   too, was describing a truck size that was bigger than

19   the truck that --

20             THE COURT:  The 70-barrel trucks which are not

21   what was being driven.  So there is a lot to support the

22   idea that there was a third phase involving larger

23   trucks, and I will just go through the evidence on that

24   point.

25             MS. FISKE:  And you will hear, your Honor,

1   that Mr. Hooper testifies that he doesn't remember ever

2   going after Mr. Varnum had retired.  He never remembers

3   going there.

4          THE COURT:  I will look at the testimony on

5   that point.  I now have the temporal sequence correct.

6   So your view is the only evidence to support the view

7   that from the start of Varnum till this letter, that

8   Fletcher was picking the stuff up on his own and testing

9   it on his own.  There's no evidence to support his

10   conclusion that there was a period post-Varnum where

11   Fletcher was not testing.

12          MR. COWAN:  That's right.  That's our

13   position, and our position with due respect to Ms.

14   Fiske, Mr. Hooper has testified that he made trips to GE

15   to purchase or collect materials purchased from GE for

16   Mr. Fletcher into the seventies, and he has said -- you

17   put it all together, Judge, Varnum comes on line, we had

18   to test every drum.  Most importantly, your Honor, he

19   said when our tests determined that they didn't have in

20   those drums what we wanted, they stayed in Hudson Falls

21   and Ft. Edward.  They never left.

22          THE COURT:  I understand.  It's just a

23   question of did that continue -- the only dispute

24   between you on this point is whether after Varnum left,

25   there was a third phase in which Fletcher drivers were

1    not picking up the drums.  There's no evidence that

2    Fletcher had a 70-drum truck.

3            MR. FLYNN:  Correct.

4            THE COURT:  Your witness is telling about

5    70-drum transports, and there are some other references

6    to this contractor in the testimony, and I will have to

7    weigh that against what you are saying that the evidence

8    simply won't support that conclusion.

9            MR. FLYNN:  That's right.  Your Honor, I just

10   want to clarify the Hooper testimony that counsel is

11   referring to.  That was tied into his memory about his

12   gallbladder where he was subsequently thinking maybe it

13   wasn't 1970s, and that will be in the trial transcript.

14           THE COURT:  Yeah, I will look at all the

15   evidence.  You can argue it in closing argument.  That's

16   one point on which you guys differ, and I'm glad that I

17   got the chronology clarified so I can evaluate the

18   competing evidence on that point.  Perhaps because of

19   the difference between you, I ended up being somewhat

20   confused about the exact sequencing of that third phase,

21   and I had tried to reconcile it by saying that third

22   phase must have come after this letter.

23           Let me just clarify.  After this letter do the

24   parties agree there continue to be shipments of Pyranol

25   to the site?  Does the government say there were

1  shipments?

2           MS. ROWLEY:  No, we say the shipments stopped

3  in 1967.

4           THE COURT:  Do you say there were shipments

5  after that date?

6           MR. BIAGETTI:  Yes.

7           THE COURT:  That's the thin.  I think we have

8  disagreement about that.  So you say there were

9  continued shipments of Pyranol after this letter; right?

10  So you are going to have to marshal your evidence on

11  that point to support that.  Do you have shipping

12  records or payment records that support that?

13          MR. BIAGETTI:  No.

14          THE COURT:  What's the evidence you have that

15  there were continued Pyranol shipments after that?

16          MR. BIAGETTI:  Recollections of the witnesses,

17  Hooper from Fletcher's side, Abbe on the GE side.

18          MR. FLYNN:  Your Honor, we have admitted

19  yesterday or this morning part of Siebels' affidavit

20  that specifically lists GE's view of when the last

21  shipments are, and it doesn't go into 1968.

22          THE COURT:  All right.  But that doesn't mean

23  that they can't today argue something different.  At

24  most that would be an admission.  It doesn't mean that

25  they are barred from saying, well, we've got a better

1    set of records now and we understand something

2    different.

