**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 5/7/09

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *  06-cv-354-PB
          v.                    *  November 5, 2008
                                *  9:20 a.m.
GENERAL ELECTRIC COMPANY        *
                                *
* * * * * * * * * * * * * * * * *
```


DAY 2
MORNING SESSION
TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE PAUL J. BARBADORO


Appearances:

For the Government:   Catherine A. Fiske, Esq.
                      Peter M. Flynn, Esq.
                      Laura J. Rowley, Esq.
                      Donald G. Frankel, Esq.
                      U.S. Department of Justice
                      Environmental Enforcement Section


For the Defendant:    Peter A. Biagetti, Esq.
                      William M. Cowan, Esq.
                      Mintz, Levin, Cohn, Ferris,
                      Glovsky and Popeo, PC

                      Thomas H. Hill, Esq.
                      Ignacia Moreno, Esq.
                      General Electric Company

Court Reporter:       Sandra L. Bailey, CSR, CRR
                      Official Court Reporter
                      United States District Court
                      55 Pleasant Street
                      Concord, NH  03301
                      (603)225-1454

2

1                          I N D E X

2

3    Witness                Direct    Cross    Redirect    Recross

4    WALLACE HOOPER

5    By Mr. Cowan                       3
     By Ms. Fiske                                 5
6

7    RICHARD WHITNEY

8    By Ms. Rowley          28

9
     ROBERT ABBE
10   (via videotape)        86

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                    BEFORE THE COURT

2          THE CLERK:  Court's in session and has for

3   consideration a bench trial in the United States of

4   America versus General Electric Company, Civil Case No.

5   06-cv-354-PB, day two.

6          THE COURT:  Good morning, sir.  Do you

7   understand you're still under oath?

8          THE WITNESS:  Yes.

9          THE COURT:  All right, thank you.  Please

10  continue.

11                    WALLACE HOOPER

12              CROSS-EXAMINATION cont'd

13          MR. COWAN:  Good morning, judge.  Good

14  morning, Mr. Hooper, how are you?

15          THE WITNESS:  Pretty good.

16          MR. COWAN:  Judge, before we begin, I think in

17  the interest of full disclosure Ms. Fiske and I have

18  spoken some more and I don't think we will be spending

19  much time with Mr. Hooper.

20          THE COURT:  That's fine.

21     Q.  BY MR. COWAN:  Mr. Hooper, first things first,

22  sir, did you make it to vote yesterday?

23     A.  Yes.

24     Q.  Excellent, excellent.  I'm going to take you

25  back to a little bit of your testimony yesterday in your

1    trips to General Electric to collect and transport the

2    Pyranol for Mr. Fletcher, okay?

3         A.   Yes.

4         Q.   I believe you testified, am I correct, sir,

5    that when you made those trips you would exchange or

6    receive paperwork, bills of lading for those shipments?

7         A.   Yes.

8         Q.   Was that always the case for every load, sir?

9         A.   I don't remember that I never signed for a

10   load.

11        Q.   When you received that paperwork, you returned

12   it to Milford, is that correct?

13        A.   Yes.

14        Q.   Do you know what happened to it at that point?

15        A.   Well, I turned it in to the office.  After

16   that --

17        Q.   Sorry, sir.

18        A.   After that I'm not sure.

19        Q.   And Mr. Fletcher at the Paint Works, at this

20   paint shop kept a log for shipments of chemicals coming

21   in; correct, sir?

22        A.   Yes.

23        Q.   And with the Pyranol shipments that you

24   received and used Aroclor shipments that you transported

25   I should say, were those logged in?

1       A.   Yes.

2       Q.   And you also testified yesterday that when Ms.

3   Fiske asked you about your trips back to Milford and

4   washing out the truck, do you remember that, sir?

5       A.   Yes.

6       Q.   And you testified that you occasionally washed

7   out the truck, steam cleaned it at some place further up

8   on Elm Street?

9       A.   Yes.

10       Q.   Am I correct, sir, that that was not -- strike

11   that.  Am I correct that that car wash or truck wash was

12   not on Mr. Fletcher's property?

13       A.   No, it was not.

14       Q.   So it wasn't at the Elm Street site where you

15   stored the drums?

16       A.   No.

17            MR. COWAN:  Thank you, judge.  Thank you, Mr.

18   Hooper.

19            THE WITNESS:  You're welcome.

20            THE COURT:  Anything else?  Do you have

21   questions?

22                    REDIRECT EXAMINATION

23   BY MS. FISKE:

24       Q.   Mr. Hooper, you testified yesterday that you

25   drove to Aerovox to pick up scrap PCB material there, do

1    you remember that?

2        A.   Yes.

3        Q.   Did you ever test drums at Aerovox with a

4    hydrometer?

5        A.   No.

6        Q.   You also testified yesterday that you drove to

7    Sprague to pick up scrap PCBs.  Do you remember that?

8        A.   Yes, yes.

9        Q.   Did you ever test drums at Sprague with a

10   hydrometer?

11       A.   No.

12       Q.   Also yesterday you talked to Mr. Cowan about

13   the price Webster paid for scrap Pyranol, and that's the

14   price Webster paid to Fletcher.  Do you remember

15   testifying about that?

16       A.   The price at Fletcher?

17       Q.   The price that Webster paid Fletcher for scrap

18   Pyranol.

19       A.   I remember it was discussed.

20       Q.   You remember discussing the price Webster paid

21   Fletcher for scrap Pyranol?

22           THE COURT:  Why don't you just -- I'll let you

23   be a little more specific with him just to get to the

24   point.

25       Q.   Okay.  Do you have any personal knowledge of

7

1    the price that Webster paid Fletcher's for scrap

2    Pyranol?

3        A.   No, I don't offhand.  I believe that the

4    thinner Pyranol they didn't pay as much for as they did

5    the heavy stuff.

6        Q.   And why do you say that?

7        A.   Well, I believe that was the story that was

8    told.  I can't come right out and say, but I believe

9    that was -- they wanted the real Pyranol, I think,

10   really, but they would take the thinner Pyranol at a

11   price I believe.

12       Q.   Do you know what price Webster paid?

13       A.   I have no idea the price Webster paid.  I

14   don't think I ever knew.

15           MS. FISKE:  Thank you, Mr. Hooper, I have no

16   further questions.

17           THE COURT:  Anything else?

18           MR. COWAN:  Nothing further, your Honor.

19           THE COURT:  Thank you, Mr. Hooper.  Now, you

20   may be surprised, why did they make me come back for

21   5 minutes of questions.  I have to tell you that's not

22   something to be critical of the lawyers for, rather we

23   should be pleased because what they did was they used

24   their time last night to go over all the things that

25   they thought they might want to ask you and they had a

1    chance to reflect on it and realized that you covered

2    most everything, but they couldn't really know that

3    until they had a chance to think about it, so, if we had

4    a choice between people that would think about it and

5    cut their questions down to 5 minutes or people who

6    would call you back and question you meaninglessly for

7    an hour and a half, you can see which would be better.

8    So, I'm sorry you had to come back, but I think it was

9    necessary and I'm glad we're able to finish with your

10   testimony this morning.  Thanks a lot for coming.

11             THE WITNESS:  Thank you.

12             THE COURT:  All right, you're excused, sir,

13   you can step down.

14             All right, you want to call your next witness,

15   please?

16             MR. FLYNN:  Your Honor, at the pretrial we

17   mentioned that we had a number of exhibits without

18   witnesses and that we would seek at the appropriate

19   juncture to just publish --

20             THE COURT:  Okay, that's fine.

21             MR. FLYNN:  So I have a few exhibits to

22   publish, and the particular rubric that I have now, none

23   of them were objected to by General Electric.

24             THE COURT:  All right, how are you going to

25   display them, the computer or the document camera?

1            MR. FLYNN:  The computer.

2            THE COURT:  While you're bringing that up,

3    does a hydrometer measure specific gravity?  Is that

4    what a hydrometer does?

5            MR. FLYNN:  I believe it does, yes, specific

6    gravity or density.

7            MR. BIAGETTI:  All I can tell you is that

8    that's what the chemist Bishop used it for, measuring

9    specific gravity.

10           THE COURT:  And viscosity is something

11   different than specific gravity, so I'm wondering why --

12   it seemed like the important thing was its viscosity and

13   not its specific gravity, but maybe specific gravity was

14   a proxy indicator for viscosity.  Does anybody know?

15   I'm not a scientist, but none of you probably are

16   either, unfortunately, but.

17           MR. COWAN:  That's correct, judge, on the

18   scientist part I'm far from it, but I'd tell the court

19   that there is expert testimony from Dr. Girard that's

20   being offered by General Electric who talks a little

21   bit, Ms. Rowley asked him some questions about

22   viscosity, gravity, and I think the record, and I don't

23   think there's any dispute here in this case from the

24   fact witnesses, they do use the term interchangeably at

25   various times.

1            THE COURT:  But they have to be proxies for

2    each other.  It may be the case that whatever the

3    principal contaminants were that made it less viscous

4    also had a lower specific gravity, and so by measuring

5    specific gravity you could determine whether the Pyranol

6    is of sufficient purity to be useful, but as far as I

7    know and the parties will have to tell me differently,

8    the potential use of this Pyranol as a plasticizer or as

9    an extender depended on its viscosity rather than its

10   specific gravity.  It isn't the density -- because you

11   can have a liquid that's highly viscous but very -- has

12   a high specific gravity.  It doesn't necessarily --

13   isn't necessarily the case that one follows the other,

14   but it may be that practically in this case it did and

15   therefore measuring specific gravity was a proxy

16   indicator for viscosity.

17            MR. FLYNN:  Your Honor, the United States also

18   has an expert, Richard Granito, in formulation, and he

19   used the numbers, the density and the specific gravity

20   to calculate what might be in the drums besides PCBs, so

21   the number came into play that way.  Also I understand,

22   and I think it's in his report, that formulas for paint

23   include viscosity as one of the elements that are

24   important.

25            THE COURT:  Yeah.  So, I guess what I'm saying

1   is you'll have to tell me, show me if I'm wrong, but

2   unless somebody shows me I'm wrong, I'm going to be

3   assuming that what matters here to a potential user of

4   scrap Pyranol is its viscosity, not its specific

5   gravity, and I'm going to assume, unless somebody tells

6   me otherwise, that in this case although a hydrometer

7   measures specific gravity rather than viscosity, that it

8   stood in for a measurement of viscosity for purposes of

9   Fletcher evaluating whether he wanted it or thought it

10  was resalable or useful, et cetera, because everybody is

11  talking about thin and thick.  Thin and thick is

12  viscosity, not specific gravity.  You talk about heavy

13  and light, you talk about specific gravity, specific

14  gravity is a dense measurement.

15          So I'm assuming that's all true.  If somebody

16  concludes I'm wrong about that, you'll have to tell me

17  about it, otherwise I'm going to act under that

18  assumption when I analyze the evidence.

19          MR. FLYNN:  I think if you read Dr. Granito's

20  report, and we will be submitting expert reports

21  tomorrow to your Honor with designated pages and

22  objections instead of live testimony, an agreement we

23  reached together for three of the experts, you will see

24  that in his view the specific gravity density number

25  would be a proxy to see what was in the drum.  That if

1   it was below a certain amount it meant that it was

2   contaminated with other material.  You know, I'm not

3   sure that that -- I'm really not sure if there's

4   testimony from any Fletcher employees that that was the

5   reason for it, but that's Granito's assessment of one of

6   its purposes.

7           MS. ROWLEY:  It's also unclear what the

8   purpose was for the testing because it was requested by

9   Webster and --

10          THE COURT:  The specific gravity testing.

11          MS. ROWLEY:  Yes.  The next witness will

12  testify a little bit about that.

13          THE COURT:  All right.  Okay, thank you.  All

14  right, go ahead with your documents.

15          MR. FLYNN:  Okay, your Honor, the first

16  document is United States Exhibit 1, and I know it's

17  pretty unreadable so I'm going to thank defense counsel

18  for providing their Exhibit 25 which is a much more

19  readable version of the same documents.  And in Mr.

20  Biagetti's opening I believe he conceded that in 1953

21  General Electric shipped --

22          THE COURT:  What is the document?

23          MR. FLYNN:  This is a ledger from 19 --

24  General Electric document from 1953 that shows various

25  vendors and charges for shipment of material.  And if

1    you go down the list here to 949, the Windsor-Embassy

2    Chemical with the M slash C next to it --

3              THE COURT:  Ah-hum.

4              MR. FLYNN:  And again, I don't want to spend

5    too much time with this document, but up until yesterday

6    morning we were not sure whether General Electric was --

7    whether they were conceding that in 1953 General

8    Electric had dealings with Windsor-Embassy Chemical and

9    provided scrap Pyranol at no cost.

10             THE COURT:  Windsor-Embassy Chemical is

11   Fletcher Paint?

12             MR. FLYNN:  Yes, there's three names for

13   Fletcher Paint.  Windsor-Embassy and Milford and

14   Fletcher's.

15             THE COURT:  All right, I don't think the

16   defendant is contesting or can contest the inference you

17   want me to draw from this document which is that

18   whatever was shipped and referenced in that ledger was

19   provided at no cost.  That's the only reasonable way to

20   interpret that language.  I don't think they disagree

21   with that.

22             You have a summary document in which you are

23   going to give me all of the GE ledger records reflecting

24   transactions between GE and Fletcher involving Pyranol?

