**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 5/7/09

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *  06-cv-354-PB
            v.                  *  November 6, 2008
                                *  1:30 p.m.
GENERAL ELECTRIC COMPANY        *
                                *
* * * * * * * * * * * * * * * * *
```

DAY 3
AFTERNOON SESSION
TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE PAUL J. BARBADORO

Appearances:

For the Government:   Catherine A. Fiske, Esq.
                      Peter M. Flynn, Esq.
                      Laura J. Rowley, Esq.
                      Donald G. Frankel, Esq.
                      U.S. Department of Justice
                      Environmental Enforcement Section

For the Defendant:    Peter A. Biagetti, Esq.
                      William M. Cowan, Esq.
                      Mintz, Levin, Cohn, Ferris,
                      Glovsky and Popeo, PC

                      Thomas H. Hill, Esq.
                      Ignacia Moreno, Esq.
                      General Electric Counsel

Court Reporter:       Sandra L. Bailey, CSR, CRR
                      Official Court Reporter
                      United States District Court
                      55 Pleasant Street
                      Concord, NH  03301
                      (603)225-1454

2

1                          I N D E X

2

3

4    Witness                 Direct   Cross   Redirect   Recross

5
     ALBERT CLARK
6
     By Mr. Biagetti          5
7    By Ms. Rowley                     22

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      BEFORE THE COURT

2               THE COURT:  Did you want to deal with the

3    Exhibit 35 issue now or do you want to finish with the

4    testimony of this witness and then deal with the

5    exhibit?

6               MR. COWAN:  Your Honor, we will deal with it

7    very briefly in a manner I think you'll find to your

8    liking hopefully.

9               THE COURT:  All right.

10              MR. COWAN:  Ms. Fiske and I have discussed the

11   matter.  Your Honor, we will withdraw our objection but

12   it's specifically agreed, with the court's willingness,

13   to allow, if you will, counter highlighting designating

14   those portions in the memo with a -- well, I'll

15   represent to your Honor, this will not be, I'm going to

16   highlight everything else, this is going to be quite

17   judicious and we pledge to get that to you by 5 p.m.

18   today.

19              THE COURT:  I think that's useful because as I

20   was thinking through the issue whether it was sponsored

21   or not, it would seem that there would be a strong

22   argument for the admission of the document under the

23   residual exception to the hearsay rule because this

24   clearly is, from GE's perspective, one of the best most

25   reliable compilations of evidence as to what actually

1    happened, it's something that the company carefully

2    prepared in anticipation of litigation where errors that

3    were damaging to GE, the company would have taken care

4    to avoid, so I think from GE's perspective it's probably

5    the best available evidence we have as to what really

6    was going on at that site in the details of the

7    manufacturing process and the way that waste was

8    treated, and in that sense I think it's highly useful to

9    both sides just to give me the background information

10   that I need, so, I think that's good way to resolve it.

11           I guess what I would say to you is this.  It

12   looks to me like, despite my best efforts, GE's going to

13   get its wish here because you've given me so much stuff

14   to read that I can't read it this afternoon, I'm going

15   to have to read it Friday and over the weekend.  So I

16   think realistically you're going to have to come back

17   Monday and make your closing arguments.  It's just too

18   much stuff for me to read.  I mean, I know it wasn't

19   your conscious strategy to burden me.

20           MR. BIAGETTI:  We had two purposes, judge, you

21   may have heard that, but I thank you.

22           THE COURT:  So we're going to have to have the

23   closing argument on Monday.

24           MR. COWAN:  Well, your Honor, with that

25   realization, respectfully may I have until tomorrow

5

1    morning to provide --

2              THE COURT:  Yeah, give it to me tomorrow

3    morning, submit it.  You don't even need to come in

4    tomorrow, today just designate what you want me to read,

5    and I'll read whatever you want me to read, and then

6    Monday you can come in and we will do the closing

7    arguments on Monday.  So if you get it to me, you don't

8    have to physically be here, my sense is you can all go

9    home for the weekend and just come back on Monday, and

10   so anything you need to do with me about the documents,

11   deal with it today, and I'll read the stuff on Friday

12   and over the weekend to the extent necessary, then I'll

13   be in a position to rule on Monday, you can make closing

14   arguments, and then I'll rule.

15             You can see my style.  When you're making your

16   closing arguments, expect to be interrupted and to be

17   asked a bunch of questions, or asked to respond to

18   argument.  Just talking to me isn't that useful.  I like

19   dialogue.

20             Okay, so you want to bring the witness back

21   and we will finish.

22             MR. BIAGETTI:  Thanks, judge.

23                  DIRECT EXAMINATION cont'd

24   BY MR. BIAGETTI:

25        Q.   Good afternoon, Mr. Clark.

1    A.   Good afternoon.

2    Q.   We were talking about Mr. Fletcher's letter

3 and your reactions to it before we broke for lunch.   Mr.

4 Fletcher in his letter to you also concluded with a

5 paragraph about as far as future sales are concerned.

6 Do you see that one?

7    A.   Yes, I do.

8    Q.   And do you remember reading that one at that

9 time?

10    A.   That he wants to leave the door open to resume

11 purchasing these drums of scrap Pyranol from us.

12    Q.   And did you view that as a good or bad thing?

13    A.   That's a good thing.

14    Q.   Why is that?

15    A.   That would be generating some income to GE.

16    Q.   Now --

17    A.   As opposed to having to pay for disposal of

18 it.

19    Q.   You mentioned before lunch, I think, that

20 there were a couple of reasons why you wanted Fletcher

21 to resume buying.  You said it was -- we can make a

22 little money, but also we were running out of room.

23 Have I got that basically right?

24    A.   That was two factors.

25    Q.   Did you consider at the time any other options

7

1   for solving the part about running out of room in the

2   storage area?

3        A.   Other options were to have a chemical disposal

4   company pay -- GE pay them to dispose of the material.

5   Another option was if we're running out of room, finding

6   more room until the financial problems or such were

7   resolved, and until he could start taking, buying more

8   Pyranol from us.

9        Q.   Do you recall whether you explored either one

10   of those options?

11        A.   I did not personally explore any of those

12   options.  I held out for the resumption of sales to

13   Fletcher.

14        Q.   Why hold out for that rather than explore one

15   of those other two options you just mentioned?

16        A.   Highest probability of success was staying

17   with Fletcher.  He had a use for the material.  We had a

18   good relationship for 15 years.  It was the easiest

19   safest thing to stay with Fletcher.  We would continue

20   to get payment for the material that he took and for

21   material he could use in his product.  It just made good

22   business sense to do everything we could to stay with

23   Fletcher.

24        Q.   I'm going to show you next a document that has

25   already been admitted, judge, as GE Exhibit 14.  It

1    appears to be a memo from E. Jones to you, Mr. Clark,

2    dated February 8, 1968, asking if you would, the last

3    paragraph, see what action can be taken toward

4    collecting this balance, meaning the sale of used

5    Pyranol to Milford Paint Works.  Have you seen that

6    document?

7          A.   Yes.

8          Q.   Have you seen it before?

9          A.   Yes.

10         Q.   Do you recall getting that?

11         A.   Again, I surmise I got it.

12         Q.   Do you have any memory as you sit here today

13    that in 1968 you got a copy of it?

14         A.   I got that copy.

15         Q.   What, if anything, did you do in response to

16    this request from Mr. Jones that you take some action

17    toward collecting this balance?

18         A.   Very shortly after we got this letter we

19    received a February letter from Fletcher raising

20    concerns about quality.  At the time that this letter

21    was written, February 8, 1968, we had not heard anything

22    of any problems with quality of the product sold to

23    Fletcher, bought by Fletcher, so we were -- we hadn't

24    taken any action on this, but we received the

25    February 16th letter which we talked about just a few

1    minutes ago where he raises the whole list of alleged

2    problems with quality.

3            THE COURT:  Could I have my clerk get me

4    Defendant's Exhibit 14, is it?

5            MR. BIAGETTI:  Yes, 14.

6    Q.    And so what if anything did you do in

7    immediate response to getting this memo?

8    A.    I remember talking with my boss, Rob Abbe,

9    bringing this into the equation of things to consider.

10   Not necessarily to react directly with Fletcher on

11   receipt of this, but again, to take Mr. Jones' concerns

12   about the balance owed to GE, take that into

13   consideration for solving multiple problems we were

14   having with scrap Pyranol.

15   Q.    And I think your testimony before the break,

16   but I want to make sure I'm correct, is that after the

17   call with Fletcher you never had a conversation with

18   him, is that right?

