**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 5-11-2009


UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *  06-CV-354-PB
          v.                    *  November 4, 2008
                                *  9:25 a.m.
GENERAL ELECTRIC COMPANY        *
                                *
* * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF BENCH TRIAL - DAY ONE
MORNING SESSION
BEFORE THE HONORABLE PAUL J. BARBADORO


APPEARANCES:


For the Government:        Catherine A. Fiske, Esq.
                           Peter M. Flynn, Esq.
                           Laura J. Rowley, Esq.
                           Donald G. Frankel, Esq.
                           U.S. Department of Justice


For the Defendant:         Peter A. Biagetti, Esq.
                           William M. Cowan, Esq.
                           Mintz, Levin, Cohen, Ferris,
                           Glovsky & Popeo, PC

                           Ignacia Moreno, Esq.
                           Thomas H. Hill, Esq.
                           General Electric Company

Court Reporter:            Susan M. Bateman, CSR, RPR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, NH 03301
                           (603)225-1453

2

I N D E X

OPENING STATEMENTS:                         PAGE


By Mr. Flynn                                06

By Mr. Biagetti                             75



WITNESS:                    Direct    Cross

WALLACE HOOPER:

By Ms. Fiske                  104

1                    P R O C E E D I N G S

2           THE CLERK:  Court is in session and has for

3    consideration a bench trial, day one, in United States

4    of America versus General Electric Company, civil case

5    number 06-CV-354-PB.

6           THE COURT:  Are we in agreement here that the

7    only issue that I need to resolve at this stage of the

8    proceedings is whether the government can establish

9    more likely than not that GE otherwise arranged for

10   the disposal of at least some of the Pyranol that had

11   transferred to Fletcher?

12          MR. FLYNN:  Yes, your Honor.

13          MR. BIAGETTI:  Agreed.

14          THE COURT:  That's the only issue I needed to

15   resolve here.  Okay.  I haven't rereviewed your

16   findings of fact.  At the last meeting I made clear to

17   you that I wanted the proposed findings and rulings

18   presented to me in a different way so I'll have to

19   review those during the course of the trial to see

20   whether you've complied or not.

21          If you are ready to proceed, we can have

22   opening statements, and then we'll go from there.

23          MR. BIAGETTI:  Your Honor, I have a couple

24   housekeeping things, and I bet Mr. Flynn does, too.

25          First of all, good morning.  There are a

4

1   couple of summary graphics that each side had

2   exchanged and intended to use in the opening.   Not

3   many.   A couple.   We have objections to the two that

4   the government intended to use, and one in

5   particular I --

6          THE COURT:   When you use them, I'll hear your

7   argument.   I can't imagine that I would sustain an

8   objection at a bench trial for something like that.

9   If it doesn't persuade me, I won't consider it.   If it

10  does persuade me, I'll use it.   That's the way it

11  goes, you know.

12         MR. BIAGETTI:   Fair enough.   I'm burdening

13  your Honor because one, in particular, relies almost

14  completely on that Ropes & Gray memo that we talked

15  about in chambers last week.   It is a lawyer's recap

16  of in some cases --

17         THE COURT:   I'll figure it out when I see it,

18  okay?   I mean I don't want to see it twice to figure

19  it out.   When it's offered, object, and I'll figure it

20  out.

21         MR. BIAGETTI:   Fair enough.   One other.   I

22  know that I will refer to a couple of passages from

23  Mr. Abbe's designated testimony, which I believe are

24  at the heart of the case -- what GE knew at the time

25  of Fletcher's use -- and I know that those have been

1   objected to by the government.  I've let them know

2   that.  I don't think they have a problem with me

3   referring to them, but there again, if you want to

4   take five minutes to take that up right now, I'm happy

5   to do so.

6          THE COURT:  No.  I'm not a jury, okay?  You

7   don't need to try to -- and you can't.  The idea that

8   you rule on these things in advance is so that you

9   shield the jury from having to consider things that

10  are not ultimately admissible, but since I am both the

11  finder of fact and the ruler on whether things are

12  admissible or not, I have to see the things that you

13  say are not admissible to decide whether they're not

14  admissible so I have to be exposed to them in any

15  event.  So why be exposed to them twice?  Why not wait

16  until they're offered, object and we'll go from there?

17  If I determine that I shouldn't rely on them, I won't

18  rely on them.  If I determine they're not persuasive,

19  I won't rely on them.

20         Bench trials don't work like trials -- jury

21  trials for that reason.  I think it's much more

22  efficient.

23         MR. FLYNN:  Can I just clarify one item, your

24  Honor?  In the opening we are using demonstrative

25  exhibits for illustrative purposes.  We're not even

1  seeking to move them into evidence, and the areas that

2  Mr. Biagetti objects to, as far as the support, there

3  are three stipulated facts that the parties filed this

4  morning that support it.

5       THE COURT:  We'll get into it when we need

6  to.  Keep the focus on the real issues, and we'll try

7  to get through this faster.  Are you ready to go?

8       MR. FLYNN:  Yes, your Honor.

9       THE COURT:  All right.  Let's go.

10      MR. FLYNN:  Good morning, your Honor.  I'm

11 Peter Flynn with the Department of Justice, and

12 there's Catherine Fisk, Laura Rowley and Donald

13 Frankel, who are also representing the United States

14 in this matter.

15      What is this case about?  This case is about

16 GE's disposal of its scrap -- its waste.  GE's scraps

17 consisted of CERCLA hazardous substances.

18 Specifically, polychlorinated biphenyls, PCBs and

19 other substances, such as TCE, trichloroethylene.

20 That is material that is a waste under the Resource

21 Conservation Recovery Act.

22      The United States seeks a determination that

23 GE is liable under CERCLA for the environmental

24 contamination at the Fletcher Paint site in Milford.

25      The only issue, as your Honor said, for this

1   phase of the proceeding is did GE arrange for the

2   disposal of this scrap material.  All other aspects of

3   GE's CERCLA liability have either been stipulated to

4   or scheduled for the next phase of this proceeding.

5           Your Honor has received extensive summary

6   judgment findings, arguments, pretrial filings, and

7   tomorrow your Honor will be receiving supplemental

8   legal briefs so I'm not planning on covering the whole

9   gamut of the legal and factual issues in this case.

10          The evidence in this case is varied and in

11  many cases quite old.  There are documents that are 40

12  to 50 years old, depositions which are 16 years old,

13  witnesses who are testifying or in person that are in

14  their 70s and their 80s.

15          You will hear testimony from three former

16  Fletcher employees, Wallace Hooper, John Racicot and

17  Richard Whitney.  You will also view a videotaped

18  deposition of a former GE employee, Robert Abbe, and

19  there are designated deposition transcripts for some

20  Fletcher employees and GE employees.

21          The parties have worked very hard to

22  stipulate to as many facts as we have, finishing up at

23  midnight last night and filing them at 7:00 this

24  morning.  We have about 128 stipulated facts which

25  hopefully will streamline this proceeding.

1         What I would like to just go through now is

2    the simple chronology of events.  1953.  A GE ledger

3    will show that in 1953 a Fletcher company received

4    scrap Pyranol, scrap PCBs from GE and a ledger that

5    says N/C, no charge.

6         Your Honor will hear via deposition testimony

7    from a son of Frederick Fletcher, Richard Fletcher,

8    establishing that his father's operation included that

9    of a junk man.  He was a collector.

10         We anticipate that Mr. Hooper will testify

11    that Fletcher was looking for a buyer for GE scrap

12    Pyranol because he had no idea what he would do with

13    the scrap and just hoped to make a dime on it.

14         Let's focus on what this case is all about.

15    GE's scrap.  The scrap PCB material.  I would like to

16    show your Honor U.S. Demonstrative Exhibit 71 somehow.

17    I think we're -- our computer is A, government table.

18         THE COURT:  So we haven't enabled you yet,

19    huh?  All right.  Do you know what number your table

20    is?

21         MR. FLYNN:  It's table --

22         THE COURT:  Is it PC-3A or PC-3B?

23         MR. FLYNN:  It's 3A, your Honor.

24         THE COURT:  Okay.

25         MR. FLYNN:  Okay.  That's it.  This is the

1   U.S. Demonstrative Exhibit 71.  What does this exhibit

2   show?  This exhibit shows various materials that would

3   be present in the scrap Pyranol drums from GE's

4   manufacturing operation.

5           The material came in from drip pans, troughs,

6   catch basins, spills, draining.  The material included

7   TCE, different dielectric fluids, degreasers, mineral

8   oil, castor oil, water, dirt, insulation, soil, paper

9   and even cigarette butts, and your Honor, to

10  supplement this table and just to put it on the

11  record, I just want to point your Honor's attention to

12  the stipulated facts that were filed this morning,

13  number 48, 59 and 68, which provide support for a

14  number of these items on this table.

15          Now, your Honor, the United States is not

16  claiming every single drum contained this collection

17  of contaminated material.  Some drums probably were

18  nearly pure Pyranol.  However, even for those drums

19  that were nearly pure Pyranol --

20          THE COURT:  Let's go through it step by step

21  from the time the chemical that becomes Pyranol is --

22  enters the GE facility until it leaves.  What's the

23  chemical that you use to make Pyranol?

24          MR. FLYNN:  Well, your Honor, let's turn then

25  to Plaintiff's Demonstrative Exhibit 69, which I think

1   addresses some of those issues.

2            THE COURT:  All right.

3            MR. FLYNN:  On the screen now, your Honor, is

4   Plaintiff's Demonstrative Exhibit 69.

5            THE COURT:  What is Aroclor?

6            MR. FLYNN:  Aroclor is a PCB product that was

7   manufactured by Monsanto.  That was -- the raw

8   material, as you would, that was sent to GE and

9   processed by GE to create their dielectric fluid,

10  which was called Pyranol.

11           THE COURT:  What did GE do to it to make

12  Pyranol?

13           MR. FLYNN:  Among other items, I understood

14  they filtered it through something called filler's

15  earth to get rid of some water and chlorides, and for

16  some of the material they added substances.  They

17  added trichlorobenzene, I think it is, in small

18  amounts and beta chloroethylene.  They basically

19  added for some of their products -- it was not pure

20  PCBs but was a mixture.  It could be 75 percent PCBs

21  and 25 percent another item.  They used that material

22  to fill up their capacitors.  That's where the -- and

23  I'm not asking to go back to that at the time but --

24  well, I guess, yes, I will.  If we could switch back

25  to Government Exhibit 71?

1        So the material was basically changed from

2    Monsanto by GE creating their Pyranol from the

3    Aroclors, and this shows the steps in the

4    manufacturing process of the capacitors and the

5    different type of waste products that were generated

6    during each of those steps.

7        THE COURT:  What did they do with the

8    Pyranol?  How was it used?

9        MR. FLYNN:  I think their main purpose was as

10   a dielectric fluid for its electrical capacity, and so

11   they were basically using it in their capacitors and

12   transformers.

13       THE COURT:  What is a dielectric fluid?

14       MR. FLYNN:  Well, I'm sure GE has a deeper

15   understanding of that, but it prevents arching, or

16   basically you can use a capacitor without it blowing

17   up or being damaged.

18       THE COURT:  How is Pyranol used in the

19   capacitor?

20       MR. FLYNN:  I think it's used however the

21   capacitor is configured.  It's -- I'm stretching here,

22   your Honor.  I don't really have that exact answer.

23       THE COURT:  Do you know?  Do the defendants

24   know?  How is Pyranol used in a capacitor?

25       MR. BIAGETTI:  I believe that it helps with

1   the conductivity and also safety.

2          THE COURT:  Well, I'm asking less function

3   and how simply -- is it poured into a part of the -- a

4   part of something and sits there between two

5   connection points?

6          MR. BIAGETTI:  The capacitor, as I understand

7   it, is submerged and the Pyranol is injected into it.

8          THE COURT:  All right, and --

9          MR. HILL:  Your Honor, the capacitor

10  generates a tremendous amount of heat, and the way

11  Pyranol is used in a capacitor is to surround the

12  coils.  Depending on the nature of the Pyranol used,

13  it can be a liquid and it can be as thick as almost a

14  waxy-like substance.

15         So what happens when the capacitor -- if it

16  overheats or it archs, there's too many sparks, the

17  Pyranol prevents fires and burns and burning, and so

18  it allows the capacitor to be used safely inside

19  buildings or --

20         THE COURT:  So then a significant amount of

21  this Pyranol, if it is used properly, remains in the

22  capacitor during its useful life.

23         MR. HILL:  It stays in the capacitor for its

24  entire useful life.  It has to be incredibly pure or

25  the capacitor itself won't work.  I don't know the

1   exact purity, but I mean the comparison would be like,

2   you know, the chips in computers.  It has to be

3   really, really pure or it won't work.

4           THE COURT:  So its principal use then is to

5   be put inside the capacitor to serve this function

6   that has been identified?

7           MR. HILL:  Correct, and then it's used also

8   in transformers -- which is a different kind of

9   electrical equipment -- in much the same fashion.

10          THE COURT:  Did GE use it for transformers,

11  as well as capacitors?

12          MR. HILL:  Yes, and those vary in size from

13  things you see hanging on a pole outside someone's --

14  down the street to very large capacitors and

15  transformers for buildings and utility companies.

16          THE COURT:  Was it used in essentially the

17  same way in transformers?

18          MR. HILL:  Yes.  It's just a matter of size.

19  The functionality is essentially the same.

20          THE COURT:  All right.  So now we're back

21  to -- I think we're at the point where your diagram

22  then becomes relevant.  You've taken me through the

23  stuff comes into the factory as Aroclor.  It gets

24  processed by filtering and through addition of other

25  chemicals.  It becomes Pyranol.  It's then employed in

1  the process of manufacturing capacitors and

2  transformers, and it actually becomes a part of the

3  capacitor or transformer in that it is placed inside

4  it and remains in the capacitor/transformer during its

5  useful life.

6          MR. FLYNN:  Yes.

7          THE COURT:  I think now we're at your stage

8  where you're talking about what happens to it, right?

9          MR. FLYNN:  Yes, and I would like to go back

10  to Demonstrative Exhibit 71.

11          In the process of creating this capacitor,

12  different waste products are produced, and this

13  diagram goes through the different aspects where waste

14  products are produced.

15          THE COURT:  How are wastes produced during

16  the process of making a capacitor or a transformer --

17  waste Pyranol?

18          MR. FLYNN:  It drips into drip pans when it

19  is being impregnated.  When it's being sealed, it

20  collects in troughs.  When it's being transported on a

21  conveyor belt, it gets caught in a catch basin.

22          THE COURT:  It goes -- some of it that is

23  meant to be in the capacitor/transformer instead ends

24  up in a drip pan rather than in the

25  capacitor/transformer.

1          MR. FLYNN:  Correct.  Along with other

2   material that is caught that is in the drip pans.

3          THE COURT:  All right, and then what are the

4   other sources of waste Pyranol during this process?

5          MR. FLYNN:  In that particular process

6   there's testimony and there's also some stipulated

7   facts that other debris would be caught in the drip

8   pans.  We even have testimony from some GE witnesses

9   about cigarettes butts winding up in the same place as

10  the caught Pyranol in that process.

11         THE COURT:  I'm sure some of it spills on the

12  ground and has to be cleaned up; is that correct?

13         MR. FLYNN:  Some of it is spilled on the

14  ground, was cleaned up, and we have testimony that

15  that, along with the dirt, was also put into scrap

16  Pyranol.

17         THE COURT:  All right.  So I've got drip pan

18  and spill.  What else?

19         MR. FLYNN:  Then, again, troughs in the

20  sealing process.

21         THE COURT:  What is that word that you're

22  using?

23         MR. FLYNN:  I'm looking at the second arrow

24  from the left here.

