**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 5-11-2009


UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *  06-CV-354-PB
            v.                  *  November 5, 2008
                                *  1:30 p.m.
GENERAL ELECTRIC COMPANY        *
                                *
* * * * * * * * * * * * * * * * *
```


TRANSCRIPT OF BENCH TRIAL - DAY TWO
AFTERNOON SESSION
BEFORE THE HONORABLE PAUL J. BARBADORO


APPEARANCES:


For the Government:        Catherine A. Fiske, Esq.
                           Peter M. Flynn, Esq.
                           Laura J. Rowley, Esq.
                           Donald G. Frankel, Esq.
                           U.S. Department of Justice


For the Defendant:         Peter A. Biagetti, Esq.
                           William M. Cowan, Esq.
                           Mintz, Levin, Cohen, Ferris,
                           Glovsky & Popeo, PC

                           Ignacia Moreno, Esq.
                           Thomas H. Hill, Esq.
                           General Electric Company


Court Reporter:            Susan M. Bateman, CSR, RPR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, NH 03301
                           (603)225-1453

2

I N D E X

| WITNESS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| JOHN C. RACICOTT: | | | | |
| By Mr. Frankel | 38 | | | |
| By Mr. Biagetti | | 59 | | |

3

 1              P R O C E E D I N G S

 2              THE COURT:  You can resume the deposition.

 3              (Deposition continued of Robert Abbe)

 4              MR. BIAGETTI:  Judge, I stopped at Mr. Abbe

 5  saying, "I don't remember", because we've just had

 6  three or four minutes where there was an attempt to

 7  refresh the witness with somebody else's testimony,

 8  and he's now said, "I don't remember", and we're now

 9  about to have another page and a half calling for

10  speculation about a conversation he did not remember.

11              THE COURT:  What page are we on?

12              MR. BIAGETTI:  We're on page 44.

13              THE COURT:  Wow.  We have to go through,

14  like, 70 pages of this?

15              MR. BIAGETTI:  More than that, I'm afraid.

16              THE COURT:  Pardon?

17              MR. BIAGETTI:  I think it goes into the 90s.

18              THE COURT:  Is there more that's meaningful

19  here because a lot of it is just kind of time-wasting,

20  I think.  Do you think we can cut it down and get to

21  what you think is really important because most of

22  this stuff seems to be --

23              MR. BIAGETTI:  I think we've designated

24  another 8 or 9 pages that we believe are meaningful.

25              THE COURT:  What's the most important thing

4

1  in the next 40 pages that the government wants me to

2  understand?  I mean, what do we get out of this?

3         MS. FISKE:  Your Honor, during the remainder

4  of the deposition he will be presented with evidence

5  of two statements that he made.  One in 1992 to a GE

6  attorney, and one to an EPA investigator.  The

7  statement that he made to the GE attorney, he said at

8  the time he thought it was being used as paint and

9  also as an insecticide or as a weed killer; and then,

10  two, the EPA investigator --

11         THE COURT:  Used by Fletcher as those things?

12         MS. FISKE:  Yes.  He testifies that his

13  memory was better at the time and that he would have

14  told them the truth.

15         THE COURT:  Is that to impeach his

16  credibility or to establish the truth of the earlier

17  statement?  Because ordinarily when you impeach with a

18  prior inconsistent statement, you don't thereby

19  establish the truth of the prior statement.  His prior

20  statement, though, if he was acting in his capacity as

21  an employee of GE, might be a statement that's

22  attributable to the company so you don't need to get

23  into the deposition to get the statement in.  Tell me

24  what you're trying to do.  If you're just trying to

25  show, Judge, don't believe him when he says he thought

1  it was used just for paint.  Well, that gets you back

2  to zero.  That gets you to, don't believe him.  That

3  doesn't get you to, and he really thought it was being

4  used for --

5        MS. FISKE:  Okay.  Then, your Honor, I accept

6  your ruling on the evidence -- extrinsic evidence of

7  an inconsistent statement and I want to propose it for

8  another reason.  What else you will get out of this is

9  he will say later on that at the time he thought they

10  might have been using it as an insecticide.  At the

11  time they thought they might have been using it as a

12  weed killer.  At the time they thought he might have

13  been using it as dust suppressant.  He also says later

14  on how he always wondered how such a small paint

15  company could be using such a large volume of this

16  material.  Those, I think, are some of the significant

17  things that he will say during the rest of the

18  deposition.

19        THE COURT:  Why don't we just admit the

20  deposition, and I'll sit here and read it.

21        MR. BIAGETTI:  And that's completely fine

22  with us.  Number one, there is still that one section

23  that I mentioned before the openings that we would

24  have to resolve because there's six pages here that we

25  think are critical to GE's state of mind at the time.

```
 1            THE COURT:  Let's go through the deposition
 2  and tell me which --
 3            MS. FISKE:  I sent you an e-mail that I
 4  withdrew my objection on that basis.  Maybe you didn't
 5  get it.
 6            THE COURT:  Let's go through the written
 7  deposition.  We're now at -- what page are we at?
 8            MR. BIAGETTI:  44.
 9            THE COURT:  All right.  You want me to strike
10  what?
11            MR. BIAGETTI:  Do you have the color coded
12  version, your Honor?
13            THE COURT:  Yes.
14            MR. BIAGETTI:  Because one thing -- to your
15  question, on this particular one it would be page 44.
16            THE COURT:  Yeah.
17            MR. BIAGETTI:  Line 4.  In other words,
18  everything after he says, "I don't remember", asking
19  him even after the attempt to refresh, and that line
20  of questioning goes all of the way to 46, line 2.
21            THE COURT:  Okay.
22            MR. BIAGETTI:  Now --
23            THE COURT:  Wait a minute.
24            MR. BIAGETTI:  I'm sorry.
25            MS. FISKE:  And --
```

7

```
 1           THE COURT:  Just let me read it.  Well, now
 2  I've lost it.  Give me the -- 44, line what?  Give me
 3  the page and line again.
 4           MR. BIAGETTI:  It was page 44, line 4.  In
 5  other words, everything after he says, I don't
 6  remember, even after the attempt to --
 7           THE COURT:  Until what?
 8           MR. BIAGETTI:  The line of questioning ends
 9  at 46, line 2.
10           MS. FISKE:  Your Honor, that's too far to go.
11  I asked the question, the only reason --
12           THE COURT:  All right.  Let me read it,
13  please.
14           MS. FISKE:  Okay.
15           (The Court reviews deposition pages)
16           THE COURT:  Okay.  Page 44, line 4, to 44,
17  line 14, the objection is sustained.  44, line 15, to
18  45, line 6, is overruled -- or line 7, rather.  Excuse
19  me.  44, line 8, to 44, line 18, sustained.
20           MR. BIAGETTI:  I think you mean 45, your
21  Honor.
22           THE COURT:  45, line 18, sustained.
23           MR. BIAGETTI:  Thank you.
24           THE COURT:  The rest of the objection is
25  overruled.  What's the next problem you want me to
```

1   look at?  So I was -- we're up to now -- I've read up

2   to 46 -- page 46.  What's the next objection you have?

3          MR. BIAGETTI:  The next one, your Honor, is

4   page 62, line 19, through 63, line 4.

5          THE COURT:  What's the basis for this

6   objection?

7          MR. BIAGETTI:  62, line 19.  The question

8   that starts with:  "Isn't it fair to say that at the

9   time you thought he might be --".

10          THE COURT:  Yeah, and then the next one is --

11          MR. BIAGETTI:  It goes all of the way through

12   to 63, line 4, calls for speculation and it is defied

13   by the statements of Abbe, which have been put into

14   evidence as exhibits.

15          THE COURT:  Wait.

16          (The Court reviews deposition pages)

17          THE COURT:  Objection is overruled.  If I'm

18   going to rule in your way, you don't need to be heard,

19   right?

20          MS. FISKE:  Thank you.

21          THE COURT:  What's next?

22          MR. BIAGETTI:  The last of my objections --

23   withdrawn.  That's it from me.

24          THE COURT:  All right.  Do you have any

25   objections?

1          MS. FISKE:  Yes, I do.

2          THE COURT:  What's the next one you have?

3          MS. FISKE:  Your Honor, starting at page 93,

4    line 20.  It's a series of questions where I don't

5    believe there's any evidence that Mr. Abbe had

6    personal knowledge of any steps that GE allegedly took

7    to improve the quality of --

8          THE COURT:  93, 20, to what?

9          MS. FISKE:  98, 7.

10          THE COURT:  And lack of personal knowledge?

11          MS. FISKE:  Yes.

12          MR. BIAGETTI:  Well, there are two pieces in

13    there that were jointly -- one piece that was jointly

14    agreed to and another piece that was designated by

15    you.  So you don't mean those, do you?

16          MS. FISKE:  No.

17          MR. BIAGETTI:  93, 20, through 94, 6, I

18    believe, is an agreed to designations, right?  Unless

19    there's a --

20          THE COURT:  93, 20 through what?

21          MR. BIAGETTI:  94, 6.  I thought was pink

22    and, therefore, agreed to but --

23          THE COURT:  On my copy -- I don't know what

24    the colors mean, but I can just tell you the copy I

25    have is not pink.  A lot of it is yellow.

1          MR. BIAGETTI:  Yes.  The yellow is a GE

2  designation, Judge, so I think we are going to fight

3  about that, but I was trying to minimize what we were

4  disagreeing on.  There's a piece here that's pink and

5  a piece that's green that's designated by the

6  government.

7          THE COURT:  Okay.

8          MS. FISKE:  Although I did file an objection

9  to it.

10          THE COURT:  I'll go through it quickly.  The

11  objection from 93, 20, to 94, 15, is overruled.  And

12  from 94, 15, to 96, 5, is overruled.  96, 9, to 96,

13  18, is sustained.  Now, you don't want to try to

14  elicit testimony that the drums from Fletcher leaked?

15  You're opposing that?  96, 19, begins a line of

16  questioning about the quality of the drums.  What do

17  you say about the quality of the drums?  They leaked.

18  What, if anything, did GE do in response?  You don't

19  like that testimony?

20          MS. FISKE:  No, your Honor.  I think my

21  objection was stated too broadly.  I should have

22  narrowed it more --

23          THE COURT:  So you want that in, right?

24          MS. FISKE:  Yes, I do.

25          THE COURT:  Okay.  If you want me to rule on

1  an objection, you need to tell me, I want to strike

2  line blank to line blank, okay, because that's how

3  I'll rule.  Can I stop there or do you want me to --

4          MS. FISKE:  I apologize.  97, 8, to 97, 17.

5          THE COURT:  97, 8, to 97, 18, and this is

6  questioning from Mr. Biagetti, is it?  Who is doing

7  the questioning here?

8          MS. FISKE:  Mr. Biagetti.

9          THE COURT:  What's the basis for his personal

10 knowledge as to that?  "We tried to clean out -- make

11 sure the drums didn't leak.  We filled them with scrap

12 Pyranol.  We stored them for a week just to make sure

13 they didn't leak."

14         MR. BIAGETTI:  First of all, he was in charge

15 of the operation of the dock; and secondly --

16         THE COURT:  But did you elicit, I saw the

17 drums or I instructed the people to do -- there's

18 something that -- I have to be able to discern -- as I

19 understand the rules of evidence, before I admit

20 something, I must be able to discern from the record

21 that the witness knows, based on personal knowledge.

22 So I was there, I did it, I watched it.  The fact that

23 he worked there -- he might have heard about it from

24 somebody else that that's what they did.  In which

25 case it would be inadmissible hearsay, right?  So you

1  need to show the basis for personal knowledge.

2           MR. BIAGETTI:  Well, he remembers the quality

3  of the drums.  On the page before, "Do you remember

4  the quality of the drums sent to Fletcher?"  "Yeah.",

5  and then he remembers a complaint which would have

6  come into his department and he remembers what the

7  nature of the complaint was.  Based on his own

8  knowledge, they leaked, and he remembers what he and

9  his team did in response.

10          THE COURT:  All right.  I'm sustaining the

11  objection, 97, 8, to 97, 21.  Is that what you wanted?

12          MS. FISKE:  Yes, your Honor.

13          THE COURT:  Okay.

14          MS. FISKE:  I have just one more piece.  Same

15  thing.  97, 22, to 97, 25.

16          MR. BIAGETTI:  Your Honor, before we leave

17  that one -- I'm sorry.  Even if what GE did in

18  response is something your Honor doesn't deem

19  competent, it then switches at 18 to, "After you made

20  those changes did Mr. Fletcher continue to buy

21  Pyranol?"  Answer:  "Yes."  That is his personal

22  knowledge.  He was in charge of the operation at the

23  dock.

24          THE COURT:  I don't know that.  The

25  foundation hasn't been laid for that.

1          MR. BIAGETTI:  He said at the beginning of

2    his direct testimony in the deposition that he was in

3    charge of the department.

4          THE COURT:  But another person was doing the

5    selling for him, that other guy, whatever his name is.

6    He wasn't the guy that was dealing directly with

7    Fletcher.  Listen, suppose there's a guy that's

8    dealing with Fletcher at the company and he goes to

9    the boss and says, I sold Fletcher another 300 drums.

10   Could two years later that person come up and say, how

11   many drums did you sell to Fletcher?  We sold him 300.

12   How do you know that?  My subordinate told me.

13   Objection.  Move to strike.  No personal knowledge.

14   Hearsay, right?  So the fact he is the

15   supervisor doesn't mean you can get over the hearsay

16   objection.

17          MR. BIAGETTI:  That would be for the truth of

18   the matter asserted, Judge, and here what we're

19   talking about is Mr. Abbe's state of mind when he --

20          THE COURT:  No.  You guys are driving me up a

21   wall with that state of mind thing.  You're trying to

22   admit it to show that they dealt with leaking drums.