3           MR. BIAGETTI:  Those were records of amounts

4    that were past due which were the amounts through

5    November '67.

6           THE COURT:  It's kind of interesting that they

7    are the ones saying we ship more to it than you guys

8    think, but I will evaluate that.

9           MR. BIAGETTI:  Again, my very last point, the

10   second thing I think I heard your Honor saying he may

11   take this stuff that this witness speaks to directly,

12   and that is, whether or not it can be used -- not can be

13   used, but whether or not it's enough for the U.S. to

14   meet the burden that GE receiving this letter meant that

15   they must have known that disposal by Fletcher was

16   substantially certain to occur, and so this man's

17   testimony, Mr. Abbe's testimony, in fact, that GE

18   disbelieved --

19          THE COURT:  I'm inferring that GE knew what it

20   was shipping to Fletcher.  It knew what it was shipping

21   to Fletcher and the quality of the Pyranol.  I think it

22   attributes a kind of a lack of diligence to GE that is

23   just untenable to suggest they had no idea what was in

24   the drums they were shipping to them.  It knew what was

25   in the drums it was shipping to them.  The dispute is

1    about what was in the drums that they were shipping, not

2    what did GE know.  Whatever was in those drums, it knew

3    what it was shipping.

4            MR. BIAGETTI:  We believe what GE knows and

5    believes about what was in those drums is central.  What

6    was in them is probative of that.

7            THE COURT:  Do you contend that GE didn't know

8    what was in the Pyranol that it was shipping to

9    Fletcher?

10           MR. BIAGETTI:  No.  GE knew it was Pyranol

11   that did not meet its very demanding --

12           THE COURT:  It knew more than that.  It

13   knew -- to the extent it was contaminated with stuff it

14   knew what was in it because its people were collecting

15   it and it knew what was in those drums, and so I'm

16   asking what was in the drums because it's fair to say

17   that GE knew what was in the drums.  So establishing

18   what was in them -- it's funny how you can't seem --

19   people can't seem to understand my thinking.

20           MR. BIAGETTI:  The case is about whether or

21   not GE had a reasonable belief that what was in the

22   drums was being used, and, again, GE has no burden

23   there.

24           THE COURT:  GE knowing what was in the drums

25   bears on the question of whether it had a belief that --

1    what it was being used for or disposed of because if it

2    was all junk and GE knew it was junk, then GE's claim

3    that it thought it was being used is less credible.

4    Can't you see that?

5              MR. BIAGETTI:  One man's junk is another

6    man's --

7              THE COURT:  You are missing the point.  I've

8    got to break for lunch.  You are going to press me into

9    a position that you're not going to be comfortable with

10   here.  You're missing the point.  The point is it's

11   highly relevant to know what was in the drums that were

12   going to Fletcher because the argument that GE

13   understood what it was shipping to Fletcher is much less

14   strong if what was going to Fletcher was a collection of

15   chemicals that contained Pyranol, all other kinds of

16   waste, water, debris, other contaminants that made it

17   unusable for any purposes, and it was so contaminated

18   that GE knew that when it shipped the Pyranol to

19   Fletcher; that it claimed that it thought Fletcher was

20   using it as an Aroclor substitute is less credible.

21             The letter from Fletcher complaining that it

22   was getting junk, now that it's admitted, is relevant

23   not just to establish what GE gleaned from the letter,

24   but is relevant to establish that what GE was giving

25   them was junk, and that is relevant regardless of what

1    GE gleaned from the letter.  Even if GE assumed that it

2    was posturing, if in fact it's evidence that what was

3    being given was junk, that is relevant in proving what

4    GE's intent was.  When it sold something, it knew what

5    it was selling.

6           Unless you have an argument that GE didn't

7    know what it was selling, it is relevant to know what GE

8    was selling in determining what the argument was.  If GE

9    knew it was selling junk that couldn't be used even in a

10   limited market that exists for Pyranol and Aroclor

11   substitutes, that it knew that what was being purchased

12   was being disposed of, and that was the nature of the

13   arrangement, that some would be used and some would be

14   disposed of.