25             MR. FLYNN:  We don't have one, but we can

14

1    prepare one.

2              THE COURT:  Because I'm not going to --

3    understand, I'm going to be giving you a decision at the

4    end of the case, okay, so anything you think I need to

5    actually look at, I know you put in hundreds of pages of

6    things, I'm not going to look at it unless you bring it

7    to my attention, all right?

8              MR. FLYNN:  Yes.

9              THE COURT:  Because I think it seems largely

10   irrelevant.  So what I'm saying to you is if you want me

11   to know what the ledger records reflect about

12   transactions with Fletcher and GE, you ought to give me

13   a typed summary document that identifies only the

14   relevant ledger entries so I don't have to go flip

15   through page after page of ledger entries to see what

16   they are, I mean, you can produce a summary for me,

17   right?

18             MR. FLYNN:  Yes, your Honor, we can produce

19   something like that.  We don't actually have maybe all

20   the ledger entries because these are old documents, but

21   we do have by stipulated facts of how much total was --

22             THE COURT:  But I guess what I'm saying to you

23   is introducing something like this, I don't know how

24   many -- how many pages of this are there?  It's just one

25   page?

1           MR. FLYNN:  Yes, I just want you to see this

2     one page.

3           THE COURT:  Oh, to show that there were some

4     ledger entries that were no charge.

5           MR. FLYNN:  For this particular company that

6     was a Fletcher company in 1953.

7           THE COURT:  All right, so there's just one

8     transaction that's a no charge transaction?

9           MR. FLYNN:  This is the only document that we

10    have that reflects this.

11          THE COURT:  Okay, well, we don't know what it

12    is, right?

13          MR. FLYNN:  Well, we know it's scrap Pyranol,

14    isn't it, at the bottom of this?

15          MR. BIAGETTI:  Material sold.

16          THE COURT:  Does the ledger reflect that?

17          MR. FLYNN:  I'm not sure the ledger reflects

18    it, but you had the testimony of Mr. Hooper yesterday,

19    1953, that was what he was picking up.

20          THE COURT:  All right, are you going to

21    contest the inference that they want me to draw from

22    this evidence is that on one occasion in 1953, scrap

23    Pyranol was provided to Fletcher at no cost.  Do you

24    have any reason to contest that?

25          MR. BIAGETTI:  Only that N/C could mean

1    something like new condition or --

2            THE COURT:  But in a ledger in which they are

3    listing the amounts --

4            MR. BIAGETTI:  The ledger says what it says,

5    absolutely.

6            THE COURT:  All right, so your only argument

7    is it might mean something other than cost, and under

8    that context I find -- that's all you've got, you've got

9    nothing else?  I find more likely than not that that

10   reference means no charge, okay, because there's no -- I

11   mean unless you've got something to call it into

12   question, they've produced substantial evidence to

13   support that view, it satisfies me more likely than not

14   that that's what it means, okay.

15           MR. BIAGETTI:  Fair enough, your Honor.

16           THE COURT:  That's what I'm going to ask you.

17   When we have facts like this that -- I don't expect you

18   to just agree to everything that they say, but it's one

19   thing to say I don't agree, it's another thing to say

20   I'm not prepared to endorse it myself, but I can't

21   contest the inference they want you to draw from it, and

22   that fact can be admitted for that reason.  They have

23   evidence to support the inference.  Although other

24   inferences are possible, I can't call that into

25   reasonable question, I'm just going to go through and

1    say that's what it is because that's -- it's very

2    commonsensical.  It's a ledger where they are putting in

3    dollar amounts, and the only entries on this page are

4    either dollar amounts or N slash C where dollar amount

5    is listed.  In context that means no charge, and there

6    isn't another alternative interpretation that's

7    reasonable.

8               So that's what I find more likely than not

9    with respect to that.

10              Okay, what's next?

11              MR. FLYNN:  Exhibit number --

12              MR. BIAGETTI:  If, just on that point, and I'm

13   not going to take up any time with regard to inferences,

14   but I ask the court's guidance.  That particular

15   document is part of a much bigger document that does

16   have -- that does show the sales and charges that came

17   thereafter.  You recall in the opening, part of the

18   argument is whether or not even if it was for no charge,

19   it was part of a way to get Fletcher to use and buy

20   more.

21              THE COURT:  All you showed me is on one

22   occasion in 1953, scrap Pyranol was provided at no cost,

23   that's all I know.  From that document, that's all I

24   know.  Based on other statements the parties have made,

25   there's going to be proof that he paid for scrap

1   Pyranol.  At other occasions you'll put that in,

2   hopefully in the form of a summary document showing me

3   the ledger entries that reflect payments that were made.

4            MR. BIAGETTI:  And that was my only question.

5   And should I wait until we're putting in our case?

6            THE COURT:  Yeah, you can wait, you can do

7   that if you want, or if you wanted to put it all in as

8   one document, generally under the rule of completeness,

9   if he puts in one page and you want to put in the whole

10  document, and you have an exhibit, then show me your

11  exhibit and we will put that in too.

12           MR. BIAGETTI:  Okay, on this particular one,

13  and I'll save all the others for putting in our case, on

14  this particular one I would ask that we put in

15  Defendant's 25.

16           MR. FLYNN:  I like his 25 better anyway

17  because it's clearer, so we don't have anything wrong

18  with that.

19           THE COURT:  Okay, I will say this.  Give me a

20  summary with just the typed entries that matter to me so

21  that I don't have to go picking through it and writing

22  them down and all that kind of stuff.

23           MR. BIAGETTI:  Will do.

24           THE COURT:  So they are both in.  What's next?

25           MR. FLYNN:  Government's Exhibit Number 7.

1   Your Honor, yesterday during my opening I referred to

2   the second two pages of this document, just briefly turn

3   to the second page anyway, which is this is the letter

4   from Fletcher to GE complaining about the shipments, and

5   there was some comment about, during Mr. Biagetti's

6   opening, about what GE's response was and whether they

7   actually measured the same drums.  If you return back to

8   the first page I'd like to just -- this is an August 6,

9   1968 GE document entitled Scrap Pyranol, Milford Paint

10  Works.  If you could focus on the first paragraph.  And

11  this essentially is a response, a review of the letter

12  that again was used during my opening, you know, he

13  cites that, you know, Fletcher is complaining basically

14  because of the contaminated material.  That would be the

15  second paragraph.

16          THE COURT:  Vinny, can you get the exhibit for

17  me.  We have a physical copy of it, right?

18          MR. FLYNN:  Exhibit 7.

19          (Pause.)

20          THE COURT:  All right, what do you want me to

21  know about these documents.

22          MR. FLYNN:  I just explained in the first

23  paragraph that Fletcher complained about the

24  contaminated material, the second paragraph, and there

25  was some question of whether or not Monsanto was

1    measuring the same material Fletcher received.  The

2    first sentence says analysis of this material by

3    Monsanto, we find that Milford has a valid claim, and

4    then in that same paragraph it mentions that the

5    material --

6              THE COURT:  Wait a minute.  You're offering

7    this to try to prove that Fletcher gave some of the

8    material back to GE to have it sampled by Monsanto?

9              MR. FLYNN:  No.  What I'm saying is that this

10   is their statement which I assume that an inference

11   could be that they had the similar type material that

12   they had given to Fletcher's at their facility and they

13   tested that, that this material would be --

14             THE COURT:  At least so far the testimony is

15   they never brought any of the stuff back.

16             MR. FLYNN:  Correct.

17             THE COURT:  What I understand, according to

18   the testimony so far, is that during the Metevier

19   administration, barrels would be shipped, they would

20   find problems with barrels, and Metevier would make

21   adjustments to what would be paid to address barrels

22   that were not of sufficient quality, and that during --

23   what's the second guy's name?

24             MR. FLYNN:  Varnum.

25             THE COURT:  During the Varnum administration

1    everything was shipped, everything was to be paid for,

2    no allowances were to be made, and that that prompted

3    this letter of complaint in '68 which prompted the

4    analysis which resulted in this memo, and that's the way

5    I understand it.  Do I have that wrong?

6              MR. FLYNN:  Well, actually the time Varnum was

7    retired at '66, so some of these shipments occurred

8    after he left.

9              THE COURT:  Yeah, I understand that, but --

10             MR. FLYNN:  But the material that was being

11   shipped, Fletcher complained about in a letter that you

12   see here, GE had material I guess that was identical to

13   which was given --

14             THE COURT:  Didn't Hooper just say the problem

15   for us really started to develop under Varnum because

16   under Metevier, he would be willing to give us

17   allowances for bad Pyranol drops.

18             MR. FLYNN:  That's correct.

19             THE COURT:  Everybody agree with me that was

20   what he testified to?

21             MR. FLYNN:  Yes.

22             THE COURT:  Okay.  And that Varnum stopped

23   doing that and we had to pay for everything that was

24   shipped to us, right?  We agree on that?

25             MR. FLYNN:  Yes.

1          THE COURT:  And then this letter in '68 is a

2   complaint about the quality of the Pyranol that we're

3   getting, and the memo is an agreement that there is a

4   problem with the quality of the Pyranol that Fletcher is

5   getting.

6          MR. FLYNN:  Yes.

7          THE COURT:  Okay.

8          MR. FLYNN:  And had some specifics like up to

9   22 percent TCE and that this material in the third

10  paragraph --

11         THE COURT:  But we don't know where the

12  samples came from.  We agree on that?

13         MR. FLYNN:  Yes.

14         THE COURT:  Okay, so we can't -- the testimony

15  is at least from Hooper, is we never brought any stuff

16  back to GE, so up to now the most reasonable inference

17  is they must have taken a sample from representative

18  drums of the type that they were providing to Fletcher

19  because there wasn't any backward shipment of material

20  that we know of.

21         MR. FLYNN:  We totally agree with that, yes.

22         THE COURT:  All right.

23         MR. FLYNN:  The next sentence mentions that

24  the material should have been disposed of.  And then the

25  last sentence, the last paragraph of the last sentence,

1    basically, and again, it could be an inference here,

2    that nothing was basically done because GE determined

3    that they were making a savings by just leaving it at

4    status quo.

5            THE COURT:  Right.  What the conclusion is, if

6    we give Fletcher bad drums and don't charge them for bad

7    drums, we net out better than if we don't give them the

8    bad drums and we have to pay to dispose of the bad

9    drums.

10           MR. FLYNN:  Yes.

11           THE COURT:  All right.

12           MR. FLYNN:  That's all I have for this

13   published one.

14           THE COURT:  Okay.

15           MR. FLYNN:  The next one is United States

16   Exhibit No. 8.  And the issue here, your Honor, this is

17   an August 30, 1968 General Electric document.

18           THE COURT:  So this is them actually writing

19   off the shipments, right?

20           MR. FLYNN:  Yes.  I believe there was some

21   question whether they had only recommended writing off

22   this shipment.  We believe that the inference from this

23   document is that it was actually written off.

24           THE COURT:  Okay.

25           MR. FLYNN:  And the final document that I'd

1    like to just show you during this -- well, actually not

2    the final document, another document I'd like to show

3    you is Plaintiff's Exhibit 32, starting with the second

4    page of that document.  If you could focus on the upper

5    left.  This is a June 14, 1965 document.  And then the

6    fourth paragraph in that document discusses the term CIA

7    which though I don't see it specifically -- non-acronym

8    here, I believe stands for cash in advance, and here it

9    discusses, you know, how cash in advance persons should

10   be treated which we interpret as meaning they basically

11   have to pay cash in advance in some form before

12   receiving a shipment.

13            THE COURT:  Yeah, so what?

14            MR. FLYNN:  And then if you go to the next

15   page.  And this is a listing of various vendors that

16   have different status.  And a third way down on that

17   page, Milford Paint Works is listed as a CIA customer

18   which means that they should not have received any

19   shipments from General Electric unless they paid up

20   front.

21            THE COURT:  Yeah, so?

22            MR. FLYNN:  Well, there's a question I believe

23   that was raised in the opening about payments, and

24   actually the inference is that --

25            THE COURT:  Why should I care is what I'm

1    getting at.

2            MR. FLYNN:  Why should you care?  Because in

3    the general business course CIA customers are not given

4    any material unless they pay in advance, and our

5    inference from this and other documents is that General

6    Electric was very happy to get rid of this material, it

7    was so happy that they were willing to ignore Milford's

8    CIA status to get it off their facility.  It's one

9    circumstantial evidence in a number of evidence.

10            THE COURT:  So you're saying they treated them

11   as a -- they characterized them as a CIA customer but

12   did not require them to have CIA, and therefore that

13   shows that they wanted to get rid of the scrap Pyranol.

14            MR. FLYNN:  Not in and of itself but as one of

15   the building blocks that show that.

16            THE COURT:  All right, well, I mean, it's a

17   weak inference.  I suppose it's something you can argue.