19   A.    No, I did not.

20   Q.    Or anybody else at Fletcher Paint?

21   A.    Not to my knowledge.

22   Q.    Now, there's a handwritten note on this

23   exhibit, Mr. Clark, I'll zoom in on it as best I can,

24   that I believe says per Al Clark.  Monsanto Chem is

25   analyzing similar material and on basis of their report

1    he will make a decision on validity of Milford Paint

2    Works claim.  See attached letter.  And again it's from

3    E. Jones, dated May 28, 1968.  Do you see that?

4         A.   Yes, I do.

5         Q.   Does that refresh your memory as to what this

6    Monsanto analysis was that's being referenced here?

7         A.   Yes, it does.

8         Q.   What was it?

9         A.   The conversations between all our management

10   team were centered around trying to resolve the problem

11   of unpaid bills for material and also to resume sale of

12   this material to Fletcher's Paint.  Mr. Barker was the

13   senior buyer who had dealt with Monsanto Chemical

14   Corporation in the purchase of Aroclor which was

15   converted by whatever process we needed, Pyranol out of

16   it, and so Mr. Abbe and Mr. Barker had a conversation

17   that I heard about afterwards.  I was not present at

18   this conversation, but I was told about it.  That Mr.

19   Barker was going to ask Monsanto --

20             MS. ROWLEY:  Objection.

21        Q.   Mr. Clark, Mr. Clark, let me ask you the next

22   question.  Do you know who, if anybody at GE, requested

23   the analysis?

24        A.   Who requested the analysis?

25        Q.   Yes, sir, did you?

 1        A.   No, it was not me.

 2        Q.   Do you know who it was?

 3        A.   It was Mr. Barker.

 4        Q.   Okay.  Did you know why it was requested?

 5        A.   To attempt to validate or disprove the

 6   statements in Mr. Fletcher's letter dated February 16th.

 7        Q.   Did you agree or disagree with that?

 8        A.   I thought it had merit.  I thought it was a

 9   good chance that we could learn something from that

10   examination of material.

11        Q.   Did you have any personal involvement in the

12   analysis done?

13        A.   I don't know anything about the analysis.  I

14   was not present and I don't know when it was.

15        Q.   Setting aside the methodology of the analysis,

16   do you know anything about the material that was tested?

17        A.   All that I can say I know about the material,

18   it was material in drums still located at Hudson Falls

19   in the storage yard, left behind for whatever reason in

20   Hudson Falls, and it was not from any of the material

21   that had been taken by Fletcher and was located at the

22   Fletcher Paint Works.

23        Q.   Do you know whether or not GE paid Monsanto to

24   do the analysis?

25        A.   I don't know.  I can offer an opinion, but if

1   that's not allowed, I won't.

2        Q.   Did you ever, in your department in the bills

3   that you handled, ever see anything from Monsanto on

4   this subject?

5        A.   No, I did not.

6        Q.   Did you ever learn anything about the results

7   of the Monsanto analysis?

8        A.   Yes, I did.

9        Q.   What did you learn?

10        A.   I learned that there was some evidence that

11   some of the things that were in Mr. Fletcher's letter

12   did exist in the samples that were still at Hudson

13   Falls.

14        Q.   And when you say some of the things mentioned

15   in Mr. Fletcher's letter, and just to recap, he said

16   that some of the drums were one-quarter or one-half

17   full.  Was that one of the things that was the result of

18   the analysis?

19        A.   No, that was not.

20        Q.   He said that some of the drums were more than

21   one-half water.  Was that part of the Monsanto analysis?

22        A.   Yes, he found some water.

23        Q.   He said that something had been added to

24   neutralize the Pyranol.  Was that --

25        A.   That never came up.  It was never mentioned.

1    Q.   He said that the drums contained a coal tar

2    emulsion which turned the Pyranol black.   Did that come

3    out of the Monsanto analysis?

4    A.   It did not.

5         THE COURT:   Counsel, I just want to be sure

6    I'm not missing something.   The Monsanto analysis is,

7    there's a document that is the Monsanto analysis, right?

8    Don't we have a document that reflects the results of

9    the Monsanto analysis?

10        MR. BIAGETTI:   We have a memorandum from Mr.

11   Clark which is coming up next, but it's not the results

12   of -- it's not a Monsanto document or --

13        THE COURT:   So we don't have the actual

14   results of Monsanto, we have Mr. Clark's report of the

15   results?

16        MR. BIAGETTI:   Yes, we have a memorandum

17   coming up next, yes.

18        THE COURT:   I mean, wasn't there something

19   from Monsanto to Clark, somebody at GE?

20        MR. BIAGETTI:   I'll ask him.

21   Q.   BY MR. BIAGETTI:   Did you ever see any written

22   report from Monsanto?

23   A.   All I received was a verbal report from Mr.

24   Barker.   I saw nothing in writing.

25        THE COURT:   So Mr. Barker is from Monsanto?

1      A.   Mr. Barker is my counterpart for GE who buys

2   the material, who bought the Aroclor from Monsanto.

3           THE COURT:  I'm confused.  Get out the memo,

4   please.

5           MR. BIAGETTI:  Yes.  If I'm anticipating your

6   Honor correctly, this is Defendant's Exhibit 17.  It's a

7   memo by Mr. Clark, and it talks about in the second

8   paragraph a review of this problem and analysis of this

9   material by Monsanto.

10          THE COURT:  Okay.  So what he's talking about

11  now is, he's talking about the -- I'm confused.  You

12  have to go through the whole line of questioning again

13  because I don't understand it.

14      Q.   BY MR. BIAGETTI:  Okay.  You mentioned that

15  you did get a verbal report on the results?

16      A.   I got this information verbally from Mr.

17  Barker.

18      Q.   Okay.  And what did you conclude once you got

19  that information from him about the results of the

20  Monsanto analysis?

21      A.   Two of the points that Mr. Fletcher --

22          THE COURT:  Can I ask you, is what's in that

23  memo on the screen, what you concluded?

24      A.   Yes, right here, that's what I was going to

25  say.

1          MR. BIAGETTI:  I was asking for his

2    independent memory, but I can certainly refresh it with

3    this.

4          THE COURT:  He's not going to remember.

5    Realistically, this is many, many, many years ago, he's

6    not going to remember what the analysis was about.  He's

7    going to look at the document which is the only thing we

8    have, and that may refresh your memory somewhat.  For

9    the most part, is what you know about the Monsanto

10   analysis in that document?

11        A.   Yes.

12        THE COURT:  Okay.

13        A.   And I do recall it.  I do have a recollection.

14   I do have a recollection about that document only

15   because the amount of time I spent carefully thinking

16   through the response to finance, talking it through Mr.

17   Abbe, my boss, we formulated the information based on

18   the information collected from -- that Monsanto gave to

19   Mr. Barker, our buyer, our senior buyer, and the two

20   points that we agreed we found evidence were, there was

21   water in the drums and there was some amount of

22   trichloroethylene.  I don't remember where the

23   22 percent came from.  I don't remember that.  But I

24   know that there was evidence they found some

25   trichloroethylene in the drums, they found some water in

1    the drums.  Those are the two.

2              THE COURT:  Okay.

3              MR. BIAGETTI:  Thank you, and thank you, your

4    Honor.

5         Q.   BY MR. BIAGETTI:  So, let's stick with this

6    document now, Mr. Clark, which is GE Exhibit 17, a memo

7    from you to Mr. Humphrey, the manager of general

8    accounting on August 6, 1998.  And it's approved by your

9    boss, Mr. Abbe; right?

10        A.   That's correct.

11        Q.   Who wrote the memo?

12        A.   I authored it.  I wrote it.

13        Q.   Did anyone approve it?

14        A.   Mr. Abbe approved it prior to him saying it.

15   He knew what I was going to write.

16        Q.   Did you have discussion with Mr. Abbe before

17   sending this to Mr. Humphrey?

18        A.   Several.

19        Q.   And you mention here that there was a review

20   of this problem and an analysis of the material by

21   Monsanto; correct?

22        A.   Correct.

23        Q.   You've already testified to what you did in

24   that regard for his Honor; correct?

25        A.   Correct.

1    Q.   And you conclude by saying it is our

2    recommendation that the outstanding accounts receivable

3    in the full amount of $6,993.75 be written off.  What

4    was the basis for that recommendation?