25         THE COURT:  Trough?  What's a trough?

16

1          MR. FLYNN:  That's sort of another collection

2  device underneath the sealing process, and here

3  mineral oil, pump oil, water and other items were

4  collected along with --

5          THE COURT:  Can GE give me a little bit more

6  detailed description of what a trough is?

7          MR. HILL:  It's a trough.  It's a collection

8  basin.

9          THE COURT:  Is it underneath a drip pan?

10          MR. HILL:  I think it would be the equivalent

11  of a drip pan.

12          THE COURT:  Okay.  Because a lot of times

13  what they'll -- I don't know anything about this

14  process, but I used to go to a lot of chemical plants

15  and look at things.  They have collection pans

16  underneath, and sometimes they would have cuts in the

17  floor that -- things that didn't get in the collection

18  pan would go in the floor and then flow into some

19  other area where that would be collected.  Is that

20  what a trough is?

21          MR. COWAN:  Your Honor, I don't know that.

22          MR. HILL:  It could be, your Honor.  It's not

23  quite clear where Mr. Flynn is referring to in the

24  testimony.

25          THE COURT:  Do you know what that is?

1          MR. FLYNN:  I think Mr. Huchro, who is one of

2    the designated depositions, with no objections from

3    either party, goes into extensive detail about the

4    process and these various collection items, including

5    the troughs.

6          THE COURT:  Okay.  Troughs.  Okay.  What

7    else?

8          MR. FLYNN:  The third arrow from the left is

9    transporting via conveyor belt, and here we also have

10   catch basins.

11         THE COURT:  Transporting of what, the actual

12   capacitor or transformer?

13         MR. FLYNN:  Of the capacitor, and here again,

14   the catch basin is collecting the Pyranol, but it also

15   picks up other material like TCE, dirt, dust and

16   degreaser.

17         THE COURT:  Okay.

18         MR. FLYNN:  Then the furthest arrow to the

19   right where it says degreasing and actually cleaning

20   off that capacitor, and as part of that, again, there

21   could be Pyranol leakage and TCE leakage.

22         THE COURT:  Well, degreasers are really

23   common in a lot of manufacturing processes.

24   Ordinarily they're -- you know, back in the 50s, I

25   don't know -- but their own process of collection and

1  recycling of degreasers.  Are you saying that the

2  degreaser, whatever they used, was just put in a waste

3  Pyranol --

4          MR. FLYNN:  No.  I think recycling was part

5  of it, but I think at the end of the day or at the end

6  of a certain period of time some of the material was

7  not reclaimable.

8          THE COURT:  Yeah, but I'm trying to envision

9  this, okay?  You have a -- sometimes a completed

10  manufactured part is degreased.  Sometimes a tool is

11  degreased.  There's a significant amount of degreaser

12  used in that process and it is collected, and most

13  companies would, to the extent they couldn't recycle

14  it, would have their own segregated degreaser waste,

15  and I'm trying to figure out whether you're saying GE

16  put all of the degreaser waste into the waste Pyranol

17  tank.

18          MR. FLYNN:  Not at all.  There were TCE waste

19  tanks, also, but we do have some testimony that some

20  of this material did wind up in scrap Pyranol tanks,

21  but they do have separate TCE waste tanks.

22          THE COURT:  Are you guys going to refute

23  that?  Do you disagree that there was degreasing

24  Pyranol residue that was in the Pyranol that you were

25  selling to --

1        MR. BIAGETTI:  You will have testimony by

2   deposition of the chemical technicians at the time who

3   say that they never recall any oil in the tanks.  They

4   never recall any contaminants beyond what Mr. Flynn

5   talked about when he said small amounts of chloride or

6   water.  We're talking about 30 parts per million could

7   make this Pyranol unfit for GE's use, and those same

8   folks will say that while there were spills, they were

9   rare.

10        THE COURT:  I assume GE is a reasonably

11   efficient company.  It wouldn't pay for Aroclor and

12   make Pyranol unless it needed to do that, right -- for

13   its manufacturing process, right?  If it could collect

14   the Pyranol at very low cost and simply reuse it, it

15   would do so, right?

16        MR. BIAGETTI:  Part of the reason for the use

17   of the fuller's earth to filter was to continue to use

18   for as long as it possibly could.  At some point it

19   became unusable for GE's purpose.

20        THE COURT:  And I assume, therefore, in order

21   to evaluate what was usable and what was not usable,

22   that there would be a lot of testing of this Pyranol

23   at various stages of the process to determine whether

24   it was still sufficiently pure to be used.

25        MR. BIAGETTI:  At each cycle.

1          THE COURT:  So do we have records as to

2    exactly the extent of contamination that had to be

3    present before GE would treat it as waste Pyranol?

4          MR. BIAGETTI:  My understanding was 30 parts

5    per million of either chlorides or water would make it

6    unsuitable for GE's purpose.

7          THE COURT:  Did they test for dirt or other

8    kinds of contaminants?

9          MR. BIAGETTI:  Well, I believe that they did,

10   but it was not -- because we're talking about such an

11   infinitesimal amount, they relied on chemical testing

12   more than they did the naked eye.

13         MR. FLYNN:  Your Honor, there's some evidence

14   in the record that some of the drums from GE contained

15   22 percent trichloroethylene, and Mr. Huchro, the

16   GE --

17         THE COURT:  Some of the waste Pyranol was 22

18   percent TCE?

19         MR. FLYNN:  Yes, your Honor, and Mr. Huchro

20   also testified, I believe, that some of the drums

21   contained only 25 to 30 percent PCBs.

22         THE COURT:  All right.

23         MR. FLYNN:  Again, your Honor, I turn your

24   attention to those three stipulated facts that I

25   mentioned which basically verify that this material

1   contained dirt, water, cleaning fluids, scrap pump

2   oil, drinking soda and different types of dielectric

3   fluids.  These are facts that were stipulated to by

4   General Electric.

5          THE COURT:  All right.

6          MR. FLYNN:  And just going off with what Mr.

7   Biagetti said, we're not claiming that each drum

8   contained all this mixture or that each drum only had

9   25 percent PCBs, but even for these nearly pure drums,

10  here are the facts that we think are relevant.  GE had

11  no use for that material.  GE obviously couldn't

12  recycle it or reuse it.

13         THE COURT:  I'm operating under the

14  understanding that if GE transferred even one barrel

15  of waste Pyranol to Fletcher under circumstances where

16  that transfer qualifies as an arrangement for

17  disposal, that that ends my analysis.  That that's all

18  that needs to be established at this phase of the

19  trial.

20         So that there could be a thousand barrels of

21  Pyranol that GE arranges to transfer to Fletcher

22  knowing that Fletcher is going to not dispose of it

23  but use it in another process, but transfers one

24  barrel with 25 percent TCE in it that is intending to

25  be disposed and knows that Fletcher can't use it

1  because of the contaminants in it, and once I make

2  that finding, that's all I need to do at this stage of

3  the proceeding.

4         MR. FLYNN:  That's the United State's

5  position, your Honor, and GE is not totally without a

6  defense at that point because the next phase of the

7  trial they could take that information and use it to

8  convince your Honor that there's some apportionment of

9  harm based on whether they had one drum out of, you

10 know, 300,000 or more.

11        THE COURT:  That's why I asked at the

12 beginning whether the sole question is whether there

13 was to some degree an arrangement for disposal.

14 That's all I need to decide now.  How much of the

15 stuff was transferred as an arrangement for disposal

16 is not something I need to resolve at this stage.

17        MR. FLYNN:  That's the United State's

18 position, your Honor.  Though on the evidence that we

19 have, you know, will show more than just one drum, and

20 we want to put that evidence before you.

21        THE COURT:  Okay.  Your diagram talks

22 about -- in addition to the four sources of

23 contaminated Pyranol, you talk about a repair being

24 made.  What are you going to tell me about that?

25        MR. FLYNN:  Again, there was an area where

1   some of the capacitors were rejected and the Pyranol

2   was drained out of them, and as part of the collection

3   process other material would get into where the --

4          THE COURT:  These are not used capacitors and

5   transformers.  These are capacitors and transformers

6   that for some reason never left the GE plant?

7          MR. FLYNN:  I believe so, and in fact, I

8   think GE, as part of their quality assurance/quality

9   testing program for their capacitor customers, did

10  these arch testings to see what electric capacity they

11  could withstand, and for some of these capacitors when

12  they reached the limit, the Pyranol basically turned

13  black and they established what their scientific

14  cutoff was, but they had to get rid of that material.

15  So that would be one area of the scrap Pyranol -- this

16  black material that hadn't survived the electric

17  currents.

18         THE COURT:  Okay.

19         MR. FLYNN:  Your point is well-taken, your

20  Honor, about the one drum aspect, but we just wanted

21  to point out that even for the better material, you

22  know, that was material GE wasn't being able to

23  recycle.  Monsanto didn't want it back.  GE had its

24  own paint manufacturing facility, but there's no

25  indication that GE ever used the scrap Pyranol in its

1    own paint manufacturing.

2              At the GE facility where there would be one

3    drum of this horrible stuff and one drum of nearly

4    pure Pyranol, they weren't labeled as such in the area

5    where they were picked up.

6              THE COURT:  Yeah.  I make the point because

7    it seems to me that one argument that is at least open

8    to you is that even if Fletcher had some plan to use

9    the least contaminated Pyranol, he was making an

10   arrangement with GE to take the good and the bad,

11   dispose of the bad and use the good, and that that was

12   what the arrangement was with GE.

13             I mean your position, I think, is I can

14   establish that every drum -- it was an arrangement to

15   dispose of every drum, but where someone pays for a

16   bunch of drums over a long period of time with varying

17   degrees of contamination, it certainly is a reasonable

18   economic behavior for someone who can dispose of the

19   bad at low cost, use the good to pay something for a

20   load that contains both good and bad.  Do you see what

21   I'm saying?

22             MR. FLYNN:  Yes, your Honor.

23             THE COURT:  I don't know if that's an

24   argument you're going to present to me, but that's at

25   least something that would occur to me as an argument

1  that someone in your position might be trying to make.

2        MR. FLYNN:  Sure, your Honor.  I would say

3  there's the range of really good stuff to really poor

4  stuff, and under the --

5        THE COURT:  A rational economic actor in

6  Fletcher's position might pay a price to take the

7  whole lot -- pick out from it what he can use and

8  discard the rest, and GE could be a knowing

9  participant in that process and have intended that

10  that occur, and therefore, to the extent to which it

11  was agreeing with Fletcher that the waste -- the bad

12  contaminated waste would just be disposed of, they

13  otherwise arranged for disposal as to those, even if

14  they didn't as to everything.  That's at least an

15  argument.  I don't know whether it's one you're going

16  to pursue.

17        MR. FLYNN:  Yes, your Honor, and we do have

18  testimony from Fred Fletcher's son, Richard Fletcher,

19  that for some of this poor quality material, this thin

20  Pyranol, it was used as a dust suppressant at the

21  facility.  They used a lot of it.  They just poured it

22  over the ground, and that's part of the contamination

23  that we're dealing with now.

24        I would like to turn now back to Exhibit 69.

25  We went through the first top of this chart, your

1    Honor, about what was the product from Monsanto and

2    what did GE do with it, did it become scrap Pyranol,

3    and here I think it's relevant to focus on what GE did

4    with this waste -- with this waste product.

5          GE has stipulated that they discharged a

6    bunch of it into the Hudson River.  They stipulated

7    that they discarded it into landfills.  They

8    stipulated that they transferred to municipalities

9    that used it as a dust suppressant.  We have other

10   evidence that establishes -- well, actually GE has

11   stipulated that it gave free scrap Pyranol to its own

12   employees, and we have evidence that shows that these

13   employees used it as a weed killer.

14         There is evidence that it was removed by

15   "scavengers", and then, of course, we have evidence

16   that it was provided to Mr. Fletcher.

17         So then I think the next question is, what

18   happened to the scrap Pyranol at Fletcher's, to the

19   extent that that is a major, relevant item.  As I just

20   mentioned earlier, we have testimony that --

21         THE COURT:  Before we get to that, logically

22   there's going to be testimony about what were the

23   dealings between GE and Fletcher so why don't you tell

24   me what your evidence will be on that.

25         MR. FLYNN:  Yes.  Well, okay.  I can go right

1  into -- I was actually going to give you a chronology

2  of that.

3           THE COURT:  Okay.

4           MR. FLYNN:  So why don't I skip to that part

5  and focus on that.

6           THE COURT:  All right.

7           MR. FLYNN:  As I mentioned, 1953 was the

8  first known dealing that we know of between GE and a

9  Fletcher company where scrap Pyranol was provided to

10  Fletcher, and the ledger has the indication N/C, which

11  pretty much everyone understands to mean no charge.

12  So our position is that the very first dealing between

13  these two entities was GE provided free scrap Pyranol

14  to Fletcher.

15           In 1956 a company called Webster Cement, also

16  known as Webtex, started picking up scrap PCBs from

17  Fletcher.  Fletcher finally found somebody that might

18  have some use for it.  GE has stipulated, however,

19  that GE did not know of the existence of Webster or

20  Fletcher's relationship with Webster.

21           THE COURT:  I'm sorry.  Was GE dealing with

22  Webster or was Fletcher?

23           MR. FLYNN:  Fletcher was dealing with

24  Webster, and GE had no knowledge of the existence of

25  Webster.

1          THE COURT:  What do you say Webster was using

2  it for?

3          MR. FLYNN:  Well, it's a little bit of a

4  mystery, your Honor.  We don't know -- there was a

5  lack of documentation and evidence concerning Webster.

6  I can see that Webster was a roof coating

7  manufacturer.  We don't have any direct evidence -- I

8  mean they did a number of different products.  We

9  don't have any direct evidence of what they used the

10  scrap Pyranol for so it would be just an inference on

11  what they were using it for.

12          THE COURT:  What did they pay for it?

13          MR. FLYNN:  We don't even have that evidence,

14  your Honor.

15          THE COURT:  How do you know they used it?

16          MR. FLYNN:  Well, the way I know they used it

17  is that there was a business relationship with

18  Fletcher for a number of years, and at one point it

19  required Fletcher to blend and filter the scrap

20  Pyranol that was too thin from GE to some consistency

21  that was acceptable to Webster.

22          We just don't have any evidence about, you

23  know, what exactly this business relationship was, as

24  far as money, or what Webster was actually using it

25  for.  Frankly, he could have been using it for a dust

1   suppressant, but we have no idea.

2           THE COURT:  All you know is that he had a

3   relationship where he was filtering Pyranol before

4   transferring it to Webster?

5           MR. FLYNN:  Yes.  Fletcher was blending and

6   filtering it.

7           THE COURT:  What do you mean by blending?

8           MR. FLYNN:  Again, we're using thin and thick

9   Pyranol as terms.  The thick Pyranol I guess is under

10  the assumption that that's the better quality, and the

11  thin Pyranol, which would probably be diluted with

12  things like TCE or other oil, you know, was basically

13  the junk Pyranol.

14          Webster, we understood, had some kind of

15  specifications for what they would accept.  So

16  Fletcher would be blending this thin Pyranol with this

17  other material to get it up to whatever level --

18          THE COURT:  Well, are they mixing Pyranol

19  from drum A with drum B to get a Pyranol of the

20  consistency that's acceptable rather than mixing it

21  with other chemicals?  That's what I'm trying to find

22  out.

23          MR. FLYNN:  The former, your Honor.  They

24  were mixing drum A with drum B to get an acceptable

25  type of Pyranol.

1          THE COURT:  We don't know what the acceptable

2     type is.  You're just presuming that it's thicker, and

3     you don't know what they were paying for it and you

4     don't know what they were using it for.

5          MR. FLYNN:  We don't know what they were

6     paying for it.  We really don't know what they were

7     using it for.  We do know that -- we have some

8     testimony that they needed to get it up to a specific

9     gravity or density of a certain level, and we do

10    have -- as long as we're on the blending and filtering

11    aspect, they filtered it, too, because some of the

12    material, obviously, from GE had, you know, dirt and

13    other items in it, but GE has also stipulated that

14    during this blending and filtering process at

15    Fletcher's there was spillage of this Pyranol on the

16    ground at Fletcher's.  Another example of -- during

17    the time period where this material entered the

18    ground.