23   Not to show that he thought they dealt with leaking

24   drums.  You're trying to misuse state of mind to get

25   in inadmissible evidence the same way she was.  That's

1    not acceptable.  Objection is sustained.  All right.

2    I will read now the deposition from page 46 on.  I'm

3    just going to stay here and read it.  I'll read the

4    whole thing.  Anybody who wants to leave can leave.

5    We'll call you back when I'm done.  All right.

6            (The Court reviews the deposition)

7            THE COURT:  Can you give me the exhibits that

8    correspond -- the trial exhibits that correspond to

9    the exhibits that are referenced in this deposition?

10           MR. COWAN:  Sure, we can, Judge.  I'll get

11   Ms. Fiske for us.

12           (Ms. Fiske returns to the courtroom)

13           MS. FISKE:  Your Honor, do you have a

14   question about the exhibits?

15           THE COURT:  Yes.  I wanted a copy of -- just

16   give me the trial exhibit number for the August 6,

17   1968 memo with the attachment of February 16th.  I've

18   seen it before.  It's Exhibit 7 of the deposition.

19           MS. FISKE:  It is also, your Honor, by

20   coincidence, United States Trial Exhibit 7.

21           THE COURT:  7?

22           MS. FISKE:  Yes, and, your Honor, I can tell

23   you that the Blake reports have also been admitted

24   into evidence without -- through prior agreement with

25   General Electric, and I can give you those numbers,

15

1  too, if you would like.

2          THE COURT:  Where are they referenced in

3  here?

4          MS. FISKE:  Maybe you haven't gotten to that

5  part yet.  You must have.

6          MR. BIAGETTI:  They're Exhibits 4 and 5 of

7  the deposition, your Honor.

8          THE COURT:  I don't need those.

9          MS. FISKE:  Was there anything else, your

10  Honor?

11          THE COURT:  Not yet.

12          MS. FISKE:  Okay.

13            (The Court reads the deposition)

14          THE COURT:  Okay.  Can you get counsel back

15  in and we'll get going?  I've read through the

16  deposition.  One portion of it that strikes me as

17  potentially interesting -- I would be interested in

18  the comments of the parties -- is on page 75, line 17:

19  "Thank you.  You're doing a very nice job.  We

20  appreciate the effort you're putting in today.  When

21  you signed off on the memo, Mr. Abbe, did you have any

22  reason to believe that Mr. Fletcher wouldn't be able

23  to use this material, and if he couldn't, that he no

24  longer wanted it?"  "I don't think that was of

25  any concern.  We just hoped he was able to use some of

1  it, and the balance of it he could dispose of it."

2  The rest of it he could dispose of?  That seems

3  interesting to me.

4          Do either of you want to comment on that

5  reference?  Is there anything you want to say about

6  it?

7          MS. FISKE:  I think it fits squarely within

8  the theory that you've been advocating that the

9  government adopt and which we've been hopefully trying

10 to persuade you all along, which is that GE was aware

11 that some of this stuff maybe was good stuff that

12 could possibly be used.

13         THE COURT:  It's like a junk dealer who goes

14 to buy a lot and there's a lot of stuff there and the

15 person wants to get rid of it all and they say, give

16 me a $100 for it and it's yours, and the junk dealer

17 spots one nice little vase in there that he knows is

18 worth $400 and he takes the rest of it away and takes

19 the vase and sells the vase and makes a profit and

20 disposes of the junk.  That was the theory under which

21 GE was operating, and that seems to be what he's

22 saying there to me -- how I'm interpreting it.  We

23 understand there's junk in our stuff, and the junk is

24 going to get disposed of, and some of it he can sell

25 and that's why it's profitable for him to pay for it

1  and it's beneficial to us.  We get a little money, but

2  more importantly we get rid of our junk.  That seems

3  to be what he's saying to me.  Am I misinterpreting

4  what he's saying?

5        MR. BIAGETTI:  Well, he's saying -- again,

6  remember, he's saying later that he's three layers

7  removed from the actual conversations with Fletcher.

8  We have never denied, Judge, that it was physically

9  possible somewhere sometime that Fletcher could

10  dispose of this material in some way.  If he was

11  selling it to somebody else, if he was selling it for

12  weed killer or anything else, he could do that.  The

13  question is, was it a substantial certainty at this

14  time or, even more importantly, prior to that that's

15  what GE thought he was going to do, and nobody

16  believes that.  Could he have done it?  Of course he

17  could.

18        THE COURT:  I thought Mr. Hooper testified

19  that this was essentially the same thing has been

20  going on from the very beginning except it was

21  addressed informally by Fletcher getting credit for

22  the bad drums early on.  So it's the same practice

23  that's occurring consistently up until now.  The

24  problem with now is they're trying to charge him for

25  the drums.  He doesn't want to pay for them, and

1   before they write off the debt, they actually go out

2   and test it and agree that it's junk and that they

3   would do better off crediting him for it than taking

4   it back and trying to pay to dispose of it, and it's

5   just the latest version of what had been occurring

6   throughout the GE/Fletcher relationship.

7           GE has waste it needs to get rid of.

8   Fletcher sees that some of it may be useful for

9   resale.  He's willing to take it off GE's hands and

10  pay a small price for it.  If he's paying so little

11  for it that if he's able to salvage a small portion of

12  it and sell it for anything approaching the $3 a

13  gallon that one had to pay for Aroclor, he could make

14  money and dump the bad stuff any time he wanted to

15  dump it.  Because frankly, in the '50s and '60s if he

16  wanted to, he could have gone just down to the river

17  down there and said, pour those out, gentlemen, the

18  same way GE did with its PCBs in the Hudson River, and

19  that's the way everybody would have done it.  It's not

20  like they're immoral or doing it in the middle of the

21  night or anything else.  That's the way they would do

22  it.

23          MR. BIAGETTI:  Well, your Honor,

24  respectfully, if that's what GE had in mind, why go

25  through all of the back and forth with Fletcher?  Why

1   do the testing of material?  Why the contrivance if

2   all that GE was thinking was, keep it?

3           THE COURT:  Because they wanted to make -- if

4   they can make some money off it, they can make it, and

5   like any good employee, before they write off their

6   debt, they need to demonstrate why they're writing it

7   off, and this is a brilliantly done memo that says,

8   look, this is junk to us.  We would have to dispose of

9   it, and we would have to pay.  So let's write this

10  off, and we're still ahead of the game.  It is putting

11  in writing what appears to have been the effective

12  understanding between the parties from the very

13  beginning of the case in the 1950s.

14          I mean, that's how it tends to support that

15  view.  I'm not saying I've reached that determination

16  yet, but that seems to be a plausible interpretation

17  of the evidence, and of this deposition the only thing

18  in there that really seems to me to be meaningful was

19  that.  The rest of it was a lot of old information,

20  and I'm not so sure and -- you know.

21          MR. BIAGETTI:  The only other thing -- I

22  argued at the opening and I will remind you briefly

23  again -- what also is significant is that this man at

24  this time has the expectation that Mr. Fletcher is

25  going to continue to buy and use, and in Mr. Abbe's

1  view and recollection, Mr. Fletcher did continue to

2  buy and use.

3          Now, the man who came up with the cost

4  benefit analysis will be here tomorrow and will

5  explain GE's thinking on this subject, but it was that

6  they believed that Fletcher was using and was

7  continuing to use.

8          THE COURT:  They, looking at Fletcher, would

9  say, Fletcher must be able to use this for something;

10  and the idea that they would understand it to be used

11  as a plasticizer makes sense to me because, in fact,

12  Aroclor was used as a plasticizer in certain kinds of

13  paint products; and these people -- being relatively

14  sophisticated people, it would make sense to them that

15  it would also be used for that purpose, but that

16  doesn't end the analysis.  It seems like the way

17  you -- the two sides presented the case to me, this

18  was a case about whether there's any use for Pyranol,

19  Aroclor or not, apart from transformers and electrical

20  products, and it seems pretty clear to me that there

21  is a use for Aroclor, limited, in small quantities, in

22  certain kinds of specialty paints as a plasticizer,

23  and perhaps in certain kinds of roofing material as an

24  extender or a plasticizer, but that doesn't end the

25  analysis.

1           I accept the view -- I don't even know if the

2    government at this point is resisting it -- that GE --

3    the arrangement it made with Fletcher was an

4    arrangement in which GE contemplated that some of the

5    waste material that it was transferring to him would

6    be converted to some kind of productive use other than

7    pouring it on the ground as a dust suppressant or an

8    insecticide, and that GE continued to have that

9    understanding with respect to this material throughout

10   the time that they were dealing with Fletcher.

11          Fletcher wasn't operating a road building

12   operation.  He wasn't operating an insecticide

13   business.  He was operating a paint factory, and the

14   Aroclor can be used as a plasticizer for certain kinds

15   of specialty paints.  So I accept that fact, but given

16   the quantities that were being shipped to GE -- from

17   GE to Fletcher and given the nature of the materials

18   that were being shipped from GE to Fletcher, is it

19   substantially certain that at least some portion of

20   those materials would not be used as an extender or

21   plasticizer but, in fact, would be disposed of because

22   they were sufficiently contaminated as to be unusable

23   and that he was receiving those in quantities that

24   were far in excess of what GE understood would have

25   been received by Mr. Fletcher for use in a specialty

1  paint product?

2          That's the issue, it seems to me.  It's not

3  the issue:  Did GE think Fletcher was going to use

4  some Pyranol, either himself or through other

5  manufacturers, as a plasticizer?  It seems like

6  there's a lot of evidence of that to suggest that's --

7  that that's probably true.  I don't know if the

8  government at this point is really disputing that or

9  not, but there also seems to be substantial evidence

10  to suggest that this was -- very large quantities of

11  this scrap Pyranol were being transferred.  That there

12  were very limited alternative uses of the product that

13  would not qualify as disposal.  That the only limited

14  uses would be as a plasticizer, an extender and some

15  of these specialty products, and that the -- it was

16  very clear in the dealings between Fletcher and GE

17  that much of what he was getting was sufficiently

18  contaminated as to not be useful for that purpose, and

19  that GE understood that, and yet the relationship was

20  productive for both of them because what he could

21  recover and sell was sufficiently profitable, if given

22  the allowances that GE was giving him, that it was

23  productive for him to take it all and dispose of what

24  he couldn't use.

25          That disposal is an arrangement for disposal.

1   It is an arrangement for use and disposal.  That's

2   the -- I mean, I just wish that the parties had sort

3   of presented that to me from the beginning because

4   that's the way -- it seems to me the most plausible

5   way to examine the case.  Is it an arrangement for use

6   and disposal, or is it an arrangement only for use?

7   It certainly is an arrangement for use of some of it,

8   and I don't even know if the government disputes that

9   anymore but --

10          MR. BIAGETTI:  Unlike summary judgment, we're

11  at trial where the government has to prove by a

12  preponderance --

13          THE COURT:  Right.

14          MR. BIAGETTI:  -- so we do not have to prove

15  that it was an arrangement only for use.

16          THE COURT:  But I'm not going to put GE in

17  jail so I don't have to worry about proof beyond a

18  reasonable doubt.  I've got to get just ever so

19  slightly more than 50 percent chance that that is so.

20          MR. BIAGETTI:  And we don't think the

21  government gets there, obviously, in proving that the

22  piece that was for disposal was a substantial

23  certainty in GE's mind.

24          THE COURT:  That's why I couldn't grant

25  summary judgment against you because to get to that

1 point I've got to try to put the whole case together

2 and draw some inferences because we didn't have a

3 video conference of all of the meetings and the

4 arrangement wasn't reduced to writing, and all we have

5 are the circumstances, the behaviors and the

6 statements of the parties at the time, and I have to

7 draw inferences from that as to -- and determine

8 whether the government can prove, more likely than

9 not, that this is an arrangement for use and disposal.

10 And that's where -- that's why this statement seems to

11 be entirely consistent with that theory that beginning

12 in the days when Fletcher would interact with the

13 first boss and get adjustments for drums that were too

14 contaminated to be used.  Later when he refused to pay

15 and still later when they tested the stuff and wrote

16 it off, and all that seems to be consistent with that

17 theory and that's where I think we ought to keep the

18 focus of whether the evidence supports or doesn't

19 support that particular theory.

20          All right.  I'm finished with this one.  Are

21 we ready for the next witness?

22          MR. BIAGETTI:  Your Honor, on a couple of the

23 exhibits that go with Mr. Abbe, namely, two prior

24 interviews and an affidavit, would this be the proper

25 time to argue about the significance of those or

1  should we wait?

2          THE COURT:  What's that?  Give me that again.

3          MR. BIAGETTI:  There are three exhibits that

4  relate to reports of prior statements by Mr. Abbe on

5  the subject of use and one affidavit.  They are

6  exhibits -- and I don't know whether you want to while

7  we're talking --

8          THE COURT:  They're exhibits here in this

9  case, not exhibits to the deposition?

10          MR. BIAGETTI:  They are both.  They were

11  exhibits at deposition, and they are trial exhibits.

12          THE COURT:  I'll take a look at them.  What

13  are the trial exhibits?

14          MR. BIAGETTI:  80, 81 and 82.

15          THE COURT:  Could I have my clerk bring me up

16  the binder with Exhibit 80 in it?  While we're doing

17  that, let me just explain the way I think about the

18  process of fact finding because it's somewhat

19  different from the typical model.  If you read a set

20  of jury instructions and ask someone, what's the

21  theory of decision making that's implicit in those

22  jury instructions, the theory of decision making by

23  jurors is jurors will remain a blank slate.  They just

24  sit there and receive things, and they never try to

25  think about anything that comes in.  They never

1    reflect on it.  They never form tentative views about

2    who to believe and not to believe.  They suspend

3    judgment completely until all the evidence is in, and

4    then they start thinking about all of it together.