15          Your argument is it knew and understood that

16   all of it would be used and none of it would be disposed

17   of.  I have to test that argument against the

18   government's claim, not under its original theory, but

19   under this modified theory, have they proved more likely

20   than not that while some of it was being used, the bulk

21   of it was being disposed of, and GE knew that at the

22   time, and it intended this relationship to be an

23   arrangement for disposal in which the buyer would gather

24   the benefit from taking the best of it and using it and

25   discarding the rest.

1          That's the theory that is tested -- I will

2     test and determine whether the government has proved

3     that theory by a preponderance of the evidence, and it

4     is highly relevant to know what was actually in the

5     drums.  That's one of the key pieces of evidence in my

6     mind in determining what the arrangement was, because if

7     it was an arrangement to sell junk that couldn't in

8     substantial part be used, then it was an arrangement to

9     dispose of it.  It it was an arrangement in which this

10    Pyranol was, as you were suggesting, only contaminated

11    with minuscule quantities of contaminants that could

12    easily be filtered out and it could be sold as Aroclor

13    or an Aroclor substitute, then the case is much better,

14    but you would encounter problems.

15          If that were true, GE would be able to get

16    more than 1/50th of the cost of Aroclor to do it, and if

17    that were true, we'd have trouble reconciling all the

18    Hooper testimony about the varying qualities of the

19    drums.  If that were true, we'd have trouble with the

20    Monsanto testing.  If that were true, we'd have trouble

21    with the Fletcher letter.  If that were true, we'd have

22    trouble with the testimony from the witness who said,

23    from GE, that we thought he used some of it and could

24    dispose of the rest of it.

25          You know, the government could have started

1   out with a more narrow-focused case, but I think it's

2   encompassed in the case the government has presented,

3   and to the extent the government's case remains viable,

4   that's the case, and I'm trying to test it against the

5   argument you are making.

6          MR. BIAGETTI:  One sentence.  GE's argument,

7   respectfully, Judge, is that what it knew it was sending

8   to Fletcher was useful for the purposes that Fletcher

9   and Webster put it to, and the expert testimony, which

10  you may not have had a chance to review that obviously,

11  is unanimous on that point.

12         THE COURT:  And I'm agreeing that some of it

13  was.  To the extent that -- all the government has to

14  prove is that some of it wasn't, more likely than not,

15  and that GE understood that, and that therefore it was

16  an arrangement for disposal to that extent, and that's

17  where you guys are -- we just aren't able to address

18  each other.  I don't understand it because that's the

19  theory that you need to be trying to address.

20         Because I have said, haven't I, from the first

21  day, to the extent the government tried to tell me

22  before the trial started that this stuff -- none of it

23  was useful, the government is wrong, okay?  That's out

24  of the case.  I'm not even considering that anymore,

25  because the government's own witnesses say that it was

1    used and it was sold, some of it.  So you're right about

2    that, but you keep repeating that statement as if it

3    decides the case, and it doesn't.

4              MR. BIAGETTI:  I'm sorry.

5              THE COURT:  The statement has to be GE

6    understood that all of the Pyranol that was shipped to

7    Fletcher would be used and not disposed of, and the

8    government can't prove to the contrary.  That's your

9    case.

10              MR. BIAGETTI:  Yes.

11              THE COURT:  And I ask the government, can the

12    government prove to the contrary that at least some

13    quantity of what was shipped could not be used, GE

14    understood that at the time and intended its

15    arrangements to be to that extent for the Pyranol to be

16    disposed of.  That's the way the case should be being

17    tried.

18              MR. BIAGETTI:  We're in agreement that that's

19    the issue.

20              THE COURT:  All right.

21              (Luncheon recess taken at 12:50 p.m.)

22

23

24

25

140

1                     C E R T I F I C A T E

2

3            I, Diane M. Churas, do hereby certify that the

4     foregoing transcript is a true and accurate

5     transcription of the within proceedings, to the best of

6     my knowledge, skill, ability and belief.

7

      Submitted:  2/3/09
8
                           /s/  Diane M. Churas  __
9                          DIANE M. CHURAS, CSR, CRR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25