18   Okay, what's next?

19            MR. FLYNN:  The last one again of this

20   grouping that I'd like to show your Honor is Plaintiff's

21   Exhibit 2, which is an August 31st, 1967 letter from

22   General Electric to Fletcher's in which they discuss the

23   past due debt and request Fletcher's to send a check.

24   And the significance the United States sees in this,

25   your Honor, is they flagged that Fletcher had received

1   shipments from July 31st, 1967 and hadn't paid for, and

2   yet if you look at the bottom left, they continue to

3   send shipments after that time to Fletcher knowing -- he

4   would know that he was both a CIA customer and had not

5   paid for the earlier shipments.  Again, an inference

6   that there was an interest on GE's part on moving the

7   scrap Pyranol off their site.

8           THE COURT:  It's also possible it would infer

9   that he had a longstanding business relationship with

10  the local people at GE, and notwithstanding his status

11  as a CIA customer, that they were willing to cut him

12  some slack because they were doing business with him for

13  a long time, right?  I mean, it's minimal, you know,

14  doesn't really do much for you, but I understand the

15  point.

16          MR. FLYNN:  And that's all I have as far as

17  those documents.

18          THE COURT:  All right, ready to call your next

19  witness?

20          MS. ROWLEY:  Just quickly before we call the

21  next witness, I wanted to mention that the United States

22  and GE have reached some stipulations of fact concerning

23  what he would testify about.  Those facts are numbers

24  104 through 109 of Document 85 which was filed yesterday

25  morning.

1          And I want to propose as a time saving device

2     that when I get to those topics I be able to ask the

3     witness a leading question just to establish the facts

4     that have been stipulated to and then proceed --

5          THE COURT:  Or just ask me to read those

6     because they are stipulated to.  You don't even need to

7     ask him to confirm them, that will be faster.

8          MS. ROWLEY:  Well, I wanted to ask him some

9     follow-up questions to get the detail --

10          THE COURT:  All right, but what you can just

11     say if you want, the parties have stipulated blah, blah,

12     blah, I want to ask you some more about that.

13          MR. BIAGETTI:  I just didn't hear the numbers,

14     I'm sorry.

15          MS. ROWLEY:  104 through 109.

16          MR. BIAGETTI:  Thank you.

17          MS. ROWLEY:  Okay.  The United States calls

18     Richard Whitney.

19          THE COURT:  Sir, come all the way up here, up

20     here, okay, and walk all the way around and there's a

21     seat up here beside me.  Come up beside that seat and we

22     will swear you in.

23          THE CLERK:  Please raise your right hand.

24                    RICHARD WHITNEY

25          having been duly sworn, testified as follows:

1             THE WITNESS:  Yes.

2             THE CLERK:  Would you please state your name

3    for the record.

4             THE WITNESS:  Richard Whitney.

5             THE CLERK:  Spell your last name.

6             THE WITNESS:  W-H-I-T-N-E-Y.

7             THE CLERK:  Thank you.  You can be seated.

8                     DIRECT EXAMINATION

9    BY MS. ROWLEY:

10        Q.   Good morning, Mr. Whitney.

11        A.   Good morning.

12        Q.   Can you hear me okay?

13        A.   Pardon?

14        Q.   Can you hear me okay?

15        A.   Let me turn this up a little bit.

16        Q.   Can you hear me now?

17        A.   Yes.

18        Q.   Okay.  Great.  Mr. Whitney, did you ever work

19   at Fletcher's Paint Works in Milford, New Hampshire?

20        A.   Yes, I did.

21        Q.   Okay.  And when did you start working at

22   Fletcher's Paint Works?

23        A.   Oh, somewhere around 1960.

24        Q.   Okay, and what kind of business was

25   Fletcher's?

1        A.    It manufactured paint.

2        Q.    And how many years did you work at Fletcher's

3   Paint Works?

4        A.    I'm not sure exactly.   Probably around

5   7 years.

6        Q.    And during the time you worked at Fletcher's,

7   who else was working there?

8        A.    Wallace Hooper, John, can't remember his last

9   name.

10        Q.    Was Warner Nutter working there?

11        A.    Pardon?

12        Q.    Warner Nutter?

13        A.    Yeah.

14        Q.    And Clyde Bishop?

15        A.    Yeah.

16        Q.    And when you worked at Fletcher's, what were

17   your specific jobs?

18        A.    I loaded and unloaded trucks and canned paint,

19   whatever they needed done.

20        Q.    Okay.  And did this stay the same over the

21   7 years that you worked there?

22        A.    Pardon?

23        Q.    Did your job at Fletcher's change over the

24   time that you worked there?

25        A.    I can't hear you with the noise.

1       Q.   Did you do these same types of jobs over the

2   7 years that you worked for Fletcher's?

3       A.   Yes.

4       Q.   And just to be clear, Fletcher's Paint Works

5   is the business operated by Mr. Fred Fletcher on Elm

6   Street in Milford?

7       A.   Yes.

8       Q.   And that he, Mr. Fletcher, also had another

9   piece of property on Mill Street related to --

10      A.   Yes.

11      Q.   Are you familiar with chlorinated biphenyl?

12      A.   With what?

13      Q.   Chlorinated biphenyl?

14      A.   Yes.

15      Q.   What are they?

16      A.   Air punches.

17      Q.   All right.  And have you heard the term scrap

18  Pyranol?

19      A.   Yes, I've heard that.

20      Q.   When did you first hear that term?

21      A.   I think when I brought the first load in.

22      Q.   When you were working at Fletcher's?

23      A.   Yes.

24      Q.   Okay.  And what was scrap Pyranol?

25      A.   Pardon?

1        Q.    What was scrap Pyranol?

2        A.    What was it?

3        Q.    (Nods head affirmatively.)

4        A.    It was a -- I don't know exactly what.

5   Chlorinated biphenyl was the name on it.

6        Q.    Scrap Pyranol was chlorinated biphenyl --

7        A.    Yes.

8        Q.    -- and Aroclor was another name?

9        A.    Yeah.

10            THE COURT:  Just wait a second.  Could you go

11   adjust his microphone so it's in the direction of his

12   mouth.  It's a little to the side.

13            Sir, the way these microphones work, they are

14   directional, so you don't have to get right up close to

15   them, but if you have it pointed towards your mouth, and

16   the same thing goes for counsel, if you raise yours a

17   little bit you probably won't have to lean over as much

18   and then -- a little bit lower, Vinny, a little bit

19   lower.  I think that should -- okay, good.  And just try

20   to speak up, and I hope the microphone will catch what

21   you're saying.

22        A.    All right, thank you.

23        Q.    Where did scrap Pyranol come from?

24        A.    Some place out in New York.  I don't remember

25   the exact address.

1        Q.    Okay.  Do you remember the name of the company

2    where it came from?

3        A.    Yeah, it was GE they said.

4        Q.    Okay, General Electric Company?

5        A.    Pardon?

6        Q.    General Electric?

7        A.    Yeah.

8        Q.    Okay.  And how did Mr. Fletcher get scrap

9    Pyranol?

10        A.    I don't know how he actually got it, and his

11    truck brought it in and I usually unloaded it.

12        Q.    Okay, did you ever drive a truck to go pick it

13    up?

14        A.    No.

15        Q.    Okay.  Who did?

16        A.    Wally Hooper.  I don't know who else, all the

17    different people were by name, you know.

18        Q.    And did they drive the truck by Mr. Fletcher?

19    Did Mr. Fletcher own the truck that they drove?

20        A.    I assume so, yeah.

21        Q.    Okay, and what kind of truck was that?

22        A.    It was a -- the first truck was a closed in

23    truck, a six-wheeler I believe.

24        Q.    Okay.  And about how many drums of scrap

25    Pyranol would the truck hold?

1     A.   Around 20 and could have been maybe even a

2     little less, I don't know.

3     Q.   Okay.  I'd like to ask you some questions

4     about unloading the trucks of scrap Pyranol.  This is

5     something you worked on, correct, you unloaded the

6     trucks yourself?

7     A.   Yeah.

8     Q.   Okay.  And can you tell me about how that was

9     done?

10    A.   Yeah.  We had a bucket and a chain and a clamp

11    and you dropped it over the bucket, and when you start

12    to bring it up it would tighten on the barrel, and then

13    you set it back down on the ground.

14    Q.   Okay.  And where were these trucks -- where

15    were the trucks of scrap Pyranol unloaded?  Where, where

16    were they unloaded?

17    A.   In the backyard usually.

18    Q.   Okay, on Elm Street?

19    A.   Yes.

20    Q.   Okay.  Were they ever unloaded on Mill Street?

21    A.   I unloaded them on Cottage Street, but I

22    didn't do anything over there.

23    Q.   Okay.  While you were unloading the trucks of

24    scrap Pyranol, were there any spills?

25    A.   No, not really.  I don't recall any spills.

1       Q.   Okay.  What about -- you didn't get the

2   material on yourself?

3       A.   Pardon?

4            MR. COWAN:  Objection.

5            THE COURT:  Overruled.

6       Q.   Did you ever spill the material on yourself?

7       A.   Oh yeah.

8       Q.   Yeah.  How often did that happen?

9       A.   Any time it came in.

10      Q.   Okay.  After you unloaded the scrap Pyranol

11  drums from the truck, what happened to the drums next?

12      A.   I still can't make all that.

13      Q.   What happened after you unloaded the drums of

14  scrap Pyranol, what happened to them next?

15      A.   To begin with, all we did was take a sample

16  and weigh it, and then they found some black specks in

17  the Pyranol they didn't want, so we filtered that.

18      Q.   Okay.  Regarding weighing, taking a sample and

19  weighing it, is that what you said?

20      A.   Yeah, we used to have a little, I believe it

21  was a hundredth of a gallon and you'd weigh it and if it

22  came down to, usually that was it.

23      Q.   And who did this testing?

24      A.   I guess Wally did it once I can remember, and

25  Earl West did it some, Clyde Bishop did it some, I did a

1    few but, that's about all.

2          THE COURT:  Can I ask you about this filtering

3    that you talked about.  How did they -- how did they

4    filter?

5          A.    They had filters.  They are line filters.

6          THE COURT:  What kind of filters?

7          A.    Like a line filter.

8          THE COURT:  Line?

9          A.    Yeah, you put one filter here and another one,

10   you go, we had like three, and then a couple more bigger

11   ones, and take the stuff out of the Pyranol, the little

12   tiny black specks --

13         THE COURT:  How did it actually work, though,

14   did you take a big drum of Pyranol and tip it in to

15   something else and run it through a filter or how did

16   that work?

17         A.    We had a tank that they cut the top off and it

18   was like maybe three and a half feet wide, the whole

19   length of the tank, and they dump them into that.

20         THE COURT:  So they dump a barrel of it into

21   that tank.

22         A.    Several barrels.

23         THE COURT:  Several barrels, and there would

24   be what, filters on one end of that tank?

25         A.    Right, and you can run it through the filters.

 1          THE COURT:  Okay.  One of the things I'm

 2   having trouble understanding, trying to picture, this

 3   Pyranol, at least in the purer form, is pretty thick or

 4   viscous, isn't it?

 5          A.   Yeah, well.

 6          THE COURT:  Somebody told me that it's thicker

 7   than molasses.  Do you --

 8          A.   No, no.

 9          THE COURT:  No?  Not as thick as molasses.

10   All right.  So was it able on its own weight to run

11   through these filters or did it have to be forced

12   through the filters?

13          A.   Well, they pumped it through.

14          THE COURT:  All right, so there was actually

15   some pumping mechanism where they would pump the

16   material through the filters to filter out these black

17   specks?

18          A.   Right.

19          THE COURT:  Okay.  And that would happen in an

20   open tank?

21          A.   Right.

22          THE COURT:  And where was the open tank?

23          A.   It used to be right outside the back door of

24   the Paint Works.

25          THE COURT:  Okay.  I've heard some testimony,

1   if your memory of this differs, let me know.  In the

2   sixties there would have been the back of the factory

3   and then there would have been a lot of barrels and then

4   there would be the river.  Is that how you remember it?

5        A.   Yeah, pretty much so, yes.

6             THE COURT:  All right.  And when you're

7   talking about the back door, that would be the back door

8   that would face the river?

9        A.   Right.

10             THE COURT:  And so would there be a lot of

11   barrels back there when you were there?

12        A.   Oh yeah, yeah.

13             THE COURT:  Okay.  And this filtering device

14   that you talk about is sort of right out the back door

15   in the vicinity of where those barrels were?

16        A.   Yeah, pretty much.

17             THE COURT:  All right.  Good, thank you.  All

18   right, thank you, go ahead.

19        Q.   BY MS. ROWLEY:  All right, I'll ask a few more

20   questions on that topic while we're on it.

21             Regarding the tanks that you put the Pyranol

22   in, how big were the tanks?

23        A.   I believe to begin with it was, I'm not sure,

24   1,000 or 2,000, I think it was over 2,000, and you dump

25   the Pyranol in that and then you run it through the

1  filters, and then when it came clean, by taking a sample

2  of it you could tell whether it was clean, and then

3  you'd get some clean drums and drum it up.

4      Q.   Was there a second tank?  Were there two

5  tanks?

6      A.   Yes, there was another big tank up in back

7  that after it was filtered, you'd pump it up into there

8  until we have enough to make a load up.

9      Q.   Okay, how big was the second tank?

10     A.   I think the big tank was, I'm not sure, but I

11 think it was 50,000 gallons.

12     Q.   So just to make sure I have this right, you

13 would dump the scrap Pyranol into the small tank.  You

14 would pump it through the filter.

15     A.   Right.

16     Q.   It would go into the big tank.

17     A.   Right.

18     Q.   And then would you recirculate it?

19     A.   Yeah, mix it up so it's the same weight per

20 gallon, it was uniform.

21     Q.   And how long would you recirculate the

22 material for?

23     A.   It varied.  Depends on what -- how much stuff

24 was in it.

25     Q.   One day, three days, how long?