5    A.   The biggest motivation was to retain Fletcher

6    Paint Works as a customer of GE, and we felt that there

7    was enough evidence that some of the things he claimed

8    could be true, and that to write off the $7,000 figure

9    was to follow up on Mr. Fletcher's offer to continue to

10   resume this agreement and arrangement in the future, and

11   it was our motivation to keep the door open and to use

12   several words that others used, keep the door open for

13   resuming the arrangement where he would buy scrap

14   Pyranol from GE.

15        THE COURT:  Can I ask you a question about

16   your memo.  In the second paragraph there you say

17   through a review of this problem and an analysis of this

18   material by Monsanto, I want you to tell me as best you

19   can, when you use the phrase this material, what were

20   you referring to?

21   A.   Material that was in our parking storage --

22   our storage yard in Hudson Falls.

23        THE COURT:  So it was your understanding that

24   what had been sent to Monsanto to analyze was --

25   A.   Can I stop, please.

1           THE COURT:  Yes.

2      A.   Nothing was sent to Monsanto to analyze.

3           THE COURT:  Oh, well, then, how did Monsanto

4  do the analysis without looking at the material?

5      A.   He looked at the material.  He was in Hudson

6  Falls.

7           THE COURT:  He came and took samples?

8      A.   He did the examination at our plant in our

9  storage yard, yes.

10          THE COURT:  So when you refer to this

11 material, you're referring to material that was in the

12 scrap Pyranol area at the plant?

13     A.   Correct.

14          THE COURT:  And your recollection or your

15 understanding was at the time, that the man from

16 Monsanto came out and took his own samples?

17     A.   Correct.

18          THE COURT:  Were you there when that happened?

19     A.   No, I was not.

20          THE COURT:  So it's an understanding you have

21 from somebody else?

22     A.   Mr. Barker.

23          THE COURT:  I see, okay.

24     A.   Okay.

25          THE COURT:  All right.

1        Q.   BY MR. BIAGETTI:  Did you have a belief at

2    that time about the material that Fletcher had opposed

3    to what Monsanto sampled?

4        A.   I had a firm belief that we did not allow him

5    to take half full drums of scrap Pyranol.  I can't

6    believe that we let him take drums of Pyranol that had

7    22 percent TCE.

8        Q.   When you say you can't believe?

9        A.   The controls and processes --

10            THE COURT:  Sustained.

11       A.   -- we had in time should prevent that.

12            THE COURT:  Sustain the objection.

13       Q.   Do you recall what your belief, if any, on

14   that subject was at the time that you wrote this memo?

15            MS. ROWLEY:  Objection.

16       Q.   Okay, I'll move on.  What if anything -- well,

17   let me ask you.  There's a notation as well on

18   Exhibit 17, handwriting on the lower right, discussed

19   with DSB on 8/13/68, okay to write off, and then

20   someone's initials which could be DWH, but I'm not sure.

21   Do you see that?

22       A.   Yes, I see that.

23       Q.   Who is DSB?

24       A.   Donald S. Bates, manager of finance for the

25   capacitor department.

1        Q.   Did you have discussion with Mr. Bates?

2        A.   No, I did not.

3        Q.   Do you know what, when it says okay to write

4    off, do you recall what -- well, did you ever have any

5    discussion with anybody else after writing this memo

6    about whether or not there would indeed be a write-off?

7        A.   No, I didn't.

8        Q.   When did you move on to your next job in GE?

9        A.   In August of 1968.

10       Q.   Do you remember how much longer after

11   August 6th?

12       A.   Not much longer.

13       Q.   Where was the new job again, I'm sorry?

14       A.   Specialist manufacturing information systems

15   for the same department.

16       Q.   In the same building?

17       A.   Same building, and Mr. Abbe was still my new

18   manager's boss.

19       Q.   Okay.  Still have conversations with Mr. Abbe

20   after moving to the new job?

21       A.   I don't recall any conversations about the

22   scrap Pyranol with him after I went on the new job.

23       Q.   All right.  And how long were you at Hudson

24   Falls after you moved to the new job?

25       A.   I left Hudson Falls in '73 to go to Virginia.

1      Q.   Did you ever hear from Mr. Fletcher again?

2      A.   Never.

3      Q.   Did that seem like a good or bad thing to you

4  or never occurred to you?

5      A.   It sounded good because by him not pursuing

6  the issues any further, it was taken by us to mean he

7  accepted the write-off.

8      Q.   Was there ever a time --

9           MS. ROWLEY:  Objecting, speculation.

10          THE COURT:  I'm not going to attach any

11 significance to it.

12     Q.   Was there ever a time up until the time you

13 made this recommendation that you thought that Mr.

14 Fletcher was going to dump or discard any of the Pyranol

15 that he picked up from GE?

16     A.   I never had that idea at all, not with our

17 dealings with him from the past, no, I never expected he

18 would do that.  Never even thought about it.  Never even

19 considered that would be an action he might take.

20          THE COURT:  I think there's a dispute between

21 the parties here, sir, as to whether after this write-

22 off, whether Fletcher purchased additional Pyranol from

23 GE.  Do you have any actual knowledge of whether he did?

24     A.   I have no knowledge of what he did after I

25 left -- after the write-off.

1              THE COURT:  After the write-off.

2              MR. BIAGETTI:  If I could have just a second.

3              (Pause.)

4         Q.   BY MR. BIAGETTI:  Did you ever learn for

5    certain whether or not the debt was indeed written off

6    by GE?

7         A.   I never learned of that, no.

8              MR. BIAGETTI:  Okay, nothing more, thanks.

9              THE COURT:  Thank you.  Cross-examination.

10                    CROSS-EXAMINATION

11   BY MS. ROWLEY:

12        Q.   Good afternoon, Mr. Clark.

13        A.   Good afternoon.

14        Q.   Mr. Clark, you stated earlier that at the time

15   you received the letter from Mr. Fletcher your reaction

16   was disbelief; right?

17        A.   That's correct.

18        Q.   You thought that he was trying to get out of

19   paying his bill?

20        A.   That's correct.

21        Q.   And essentially you believed he was telling a

22   lie when he stated that a large percentage of the drums

23   he had were garbage, is that right?

24        A.   I did not believe that.

25        Q.   Okay.  And after receiving Mr. Fletcher's

1   letter, GE had someone from Monsanto test the drums,

2   test some drums of scrap Pyranol; correct?

3        A.   That's not true.

4        Q.   You didn't have someone from Monsanto --

5        A.   I did not --

6             THE COURT:  Excuse me, sir, wait a minute.

7   Only one person can talk at a time.  So until she

8   finishes asking her question, you can't begin your

9   answer.

10       A.   Correct.

11            THE COURT:  Put a question to the witness,

12   please.

13       Q.   Sure.  We just got done discussing that after

14   you received the letter from Mr. Fletcher, GE had

15   someone from Monsanto test drums of the scrap Pyranol

16   that were still at GE; correct?

17       A.   Someone from what company?

18       Q.   Monsanto.

19       A.   Monsanto, yes, that is true.

20       Q.   And the person from Monsanto found that the

21   material it tested contained anything from water to

22   trichloroethylene; correct?

23       A.   That's correct.

24       Q.   And in your words you wrote a memo that said

25   that Milford had a valid claim; correct?

1          A.    Had a valid claim is my words, yes.

2          Q.    Okay.  And you wrote that the material that GE

3   had sent to Fletcher's, quote, should have been disposed

4   of.  Is that right?

5          A.    If it was like that, yes.

6          Q.    And looking at your memo, you used the phrase

7   acceptable method of disposal; correct?

8          A.    Correct.

9          Q.    And by that term, acceptable method of

10  disposal, you meant you should have paid someone to

11  dispose of it; correct?

12         A.    We would have to pay a chemical disposal firm

13  to dispose of it, yes.

14         Q.    Send it to something like send it to a

15  landfill?

16         A.    I didn't hear you.

17         Q.    Does that mean you would have sent it to a

18  landfill?

19         A.    No, no, no.

20         Q.    You would have paid a chemical disposal

21  company to take it away?

22         A.    Correct, it would have been -- Monsanto is not

23  a chemical disposal firm.  It would have been a chemical

24  disposal company, and again, we didn't do it, so I can't

25  supply who it would be.

1      Q.    And your conclusion in this memo is that

2   sending this scrap Pyranol to Milford had saved GE

3   money; correct?

4      A.    Correct.

5      Q.    And the amount of money that it saved GE was

6   $3,248; correct?

7      A.    That's as an alternative, yes.

8      Q.    And Mr. Clark, it's true that GE wanted to

9   keep selling scrap Pyranol to Mr. Fletcher?