19         THE COURT:  Is Aroclor a product that

20    contains PCB, or is Aroclor a PCB?

21         MR. FLYNN:  Aroclor is a PCB.  In fact --

22         THE COURT:  What is a PCB?

23         MR. FLYNN:  It's a polychlorinated biphenyl

24    that has a certain level of chloride atoms, and

25    depending on the chloride atoms is how thick it is.

1   There's different grades of Pyranol from Monsanto.

2   There's 1242, 1248, 1254, 1260, and there's even like

3   a poly triphenyl that's really thick, but what we

4   have, your Honor, is -- 1242 is the one that was

5   primarily used at GE.  So again Aroclor and PCBs are

6   kind of interchangeable.

7           THE COURT:  What were the uses at the time of

8   the PCBs other than in capacitors and transformers?

9           MR. FLYNN:  Well, we have a GE exhibit that I

10  looked at that showed sales from Monsanto during the

11  relevant time period, and the primary sales are for

12  dielectric fluids in capacitors and transformers.

13          The second most sales are for what's called

14  plasticizers, and plasticizers cover actually a wide

15  range of material.  They could be like shoes.  It

16  could be used like in heavier -- PCBs could be used in

17  the creation of shoes.  Plasticizers create some

18  flexibility.  It was certainly an additive to some

19  specific type paints, some rubber -- like chlorinated

20  rubber paints, and there's a range of items that a

21  plasticizer would go into so that was the second most

22  sales by the Monsanto company.  Again, we're talking

23  pure PCBs here.

24          THE COURT:  So I imagine then GE would say,

25  you need pure PCB for capacitors and transformers.

1  You can take much less pure PCB and have them still

2  function as a plasticizer.  Therefore, you should

3  conclude that because Fletcher was purchasing it, he

4  was anticipating and GE was anticipating that it would

5  be sold down market where PCBs don't have to be as

6  pure for their use in plasticizers.

7        MR. FLYNN:  Our response to that, your Honor,

8  is that GE had its own paint manufacturing facility

9  just up the road from where this scrap Pyranol was

10  produced.  We sent GE discovery responses saying, you

11  know, hey, did you guys use plasticizers, did you guys

12  use scrap Pyranol.  The discovery responses that came

13  back included a patent and another document that

14  showed that GE either had a patent or capacity to use

15  a plasticizer in its business.  It could use Aroclor

16  that was produced by Monsanto.

17        However, there's no evidence that they drove

18  their truck a few miles up the road, gave them the

19  scrap Pyranol and they used it in their own paint

20  manufacturing facility.

21        Related to that, your Honor, we have a paint

22  formulation expert, a Mr. Granito, who has been in the

23  paint business for 45 years, directly hands on.

24        THE COURT:  Why shouldn't I engage in this

25  kind of reasoning?  GE is a sophisticated company in a

1   business to make profit.  GE is able to identify the

2   marketplace for materials that it can no longer use.

3   If there were a substantial marketplace for the

4   materials that GE could no longer use, it's reasonable

5   to assume that GE would have tried to identify that

6   marketplace.  Since the evidence demonstrates that GE

7   discarded -- deliberately disposed of substantial

8   quantities of waste Pyranol, it's reasonable to infer

9   from that that there wasn't a market at the time or GE

10  would have exploited that market.

11          GE doesn't just throw money out the door.  It

12  doesn't burn dollar bills.  It's in the business of

13  making money, and wouldn't we expect to see GE dealing

14  with the market that exists for plasticizers if it

15  could exploit that market by selling Pyranol in the

16  marketplace?

17          MR. FLYNN:  Definitely, your Honor.  For

18  example, with things like that you would expect that

19  they would be advertising the scrap Pyranol.  We have

20  no indication they ever advertised it to anyone, and

21  you would be expecting that this scrap Pyranol would

22  be handled like other products.  Like, for example,

23  their capacitors and transformers had -- you know,

24  contains PCB.  Be careful.  Use the right safety

25  procedure.  None of that was on these scrap drums.

1    They were stored in the scrap and salvage area of GE.

2         THE COURT:  Okay.  Keep going.

3         MR. FLYNN:  And just again -- I don't want to

4    beat this point too much, but our paint expert would

5    basically say, even if the scrap Pyranol was decent

6    quality -- because you didn't know what was in this

7    drum or in this drum -- you would be playing Russian

8    roulette, essentially, with the batch of paint you

9    were making because paint has specific, precise

10   formulas.  If you didn't really know what was going in

11   it, you might have saved some money but you could have

12   ruined the whole batch so this was not really a good

13   approach to use for a scrap Pyranol, as compared to a

14   pure PCB product.

15        THE COURT:  All right.

16        MR. FLYNN:  As I mentioned, at some point

17   Webster returns the PCBs -- Webster, Fletcher's

18   customer, returned PCBs to Fletcher saying, I can't

19   use this.  It's too thin.  Fletcher's drivers went and

20   complained to the foreman at GE, Mr. Tony Metevier,

21   about the poor quality of PCBs they were getting.  So

22   at that time Tony Metevier provided Fletcher with some

23   free shipments of scrap Pyranol to make up for the

24   poor quality they had previously provided.

25        So our position is at that point anyway Tony

1  Metevier, a GE employee, knew that --

2          THE COURT:  Do you think that cuts your

3  way -- that evidence?

4          MR. FLYNN:  Well, it shows that Mr. Metevier

5  knew that they had been providing basically unusable

6  Pyranol.

7          THE COURT:  It also puts GE in a position

8  where GE is acting like an entity that is supplying

9  this not for disposal but for another purpose because

10 why do they say to Fletcher, well, let me make it up

11 to you, if they weren't providing products that they

12 thought Fletcher had some use for apart from disposal?

13         MR. FLYNN:  I think the more appropriate

14 inference -- I mean there are a number of inferences,

15 of course, that can be made from these facts -- but GE

16 was a wash in the scrap Pyranol.  They were disposing

17 of it in a number of different areas.  They had

18 Fletcher's, essentially a scavenger company, taking it

19 from them and even paying them some pennies for it.

20 They wanted to keep this outlet for their scrap

21 Pyranol alive.

22         THE COURT:  Is there any evidence that GE has

23 ever had another productive outfit take the scrap

24 Pyranol -- people other than Fletcher who were paying

25 GE for the Pyranol?

1          MR. FLYNN:  As far as we were able to

2    discover, absolutely not.

3          THE COURT:  So during the entire history of

4    GE's use of Pyranol, the only person that ever paid

5    for it was Fletcher?

6          MR. FLYNN:  There might have been some money

7    paid by the towns that used it as dust suppressant.  I

8    don't know.  A drag strip in upstate New York used it

9    as a dust suppressant.  They may have paid for it,

10   too.  I don't know that.  There is a 1970 document

11   produced by GE that discusses giving it to scavengers.

12   I think that that's probably the category that

13   Fletcher fits in.  I would say if we're talking about

14   a market here, your Honor, it's a market of one, Mr.

15   Fletcher, who is really another outlet for waste

16   disposal.

17         THE COURT:  The use of a hazardous waste as a

18   dust suppressant is a disposal of the waste; wouldn't

19   you agree?

20         MR. FLYNN:  We certainly agree with that,

21   your Honor.

22         THE COURT:  When GE has its turn -- I don't

23   understand how -- because in the conference there was

24   some suggestion that if you place a hazardous waste on

25   the ground and you intend to use it for dust

1  suppressant purposes, that's not a disposal, but I

2  don't see how that possibly fits within the definition

3  of disposal, which is quite broad and encompasses

4  placing a waste so that it may be -- the waste or any

5  constituent thereof may enter the environment or be

6  emitted into the air or discharged into any waters.

7           Use of a chemical as a dust suppressant

8  involves placing it on the ground so that it will get

9  into the air and on the ground and in the water,

10 right?

11          MR. FLYNN:  That's our position, your Honor,

12 and we believe that that's supported by the case law,

13 including that case that I think GE was involved in

14 with the State of New York.

15          THE COURT:  Okay.  Well, what else do you

16 want to tell me?

17          MR. FLYNN:  There is also testimony -- again,

18 I'm just following a sort of chronological framework

19 here -- that at some point Fletcher's employees had to

20 bring tools with them to the GE facility because the

21 drums that GE was pushing off on them were leaking so

22 they had to tighten them up so that they wouldn't

23 continue spilling during transit.

24          Another what we think is a very important

25 item, your Honor, is that --

1          THE COURT:  Are you proceeding under a theory

2    like the one that the Ninth Circuit employed in the

3    Burlington case?  Are you saying that they transferred

4    this stuff -- even if they transferred this stuff to

5    Fletcher for use in a manufacturing process that

6    Fletcher had, that leaks inevitably would occur during

7    the transportation process, and to the extent leaks

8    are disposal, GE intended the portion of it that

9    leaked to be disposed of?

10          MR. FLYNN:  We're not asking your Honor to go

11   to that extent.  In the whole totality of

12   circumstances, we're putting together pieces of

13   evidence -- like that evidence, for example -- again,

14   showing what GE thought about this product --

15          THE COURT:  If you're proceeding on that

16   theory, we probably ought to delay the trial until the

17   Supreme Court acts because I don't want to waste my

18   time on that.

19          MR. FLYNN:  No.  We are not proceeding on

20   that theory.  Again, to us, that fact -- one inference

21   is --

22          THE COURT:  Don't come back if you lose and

23   tell me -- after the Supreme Court endorses the Ninth

24   Circuit position -- that that's how you were really

25   trying this case, okay?  That's not a theory on which

1   you're proceeding.  If you were, I would be inclined

2   to say come back and see me in the summer.

3           MR. FLYNN:  That's not the theory we're

4   proceeding on, your Honor.  Again, that fact -- the

5   inference that we would draw from that fact is that GE

6   is treating this product -- if you call it a

7   product -- it's actually a waste product --

8   differently than it treats the capacitors and the

9   transformers.

10          They have basically these leaking drums with

11  no QA/QC that are sitting in a scrap salvage

12  department.  So that fact to us again shows how GE

13  views the scrap Pyranol.  It views it as essentially a

14  waste.

15          THE COURT:  Okay.

16          MR. FLYNN:  I would like to turn -- yes, your

17  Honor.  In 1965 -- again, I'll be moving a little

18  quicker, but I just wanted to again give you a

19  chronological framework.

20          GE documents indicate that Fletcher was what

21  was called a cash in advance customer, and what that

22  means was, for whatever credit reason, they required

23  Fletcher to pay before they got the material.

24          However, despite the status that's listed in

25  a GE document from 1965, in the 1966-67 period GE

1   provided Fletcher 100,000 gallons of scrap Pyranol

2   without acquiring payments in advance.  100,000

3   gallons.  In August '67 GE writes to Fletcher, a CI

4   customer, again and demands payment.  GE does not get

5   paid.

6          However, after that time there were three

7   additional shipments from GE to Fletcher.  They

8   continued to offload this material to Fletcher.  The

9   last one was received in November '67.

10         In February '68, Fletcher writes to GE to

11  complain about the quality of the scrap Pyranol, and

12  here is, I think, a really significant exhibit, your

13  Honor.  I would like to turn to U.S. Exhibit 5.  It's

14  a little foggy, but we'll zero in on some parts.

15         This is a letter from Frederick Fletcher to

16  GE complaining about the material received.  I would

17  like to turn to paragraph four in this letter on the

18  first page.  Mr. Fletcher is basically saying that the

19  material that he's been receiving of late from GE was

20  garbage in the chemical trade.

21         Moving further down on that page to paragraph

22  five, one of the reasons that this change occurred was

23  that Fletcher was no longer sending trucks to GE where

24  Fletcher's drivers at GE could see if the stuff was

25  bad or good.  Apparently there were contract truckers

1  used at this time, and they were not doing the checks

2  at GE that would have separated out the awful material

3  from some stuff that wasn't as awful.

4          If you turn to the second page at the top,

5  the first paragraph, at this time -- and this is a

6  1968 letter.  Fred Fletcher states that he had 1,800

7  to 2,000 drums on hand of this material.  1,800 to

8  2,000 drums.

9          If you could turn further down on that same

10  page to the fourth paragraph, he's describing the bad

11  drums, and I think what's really interesting is his

12  last sentence in this paragraph.  He's basically

13  noting that they've just been loading anything they

14  want onto these contract trucks and sending them off

15  to his place.

16          We will expect that your Honor will hear

17  testimony confirming that these later shipments from

18  GE were very, very poor quality, and the contract

19  truckers were used.  We have testimony that will

20  support that.

21          GE knew that Fletcher didn't want this poor

22  material.  GE then took this letter, and what did they

23  do?  They took some of the material and they sent it

24  back to Monsanto and they said, well, you know, look

25  at this material and you tell us what you think about

1   it, and so there's a correspondence -- there's a

2   letter -- there's a document from GE that basically

3   says Fletcher's complaints are correct.  This scrap is

4   badly contaminated, and this document from GE is one

5   of the ones that says some of the drums contained up

6   to 22 percent TCE.  So these drums were tested and

7   found to be really junk, and that was what Mr.

8   Fletcher was complaining about.  GE wrote off the

9   debt.  Fletcher didn't have to pay for that.

10          I would like to just put that in a little

11  economic perspective, your Honor.  Again, we're

12  talking 100,000 gallons of scrap Pyranol.  GE has

13  stipulated that when they bought the Aroclors, PCBs

14  from Monsanto, they were paying Monsanto $3.00 to

15  $3.50 per gallon.  If this were pure or nearly pure

16  PCBs from Monsanto, it would have been worth $300,000

17  to $350,000.

18          Then we get to the next step.  GE billed

19  Fletcher's $7,000 for this material.  Ultimately

20  decided it was so bad GE billed them nothing.  They

21  paid nothing for this material that if it was pure

22  would have been worth $300,000 to $350,000.

23          We will also hear testimony, your Honor, from

24  some GE employees who would say even after this

25  juncture, even after writing off Fletcher's debt, they

1   still wanted to keep a business relationship going,

2   and of course this was an outlet for their scrap

3   material.

4          I would like to show you what's been marked

5   as U.S. Exhibit No. 9.  This, your Honor, is a 1970

6   document -- a GE document addressed to the Pyranol

7   Task Force and it discussed -- again, this is 1970.

8   It discussed the past status of disposal.

9          I would like to turn your attention to

10  paragraph three.  This paragraph discusses the past

11  status of disposal that is discharged in the Hudson.

12  That's not a contested fact.  GE stipulated to that.

13         Paragraph five.  This paragraph discusses

14  disposing of it in landfills.  That's not a contested

15  fact.  GE stipulated to that.

16         Paragraph four.  This is where some of the

17  other material went.  It went to scavengers, and look

18  at the description here of -- this is a GE document.

19         THE COURT:  How close to finishing are you?

20         MR. FLYNN:  Very close.  This is how they

21  describe the -- where it didn't go to a landfill or it

22  didn't go to the Hudson, what happened to the rest of

23  the material.  It was out of sight, out of mind.

24         I'll move on a little quicker now, your

25  Honor.

1          By 1974 Fletcher still had over 1,000 drums

2   at the site that he was trying to get rid of.  In 1975

3   Monsanto found out about this.  They suggested they

4   should be incinerated.

5          Fred Fletcher dies in 1983.  There were no

6   records of sales of any material from Fletcher's from

7   1968 to '83.  Somebody in the mid-80s took away a

8   bunch of drums -- some guy named Kamieniki, and at

9   this time the TSCA -- the Toxic Substance Control Act

10  was in play so commercial use of PCBs were either

11  banned or severely restricted.  EPA comes on site in

12  1987 and observes hundreds of drums still on the site.