5    Because that's what we tell jurors.  Don't make up

6    your mind.  Keep an open mind.  You've got to hear

7    what other people on the jury have to say.  And we

8    kind of don't want them to even form any kind of

9    tentative view.  Most cognitive science would suggest

10   that that's physically impossible for anyone.  That's

11   not the way the human brain works.  Every second of

12   every minute of every day every conscious human being

13   is forming tentative views about the world, and

14   they're testing those views against their experience.

15   And those views get modified, and sometimes the views

16   get rejected, and my approach to fact finding is I try

17   to be a little more consistent with the way I think

18   the human brain works.  I don't have to wait and hear

19   what other people think.  I just have to think about

20   it myself.

21          My approach is to constantly be thinking

22   about the evidence and forming views that are

23   extremely tentative in nature, and then I try to

24   falsify those views.  I test them against the

25   experience that I have, the evidence as it comes in

1  and I form alternative views and I test those.

2          So my process of decision making is not one

3  that is completely passive until you've presented all

4  of the evidence and then I start to think about the

5  case.  I just couldn't do that.  So I'm thinking about

6  it every minute, and when I express views about the

7  case, though, it isn't a well-thought out conclusive

8  view.  It's to form a model about what you're seeing,

9  how it makes sense to you, and then test it against

10  the experience of the trial and form several different

11  models about the evidence and test them periodically

12  and see which ones make the most sense and don't make

13  any decision until you have to make a decision, which

14  is right at the very end, and until then any views

15  that I have are very consciously kept as very

16  tentative views.

17          It's probably disconcerting to lawyers to

18  hear me say, well, why shouldn't I think of the

19  evidence this way?  And they think, oh, it's over.

20  The judge's mind is made up.  He's not even going to

21  let me put on my case.  That's not the way I think

22  about things.  I'm trying to examine every piece of

23  evidence and test it and test it against the two

24  competing models that you've presented to me and a

25  third model, which I think the government -- is

1  implicit in what the government is saying.  Maybe it's

2  part of what the government is saying but doesn't go

3  as far as what the government is saying.  Because to

4  the extent the government is going so far as to say

5  this never had a useful life, the government itself

6  has put on evidence that suggested -- that seriously

7  undermines that.

8            Mr. Hooper, who you put on and advocated for,

9  says that Aroclor was used by Fletcher as a

10  plasticizer.  He says that the Pyranol was -- scrap

11  Pyranol was transferred to other users who considered

12  it valuable for them.

13            So to the extent you came in and told me from

14  the beginning -- and maybe I misunderstood you -- that

15  this Pyranol was junk.  It wasn't usable at all.  It's

16  just a complete worthless product that was only usable

17  as waste.  To the extent you claim that, I think your

18  own evidence undercuts that.

19            So then I say:  What are they really saying?

20  And the way I understand your model, to the extent

21  it's viable, it's a model of use of these products and

22  I'm testing that model against GE's model, which is a

23  use model.  The only thing that we understood -- that

24  we knew was going to happen was use and anything else

25  is -- I may have wondered about it -- like the witness

 1   whose deposition I just read.  I wondered about how

 2   they could use so much stuff, but wondering about it

 3   isn't proof that disposal was substantially certain to

 4   result, and so you're going to maintain your view that

 5   the model that I should apply to decide this case is a

 6   model in which I construe the evidence to see it as an

 7   arrangement, and then you, of course, have the right

 8   to argue to me that even if you don't buy that.  At

 9   best, the evidence is in complete equipoise, and

10   therefore, the government should lose because it has

11   the burden of proof.

12        MR. BIAGETTI:  Well, first of all, in terms

13   of your model of thinking incrementally through it, I

14   think both sides respect the engagement here.  It's

15   been a pleasure.  Second of all --

16        THE COURT:  I just don't want you to think

17   and misconstrue I've made up my mind.  I'm completely

18   open minded, I'm just constantly trying to make sense

19   of things.  That's all I'm doing.

20        MR. BIAGETTI:  Of course.  Even the use and

21   disposal model, your Honor, the government bears the

22   burden on preponderance; and respectfully, there is

23   not a preponderance of what those drums that Mr.

24   Hooper talked about were set aside -- whatever

25   happened to those.  To the extent they were GE drums

1   or whatever happened to them, but secondly, in my

2   view, respectfully, more importantly, no

3   preponderance.  It's not even close that GE knew

4   during the time it was shipping to Fletcher that any

5   were being set aside for something other than a

6   productive use.  The GE folks are saying, we knew he

7   was using a plasticizer.  Had no idea how much.  No

8   idea how much.

9           What do they see?  In the Metevier years,

10  they see that he's complaining about some too thin.

11  He's returning nothing, and he continues to buy.  Why?

12  It turns out when you mix the thin with the thick, you

13  can still sell it.  Okay?

14          In the Varnum years all they see at GE is a

15  crew that is testing, rejecting some and selecting

16  others to -- they think -- use by Fletcher in paint.

17          Now you get to February of '68.  I don't want

18  to get ahead of myself because Mr. Clark is going to

19  explain tomorrow, but even if you decide that they

20  indulged Fletcher's posturing on quality -- all defied

21  by the record and we'll go through it.  Even if you

22  decide that they did and to cultivate him to continue

23  to buy and use, they wrote off, that does not, in and

24  of itself, prove by a preponderance that back when

25  those shipments were made, the 77 shipments over 14

1  years, that GE at that time had an intent or a

2  knowledge that those drums that they were selling were

3  going to be, in your words, used and disposed of.

4  They're just not there on a preponderance.

5          THE COURT:  Okay.

6          MR. BIAGETTI:  So just a couple of points

7  on --

8          THE COURT:  You wanted to get to some of

9  these --

10          MR. BIAGETTI:  Thank you.  So if you look at

11  Exhibit 80 first -- Trial Exhibit 80.

12          THE COURT:  Yeah.

13          MR. BIAGETTI:  And we need to turn on the TV,

14  please.

15          THE COURT:  Which do you want to use, the

16  document camera?

17          MR. BIAGETTI:  Yeah.  There we go.  Thank

18  you.

19          THE COURT:  Okay.

20          MR. BIAGETTI:  So this is, first of all,

21  Judge, a statement prepared by the Blake Investigative

22  Agency.

23          THE COURT:  Are these objected to, or are

24  these in?

25          MR. BIAGETTI:  These are in.

1          THE COURT:  And you wanted them in?

2          MR. BIAGETTI:  Both sides did.

3          THE COURT:  Okay.

4          MR. BIAGETTI:  Prepared by the Blake

5   Investigative Agency for the government in 1992, and

6   in this document the government agent reports, January

7   10, 1992, that Abbe told him that at some time

8   Fletcher purchased waste Pyranol for use as a

9   plasticizer and also for use in insecticides.

10          Now, remember, Abbe works there until 1974.

11  No attempt here to place when he finds that out or

12  when this was happening, but here's an example of

13  something probative of -- to use your Honor's

14  formulation, you know, use for plasticizer and for

15  something else, not necessarily disposal but

16  insecticides, and that's what this document says.  He

17  says further along that Mr. Abbe will sign an

18  affidavit concerning the aforementioned.

19          A month later they talk again.  February, a

20  month later.

21          THE COURT:  Exhibit 81?

22          MR. BIAGETTI:  Exhibit 81.  Thank you, and

23  here Mr. Abbe, when apparently pressed, says what he

24  said in his deposition that you just read and took a

25  look at, which is that he has no idea what Fletcher

1   was doing with the scrap Pyranol.  By the way, he also

2   says there were no precautions taken in the handling

3   of it because it was not considered hazardous, okay?

4           THE COURT:  I'm not sure I interpret -- had

5   no idea why Fletcher contacted GE in December and

6   January, is not the same thing as saying, I have no

7   idea what he was doing with the scrap Pyranol.

8           MR. BIAGETTI:  He says here he has no idea

9   what Fletcher was doing with the scrap Pyranol.

10          THE COURT:  I've got the wrong "no idea"

11  then.  I'm looking at Exhibit 81.  Which paragraph?

12          MR. BIAGETTI:  It's the paragraph that

13  starts, "He said PCBs," and it's about -- I've got it

14  up on the screen there.

15          THE COURT:  That paragraph in my document 81

16  says, "He said PCBs have been in Pyranol since 1926.

17  He had no idea why Fletcher contacted GE in December

18  and January."

19          MR. BIAGETTI:  You have to go further down.

20          THE COURT:  Oh, then the next -- it's the two

21  sentences down.  He had no idea whether -- no --

22  copies were sent or --

23          MR. BIAGETTI:  You have to get about ten

24  lines into the paragraph.  Please read the whole thing

25  because I'm also going to call your attention to the

1  last two sentences.

2          THE COURT:  Well, he has no idea what

3  Fletcher was doing with the scrap Pyranol.  Says there

4  were no precautions taken in handling scrap Pyranol

5  because it was not considered hazardous at the time.

6  Okay.

7          MR. BIAGETTI:  Take a look at this again.

8  This is the government agent's interpretation, and the

9  last two lines he says --

10          THE COURT:  If the government wants to rest

11  its case on trying to prove that Abbe understood that

12  Fletcher was using this as an insecticide based on

13  this, I'm not doing that.  I mean, he said in his

14  deposition, I really don't know, and it's -- to base

15  liability on an offhand statement somebody makes and

16  then later claims he can't remember the source of, an

17  older gentleman talking about what happened years and

18  years ago in a second or thirdhand conversation, I'm

19  not going to credit that.  I don't know -- and there

20  really isn't any substantial evidence -- he was a

21  paint manufacturer.  He wasn't an insecticide

22  manufacturer.  Maybe he poured some of it to cut down

23  on weeds or something like that on his property, but

24  that's not what he was using it for.  So I'm not going

25  down that track unless the government --

1          MR. BIAGETTI:  Exactly my point, and the last

2   sentence -- again, this is in '92, much closer to the

3   time of the facts in issue.  He said the material was

4   of no use to GE but of some use to Fletcher, and that

5   is why Fletcher came after it.  Abbe's knowledge,

6   state of mind, was that he was selling to Fletcher

7   because Fletcher had some use for it, and that is why

8   he came after it.

9          THE COURT:  Okay.  I'm not inclined to

10  disagree.  What did you want to say?

11         MS. FISKE:  Just in the context of your

12  theory on use and disposal, I would take this evidence

13  in in the context of commonly -- what was commonly

14  understood that could be done with scrap Pyranol.  One

15  of those commonly understood uses was for it to be

16  applied to the ground, such as through an insecticide.

17         THE COURT:  Yeah.  I don't disagree with

18  that, either.  I don't disagree that -- they use waste

19  oil for the same purpose.  Anything that was heavy and

20  oily that would keep down dust or kill insects or

21  plants, that was waste.  They would pour it on the

22  roads.  That doesn't mean that that's what Fletcher

23  was -- GE understood Fletcher was doing, but yes, as

24  far as I know so far -- there may be additional

25  evidence -- the only possible uses for this product,

1   since it couldn't be used in electrical equipment

2   anymore, at least to GE's standards, was to use it as

3   a plasticizer in a certain sub-class of paint products

4   or to pour it on a dusty ground to cut down dust or to

5   pour it where plants or insects might be to cut down

6   on them; and otherwise it's to dump it on the ground,

7   pour it in the river, do something like that with it

8   to make it go away, and I don't think anybody is

9   really disagreeing about that.  Whether he thought --

10  whether GE thought Fletcher was using it, I've got to

11  tell you, with respect to Mr. Abbe, to the extent he

12  made that statement in an interview, he doesn't have a

13  memory of it by the time he makes the statement under

14  oath about it, and he's probably questioning his own

15  memory and not sure whether he knew some people in his

16  office were using it for that purpose, and he's afraid

17  he might have mixed it together and he's not willing

18  to say it under oath.  I'm certainly not willing to

19  attribute that fact as a fact against GE when he's not

20  willing to stand up and make that statement.

21       MS. FISKE:  Your Honor, I understand the

22  qualifications with which you're taking this evidence

23  and in terms of the framework as the evidence comes in

24  and where you put in the evidence in the theory

25  that -- the model that you've constructed, and I ask

1    you to take it in with the qualification to the point

2    that there was commonly understood --

3              THE COURT:  Well, I've admitted that there

4    was a guy who had jars of it in his office, and I

5    don't doubt that -- I mean, it's almost to the point

6    of being general knowledge that that's what was done

7    often with industrial waste chemicals of this kind

8    that were sufficiently viscous to not evaporate and

9    remain on the ground and keep the dust from rising.

10             I mean, that's -- I mean, everybody knows

11   that, I think, but that doesn't really have a lot to

12   do with this case because it's what did GE

13   understand -- what was the arrangement between GE and

14   Fletcher, not what was going on with waste oil and

15   waste products of this sort at the time.  It may be

16   useful background information, but not much more than

17   that.

18             All right.  We've got another witness?

19             MR. FRANKEL:  Yes, your Honor.

20             THE COURT:  Come on up.  All of the way up

21   here, sir.  Stand right up by this chair over here

22   beside me.

23                      JOHN RACICOT

24             having been duly sworn, testified as follows:

25             THE CLERK:  Would you please state your name

1  and spell your last name for the record?

2          MR. RACICOT:  John C. Racicot, Senior.  Last

3  name R-A-C-I-C-O-T.

4          THE CLERK:  Thank you.  You may be seated.

5          MR. FRANKEL:  Good afternoon, your Honor, I

6  don't think you've heard from me yet.  I'm Don

7  Frankel.

8          THE COURT:  All right.  Good.  Go ahead.

9                  DIRECT EXAMINATION

10  BY MR. FRANKEL:

11      Q.  Good afternoon, Mr. Racicot.  Could you

12  please state your full name for the record?