```
 1        A.   Usually one day, filtering one day, run it
 2   overnight, the next morning put it in some clean drums
 3   if we had them.   Sometimes we had to wait for drums.
 4        Q.   Okay.   Could it take longer than one day?
 5        A.   Yeah, sometimes.
 6        Q.   Okay.   Now, did you filter and blend all of
 7   the drums of scrap Pyranol or just ones that were too
 8   thick and some were too thin?
 9        A.   For a while they tried just one individual
10   barrel and they found out that that wasn't going to
11   work, so.
12        Q.   Okay.   You mentioned after the filtering and
13   blending process you would put the scrap Pyranol into
14   clean drums.   You did not put it back into the same
15   drum?
16        A.   No, no, we did not put it back in the same
17   drums.
18        Q.   Who is Whitney Barrel?
19        A.   Pardon?
20        Q.   Who was Whitney Barrel, or what was Whitney
21   Barrel?
22        A.   Well, not let related that I know of, but they
23   sold clean drums, you know, they take old drums, clean
24   them all up and then they'd sell them to people.
25   Apparently did quite a little business with them as far
```

1    as that stuff goes.

2        Q.   So would Whitney Barrel pick up the drum that

3    the scrap Pyranol came out of?

4        A.   Yeah.

5        Q.   Take them from you?

6        A.   Take them back and clean them.

7        Q.   Okay, and then he'd bring them back.  Would

8    they be the same drums or --

9        A.   Pardon?

10       Q.   Would it be the same drums that they brought

11   back?

12       A.   Sometimes they did because he used to buy

13   drums from a lot of places.

14       Q.   Okay.  Why didn't you just put the scrap

15   Pyranol back into the same drum it came out of?

16       A.   Well, because there's liable to be black

17   specks in that and then it would contaminate the whole

18   load again.

19       Q.   What happened to the black specks after they

20   were filtered out?

21       A.   There was a -- we used to drain the filters

22   out, to clean the filters, and that used to go into a

23   bucket and I don't know what actually happened to the

24   bucket because I wasn't over there when they took care

25   of it.

1     Q.   Okay.  I'd like to go back to the questions I

2  was asking you earlier about unloading the trucks.

3          When you took the scrap Pyranol off the truck,

4  you tested each drum?

5     A.   Yeah.

6     Q.   Okay.  Were all the drums scrap Pyranol?

7     A.   Not always.  Sometimes you'd get something

8  that had some sort of solvent in it and then we just set

9  that barrel aside.

10     Q.   Do you know what ultimately happened to those

11  drums?

12     A.   No, I don't.

13     Q.   After you took the drums off the truck and

14  after you tested them, that's when you would start the

15  blending and filtering process; correct?

16     A.   Pardon?

17     Q.   Then you would set them aside for blending and

18  filtering, is that right?  Or did you store the drums

19  somewhere?

20     A.   We used to put the drums in a pile and then

21  Whitney would come up and pick them up.

22     Q.   Okay.  I'd like to ask you a few questions

23  about what Fletcher's was doing with scrap Pyranol

24  himself.

25          Do you know if Mr. Fletcher used scrap Pyranol

1    for any of his own products?

2         A.   Not that I know of.  Seems though one time

3    they used some of it on some sort of roof coating, but I

4    can't remember how much he used.

5         Q.   Okay.  Were you personally involved in making

6    that roof coating?

7         A.   Canning it I believe.

8         Q.   Okay.  Was this a product that Fletcher's made

9    a great deal of?

10        A.   Yeah, that was a product he made.

11        Q.   Okay.  Did he make roof coating the whole time

12   you were working for Fletcher's?

13        A.   I don't know how long he actually made that

14   stuff.  Seems it only lasted a little while.

15        Q.   Okay.  Compared to paint, was roof coating a

16   big product?

17        A.   Well, as far as paint goes, I mean thousands

18   and thousands of gallons of paint.

19        Q.   I'm just saying how did roof coating compare

20   to paint.  Did you make a lot of roof coating?

21        A.   No, no.  Maybe -- I don't know.  It wasn't

22   much.  Maybe one or 200 gallons over the course of it.

23        Q.   All right.  In a hundred gallons of roof

24   coating can you recall about how much scrap Pyranol you

25   would add to it?

1     A.    No.  Wally, my boss, would remember it, but I

2  can't remember how much.

3     Q.    Was it one gallon of scrap Pyranol?

4           MR. COWAN:  Objection.

5           THE COURT:  Sustained.  If you remember, you

6  can say, but if you don't remember, you can't say,

7  right?  Do you remember?

8     A.    No, I can't.  I know it was a minor amount.

9           THE COURT:  Okay.

10    Q.    Other than using the scrap Pyranol in roof

11  coating, can you recall any other products that Mr.

12  Fletcher would put scrap Pyranol in?

13    A.    No.

14    Q.    Other than this use that Mr. Fletcher made of

15  scrap Pyranol, what else did he do with it?

16    A.    He did what?

17    Q.    What else was Mr. Fletcher doing with scrap

18  Pyranol?  Was he selling some?

19    A.    No.  I think the only thing he used scrap

20  Pyranol for was that one little bit with the roof

21  coating and I don't think he used it in anything else.

22          THE COURT:  Was he making any pool paint at

23  that time?

24    A.    No.

25          THE COURT:  Do you remember?  How about cement

44

1    floor covering paint, did he make any of that?

2         A.   We made floor paint and deck paint, but you

3    couldn't put that in the paint because it wouldn't dry.

4              THE COURT:  You couldn't put the Pyranol into

5    that paint.

6         A.   Right, it wouldn't dry.

7              THE COURT:  Okay.

8         Q.   BY MS. ROWLEY:  Mr. Whitney, were you involved

9    in making the paint yourself?

10        A.   Pardon?

11        Q.   Were you involved in making the paint

12   yourself?

13        A.   A little bit.  I used to bring all of the

14   materials over.

15        Q.   All right.  Who is Webster Cement Company?

16        A.   Who?

17        Q.   Webster Cement Company.  Webtex or Webster.

18   Do you recall that name?

19        A.   I remember Webtex.

20        Q.   Okay, who is Webtex?

21        A.   They used to come up and get the Pyranol after

22   it was completed.

23        Q.   Okay.  How did Webtex get the scrap Pyranol?

24        A.   How did they get what?

25        Q.   How did they get the scrap Pyranol.  Did they

1    pick it up?

2         A.   Yeah, usually they came up with their own

3    truck to pick it up.

4         Q.   Did Fletcher's ever deliver it to Webster,

5    Webtex?

6         A.   I don't know.

7         Q.   And do you know what Webtex was doing with the

8    scrap Pyranol?

9         A.   No.

10        Q.   Now, how often would Webtex come and make

11   pickups at Fletcher's?

12        A.   I can't hear you.

13        Q.   How often did Webtex come and pick up the

14   scrap Pyranol?

15        A.   I don't know.  Depends on the time of year.

16        Q.   Do you know anything, Mr. Whitney, about the

17   payment arrangement between Webtex and Fletcher's for

18   the scrap Pyranol?

19        A.   No, I didn't know nothing about their

20   agreements --

21        Q.   Okay.

22        A.   -- amongst themselves.

23        Q.   Okay.  And back in the 1960s when you worked

24   at Fletcher's, what was your understanding about the

25   payment arrangement between GE and Fletcher's for scrap

1   Pyranol?

2          MR. COWAN:  Objection, no foundation.

3          THE COURT:  Hang on just a second, sir.  Do

4   you have any personal knowledge about how payment was

5   arranged?

6      A.  No.

7          THE COURT:  You need to give some foundation.

8   The objection is sustained.

9      Q.  Do you know if Mr. Fletcher ever got

10   chlorinated biphenyls or used Aroclor from anyone other

11   than GE?

12      A.  Yes, seems as though there was some from -- I

13   can't think of the name right now.

14      Q.  Is it Sprague?

15      A.  Yeah, Sprague Electric I believe.

16      Q.  Anywhere else?

17      A.  I don't know.  I don't think so.  But it might

18   have been one other one.

19      Q.  Okay.  How often did Fletcher's get scrap

20   Aroclors from Sprague compared to from GE?

21      A.  Not nowhere near as often.

22      Q.  Did you ever observe the scrap Aroclors

23   obtained from Sprague?

24      A.  Treated it the same way they did anything

25   else.

47

1      Q.   Okay, so you would test those drums?

2      A.   Yeah, we tested some of it.

3      Q.   A couple other questions.  Did you ever

4   receive any special instructions from GE about how to

5   handle scrap Pyranol?

6      A.   No.

7      Q.   Okay.  To your knowledge did the drivers from

8   Fletcher's ever come back from GE with any paperwork

9   about how to handle the scrap Pyranol?

10     A.   No, I don't recall.

11     Q.   Were you ever provided with any warning

12   material from GE about scrap Pyranol?

13     A.   No.

14     Q.   Okay.  Did you ever see any warning labels on

15   the drums that related to scrap Pyranol?

16     A.   I couldn't hear that.

17     Q.   Did you ever see any warning labels or

18   information on the drums?

19     A.   No.

20     Q.   Okay.  I'd like to go back and ask you a few

21   more questions about how Mr. Fletcher got the scrap

22   Pyranol, how it arrived at the site at Elm Street.

23          Did scrap Pyranol always arrive in the mill by

24   a truck owned by Mr. Fletcher?

25     A.   No.

1    Q.   What other kind of trucks did it arrive on?

2    A.   There was a tractor-trailer that would haul

3    some in.  I can't remember the guy's name that drove

4    truck for him, it's been so many years.

5    Q.   The tractor-trailer truck, about how big was

6    that truck?

7    A.   Fletcher's truck?

8    Q.   No, the tractor-trailer truck, about how many

9    drums could that one hold?

10   A.   Oh gee, it's a lot.  It depends on whether or

11   not they stacked them up two high on the truck or they

12   laid them down, so it's pretty hard to say exactly how

13   many.  It was a lot of them over a period of a couple

14   years that I know of.

15   Q.   Did the tractor-trailer truck hold more drums

16   than Fletcher's truck?

17   A.   Oh yeah.

18   Q.   And how do you know this?

19   A.   Pardon?

20   Q.   Did you personally unload the tractor-trailer

21   truck?

22   A.   Yeah, most of the time, not always, but most

23   of the time.

24   Q.   Okay.  And who is Ted Madsen?

25   A.   Ted Madsen used to live over on the other side

1   of Cottage Street.  I think he hauled a load or two for

2   Fred as a favor, but I don't know what he charged him or

3   if he charged him.

4       Q.   When you say he hauled a load or two, is that

5   a load or two of scrap Pyranol?

6       A.   Pardon?

7       Q.   Do you mean a load or two of scrap Pyranol?

8       A.   Yeah.

9       Q.   Okay, scrap Pyranol from GE?

10      A.   Right.

11      Q.   In terms of the tractor-trailer truck that

12   brought scrap Pyranol to Fletcher's, how often did that

13   truck bring scrap Pyranol to Fletcher's?

14      A.   I was getting through about that time when

15   they started having Madsen hauling in, I couldn't tell

16   you how often he came in with it.

17      Q.   Okay.  And when you say you were getting

18   through, do you mean this was toward the end of your

19   employment?

20      A.   Right, right.

21      Q.   Okay, so if you started in the early sixties,

22   this would be the late 1960s?

23      A.   Yeah, I was -- it was either '60 or '61 when I

24   started at Fletcher's and I went through '65 or 6,

25   something like that.

1    Q.   Okay.

2    A.   Practically seven years that I worked there

3  anyways.