10      A.    That is true.

11      Q.    It's fair to say you would have been happy to

12   have Mr. Fletcher come back and take more scrap Pyranol?

13      A.    Yes.

14      Q.    I'd like to look at Mr. Fletcher's letter

15   again.  The second page.  Could you look at the fifth

16   and sixth paragraph on this page.  Actually that's not

17   what I -- sorry.  The second to last paragraph.

18      A.    As far as?

19      Q.    Yes, would you take a look at that paragraph.

20      A.    Okay.

21      Q.    Mr. Fletcher is discussing future sales and he

22   mentions that it wouldn't be worth it for him to haul

23   more scrap Pyranol unless GE can, quote, tighten up as

24   to what is Pyranol and what is not and furnish

25   reasonably clean drums.

1           Mr. Clark, GE did not make any changes to the

2    way it collected and stored scrap Pyranol in order to

3    respond to Mr. Fletcher's comment, did it?

4           A.    Yes.

5           Q.    It did not or did?

6           A.    Ask the question again.

7           Q.    Did GE make any changes to the way that it

8    collected or stored scrap Pyranol in response to Mr.

9    Fletcher's comment here?

10          A.    No.

11          MR. BIAGETTI:  Objection, only because he said

12   I believe on direct that he had no direct personal

13   knowledge of how it was collected.

14          THE COURT:  I think that's true.  I take it as

15   he doesn't really know.

16          A.    That's the real answer, I don't really know.

17   On the other hand, I don't know of anything that was or

18   was not changed.  My belief is that nothing was changed

19   because it didn't need to change, but that's my belief.

20          Q.    Because there was nothing to tighten up?

21          A.    That's correct.

22          Q.    Because scrap Pyranol is scrap material;

23   correct?

24          A.    That's correct.

25          Q.    And it was not intended to be pure; correct?

1        A.    That's correct.

2        Q.    And by definition scrap Pyranol could contain

3    impurities?

4        A.    It's of no further use to General Electric in

5    manufacturing capacitors.

6        Q.    Was that a yes or no?  You said it was no use

7    to GE but the question was the --

8        A.    The answer --

9            MR. BIAGETTI:  Objection.

10           THE COURT:  Whoa, whoa whoa.

11       A.    I think --

12           THE COURT:  Wait, wait.  Sir, sir, can I tell

13   you, I got to run things, so if I tell you to stop,

14   please stop, okay.  Let's have counsel ask a question

15   again.  Before she -- you answer, let's give defense

16   counsel chance to object.  So ask your question again.

17       Q.    Okay.  Scrap Pyranol could contain impurities;

18   correct?

19       A.    I don't understand your question.

20           THE COURT:  You don't understand the question

21   isn't it true that scrap Pyranol contains impurities?  I

22   think that's a given.  That part is easy.  We haven't

23   got to the hard part yet.  Everybody knows scrap Pyranol

24   contains impurities.

25       A.    Exactly.  I don't understand the question.

1          THE COURT:  Don't worry about trying to be

2     trapped.  Just try to answer the question that's asked.

3          A.   The answer is yes, it does have impurities and

4     everybody knew it.

5          Q.   Okay.  After this memo recommending a

6     write-off, you never called Mr. Fletcher to ask what

7     they were going to do with the scrap Pyranol, did you?

8          A.   No, I did not.

9          Q.   So you didn't confirm with him whether he

10    could use the material that he complained about in his

11    letter, did you?

12         A.   I'm having a hard time understanding.

13         THE COURT:  I think he's having trouble

14    hearing the words.  It's not so much the matter of

15    understanding.

16         A.   I can't hear.

17         THE COURT:  Can't hear.

18         A.   Try again, please.

19         Q.   Okay.  You didn't confirm with Mr. Fletcher

20    that whether or not he could use the material that he

21    complained about in his letter, did you?

22         A.   That's right, yes, I did not confirm.

23         Q.   Okay.  And you left the decision on how

24    ultimately to dispose of that scrap Pyranol with Mr.

25    Fletcher; correct?

1    A.    Correct.

2    Q.    Okay.  Mr. Clark, is it fair to say that you

3    personally didn't know much of anything about Fletcher's

4    Paint Works?

5    A.    That's fair to say.

6    Q.    To your knowledge the company manufactured

7    paint?

8    A.    Correct.

9    Q.    And you assumed Fletcher's to be a small paint

10   company; correct?

11   A.    Yes, I did.

12   Q.    Local to New Hampshire?

13   A.    Yes, I did.

14   Q.    And beyond that you didn't know anything else

15   about the company?

16   A.    I did not, no.

17   Q.    And you never tried to find out; correct?

18   A.    I never found out -- never tried to find out.

19   Q.    And you once had a telephone conversation with

20   Mr. Fletcher; correct?

21   A.    What -- ask the question again.

22   Q.    You once, at least once you had a telephone

23   conversation with Mr. Fletcher?

24   A.    At least once.

25   Q.    January 1968?

1      A.   Yes.

2      Q.   And you were on the telephone with him and you

3 spoke with him about whether or not he could use anymore

4 scrap Pyranol; correct?

5      A.   That's right.

6      Q.   Okay.  But during this telephone conversation

7 you never asked Mr. Fletcher what he was using scrap

8 Pyranol for, did you?

9      A.   No, I did not.

10      Q.   When you were a senior buyer of indirect

11 material, GE was manufacturing a lot of power

12 capacitors, wasn't it?

13      A.   That's right.

14      Q.   And that caused GE to generate a lot of scrap

15 Pyranol?

16      A.   Yes, it did.

17      Q.   And GE had more scrap Pyranol than Fletcher's

18 could take from you; correct?

19      A.   More than he could use, yes.

20      Q.   Okay.  And at that time you were working with

21 another buyer, Mr. Barker?

22      A.   Yes.

23      Q.   All right.  And you and Mr. Barker made some

24 effort to try and find other outlets besides Fletcher's

25 that might want to take scrap Pyranol, didn't you?

1       A.    That's true.

2       Q.    Okay.  And among your efforts was a telephone

3  call to Monsanto; correct?

4       A.    I did not make a telephone call to Monsanto.

5       Q.    Mr. Barker made the call?

6       A.    It would have been Mr. Barker.

7       Q.    Okay.  And Monsanto had no advice to offer you

8  on how to get rid of the scrap Pyranol?

9       A.    That's what Mr. Barker told me.

10      Q.    Okay.  And your efforts also included a

11  telephone call to GE's internal consultants in

12  Schenectady, New York; right?

13      A.    I have no knowledge of that.

14      Q.    You don't recall the telephone call?

15      A.    I never called.

16      Q.    Okay.  However, in your efforts to find other

17  outlets for scrap Pyranol, you personally never

18  approached another paint company to ask if they would be

19  interested in scrap Pyranol?

20      A.    No, I did not.

21      Q.    And to your knowledge Mr. Barker did not do

22  that either?

23      A.    To my knowledge he did not.

24      Q.    Okay.  At the time you were a senior buyer for

25  indirect materials, you weren't familiar with the term

1   plasticizer, were you?

2        A.   No, I was not.

3        Q.   You were familiar with the term Aroclors;

4   correct?

5        A.   Yes, I was.

6        Q.   But you weren't familiar with various types of

7   Aroclors, were you?

8        A.   No, I wasn't, if there were different types.

9        Q.   And at the time you were a senior buyer, you

10  didn't know whether Aroclors could be used to

11  manufacture paint, did you?

12       A.   Ask the question again, please.

13       Q.   At the time you were a senior buyer, you

14  didn't know whether Aroclors could be used to

15  manufacture paint, did you?

16       A.   I didn't know that, no.

17       Q.   During your time as senior buyer for indirect

18  materials there was some chemicals that GE paid to

19  dispose of; correct?

20       A.   That's correct.

21       Q.   And one of those materials was

22  trichloroethylene, wasn't it?

23       A.   That's correct.

24       Q.   Okay.  While you were senior buyer of indirect

25  material, is it fair to say that GE had no restrictions

1    on selling scrap Pyranol to Fletcher's?

2          A.   That's correct.

3          Q.   Okay.  Whatever he could take, you would let

4    him take?

5          A.   That's correct.

6          Q.   So any kind of scrap Pyranol would be -- any

7    kind of scrap Pyranol would be sold to Fletcher's;

8    correct?

9          A.   Anything that he agreed to take and pay us

10   for.  It wasn't a one way decision, it was a mutual

11   decision.