13         You will hear testimony, your Honor, and I

14  have to say that some of this testimony is objected to

15  by General Electric counsel -- the admissibility is

16  contested -- but you will hear testimony that Tony

17  Metevier, the foreman of the scrap and salvage place,

18  heard that Fletcher's was using this as a defoliant

19  and spread on fire lanes.

20         You will hear from Mr. Abbe, who was an

21  upper-ranking corporate person there.  He was

22  wondering how such a small paint manufacturer could

23  use the volumes that they were giving, and he thought

24  that Fletcher might be using it as an insecticide,

25  weed killer or dust suppressant.  All commonly known

1   uses for PCBs for that time period.

2          In closing, your Honor -- I know this took

3   longer than --

4          THE COURT:  I asked you a lot of questions.

5          MR. FLYNN:  Okay.  I just wanted to say, your

6   Honor, that we believe that the stipulated facts, the

7   uncontested evidence and documents, the testimony and

8   even at the end of the day when we finish up with the

9   disputed facts, that you will conclude that we have

10  met our burden, the United States, in establishing

11  that Fletcher's was just another outlet for GE to

12  dispose of this scrap product.

13         THE COURT:  Are you still pushing the theory

14  that you can have an arrangement for disposal if you

15  agree to transfer materials thinking that they're

16  going to be reused but under circumstances where a

17  reasonable person would have understood that they

18  would be disposed of?

19         MR. FLYNN:  Yes, your Honor.  I just have to

20  check with my co-legal counsel.

21         THE COURT:  Whoever best knows that theory --

22  I can't find any support for it in the case law.  Do

23  you want to just tell me where it comes from?

24         MR. FLYNN:  Well, your Honor -- just a

25  second.

1            (Attorney Flynn confers with Attorney Fiske)

2            MR. FLYNN:  Your Honor, one of the attorneys

3     in our group -- per what you've requested and per what

4     we've agreed -- is working on a supplemental legal

5     brief that we'll be submitting tomorrow morning.

6            THE COURT:  I'll take a look at it.  It seems

7     to me, when I'm just acting as a fact finder, it's

8     good to know what the legal standard is that you need

9     to employ when you find facts, and I tried to read

10    every case that says anything significant about

11    arranger liability, and I don't see any holding of any

12    case where the standard has been construed as broadly

13    as the one that you're suggesting, and indeed, it

14    seems to me that there are cases that hold that the

15    purpose of the -- certainly there are cases that

16    recognize that the sole purpose of the arrangement

17    need not be for disposal.  There are cases that

18    recognize that the purpose of the arrangement need not

19    be for disposal.  There are cases -- and even those I

20    think that require intent -- for example, the Sixth

21    Circuit has said that while intent is implied in an

22    arrangement for disposal, they rely on the basic

23    concept in American law that one is deemed to intend

24    that which is substantially certain to follow from

25    one's actions.

1          So I see cases that recognize that you can

2    have an arrangement for disposal without an actual

3    intent to dispose as long as the arrangement is such

4    that under the circumstances disposal is substantially

5    certain to result and you're aware of that at the time

6    of the arrangement.

7          But that's as far as I can see the law going

8    in any of the cases that I've looked at.  So if you're

9    going to rest your case on this theory that should

10   have known, you're going to have to provide a lot

11   better support for it than you provided today because

12   I just don't see any real support in the case law for

13   such an expansive interpretation of the language of

14   107(a)(3).

15          MR. FLYNN:  We're really going, again, you

16   know, with a huge amount of evidence to satisfy the

17   totality of circumstances test.  It's not just what

18   the people say.

19          THE COURT:  I like totality of circumstances.

20   That's one of my favorite buzz words because the way

21   judges go about deciding cases, almost everything

22   should be decided based on the totality of

23   circumstances, but that begs the question, what has to

24   be proved by the totality of circumstances, and to

25   simply say an arrangement for disposal has to be

48

1  proved by the totality of circumstances doesn't answer

2  the question:  What is an arrangement for disposal?

3         So telling me the test is totality of

4  circumstances -- because I agree that some courts

5  do -- does not provide any guidance as to what

6  arrangement for disposal means, and if those courts

7  are saying one cannot more precisely identify what an

8  arrangement for disposal is, you know it when you see

9  it, look at all of the factors and decide, and it's

10 completely determined without any further guidance on

11 a case by case basis, those courts should say that.

12        I think it's possible to get a better idea as

13 to what the concept of otherwise arranged for disposal

14 means, but I don't think simply using the buzz phrase

15 totality of circumstances answers it.  Totality of

16 circumstances as to what?

17        MR. FLYNN:  I guess our position with the

18 case law is the cases have identified a number of

19 factors.  None of them seem to be preeminent so --

20        THE COURT:  Yeah, but factors as to what?

21 See, this is the -- totality of circumstances is a

22 test that describes evidentiary sufficiency.  It isn't

23 a test that identifies the legal standard.  You still

24 have to prove what by a totality of circumstances?

25 You would say, oh, Judge, otherwise arranged for

1    disposal.  I would say, yes, but then I would say,

2    what does otherwise arranged for disposal mean?  The

3    answer to that is not to say totality of

4    circumstances.  Do you see the problem?  That's the

5    problem with that test.  It doesn't -- you have to

6    answer the question:  What has to be established by

7    totality of circumstances?

8              MR. FLYNN:  I guess -- you know, again, the

9    cases, as your Honor pointed out at the summary

10   judgment hearing, are pretty all over the place.

11             THE COURT:  They're complete muddle.

12   Completely almost incoherent in how they address this

13   problem, but the ones that are particularly incoherent

14   are the ones that say the test is totality of

15   circumstances but then don't go on to try to give any

16   guidance, and to say totality of circumstances, intent

17   is one factor to be considered, doesn't really tell

18   you anything more about what otherwise arranged for

19   disposal is.

20             Now, there are some concepts that can't be

21   more precisely defined.  You know, maybe obscenity is

22   like that, if you believe that famous "I know it when

23   I see it" comment, but I think otherwise arranged for

24   disposal can be more precisely explained in a way that

25   is useful to judges, and you would use standard

1  approaches to try to give meaning to that language,

2  right?  You would use -- start from the text and ask

3  yourself, what does otherwise arranged for disposal

4  ordinarily mean?  Is there something about its use in

5  this particular context that suggests different

6  meanings?  Is there something, in light of the overall

7  purpose that CERCLA is attempting to achieve, that

8  supports a broader or a narrower interpretation if

9  more than one interpretation is possible from the

10  text?  Telling me totality of circumstances doesn't

11  help me answer that question at all.

12      If I wanted to evade responsibility for

13  trying to give meaning to the statute, I might do

14  that.  That makes it hard to reverse me because you

15  don't really know what I've done, but I think I owe it

16  to the parties and to the reviewing court to try to

17  explain as best I can what I understand that concept

18  to mean when I make my ultimate ruling on it.

19      And I don't think it means reasonably should

20  have known.  It might mean intended in the broadest

21  sense of -- actually desired that the outcome occur or

22  was aware that the outcome was substantially certain

23  to follow from the act.  That concept is not knew or

24  should have known.  That's a -- in the law it's called

25  a constructive intent sometimes.  You see it in the

1  criminal law.  You see it in the Restatement (Second)

2  of Tort.  If you look up intent in the Second

3  Restatement, what does it tell you?  It tells you -- I

4  think I've actually got it here.  Intent is used

5  throughout the restatement to denote that the actor

6  desires to cause the consequences of his act or that

7  he believes the consequences are substantially certain

8  to result from it.

9          That's not reasonably should have known.

10  That's a much more rigorous standard than reasonably

11  should have known, but it's a standard that's

12  well-grounded in the law of intent, both in criminal

13  law and tort law, and if that's what you're thinking,

14  that concept has at least been recognized by the Sixth

15  Circuit, which is one of the cases I think GE thinks

16  is an intent jurisdiction.

17          If you look at the Sixth Circuit's opinion in

18  the Carter -- in the Carter Jones Lumber Company case,

19  the court there says -- after talking about intent

20  being the standard -- normally the actor is presumed

21  to have intended the natural consequences of his deed,

22  citing that well-established legal principle.

23          So I think you would be better off -- and

24  I've been trying to essentially help you define your

25  positions because when you started summary judgment

1  you were, in my view, off in Neverland.

2          MR. FLYNN:  We came back, though.

3          THE COURT:  I know.  That's good, but you

4  need to come back even further because it seems to me

5  your reasonably should have known interpretation is

6  also untenable.  At least what is possible is an

7  interpretation that an arrangement for disposal is an

8  arrangement in which disposal is either intended to

9  follow from the act or substantially certain to result

10 from the arrangement.

11         You can ground that in basic common law in

12 the criminal area and the tort area and cite that

13 well-established legal principle that a person is

14 deemed to intend that which follows naturally from

15 their actions.  You can be found guilty and sentenced

16 to prison under that kind of concept of intent.  You

17 can be adjudged liable in tort for intentional conduct

18 under that conduct of intent, and I think the argument

19 you would make is it is reasonable to construe

20 arrangement for disposal against that legal backdrop

21 and understand an arrangement for to encompass both

22 desiring a particular outcome and engaging in the

23 arrangement with knowledge that disposal is

24 substantially certain to result.

25         MR. FLYNN:  Your Honor, I believe under that

1   standard that you articulated --

2           THE COURT:  You believe it under all

3   standards.  You may, but it's important to at least

4   try to identify the standard.  I don't think totality

5   of circumstances really answers it, and I don't think

6   reasonably should have known is legally tenable as a

7   standard.

8           MR. FLYNN:  I guess in my view, for what it's

9   worth, the totality of circumstances kind of leads you

10  into that --

11          THE COURT:  Think about what I said to you

12  because if you try to analyze it, I think you'll come

13  to realize that totality of circumstances is a phrase

14  that really is useful in identifying what kinds of

15  evidence can establish a proposition.  It doesn't

16  define the proposition.  The proposition still has to

17  be stated, and it may be that you can't state the

18  proposition any more specifically than otherwise

19  arranged for disposal, but I think you probably can,

20  as I've just suggested one way to do it, the way GE

21  would do it, and also there's some support in the case

22  law for this, is that an arrangement for disposal is

23  an arrangement, the purpose of which is to dispose,

24  and if there is not a purpose to dispose, there isn't

25  an arrangement for disposal.

1          I think those are two tenable ways to state

2   the proposition, and then after you identify the

3   proposition, then you of course use -- and GE would

4   agree with this -- totality of circumstances to

5   establish whether the proposition is proved.

6          Do you guys see what I'm saying here in terms

7   of the way to go about it?  I think the dispute

8   between you as to the legal standard, if you really

9   think about it, probably should be that GE argues that

10  an arrangement for disposal requires an arrangement

11  that the purpose of which is to dispose.

12         Your position, it seems to me, ought to be,

13  it is an arrangement, either the purpose of which is

14  to dispose or for which disposal is substantially

15  certain to result -- from which disposal is

16  substantially certain to result.  Both of you then can

17  join in arguing that the totality of circumstances

18  should be considered in determining whether that

19  proposition is established.  That's how I would

20  identify the two competing approaches.

21         Have I got GE's position right?

22         MR. BIAGETTI:  You have GE's position right

23  to the extent, your Honor, that arrangement for

24  disposal requires intentional action for that purpose.

25  Intentional action may include -- must include

1  knowledge at the time.  Knowledge may be proven

2  directly, somebody confesses it, or circumstantially,

3  and I think that's where your substantially certain

4  formulation, I believe, comes in.

5          THE COURT:  Well, okay.  Now, we're getting

6  somewhere because you may be endorsing a somewhat

7  broader test and maybe a more acceptable test than I

8  thought you were.

9          If you're saying all that's required is an

10  awareness that disposal will result at the time of the

11  agreement --

12          MR. BIAGETTI:  No.

13          THE COURT:  Okay.  You're not saying that?

14          MR. BIAGETTI:  No.

15          THE COURT:  Then when you're talking about

16  knowledge, that's what you're talking about.  Here's

17  the problem.  I'll just put to you a hypothetical that

18  will illustrate why your definition is at least

19  problematic to me.

20          If GE has waste on its site and it goes to

21  someone and says, I will pay you to take it away.  I

22  don't care whether you resell it.  I don't care

23  whether you dispose of it.  I am indifferent to what

24  you do with it.  It is not my purpose that this be

25  disposed.  It is not my purpose that it be reused.  I

1   am indifferent to whether it is disposed of or reused.

2   I just want it off my site.

3          If that is what the mind-set of the arranger

4   is under your interpretation in that hypothetical, I

5   assume that GE has not arranged for disposal.  Even if

6   it knows that the person is, in fact, going to dispose

7   of it, right?  They have actual knowledge.

8          The guy who they send it to says, listen, GE,

9   do you understand, I'm burying this in the ground, and

10  GE says, I don't care.  You can sell it if you want.

11  You can do whatever you want with it.  I just want it

12  gone.  How is that an arrangement for disposal under

13  your hypothetical -- under your test?

14         MR. BIAGETTI:  Well, first of all --

15         THE COURT:  Is it an arrangement or is it

16  not?  I assume it's not under your test.

17         MR. BIAGETTI:  No.  Then I'm not articulating

18  it properly because you can have it -- if you use your

19  standard of substantially certain, those facts could

20  prove that the arranger, the GE person, was

21  substantially certain that disposal would result.

22         THE COURT:  Okay, but understand, here's the

23  problem, okay?  I think it's possible to construe this

24  statute -- if you look at the definitions of the term

25  "arrange", the definition of the term "for", and the

1   statutory definition of the term "disposal", I think

2   you could make an argument that the way those things

3   are to be construed together in context requires --

4   and I will take the OED definition of "arrange" --

5   that seems most appropriate to me -- to come to an

6   agreement or an understanding as to mutual relations,

7   claims, matters of dispute -- to come to agreement is

8   essentially what I think is the most likely definition

9   of "arrange".

10          The most likely definition of "for", in

11  context, is a purpose or destination with a view to,

12  with the object or purpose of, okay; and "disposal" is

13  the broad statutory definition of disposal that's in

14  the statute that we've already talked about.

15          So one way to construe this is to say the

16  arrangement must be for the purpose of disposal.

17          MR. BIAGETTI:  Yes.

18          THE COURT:  The hypothetical I have given you

19  does not involve arrangement, the purpose of which is

20  to dispose.  It's an arrangement, the purpose of which

21  is to get it off my property.  I don't care what

22  happens to it.  It's not my purpose to dispose.  I

23  don't care.  You act entirely consistent with my

24  purpose if you reuse it, all right, but even if they

25  know it's going to be disposed of, it still isn't GE's

1   purpose to dispose of it under that narrow

2   construction; yet I think you're not arguing for that

3   narrow construction because you realize it would

4   completely defeat the purpose of CERCLA, right?

5           MR. BIAGETTI:  Yes.

6           THE COURT:  There's the problem.  If you

7   interpret the language of the provision as narrowly as

8   the OED definition would suggest, it would leave a

9   gaping hole in arranger liability in which the person

10  responsible for the waste, having full knowledge that

11  the waste is about to be disposed of, could avoid

12  liability simply by claiming indifference as to what

13  happens, and that can't be what it means, right?

14          MR. BIAGETTI:  I agree.

15          THE COURT:  Indifference is not sufficient to

16  defeat arranger liability.  Do you agree with that?

17          MR. BIAGETTI:  I do, and that's the Summit

18  case that the government cites to you, and we're going

19  to give you that short memo tomorrow on it because

20  there the arranger was selling the product at auction

21  and essentially said, I don't care who it goes to or

22  what they do with it, and there were lots of other

23  circumstances.

24          THE COURT:  So it has to be broad enough to

25  encompass the case in which the transferor is

1  indifferent but understands -- is fully aware that

2  disposal will result, right?