13      A.  John C. Racicot, Senior.

14      Q.  What is your address, sir?

15      A.  10 Mill Street, Milford, New Hampshire.

16      Q.  What year were you born?

17      A.  I was born in Vermont.  Newport Center.

18      Q.  What year were you born, sir?

19      A.  Newport Center, Vermont.

20      Q.  I asked what year were you born in.

21      A.  1937.

22      Q.  Thank you.  Could you provide the Court with

23  a brief description of your educational background?

24      A.  8th grade.

25      Q.  What did you do after you left school?

1        A.   Worked on a farm.

2        Q.   Where was that farm located?

3        A.   Newport Center, Vermont.

4        Q.   Did you move to Milford, New Hampshire at

5   some point in time?

6        A.   Yes.  I moved to Milford in 1958.

7        Q.   To what location did you move in Milford at

8   that time?

9        A.   2 Park Street.

10       Q.   How long did you live at Park Street in

11   Milford?

12       A.   Until '62 -- 1962.

13       Q.   Where did you move after you left Park

14   Street?

15       A.   I lived on Cottage Street for a short time,

16   and then I moved to Mill Street.

17       Q.   When did you move to your current address at

18   Mill Street?

19       A.   1962.

20       Q.   Do you know about when in 1962?

21       A.   During the summer.

22       Q.   How is it you're able to place the date as

23   about the summer of 1962?

24       A.   Because I started working at Fletcher's

25   around February of 1962, and I got married in March

1  and then I moved over to Mill Street during that

2  summer.

3       Q.  So you recall moving shortly after getting

4  married?

5       A.  During the summer.  Probably three or four

6  months.

7       Q.  What was located right across the street from

8  your home at 10 Mill Street?

9       A.  Fletcher's warehouse.

10      Q.  So you have lived right across the street

11  from that warehouse for the past 46 years,

12  approximately?

13      A.  Yes.

14      Q.  Could you provide the Court with a brief

15  statement concerning your employment history?

16      A.  Well, I worked -- like I say, I worked on the

17  farm until I was 20.  I moved to Milford.  I worked

18  for the White Mountain Freezer for a year.  I also

19  worked at Wilton Box Shop for a year after that; and

20  then I spent one whole year in the spring until about

21  Christmas time doing masonry as a masonry helper; and

22  then in 1962, around February, I got a job down at

23  Fletcher's.

24      Q.  Now, for how long did you work at Fletcher's?

25      A.  From February of '62 until June or July of

1   1968.

2       Q.  How do you know that you left Fletcher's in

3   June or July of 1968?

4       A.  Well, I got another job at Okay Tool, but I

5   worked part-time for Fletcher for a short time; and

6   that was during the time of the Bobby Kennedy

7   assassination.

8       Q.  What has been your employment since you left

9   Fletcher's?

10      A.  I worked at Okay Tool for 20 years, a machine

11  shop, and then I got a job in 1987 at the Milford High

12  School as a janitor.

13      Q.  Are you still working at Milford High School?

14      A.  No.  I'm retired.  I retired in 2005.

15      Q.  Mr. Racicot, I would like to turn your

16  attention to the period of time that you worked at

17  Fletcher's.  Could you tell the Court what you did at

18  Fletcher's?

19      A.  Well, when I first started there, we labeled

20  cans, you know, five gallon cans; and if there was

21  some paint put in gallon cans, we labeled gallon cans,

22  quart cans and pint cans and stuff like that.

23      Q.  So initially you were labeling cans?

24      A.  Yes.

25      Q.  Did you take on any responsibilities after

1  that?

2      A.  I became a filler, filling cans with paint.

3      Q.  Did you take on any responsibilities after

4  being a filler?

5      A.  I mixed paint for a little while, maybe a

6  year, year and a half, maybe.  I don't remember

7  exactly how long, but it was a year or two.

8      Q.  During the period of time that you worked for

9  Fletcher's, could you describe Fletcher's locations in

10  Milford?

11      A.  Well, the factory is on Elm Street, and the

12  warehouse is right across from where I lived.

13      Q.  And do you recall some of the other employees

14  at Fletcher's at the time?

15      A.  There was Wally Hooper who was there.  There

16  was Dick Whitney, Warner Nutter, and that's all that I

17  can recall right now.

18      Q.  Do you recall whether there was a chemist?

19      A.  Oh, Clyde Bishop, yes.

20      Q.  Now, while you were working at Fletcher's,

21  did you ever become involved in the shipment of any

22  materials that were brought into Fletcher's location

23  from outside sources?

24      A.  No.

25      Q.  Were you ever involved while you were at

1   Fletcher's in assisting with material that had been

2   brought into Fletcher's after it had arrived there?  I

3   understand you didn't actually truck it in yourself,

4   but did you assist after any materials had arrived at

5   the plant or at Mill Street?

6        A.  Not on Mill Street.  On Mill Street we had

7   samples of Pyranol.

8        Q.  Let me ask you some questions about that.

9   Could you describe for the Court how the Pyranol came

10  to the Mill Street location?  How did that arrive?

11       A.  By truck.

12       Q.  Can you describe the truck, sir?

13       A.  Just an open truck with sides on it, you

14  know, straight job truck.

15       Q.  Can you describe how many drums approximately

16  were in the truck?

17       A.  Oh, I don't know.  18, 20, 25, maybe.

18       Q.  Did you recognize the truck?

19       A.  No.

20       Q.  Did you recognize the driver?

21       A.  No, I did not.

22       Q.  Now, could you describe for the Court why you

23  were involved in these shipments of Pyranol?  What did

24  you do?

25       A.  Well, me and Clyde Bishop, a lot of times we

1   would go take samples, you know.

2        Q.   How often did you assist in the -- I'll call

3   it the sampling of Pyranol drums -- how many times

4   during the period of time that you worked at

5   Fletcher's?

6        A.   I don't know.  Maybe a dozen times.  Maybe.

7        Q.   Now, when I asked you questions about these

8   shipments, if your answer would vary depending on the

9   particular shipment, would you please let me know?

10        A.   Yes.

11        Q.   Now, where specifically were the drums

12   delivered, to the Elm Street location or the Mill

13   Street location?

14        A.   Mill Street.

15        Q.   Was that true in each of the approximately 12

16   times that you assisted in this sampling operation?

17        A.   Yes.

18        Q.   Could you describe for the Court specifically

19   how you assisted Mr. Bishop in the sampling process?

20        A.   Well, the drums are all standing up, and I

21   would loosen the bungs up so he came around behind me

22   with a syringe and took samples and put them in a pint

23   can and put the lid on it, and then we put a number on

24   the can, whatever number went with the barrel.

25        Q.   Did you -- were you able to observe Mr.

1  Bishop withdraw the Pyranol from the drums with a

2  syringe?

3       A.  Yeah.  I seen him do it.

4       Q.  Based on your personal observation of this,

5  are you able to tell the Court what the viscosity of

6  the Pyranol was or the thickness of it?

7       A.  Well, it was fairly thin, you know.  It was

8  probably like motor oil, I guess, or something like

9  that.  Thin enough you could pull it out with a

10  syringe without any problem.

11       Q.  Did Mr. Bishop ever have any difficulty

12  withdrawing the Pyranol with the syringe because it

13  was too thick?

14       A.  No.

15       Q.  Where exactly did the sampling take place?

16       A.  Right on the truck.

17       Q.  Do you know the results of the sampling?

18       A.  No.

19       Q.  Do you know why the Pyranol was being

20  sampled?

21       A.  No idea.

22       Q.  Now, what happened after Mr. Bishop withdrew

23  a sample of the Pyranol from the drum?

24       A.  I would put the bung back on, tighten it up

25  with a bung wrench and move on to the next barrel.

46

1      Q.  Could you describe for the Court what the

2  drums looked like?

3      A.  They were just regular 55 gallon drums, you

4  know.  Varied in different shade, colors, whatever,

5  you know.

6      Q.  Were there any labels on the drums?

7      A.  None that I noticed.

8      Q.  Were there any warnings on the drums about

9  any dangers -- potential dangers associated with the

10  Pyranol?

11      A.  Not that I noticed, no.

12      Q.  Do you believe that there were shipments of

13  Pyranol that you were not involved with?

14      A.  Oh, I'm sure there was.

15      Q.  Do you know whether or not Mr. Whitney or Mr.

16  Hooper brought drums of Pyranol from GE to Fletcher's?

17      A.  Not as far as I know.

18      Q.  Would you have been in a position to know

19  whether they were bringing in the drums?

20      A.  No, because most of the time I worked inside.

21      Q.  So is it fair to say that you assisted in

22  this operation when asked to when they needed some

23  help?

24      A.  Yes.

25      Q.  It wasn't your job to do this each time drums

1  arrived?

2      A.  Excuse me?

3      Q.  It wasn't your responsibility to assist in

4  this each time drums arrived; is that correct?

5      A.  No.  Whoever happened to be, you know, out of

6  work at the time was the one that got picked to do it.

7  So I did it probably a dozen times.  I can't remember

8  exactly.

9      Q.  And when you assisted in this operation, how

10  did you know that this was Pyranol coming in from GE?

11      A.  Well, it was said, we have to go over and

12  sample some Pyranol, so that's how I found out it was

13  Pyranol.

14      Q.  Okay.  Now, after the sampling was completed,

15  what happened to the drums?

16      A.  The drums were picked up and put on the

17  ground.

18      Q.  Where were they placed on the ground?

19      A.  Right next to the warehouse.

20      Q.  Could you describe for the Court in a little

21  more detail exactly what happened to the drums after

22  they were -- how were they lifted off the truck?

23      A.  We had a forklift with some tongs on the

24  forklift, and they'd hook that onto the barrel and

25  they would pick the barrel up and set it on the

1  ground.

2      Q.  Did they set it on the ground next to the

3  warehouse?

4      A.  Yes.  There was someone -- most of the drums

5  were on the west side -- excuse me -- on the east side

6  of the warehouse.

7      Q.  So as you recall, sir, were there some drums

8  on both sides of the warehouse -- both the east and

9  the west?

10      A.  Yes.

11      Q.  But you always placed the GE drums on the

12  east side; is that correct?

13      A.  On the east side, yes.

14      Q.  Thank you.  How were the drums placed at the

15  Mill Street location?  Were they upright, on their

16  sides, can you explain that to the Court?

17      A.  On their sides.

18      Q.  Were they stacked in more than one row?

19      A.  Yes.  It was probably three or four high.

20      Q.  Now, you live right across the street from

21  this location, correct?

22      A.  Yes.

23      Q.  And you've been in a position to observe the

24  Mill Street location on almost a daily basis for --

25  well, since 1962; is that correct?

1      A.  Yes.

2      Q.  Now, with respect to the drums that were off

3  loaded when you assisted with this operation, do you

4  know how long those drums remained at the Mill Street

5  location?

6      A.  Well, as far as I can remember, they were

7  there -- I think they probably started moving them all

8  out around the late '70s, early '80s I would say.

9          THE COURT:  Can I ask you -- I'm trying to

10  envision what this was like.  These drums are stacked

11  on their side.  They're not just stood up in the

12  ordinary way you would store 55 gallon drums?

13         THE WITNESS:  No.  They were just laid down

14  flat, and they were stacked one on top of the other.

15         THE COURT:  Why don't they just roll away?

16         THE WITNESS:  I imagine they must have put

17  some pieces of wood on the end so they wouldn't roll.

18         MR. FRANKEL:  Your Honor, we have what we

19  believe is a photograph of these drums.

20         THE COURT:  Yeah.  I would like to see it.

21     Q.  Mr. Racicot, do you know whether the weather

22  impacted these drums at all?

23     A.  Oh, yeah, but imagine when it was real hot

24  and sunny out, you could hear them binging and banging

25  out there, you know, during the daytime.  At night

1  they would cool off, and they would be banging some

2  more.

3       Q.  Sir, when you say you could imagine it, you,

4  in fact, heard this, did you not, from your house

5  located right across the street?

6       A.  Yes.

7       Q.  Mr. Racicot, a few weeks ago did I ask you to

8  see if you could locate any old photographs of the

9  Mill Street location?

10      A.  Yes.

11      Q.  Did you attempt to find such photographs?

12      A.  Yes, I did.

13      Q.  Did you, in fact, find some old photographs?

14      A.  Yes.

15      Q.  In particular, did you find an old photograph

16  of drums located to the east of the warehouse building

17  at the location where you had placed your GE drums?

18      A.  Yes.

19           MR. FRANKEL:  Your Honor, could I show the

20  witness a photograph marked for identification as

21  Exhibit 77?

22           THE COURT:  Do you want the computer as the

23  presenter, or do you want the document camera?

24           MR. FRANKEL:  I think the computer will be

25  fine.  Your Honor, I have the original of this

1  photograph here if you would like to see it.

2          THE COURT:  Yes.  Please.

3          MR. FRANKEL:  Could I pass that up to the

4  clerk?

5          THE COURT:  Yes.  What's the exhibit number

6  for this?

7          MR. FRANKEL:  77.

8          THE COURT:  Here is the original of 77.  Is

9  that a photograph you supplied?

10          THE WITNESS:  Yes.

11          THE COURT:  And what is in it?  What's shown

12  in the photograph?

13          THE WITNESS:  Barrels and my front lawn.

14          THE COURT:  So that's your front lawn in the

15  foreground here, and then the barrels in the

16  background?

17          THE WITNESS:  Yeah.  Right across the street

18  there's the tree.  There's the swimming pool.  We've

19  got two little boys.  Those are my sons.  There's a

20  sidewalk, and then you've got Mill Street, and the

21  other side of Mill Street are the barrels.