4    Q.   All right.  So the tractor-trailer truck

5  brought the loads in of scrap Pyranol after the time

6  period when Hooper was driving it, was driving the

7  truck?

8    A.   I see it a couple of times afterwards, but I

9  never paid too much attention to it.  I mean, it was

10  basically out of my mind then, I was going to work for

11  someone else.

12    Q.   All right, at the time when you stopped

13  working for Mr. Fletcher, was Webster still picking up

14  the scrap Pyranol?

15    A.   To the best of my knowledge, yeah, but I

16  couldn't swear to it.  I wasn't there, so I couldn't

17  say.

18    Q.   No, no, I'm talking about before you stopped

19  working for him, right around that time, right before

20  you stopped working for Fletcher's?

21    A.   Seemed as though there was a lull at that time

22  in the amount that was coming in and going out.  I don't

23  know if there was anything going out to speak of, that's

24  why they stacked the drums up.

25    Q.   Okay, so around that time the drums of scrap

1    Pyranol was stacked up?

2         A.    Yes.

3         Q.    On Fletcher's property.   Was this on Elm

4    Street?

5         A.    No, that was Cottage Street.

6         Q.    Cottage Street.   And is Cottage Street the

7    same piece of property as Mill Street?

8         A.    Yeah, that's the same, Fletcher's, just the

9    same.

10         Q.    Okay, same location?

11         A.    It was just to get it out of the way.   They

12    had no storage space to speak of.

13         Q.    Okay, they put it over on Mill Street?

14         A.    Yeah.

15         Q.    Okay.   How were the drums stored over there.

16    Were they on their side or were they on pallets?

17         A.    How many do you pile on a pallet?

18         Q.    No, no, were they stored on their side or were

19    they stored on the pallets?

20         A.    Back at the factory we usually stored them on

21    pallets.

22         Q.    Ah-hum.

23         A.    And I guess over to Cottage Street they were

24    laid on their side.

25         Q.    Okay.

1        A.   Until they took it all away.

2        Q.   Okay.  Were there any problems with storing

3   the drums on its side?

4        A.   Yes.

5        Q.   What were the problems?

6        A.   When the weather changes the -- it will blow

7   out the end, not necessarily the end of the drum but the

8   gaskets, and that would make them leak.

9        Q.   Okay.  And this happened while you were

10   working there?

11       A.   Pardon?

12       Q.   Did this happen while you were working at

13   Fletcher's?

14       A.   Well, if I see anything that was leaking like

15   that, I used to put a new gasket in.

16       Q.   Okay.  What happened if a drum in the middle

17   of the pile was leaking like that?

18       A.   We tried not to have too many in that middle

19   pile.

20       Q.   Would you be able to reach the drum and fix

21   the leak?

22       A.   Well, yeah, we'd move them and repair the

23   leak.  Sometimes we'd stand them up on end and put a new

24   gasket and leave it that way for a little while and you

25   can see if there's anything in the drum that would push

1   it out, you know, heat or something.

2        Q.   Okay.

3        A.   If the drum would stop leaking, then it's okay

4   to put it back in the pile.

5        Q.   Okay.  I'd like to go back just for a second

6   and talk about the blending and filtering of the scrap

7   Pyranol again.

8        A.   Uh-huh.

9        Q.   Before you started this process, Webtex had

10  brought back a load of thin scrap Pyranol; right?

11             MR. COWAN:  Objection.

12       A.   Yes.

13             MR. COWAN:  Withdrawn, my apologies.

14       Q.   It's between 104 and 109.  Let me just read

15  it.

16             MR. COWAN:  I renew my objection, the

17  reference to the thin loads.

18       Q.   BY MS. ROWLEY:  Mr. Whitney, do you recall

19  Webtex returning a load of scrap Pyranol to Fletcher's?

20       A.   It's possible they returned some that had

21  black specks in it, but that would have been early on.

22  Apparently they solved the problem by putting the two

23  filters.

24       Q.   Is that when the blending and filtering

25  started?

1      A.    Yes.

2      Q.    Okay.  Do you know whether Webtex would have

3  kept purchasing scrap Pyranol from Mr. Fletcher if you

4  hadn't done the blending and filtering?

5      A.    I don't know that.  Fred wasn't one to confide

6  in everybody.

7      Q.    He didn't tell you the arrangement?

8      A.    Pardon?

9      Q.    He didn't tell you the arrangement?

10      A.    No.

11      Q.    Okay.

12            MS. ROWLEY:  I'd like just one second.

13            (Pause.)

14            MS. ROWLEY:  I don't have any further

15  questions, so I'll let Mr. --

16            THE COURT:  All right, let's take our morning

17  break now.  We will take a break for about 15 minutes,

18  sir, then we will come back and the lawyer for General

19  Electric is going to ask you some questions, okay?

20            (Recess taken.)

21            THE COURT:  Go ahead.

22            MR. COWAN:  Your Honor, I'm simply just going

23  to say good morning to Mr. Whitney, good to see him

24  again, and let you know we have no questions for this

25  witness.

1          THE COURT:  All right, sir, you're all set.

2     Thank you very much for coming in, you're excused and

3     you can step down.  And the government can call its next

4     witness.

5          MR. COWAN:  Have a good day, Mr. Whitney.

6     Good to see you again, sir.

7          THE WITNESS:  Thank you.

8          MR. FLYNN:  Your Honor, similar to what we did

9     a few minutes ago with other exhibits, we have a few

10    more exhibits at this point.

11         THE COURT:  All right.

12         MS. ROWLEY:  The next exhibits I'd just like

13    to briefly show you are U.S. Exhibits 57, 58, 59.

14    Exhibit 57 is a document, this is a motion filed in

15    United States District Court in the District of Nevada

16    by defendants General Electric Company and Westinghouse,

17    summary judgment motion on a failure to warn claim.

18         THE COURT:  What's the exhibit number again?

19         MS. ROWLEY:  Exhibit 57.

20         THE COURT:  Can I have my clerk give me the

21    next volume of exhibits.

22         MS. ROWLEY:  I'm sorry, I should point out

23    this is actually objected to by General Electric on

24    relevancy grounds.

25         THE COURT:  All right.  All right, what do you

1    want to draw my attention to?

2            MS. ROWLEY:  PAI 1092 which shows that the

3    plaintiff's claims in this case are dated for the 1950s,

4    60s and 70s, so they overlap with the relative time

5    period in this case, and the next page just shows the

6    motion was signed for an attorney for GE.

7            THE COURT:  Why does that matter?

8            MS. ROWLEY:  Oh, well, it's GE's motion, and

9    the next exhibit is 58, which I will show you the

10   substantive point to point out here is PAI 11.  Page

11   1100 is the bates number.  Here GE is the equipment

12   manufacturer.  And then on page Bates labeled 1103 in

13   the memorandum GE argues that it provided the plaintiff

14   in this case, which was the purchaser of capacitors and

15   transformers with precautionary warnings regarding PCB

16   fluids, they provided each piece of PCB electrical

17   equipment they sold to the plaintiff.  And on the next

18   page, at the top of the page they state that the warning

19   contained instructions to avoid contact with PCB fluids

20   and inhalation of PCB vapors.  The middle paragraph on

21   this page states that the warnings on PCBs were at all

22   times consistent with the applicable industry standards

23   and even more detailed warnings for PCBs that were

24   approved by the United States Surgeon General.  Going

25   back up on this page states that GE would modify their

1   warnings from time to time to keep up with available

2   information on PCBs.

3           THE COURT:  All right, and you don't want it

4   to come in for what reason?

5           MR. BIAGETTI:  Well, it talks about, and the

6   only place where it does talk about time frame, first of

7   all, we're talking about the late sixties, so it's not

8   clear we're talking about the same time frame.  Secondly

9   it talks about warnings in instruction booklets with

10  electrical equipment.  That's not an issue in this case.

11  There's no -- we're -- there's no provision of any

12  electrical equipment here.

13          MS. ROWLEY:  Our point is that the warnings

14  pertain to PCBs.  PCBs is to Fletcher's.  They didn't

15  provide the same warnings to Fletcher's.  It doesn't

16  reflect that it had to treat the scrap Pyranol like a

17  product.

18          THE COURT:  Did you try requests for

19  admissions or something to try to get at exactly how

20  they labeled their PCB containing products and when they

21  labeled it?

22          MS. ROWLEY:  There is some more specific

23  information in trial Exhibit 59 which is also part of

24  this set of documents.  It's the statement of undisputed

25  facts that GE submitted with this motion for summary

1   judgment in the federal court, and in that document they

2   do get into the specific warnings and there's an example

3   of one from 1945.

4           THE COURT:  1945?

5           MS. ROWLEY:  Yes.

6           THE COURT:  And it's a PCB warning?

7           MS. ROWLEY:  Yes.  I mean, it doesn't include

8   the same information that would have been provided in

9   the seventies, but --

10          THE COURT:  No, it doesn't -- the nature of

11  the information doesn't matter.

12          MS. ROWLEY:  Exactly.

13          THE COURT:  Your point is, useful products

14  containing PCBs bear labels containing PCBs, and we can

15  demonstrate that that was true as in the forties and

16  generally, more generally in the fifties, sixties and

17  seventies based on this statement.  The actual content

18  doesn't matter.

19          MS. ROWLEY:  Right.

20          THE COURT:  Do you disagree with their

21  contention supported by this evidence that when GE sold

22  a product containing PCBs, its practice was to label the

23  product as containing PCBs?

24          MR. BIAGETTI:  Its practice was to label and

25  to provide instruction booklets.  I think we have some

1   of those that are going to be brought where they speak

2   for themselves.

3           THE COURT:  All right, so the central point I

4   think is conceded that GE labeled a product containing

5   PCBs, that it contained PCBs.

6           MR. BIAGETTI:  No, I don't believe that the

7   labels do say that they contain PCBs.

8           THE COURT:  What's the 1940s warning say?

9           MS. ROWLEY:  I have to find the document.

10          (Pause.)

11          MS. ROWLEY:  I believe it's on the page that's

12   labeled PAI 1173.  It's part of Exhibit 59.

13          MR. BIAGETTI:  59?

14          MS. ROWLEY:  59, yes.

15          THE COURT:  All right, we're talking about

16   here instruction booklets rather than product labels.

17          MS. ROWLEY:  Ah-hum.

18          THE COURT:  Okay, and at least a quick scan

19   doesn't specifically identify a product as containing

20   PCB, just references that it's Pyranol and identifies

21   the certain risks associated with it, right?

22          MS. ROWLEY:  It identifies liquid Pyranol.

23          THE COURT:  Right, it calls it Pyranol,

24   doesn't call it PCB.

25          MS. ROWLEY:  Right.

1              THE COURT:  So literally what counsel is

2    saying is correct.

3              Do you have anything about product labels as

4    opposed to instruction booklets?

5              MS. ROWLEY:  I don't.  The only thing I would

6    point out in a minute.

7              (Pause.)

8              MS. ROWLEY:  PAI 1167.  No, it was all

9    contained in the instruction booklets that came with the

10   product, but it was information provided about the PCB