12         Q.   Thank you.

13              MS. ROWLEY:  Can I have just a moment.

14              (Pause.)

15              MS. ROWLEY:  Actually, I would like to see

16   Fletcher's letter one more time.  Can I see the second

17   page.

18         Q.   BY MS. ROWLEY:  Looking at the, I think it's

19   the third paragraph from the bottom, we shall expect

20   freight, Mr. Fletcher has offered to send the drums of

21   scrap Pyranol that he can't use or that he's complaining

22   about in his letter back to GE.  Is that something that

23   you had any conversations about with other people at GE?

24         A.   I talked to Mr. Abbe about this whole issue of

25   paying for rejected material.

1          Q.   And that was part of your analysis that it was

2     a cost --

3          A.   That was part of the analysis that the cost to

4     determine what material was rejected, as far as Fletcher

5     was concerned, and what was good, was going to cost us

6     time -- take a person's activities away from his regular

7     job, send a chemist up there.

8          Q.   So it was concluded that that was not an offer

9     you were interested in pursuing?

10         A.   That's right.

11              MS. ROWLEY:  Okay, thank you, Mr. Clark.

12         A.   You're welcome.

13              THE COURT:  Can you put up Defendant's

14    Exhibit 17 on the document camera again, Mr. Biagetti.

15    I want to ask you about some of the cost information

16    here.  You say in the second to the last paragraph that

17    the value of the drum to GE at that time was a $1.25 per

18    drum.

19              THE WITNESS:  Yes.

20              THE COURT:  And would that be based on your

21    personal knowledge or some research you had done at the

22    time?

23              THE WITNESS:  That's research -- I found out

24    what the deposit amount was, and the $1.25 was the

25    deposit that we lose on that.

1            THE COURT:  Help me understand what that

2    means, the deposit amount.

3            THE WITNESS:  When Monsanto sold us the

4    Pyranol -- Aroclor, he charged us a deposit for the drum

5    that we would get back if we returned the drum.

6            THE COURT:  I see.

7            THE WITNESS:  As opposed to returning the drum

8    our practice was to put scrap Pyranol into the drum and

9    sell the drums of scrap Pyranol to Fletcher.

10           THE COURT:  I see.  So that was the amount of

11   the deposit that you had been charged by Monsanto that

12   you would lose for every drum?

13           THE WITNESS:  That's correct.

14           THE COURT:  I see.  Do you know whether that

15   would represent the going rate for a used drum,

16   55-gallon drum at that time?

17           THE WITNESS:  I had a --

18           THE COURT:  Because I know you bought some

19   used drums at various times you talked about, and I

20   wondered if you knew what the cost of the drums were.

21           THE WITNESS:  I can't answer that question.

22   It's too far back.

23           THE COURT:  You just don't remember.

24           THE WITNESS:  I just don't remember all of the

25   arithmetic I went through for that.

1          THE COURT:  The 50¢ per drum to dispose of

2    cost, was that based on some either pre-existing

3    knowledge you had or some research you did in connection

4    with this memo?

5          THE WITNESS:  It was a reasonable estimate of

6    what it would probably cost us.  I got that working with

7    Mr. Abbe and Mr. Barker.

8          THE COURT:  All right, so in consultation with

9    them you arrived at --

10          THE WITNESS:  We arrived at that number.

11          THE COURT:  Okay.  And the contemplation would

12    be for what kind of disposal at 50¢ per drum?

13          THE WITNESS:  Whatever the chemical disposal

14    company's practice would be for disposing of it.

15          THE COURT:  All right.

16          THE WITNESS:  We would have no control over

17    what they did with it.

18          THE COURT:  And as far as you know, then, at

19    the time that would have been the going rate for the

20    disposal of the 55-gallon drum of Pyranol.

21          THE WITNESS:  Yes.

22          THE COURT:  Okay, thank you.  Mr. Biagetti, do

23    you have anything else?

24          MR. BIAGETTI:  No.  Thank you, Mr. Clark.

25          THE COURT:  Thank you very much for coming,

1    sir, appreciate it, you're excused.

2              THE WITNESS:  Thank you.

3              THE COURT:  Do you have any other witnesses?

4              MR. BIAGETTI:  No witnesses.  We wanted to

5    call a couple of things to your attention.

6              THE COURT:  Okay.  You can do that.

7              MR. COWAN:  Thank you, judge.  I just wanted

8    to present a few documents for you to add to your

9    reading over the weekend.

10             THE COURT:  Okay.  The government's given me a

11   list of what you want me to read tomorrow.  Have you

12   given me one yet?

13             MR. COWAN:  Yes we have, judge, it's been

14   filed.

15             THE COURT:  I just want to make sure I have

16   it.

17             (Pause.)

18             THE COURT:  I've got it, okay.

19             MR. COWAN:  Thank you, judge.  So I just want

20   to offer into evidence for the court's consideration a

21   few documents.

22             THE COURT:  Yes.

23             MR. COWAN:  First of all, pursuant to the

24   parties' agreement we're going to introduce the expert

25   report of Dr. James Girard accompanied by his designated

1    deposition testimony.  By agreement of the parties we

2    have designated experts by way of designations and their

3    reports.  On that vein, judge, I know you're going to

4    read the whole expert report, because who could resist,

5    but I would point out --

6                THE COURT:  I'm really looking forward to it.

7                MR. COWAN:  Just a few things.  The documents

8    will speak for themselves, but I think you will agree

9    after you read them that there's agreement among experts

10   on some key points here.  His Honor has already alluded

11   to them.  That the material, the Pyranol, scrap Pyranol

12   that Fletcher was receiving from GE was being used.

13               MR. FLYNN:  Objection.  This seems to be

14   beyond presenting what we agreed to, which is giving

15   your Honor copies of the reports and the depositions

16   that --

17               THE COURT:  Yeah, but I'm not, I don't want to

18   waste a lot of time over it.  Yes, draw my attention to

19   what you need to in the deposition and I'll ask you some

20   questions about it, so.

21               MR. COWAN:  Fair enough, judge.  To move this

22   along, we will submit the report, and the deposition

23   designations I think accurately draw the court's

24   attention to the issues we want you to consider.

25               THE COURT:  And I'll talk to you more about

1    that.  What I understand as of now is that there was a

2    limited market for Pyranol as sufficiently

3    uncontaminated as an Aroclor substitute to be used in

4    certain rubber-based paints, cement coatings and roof

5    coatings where it could be used as a plasticizer and/or

6    extender, and beyond that I'll look for the depositions,

7    although I think there's some substantial evidence in

8    the record to support the reference that the market was

9    an extremely limited one and that it was one in which

10   there was not substantial economic value associated with

11   the sale of contaminated Pyranol suggesting that the

12   market is extremely limited for it, but if the experts

13   have better evidence for me, I'll certainly listen to

14   what they have to say.  I'm drawing my conclusions based

15   on GE's course of conduct, the price that was negotiated

16   for the used Pyranol, and the testimony I've received

17   concerning how Fletcher actually used it.  I'll be

18   interested to see what the experts say about the extent

19   of the market for this, what kind of state it would have

20   to be in in order to be useful as a plasticizer or an

21   extender because those things may influence my

22   consideration, but until I read the depositions I won't

23   really know, and I'm sure I'll have some questions for

24   you about them when we have closing arguments.

25            MR. COWAN:  Thank you, judge.  Then moving

1   along we would like to offer into evidence for the

2   court's consideration Defendant's Exhibit 24 which I

3   believe is agreed upon.  It's agreed upon, judge.

4           THE COURT:  Can I have the clerk give me a

5   copy of it.

6           MR. COWAN:  Yes.

7           THE COURT:  You can put one up on the screen,

8   but I'd like to look at the document.

9           THE CLERK:  44?

10           MR. COWAN:  24.

11           THE CLERK:  24.

12           MR. COWAN:  Your Honor, it's a multi-page

13   document showing ledgers or a series of ledgers for

14   calendar year 1957 with account receivables.