3          MR. BIAGETTI:  And again, your formulation,

4  substantially certain that disposal will result.  Now,

5  the Burlington Northern panel, with eight judges

6  dissenting on, I think is quarreling with what's going

7  a little further than substantially certain.  They

8  were saying something more like actuarially certain,

9  inevitable, there were going to be leaks.

10          THE COURT:  The Burlington Northern case

11  points to a problem, and Judge Posner recognized this

12  problem in his case, as well.  The purpose and intent

13  is to transfer or reuse a virgin chemical.  Is that an

14  arrangement for disposal if the evidence demonstrates

15  that spills inevitably accompany large volume

16  transfers of virgin chemicals for reuse?  That's a

17  problem because that's not -- despite the language --

18  what would have been envisioned by CERCLA.

19          Fortunately, that they disclaimed any intent

20  to follow that line of analysis, I don't have to get

21  into that huge -- what I think is a huge Burlington

22  Northern problem.

23          MR. BIAGETTI:  They, meaning the government,

24  this morning?

25          THE COURT:  Yes.  The government.

1        MR. BIAGETTI:  I heard that, as well.

2        THE COURT:  The government has disclaimed any

3   intention to rely on that theory, it is very

4   problematic, and I don't know how I would resolve it,

5   but I don't have to, and maybe the Supreme Court will,

6   but I agree that the Ninth Circuit -- in a way that

7   Judge Posner would have said is not acceptable to

8   him -- allows for arranger liability under

9   circumstances where the purpose of the arrangement is

10  to transfer a chemical for use but spillage inevitably

11  results, and that, I think, is problematic, but I

12  don't think I have to answer that, and I guess what I

13  need to understand is, to the extent I can convince

14  the government that it should narrow its theory of

15  liability to a circumstance where either there is a

16  desire to achieve disposal or an arrangement where the

17  circumstances are such that the transferor knows that

18  disposal is substantially certain to result, have I

19  narrowed the gap between the two of you so there is no

20  more gap?

21        MR. BIAGETTI:  You have certainly narrowed

22  the gap.

23        THE COURT:  What I want to know is, is there

24  a remaining gap, and if so, how does your

25  interpretation differ from --

1          MR. BIAGETTI:  Only to this extent.  GE's

2    position is that arranged for requires intent and

3    purposeful action toward disposal.  Intent may be

4    proved directly, a GE witness could confess it, or

5    circumstantially.

6          THE COURT:  All right.  Here's the problem

7    with -- okay.  You're saying substantially certain to

8    result -- disposal is substantially certain to result

9    operates as a kind of evidentiary presumption of

10   purpose, and that still doesn't defeat the -- doesn't

11   resolve the hypothetical.

12         You have the Pope and religious leaders from

13   all over the country in the room witnessing the

14   negotiation between the parties, and it is absolutely

15   undisputed that GE did not have an actual purpose to

16   dispose.  It is absolutely undisputed that GE was

17   indifferent to what happened, but it is also

18   absolutely undisputed that GE knew that disposal would

19   occur as a result of the agreement.

20         In that circumstance the government would say

21   there is liability.  If the substantially certain to

22   result operates only as an evidentiary presumption, it

23   is overcome by the abundant evidence of actual mental

24   state, and I guess you're saying that -- you're

25   arguing for the interpretation in which substantially

1  certain to result operates as a kind of evidentiary

2  presumption of purpose that can be overcome by

3  sufficient evidence to the contrary; where I think the

4  position I'm advocating that the government should be

5  taking, the narrow position, is that at that point

6  proving that stands in as a substitute for purpose,

7  and even if GE was indifferent, it is sufficient to

8  make it liable, and that interpretation is necessary

9  to solve the problem that would be the gaping hole and

10  liability created by somebody who willfully makes

11  themselves indifferent.

12          You can think about this.  We've got to take

13  a break, but I would like to -- it sounds like your

14  positions are getting very close, if I can get the

15  government to modify its view somewhat, but I'm still

16  not sure where there's this little gap, and the way I

17  would define the gap, potentially, is you say

18  substantially certain to result operates as an

19  evidentiary presumption that could be overcome by

20  evidence to the contrary as to what actual intent was;

21  whereas I would expect the government to say, no, if

22  you establish disposal is substantially certain to

23  result, that stands in as sufficient to make the

24  agreement an agreement for disposal, regardless of

25  what the actual intent of the person was because

1   otherwise that provision of arranger liability would

2   be rendered virtually meaningless as all polluters

3   would simply say, I don't care what you do with it.

4   Put it up for auction.  Do something like that, and

5   they truly are indifferent because, in fact, most

6   manufacturers who have waste, they don't want to

7   dispose of it.  They want it gone.  It's not like

8   they're desiring disposal.  Let's see if we can

9   contaminate the water with this.

10        I don't think anybody said that's what GE was

11   trying to do when it dumped PCBs into the water.  It

12   was trying to get rid of it, and yet it's liable, even

13   though its purpose was not to dispose.  Its purpose

14   was to get rid of under circumstances where disposal

15   would inevitably result.

16        So you guys think about this, but I think

17   we're -- you know, first, the government, you think

18   about my analysis because the case law has been very

19   muddled on this, and I thought about it now for a long

20   time, and I think the way I'm thinking about it is the

21   right way to resolve this, and you might get the

22   Supreme Court to adopt a very narrow interpretation

23   because there are some justices on that Court that

24   abdicate a very rigorous form of textualism, and if

25   you did, then arranger liability becomes avoidable by

1  almost all polluters, or you could adopt a somewhat

2  broader interpretation which requires suggesting that

3  in context there's ambiguity in that language because

4  it has to be interpreted in light of the CERCLA

5  statute, as a whole, and against the backdrop of the

6  American common law which recognizes this concept of

7  intent, and the interpretation I'm proposing, because

8  it doesn't leave the gaping hole in liability that

9  would totally defeat the purpose of CERCLA to hold the

10 polluter responsible, is the right interpretation, and

11 I think that's how -- if this issue ever does get

12 squarely addressed by the Supreme Court -- I don't

13 know that it will in Burlington -- that's how that

14 court is going to look at it.  It's going to analyze

15 it the way I just have, and they're not going to be

16 considering reasonably should have known because

17 that's too far out there, and they're not going to be

18 talking about totality of circumstances as the

19 defining standard.  They're going to talk about

20 totality of circumstances as being the means by which

21 you prove whatever the standard is, and they're going

22 to get into a debate about what arranging for disposal

23 means.

24         Some of the judges who are most narrowly

25 textualist would say it requires a purpose to dispose.

1  If that doesn't work well for CERCLA, too bad.

2          Other justices would say, we have to

3  interpret this against the backdrop of the American

4  common law, the statute, as a whole, considering the

5  purposes of CERCLA, and the reasonable construction is

6  one that allows for liability when there is

7  indifference on the part of the transferor but an

8  awareness that disposal will result.

9          That's how I analyze the whole problem.  You

10  guys think about it.  Maybe you can come to some kind

11  of agreement with me or at least agree that we're

12  pretty close, and bear in mind, I may not have to

13  resolve that problem to decide the case because the

14  government's view is we can prove there was an actual

15  purpose to dispose when they transferred to Fletcher,

16  and that's what you're going to try to do.

17          MR. BIAGETTI:  And our view is that they

18  can't even make it to the substantially certain stage.

19          THE COURT:  All right.  We'll take a break.

20          (RECESS)

21          THE CLERK:  In the matter of the United

22  States of America versus General Electric Company,

23  civil case number 06-CV-354-PB, the government has

24  premarked Exhibits 1 through 74.

25          All exhibits not marked for identification

1  are herewith accepted into evidence, there being no

2  objection by opposing counsel.

3          Those to which objection has been made shall

4  remain marked for ID at this time.  They are 9, 10,

5  13, 18 through 21, 31, 34 through 36, 44 through 46,

6  48 through 53, 56 through 58, 60, 61, 63 through 65,

7  68 through 74.

8          Defendant's have premarked Exhibits 1 through

9  83.  All exhibits not marked for identification are

10  herewith accepted into evidence, there being no

11  objection by opposing counsel.

12          Those to which objection has been made shall

13  remain marked for ID at this time.  They are 1, 3, 5

14  through 7.

15          MR. BIAGETTI:  I come with good news, your

16  Honor.  In addition to stipulating on a few witnesses

17  and a bunch of facts, GE is prepared to embrace your

18  awareness that the outcome was substantially certain

19  to result in disposal standard.  It is an evidentiary

20  avenue to the proof of requisite knowledge and intent

21  to satisfy the statute.

22          THE COURT:  Is it a permissive presumption or

23  a conclusive presumption?

24          MR. BIAGETTI:  Well, there I don't completely

25  follow you.  In other words, you're saying that even

1   if they prove substantially certain, are they presumed

2   to have proven intent?

3          THE COURT:  Well, you know how presumptions

4   work in the law.  Presumptions can be conclusive or

5   permissive, and the way a permissive presumption would

6   work, you prove the facts that warrant the application

7   of the presumption, and then it simply becomes

8   something that can be a sufficient basis on which to

9   decide the point but is not necessarily a sufficient

10  basis on which to decide the point.  Instead you have

11  to look at countervailing evidence.

12         That's why that hypothetical I gave you of

13  the Pope and everyone else sitting in the room

14  watching the actual arrangement be drafted -- there's

15  absolute clarity as to what's intended.  Your auction

16  case is probably a good example of that.  What was

17  actually in the mind of the person putting it up for

18  auction is, I just want it gone.  I'm not wanting it

19  disposed of.  I'm indifferent to whether it's disposed

20  of, and if what actually has to be proved is, I want

21  it disposed of, then under that circumstance --

22  evidence that disposal is substantially certain to

23  result is evidence that you might infer that his

24  actual intent is something, but his actual intent is

25  truly -- he's truly indifferent as to whether there's

1   disposal.

2           It's possible to be absolutely indifferent to

3   something that you know will follow from your actions.

4   I want to kill you.  I know you're on an airplane.  I

5   know there are other people on the airplane.  I don't

6   care whether they live or die.  I plant a bomb on the

7   airplane to kill you.  My purpose is to kill you.  I

8   kill 300 other people.  It's not my purpose to kill

9   them.  It's not my intent to kill them, but in the law

10  I'm deemed to have intended to have killed them, and

11  it's not a matter of, well, what's your actual intent.

12  You know, you knew this would happen so you must have

13  intended.  It's that you knew this would happen so

14  you're liable, okay?  You're deemed to have intended.

15  You constructively intended it.  There are a lot of

16  ways to describe it.

17          If intent encompasses actual intent and

18  constructive intent, then proof of constructive intent

19  is not evidence of actual intent.  It's another means

20  by which actual intent -- the intent requirement is

21  satisfied, or you could have evidence of -- you knew

22  that something bad would happen is evidence that the

23  fact finder can take into account in deciding whether

24  you actually intended the bad thing to happen.

25          See, I think this concept is so deeply

1   imbedded in the law that you think of the two

2   circumstances as being identical, and I think most

3   people do, but it doesn't necessarily follow that they

4   are.

5          I think lawyers are almost all trained that

6   the common law -- the way tort law works is that we

7   just understand you're deemed to have intended what

8   will necessarily follow from your actions, but it

9   isn't, as a matter of fact, true, and the case in

10  which you're indifferent to disposal is a case in

11  which you don't intend to dispose.  You just don't

12  care, and even if you know that there will be

13  disposal, that doesn't mean that you intended.  You

14  still remain indifferent even though you know, but in

15  the law you are -- you have constructive intent to

16  dispose under that circumstance.

17         So I was trying to get at the distinction --

18  it would be possible for you to embrace the should

19  have known standard and say to me, Judge, that's

20  evidence of actual intent but it can be -- the

21  evidence in the case can warrant a conclusion that

22  there was no actual intent, even if we knew that

23  disposal would follow.  You have to consider the

24  totality of circumstances, and the challenge is to

25  determine what GE actually intended when it went into

1   the arrangement.

2          You can consider evidence that disposal would

3   inevitably follow from an action, but that doesn't

4   decide the case.  You have to still look at everything

5   and ask yourself, considering everything, including

6   evidence that we knew disposal would follow, has the

7   government proved that we intended to dispose.  That's

8   one way to interpret it.

9          Another way -- even if the government

10  embraces my standard -- would be to say that's not

11  quite right, Judge.  If we proved that GE knew that

12  disposal would follow from the arrangement, we've

13  satisfied our burden of proof and it doesn't matter

14  whether GE had an actual desire to dispose of rather

15  than being indifferent to disposal.

16         So I still think there's a potential

17  distinction between the two of you, and you can think

18  about it some more whether -- in most cases it won't

19  make a practical difference because if the fact finder

20  is satisfied that you knew there was disposal that

21  would result from your actions, it's going to find you

22  intended that.  In almost all cases it may be just a

23  theoretical distinction, but it is one that you

24  potentially would have to make.

25         MR. BIAGETTI:  In this case, your Honor,

1   respectfully, we believe the evidence will show that

2   the government fails by a preponderance of the

3   evidence to prove that GE was substantially certain

4   that any of the Pyranol it sold to Fletcher would

5   result in disposal.  They will not meet that standard

6   in this case.

7           THE COURT:  Okay.

8           MR. BIAGETTI:  One of the things that's

9   happened since summary judgment, obviously, your

10  Honor, is that --

11          THE COURT:  The government might try to go

12  beyond that and say, as it has, well, even if it

13  wasn't substantially certain, it was so likely that it

14  was reckless for them to assume otherwise or it was so

15  likely that it was negligent for them to assume

16  otherwise.  They reasonably should have known.

17          I think that gets too far afield from the

18  language of the arranger provision.  I don't see in

19  the arranger provision any evidence to suggest that --

20  say someone who sells a virgin chemical to a company

21  for use in that company's product -- that it should

22  have gone out and conducted a site review and realized

23  that they were using some of the product for dust

24  suppressant.  Because they didn't do that site review,

25  they're liable as an arranger for disposal because

1  they didn't use reasonable care.  That's a whole

2  different approach to liability than seems to be

3  envisioned by the arranger provision.

4        I mean we have to understand the people that

5  draft our laws do not have perfect foresight, and they

6  are not linguists.  I think we all know the paradigm

7  problem that the drafters had in mind was the

8  situation in which someone is contracting with a waste

9  company to take the waste away and put it in a

10 landfill.  That's the paradigm arranged for disposal

11 case, but I don't think that's the only possible case,

12 but if you're sitting in a room with the people that

13 were drafting this provision and asked them, tell me

14 what you're thinking about while you're drafting this,

15 they would say, you want to capture the case where the

16 guy contracts with waste company A to haul away the

17 waste that's buried in the ground and make them liable

18 in that circumstance, and they probably didn't think

19 beyond that, and then if you ask them, well, what

20 about a case where someone hauls it away but the

21 company doesn't have any knowledge as to what they're

22 going to do with it?  You have to -- the problem of

23 getting into intent of the drafter is very difficult.

24 So you look at the language in light of the overall

25 purpose and ask what different ways it can be

1  interpreted.

2       I'm glad to hear your position is not so

3  rigid that you would disavow liability even if the

4  evidence proved that you were substantially certain --

5  that it was substantially certain to your company when

6  you were engaged in the arrangement that disposal

7  would result.

8       MR. BIAGETTI:  Yeah, and I was about to get

9  to the evidence, but I want to just make an offer of

10  one other point that may help to make the distinction

11  we're all talking about, and it's the Cello-Foil --

12  the Sixth Circuit case that the plaintiffs talk about.

13  There you had buyers of solvent in drums -- 55 gallon

14  drums.  They used the solvent, and they returned the

15  drums and got a deposit back from seller.  They knew

16  seller had no use for the solvent.  That's why seller

17  was selling to them.