22          THE COURT:  Do you know when this photograph

23  was taken?

24          THE WITNESS:  It was taken, your Honor, the

25  summertime of 1970.

1          THE COURT:  All right, and how old would your

2   children have been then?

3          THE WITNESS:  Well, my oldest was born in '63

4   so he would be right around 7 there, and my youngest

5   one next to the pool he was born in February of '65 so

6   he was probably 5 and a half.

7          THE COURT:  And did the appearance of this

8   barrel -- pile of barrels change at all during the

9   time you worked at Fletcher, or was it like that the

10  whole time?

11         THE WITNESS:  Oh, no.  It got bigger as time

12  went on.  It didn't start off that big when I was

13  working there.  It just got bigger as time went on.

14         THE COURT:  Were there barrels stored in that

15  way when you started to work there?

16         THE WITNESS:  There wasn't very many.  It

17  might have been a very few.  I can remember there was

18  not very many barrels there so, you know -- as I

19  worked there from '62 to '68 we brought in some loads,

20  and then it got bigger and bigger as it went on.

21         THE COURT:  So would you say that gradually

22  over time the size of the piles expanded?

23         THE WITNESS:  Oh, yes.

24         THE COURT:  I see, and how long -- you've

25  lived there the whole time.  After this picture was

1   taken, what happened to the size of the barrel pile?

2          THE WITNESS:  Well, eventually they all got

3   moved out in the late '70s, early '80s.  I can't

4   remember exactly what year, but they all disappeared.

5          THE COURT:  Okay.  So until that time -- was

6   there a point in time when they weren't adding barrels

7   anymore after that?  Just the number that were there

8   stayed there for a while?

9          THE WITNESS:  Stayed there for a while, yes.

10         THE COURT:  Okay, and then late '70s, early

11  '80s is when they started taking them away?

12         THE WITNESS:  Yes.

13         THE COURT:  Thank you.  That was helpful to

14  see.  You should mark the original photograph, too.

15  Does he need that back?  Does he want that?

16         MR. FRANKEL:  I'll mark it, your Honor.

17         THE COURT:  Do me a favor, though.  We'll

18  mark a copy.  Take it back but just be sure you don't

19  destroy it in case we need to look at it again, okay?

20         MR. FRANKEL:  Your Honor, I'm sure Mr.

21  Racicot will be okay with the Court keeping the

22  original.  I think you should have that.

23         THE COURT:  You don't have any problem with

24  us holding on to that?

25         THE WITNESS:  No.

1          THE COURT:  When the trial is over, we'll

2  give it back to you.

3          THE WITNESS:  Okay.

4          MR. FRANKEL:  Your Honor, I move Exhibit 77

5  into evidence.

6          THE COURT:  Any objection?

7          MR. BIAGETTI:  No objection.

8          THE COURT:  Without objection, it will be

9  admitted.

10          (Government's Exhibit 77 admitted)

11     Q.  Now, Mr. Racicot, referring to Government

12  Exhibit 77, which is a photograph, this is a

13  photograph of the Mill Street location to the east or

14  to the right of the warehouse; is that correct?

15     A.  Yes.

16     Q.  And this is the location where you placed the

17  GE drums of Pyranol, right?

18     A.  Right.

19     Q.  Are the drums in the photograph stacked in

20  the way that you stacked the GE drums when they

21  arrived at Fletcher's?

22     A.  Yes.

23          THE COURT:  Do you have an understanding as

24  to why they were stacked that way?

25          THE WITNESS:  I have no idea.  I just --

1  that's just the way they started doing it and

2  continued after that, I guess.

3       Q.  Mr. Racicot, is it fair to say that this

4  photograph shows not just -- it shows drums at least

5  maybe two or three deep; is that correct?  It isn't

6  just one?

7       A.  Yeah.  They had more than one row.  There was

8  probably two or three, maybe four rows deep.

9       Q.  And about four or five rows high,

10 approximately?

11      A.  Yeah.  Four or five I guess it looks like in

12 the picture.

13      Q.  Mr. Racicot, do you know why Pyranol drums

14 from GE were delivered to Fletcher's?

15      A.  I have no idea.

16      Q.  Do you know whether Fletcher's paid for the

17 Pyranol?

18      A.  I don't know.

19      Q.  Do you know anything about the terms of the

20 transaction that resulted in the shipment of the

21 Pyranol to Fletcher's?

22      A.  No.

23      Q.  Do you know what Fred Fletcher intended to do

24 with the Pyranol?

25      A.  I have no idea.

1     Q.  Mr. Racicot, let me turn back to the period

2   of time when you were a paint mixer.  I believe you

3   testified that near the end of your employment with

4   Fletcher's you mixed paint?

5     A.  Yes.

6     Q.  What did you do when you mixed paint?  Could

7   you describe that for the Court?

8     A.  Well, you had tanks that you could move

9   around on the floor, you know.  They probably held

10  like 120, 125 gallons.  It was a pretty good sized

11  tank.  You've got their ticket for -- like they said,

12  you needed 30 or 40 gallons of resin, you know, you

13  would push underneath the resin tank and open the

14  spicket, and you had a measuring stick that you

15  measured however many gallons you needed, and then you

16  went from there and moved it over to the mixer and you

17  added on the pigment and the driers and all of that

18  stuff what was on the formula.

19    Q.  So just to recap that, there was resin,

20  pigment and driers and thinner that was used?

21    A.  Paint thinner, yes.

22    Q.  Any other ingredients for the paint?

23    A.  There was probably a whole bunch of other

24  ingredients, you know.  You add whitening that you

25  added onto the -- that was part of the pigment, and

1   you had dryer and you had thinner.  Whatever was on

2   the formula.

3       Q.  Okay.  Now the paint mixing took place at the

4   Elm Street location; is that correct?

5       A.  Yes.

6       Q.  Where was the resin located?

7       A.  In the factory.

8       Q.  Where was the pigment located?

9       A.  Well, we kept some in the warehouse, but you

10  would take some from the warehouse whenever you needed

11  some, and you would bring it over to the factory with

12  a forklift.

13      Q.  Where were the driers located?

14      A.  In the factory.

15      Q.  Where was the thinner located?

16      A.  In the factory.

17      Q.  During the period of time that you were

18  mixing paint at Fletcher's, did you ever mix Pyranol

19  into any of the paint that you were making?

20      A.  No.

21      Q.  Did you ever see drums of Pyranol inside the

22  paint factory building?

23      A.  No.

24      Q.  Now, Mr. Racicot, during your period of

25  employment with Fletcher's, did you ever enter the

1   warehouse building on Mill Street?

2       A.  Oh, yes.

3       Q.  Could you describe what was in the warehouse

4   building?

5       A.  Mostly all pigment.  We would get a freight

6   car, which is right behind the warehouse, and we used

7   to have a conveyor going from the freight car into the

8   warehouse, and a couple of guys would get in the

9   freight car and put the bags on the conveyor and then

10  there would be a couple guys in the warehouse that

11  would take them off and stack them.

12      Q.  Did you ever see any drums of Pyranol in the

13  warehouse building?

14      A.  No.

15      Q.  Did you ever see drums of Pyranol inside any

16  building at Fletcher's?

17      A.  No.

18      Q.  Was the Pyranol that you saw at Fletcher's

19  always stored outside?

20      A.  Outside, yes.

21      Q.  Mr. Racicot, could you tell the Court about

22  your eyesight?

23      A.  I'm legally blind.

24      Q.  Is it fair to say that that prohibits you

25  from driving an automobile; is that correct?

1      A.  Oh, sure.

2      Q.  You can see well enough to operate as a paint

3  mixer, for example?

4      A.  Yes.

5      Q.  And to have other factory jobs?

6      A.  Yes.

7      Q.  And from your front porch at Mill Street are

8  you able to look across the street and see a large

9  pile of drums?

10     A.  Oh, sure.

11         MR. FRANKEL:  I have no further questions.

12         THE COURT:  Thank you.  Cross examination?

13                   DIRECT EXAMINATION

14  BY MR. BIAGETTI:

15     Q.  Hello, Mr. Racicot.  Peter Biagetti, one of

16  the lawyers for GE.  We met briefly out there, but I

17  haven't had a chance to talk to you personally.  I'm

18  going to ask you a few of questions, okay?

19     A.  Sure.

20     Q.  Just another one on your eyesight.  At the

21  time that you worked at Fletcher's, '62 to '68, did

22  you have an eyesight problem then?

23     A.  Yes.

24     Q.  Did you have a sensitivity to light, was that

25  part of the problem?

1       A.  Yes.

2       Q.  As a result of that, did you end up doing

3   most of your work at Fletcher's indoors?

4       A.  Mostly indoors, yes.

5       Q.  Did it cause any problems for you in terms of

6   reading?

7       A.  No.  I can read if it's large print.  I can

8   read that all right.

9       Q.  But you didn't do much reading during the job

10  at Fletcher's; isn't that right?

11      A.  No.

12      Q.  And how about distinguishing colors?  Did it

13  cause you a problem in that sense when you were back

14  working at Fletcher's?

15      A.  No.  Because you followed your formula.

16  Whatever the particular formula asked for, that's what

17  you put into your paint.

18      Q.  Well, how about between, say, black and dark

19  red?  Did you have a problem distinguishing between

20  those two colors when you worked at Fletcher's?

21      A.  Oh, yeah.  I'm colorblind.  I can't tell -- I

22  have an awful hard time between black and red, you

23  know.  I can look at a shade -- a light shade and a

24  dark shade, and I can tell the difference.

25      Q.  But as between two dark shades, say, black

1  and dark green, you couldn't distinguish those, could

2  you?

3       A.  It's very difficult, yes.

4       Q.  Or black and dark blue?

5       A.  Yes.

6       Q.  And you said that when these -- that the 10

7  or 12 loads that you helped to unload -- the 10 or 12

8  loads of drums, I want to direct your attention to

9  those now.  You said that you didn't recognize the

10 trucks, correct?

11      A.  No.  It was just the regular, you know, open

12 truck.

13      Q.  The truck didn't have any markings on it from

14 what company it came from?

15      A.  No.

16      Q.  And you didn't recognize or see any labels on

17 any of the drums; is that right?

18      A.  No.

19      Q.  You didn't see any special markings on the

20 drums that would tell you where they were from, did

21 you?

22      A.  No.

23      Q.  So there was nothing on those drums or on

24 that truck that told you that what you were unloading

25 was from GE; isn't that right?

1        A.  Well, as far as the truck goes, somebody

2   would always say, we've got a load from GE, Pyranol,

3   so that's how I found out it was from GE.

4        Q.  Yeah, but on those 12 or so trucks that you

5   helped unload, can you tell this Court today that you

6   can remember seeing something that made you think

7   those trucks were from GE?

8        A.  No.

9        Q.  Or the drums?

10        A.  No.

11        Q.  Had you heard of Sprague at the time, Mr.

12   Racicot?

13        A.  Sprague?

14        Q.  Yeah, Sprague Electric.

15        A.  The name -- I vaguely remember the name.

16        Q.  You said that you worked at Fletcher from

17   February 1962 to about June of '68; is that right?

18        A.  Yeah.  About that.

19        Q.  During that time did you see drums come into

20   Fletcher?  You saw drums coming in, right?

21        A.  Over on Mill Street, yes.

22        Q.  And you saw them go out to somewhere, didn't

23   they?

24        A.  Well, I didn't see them go.  There was some,

25   I guess, that were going but --

1     Q.  But you didn't just see them pile up and pile

2  up for six years, did you?

3     A.  Well, a lot of them piled up.  The pile

4  seemed like it got bigger and bigger as time went on.

5     Q.  And did they get smaller and smaller at some

6  point, too?

7     A.  Well, in the late '70s, early '80s, when they

8  all disappeared.

9     Q.  But before that, '62 to '68, did you see

10  drums that came in and then came out again from

11  Fletcher?

12     A.  I didn't see any go out.  I know I saw plenty

13  of them come in.

14     Q.  Did you work in sales at all while you were

15  at Fletcher?

16     A.  No.

17     Q.  Did you have any idea who Fletcher's

18  customers were for those drums?

19     A.  No idea.

20     Q.  Had you heard of Webtex or Webster during the

21  time you were at Fletcher?

22     A.  Webtex rings a bell, but I don't know if it

23  was from Fletcher's or somewhere else I heard the name

24  Webtex but --

25     Q.  But you weren't involved in sales at all?

64

1    A.  No.

2    Q.  Okay.  You said you spent a lot of time at

3  your job labeling cans; is that right?

4    A.  Yes.

5    Q.  And then filling cans or buckets; is that

6  right?

7    A.  Yes.

8    Q.  And those were for filling into paint cans;

9  is that right?

10    A.  Well, we made a lot of paint for the State of

11  New Hampshire for the yellow and white lines, you

12  know, on the highway.

13    Q.  You made paint for other purposes, too,

14  right?

15    A.  Oh, sure.  He had guardrail paint.  He had

16  stores -- he had a store in Milford.  He had a store

17  in Concord.

18    Q.  About how many stores do you think he had in

19  total?

20    A.  He had six or seven, I would say.

21    Q.  Six or seven stores in which he sold his

22  paint, right?

23    A.  Yes.

24    Q.  Did he also sell latex paint?

25    A.  Yeah.  Towards the end latex was coming in.

1      Q.  House paint, interior paint?

2      A.  Interior paint, exterior paint.

3      Q.  Floor paint?

4      A.  Floor, deck paint.

5      Q.  Deck paint.  Roof coating?

6      A.  Aluminum roof coating, yes.

7      Q.  So when you did some of that mixing -- you

8  said you did mixing for, what, 12 to 18 months?