11   content which GE referred to as Pyranol.

12             THE COURT:  It just doesn't call it PCB.

13             MS. ROWLEY:  Correct, but in their motion they

14   call it PCB.

15             THE COURT:  Right.  Where, again, the

16   distinction I'm drawing between product labels and

17   booklets, show me the reference to product label.

18             MS. ROWLEY:  No, I think I conceded it was

19   information booklets.

20             THE COURT:  Is there anywhere, though, in

21   there where they talk about product labels, whether they

22   contain PCB or not?

23             MS. ROWLEY:  I'd have to look back at their --

24             THE COURT:  I thought there was some reference

25   in 58 where they reference the fact that they labeled

1   their product and provided booklets in accordance with

2   industry standard.

3           MS. ROWLEY:  Simply on 1103, the way that GE

4   words it in their memorandum in this case, that they

5   provided precautionary warnings to this electrical --

6           THE COURT:  In the form of instruction

7   booklets.

8           MS. ROWLEY:  In the instruction booklets.

9           THE COURT:  Okay, so I think what the

10  government is trying to argue here is that your practice

11  from the 1940s through the 1970s as evidenced by these

12  documents, was to provide a warning -- a booklet

13  containing warnings about the products that you

14  manufactured that contained Pyranol, and those warnings

15  reference the fact that there were Pyranol in the

16  product, and that's all they're trying to establish

17  through these exhibits.  They then want to argue that

18  because other evidence shows you didn't provide a

19  warning booklet to Fletcher Paint for this product

20  containing Pyranol, that I should infer from this that

21  the arrangement was to dispose rather than to sell the

22  product, okay, so the fact, I don't think you really

23  disagree with the underlying facts from which the

24  inference would be drawn, that is, when you manufacture

25  products that contain Pyranol, the practice of GE from

1   the forties through seventies was to provide a booklet

2   that included a warning that identified the product as

3   containing Pyranol and described some of the risks that

4   are associated with that Pyranol.

5         Do you disagree with that?

6         MR. BIAGETTI:  Yes.

7         THE COURT:  Okay.

8         MR. BIAGETTI:  We've provided instruction

9   books, we've offered them in evidence, I believe they

10   were objected to.  They speak for themselves.  They do

11   not contain warnings.

12         THE COURT:  So how do you reconcile what

13   you've got here which is the admission by GE through its

14   attorneys in another case?

15         MR. BIAGETTI:  I can't reconcile it, I can

16   only provide the context by providing the actual

17   documents.

18         THE COURT:  All right, well, the objection to

19   the admission of the documents is overruled.  I'm going

20   to tell you, if you don't provide me with an explanation

21   I'm going to conclude, based on this, that your practice

22   was to label it to provide instruction booklets because

23   that's what the documents that you submitted to a court

24   that are admissions on behalf of GE say.

25         MR. BIAGETTI:  Would you take a proffer of the

1    documents themselves?

2           THE COURT:  Yeah, but I'm asking you to come

3    up with an explanation that reconciles these things.

4    You're the ones that control these things.  You can call

5    the people from GE who are involved in putting these

6    things together and provide some reconciliation for me.

7    If you fail to explain what seems to me to be an

8    admission that you did have products that you didn't

9    reference the Pyranol in the products that you sold that

10   contained Pyranol in the instruction booklets, if you

11   don't provide me with a satisfactory explanation, I'm

12   unlikely to buy your challenge to the government's point

13   here.

14          MR. BIAGETTI:  Understood.

15          THE COURT:  I'm just giving you fair warning

16   on that, all right, but the objection's overruled.

17          MS. ROWLEY:  Okay.  And I just conclude on

18   this point that U.S. Exhibits 44 and 45 are GE documents

19   that provided personnel with handling instructions for

20   TCE and PCB.  These are dated to the 1960s and these

21   documents speak for themselves.

22          THE COURT:  45?

23          MS. ROWLEY:  44 and 45.  I believe one is for

24   TCE and one is for Pyranol.  The dates of the documents

25   are in the lower right-hand corner.

1          THE COURT:  These are internal GE documents.

2          MS. ROWLEY:  Correct, so these are not

3    documents that went out to customers but a related point

4    that I make.

5          THE COURT:  All right.

6          MS. ROWLEY:  And that's all.

7          THE COURT:  Okay.  You ready to call the next

8    witness?

9          MR. FLYNN:  Your Honor, I'd just like to

10   clarify one point that Mr. Biagetti raised.  The United

11   States has not objected to the instruction books that

12   he's proffered, but from my understanding from my

13   conversation with Mr. Biagetti, these were not the

14   instruction books that accompanied this filing in court

15   but other ones that GE has recently found.  Apparently

16   neither side has the actual instruction books that were

17   filed with the court.

18         THE COURT:  I don't think you can -- he's not

19   representing that the instruction books are for those

20   products.  What he's trying to say is we had other

21   products around that time that contained Pyranol.  We

22   had instruction booklets for those products.  Those

23   instruction booklets don't warn about Pyranol.  And so

24   they're offering that to undercut the strength of the

25   inference that you want me to draw from your exhibit

1  because the strength of your inference diminishes to the

2  extent you can show they didn't have a consistent

3  practice of warning customers about the fact that the

4  product contained Pyranol.

5          MS. ROWLEY:  To that I would actually draw

6  your attention to, again, Exhibit 59, page Bates labeled

7  1167.  Okay, this is a general statement and it goes

8  outside of their statements earlier which just reference

9  the plaintiff, providing instruction booklets to the

10  plaintiffs and it references their electrical equipment

11  customers in general.

12          THE COURT:  Yeah, so, I guess what they would

13  say is that admission, I mean this is the explanation I

14  would expect them to offer because they haven't offered

15  one yet, but I would think they would say that statement

16  is a statement that, as to GE and Westinghouse customers

17  -- excuse me, GE and Westinghouse provided to customers

18  who purchased PCB equipment included information about

19  the proper handling, they would say that's not a

20  statement that we did to all and every product and, you

21  know, to the extent we may have inadvertently misled a

22  court, we're sorry, but we now found in fact we didn't

23  do it uniformly and consistently, so you can't infer

24  much from the fact we didn't do it.

25          MS. ROWLEY:  Actually I would point out that

1    it says electrical equipment customers at the Hudson

2    Falls and Fort Edward plant, we have a stipulation they

3    were manufacturing capacitors and transformers there,

4    those were the electrical equipment.

5              THE COURT:  All right, wait a minute, I'm on

6    the wrong page, then.  Which paragraph, 12?

7              MS. ROWLEY:  I'm still on 1167, paragraph 14.

8    It's on the screen.

9              THE COURT:  That one doesn't say specifically,

10   14 doesn't specifically say customers for a particular

11   plant, right?

12             MS. ROWLEY:  No, but I was just pointing now

13   to our stipulation of facts where both sides stipulated

14   that at Hudson Falls and Fort Edward, those plants

15   manufactured electric capacitors which is electrical

16   equipment, so I would argue, I don't know if they have

17   evidence to rebut this, but I would say if they are

18   saying they provided this information to their

19   electrical equipment customers that at the Fort Edward

20   and Hudson Falls plant they would have been --

21             THE COURT:  But where are you getting that

22   from the plants?

23             MS. ROWLEY:  From our stipulated facts.

24             THE COURT:  What's the stipulation?

25             MS. ROWLEY:  It's again from Document 85 that

1    was filed yesterday morning, numbers 22 and 23.

2              THE COURT:  Just give me, read to me what --

3              MS. ROWLEY:  During the applicable time period

4    GE operated manufacturing plants at Fort Edward, New

5    York, and Hudson Falls, New York, for GE plants.  The

6    next one says during the applicable time period the GE

7    plants manufactured capacitors.

8              THE COURT:  Okay, yeah, I understand but that

9    doesn't respond to the point that I think that you're

10   making.  The point I think you're trying to suggest to

11   me is this admission that we made in this case does not

12   -- is not logically inconsistent with the instruction

13   booklets which we are producing to you which do not

14   contain that reference, and are those instruction

15   booklets for equipment that is of the type referred to

16   in Exhibit 59?  Is it electrical equipment?

17             MR. BIAGETTI:  They are instruction booklets

18   for Pyranol for use in transformers, regulators and

19   reactors.  So they are instruction booklets.

20             THE COURT:  Yeah.

21             MR. BIAGETTI:  They are with regard to the

22   handling of Pyranol in transformers, regulators and

23   reactors, and they do talk about, if you get it in your

24   eyes, you know, wash your face, so that's as far as they

25   go, they speak for themselves.  At the appropriate

 1    time --

 2              THE COURT:  So you disagree -- hand them up to

 3    me.  Give me the exhibit numbers and he'll --

 4              MR. BIAGETTI:  They are Defendant's

 5    Exhibits 73, 74, 75, 76 and 77.  I'm sorry, and 79.

 6              THE CLERK:  77 and 79?

 7              MR. BIAGETTI:  Yes.

 8              THE COURT:  Okay.

 9              MR. BIAGETTI:  There may be one more.

10              THE COURT:  These instruction manuals do

11    provide warnings about Pyranol.  They're just different

12    kinds of warnings than the ones that are quoted in that

13    document, right?  They identify Pyranol.

14              MR. BIAGETTI:  Yes.

15              THE COURT:  They give instructions about how

16    to handle Pyranol, and they talk about the need to wash

17    off --

18              MR. BIAGETTI:  Yes.

19              THE COURT:  Okay, that's a warning.  It may

20    not be as stringent a warning, but it's a warning, and

21    their point is that for what it's worth, it isn't by

22    itself sufficient, but their point is a simple one.

23    Their point is, when you sell product containing

24    Pyranol, you give an instruction manual identifying

25    Pyranol and instructing buyers what to do in the event

1    that they're exposed to Pyranol.  You did that

2    consistently from the forties to the seventies for

3    products containing Pyranol.  The nature of the exact

4    warning changed over time and was not consistent from

5    product to product, but there was a warning, unlike what

6    you shipped to Fletcher which contained no instruction

7    manual, no warning, so that supports, however weakly, an

8    inference that you didn't view this as a product, you

9    viewed it as a waste.  That's their point.  You

10   understand the point?

11        MR. BIAGETTI:  I understand their point.  Of

12   course our point is that we were selling to Fletcher for

13   a use that was not in capacitors, transformers or

14   otherwise.  And I missed one, there's also 78 is the

15   last of the booklets.