15           THE COURT:  Okay, I've got it.

16           MR. COWAN:  And you'll see at the bottom of

17   the page there, under sale scrap material, you'll see

18   Milford Paint Works.  I represent to his Honor that you

19   will see the reference to Milford throughout this

20   document.  I draw your attention to a page that has

21   Bates labeled GESP0000310MSJ showing an annotation at

22   the bottom of the page, letter A, indicating a letter

23   sent requesting check, and that letter also appearing at

24   Milford Paint Works referenced earlier in the documents.

25   Your Honor, we'd offer this to show that the time in

1   question is early 1957, GE was in fact diligently

2   pursuing its customer for debts owed and was not

3   allowing anything to languish, and was responsive to its

4   business relationship with its customer.  Similar on

5   page GESP --

6            THE COURT:  Yeah, when the time comes my sense

7   of the evidence is that the government has some limited

8   evidence that earlier in the 1950s, on at least one

9   occasion, that materials provided by GE to Fletcher at

10  no cost, but that otherwise throughout the relationship

11  until such time as there was a prolonged period of

12  non-payment by Fletcher, that GE did charge Fletcher for

13  the Pyranol that he was taking, that he took it.  There

14  is some testimony to suggest that there were informal

15  allowances made during certain phases of the proceeding,

16  but that the evidence suggests to me that GE did

17  consistently charge Fletcher for the material that

18  Fletcher was taking away.

19            MR. COWAN:  All right, judge, we'll move on

20  then.  Just again to get into the record Defendant's

21  Exhibit 29, agreed upon by the United States, which is a

22  label from a Webtex roof coating product.  His Honor has

23  made the point that there's evidence in the record that

24  material purchased by Fletcher had used and was used in

25  some roof coating materials.  We also note that Webtex

1    was purchasing significant amounts of scrap Pyranol that

2    Fletcher purchased from General Electric.  We'd offer

3    that as evidence of Webster's and Webtex's product in

4    the marketplace, and it's also useful as his Honor

5    considers the expert testimony.

6              THE COURT:  But it doesn't list specifically

7    the ingredient in there, right?

8              MR. COWAN:  That's correct, judge, cannot make

9    that representation.

10             MR. FLYNN:  I do want to, your Honor --

11             THE COURT:  It's guaranteed free from coal

12   tar, though.

13             MR. COWAN:  Can't be that, judge.

14             THE COURT:  I had a lot of those cases going

15   back into the 1880s here, so this case is like brand new

16   compared to some of the cases.

17             MR. FLYNN:  Your Honor, I just want to point

18   out that the United States has not objected to this

19   exhibit, but we have pending before you a motion in

20   limine to restrict expert testimony concerning the whole

21   topic of roof coating.

22             THE COURT:  All right, well, we will get to

23   that if we go through his documents.  What else do you

24   want to show me?

25             MR. COWAN:  Just very quickly, judge,

1   Exhibit 30.  Again, this is a United States Patent

2   Office, Defense 30, agreed upon by the parties showing a

3   trademark by Webtex and again listing for a coating for

4   application for billing services including water,

5   roofing liquids for roof, foundations, et cetera.

6   Again, for evidence of the manner in which Webtex was

7   using this material, again helpful as his Honor

8   considers the expert's testimony.  Moving along.

9           MR. FLYNN:  Your Honor, just --

10          THE COURT:  It's the same.

11          MR. FLYNN:  Yes.

12          MR. COWAN:  Thank you, judge.  Moving along,

13   Defendant's Exhibit 34, also agreed upon, this is a

14   document taken from Monsanto's materials indicating for

15   the year '63 through '71, plasticizer applications,

16   forgive me, plasticizer applications for Aroclors were

17   the second most common use or at least sales by Monsanto

18   during that period.

19          THE COURT:  All right, let me look at this.

20   That sounds interesting.

21          (Pause.)

22          THE COURT:  Now, my question to you is, can I

23   infer from this that plasticizer applications are

24   plasticizers that consist of Aroclor, or are there

25   non-PCB plasticizers, because Monsanto made a ton of

44

1    different chemicals.

2              MR. COWAN:  Yes it did, your Honor, and they

3    were quite good at it.  They did well by themselves.  I

4    next offer --

5              THE COURT:  Well, but can you tell me, I mean,

6    when it says plasticizer applications --

7              MR. COWAN:  Yes, your Honor.

8              THE COURT:  It did make, say, for example, in

9    1963 it sold thousands of pounds, 9,181 pounds, so 9,181

10   pounds of plasticizer, but does that mean it sold that

11   amount of Aroclor, or does that mean it sold

12   plasticizers of a variety of kind, only one of which was

13   maybe Aroclor, which we don't know how much of it was

14   plasticizer.

15             MR. COWAN:  Yes, your Honor, no dispute there,

16   we have entered into or offered for the court's

17   consideration testimony of William Papageorge, a

18   Monsanto technician chemist, who speaks about Monsanto's

19   Aroclor business -- excuse me, its plasticizer business

20   and how significant it was for the company and the

21   material, the kind of plasticizers that the company

22   offered.

23             THE COURT:  So you have a deposition you want

24   me to read that tells me more about that?

25             MR. COWAN:  Yes, your Honor.

1          THE COURT:  All right, and did you want to say

2     something?

3          MS. ROWLEY:  I just want to clarify that there

4     are many different types of Aroclors and the ones that

5     GE was using were not necessarily the kind that Monsanto

6     was selling for use at that time.

7          THE COURT:  All right.

8          MR. COWAN:  I refer his Honor to Mr.

9     Papageorge's testimony and the expert's testimony.

10         THE COURT:  All right.

11         MR. COWAN:  One second, your Honor.

12         THE COURT:  Yup.

13         (Pause.)

14         MR. COWAN:  Your Honor, thank you, I believe

15    that's it.

16         THE COURT:  Okay.  You want to take up some

17    objection you have to their expert deposition?

18         MR. FLYNN:  We actually have two pending

19    motion in limine's before your Honor.  One is related to

20    this whole roof coating issue and their expert, Dr.

21    Girard, and then we have a --

22         THE COURT:  All right, well, let's go.  I've

23    got to rule on it, right, I've got to read the

24    deposition today so I'm going to decide whether I'm

25    going to keep it out.  What do you want to say about it?

1          MS. ROWLEY:  It's just a short point that we

2    made in the motion.  We had a motion to strike at the

3    summary judgment stage certain evidence that GE never

4    relied upon, inadmissible hearsay.  They haven't really

5    briefed any different evidence to show that Webtex was

6    using the scrap Pyranol in roof coating.  We agree it

7    was used for something, we don't know what --

8          THE COURT:  Does your motion depend upon your

9    assertion that there is no evidence to permit a

10   conclusion that the Webtex, whatever the name of the

11   predecessor, was getting Pyranol from Fletcher?

12         MS. ROWLEY:  No, we agree they were getting

13   Pyranol from Fletcher.

14         THE COURT:  Okay.

15         MS. ROWLEY:  We just don't agree that, you

16   know, we can identify what they were using it for at the

17   end of the day, so therefore any expert testimony on

18   specific roof coating specifically is irrelevant.

19         THE COURT:  I don't think it particularly

20   matters all that much.  The point is, they were buying

21   it because they could use it in their product.  One of

22   their products was roof coating.  It's logical they

23   probably used it as a roof coating additive, but --

24         MS. ROWLEY:  And it's also irrelevant because

25   GE didn't know about the sales to Webtex.

```
1              THE COURT:  Yeah, but you brought in a whole
2    lot of evidence about what's happening at the site and
3    didn't tie any of it to what GE knew, so, I'm going to
4    receive it depending, you know, I won't necessarily
5    assign any significant weight to it, but I'm not going
6    to exclude it for that reason.  So if the arguments are
7    that I should exclude the evidence concerning Webtex
8    because there isn't sufficient evidence to permit a
9    conclusion that Webtex is using the Pyranol it obtained
10   from Fletcher in a roof product as opposed to something
11   else, I overrule that objection, and if the -- I forget
12   now, your second argument was?
13             MR. FLYNN:  We also have pending a motion in
14   limine to completely exclude the testimony of Neil
15   Shifrin who's another expert of GE.
16             THE COURT:  And why do you want to exclude
17   him?
18             MR. FLYNN:  Turn to my colleague.
19             MS. FISKE:  We don't think that he's qualified
20   as an expert or that his opinions will help you resolve
21   the issues that are in dispute.
22             THE COURT:  Why?
23             MS. FISKE:  For the reasons stated in our
24   papers.
25             THE COURT:  I know, but I want you to tell me
```

1    why.

2            MS. FISKE:  Well, for one thing he talks -- he

3    talks about the lack of environmental regulation during

4    the relevant time period.  I think all he's stating is

5    something that's really a matter of common knowledge.

6    You've indicated yourself, you know, by reference to

7    stories growing up in Woburn, he's not adding anything,

8    and he doesn't talk whatsoever --

9            THE COURT:  I grew up in Acton, not Woburn.

10           MS. FISKE:  I'm sorry, I'm thinking civil

11   action.  So, you know, that's common knowledge.  You

12   don't need an expert to tell you that.  And he does not,

13   even though he's purporting to talk about environmental

14   regulation at the time period, he does not mention any

15   of the laws regarding regulation of the Hudson River

16   that were in place at the time.