18       Some of those drums had as much as 15 gallons

19  of solvent still in them upon return, okay?  The Court

20  held that -- remanded for trial to say there's a

21  question of fact here about what the parties "had in

22  mind".  Not what they should have had in mind.  Not

23  what was likely.  What they had in mind.

24       Leaving residual amounts in the drums may not

25  support an inference of purposeful or intentional

1  disposal.  So the standard is still purposeful or

2  intentional disposal based on what the parties had in

3  mind, but one may infer that based on the totality of

4  the circumstances of evidence of what buyers were

5  thinking when they were returning some of those drums

6  with 15 gallons of solvent in them.

7          THE COURT:  I understand.  The problem

8  though -- the practical problem is in the real world

9  when somebody has waste on their site, they are not

10  going to -- in the ordinary case when they get rid of

11  it by giving it to somebody -- desire that it be

12  treated in a particular way.  They don't care.  The

13  average person getting rid of waste just doesn't care.

14  They just want it gone, and the only way that that

15  kind of person could be held liable is if they

16  actually intended that it be put in the ground.  Then

17  almost no disposers of waste would be held liable

18  because any sophisticated company would simply make

19  sure that it was clear on the record that it was

20  indifferent to whether there was disposal.  That the

21  auction example would work, and it doesn't work,

22  right?

23          MR. BIAGETTI:  It doesn't work.

24          THE COURT:  If the auction example were

25  sufficient, then the arranger liability would have a

1   loophole within it that was big enough to drive a

2   truck through, and every sophisticated company would

3   take advantage of that loophole, and I don't think --

4   it has to be broad enough practically to encompass

5   cases where the arranger understands that there will

6   be disposal but isn't desirous of it.  It simply

7   recognizes that there will be disposal as a result of

8   its arrangement.

9          MR. BIAGETTI:  So on to, Judge, what the

10  evidence will show here.  GE knew and reasonably

11  expected that all of the Pyranol it sold to Fletcher

12  was for his and his company's use.  All that GE saw,

13  heard, learned, supported that reasonable

14  understanding.

15         It's not a case like the sellers at auction

16  who have no idea and want no idea.  Here GE, from 1953

17  to 1968, sees nothing but something like 77 pick-ups

18  by Fletcher trucks.  His son will recall the long

19  rides to GE.  77 pick-ups by Fletcher trucks.  He's

20  paying two different prices based on how thin it was.

21  He's not rejecting any of it.  He's bargaining.  He's

22  paying two different prices, and we find out later

23  that, well, the evidence will establish that it was

24  because he's selling at different prices to his

25  seller.

1          THE COURT:  So you're saying that it's the

2    government's contention that the first loads were

3    provided for free?

4          MR. BIAGETTI:  It says N/C, and a reasonable

5    inference is that that is no charge, okay?  It matters

6    not.

7          Giving a sample by a seller so that buyer

8    will buy and pay and continue to use is completely

9    consistent with an intention to buy.

10          Mr. Flynn, I think, said something like,

11    Fletcher had a hope that he could make a buck from it.

12    If Fletcher was taking it to dispose of for GE, then

13    Fletcher wouldn't have any hope about making a buck.

14    Fletcher would be taking it and throwing it away.  He

15    was --

16          THE COURT:  You talk about evidence of

17    different pricing for different grades.  What's going

18    to be the evidence on that?

19          MR. BIAGETTI:  The evidence -- Mr. Hooper,

20    who is about to join us, who was a lifelong worker at

21    Fletcher, will talk about the two different prices

22    that Fletcher paid GE.  There's also documentary

23    evidence in that regard.  Different prices were paid

24    and --

25          THE COURT:  How is it -- were drums marked

1   based on their quality?

2          MR. BIAGETTI:  No.  In fact, they were not,

3   and so the only way that Fletcher could have known of

4   the difference is that Fletcher did testing.

5          You will hear from Mr. Hooper and Mr.

6   Racicot.  These are folks that worked at Fletcher.

7   There were two different ways that it was done during

8   the Metevier years -- we'll call them -- when the

9   fellow in charge at GE would allow Fletcher to take

10   and test back at Fletcher.

11          There was a chemist, a fellow named Bishop.

12   He had a beaker.  He had a hydrometer.  He would test.

13   Mr. Racicot often helped him.  Mr. Racicot will

14   testify to this.  He was testing for the quality --

15   the thinness and thickness, if you will -- of the

16   material, and when it did not measure up, he

17   complained to GE and he bargained for a lower price.

18   Even, Mr. Hooper will testify, for the thinner stuff.

19   He never returned it.  He never rejected it.  He

20   bargained for a lower price.

21          We know why.  The evidence will show that his

22   customer, Webtex, wanted the thick stuff, paid a

23   higher price for that, but could still use the thinner

24   stuff.  Paid a lower price.

25          THE COURT:  What evidence is there of

1  Fletcher rejecting barrels?

2          MR. BIAGETTI:  After Metevier retires --

3  which I believe is in '64 or '65, so there's still

4  three years left in the relationship -- a fellow named

5  Varnum comes on, and Fletcher recounts some of this in

6  his letter, and you will also have testimony of the

7  witnesses, and Varnum says to Fletcher, do your

8  testing here.  I don't want you taking it, complaining

9  and then we have to bargain over price -- or what the

10  government calls compensatory loads -- because there

11  were some.  We allowed him to have some extra when he

12  complained about short loads or inferior loads.

13          THE COURT:  Did he bring back inferior loads

14  and give them to GE?

15          MR. BIAGETTI:  Never brought a single load

16  back.  77 trips, Judge.

17          THE COURT:  Which way does that cut?

18          MR. BIAGETTI:  That cuts in our favor.

19          THE COURT:  I think the argument would be

20  that the arrangement here was -- one way to construe

21  this is that Fletcher had an arrangement to take the

22  waste off of GE's hands, hoped to be able to use the

23  best of it, recognized it and everybody understood

24  that he was getting a bunch of junk barrels, and those

25  were going to be disposed of.

1          GE's problem was to get rid of its waste.  If

2    it could make a little money on the side, great.  If

3    there were a few barrels that might be usable, great,

4    but a lot of it was going to be junk and everybody

5    knew it, and that's why he didn't return the bad

6    barrels because if it were a product that was

7    substandard and unusable, the buyer ordinarily brings

8    it back.

9          MR. BIAGETTI:  Fletcher's own employee, Mr.

10   Whitney, will testify that every barrel Fletcher

11   bought from GE was either used by Fletcher to make

12   paint in his operation or sold to Webtex.  Remember,

13   Judge, it's a long time ago, but Fletcher wanted so

14   much of this stuff because he was making so much money

15   off of it, he was buying from Sprague and Aerovox, as

16   well as GE.  When we get to the graphics -- one of my

17   big problems with it is the record evidence is that

18   some of this stuff is not GE's.  He was buying from

19   three different sources.  What we do know is that --

20         THE COURT:  You say he was making so much

21   money.  Is there going to be any record as to what

22   money he made from the use of this product or sale of

23   it?

24         MR. BIAGETTI:  I don't believe we have any.

25         THE COURT:  So we don't know about him making

1  money on it.

2          MR. BIAGETTI:  We can infer it, respectfully,

3  from this fact, your Honor.  Over those years, '53 to

4  '67, 77 pick-ups, and his consumption increases in the

5  later years.  He buys more in '64, '65 and '67 than he

6  did in the prior years.

7          THE COURT:  What's he paying per barrel?

8          MR. BIAGETTI:  He's paying $3.50 or $4.00.

9          THE COURT:  What's the cost to transport per

10 barrel, do you think?

11         MR. BIAGETTI:  I don't think we have any

12 evidence of the cost.  Only that Fletcher was picking

13 up all of the cost.

14         THE COURT:  I'm trying to figure the cost to

15 Fletcher for this material.  Do you agree that the

16 cost of Aroclor was $3.00 a gallon?

17         MR. BIAGETTI:  That Monsanto sold to GE,

18 yeah.  I believe that's right.

19         THE COURT:  So the market for uncontaminated

20 PCBs was about $3.00 a gallon.  The market for the

21 product that you say you were selling to Fletcher

22 was -- what are these, 55 gallon drums?

23         MR. BIAGETTI:  Yes, they are.

24         THE COURT:  And you were paying how much per

25 drum?

1           MR. BIAGETTI:  $3.50 or $4.00.

2           THE COURT:  Quite a bit less.

3           MR. BIAGETTI:  A lot less, and the case law

4  makes clear that just because a product is inexpensive

5  doesn't make it waste.  If that were enough, then we

6  would have lost on summary judgment.

7           THE COURT:  Just because they were inventive

8  isn't enough; and the converse of that, just because

9  he paid for it doesn't make it not enough.

10          MR. BIAGETTI:  Understood.  Totality of the

11 circumstances.  But let's think about all the other

12 things that GE saw that Fletcher was doing.

13          Fletcher was for a time -- the Varnum

14 years -- doing the testing at GE on the loading dock.

15 He was testing.  He was selecting those drums he

16 wanted, and he was rejecting and leaving behind

17 others.

18          THE COURT:  Can I ask about testing because

19 the government left me with the impression that

20 whatever analysis was being done or whatever quality

21 measure was being used was viscosity.

22          MR. BIAGETTI:  For viscosity, correct.

23          THE COURT:  So there wasn't an analysis for

24 other contaminants, dirt, cigarette butts or solvents,

25 TCE.  Typically, the usefulness of this product

1   depended on its basic content.  That it is primarily

2   PCBs and viscosity?

3           MR. BIAGETTI:  Yes, and the reason why there

4   was no testing for quality is that Fletcher did not

5   need to test for quality because the evidence will

6   show that everything he was getting was either pure

7   enough -- viscous enough to go directly to Webtex or

8   viscous enough to be blended with other Pyranol that

9   may or may not have come from GE.  It could have been

10  from Sprague or Aerovox to sell to Webtex, or that it

11  was thinner but Webtex could still buy it and use it

12  in -- not paint -- roof coating.

13          We have not only the witnesses who will

14  testify to their recollections of that, but the

15  government's own experts agree that even with TCE,

16  oil, dirt, this product was still perfectly acceptable

17  as a low cost substitute in roof coating.  It was

18  useful and was used for that purpose.

19          THE COURT:  When we talk about use, in your

20  view, is it solely as a plasticizer or is it a volume

21  enhancer, or what are the uses of this product?

22          MR. BIAGETTI:  What the expert reports will

23  tell you is that it was used as a plasticizer, a

24  drying agent and as a low cost extender.  All three.

25          THE COURT:  Okay.  What do you say to this

1    evidence about the testing that was done of some of

2    the barrels that showed very high concentrations of

3    things like TCE?

4         MR. BIAGETTI:  It was not done of any of the

5    barrels that were sent to Fletcher.  There's one

6    letter that they're relying on and --

7         THE COURT:  These are barrels before they

8    left your site?

9         MR. BIAGETTI:  No.  These are barrels which

10   Mr. Clark -- who is traveling to testify for you on

11   Thursday morning.  Mr. Clark had barrels of what he

12   called at the time similar material tested by

13   Monsanto.  He gets a complaint for the very first time

14   from Fletcher in February of '68 regarding quality.

15   First time ever.  He had talked with him two weeks

16   before.  Fletcher hadn't made a peep.  He gets a

17   letter that says, we have some quality issues, and

18   we'll go through -- not now, Judge, but when the

19   letter comes up -- all the ways that Fletcher was

20   saying in that letter are defied by the record

21   evidence, but Mr. Clark, in an effort to continue to

22   cultivate his valued customer, he wants Fletcher to

23   keep on buying.

24         Clark has a test done by Monsanto of similar

25   material.  Not a drop that was tested was what was at

1  Fletcher.  Not a drop.  And based on that he decides

2  that it is at least possible that Fletcher has a

3  legitimate claim that some of the barrels are not of

4  the highest quality that GE had been providing, and

5  he's going to explain all of this to you, but he and

6  Abbe, his boss, make a reasoned business decision that

7  rather than send their own chemist all the way to New

8  Hampshire and rather than spar with their valued

9  customer, that they are going to recommend a write-off

10  to continue to cultivate his buying and using, and

11  there is evidence that it worked.

12         Mr. Hooper will testify that he recalls

13  making pick-ups at Fletcher for as much as -- for

14  Fletcher at GE for as long as six years.  After that

15  back and forth on the write-off, that Fletcher

16  continues to buy and use.  Whether or not he did, that

17  was the state of mind of Clark and Abbe, and they will

18  explain it to you in their own words.

19         THE COURT:  All right.

20         MR. BIAGETTI:  Your Honor, I want to talk for

21  a minute about the graphic, and thank you.  The

22  government is going to help me put it back up.

23         THE COURT:  Do you want one of the computers

24  enabled, or do you want the document camera enabled?

25         MR. BIAGETTI:  I want to put up one of

1  their --

2          THE COURT:  Are you going to put it on the

3  document camera or --

4          MR. BIAGETTI:  We actually have the

5  electronic version up.  Thank you.  It's the

6  destination graphic.

7          THE COURT:  Yeah.  Hang on a second.  I

8  pushed the wrong button.  Okay.

9          MR. BIAGETTI:  Thank you.  I wanted to

10 correct one point about what the evidence will show,

11 thanks to Mr. Cowan.

12          Mr. Hooper will testify about the fact that

13 Webster paid two different prices.  It's the record

14 evidence, the documents, that will establish that it

15 was Fletcher who, in turn, paid two different prices

16 to GE.  I may have misspoken about the second half of

17 that.

18          When you look at this graphic, Judge -- I'm

19 sorry.  It's the other one.  Thank you very much.

20 When you look at this one, the first problem that we

21 have with it is this becomes contaminated during the

22 manufacturing process.  I won't spend a lot of time on

23 it, but as I mentioned, there was no contamination in

24 the large measure of -- the Pyranol that GE could not

25 use.  As little as --

1          THE COURT:  If it doesn't become

2   contaminated, you could continue to use it.

3          MR. BIAGETTI:  Even if it was somewhat

4   contaminated in one cycle, it was run through the

5   fuller's earth again and could be used again.  We've

6   got the chemical technician for GE at the time,

7   through deposition testimony, who is going to tell you

8   as little as 30 parts per million would make it

9   unsuitable for GE's use.  So if that's contamination,

10  so be it.  The proper term there, obviously, is

11  unsuitable for GE's use.

12         GE had tremendously high standards because

13  these capacitors could cease up with as little as 30

14  parts per million of water or anything else in them.

15         Secondly, and I referred to this already, but

16  this removed by scavengers for out of sight, out of

17  mind disposal -- 1970 document talking about Pyranol

18  from manufacturing sites and service shops.  Not just

19  Hudson Falls or Fort Edwards.  This will happen

20  throughout -- I respectfully submit -- the

21  government's case.

22         There's no evidence that we're talking about

23  what GE sent from Hudson Falls and Fort Edward to Mr.

24  Fletcher.  There will be evidence at various times

25  about drums that are at Fletcher, but they may well

1  have come from Sprague or Aerovox, not necessarily GE

2  or GE Hudson Falls and Fort Edwards.

3          THE COURT:  Sprague Electric, you're talking

4  about?

5          MR. BIAGETTI:  Sprague Electric and Aerovox.

6          THE COURT:  I used to represent Sprague

7  Electric years ago, but I don't think I did anything

8  in connection with this site.

9          MR. BIAGETTI:  I think we've got one Sprague

10 witness by deposition designation, and about the only

11 thing he's going to say is that he had no quarrel with

12 the testimony of GE witnesses that you're going to

13 hear from today.