9      A.  Probably about that, yes.

10     Q.  Okay.  Of all those kinds of paints that Mr.

11 Fletcher had, do you remember which ones, in

12 particular, you were mixing?

13     A.  It was all different kinds.  I mean, every

14 day it was something different, you know.

15     Q.  So some of them may have been rubber-based

16 paint that you were mixing, right?

17     A.  I don't recall doing rubber-based paint, but

18 it might have been.  You know, you've got so many

19 different kinds.  We did a lot of the yellow and white

20 paint and guardrail paint.

21     Q.  I know it's tough, and it was a long time

22 ago.

23     A.  Yes.

24     Q.  So it's fair to say you don't remember ever

25 mixing any rubber-based paint, do you?

1     A.  Probably not.  Rubber-based was something you

2   saw on boxes or something, but I mean -- maybe some

3   boxes of paint, but as far as mixing rubber-based, you

4   know, sometimes you mix a tank of paint and it might

5   last you a long time before you made another one, you

6   know.

7     Q.  I don't want you to guess.  I want you to

8   give your best memory of those 12 to 18 months.  Do

9   you ever remember mixing any rubber-based paint, sir?

10     A.  I can't say for sure that I did.

11     Q.  The drums that came in, at the time that you

12   helped to unload them, what condition were they in?

13     A.  They were fairly -- you know, fairly good

14   shape, you know.  They weren't all rusty and banged up

15   or nothing.

16     Q.  And you said, I think, that you helped the

17   chemist do his -- what did you watch Mr. Bishop do

18   again?

19     A.  Well, he would take the syringe and take the

20   samples out of the drums.

21     Q.  To get the syringe in there, I think you said

22   something about having to loosen something, what was

23   it?

24     A.  Loosen the bungs.  That's the big -- you

25   know, you've got two bungs on the drum.  You have the

1  big one and then right across you have the small bung.

2  I would loosen up the big bung.

3      Q.  So that he could get the syringe in there?

4      A.  Yes.

5      Q.  And you had to do that on every drum, didn't

6  you?

7      A.  Every drum, yes.

8      Q.  Is it fair to say, sir, that sometime after

9  you left Fletcher you had occasion to see those drums

10  that went across the street, right?

11     A.  Yes.

12     Q.  And you were able to see those for 20 years

13  thereafter, right?

14     A.  Until the late '70s, early '80s.

15     Q.  Early '80s.  Okay.  Right.  So maybe fifteen

16  years after that, right?  Did you ever remember seeing

17  a drum leaking during the time you worked at Fletcher,

18  as opposed to after that time when you saw them across

19  the street?  Did you ever see one leaking during the

20  time you were at Fletcher?

21     A.  I can't say as I saw one leaking, you know.

22  I would imagine over time that after a few years of

23  laying there like that with the sun beating on it and

24  the weather and everything else it's going to start to

25  rust.

1      Q.  Over time?

2      A.  Yes.

3      Q.  And during the time that they were across the

4  street, did you ever go over there and take a close

5  look at any of them?

6      A.  No, not really.  I used to go over there

7  because my kids used to play over there, and I used to

8  go over and tell them to get the heck off those drums.

9      Q.  What were you worried about?

10      A.  I was worried some would fall on them and

11  they would get hurt.

12      Q.  On those times when you would go over to at

13  least get close enough to the drums to get your kids

14  home, did you ever notice any labels of any kind that

15  told you where those drums were from?

16      A.  No.

17      Q.  You don't know where the drums that were

18  across the street were from, do you?

19      A.  No idea.  I knew it had something to do with

20  GE, but I couldn't say for sure, you know, which ones

21  were GE and which ones wasn't.

22      Q.  I'm going to just press you for a second on

23  that.  You couldn't tell -- there were no labels on

24  those drums, correct?

25      A.  No.

1        Q.  There was no distinctive color about them

2   that would tell you they were GE's, correct?

3        A.  No.

4        Q.  You only unloaded a few loads of drums

5   yourself, correct?

6        A.  Yes.

7        Q.  So there's nothing about those drums that you

8   saw, sir, that would have led you to believe that they

9   were GE's drums; is that right?

10       A.  No.  As far as markings, no.  The only thing

11   I'm saying is that was mentioned that we got a load of

12   Pyranol from GE, and that was just word of mouth, you

13   know.

14       Q.  And you never looked at what was in any of

15   those drums after the time you left, did you?

16       A.  No.

17           MR. BIAGETTI:  May I have a moment, your

18   Honor?

19           THE COURT:  Yes.

20           MR. BIAGETTI:  Nothing further.  Thank you,

21   Mr. Racicot.

22           THE COURT:  Anything else from this witness?

23           MR. FRANKEL:  Not with this witness, your

24   Honor.

25           THE COURT:  Thank you very much, sir.  I

1  appreciate you coming.  You're excused.  Call your

2  next witness.

3         MR. FRANKEL:  Your Honor, at this point if we

4  could bring to the Court's attention several

5  documents?

6         THE COURT:  Okay.

7         MR. FRANKEL:  At least some of them GE has

8  agreed can be admitted into evidence.

9         THE COURT:  All right.

10        MR. FRANKEL:  Your Honor, the reason for

11 bringing these documents to your attention -- and the

12 first one I bring to your attention is Government

13 Exhibit 17.

14        THE COURT:  Is there an objection to its

15 admission?

16        MR. FRANKEL:  There is not.

17        THE COURT:  Okay.

18        MR. FRANKEL:  Your Honor, I'm bringing this

19 series of documents to your attention because we

20 believe it shows that as late as 1974 there were over

21 1,300 drums that Fletcher's was trying to sell from a

22 broker named Hub Fabric, and this fits in with the

23 photograph that your Honor just saw.

24        Essentially, this shows that six years after

25 the last GE shipment there's an attempt to sell a very

1   large amount of scrap Pyranol.  GE has stipulated that

2   at this time over a thousand drums of scrap Pyranol --

3   has stipulated that Fletcher's was trying to sell over

4   a thousand drums of scrap Pyranol through the broker

5   named Fletcher, and what happened was -- I'm sorry,

6   through the broker named Hub Fabric.  Hub Fabric

7   contacted Monsanto in an attempt to sell this scrap

8   Pyranol to Monsanto, and what happened was Monsanto

9   informed Hub Fabric, which was acting as the broker,

10  that the drums were contaminated.  It says here,

11  "Samples of the polychlorinated biphenyls from your

12  friend's inventory --", and that friend is Fletcher,

13  "-- were analyzed and were found to be contaminated

14  and not reclaimable for approved dielectric use.  To

15  eliminate any potential opportunity for this material

16  to become an environmental pollutant, I strongly

17  recommend proper disposal by high temperature

18  incineration."

19          In fact, your Honor, the next paragraph

20  indicates that Monsanto was even thinking about paying

21  for part of the cost of this incineration.  Your

22  Honor, if I could turn your attention to Exhibit 12.

23          THE COURT:  Okay.  I think -- again, I don't

24  think there's any dispute from GE that every barrel of

25  Pyranol that was transferred from GE to Fletcher was,

1  from GE's perspective, contaminated and unfit for

2  dielectric use.  Do you disagree with that?  Because

3  by definition -- GE's a rational company.  They don't

4  take dielectric fluid that they can use in their

5  business and put it in their scrap area and sell it

6  for a fraction of what they had to pay for it.  I

7  mean, it's contaminated for dielectric use at the very

8  high standards that GE maintains.  So this exhibit

9  doesn't really tell me much except that what we

10  already know, which is it was contaminated.  How much

11  it was contaminated is the dispute.  This doesn't tell

12  me how much.

13         MR. BIAGETTI:  30 parts per million

14  of chloride and water.

15         THE COURT:  I see the exhibit, but I don't

16  think it tells me much I don't already know.

17         MR. FRANKEL:  Your Honor, the purpose of this

18  exhibit -- and let me show you Exhibit 12, which is

19  also not objected to.  The exhibit makes clear in the

20  second paragraph that these drums -- it says over a

21  thousand drums were stored outdoors at the plant, and

22  on the second page it indicates that there were 1,366

23  drums, which was 800 pounds of scrap Pyranol.

24         The main point here, your Honor, isn't that

25  the Pyranol was unavailable for dielectric use.  The

1  main point was that Fletcher still has 1,366 drums

2  sitting on its lot six years after the last GE

3  shipment.

4          THE COURT:  This is where I'm kind of at a

5  loss.  Both of you seem to be wanting to try to

6  convince me of something concerning the quantities of

7  drums that remained there at various periods of time.

8  I'm not sure why.  It's very clear to me, based on Mr.

9  Hooper's testimony -- and I don't think GE is going to

10  be in a position to dispute it -- that they -- based

11  on your stipulation, that over 3,000 barrels were

12  received from GE of contaminated Pyranol and/or other

13  chemicals mixed with contaminated Pyranol.

14          It's very clear to me from Mr. Hooper's

15  testimony that Fletcher used, at best, a very small

16  quantity of Pyranol in the manufacture -- very small

17  quantities of a subset of paints and roofing material

18  that was -- would not have come close to consuming

19  anything like the quantities of drums that were taken

20  in over the life of Fletcher Paint Works.  It's very

21  clear to me from Mr. Hooper and the testimony and some

22  of the other exhibits that Mr. Fletcher was able to

23  sell some but not all of the scrap Pyranol; but it is

24  very clear to me that he wasn't able to sell anything

25  close to the amount that he received, and I don't know

1   why else I would want to -- we would want to spend a

2   lot of time on, you know -- and maybe you can help me

3   understand the significance.

4          Why do you want to convince me that there

5   were thousands of drums of scrap Pyranol -- there

6   probably were, but I don't know why it really matters

7   that much.

8          MR. FRANKEL:  Here is why I think it matters,

9   your Honor.  The legal test is whether they were an

10  arranger for a disposal of a hazardous substance and

11  our position -- while your Honor stated two standards

12  yesterday, scienter, specific intent or constructive

13  knowledge essentially would be if there's a

14  substantial certainty that these materials -- some of

15  which would be disposed of, you would find liability.

16         The importance of this is, I agree, that it's

17  after the fact evidence, but I think it's related to

18  whether at the time there was, in fact, an intentional

19  arrangement that a lot of this stuff just wouldn't be

20  used.  Well, look six years later.  It's sitting on

21  the ground at Fletcher's.  That's circumstantial

22  evidence.  It confirms the agreement.  If your

23  Honor --

24         THE COURT:  You're saying because we can

25  prove that Fletcher wasn't able to use it, that's

1  evidence that GE understood that Fletcher wouldn't be

2  able to use it.

3       MR. FRANKEL:  I don't think it proves it in

4  and of itself, but it's circumstantial evidence that

5  confirms the theory.  In other words, if the evidence

6  in this case showed that it all had been used --

7       THE COURT:  But I set up the logic of it the

8  right way.  You're saying that what needs to be proved

9  is that GE -- it was substantially certain to GE at

10 the time that it entered into this arrangement that

11 Pyranol would be disposed of as a result of the

12 arrangement.  It was substantially certain to GE

13 because Fletcher couldn't use all or nearly all of the

14 material or couldn't sell it, couldn't dispose of it

15 in any way that didn't involve disposal under the

16 statute; and we can prove that he couldn't use it all

17 because we can prove that there were a lot of barrels

18 on the site after he stopped operations and because of

19 that, it tends to prove that GE -- it was

20 substantially certain at the time of the arrangement

21 that he would not be able to sell.  Is that the chain

22 of reasoning that --

23      MR. FRANKEL:  That's part of the chain.  Your

24 Honor, I think the main focus would be on the intent

25 of GE at the time or, as you talked about, a

1  constructive intent --

2        THE COURT:  Say in the 1980s there are a lot

3  of barrels there.  That proves GE knew because --

4        MR. FRANKEL:  No.  It doesn't prove it, but

5  it's evidence that supports the theory -- it could

6  support two theories.  If the theory is that the

7  parties had the intent that some of this stuff would

8  be used but a lot of it would be pushed off to the

9  side, and that was the understanding of both GE and

10  Fletcher which your Honor just discussed, the fact

11  that a lot of it was, in fact, put off to the side I

12  think is circumstantial evidence that that, in fact,

13  was the intent at the time of the transaction.

14        THE COURT:  So Fletcher pays money to GE for

15  the purpose of storing in perpetuity Pyranol.  Mr.

16  Fletcher is a better businessman than that.  He

17  thought he was going to make money off of this, right?

18  I don't assume people act irrationally unless there's

19  evidence or circumstances to justify a conclusion that

20  they're insane.  I mean, he was trying to make money.

21  Do you agree that he was trying to make money off of

22  this?

23        MR. FRANKEL:  I agree with that.

24        THE COURT:  The way he makes money is either

25  by using it productively in some process from which he

1    can generate money or by selling it, right?

2         MR. FRANKEL:  That's correct.

3         THE COURT:  So Mr. Fletcher believed at the

4    time he entered this transaction that he would be able

5    to sell or use enough of it to make this transaction

6    profitable.  Don't you agree with that?

7         MR. FRANKEL:  Yes.

8         THE COURT:  And don't you agree that someone

9    entering into negotiations with Mr. Fletcher would

10   come to understand that Mr. Fletcher was willing to

11   pay for this stuff would also understand, be aware,

12   that the buyer was, in fact, intending to use or sell

13   at least some of it?

14        MR. FRANKEL:  At least some of it.  That's

15   the key, your Honor.

16        THE COURT:  That's the key.  Okay.  So I

17   guess what I -- I'm not seeing how this proves an

18   awful lot, but it seems to me there's some pretty good

19   evidence that there was a lot of Pyranol on this site.