16        THE COURT:  We spent like 20 minutes on a

17   completely minor point.  The problem for you that you're

18   going to need to deal with and the government should be

19   focusing on so we don't waste a lot of time here is a

20   very simple problem.  It seems to me based on prior

21   statements, your admissions and so forth, that there is

22   no question in anyone's mind that GE viewed scrap

23   Pyranol for GE as a waste, something that it did not

24   have a productive use for, and it wanted to get rid of

25   the waste Pyranol in the most cost effective way that it

1   could do it.  That for a time it simply disposed of it

2   itself or it found people to carry it away and paid them

3   to take it away as a waste, and that they eventually

4   found someone, or Fletcher found them, someone who was

5   willing to pay for the product and who thought that at

6   least some of it would be useful to him, and as is

7   almost always the case in litigation the parties take

8   extreme positions, the truth is really somewhere in the

9   middle, and the real suggestion here is that the

10  evidence leads to the conclusion that of course GE's

11  motive here was to get rid of the waste Pyranol in the

12  most cost effective way, and Mr. Fletcher wouldn't pay

13  for it unless he thought he could put it to some use,

14  and he, unlike what the government seems to be

15  suggesting, he wasn't just paying for it so he could put

16  it into the ground there or let it sit there until it

17  became useless, he in fact had a use for some of it,

18  found some people that were willing to pay for it, some

19  of it was in fact used, but the problem that neither of

20  you seem to be focusing on sufficiently is Mr. Hooper's

21  testimony that this Pyranol, waste Pyranol was of

22  extraordinarily varied in its quality, and a lot of it

23  was garbage junk that everybody knew could not be used,

24  and that GE was taking advantage of a situation with

25  someone who thought that they could make some use of

 1   some of it and that some of it would be junk, and that

 2   GE's motive was to get it all out there knowing that a

 3   big chunk of what they were giving out was non-useable

 4   junk, and that therefore its disposal would be

 5   substantially certain to result from GE's conduct, and

 6   it is economically sensible for GE to give Hooper a load

 7   of junk that contains a couple of good barrels for which

 8   Hooper paid, contains a bunch of junk, Hooper never

 9   brings back the junk, he just takes it, so GE's problem

10   is solved.  In the early days the first manager would

11   make allowances, as Mr. Hooper testified to, for the

12   junk and he would reduce the price so Fletcher wouldn't

13   have to pay, but GE's interests are served because it

14   stays there.  Later on there was some dispute about that

15   and eventually GE agreed to write off some of the bills

16   because they realized we won here, we got what we

17   wanted.  Our junk that we would have had to dispose of

18   would have cost us more to dispose of it, so we got it

19   to Hooper, so let's forget the debt and let them keep

20   the junk.  We've won.  We achieved what we wanted.

21          So the truth is, the argument that I thought

22   somebody should be advocating here is the truth is

23   actually somewhere between the two of your positions.

24   Your position that this was an arrangement to sell a

25   useful product is challengeable based on substantial

1    testimony that a lot of what was being sold was junk and

2    known by GE to be junk and understood by Fletcher to be

3    junk, and it was substantially certain that it would be

4    disposed of, but that unlike what the government was

5    suggesting to me at the beginning of the case, some of

6    the stuff was useful to Fletcher.  He wasn't just paying

7    money out for the heck of it, he was using it in his

8    product in small amounts, and he found some people who

9    were willing to take some of it if he could get it of

10   sufficient quality, and there is in fact a use for

11   Aroclor or clean enough Pyranol as a plasticizer in

12   various products or as a filler, extender, and so it's

13   not the case that there was no use for this product.  On

14   the other hand, a lot of what was being transferred was

15   Pyranol that was so heavily contaminated that it

16   couldn't be used and everybody understood that, and that

17   was part of the price of doing business, and this was

18   the means by which GE got rid of what it wanted to get

19   rid of, which was its waste.  Somebody should be

20   presenting that argument.  Instead I get your argument

21   that the evidence says it's all highly valuable and

22   useful stuff and your argument that it's all junk.  It's

23   not either of those things.  Somebody ought to be

24   presenting a middle ground argument, which I haven't

25   heard much from the parties frankly.

1            MR. BIAGETTI:  Your Honor, you know, on the

2    middle ground, the other things that Hooper said were,

3    first of all, that trailer truckloads of this stuff that

4    Fletcher bought was either sold or used by him so much

5    so that he ran out and had to come back for more.  So

6    we're talking about a small amount, if any.  Secondly,

7    that during the Varnum years, those drums that were

8    tested that were not up to Fletcher's specifications

9    were left back at GE.  And as to the ones during the

10   Metevier years that were not the highest quality of

11   scrap Pyranol, number one, some of it was blended so

12   that it could be still sold to Webster albeit at a lower

13   price, and there was some I believe he said that when

14   they looked at it in all those trailer loads, there were

15   a few barrels that didn't have Pyranol at all.  So even

16   if we believe in the middle ground that some barrels

17   were being set aside by Mr. Fletcher because they didn't

18   have Pyranol at all, number one, GE didn't know that.

19   And number two, those barrels don't have Pyranol in

20   them.

21            THE COURT:  They have another hazardous waste,

22   TCE, which he called tri-clean D, which is TCE.  I mean,

23   that's a degreaser.  That's probably the biggest single

24   hazardous waste you'll find in New Hampshire ground is

25   TCE because that's what most of our plants up here were

1    using for degreasers at the time.  So that's the problem

2    that you face.  Your argument seems to be more based on

3    kind of an apportionment theory for a later phase of the

4    trial, that we didn't do a lot of it, judge, so don't

5    hold it against us.  Well, phase one, this phase,

6    one ounce, okay, you had one ounce of hazardous waste

7    for disposal, you lose at this phase.  I'm not making a

8    decision about how much of it.  So that's more an

9    argument of apportionment.  We did do much of it, much

10   junk along with the good stuff, okay, but you still

11   lose.  That's the problem with your analysis.  But

12   you've got to show there wasn't an arrangement for

13   disposal of any hazardous substance.  None of these

14   transactions involved an arrangement for disposal of any

15   amount to any degree, and that's a difficult problem.

16        MR. BIAGETTI:  Well, I understand, but it does

17   get me back to, I hear your apportionment concern and if

18   it's going to be a TCE case, that's a different thing,

19   but for now, that small fraction which may or may not

20   have been, you know, a few drums that were set aside

21   that did not have Pyranol in them, is relevant to,

22   again, GE's intent, what GE must have known when it was

23   shipping truckloads of stuff to a man who was

24   inspecting, rejecting, or using even the thinner ones on

25   the degreaser.  Some of those, indulging again the

1    recollections, some of them had degreaser in them, some

2    of those were thinner and could be mixed with the

3    thicker and sold, number one.  Number two, the expert

4    testimony is that even with the degreaser in it, that

5    product was still useful and useable in, among other

6    things, roof coating, which he was selling to Webster.

7    And finally, if there was in the thousands of barrels, a

8    barrel or two of pure TCE, that's a valuable barrel for

9    a guy who is always looking to make a buck.

10              THE COURT:  If it is pure, but if the

11   recycling practices -- I've had a lot of TCE cases so I

12   know TCE a lot better than I know PCB.  I can tell you

13   that in the fifties and sixties the recycling practices

14   for TCE, there were not methods to decontaminate TCE and

15   reuse it that were economically viable given the price

16   of TCE, so the idea that they were going to take -- and

17   I hope I'm going to hear about how GE did this because

18   I'm envisioning that they used, when they would apply

19   Pyranol, right, they would need to clean things out when

20   they were done, that's what most businesses do, and most

21   businesses then would use something like TCE to clean

22   out things that had Pyranol in them, and then that

23   mixture of TCE and Pyranol would end up in a drum that

24   would get sent to Fletcher.  I mean, that's what I'm

25   assuming happened.  Maybe the evidence won't support

1    that view.

2              MR. BIAGETTI:  Well --

3              THE COURT:  But Mr. Hooper certainly testified

4    that there were a significant number of the drums that

5    contained a lot of tri-clean D in it, and the testing

6    data tends to support the, that was done years later,

7    tends to support the idea that it was a significant

8    amount, and common sense suggests that the waste

9    involved here would contain substantial amounts of a

10   cleaning agent or degreaser.  So all of that seems to

11   fit.  We'll see what, when your guys testify, how that

12   works out, people who were actually involved in the

13   process can explain how it was used.

14             All right, we ready to go on to the next

15   thing?

16             MR. FLYNN:  I've got three, again, this idea

17   of publishing documents without witnesses, I have three

18   more documents.

19             THE COURT:  Okay.

20             MR. FLYNN:  I'll try to be quick with.  The

21   first one is United States Exhibit Number 19.

22             THE COURT:  So in any event, I think this

23   evidence about label, didn't label, GE thought this

24   Pyranol was a waste.  I don't think GE really disputes

25   this.  It thought it was a waste for it.  GE thinks it

1  might have been useful to somebody else, but it at least

2  makes sense to me, even if they thought it was useful

3  for somebody else, they wouldn't prepare a manual, a

4  user manual for the waste Pyranol in the same way they

5  would for a transformer that they were manufacturing, so

6  I'm not sure that given the half hour or so we spent on

7  it that it's really worth all that much time and effort

8  to try and go through it.  But I understand, you've got

9  to try and milk it for everything you can.  But try to

10  get the focus on what the big evidence is because that's

11  what -- these kind of little details that are

12  susceptible to multiple inferences don't really amount

13  to much in the grand scheme of things.  There's no doubt

14  that GE, I don't think there is, that GE thought this

15  Pyranol for it was a waste.  It was a nuisance that had

16  to be gotten rid of.  And if it could make a little

17  money on the side doing it, great, but GE was not

18  supporting its stock price through the sale of used

19  Pyranol to Fletcher Paint, you know, that wasn't how

20  they were making their bucks.  That was a way of getting

21  rid of a problem for them.  So they wouldn't put a

22  product manual together for something like that.  The

23  cost of putting it together would outweigh the potential

24  benefit of selling it.  So I'm not sure that I would

25  make much of the product manual stuff.  Go ahead.