17           THE COURT:  Is he being offered to stand for

18   the proposition that there weren't any restrictions?

19           MS. FISKE:  He says virtually unregulated.

20           THE COURT:  I think it was virtually

21   unregulated.

22           MS. FISKE:  Right.

23           THE COURT:  So I don't think it's going to be

24   a problem.  I mean, it's ironic because earlier on they

25   wanted to introduce evidence that it was regulated and

1    illegal in the early seventies.  Most of the time this

2    was going on there were very little restriction on GE's

3    ability to dispose of this waste in any way it chose.

4    The clean water act hadn't been enacted.  Most local

5    regulations didn't bar disposing of waste in rivers.

6    People who lived in Concord, New Hampshire in the 1950s

7    and 60s would tell you that this Merrimack River was so

8    polluted that in fact it did catch fire periodically.

9    People were regularly depositing all kinds of hazardous

10   substances in the river and not being held to account

11   for it.  GE acknowledges that it was dumping lots of

12   Pyranol into the Hudson River and -- so I don't think it

13   really matters.  I'll look at it.  But if that's all it

14   is, that's not going to be a problem.  Anything else?

15        MS. FISKE:  Well, here's two more opinions

16   that we don't think are going to assist the court.  His

17   second opinion is the transportation of NQ which is what

18   he calls scrap Pyranol over long distances at Fletcher's

19   expense was not consistent with the means of disposal of

20   industrial waste readily available to GE at the time,

21   when the disposal of such waste, including those

22   contaminated PCBs, was effectively unregulated.

23        THE COURT:  Well, in theory they could have

24   dumped it in the river, so why did they transport it

25   over a long period of time.  The answer is, because they

 1    could get somebody to pay them for it.  That's the

 2    answer to that.  That's the end of the story.

 3              MS. FISKE:  Why do you need an expert for

 4    that?

 5              THE COURT:  Well, but, so what?  To the extent

 6    he says that, his argument is completely unpersuasive.

 7    So, if I don't think it makes any sense, I'm not going

 8    to adopt it anyway.

 9              It's obvious, why would they send Pyranol all

10    across state lines?  Because Fletcher was willing to pay

11    for it.  Why did they do that?  They could have gotten

12    rid of it, even in the late 1960s for 50¢ a drum,

13    according to GE's expert, so yeah, they could get rid of

14    it relatively cheaply, but they could get rid of it and

15    make some money on the side while they were getting rid

16    of it by paying this guy to take it.

17              MS. FISKE:  His third point, your Honor, is

18    equally unpersuasive.  He says the nature of the

19    transaction between GE and Fletcher was consistent with

20    a sale, paren, GE and purchase, paren, Fletcher's of a

21    useful product, meaning scrap Pyranol.  That ultimately

22    goes to the conclusion --

23              THE COURT:  I think they didn't bring him in

24    here for a reason because, I mean, it wouldn't really

25    withstand careful analysis.  It either does or doesn't

1    -- the expert isn't going to -- I mean just because --

2    there are many styles of argument.  One style of

3    argument is called argument by authority, and that is

4    you bring somebody in and say I am an authority and I

5    say it's true and therefore it is.  Well, I don't find

6    argument by authority persuasive.  If it doesn't make

7    sense to me, I'm not going to believe it, and I don't

8    care who you are.  I feel I can understand whatever kind

9    of expert testimony people are going to produce, and if

10   I don't, if what you say doesn't make sense, I don't

11   care what your qualifications are, I'm not going to

12   accept it.  And just saying I'm an expert, it's

13   consistent with sales, that doesn't really tell me much.

14   So I'll read his deposition.  If it's persuasive to me,

15   I'll consider it, but I'm not going to exclude it, I'm

16   just going to say I don't really buy it.

17          MR. BIAGETTI:  May I make one comment in

18   response because it may save you some time.  We made a

19   proposal to the government and I'll reiterate it here.

20          There's only one strand of one argument that I

21   think is anywhere in the government's case, and frankly

22   it's more in the pretrial pleading, the proposed

23   conclusions of law than I heard at the presentation of

24   the evidence, that Dr. Shifrin would still need to rebut

25   the report and deposition if you decided so, judge, and

1    it's this.  The government asked you to conclude as a

2    matter of law that given the promulgation of laws and

3    regulations governing and limiting the discharge of

4    hazardous substances into water bodies such as the

5    Hudson, GE was forced to consider other cost effective

6    disposal methods for scrap Pyranol.

7            We don't think the case is about discharges of

8    hazardous substances --

9            THE COURT:  Who's saying that?

10           MR. BIAGETTI:  The government is asking you to

11   conclude that at --  at proposed conclusion -- the

12   government is making that argument at --

13           THE COURT:  Well, I expect the government to

14   show me here's the New York State law that would have

15   barred him from putting it in the river that was in

16   effect at the time.  Here's the local ordinance that

17   would have barred him from dumping it.  Here's the

18   federal law that addresses this.  So if GE wanted to

19   behave lawfully, it couldn't do that and therefore it

20   had to find an alternative.  That didn't require an

21   expert.  That's just here, show me the law.  I'm sort of

22   the expert in the law here.  Just bring it to my

23   attention and I'll look at it and I'll see whether there

24   were in fact laws in place.  I don't understand that

25   ordinarily to be the case because I represented so many

1    companies who had wastes in the 1950s and 60s where the

2    product, recommended disposal of the product was dig a

3    trench into the ground, pour the stuff into the ground

4    and cover it over, and that's the way it worked.  Now,

5    maybe there were laws in place that I'm not aware of in

6    the fifties and sixties, but that's not the way -- I

7    don't think they were in New Hampshire because in New

8    Hampshire that's the way they did things.  They just dug

9    a trench or they put a punch of barrels in the ground,

10   took a bulldozer and ran over them and pushed dirt over

11   it.  That's how they would do it.

12            MR. BIAGETTI:  And your recap is the essence

13   of Dr. Shifrin's report on that subject which I think is

14   all --

15            THE COURT:  Maybe New York law is different.

16   I don't think there are any federal laws.  Were there

17   any federal laws that barred disposal of hazardous

18   waste?

19            MS. FISKE:  Well, we intend to -- the answer

20   to your question is the Refuse Act 1899 and then there

21   are also New York laws, but we don't intend to make this

22   significant argument at our closing and we do intend to

23   present it just exactly as you have said, by citing to

24   the laws themselves.  You are the expert in the laws,

25   not Dr. Shifrin, who by the way has never been to law

1   school.

2          THE COURT:  I'm interested in -- I'm more

3   interested, frankly, maybe the parties didn't get this,

4   what would have been interesting to hear, I'm an expert

5   in paint, and I've looked back over 50 years and I've

6   looked at the formulas for paint and I know the market

7   shares and I know what paint products are made and I

8   know how you make plasticizers and I know how you make

9   roof coatings, and to the extent Aroclors were used they

10  had to be this kind of purity, and without that kind of

11  purity you couldn't put it in the product, it wouldn't

12  work and nobody would buy it, you know, and if you've

13  got an expert like that, that would be interesting.

14         MS. ROWLEY:  That's our expert.

15         THE COURT:  Okay, well, good, I'll be

16  interested.  That's worth reading because that requires

17  an expertise that I don't have.

18         MR. COWAN:  It is good reading, judge, but

19  read his report, then read his deposition.  Now that's a

20  good read.

21         THE COURT:  Okay.

22         MR. COWAN:  Also respectfully, judge, the

23  report of Dr. James Girard, I apologize to your Honor, I

24  inadvertently left off the list of exhibits we ask you

25  to read, but the parties have agreed to it by agreement,

1    so with that friendly amendment I believe we're all set.

2            THE COURT:  Okay, the defense rests.

3            MR. COWAN:  Yes.

4            THE COURT:  The objections to the

5    admissibility of the expert's depositions that the

6    government has raised I will take under advisement and I

7    will read the depositions and I will make a final ruling

8    after reading the depositions.  My inclination is,

9    frankly, is to deny the motions to exclude, but I'll see

10   what the people have to say.  In denying the motions to

11   exclude doesn't mean I'll choose to credit the

12   depositions.  I may find what they have to say not

13   credible, or I may find what they have to say credible

14   but doesn't require really expert analysis but just

15   states something that is already evident under the

16   circumstances.