14         THE COURT:  All right.

15         MR. BIAGETTI:  One point is significant in

16 terms of Sprague and in terms of what Fletcher was

17 doing in value.  Sprague sold to Fletcher at higher

18 prices.  I think $5.00 will be the evidence.  Fletcher

19 had an appetite for this stuff.  He was buying it from

20 three different sources.  He was buying it even at

21 higher prices when he couldn't get enough from GE; and

22 finally, when he did have on occasion enough from GE,

23 Mr. Clark will testify, he told him, I can't use

24 anymore at this time.  In the future if I have a use

25 for more, I'll come pick it up.  That's what GE heard

1   that he was using, and that the only curb on how much

2   they could sell him was not what they could unload to

3   him.  It was what he could buy and use.

4          Lastly -- not lastly.  Two others on this

5   chart.  Again, when we're talking about what was

6   applied to the ground and spilled on the ground, not

7   necessarily the Pyranol from GE.  It may have been.

8   No evidence that it is.

9          The biggest point, I think, about this chart

10  is when we talk about Aroclor at the top coming from

11  Monsanto, where's Monsanto in the government's case?

12  Monsanto sold to GE knowing that GE was purifying for

13  its purpose.  There's a stipulated fact that GE's

14  specifications for the Aroclor from Monsanto was

15  higher purity than what Monsanto used it for.  Was it

16  not possible, even likely, that GE would spill in its

17  pick-up or use of the Monsanto product?

18         THE COURT:  Well, that's the problem with the

19  definition as broad as the Burlington case.  It would

20  encompass -- and many people have argued for an

21  alternative to the Superfund law that involves simply

22  taxing the manufacturers of chemicals to address the

23  clean-up costs, but the Superfund did not take that

24  approach and doesn't make liable strictly

25  manufacturers of hazardous substances.  It requires a

1   closer connection to the actual disposal, and any

2   large scale manufacturer of any kind of chemical, like

3   TCE, is going to have an awareness that at some point

4   during the life cycle of the use of that product it's

5   going to get spilled from time to time, and if you

6   construe arranger liability to encompass all of those

7   circumstances, you really are making all chemical

8   manufacturers liable, and I think that doesn't appear

9   to be something that CERCLA intended.  That's the

10  problem with the Burlington reasoning, I think.

11  Hopefully the Supreme Court will clarify.  It's just

12  not a problem I have to deal with.

13          MR. BIAGETTI:  You have my point, obviously,

14  your Honor, and I bring it up now because I think it

15  helps us to understand where, I believe, based on the

16  proposed findings of fact and what we heard in the

17  opening, the government's case is ultimately going.

18          It's not about whether Fletcher employees

19  were spreading it on the ground for weeds or for dust

20  or whether GE employees were doing the same.  If that

21  were enough, Monsanto would be on this chart and

22  Monsanto would be --

23          THE COURT:  Well, if we hypothesize a

24  contract between Fletcher and GE in which GE agrees to

25  provide contaminated Pyranol to Fletcher and Fletcher

1   agrees to use it exclusively to spread it on the

2   ground and we actually had that contract here, I think

3   you would be in some big trouble.

4           I do think it does matter, potentially, but

5   it goes to the question of does it establish -- have

6   any tendency to establish that GE was aware that

7   disposal would be substantially certain to result.

8           MR. BIAGETTI:  And was it aware at the time

9   that --

10          THE COURT:  Right, but if it was discovered

11  three years later that this happened, it's not going

12  to be persuasive evidence.

13          MR. BIAGETTI:  That's what I'm finally

14  getting to because if you look at one piece here in

15  the lower right, and it's just a morsel, I think, of

16  what's to come from the government, but what their

17  case, I believe, shrinks to is that there was an

18  abandonment by Fletcher of somebody's drums.  We don't

19  know if they were GE's, but there was an abandonment

20  by Fletcher of somebody's drums after the man dies

21  that are found in the '80s, 20 to 30 years after the

22  sales by GE, and your Honor, the evidence will show

23  that that long later fact does not prove by a

24  preponderance intent by GE at the time of the sales to

25  have either arranged for that abandonment or to have

1   been substantially certain of it or, frankly, given

2   the evidence already talked about and what they did

3   know and hear, that it was even a reasonable

4   possibility that that's what was going to happen.

5           THE COURT:  Well, by itself abandonment

6   doesn't -- by Fletcher years later doesn't really say

7   much, but it could become relevant or it could not,

8   depending on the circumstances.

9           MR. BIAGETTI:  It could become relevant.  It

10  could have marginal relevance, but that's really where

11  we are.  What we're talking about now.  We are talking

12  about drums, which may or may not have been GE's, that

13  are left 20 to 30 years after the transactions at

14  issue, and we respectfully submit that that's pretty

15  tenuous evidence of a present intention to dispose or

16  an awareness that disposal would be substantially

17  certain.

18          Fletcher never returns a single drum and says

19  it's leaky or rusty.  He never returns any Pyranol and

20  says, I can't use it for whatever my purposes are.

21  All GE ever sees is him buying and using and paying.

22          A couple of other points.  I have one graphic

23  of our own, just to sort through a little bit what I

24  believe the evidence will be about what GE did know

25  and did not know about Fletcher's uses.

1           Respectfully, I think that the government

2    occasionally bunches these bits of knowledge, and it's

3    important to understand the distinction.  The evidence

4    will be that GE knew that Fletcher made paint.  We

5    have one example from Mr. Abbe:  What did you know

6    about Fletcher's operations?  Nothing.  Except he made

7    paint.  But GE did not know how much paint Fletcher

8    made.

9           We've got one example of that on the right.

10   No.  So while it may or may not be so that Fletcher

11   was only putting one to five gallons in a batch, GE

12   never knew that, and the folks on those loading docks

13   at Fort Edward and Hudson Falls were not the paint

14   makers for GE at some other spot in the GE empire.

15   All they knew was the man makes paint, and they didn't

16   know how much paint he made.

17          They knew that Fletcher was adding

18   plasticizer to paint.  Abbe says, I asked him what he

19   was going to do with it.  He said, as plasticizer.

20   He's a paint manufacturer.  But Mr. Clark will testify

21   that he didn't know -- GE didn't know how much

22   rubber-based paint Fletcher was making that would have

23   to use such plasticizer.

24          THE COURT:  Isn't that a little bit strained?

25   He's not Sherwin Williams.  He's a small-time paint

1  maker.

2          MR. BIAGETTI:  You're going to hear Mr.

3  Racicot on that subject, among others.  This guy had

4  seven or eight stores.  He was making paint and

5  selling it, and here's how enterprising he was.  Mr.

6  Fletcher's son recalls that his dad was also selling

7  the Webtex product.

8          So he's reselling ingredients to Webster.

9  Webster is making roof coating.  Fletcher puts the

10  roof coating in his store, and he's selling all of

11  that, too, so he's making it two ways with Webster.

12          THE COURT:  But you only use a very small

13  amount of PCB plasticizer in a gallon of paint, right?

14  I mean you're talking a very small amount.

15          MR. BIAGETTI:  Maybe so.  Again, I think it's

16  Fletcher, the son, and there may be others who will

17  testify one to five gallons of Pyranol in a batch of

18  the paint that Fletcher was making, but the point is

19  this --

20          THE COURT:  So he had thousands and thousands

21  of gallons of Pyranol that he got from you guys.

22          MR. BIAGETTI:  And he was selling it

23  thousands and thousands to Webster.  GE did not know

24  that.  We get to, if you can, the fact that Fletcher

25  sold scrap -- no.  One down below that.  Fletcher sold

1    scrap to Webster.  There you go.  When you made your

2    trips to see GE or Aerovox, Sprague, to buy the used

3    Pyranol, did you tell anybody at those companies what

4    Fletcher was making with the Pyranol?  I never did.

5    We were told not to.  Who told you?  Mr. Fletcher.  He

6    didn't want GE to know.

7            He, Fletcher, was protecting his resale

8    customer from GE finding out about it, and the GE

9    witnesses will corroborate that they didn't know about

10   the resale so it's important -- can we come back and

11   just talk, again, about a couple of things that GE did

12   know about other uses -- that towns used scrap Pyranol

13   for road oil and dust suppression.  The Town of

14   Queensbury.  This is firsthand?  No.  Secondhand,

15   thirdhand, yeah.  I heard that over the years that GE

16   was selling to towns for that purpose but not

17   Fletcher.  Go to the comparison.

18           THE COURT:  Do you really argue that putting

19   down oil on a dirt road is not disposal of oil?

20           MR. BIAGETTI:  Well, I think the law makes

21   clear that it is.  I do think this is relevant,

22   though.  If we're talking about that state of GE's

23   knowledge to inform what GE's state of mind was at the

24   time that it was selling its useful product to

25   Fletcher, then, no, I don't think that you can

1   necessarily say that GE knew in 1953 when it was

2   selling or giving to a drag strip that that was not a

3   productive use by that drag strip or municipality.

4          THE COURT:  No, but I think we have to be

5   careful about this.  I can't simply interpret the

6   phrase disposal to mean abandonment or waste or

7   anything like that.  It doesn't matter what GE

8   understood disposal to mean at the time.  It was what

9   did GE understand when it made the arrangement would

10  happen, and if what it understood would happen

11  qualifies as disposal, GE is liable.

12         So in this case if we had a hypothetical

13  contract between Fletcher and GE where GE agrees to

14  sell Pyranol to Fletcher and Fletcher agrees to use it

15  as a dust suppressant on dirt roads or in a parking

16  lot, that would be an arrangement for disposal even if

17  GE thought, that's a good use for our product, we can

18  make money selling it for that purpose.  They may have

19  thought it was useful, but it still qualifies as

20  disposal so I think you lose under that kind of

21  analysis.

22         MR. BIAGETTI:  We, fortunately, need not

23  reach it because, the evidence will show:  Did you

24  ever think Fletcher's might have been using some of it

25  as road oil or dust suppressant?  Answer:  No.

96

1          Again, my point is if we look in that upper

2     left hand quadrant of what GE knew, and I ask your

3     Honor -- and I know you will -- to be especially

4     attentive about what the evidence shows on that

5     subject as opposed to what it did not know about what

6     Fletcher was doing or what GE knew that others besides

7     Fletcher might have been doing.  A tremendously

8     important distinction.

9          A couple more points.  Not only does Mr.

10    Abbe, a key witness here, insist that he had no idea

11    what Fletcher was doing with it at deposition, but you

12    will see a document, which is an interview with Mr.

13    Abbe in 1992 in which the government -- a government

14    interviewer is trying to press him on what he

15    remembers, and Abbe makes clear that he had no idea

16    what the actual use was.  Only that Fletcher was using

17    it for some purpose, and he fleshes that out at

18    deposition that he knew Fletcher made paint, the use

19    must have had something to do with paint, but he is

20    consistent throughout that that's all he knew that

21    Fletcher was using it for.

22          Now, Abbe, like anybody at GE, acknowledges

23    that Fletcher could have been doing something else

24    with it.  In fact, Abbe is going to say, I was

25    curious.  I asked, what are you doing with it, but the

1   only answer he ever got was, buying and using it in

2   paint.  Hooper will explain, in part, why.  Fletcher

3   didn't want GE to know about this aftermarket, and all

4   that these folks reasonably understood was that

5   Fletcher was picking up, buying, testing, complaining

6   about short loads.  Why does a disposer complain that

7   he's not getting enough?  It makes no sense in the

8   ears or to the eyes of the seller.  That's what GE saw

9   and heard here.  It's the antithesis, respectfully,

10  Judge, of willful blindness.

11          GE did inquire.  GE did watch.  GE did see.

12  GE did ask.  And all they ever heard in return was,

13  I'm picking up, I'm selecting, I'm rejecting what I

14  don't want but I'm leaving it at GE, and when you give

15  me something that I don't want, I'm going to complain

16  and argue for a better price.

17          THE COURT:  We've talked in the past about

18  willful blindness.  Just as a theoretical measure, I'm

19  not anticipating there's going to be an argument or

20  evidence about willful blindness.

21          MR. BIAGETTI:  I don't think so.

22          THE COURT:  Most of the time this was

23  happening it was perfectly legal for GE to just take

24  it out in the back woods and pour it into the ground.

25  It didn't need to be willfully blind until many years

98

 1  later.

 2          Willful blindness comes into play when people

 3  have a strong risk that if they know certain things,

 4  they're going to incur certain costs or incur certain

 5  penalties and they take active steps not to know, but

 6  back in the '50s, '60s, I'm not aware that GE would

 7  have been doing this surreptitiously.  They're just

 8  trying to get rid of the stuff.  Doesn't need it.

 9  Doesn't want it.  Needs to get rid of it.  What's the

10  best way to get rid of it?  If I can get somebody to

11  pay me for it, that's better than me doing it on my

12  own, and I just want to be rid of it.

13          MR. BIAGETTI:  You will see a memo -- I

14  believe it's either from or to Mr. Abbe from 1968,

15  right in our time frame, where he talks about whether

16  or not scrap Pyranol should be disposed of by our --

17  something like -- usual landfill operations.

18          THE COURT:  Well, many of these -- I don't

19  know what Monsanto recommended, but many of these

20  chemical companies actually recommended disposal by

21  digging a trench and pouring it into the ground in the

22  '50s.  That was the accepted industry standard

23  practice for getting rid of a lot of these chemicals.

24          MR. BIAGETTI:  We certainly know that at the

25  time GE was paying an outfit called Caputo serious

1  money to make some disposal in landfills.

2          THE COURT:  I grew up in the '60s near W.R.

3  Grace, and one of our favorite things as kids was to

4  go out to the back woods behind the W.R. Grace plant

5  and throw rocks in the pond with the various colored

6  water because it was so pretty with the green water

7  and the red water, and they had big, giant retention

8  ponds out in the woods.  That's the way they did it

9  then.

10          MR. BIAGETTI:  You are going to hear Mr.

11  Racicot, who worked for Fletcher and lived across the

12  street from the Fletcher plant where drums were piled

13  up, say that his kids used to climb on the drums and

14  he was worried about them but not because of their

15  contents.  He doesn't know what was in there.  He was

16  worried they were going to fall off.

17          THE COURT:  We also used to run behind the

18  mosquito sprayers spraying DDT.  I mean that's what

19  you did in the '60s.

20          MR. BIAGETTI:  I have one more point, your

21  Honor, and then we will get on with it.  We get,

22  finally, to what my brother talked a little bit about,

23  which is this business decision in 1968 to recommend

24  the forgiveness of the debt.

25          There is no evidence that the debt, itself,

1  was ever forgiven by GE, but there is absolutely a

2  recommendation by Mr. Clark, and he's going to be

3  here, as I said, to explain it to you, but your Honor

4  said something at summary judgment when you were

5  indulging inferences, about GE let a receivable

6  languish for a while, and the evidence will be to the

7  contrary.  When Fletcher was slowing on payment, GE

8  went after him, just like they would any customer, and

9  we have, for example, up here one of our exhibits --

10         THE COURT:  Do you want it on the document

11  camera?

12         MR. BIAGETTI:  Yes.  Can we take the graphic

13  off and put this one on?  Thank you.  This is from

14  1957.  It's a capacitor department receivables ledger,

15  and you can see that the "A" refers to the debt of

16  Fletcher, if I can get that on there right.  Then we

17  have the Milford Paint Works and they owe 196 bucks,

18  and what the receivables department says at the bottom

19  is, letter sent requesting check.  So GE was vigilant

20  about debts from Fletcher right from the beginning of

21  the relationship all of the way to the end.

22         If he ever got behind -- there was a shipping

23  slip every time he took something out.  That became a

24  bill of lading that he had taken it away.  That was

25  sent to the receivables, the accounts department, and

1  he was billed, and if he didn't pay, that receivables

2  department let folks at the capacitor department know.

3  Mr. Clark will go through all of that for you, but it

4  is so that in '68 he's behind.

5          When he got to $6,000 behind, they -- GE

6  sends him a dunning letter in August of '67.  Clark is

7  going to tell you that, yeah, Clark was in the

8  accounts department.  Clark is on the dock, and he

9  wants to continue to sell to his valued customer so

10  he's getting it from both directions.  The accounts

11  department is saying, this guy owes 6,000 bucks.  Do

12  your best to get it collected.  Clark's boss, Abbe, is

13  saying, can you encourage Fletcher to buy some more.