20   There was a lot of it for years.  There were growing

21   amounts of it.  Most of it came from GE, although not

22   all of it, and it remained there in large quantities

23   for a long time.  So if that's what you want me to

24   understand, I understand that.

25        MR. FRANKEL:  That is what we want you to

1   understand, but we think it's relevant to the extent

2   that if your Honor is looking at an intent test or a

3   constructive knowledge test, we think at the time of

4   the transactions, based on the fact the nature of the

5   waste product and the knowledge GE had of the

6   business, they should have -- we just filed a brief on

7   what we think the legal standard is.  We think we can

8   prove the case based on specific intent or

9   constructive knowledge, but we also believe that your

10   Honor should consider a third theory, which would be

11   that GE at the time of the transaction had an

12   expectation that it was likely that some of the

13   material would be disposed of.  Not all of it.  Some

14   of it.  We think that that can fit within the

15   statutory language and Congress's intent.

16         THE COURT:  I'll read your brief.  I really

17   thought about it pretty hard.  I just don't see how

18   the language of the statute can be contorted into that

19   kind of standard of liability, and I don't see any

20   court that has done it -- any Circuit court.  Some

21   district courts have done all kinds of crazy things,

22   but I haven't seen any Circuit court that has done

23   that.

24         MR. FRANKEL:  Your Honor, even if you don't

25   adopt the standard we're proposing, we think we can

1   establish liability based on the two standards that

2   your Honor has indicated.

3           THE COURT:  I'll take what you say here.

4   What do you want to say about this document?

5           MR. BIAGETTI:  Two points.  On page one of

6   Exhibit 12 at No. 1, the writer makes clear that he is

7   talking about an Aroclor inventory.  Again --

8           THE COURT:  So you don't think this even

9   refers to the Pyranol?

10          MR. BIAGETTI:  No reference to Pyranol.

11  Certainly no reference to GE's Pyranol.

12          THE COURT:  How do you tie this to the GE

13  Pyranol?

14          MR. FRANKEL:  Your Honor, there are several

15  ways we can tie it.  First of all, GE has stipulated

16  that Fletcher was trying to sell 1,000 drums of

17  Pyranol at this time.  So my understanding is that GE

18  has conceded that these Hub Fabric transactions relate

19  to their material; is that correct?

20          MR. BIAGETTI:  No.

21          MR. FRANKEL:  Well, your Honor, if you look

22  at stipulation number 124, it states:  "GE stipulates

23  that Fletcher was trying to sell over 1,000 drums of

24  scrap Pyranol.", and Pyranol was the GE product.  It

25  wasn't the product of Sprague or Aerovox.  Beyond

1  their stipulation, your Honor --

2          THE COURT:  Do you have a time frame on this

3  stipulation when they were trying to sell?

4          MR. FRANKEL:  I don't have it in front of me,

5  but the stipulation I think refers to about this time

6  period, 1974.  So as far as I'm concerned, they have

7  stipulated to it.  Stipulation 124.

8          THE COURT:  All right.  They didn't stipulate

9  that what was referred to in 12 is Pyranol.

10          MR. BIAGETTI:  That's my only point, Judge.

11          THE COURT:  You say circumstantially you

12  established it by the temporal connection between what

13  GE has stipulated and the date of the letter.

14          MR. BIAGETTI:  To that point, just one other

15  letter in Exhibit 12, if I may, Judge.  It's the third

16  page in, Bates stamp GE ending 535.  Point number two,

17  Laham is talking about his client having 1,300 drums.

18  Some of it is in original Monsanto drums.  Condition

19  of material is supposedly good except for some

20  moisture content.

21          So again, whoever's drums these were, they

22  were still good.  The condition of the drums was good,

23  and they were -- if this client of Laham is Fletcher,

24  it confirms what Abbe and Clark thought at the time.

25  That Fletcher was going to continue to value these

1  drums.  That he was going to continue to use them.

2  That's what they thought.  And what did Fletcher, in

3  fact, do even after his customer, Webster, dried up?

4  You heard Mr. Hooper say, he continued to check the

5  drums.  He continued to make sure there weren't

6  leakers.  If there were, he fixed them.  He cared for

7  them.  Why?  Because your Honor could draw the

8  inference that he was still trying to, in Mr. Hooper's

9  words, make a dime from it.  That's not the work of a

10  disposer.  That's someone who values it and is

11  continuing to try to make money from it.

12         THE COURT:  I don't know if it's really worth

13  spending a lot of time on this.  14 then refers to the

14  same discussion and talks about it being --

15         MR. FRANKEL:  Specifically refers to GE

16  material.

17         THE COURT:  I mean, I could go through this

18  stuff and we could try to point all of this out.

19  There were a lot of barrels of GE scrap Pyranol at

20  that site for a very long period of time.

21         MR. FRANKEL:  That's all I'm trying to

22  establish.

23         THE COURT:  It was a growing number, and

24  unless somebody has some contrary evidence, again, Mr.

25  Hooper provides the best source.  We've got tons and

1    tons of GE barrels and very few barrels of Pyranol

2    from anybody else in comparison; and all of the

3    evidence suggested that the stockpiles -- although

4    they fluctuated to some extent because some were taken

5    off-site for use -- tended to grow over time and grew

6    very substantially over time into the '70s.  So that

7    it's entirely likely and indeed probable that there

8    were in excess of a thousand barrels of GE Pyranol on

9    the site in the '70s.  If that's all you want to try

10   to prove, I'll wait and hear if there's any contrary

11   evidence, but that seems to be the most likely way to

12   make sense of the evidence that I have received so

13   far.

14           MR. COWAN:  Judge, if I may, only one thing

15   for your Honor's clarification, and the United States

16   thinks Hooper's testimony will bear this out and we'll

17   all review the record, respectfully.  I think the

18   testimony in the case is that no one knows whose

19   barrels were left at the end of this time period, and

20   I don't think the government has any evidence they're

21   going to offer to establish --

22           THE COURT:  Thank goodness under Superfund we

23   don't have to get into that detail.  Because if you

24   can't prove some basis for segregation, it doesn't

25   matter to me.  You don't have to prove that they -- 15

1   of the barrels were Sprague and 23 of them were GE.   I

2   haven't done this in a long time, but back when I was

3   doing that -- the problem is for someone like you to

4   come forward and say, I can prove that we had one

5   barrel that was in one corner of the site and the

6   plumes are different, and we have no liability for

7   what -- it's pretty hard to do that, but it isn't up

8   to the government to prove that they can trace each

9   PCB molecule to a GE drum.   That's not the way the law

10  is written.   All right.   Go ahead.

11          MR. FRANKEL:   Your Honor, if I could -- we

12  were going to call John Harrington as a witness.

13  We're not going to because GE has stipulated that his

14  affidavit can go into evidence.

15          THE COURT:   Okay.

16          MR. FRANKEL:   If I could just point your

17  Honor to a couple of passages?   That is Government's

18  Exhibit No. 37.   The reason I -- I'll let your Honor

19  get to that.

20          THE COURT:   Okay.   I've got it.

21          MR. FRANKEL:   Mr. Harrington was the GE

22  employee during the relevant time.   He worked in the

23  repair department where they dealt with capacitors

24  that had been rejected; and I wanted to point out,

25  first, paragraph 5 where he indicates that after the

1   oil flowed into the table drains, which emptied into

2   55 gallon drums, and then he says when the drums were

3   full, they were labeled waste Pyranol.

4           Focusing on paragraph 7, your Honor, you were

5   asking about degreaser yesterday, and this paragraph

6   specifically discusses it.  It indicates there was a

7   vapor degreaser and waste degreaser liquid -- I'm

8   sorry, your Honor.  It says in this same department

9   there was a vapor degreaser, and the waste degreaser

10  liquid was also barreled and labeled.  This vapor

11  degreaser was used to clean any excess Pyranol from

12  the capacitors.  The capacitors, in units of fours,

13  were loaded onto an aluminum rack and lowered into the

14  degreaser solution taking off any excess Pyranol.

15  When the vapor degreaser liquid became depleted, it

16  was barreled with the waste Pyranol and labeled waste

17  Pyranol.

18          Just two more passages of this I would like

19  to bring to your Honor's attention.  In paragraph 11

20  it indicates when the Pyranol could not be filtered to

21  specifications, it became scrap.  It was then placed

22  into barrels which were labeled scrap or waste

23  Pyranol.  The labeling was spray painted on the

24  barrels through a stencil.

25          Finally, your Honor, paragraph 13 essentially

1  indicates that often this waste Pyranol was

2  essentially sent into the river.  A valve was opened,

3  and the waste Pyranol was essentially let out into the

4  Hudson.  So I bring this affidavit to your attention

5  because it essentially brings into focus how GE was

6  treating its material.

7          THE COURT:  Okay.  Thank you.

8          MR. FRANKEL:  That's all I have, your Honor.

9          THE COURT:  Are there any other witnesses you

10 have, or are you done?

11         MS. FISKE:  If your Honor would like, I could

12 discuss some of the other exhibits, but I don't

13 believe there are any further witnesses.

14         THE COURT:  Do you have anymore witnesses to

15 put on?  Do you have an expert who is going to

16 testify?

17         MR. FLYNN:  We've stipulated with defense

18 counsel to eliminate the live testimony of three

19 expert witnesses so we are handing them in tomorrow in

20 marked up depositions for your Honor with objections.

21         MR. BIAGETTI:  And I'm pleased to report that

22 the one expert that we were still sparring over,

23 Shifrin, we've agreed to also submit via report and

24 deposition designation so you will have all of the

25 testimony by deposition as opposed to live.

1        THE COURT:  So you have more exhibits to

2  discuss, but you don't have any more witnesses to

3  present?

4        MR. FLYNN:  Correct, but could I clarify --

5        THE COURT:  Yes.

6        MR. FLYNN:  It will probably take an extra

7  day to do this additional witness that we just learned

8  about this afternoon, but relating to that witness,

9  the government has pending a motion in limine to

10  exclude all testimony --

11        THE COURT:  Let me hear first -- so you're

12  done with your witnesses now.  Who do you want to

13  call?

14        MR. BIAGETTI:  I wanted to talk for a moment

15  about the Harrington affidavit, but then -- in terms

16  of witnesses we're going to call in our case, right

17  now it's -- live, only Mr. Clark.

18        THE COURT:  So we'll finish tomorrow with

19  the --

20        MR. BIAGETTI:  Live testimony tomorrow, yes.

21        THE COURT:  And then you will give me the

22  exhibits that you want me to read, the excerpted

23  depositions.  I could rule on any objections.  I could

24  take them back up to my office and read them tonight

25  and then when you could come in -- tomorrow night,

1   that would be Thursday.  So Friday you could come in

2   and present closing arguments, and I'll give you a

3   decision on Friday.

4          MR. FLYNN:  We actually gave you all of the

5   fact witness depositions marked up on Monday, which we

6   submitted it to the court.  The only ones you don't

7   have now will be for the four experts.

8          THE COURT:  Well, I want to -- before you

9   leave today, you write down whatever it is by exhibit

10  number what you want me to read before Friday so then

11  I'll just spend Thursday afternoon up in my office

12  reading everything that you want me to read, okay, but

13  don't give me a bunch of stuff I don't need to read.

14  If it's something I need to read -- if you think it's

15  important, give me a list.  All right.  If you've

16  already filed it -- I just want you to understand, you

17  guys file things like this that never get referred to

18  in the course of the trial.  I'm not going to look at

19  it.  So if what you think is, oh, the judge is going

20  to spend three months reading every document none of

21  us even referred to and try to discern what the

22  significance of it is on his own and write a decision

23  explaining how each document fits in, I'm not doing

24  that.  Okay?

25          I'm here to resolve whatever factual disputes

1  you need to have me resolve, and you need to tell me

2  what facts I need to consider to resolve them.  So

3  give me something you think I need to look at and I'll

4  look at it, but just because you've marked it or

5  submitted it or something else, don't think I'm going

6  to read it.  You tell me.  I'm giving you the chance.

7  I will read anything that you think I need to read to

8  decide this case, but don't say to me, Judge, I need

9  you to read every line and every exhibit.  I mean,

10  come on.  You've got, like, five books of exhibits.

11  Do you really want -- nobody has referred to most of

12  them.  Why should I read them?

13         MR. COWAN:  Your Honor, if I may.

14  Respectfully, I know your Honor suggested we provide

15  you a list today, but Ms. Fiske and I, for example,

16  have initiated some discussion about some exhibits,

17  and we think it might be efficient and prudent if we

18  provide you that list tomorrow.

19         THE COURT:  If you provide it tomorrow so

20  that tomorrow afternoon and tomorrow night I can read

21  whatever I have to read, then Friday you can come in

22  and make whatever arguments you want to make, and then

23  Friday afternoon I'll give you a decision, and then I

24  will be done with the case and I can move on to the

25  next thing I have, which I've got a lot to do so I've

1   got to get moving.

2        MR. BIAGETTI:  I have a proposal for you.

3        THE COURT:  Okay.  This is a very simple -- I

4   mean, among the problems that I have to deal with,

5   this is like about as easy a case as you can get to

6   deal with.  I can deal with this very easily.  Just

7   give me what you want me to read, and Friday afternoon

8   I'll tell you what the answer is.  I mean --

9        MR. BIAGETTI:  Would you consider -- since I

10   think we did a good job in streamlining the

11   presentation of evidence -- giving us the weekend and

12   having closings Monday morning?

13        THE COURT:  I've got a lot to do.  I've --

14        MR. FLYNN:  We don't agree with that.  We

15   would prefer it be Friday.

16        THE COURT:  Just give me what you need on

17   Friday.  I really need to get moving.  I've got a

18   major case that I've got pending motions in that I

19   need to get those out.  I've been working on those.  I

20   have the Tyco case, and I just have too much to do to

21   be spending a lot more time on this.  This is really

22   easy.  It's simple.  It's not all that complicated.