```
 1              MR. FLYNN:  Your Honor, I want to point out

 2    for this exhibit that General Electric has objected to

 3    it on a number of grounds, relevancy --

 4              THE COURT:  What's the number?

 5              MR. FLYNN:  U.S. Exhibit Number 19.

 6              THE COURT:  Okay.

 7              MR. FLYNN:  Their objections are relevancy.

 8              THE COURT:  What is it?

 9              MR. FLYNN:  What is it?  It's a document

10    produced to the United States by General Electric,

11    prepared by General Electric in 1975 that documents

12    different places that their scrap PCBs were disposed of,

13    and it includes Fletcher's Paint, Milford Paint Works as

14    one of the disposal places.

15              THE COURT:  Yeah, here's the problem, okay,

16    you look up disposal, the term disposal on the OED, you

17    know what the applicable definition is?  Gotten rid of,

18    okay.  When this document was drafted, do we have a date

19    on it?

20              MR. FLYNN:  1975.

21              THE COURT:  Okay, that was -- Superfund hadn't

22    been passed, had it?

23              MR. FLYNN:  No, it had not.  It was before

24    there was a legal definition of disposal that was

25    potentially relevant to GE's liability.  I don't think
```

1    it was adopting the definition of disposal here that is

2    set forth in 42, USC, Section 9603, okay, they were

3    using the term disposal in the sense of gotten rid of,

4    and I think that's what they -- that's what I would

5    understand the term to mean.  It doesn't really answer

6    the question.  They were getting rid of the Pyranol.  I

7    mean, if they thought it was one of their potential

8    product lines they wouldn't call it disposal, but they

9    got rid of it, it was a waste, they got rid of it.

10            MR. FLYNN:  Well, your Honor, I forget the

11   exact phrase, you are the company you keep with or

12   something like that.  If you look at the other places

13   that are listed for under disposal, one of them is a

14   landfill and two of them are chemical places that did

15   incineration.

16            THE COURT:  Ah-hum, okay, I understand the

17   point and, I mean, it's here and you want me to rule on

18   objections to it.  Are there any objections they want to

19   make to it?

20            MR. FLYNN:  I can tell you which ones they

21   listed.

22            THE COURT:  They can make their objection.

23   You want to press objections to --

24            MR. BIAGETTI:  No, we withdraw the objection.

25            THE COURT:  Okay.  All right, that document

1    will be admitted.

2              MR. FLYNN:  Okay, your Honor.  The next

3    document, and I only have two more, was U.S. Exhibit

4    Number 6 which is not objected to.

5              THE COURT:  Hang on just a second.  Can I go

6    back to your last exhibit.  It says method and place of

7    disposal.  Where does it talk about method?

8              MR. FLYNN:  As I'm reading it, I don't see the

9    method other than the understanding of certainly what A,

10   B and C did with material they received.

11             THE COURT:  Do we have a version that doesn't

12   have the last bit of handwriting blanked out?  The copy

13   I have you can't -- there's handwriting that's not

14   legible.

15             MR. FLYNN:  I'm not sure the United States has

16   a copy.  This was originally obtained from GE.  I don't

17   know if they have a better copy.

18             THE COURT:  It looks to me like it's a draft,

19   isn't it?  I mean, somebody sort of making a

20   modification to it.

21             MR. FLYNN:  Well, it was then 3 years later it

22   was sent to the people on the left.  If you see, that's

23   November 1978.

24             THE COURT:  Do you see what I mean, the

25   original title to that table was where disposed, and it

1    seems to fit that, and then somebody scratches that out

2    and writes over method and place of disposal, and I'm

3    wondering whether there are any subsequent versions of

4    that document that identify method of disposal.

5              MR. FLYNN:  I'm unaware of that.  We don't

6    have it that I understand.

7              THE COURT:  All right, now back to your next

8    exhibit.

9              MR. FLYNN:  Which is United States Exhibit

10   Number 6, was again, not objected to by General

11   Electric.

12             THE COURT:  All right.  And what do you want

13   me to know about this?

14             MR. FLYNN:  It's a March '68 document, a GE

15   document, and there's two what we think are noteworthy

16   passages.  The bottom one, the last paragraph about the

17   GE's knowing about the dangers of this type of Pyranol

18   in 1968.

19             THE COURT:  Ah-hum.

20             MR. FLYNN:  And then early on, in the first

21   paragraph, that at this time they were quietly burying

22   themselves in scrap Pyranol.  That's all I wanted to

23   point out to your Honor.

24             THE COURT:  You never got anything more about

25   this?  No further memos or anything else?

1          MR. FLYNN:  No, I don't think so.

2          THE COURT:  Okay.

3          MR. FLYNN:  Then the last exhibit was one that

4     I used in my opening, and I'm not going to go over it

5     again with your Honor, it's Exhibit Number 9.  I just

6     wanted to bring it up because it was objected to by

7     General Electric, so it's not in evidence, and this is

8     the one of the 1970 document that talks about past

9     status of disposal and it has the Hudson River disposal,

10    the landfill, and the scavenger pickup, out of sight out

11    of mind.

12         THE COURT:  All right, let me look at it.

13         (Pause.)

14         THE COURT:  All right, and basis for the

15    objection for this?

16         MR. BIAGETTI:  As I mentioned in the opening,

17    judge, it's a 1970 argument, it's after our time period,

18    talks about what's going to happen in the future, and it

19    talks about in the first line, a survey of manufacturing

20    sites and service shops presumably all over the country,

21    so there was nothing that tied it to any of the Pyranol

22    at issue in this case.

23         THE COURT:  All right, I will overrule the

24    objection but take it for what the caveat that you have

25    identified.

1          All right, what's next.  Another witness?

2          MS. FISKE:  Yes, your Honor.

3          THE COURT:  Okay.

4          MS. FISKE:  This witness will be by video

5     testimony, and I'd like to just address a couple of

6     logistics with you about the video.

7          THE COURT:  Okay.

8          MS. FISKE:  This is the video testimony of

9     Robert Tilton Abbe taken in June.  The video duration is

10    about an hour and a half.  We've edited the video to the

11    questions and answers as designated by the parties.  I

12    have a binder here for you which is the complete

13    transcript that's been color coded by the parties'

14    designations and the exhibits so you can follow along.

15    The screen will show Mr. Abbe and there will be a tape

16    underneath it.

17         THE COURT:  Okay.

18         MS. FISKE:  Mr. Biagetti and I have agreed

19    that objections to his testimony will be handled by us

20    standing up and objecting.  The video will be put on

21    pause for you to rule on it.  I just want to caution you

22    that we are -- our technical advisor has warned that

23    there may be some issues that if we're going to try to

24    skip material based on your objections to judgment --

25    rulings on objections.

1           THE COURT:  We will worry about it when we get

2     there.

3           MS. FISKE:  Okay, see how it goes.

4           THE COURT:  Yes.

5           MR. BIAGETTI:  I just have one question about

6     a ground rule here.  In reviewing our objections last

7     night, several of them are the places where Mr. Abbe

8     guesses or assumes.  He was quite properly being led

9     during the examination, this is a GE employee.

10    According to the record at the beginning, he takes

11    medication that affects his short-term memory.  We've

12    attached to our pretrial memo which you have, judge, a

13    letter from his doctor who says that he suffers also

14    from dementia due to Alzheimer's, so there are several

15    places where he's being led and guessing.  In light of

16    what you said I think yesterday with regard to one of

17    the witness, I won't jump up on those --

18          THE COURT:  Yeah, here's -- I want the parties

19    to understand this.  The rules of evidence require that

20    a party seeking to elicit information from a witness

21    must establish that the witness has personal knowledge

22    of the information.  So you have to, ordinarily when you

23    ask a question, show, first, how do you know what you're

24    going to testify about.  Second, testimony that is

25    speculative should be stricken.  Now, there are times

1    when as a kind of verbal tick someone may testify to

2    something and then say I guess, and it's apparent to me

3    that they were there and talking about what they saw and

4    the statement I guess is just a kind of verbal tick, but

5    when people say, are asked a question it must have been

6    the case that, and there's no other reason in the record

7    why they would know what they know, I'm going to

8    disregard testimony like that because I'll decide if it

9    must have followed from something that's in evidence,

10   but his assumption that something occurred is not going

11   to be admissible in almost all instances unless it can

12   qualify as a lay opinion testimony or habit or some very

13   rare unusual circumstance, so I'll just have to see

14   what's there.  If it's obvious to me that the person is

15   speculating, I'm just going to disregard the evidence.

16   I won't consider it.  If you have some doubt about it,

17   you can object and I'll rule on it, but I can tell you,

18   I know when a witness has testified that they have

19   personal knowledge and when they're just speculating,

20   and I don't consider speculation.

21          MR. BIAGETTI:  I will pick my spots, but I do

22   just want to note --

23          THE COURT:  You want to strike his entire

24   testimony?

25          MR. BIAGETTI:  No, no.

1           THE COURT:  All right.

2           MS. FISKE:  Should --

3           THE COURT:  Hand it up to the clerk.  Can you

4     get the binder.  And then you can start playing.

5           The court reporter will not record the

6     deposition, but she will be here if there are any

7     statements or objections, she will take those down.

8           Okay, you can start it.

9           (Video being played.)

10          MR. BIAGETTI:  Could we stop it there for a

11    second.

12          THE COURT:  Stop.

13          MR. BIAGETTI:  Thanks, judge.  So he just

14    talked about how he doesn't know anything about where it

15    was taken.  The next question is one that starts with

16    did you ever hear that, and it fails to establish any

17    foundation for what Mr. Abbe is about to say.  Was it

18    within his personal knowledge, or even anybody he heard

19    it from --

20          THE COURT:  Okay, I understand the objection.

21    Do you have any argument that that is sufficient

22    foundation to allow for its admission?

23          MS. FISKE:  Yes, I do.  The answer to the

24    question proceeds, series of questions proceeds to

25    establish that he has heard this information and the

1   point of the questioning is not to establish the truth

2   of the matter asserted but to establish what he was

3   thinking at the time about commonly understood uses for

4   scrap Pyranol.

5           THE COURT:  What page is this on?

6           MS. FISKE:  We're now on page 19, line 25.

7           THE COURT:  And how far down does your

8   objection go?

9           MR. BIAGETTI:  Page 20, line 7, judge.

10          (Pause.)

11          MS. FISKE:  Your Honor, if I may, he continues

12  to talk about his -- somebody who worked in the office

13  next door and seeing cans of it on his desk and a

14  gentleman telling him that he takes it home with him to

15  pour on the ground.

16          THE COURT:  All right, objection sustained.

17  Okay, you can either play it if you want or skip over

18  it, I'm not going to consider, whichever works best.

19          (Video being played.)

20          THE COURT:  Can we stop for a second.  I

21  sustained the objection from 19/25 to 20, what line did

22  you have?

23          MR. BIAGETTI:  Seven.

24          THE COURT:  To 20/7.  You can keep going.  I

25  just wanted the record to be clear about that.

1          (Video being played.)

2          MR. BIAGETTI:  Can we stop it there.  I guess

3  by this time, judge, I believe that he's established

4  that when he's using guess, it's not in that colloquial

5  sense.  He's just said he doesn't know.

6          THE COURT:  What page, line?

7          MR. BIAGETTI:  We are at 22 and we're talking

8  about all this information now about what uses --

9          THE COURT:  Until where is your objection?

10          MR. BIAGETTI:  It would I guess start really

11  up at 21, line 10, through all of this testimony on what

12  he heard about uses by municipalities.  Just to make

13  clear, that he was asked whether they were using it for

14  weed killer, for dust suppression, he says I don't know.

15  That's at page 22, line 12.  He's led again, and at line

16  16 he says I guess I heard it by a conversation with

17  someone, and there's no foundation that even that person

18  had personal knowledge, so I would move to strike this

19  portion of the testimony.

20          THE COURT:  From 21/10 did you say?  I just

21  need to be clear for the record what you're moving to

22  strike so then I can rule on it so it's coherent.

23          MR. BIAGETTI:  You're absolutely right.  It

24  would be from 21, line 24.

25          THE COURT:  Okay.

1          MR. BIAGETTI:  First reference to transferring

2     to municipalities.

3          THE COURT:  Until where?

4          MR. BIAGETTI:  Through 23 line 4, I think is

5     the line, 23 line 4, which I believe is the last bit

6     about the guess about uses by municipalities.

7          THE COURT:  23/4, okay, and your response?

8          MS. FISKE:  Two points, your Honor.  First of,

9     all the parties have a stipulation, it's number 74, that

10    during this applicable time period that GE plants sold

11    or transferred scrap Pyranol to the Southwest Falls, New

12    York, drag strip which used it for dust suppression.

13         THE COURT:  Good, we don't need that.

14         MS. FISKE:  But it also goes to his state of

15    mind.  He's the most senior GE level official who has

16    knowledge of the GE/Fletcher's transactions.

17         THE COURT:  It isn't meaningful to me his

18    state of mind.  Motion sustained.

19         It's undisputed that GE saw this as a waste

20    and disposed of tons of it into the Hudson River.  It

21    got rid of -- it viewed this stuff as a waste.  There's

22    no question about that.  So I don't think we need to

23    spend any real time on it.  Your stipulation covers it

24    adequately.

25         MS. FISKE:  The point is a little bit slightly

1  different from the one that you make which I'm not

2  trying to make through this.  I'm trying to say he

3  doesn't -- he thinks of it as something that you can use

4  to pour on the ground, not as something to make paint

5  with.  That's why I would like it --

6           THE COURT:  It's way too strained.  Sustained.

7  Let's go on.

8           (Video being played.)

9           THE COURT:  Can we stop this.  Okay, why don't

10  we take a lunch break.  I've got a very short meeting in

11  my office at 1:30, take 5 minutes or so, so let's try to

12  resume as soon as we can after 1:30, okay.

13           (Recess at 12:10 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

91

1

2                         C E R T I F I C A T E

3

4            I, Sandra L. Bailey, do hereby certify that

5    the foregoing transcript is a true and accurate

6    transcription of the within proceedings, to the best of

7    my knowledge, skill, ability and belief.

8

9

10   Submitted: 2/6/09          /s/ Sandra L. Bailey
                                SANDRA L. BAILEY, CSR, CM, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25