17           So, I will, unless anybody wants to say

18   anything more today, my plan is to have all your

19   exhibits brought up into my office.  Take your lists,

20   sit down and read every exhibit that the government has

21   asked me to read, every deposition the government has

22   asked me to read, and read every exhibit the defendant

23   has asked me to read and every deposition that the

24   defendant has asked me to read, and I'll do that

25   tomorrow and if necessary over the weekend, then Monday

1    you will come prepared to make final arguments.

2             I do have to say I've read the government's

3    memorandum on the legal standard and I'm not inclined to

4    change my view.  I think the government's current

5    position is not that far from my view, but it is a

6    different view.  I would take the view that you have,

7    and you've used this term, the government has,

8    constructive knowledge.  The way I see it, it's

9    something that you would call an alternative form of

10   intent that the law sometimes refers to as constructive

11   intent.  In other words, if the arrangement is an

12   arrangement for the transfer of waste under

13   circumstances where the defendant understands and agrees

14   that the waste will be, some of it used for useful

15   purpose and some of it will be discarded in ways that

16   qualify as disposal under the statute, that that is an

17   arrangement for disposal, and, but I am not willing to

18   go so far as what I think the government is suggesting,

19   is that even if under the circumstances the defendant

20   didn't know that disposal was substantially certain to

21   result, but if under the circumstances it reasonably

22   should have known that, that it's chargeable with

23   liability because I find no support in the case law for

24   that view and I don't think I can square it with the

25   statutory construction, and I think the government just

1    takes a very expansive view of the concept of statutory

2    construction.  I am essentially a texturalist.  I

3    believe in construing the text of the statute in

4    context.  I try to determine what the objectively

5    manifested purpose of the statute would be.  The

6    government's approach seems to be CERCLA has a purpose

7    to clean up the environment and make polluters pay.  If

8    there are two possible interpretations, one of which can

9    be construed to enhance the ability to make polluters

10   pay, then that's what we're going to adopt, and I don't

11   think there's even -- I don't even think the statutory

12   language can be stretched that broadly, and I don't

13   think any court would stretch it that broadly.  There

14   may be good public policy reasons to do so, but that's

15   the difference between the Congress and the judiciary.

16   The Congress decides how to amend statutes to make them

17   more effective.  The judiciary applies the statutes and

18   construes the statutes reasonably in light of the

19   purpose of the statute, but must attend carefully to the

20   language, and I don't see how an arrangement can be an

21   arrangement for disposal unless the arranger either had

22   disposal as an objective, or the arranger knew,

23   understood that the disposal was substantially certain

24   to result from the arrangement, and I think in that

25   sense I am agreeing with what I understand the

1    defendant's position to be on the statute, and I am not

2    persuaded by the government's position.  So you should

3    keep that in mind when you present your arguments.  Yes.

4              MR. COWAN:  Your Honor, I apologize, just one

5    small housekeeping matter if his Honor --

6              THE COURT:  Yes.

7              MR. COWAN:  On the identification of those

8    exhibits you asked us to bring to your attention, I

9    asked for friendly amendment of the Girard report.  One

10   final, and perhaps it's oversight, the parties have a

11   stipulation that all expert testimony by way of

12   deposition, their reports would be entered into

13   evidence.  I just took a quick glance.  They have

14   another expert, Mr. Portfolio.  I didn't see it on their

15   list presented to the court, so I just want to add that

16   to our list and I'll file an amendment for your

17   consideration.

18             THE COURT:  You want me to read their

19   deposition, their expert's deposition?

20             MR. COWAN:  I want you to read their roof

21   coating expert's report.

22             THE COURT:  All right, so you want me to read

23   what from Portfolio?

24             MR. COWAN:  They didn't designate anything

25   even though we have a stipulation that we were going to

1  do so.

2           MR. FLYNN:  There's no deposition for

3  Portfolio.  There's a report that they listed as an

4  exhibit and we said, you know, you can read it.

5           THE COURT:  Okay, so you want to add

6  Portfolio's report to the list of things you want me to

7  read.

8           MR. COWAN:  Yes.  So if it's okay with you,

9  judge, I'll file an amendment which lists Mr.

10  Portfolio's report and Mr. Girard's which I think is

11  honest and reflectful of our agreement.

12           THE COURT:  That's fine.  Here's what you're

13  going to do.  I'm going to leave in a minute and then

14  you're going to stand here with my clerk and make sure

15  everything that you want me to read is on a cart or

16  carts that he's going to bring up to my office, and that

17  your lists, you'll actually take the lists, and if you

18  need to physically write on them to add what needs to be

19  added to it, and then the clerk will bring up on carts

20  the binders containing the exhibits they want me to

21  read, and for the defendants I think as their exhibits

22  are presented separately, those exhibits that they want

23  me to look at, with the currently updated lists that

24  each side wants me to look at, and then I will come in

25  Friday morning and start reading.  And then you can

1    present your oral arguments.  As I said, I am already --

2    so the defense has rested.  The evidence in the case is

3    complete.  I am quite satisfied that there is persuasive

4    evidence, and certainly the government can't prove to

5    the contrary that Fletcher did use scrap Pyranol in a

6    small percentage of its operations and did transfer to

7    third parties an amount of scrap Pyranol and --

8              MS. FISKE:  We conceded that in our summary

9    judgment papers.

10             THE COURT:  Okay, so that's basically -- that

11   issue is done.  So the question then becomes,

12   notwithstanding that, was this an arrangement for

13   disposal because even if GE understood and agreed that

14   some of the Pyranol would be used in productive ways,

15   its agreement with Fletcher is such that it qualifies as

16   an arrangement for disposal because GE knew and

17   understood that not all of it would be able to be used

18   and that substantial quantities of it would have to be

19   disposed of, and it knew that at the time it went into

20   the arrangement and during the time the arrangement was

21   continuing to be in place, and on that basis it meets

22   the standard.  That's what I understand the argument

23   that the government is going to present to me.

24             The argument I understand that the defendant

25   is going to present to me is in GE's view the

1    arrangement was an arrangement to transfer Pyranol for

2    use in a series of products, a productive use that would

3    earn him money other than a use that would qualify as a

4    disposal, and that importantly the government can't

5    prove otherwise because it's the government's burden.

6    So you've got to present an argument to try to

7    demonstrate to me that the Pyranol, there was a market

8    for it, Fletcher was paying for it, Fletcher was making

9    statements suggesting that he had uses for it, the

10   circumstances under which it was transferred suggests

11   that it was going to be used, not disposed of, the

12   Pyranol was sufficiently clean to be useable for the

13   alternative purposes that Fletcher was putting it to.

14   GE had no basis on which to know and understand during

15   the course of the agreement that this would be disposed

16   of.  Fletcher never told them he was disposing of it.

17   There is simply no persuasive evidence that he was in

18   fact disposing of it.  That's what I understand your

19   argument's going to be.  Try to marshal the facts in

20   evidence to support that view, and I'll hear from the

21   government, then I'll hear from the defendant, and then

22   we'll go from there, although, I mean, I can switch the

23   order of argument if you want.  I mean, it is usually

24   the party with the burden of proof gets to go last, but

25   it might make sense for the government to just present

1   its argument and then the defendant.  It may make more

2   sense for me because --

3            MS. FISKE:  If you'd prefer.

4            THE COURT:  Yeah, I think that makes more

5   sense because I'm going to be asking a series of

6   questions, and then after the defendant's done, if you

7   have some kind of need to respond to something they've

8   said, I'll certainly hear you on that.  It's going to be

9   a much less formal approach to argument than you would

10  present in front of the jury.

11           MS. FISKE:  We'll plan on that.

12           THE COURT:  Okay.  And I hope we won't spend

13  too too long, you know, I'm certainly willing to spend

14  an hour with each of you and longer if we need to, but I

15  hope we can wrap that up in the morning on Monday and

16  then I can give you a decision and move on to the next

17  case I've got to work on.

18           All right, anything else we need to cover

19  today?

20           MR. BIAGETTI:  Nothing.

21           THE COURT:  Okay.  Thank you.  So work with my

22  clerk and make sure you get everything I need organized.

23           (Adjourned at 3:00 p.m.)

24

25

63

1                    C E R T I F I C A T E

2

3            I, Sandra L. Bailey, do hereby certify that

4    the foregoing transcript is a true and accurate

5    transcription of the within proceedings, to the best of

6    my knowledge, skill, ability and belief.

7

8

9    Submitted: 2/6/09        /s/ Sandra L. Bailey
                              SANDRA L. BAILEY, CSR, CM, CRR
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25