14  So Clark calls him up.  Clark calls him up, and he's

15  going to say, I mentioned the receivable, but I didn't

16  push it.  I wanted him to continue to use and buy and

17  Fletcher says, "I can't use any right now, but I will

18  let you know."

19          The next thing you know Clark is surprised to

20  receive the letter from Fletcher.  It's filled with

21  posturing.  He's a bargainer, Judge, and he is trying

22  to bargain for a lower price on what he's got in the

23  same way that he had in years past.  In that whole

24  letter -- and we're going to go through it when it

25  comes in -- he never says that he wants to return any

1  of it and he never does, and in fact, among the

2  telling things he does say is that everything was

3  going perfectly until your man -- GE's man started to

4  ship to Fletcher.  When your man started shipping, GE

5  added everything under God's green earth.

6         Judge, the evidence unanimously is that only

7  Fletcher trucks or Fletcher's contractor ever went to

8  GE.  It could well be that Fletcher got trucks from a

9  man from Sprague or Aerovox but not GE, and that is

10  only one of the several reasons why when Clark reads

11  the letter, he doesn't for a minute believe that

12  anything that Fletcher has cannot be used by Fletcher,

13  but he makes a decision with his superior to recommend

14  a write-off at that time based on the cost it would

15  have taken to challenge Fletcher and the risk that

16  Fletcher would not continue to use or buy.

17         There is evidence not only that that was the

18  state of mind of Clark and Abbe when they made that

19  decision, but also that it worked.  That Fletcher,

20  their valued customer, continued to use and buy after

21  that.

22         So again, the evidence will show that at the

23  time of the sales by GE to Fletcher, GE knew, had

24  knowledge and a reasonable expectation that Fletcher

25  would only use what he had.  That is borne out, the

1  evidence will show, by what Fletcher actually did with

2  GE's drums, and the forgiveness of the debt is no

3  evidence -- is no -- does not reach a preponderance of

4  the evidence that GE, when it forgave that debt, was

5  substantially certain that some drums that Fletcher

6  may have had from GE at that time would 20 years later

7  be abandoned by Fletcher.

8          THE COURT:  All right.  Are we ready to go

9  with the evidence?

10          MS. FISKE:  Yes, we are, your Honor.

11          THE COURT:  I know you would like for me to

12  have to make that kind of connection, that they

13  intended that the drums that were eventually found on

14  the site would be disposed of, and that's a leap too

15  far.  That's not what's required.  All right.  Do you

16  want to call your first witness, please?

17          MS. FISKE:  Yes.

18          THE COURT:  I'm only going to go until 12:30.

19  We'll take a break at 12:30.

20          MS. FISKE:  All right.  Let's start.  That's

21  a good idea.

22          THE COURT:  Come right up here, sir, and walk

23  around to this witness stand right here, and stand

24  right there and the clerk will swear you in.

25          MR. BIAGETTI:  Judge, for the record, while

1   we're waiting, I only addressed one of the two

2   government's graphics in my opening.  For the record,

3   I do object to this use of the second one, as well.

4           THE COURT:  Okay.

5                         WALLACE HOOPER

6           having been duly sworn, testified as follows:

7           THE CLERK:  Would you please state your name

8   for the record?

9           MR. HOOPER:  Wallace Hooper.

10          THE CLERK:  Spell your last name, please.

11          MR. HOOPER:  H-O-O-P-E-R.

12          THE COURT:  Sir, we're just going to have a

13  few questions for you, and then we're going to have to

14  break for lunch and you will have to come back after

15  lunch.  Go ahead, counsel.

16                    DIRECT EXAMINATION

17  BY MS. FISKE:

18      Q.  Good afternoon, Mr. Hooper.

19      A.  Good afternoon.

20      Q.  After high school, what was your first job?

21      A.  I went to work for Mr. Fletcher.

22      Q.  How long did you work for Mr. Fletcher?

23      A.  I worked for Mr. Fletcher or for the

24  companies that he owned till I had a heart attack in

25  '87.

1      Q.  So that's over 40 years?

2      A.  I graduated in '43.  Yeah.  Yes.

3      Q.  What type of work did Mr. Fletcher do?

4      A.  Well, he raised potatoes and chickens during

5  the Second World War.

6      Q.  Is that what you started out doing for him?

7      A.  Yes.

8      Q.  Was he a farmer?

9      A.  A farmer?

10     Q.  Yes.

11     A.  Well, not really, I wouldn't say, but he did

12  that.

13     Q.  What else did he do?

14     A.  Well, he ran the Embassy Chemical Products in

15  Boston.

16     Q.  Anything else?

17     A.  Well, he dabbled in other things -- in

18  anything he could make a little money on.

19     Q.  How many different companies would you say

20  that he ran -- let's focus on the time period of the

21  '50s to the '60s?

22     A.  Oh, many.  He went under many names.

23     Q.  And what did they do?

24     A.  Well, the Embassy Chemical Company was a

25  manufacturing concern that made duplicating supplies,

1  such as duplicating inks, duplicating stencils, soap

2  for cleaning your hands, hectographs, photographic

3  supplies.

4      Q.  Any other companies that he was involved in

5  in the '50s and '60s?

6      A.  Oh, several.

7      Q.  Can you list those for us?

8      A.  He had a lumber concern.  He had Fletcher

9  Lumber Construction, Souhegan Valley Paper Company,

10 the Chambeau (ph.) Perfume Company.

11     Q.  Anything else?

12     A.  Well, he dabbled in many businesses, I would

13 say.

14     Q.  What about a paint company?

15     A.  He bought the old Milford Paint and

16 Manufacturing Company.

17     Q.  And did you say that was in Milford?

18     A.  In Milford, yes.

19     Q.  And where was that located?

20     A.  It was located on Elm Street in Milford.

21     Q.  Did you work for him at that location?

22     A.  Yes.

23     Q.  When did you start working for him there?

24     A.  Well, he moved the duplicating supply

25 business from Garden Street to the paint mill -- to

1  the paint site building.  I'm not sure just what year.

2  It must have been in the late '40s.

3      Q.  And that was when you started working for him

4  there?

5      A.  At that location, yes.

6      Q.  And when did that location move to Mill

7  Street?

8      A.  Well, he bought property at Mill Street.

9      Q.  I'm sorry.  When did that location -- when

10  did he -- when did you start working at Elm Street?

11      A.  Well, he moved the duplicating concern there.

12  I'm not sure.  I think it was in the late '40s

13  sometime.

14      Q.  And then you said he later on bought property

15  at Mill Street?

16      A.  Yes.

17      Q.  Do you remember when that was, approximately?

18      A.  Well, I would guess in the early '50s

19  sometime.  I'm not sure.

20      Q.  And what was the connection between the Elm

21  Street and the Mill Street properties that Mr.

22  Fletcher owned?

23      A.  Well, he used the Mill Street property for

24  storage of barrels -- the building -- the big ones and

25  cans and things.

1      Q.  So he used the Mill Street property as

2  storage for materials that were related to the

3  business that he was running at Elm Street; is that

4  right?

5      A.  Yes.

6      Q.  Okay.  So for purposes of today's

7  questioning, I'm going to refer to the operations that

8  Mr. Fletcher was running out of Mill Street and Elm

9  Street in the '50s and '60s and beyond as Fletcher's.

10  Is that all right with you?

11      A.  Yes.

12      Q.  Okay.  I would like to show you a diagram

13  that's marked for identification as U.S. Trial

14  Exhibit 30.

15          MS. FISKE:  Judge, can I switch the camera,

16  please?  Thank you.

17      Q.  Do you recognize this diagram?

18      A.  Yes.

19      Q.  What do you recognize this diagram to be?

20      A.  Fletcher's property at Mill Street, 111, I

21  believe it says, and the property on Elm Street.  This

22  is -- he went to the Mill Street property and then

23  went back.

24          MS. FISKE:  I would like to move to enter

25  this as U.S. Trial Exhibit 30.

1        MR. COWAN:  No objection, your Honor.

2        THE COURT:  Without objection.

3        (Government's Exhibit No. 30 admitted)

4    Q.  I would like to go back to discussing what

5    types of activities Mr. Fletcher was conducting on the

6    Elm Street portion of the site that we were looking

7    at.  Can you describe in a little more detail the

8    different types of activities that Mr. Fletcher

9    conducted at Elm Street?

10   A.  As I mentioned, he purchased the old Milford

11   Paint Manufacturing Company.  I believe he purchased

12   it from the banks because the company had gone

13   bankrupt, and he moved the duplicating supply business

14   from Garden Street to that location until he sold that

15   business and left the building.

16        After that he manufactured paint, and at the

17   store there sold paint and wallpaper and all those

18   type of things.

19   Q.  Did he manufacturer anything else besides

20   paint at that location?

21   A.  I can't recall that he did.

22   Q.  What about driveway dressing?

23   A.  Well, driveway dressing, yes.  I always

24   called that a type of coating.

25        THE COURT:  What is a driveway dressing?

1           THE WITNESS:  A driveway dressing -- he

2    brought in barrels of -- I think it was called

3    Gilsonite.  It was black, and it had to be dissolved,

4    and he set up -- he couldn't do that inside the

5    building because of the smell that it created -- the

6    odor.  It had to be broke down with a product called

7    VM & P.  After it was broke down with the VM & P the

8    driveway -- the old thinners that we had that had

9    mounted up over the years could be used to thin it.

10          THE COURT:  I'm just asking -- I'm sorry I

11   don't understand this stuff.  Driveway dressing -- is

12   it like that black stuff you put over a driveway?

13          THE WITNESS:  Yes.

14          THE COURT:  Okay.  Thanks.  Go ahead.

15      Q.  For his manufacturing operations did he

16   acquire raw materials?

17      A.  Yes.

18      Q.  Were those raw materials always new

19   materials?

20      A.  Always new materials?

21      Q.  Yes.

22      A.  No.

23      Q.  Can you describe the types of materials that

24   he might acquire that were not new?

25      A.  Well, he purchased obsolete chemicals or

1  something like that, resins from other companies,

2  pigments from other companies and oils.

3      Q.  When he purchased these types of materials

4  that you've just described as obsolete chemicals for

5  resins, pigments and oils, did he ever buy any of

6  those with the intention not to use them in paints but

7  maybe for some other purpose?

8          MR. COWAN:  Objection.

9      A.  Well, yes.

10          THE COURT:  I'm sorry, sir.  How do you know

11  that?

12          THE WITNESS:  Well, I'm trying to think of

13  things he might have bought that he didn't use in

14  paint.

15          THE COURT:  Let me just ask -- this is

16  something the lawyers need to do.  Establish that the

17  person has a basis for knowledge before you elicit the

18  information.  So you might ask him, did you ever see

19  him use chemicals on-site for some purpose other than

20  paint, something like that.  You need to establish

21  that the witness knows what the witness is about to

22  testify about because I don't expect him to be

23  limiting his answers in that way.  Non-lawyers don't

24  even understand that.

25          MS. FISKE:  Yes, your Honor.

1        Q.  Can you think of any other examples of

2   materials that he bought that were not new?

3        A.  At Paint Works?

4        Q.  Yes.

5        A.  Well, I remember he bought mustard pots from

6   the government and used them, you know, to put ginger

7   in with fancy labels and sold them.  I believe that

8   was after he had the paint company.

9        Q.  Let's switch gears now to Mill Street.  What

10  did he use -- I think you mentioned earlier that he

11  used the property at Mill Street for storage.  What

12  type of material was stored at Mill Street?

13       A.  Well, in the larger building he used to store

14  a lot of pigments because he used to get different

15  pigments like whitening titanium and things by freight

16  car and we could put a set of rollers -- the building

17  was close enough to the railroad so that you could put

18  a sell of rollers on the freight car down to the

19  building and unload it.  He kept a lot of pigments

20  there and at times we had empty cans there, and I know

21  he occasionally stored resins outside in barrels.

22       Q.  What about off-spec material?  Did he ever

23  get any of that?

24       A.  Yes.

25       Q.  Can you give me some examples?

113

1      A.  Well, one thing, I believe, that was off-spec

2  was Pyranol.

3      Q.  Anything else?

4      A.  Well, there may have been other things

5  because he used to buy chemicals in sometimes.

6  Probably some were.  I know he bought resins and

7  things that had been through fires and things

8  sometimes and pigments and things, too.

9      Q.  Can you tell me about the resins that had

10  been through the fire?

11      A.  Well, we had a lot of the acrylic resins at

12  one time that had been through a fire.  You could tell

13  by the drums they had them in.  We used most of it.

14  Some of it was bad.

15      Q.  What happened to the bad part?

16      A.  Oh, I don't recall now.  Back in those days a

17  lot of times you could take stuff to the town dump and

18  nobody said anything.

19          MR. COWAN:  Objection, your Honor.  Move to

20  strike the last half.

21          THE COURT:  Overruled.

22      Q.  What were your jobs working at Fletcher's?

23      A.  Oh, I did a little of everything.  I worked

24  in the paint factory, mixed paint, drove the truck at

25  times.  Anything that needed to be done.

1        Q.   You mentioned the term Pyranol earlier.   When

2   was the first time you heard the term Pyranol?

3        A.   I'm not sure.   I know that I heard it called

4   Pyranol when he started to go get it.   I'm not sure if

5   I heard it called that before or not.

6        Q.   When was the first time that Fletcher's

7   obtained Pyranol from GE?

8        A.   Well, he got several loads.   I'm not sure

9   just -- it would have been the early '50s somewhere --

10  I'm not exactly sure of the year -- and they were

11  trailer truckloads.

12       Q.   What were trailer truckloads?

13       A.   Barrels of Pyranol was delivered that way.

14       Q.   And what size barrels?

15       A.   55 gallon drums.

16       Q.   And it came by trailer truck, is what you're

17  saying?

18       A.   Yes.

19       Q.   Whose trailer trucks?

20       A.   As I recall, they had the GE name on them.

21       Q.   And how do you know that?

22       A.   Well, I remember seeing the trucks and I

23  remember talking to the drivers.   They used to come in

24  and eat with us in our lunch room.

25       Q.   How many drivers were there that you were

115

1  talking to?

2       A.  Oh, I don't remember now.

3       Q.  Was it more than one?

4       A.  I'm not sure.  As I remember, they came one a

5  day spread over a few days.  So I'm not sure if it

6  was -- there may have been more than one.

7            THE COURT:  Sir, we're going to take our

8  break for lunch now.  Can I ask you, though, before we

9  do, about how many barrels would there be in a

10 truckload of this stuff?

11           THE WITNESS:  Well, it depended on the truck

12 we used.

13           THE COURT:  When you're talking a trailer

14 load, what are we talking about?

15           THE WITNESS:  I don't remember how many there

16 were in a load of those.

17           THE COURT:  When we talk about a trailer, can

18 you give me a sense of what the size of this trailer

19 is?

20           THE WITNESS:  Oh, one of these that you

21 call -- what is it -- that they call 18 wheelers or

22 something.

23           THE COURT:  So one of these big, long trucks

24 that you see on the highway carrying product or

25 equipment, but one of the longer kinds of trucks that

116

1  you could see?

2          THE WITNESS:  As I recall, yes.

3          THE COURT:  Okay.  All right.  Thanks.  Let's

4  take a break.  We'll come back at 1:30.

5          (Recess)

6

7

8

9                  C E R T I F I C A T E

10

11

12          I, Susan M. Bateman, do hereby certify

13  that the foregoing transcript is a true and accurate

14  transcription of the within proceedings, to the best

15  of my knowledge, skill, ability and belief.

16

17

18  Submitted: 2-10-09     /s/   Susan M. Bateman
                           SUSAN M. BATEMAN, CSR, RPR, CRR
19

20

21

22

23

24

25