23        MR. BIAGETTI:  Your Honor, we did make sure

24   we reduced the number of live witnesses.  There's

25   still a lot of deposition testimony and the

1    transcripts coming in every day so --

2            THE COURT:  If I can't read them by Friday,

3    then you will have to come back in.

4            MR. BIAGETTI:  Listen, I'm not asking because

5    I think you need extra time.  I'm asking because I

6    think we would do a better job presenting to you if we

7    had the weekend.

8            THE COURT:  Well, let me see where we are

9    tomorrow and I'll make up my mind, but try to be ready

10   to get this thing resolved on Friday.

11           MR. FLYNN:  Your Honor, we'll be ready to

12   present a closing on Friday.

13           THE COURT:  Sit down, before you leave today,

14   and give my clerk -- or have for me at least first

15   thing tomorrow a list of -- here are the depositions

16   we want you to read and here are the additional

17   exhibits we haven't yet referred to that we aren't

18   going to refer to directly but we want you to look at,

19   and I'll just go up into my office and read them all.

20   I'm happy to spend time tomorrow -- if you want to do

21   what you've been doing, draw my attention to Exhibit

22   37, go over it with me, tell me why you think it

23   matters.  I can ask you questions about it and I can

24   go on to the next exhibit.

25           I'm happy to spend my time doing that.  I

1  think that's productive because then I can get right

2  to the heart of, well, why do you think this matters?

3  Because a lot of times if you just gave me this book

4  and read through stuff, I would read through it but I

5  probably would miss the significance of -- because you

6  guys make such esoteric points that to the extent they

7  have any bearing on the case, they have so little

8  bearing that it's hard to pick up.  I might benefit

9  from why you think it's important.

10        When a judge decides a case like this, you

11  have to try to look at it in a commonsensical way.

12  You ask:  Given what you know about human behavior,

13  which of the two competing interpretations of the

14  evidence make the most sense?  That you can come up

15  with 800 points that could conceivably under some set

16  of circumstances have marginal relevance to the

17  outcome.  The danger when you take that kind of

18  approach is you lose sight of what's really important,

19  and the case is going to get decided based on what's

20  really important and not some very minor issue.

21  That's just not the way human beings decide cases, but

22  I'm happy to have you go over any exhibit you want to

23  go over with me and tell me why you think it's

24  important, and let me react to it and I'll consider

25  it.

1          MR. BIAGETTI:  Before we leave, the

2    Harrington affidavit.

3          THE COURT:  Yes.  What did you want to say

4    about that?

5          MR. BIAGETTI:  Just at paragraphs 12 and 13

6    he gave his recollection, Judge, of how much drummed

7    Pyranol was generated over the course of a year, as

8    opposed to Pyranol that was disposed of in other ways,

9    and I know your Honor was curious about that before,

10   but you can see in paragraph 12 he talks about 200 to

11   300 gallons a month.  If there's 50 gallons in a drum,

12   that's six a month, times 12, that's about 72.

13         And then in 13 he says two or three times a

14   year, if not more, up to a thousand.  So if we decide

15   that's three times a year at a thousand, that's

16   another 3,000 gallons.  50 gallon drums.  It's about

17   60, plus the other 72.  Round numbers, 130 or so

18   drums, if not something additionally more.  It gives

19   you some order of magnitude of what he's talking about

20   in terms of --

21         THE COURT:  Except you agree to at least

22   3,000 drums have gone to this site.

23         MR. BIAGETTI:  Well, we agree that over

24   time -- and again, we're using the government's

25   reports -- that, yes, there were shipments and

1  pick-ups of more than that from year to year, but this

2  was one man's recollection of where some of the drums

3  at least were coming from.

4          THE COURT:  Okay.  Anything else you want to

5  tell me about Harrington?

6          MR. BIAGETTI:  No.  Oh, a housekeeping point.

7  I thought I heard the government say they had some

8  additional witnesses, and I thought we had a pretty

9  clear agreement on who the witnesses were and who was

10 being called.

11         THE COURT:  He made some comment about your

12 having another witness that may take some time.

13         MR. FLYNN:  Unless you don't want to call

14 him, of course.

15         MR. BIAGETTI:  Mr. Clark is looking forward

16 to testifying.

17         THE COURT:  You have this one guy tomorrow,

18 Clark.  We'll see how long that takes.  Tomorrow we'll

19 do Clark.  Give me a list of what you want me to read.

20 After Clark, if you want to take some time and each of

21 you point out things that you think are important in

22 the exhibits, we'll go through that.  Everything that

23 you point out to me I will consider, but if you don't

24 put it on a list of exhibits that you think I need to

25 read or you don't bring it to my attention orally

1  during the course of the trial, in my view you're not

2  going to be able to rely on it because I'm giving you

3  a full and fair opportunity to present it to me in a

4  way in which I can digest its significance.

5       So what I mean by this is if one of you loses

6  and appeals and goes to the Court of Appeals and say,

7  this judge made a crazy decision because he didn't

8  consider Exhibit 375, and Exhibit 375 was never

9  presented to me orally, it wasn't on the list of

10  exhibits you wanted me to read, I would hope the other

11  side would stand up in the oral argument on appeal and

12  say, Judges, the District Judge begged the parties --

13  instructed the parties to bring exhibits to his

14  attention.  He said he wouldn't consider them unless

15  they did.  They didn't bring it to your attention.

16  They're barred from asking you to reverse it on the

17  basis of that document.  Okay?

18       So I've made myself clear.  Bring it to my

19  attention, and I'll consider it.  If you don't bring

20  it to my attention, I don't expect any Court of

21  Appeals will let you rely on the document in trying to

22  challenge any decision that I make.

23       I want to give you a full and fair shot.  You

24  give me a full and fair shot by giving me the

25  documents that actually bear on the resolution of the

1  case.  Okay.

2          MS. FISKE:  Your Honor, may I quickly try to

3  take you up on your invitation to introduce a couple

4  of exhibits which I think are very --

5          THE COURT:  You want to do that now?  All

6  right.

7          MS. FISKE:  I think you will find these

8  exhibits very helpful to you, and I'll try to be very

9  quick about it.

10         THE COURT:  All right.  What number?

11         MS. FISKE:  We're going to start with Exhibit

12  36, which is a 30(b)(6) affidavit of GE's -- 30(b)(6)

13  designee, and the reason why I think you will like

14  this exhibit -- it's intended to supplement deposition

15  testimony given in a contribution case that GE brought

16  against Sprague.

17         THE COURT:  Is this objected to?

18         MR. COWAN:  Yes, your Honor.

19         MS. FISKE:  Turning to the third paragraph,

20  it describes a process after her deposition in which

21  the auditor reviews all of the GE records and provides

22  a summary.  Can you turn to paragraph 9, actually?

23         MR. COWAN:  I apologize.  Your Honor, I may

24  be able to short circuit this and sort of focus this

25  to what's in dispute.  To the extent you made any

1  previous objection to the attachments which

2  summarize -- it's entitled GE's Reconciliation of

3  Records of Pyranol sold to Fletcher's -- we withdraw

4  the objection to that portion of the affidavit.

5           MS. FISKE:  Your Honor had expressed an

6  interest in a summary of sales information, and I

7  think you will find a very helpful summary there.  The

8  United States doesn't completely agree with that

9  position because it characterizes the last two years

10 as sales, and we don't think that's a proper

11 characterization since no payment actually was ever

12 made.

13          THE COURT:  What are you talking about, the

14 exhibit now?  Are we looking --

15          MS. FISKE:  Yes.

16          THE COURT:  Tell me what the exhibit shows

17 that you think is significant?

18          MS. FISKE:  It shows GE's summary of the

19 total volume year by year of estimated gallons sold to

20 Fletcher's, and I use the term "sold" as they are

21 using it, which means --

22          THE COURT:  I will say transfer is a neutral

23 term.  They say sale.  You say whatever.  Okay.  So

24 that tells me -- when it says 1956, estimated sales

25 70, what does that mean?

1            MS. FISKE:  I believe that's the price.

2            THE COURT:  And gallons, 1,100, corrected low

3    estimate, corrected low-end range, corrected high-end

4    range, what do those mean?

5            MS. FISKE:  I think they weren't entirely

6    sure whether it was $3.50 a barrel or $3.75 a barrel

7    or $4.00 a barrel so they were estimating, but I think

8    for our purposes that we consider this a reliable

9    measure indicator of approximately how much -- what

10   volume was being transferred.

11           THE COURT:  I'm lost.  The corrected low-end

12   range estimated gallons -- so you're saying they're

13   drawing an estimate of gallons based on a sales record

14   as to how much was paid?  Is that what you're telling

15   me?  That $70 was paid, assuming a low-end price.  You

16   can infer from that that there were this many gallons.

17   Assuming a high-end price or vice versa you can --

18           MS. FISKE:  Yes.

19           THE COURT:  Okay.  So the low -- well, then

20   what we see is corrected low-end estimate and

21   corrected high-end estimate are --

22           MS. FISKE:  Honestly, your Honor, I think the

23   bottom line differences are so small --

24           THE COURT:  They're virtually the same.

25           MS. FISKE:  -- it's not worth our time.  I

1   don't think you need to dwell on it.  I think you can

2   move on to other aspects.  I just wanted to bring to

3   your attention there are other aspects of this

4   affidavit that I also think are very interesting.

5           THE COURT:  Well, what this affidavit tells

6   me -- one thing it tells me, in your view, is that

7   201,685 gallons of Pyranol were transferred to

8   Fletcher's between '56 and '67?

9           MS. FISKE:  Exactly.

10          THE COURT:  What's the stipulated amount?

11          MS. FISKE:  We don't have a stipulated amount

12  because it doesn't take into consideration that there

13  were some free loads in 1953 and --

14          THE COURT:  I thought we had a stipulation

15  regarding the volume.

16          MS. FISKE:  200,000.

17          THE COURT:  200,000.  All right.  So it's in

18  the range of what the documents shows.

19          MS. FISKE:  Right.

20          THE COURT:  What else is important about this

21  document?

22          MS. FISKE:  Can you turn to the paragraph

23  dealing with employee interviews, I believe?  I think

24  it's paragraph 5.  You heard Mr. Hooper testify about

25  Mr. Metevier's visit to the site.  Mr. Metevier, as

1   you recall, was the foreman of the scrap and salvage

2   department, probably one of the GE employees who had

3   the most contact with Fletcher's during the time

4   period or with Mr. Hooper.  He had -- in terms of the

5   question of use -- an arrangement for use and

6   disposal, Mr. Metevier recalled making the trip to

7   Milford and taking a tour of the Milford plant where

8   he was told that Milford used Pyranol as a defoliant

9   and/or that it was spread on fire lanes.

10          THE COURT:  All right.  Is there some

11  objection to this?

12          MR. COWAN:  Yes, there is, your Honor.

13          THE COURT:  What's the basis?

14          MR. COWAN:  The basis of the objection is

15  that it's inadmissible hearsay.  What we have here is

16  a witness who is recounting -- not necessarily

17  adopting -- a statement of a former employee, and

18  there's no doubt about this.  At the time the

19  statement was made, Mr. Metevier actually was dying.

20  He was dead at the time it finds its way into this

21  document, which is 2001, and in '79 or '80, many years

22  after he left the company, had a vague recollection of

23  a trip to Milford and a conversation or claimed

24  conversation that he heard.  We think that that's

25  inadmissible hearsay and it lacks any real -- to the

1  extent it has probative value, it's certainly

2  prejudicial --

3          THE COURT:  Ordinarily a 30(b)(6) witness of

4  GE who testifies about statements on behalf of the

5  company would bind GE, wouldn't it?

6          MR. COWAN:  Respectfully, Judge, this isn't a

7  statement on behalf of the company.  This is a

8  statement of a former employee who fifteen years after

9  departure from the company was asked, hey, what did

10  you hear?  Did you hear anything at the time?  So we

11  don't know -- first of all, we don't know that at the

12  time he was asked this statement was his present

13  recollection of the events at that time.  Much has

14  passed.  We had Mr. Hooper on the stand yesterday who

15  talked to us firsthand about this visit, and he said,

16  while there -- first of all, Mr. Metevier didn't even

17  see --

18          THE COURT:  What's the document that this

19  supplements?  Does it refer to some kind of

20  investigation or some kind of report that GE made?

21          MS. FISKE:  This is a document that

22  supplements her testimony because she was a 30(b)(6)

23  witness and she does not have personal knowledge --

24          THE COURT:  What is Siebel's Exhibit 5?

25          MS. FISKE:  It's her supplemental affidavit.

1  Can you go back so that we can look at the entire

2  exhibit?  In addition, your Honor, this is not

3  being -- Mr. Metevier's statement is not being

4  admitted for the truth of the matter asserted.  It's,

5  again, showing a state of mind, an intent, if you

6  will, of the company, and this is the company's

7  statement.  It's the company's deposition.

8          THE COURT:  What is Siebel's Exhibit 5?

9          MS. FISKE:  Can you get to the first page?

10 Siebel's Exhibit 5 -- I'm sorry -- was -- during her

11 deposition she is asked --

12         THE COURT:  I have to stop for the day.  My

13 reporter is tired.  We'll stop for the day.  Off the

14 record.

15         (Conclusion of Hearing at 4:35)

16

17                  C E R T I F I C A T E

18

19         I, Susan M. Bateman, do hereby certify that

20 the foregoing transcript is a true and accurate

21 transcription of the within proceedings, to the best

22 of my knowledge, skill, ability and belief.

23

24 Submitted: 2-10-09      /s/   Susan M. Bateman
                           SUSAN M. BATEMAN, CSR, RPR, CRR
25