**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 5-11-2009

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
                                *
UNITED STATES OF AMERICA        *
                                *  06-CV-354-PB
             v.                 *  November 10, 2008
                                *  9:55 a.m.
GENERAL ELECTRIC COMPANY        *
                                *
* * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF BENCH TRIAL - DAY FOUR
ORAL ARGUMENTS
BEFORE THE HONORABLE PAUL J. BARBADORO

APPEARANCES:

For the Government:        Catherine A. Fiske, Esq.
                           Peter M. Flynn, Esq.
                           Laura J. Rowley, Esq.
                           Donald G. Frankel, Esq.
                           U.S. Department of Justice

For the Defendant:         Peter A. Biagetti, Esq.
                           William M. Cowan, Esq.
                           Mintz, Levin, Cohen, Ferris,
                           Glovsky & Popeo, PC

                           Ignacia Moreno, Esq.
                           Thomas H. Hill, Esq.
                           General Electric Company

Court Reporter:            Susan M. Bateman, CSR, RPR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, NH 03301
                           (603) 225-1453

2

I N D E X

ORAL ARGUMENTS:                        PAGE

By Ms. Fiske                           24

By Mr. Biagetti                        71


ORAL RULING:


By The Honorable Paul J. Barbadoro     137

3

1                    P R O C E E D I N G S

2          THE CLERK:  Court is in session and has for

3    consideration a bench trial in United States of

4    America versus General Electric Company, civil case

5    number 06-CV-354-PB.

6          THE COURT:  All right.  Let's do some

7    housekeeping first.  I have read everything that the

8    parties have asked me to read, although it took me

9    about ten hours to do it.  And I wish that they could

10   have given me less to read, but I extend the courtesy

11   to the parties to actually read everything that they

12   send to me.  So we need to make sure that everything

13   that is on that cart is included in the record and so

14   that all of the exhibits have been identified and

15   those depositions that have been -- where you have

16   made designations and asked me to read the

17   designations -- are part of the record.  So what I

18   need to make sure the Clerk does is go through the

19   list of admitted exhibits with the parties after we're

20   done today and make sure that those items are all in

21   the record.  Any exhibits that the parties ask me to

22   admit during the trial and that they, in fact,

23   presented to me during the trial should also be

24   admitted, and you need to have a record of that.

25          Okay.  Now, there may be other exhibits that

4

1   the parties agreed to admit but that you didn't ask me

2   to read and didn't show to me.  In my view, those

3   should be stricken and not included in the record

4   because I made clear to you that anything on which you

5   wanted me to base the decision should be presented to

6   me.  And so I want to clean that up and remove

7   anything that was not shown to me from the record.  So

8   those will be treated as ID exhibits that were not, in

9   fact, introduced.  The Clerk needs to make that

10   distinction clear.

11          Finally, there may be some unresolved

12   objections to the admissibility of some of the

13   materials that you presented to me.  Perhaps not.

14   Perhaps you've agreed that all of those things can be

15   admitted, but if there are any -- if anyone is

16   asserting that I should not base my decision on any of

17   the materials you asked me to read because some of

18   those materials are inadmissible, you should stand up

19   now, identify what it is that needs to be stricken,

20   make your argument, and I will decide whether to

21   exclude it or not.  Otherwise, I'm going to treat all

22   of that as admissible, notwithstanding any objections

23   that had been previously made to it, either in the

24   final pretrial submissions or in a motion in limine or

25   anything like that, okay?  So if you want anything

1  stricken from the record that you presented to me to

2  read on Friday, stand up now.  Otherwise we're going

3  to include it in the record.

4          MR. FLYNN:  Your Honor, as you know, we have

5  the pending motion in limine for Neil Shifrin.

6          THE COURT:  I just want to be clear so

7  there's no doubt about this.  There are no pending

8  motions to strike anything that you asked me to read.

9  Now is your time to orally stand up and tell me, we

10  want you to strike Shifrin's deposition in its

11  entirety and here are the reasons why.  So speak now

12  and I will rule now.  So if you don't speak now and if

13  you can't even remember why you objected, how do you

14  expect me to know.  So tell me what you're objecting

15  to, why you're objecting to it and I will rule, and

16  otherwise I will admit, okay?

17          So what do you want to strike in the

18  materials that were given to me?

19          MR. FLYNN:  The United States would like you

20  to strike the deposition testimony and the report of

21  GE's expert, Neil Shifrin.

22          THE COURT:  And what's the basis for the

23  objection?

24          MR. FLYNN:  Essentially -- there's a few

25  bases, but if I can summarize, the general basis is

1   pretty much what he talks about is it's not something

2   that an expert needs to testify about.  It's common

3   sense.  It's something that --

4           THE COURT:  It's within the cannon of the

5   judge, and therefore is not properly the subject of

6   expert testimony.

7           MR. FLYNN:  Correct.

8           THE COURT:  All right.  Anything else you

9   want to say about that?

10          MR. FLYNN:  We do think he's also unqualified

11  for some of the areas that he was proffered as an

12  expert in.  He's an environmental engineer who

13  testified strictly about basic transport issues, and

14  here he's testifying about the regulations governing

15  disposal, about whether it makes commercial sense for

16  Fletcher to pick up material at GE, and then he

17  ultimately testifies on the ultimate issue of the

18  case, whether the scrap Pyranol is a useful product.

19          THE COURT:  Okay.  I overrule your objection.

20  The Shifrin deposition will be admitted.  I found it

21  to be of almost no value to me and haven't really --

22  and don't intend to rely on it in making any decisions

23  because it either says things that I already

24  understand, says things about which there are not

25  conflicts, or says things that I don't feel are

1    material to the analysis of the problem that you've

2    asked me to resolve so I don't intend to rely on it.

3    I'm going to admit it.  I just don't deem it to be

4    persuasive on any point.  Of course, subject to the

5    defendant making some argument to me in closing that

6    helps me understand why it is valuable to me.

7            All right.  Your objection is overruled.

8    What's the next thing you want to try to move to

9    strike, if anything?  Anything else?

10           MR. FLYNN:  I think that's it, your Honor.

11           THE COURT:  All right.  Do the defendants

12   want me to strike anything -- or any portion of

13   anything that they have submitted to me to review

14   here?

15           MR. BIAGETTI:  No, your Honor.

16           THE COURT:  Okay.  So those will all be

17   admitted then, Vinny.  And I think, therefore, we have

18   the record on which we're deciding the case.  The

19   record consists of the testimony of those witnesses

20   who testified live, the videotaped deposition, the

21   excerpts that were designated and played and/or read

22   by me in the deposition that was submitted to me, any

23   exhibits that were admitted during the course of the

24   witness testimony or that were admitted during

25   interludes between witness testimony where the parties

1   offered an exhibit and either did so by agreement or

2   there was objection and I ruled and admitted in whole

3   or in part the exhibit, and those materials that have

4   been submitted to me for review that I have read in

5   preparation for the closing arguments today.

6           That comprises the record on which I will --

7   the evidentiary record on which I will decide the

8   case.  Everybody agree?

9           MR. FLYNN:  Your Honor, I apologize.  My

10  colleague just reminded me that we had one other

11  objection that we would like to bring to your

12  attention.

13          THE COURT:  What is that?

14          MR. FRANKEL:  Your Honor, I believe that your

15  Honor designated certain portions of the Lloyd

16  Papageorge deposition where Mr. Papageorge testifies

17  concerning a market for used Aroclor, and we objected

18  to it based partly on your Honor's own ruling.  You

19  struck this evidence at the time of the summary

20  judgment proceeding on the ground that you found it

21  was based on hearsay and not based on his personal

22  knowledge.  So we would raise the same objection at

23  this point.

24          THE COURT:  I don't frankly remember, but are

25  you speaking about the deposition testimony that --

1   and I may be confusing the witnesses' names -- who

2   testified that it was useful as an extender or --

3   which one testified that it was useful as an extender

4   and which one testified that it was useful as a

5   plasticizer?

6           MR. FRANKEL:  Well, your Honor, I believe Mr.

7   Papageorge, who was a Monsanto employee, testified

8   that he believed there was a market for used Aroclor,

9   and basically if you read the --

10          THE COURT:  I didn't find any testimony about

11  the market for scrap Pyranol -- expert testimony to be

12  useful, and I'm just not going to consider it.  It

13  doesn't persuade me of anything, subject to the

14  defendants telling me why it does.  I found the expert

15  testimony extremely unhelpful on both sides.  It was

16  useful in telling me something I already knew from

17  other witnesses, which is that there are uses of

18  Aroclors as plasticizers and there were at the time

19  but as far as it said anything else -- the only thing

20  that I could glean from the depositions from the

21  experts that was useful was something that I already

22  knew, which is when you make a batch of something

23  using an Aroclor as a plasticizer, the Aroclor

24  comprises, by volume and by cost, a very small

25  percentage of the batch of whatever it is that you're

1  producing, and therefore it is very risky to use scrap

2  Pyranol as a substitute for virgin Aroclor because if

3  there's any contaminant in there that makes the batch

4  unsuitable to save two bucks, you may lose $2,000.  So

5  that businesses don't ordinarily do that kind of thing

6  when the constituent that they're using as a

7  substitute comprises such a small part of the cost of

8  the batch they're producing.  The risks are simply too

9  great.  Now, I didn't need an expert for that.  I

10  already knew that based on other testimony so it just

11  says something I already knew but -- that was useful,

12  but pretty much everything else was -- either I

13  already understood or it was not useful to me.

14         All right.  So I overrule your objection.  I

15  certainly don't mean to be inconsistent with what I

16  did in the summary judgment, but to the extent I don't

17  find it to be useful to me, it's a ruling of no

18  consequence, okay?

19         MR. FRANKEL:  Okay, your Honor.

20         THE COURT:  All right.  Anything else?  Okay.

21  So we now have identified the record.  I'm ready to

22  hear closing arguments, but I want to ask the parties

23  before I do, is the government in its closing argument

24  going to have a discussion about the correct

25  interpretation of the phrase "otherwise arranged for

1   disposal", or are you done with that discussion and

2   are you going to focus solely on the facts?

3          MS. FISKE:  Your Honor, we have understood

4   you to articulate a standard by which the government

5   can establish that scrap -- GE arranged for the use

6   and disposal of scrap Pyranol through its transfers to

7   the Fletcher site; meaning that the government must

8   establish by a preponderance of the evidence that GE

9   intended or had constructive intent that Fletcher's

10  would dispose of at least some of its scrap Pyranol.

11         The Court further articulated that

12  constructive intent is established if GE knew that

13  disposal was a substantial certainty at the time of

14  the transaction, and I will be presenting evidence to

15  you, your Honor, today -- or discussing the evidence

16  today in the context of that legal standard.

17         THE COURT:  All right.  So you're not going

18  to argue -- to the extent in the past you argued for a

19  broader standard, you preserved your right to argue

20  that, but you're not going to, in this closing

21  argument, try to advocate for that.

22         MS. FISKE:  That's exactly correct.

23         THE COURT:  Okay.  Then before we get into

24  the closing arguments, let me just explore with you --

25  because once I get on a case I start thinking about it

12

1  24 hours day before I'm done with it.

2          I wanted to ask a couple of questions about

3  the government, and then if the defendant has any

4  input on this.

5          The Burlington Northern case seems to me to

6  be wrongly decided, and I'm trying to understand and

7  explain and reconcile that with my own view that if,

8  for example, there is, in fact, an arrangement for

9  disposal, that is, GE knows that spills -- GE intends

10  to dispose of the waste Pyranol and knows that spills

11  will result, that those spills do qualify as a

12  disposal, but that the spills of virgin chemicals to

13  be used in a manufacturing process would not be.

14  Because Burlington Northern suggests that those are --

15  an arrangement for disposal occurs when there is an

16  arrangement to transport a virgin hazardous substance

17  and the transporter knows that spills will result.

18          That is, I think, wrong, and I think I have

19  an understanding as to why, under the language of the

20  statute, it is wrong, but my analysis about how

21  disposal works with a waste chemical is correct, and I

22  want to just ask a couple of questions and then make a

23  statement and get your reaction to it.

24          In order for there to be an arrangement for

25  disposal, CERCLA incorporates the definition of

1  disposal that's in the -- what's the solid waste --

2  what's the name of the act?

3          MS. FISKE:  RCRA, your Honor.

4          THE COURT:  It's the RCRA definition of

5  disposal.

6          MS. FISKE:  Solid Waste Disposal Act.

7          THE COURT:  Solid Waste Disposal Act.  And

8  therefore a disposal means discharge, deposit,

9  injection, dumping, spilling, leaking or placing of --

10  and this is what I want to talk to you about -- solid

11  waste or hazardous waste into or on any land or water,

12  et cetera, et cetera.

13          So an arrangement for disposal must be an

14  arrangement for discharge, et cetera, of a solid waste

15  or a hazardous waste.  A hazardous waste must be a

16  solid waste by the definition.  You can't have a -- it

17  can't be a hazard -- in order to be a hazardous waste,

18  you must be a solid waste.  If anyone doubts that,

19  I've got the definitions.  I thought I brought it down

20  here.  Where's my cart?  Right here.  Hazardous --

21          The RCRA definition -- or excuse me.  The

22  Solid Waste Disposal Act definition of hazardous waste

23  is a solid waste or combination of solid wastes

24  which -- blah, blah, blah.  So it's not a hazardous

25  waste unless it's a solid waste, and the definition of

14

1  solid waste is garbage, refuse, sludge -- skipping

2  over some things -- or other discarded material, and

3  the regulations interpreting the Solid Waste Disposal

4  Act define a solid waste as any discarded material

5  that is not excluded.  And a discarded material is any

6  material which is abandoned, recycled, considered

7  inherently waste-like, et cetera.

8         So I think there's a way -- and I don't know

9  if this has been explored -- but it seems to me that

10  an otherwise arranged for disposal of a hazardous

11  substance cannot occur unless the disposal is the

12  disposal of a solid waste, and a solid waste is an

13  abandoned or discarded material.  And therefore,

14  Burlington Northern, in my view, is wrongly decided

15  because what you are arranging to transport is not a

16  solid waste.  It is a hazardous substance but not a

17  solid waste.  The argument that the government might

18  make that -- well, spilling makes it a solid waste,

19  but that would be an entirely circular definition

20  because spilling of a hazardous substance

21  automatically made it a solid waste -- you wouldn't

22  have the definition of disposal that requires spilling

23  of a solid waste.

24         So the way to distinguish Burlington Northern

25  -- and I think consistent with the purposes of CERCLA

1   -- is to say that an agreement to transport a chemical

2   that is to be used in the manufacturing process is an

3   agreement that does not involve an agreement for

4   disposal because the substance -- although it's a

5   hazardous substance -- is not a solid waste; and the

6   spilling of it in that process does not make it a

7   solid waste, and therefore the agreement, even if it

8   includes or contemplates a spilling, is not spilling

9   of a solid waste and therefore it's not an arrangement

10  for disposal.  So Burlington Northern was wrongly

11  decided, even though it is true, in my view, that an

12  arrangement for transport of a solid waste under

13  circumstances where the arranger knows that spilling

14  will occur is an arrangement for disposal of a

15  hazardous substance.

16          Do you see that distinction?  Does the

17  government see that distinction?

18          MS. FISKE:  Your Honor, I would like to make

19  two points in response to that.

20          THE COURT:  First, do you see that

21  distinction?

22          MS. FISKE:  Yes, I see the distinction.

23          THE COURT:  And it's a way to say even my --

24  how I'm applying it here is right, and you don't have

25  to agree that Burlington Northern was right in order

1   for you to reach the conclusion that I'm reaching,

2   okay?  Now, what comment do you want to make?

3           MS. FISKE:  Thank you, your Honor.  First of

4   all in this case, as we've shown in our summary

5   judgment motion, that this material is a RCRA

6   hazardous waste because of the TCE content in the

7   material, and then the second point --

8           THE COURT:  You're missing the point, okay?

9   It is not necessarily a hazardous waste simply because

10  of the TCE content.  It has to be a solid waste to be

11  a hazardous waste, and a waste requires -- it's what

12  you're going to do with it.  It isn't a waste unless

13  it's abandoned, discarded, recycled or blah, blah,

14  blah.  There are certain chemicals that are inherently

15  waste-like, and they're defined in the regulations.

16          Now, maybe you can say that this is

17  inherently -- meets the -- the regulation talks

18  about- -- if you get into -- this isn't in the

19  statute.  This is in 40 C.F.R. 261, 2(d).  Inherently

20  waste-like material:  "The following materials are

21  solid wastes when they are recycled in any manner.",

22  and it lists hazardous waste numbers FO20, F021; under

23  certain circumstances, F022, 23, 26 and 28.  Now,

24  maybe TCE is one of those wastes, is it?  Is it one of

25  those substances?  Is it a 21, 20, 22?

 1          MS. FISKE:  Yes, it is.

 2          THE COURT:  I'm not an expert in

 3   environmental regulations.  Do you know what those

 4   numbers mean, FO20, FO21, FO22?

 5          MS. FISKE:  That's a reference to a list.

 6          THE COURT:  And is TCE one of those?

 7          MS. FISKE:  Yes.

 8          THE COURT:  So if it involves recycling of

 9   TCE, it is a hazardous waste because it's deemed to be

10   a solid waste so, yes, but not inherently, okay?

11   Aroclor is not a solid waste unless it is to be

12   abandoned, et cetera, et cetera.  TCE is not a solid

13   waste unless it is to be recycled.  That's my point,

14   okay, and that's why -- because none of you have been

15   doing environmental law as long as I have.  Back in

16   the early ages of environmental law was when I was an

17   environmental lawyer, and we always thought about

18   arranger liability as generator liability, but it

19   isn't and it's clear when you look at the statute that

20   it isn't.  And you cite a piece of legislative history

21   that suggested that Congress wanted generator

22   liability, but the language that he used very clearly

23   draws a line between generators and arrangers for

24   disposal.

25          It might have decided -- and indeed many

1    people argued that it should have allocated costs with

2    the person that creates the substance, but they did

3    not, and if they did something different and they

4    wanted to put the concept of polluter pays --

5    identifies the polluter not as the generator but the

6    person that arranges for disposal.  And the problem

7    with Burlington Northern is it gets very close to

8    saying the manufacturer of a hazardous substance is an

9    arranger for disposal because -- as almost anybody who

10   does environmental law knows -- all hazardous or

11   environmental chemicals will spill at some point, and

12   everybody knows that.  You could simply say all

13   manufacturers of hazardous waste arrange for

14   the disposal -- of hazardous substances arrange for

15   the disposal of it because they know that spilling is

16   certain to result, and that's an overly expansive,

17   unrealistic definition of the arranger liability

18   standard.

19          Why is all of that important to me?  Because

20   the definition that I am employing here is one that I

21   think is consistent with the overall purposes of

22   CERCLA.  It does not expand liability so broadly that

23   it captures generators of waste who know that spilling

24   is going to occur.  It's a narrower definition that

25   requires that there be disposal of a solid waste, and

1   that is an important limiting principle on the

2   definition that I'm using because otherwise it would

3   expand the definition in the way that Burlington

4   Northern has.  In a way that I think is

5   unrealistically broad.  All right?  So that if

6   Burlington Northern is reversed by the Supreme Court,

7   it does not necessarily follow that the standard that

8   I'm using is incorrect because I am using a different

9   standard that I think is narrower, that I think is

10  more consistent with the purposes of CERCLA and better

11  reflects the actual language of the statute that I'm

12  required to interpret.

13          Does anybody not understand me, or does

14  anybody want to say anything about what I have said?

15          MS. FISKE:  I understand, your Honor.

16          MR. BIAGETTI:  I agree with what you said,

17  your Honor, and I would only add that the articulation

18  you gave us on Thursday was not only narrower but more

19  demanding than Burlington Northern.

20          Burlington Northern talked about to avoid

21  imposing arranger liability on anybody that

22  manufactured -- that in that case, they decided there

23  was necessary, immediate, inevitable spillage out of a

24  process under the arranger's control.

25          What your Honor has I think articulated to us

1    on Thursday was GE would have to know and understand

2    that not all of it would be able to be used and that

3    substantial quantities of it would have to be disposed

4    of.  There's the increment of extra demand that I

5    think allows you, in your words, to avoid your huge

6    Burlington Northern problem.

7             THE COURT:  It's two things.  It is that --

8    it is my view that arranged for disposal complicates

9    both cases in which the objective of the arrangement

10   is disposal and cases in which the arrangement is such

11   that the arranger knows that disposal will result from

12   the arrangement.  That is narrower in the sense that

13   Burlington could be interpreted to suggest that even

14   where the arranger doesn't know it, but it is in fact

15   inevitable that he's conclusively presumed to know it,

16   the government -- that's the government's kind of

17   constructive knowledge standard that I think goes one

18   step too far in defining arranger liability.

19             Second, and equally important to distinguish

20   in Burlington Northern, I think the arrangement must

21   involve the discharge, deposit, injection, dumping,

22   spilling, leaking or placing of a solid waste.  And a

23   chemical that is being used in a manufacturing process

24   is not at that point a solid waste, and it does not

25   become a solid waste merely because it is spilled.  A

1   waste has got to be a -- a solid waste has to be

2   discarded, abandoned, recycled or inherently

3   waste-like or a military munition identified in the

4   statute not otherwise accepted under the regulations.

5   And ordinarily if I make Aroclor -- for example, when

6   Monsanto sells Aroclor to GE, Monsanto knows when it

7   sells Aroclor to GE that GE is going to spill it.

8   They know it.  It will happen.  Does that mean the

9   arrangement to sell Aroclor to GE is an arrangement

10  for disposal?  It is not because Aroclor is not a

11  solid waste.  And so I think those are two important

12  limiting principles on my understanding of the phrase

13  "otherwise arranged for disposal" that distinguish

14  Burlington Northern and in my view cabin the

15  definition in such a way that is consistent with the

16  purposes of CERCLA, one of the principal purposes

17  being polluter pays; and as that concept has

18  developed, it is the person not that manufacturers but

19  that arranges for disposal that is identified in this

20  context as the polluter.

21          And so I am using that narrower definition,

22  and I have arrived at it by trying to be true to the

23  text of the provision that I am interpreting.  Now, to

24  resolve this case I don't need to give a

25  finely-developed definition of that phrase.  I think

1   I've identified it with enough specificity to permit

2   the parties to argue how the evidence supports or

3   doesn't support that definition, and I think it gives

4   me enough specificity to apply the facts to the

5   phrase, as I've identified it, in such a way as to be

6   able to decide this dispute the parties have presented

7   to me, and that's all I need to do.  The appellate

8   court might be more -- need to be more specific in how

9   it applies it.

10        All right.  Does anybody want to say anything

11   more about the legal standard?  If not, we can turn to

12   the closing arguments on the facts.

13        MR. BIAGETTI:  Just, your Honor, as to the

14   wrestling over TCE versus Pyranol.  There's no

15   evidence in this record that PCBs from either source

16   were found at this site, even when the EPA arrived,

17   and no evidence on this record that there was any

18   discarding done by Fletcher of anything in any drums,

19   as opposed to a release, which is a very different

20   portion of the statute.  Release includes abandonment.

21   Disposal, discard, does not.

22        THE COURT:  Well, an arrangement for disposal

23   by itself does not make somebody liable for clean up

24   costs, okay, but the issues that you've just cited to

25   me may be evidence about whether there was an

1    arrangement for disposal, but they aren't dispositive

2    of the question.  Because as I think we all have

3    agreed at this point, what matters is what was the

4    nature of the arrangement and what did the arranger

5    understand would be the result of the arrangement.

6    That's all I need to focus on.  What actually happened

7    may have some relevance in trying to give meaning to

8    that problem, but I'm not examining here whether

9    Fletcher disposed of scrap Pyranol at the site.

10   That's not the issue because you conceded the other

11   elements of being liable here for arranger liability.

12              The only test is did GE otherwise arrange for

13   disposal of scrap Pyranol in any -- to any significant

14   degree during its arrangement with Fletcher, and on

15   that point I think there clearly was an arrangement

16   with Fletcher for the -- doing something with the

17   scrap Pyranol.  I think you agree.  So there was an

18   arrangement.  GE otherwise arranged with Fletcher to

19   do something with the scrap Pyranol.  It's a question

20   of what was the nature of the arrangement?  Did GE

21   arrange for disposal of it, as I've identified that

22   term, and that's where the focus needs to be today

23   because that's the only question that I'm going to

24   resolve.

25              All right.  So with that in mind, the

1   government can go ahead.   Present your argument.

2          MS. FISKE:   Your Honor, can we ask the focus

3   to be switched over to the U.S.?

4          THE COURT:   Okay.

5          MS. FISKE:   This is a case about arrangements

6   for the use and disposal of GE's hazardous waste at

7   the Fletcher's Superfund site in Milford, New

8   Hampshire.

9          GE arranged for the transfer of scrap Pyranol

10   to Fletcher that GE knew was a rare and unpredictable

11   mix of hazardous substances, including spent TCE.

12          Fletcher's never used any more than two to

13   three drums a year of this material for his own

14   manufacturing operations.   The balance was transferred

15   to third parties, including a company by the name of

16   Webtex or Webster.   Some of it was also disposed of by

17   Fletcher's on the site, and much of the scrap Pyranol

18   remained unused for many years from leaking drums on

19   the site.

20          At the time GE did not care whether

21   Fletcher's used any of this scrap Pyranol or disposed

22   of it all.   Mr. Abbe admitted that during his video

23   deposition that GE -- he would have transferred it all

24   to him even if he knew Fletcher's was using it all as

25   a weed killer, insecticide or dust suppressant.   This

1  is because scrap Pyranol was a hazardous waste

2  disposal problem for GE.  GE dumped it in the Hudson

3  River, put it in landfills or gave it to people to

4  dump on the ground as a dust suppressant, defoliant or

5  insecticide.  All that the corporation cared about was

6  removing it in the most economical manner possible.

7          THE COURT:  Well, the most damaging statement

8  in Abbe's deposition is the following:  "I don't think

9  that that was of any concern.  We just hoped he was

10  able to use some of it, and the balance of it he could

11  dispose of it."  That's the one sentence in Abbe's

12  deposition testimony that is the most damaging

13  statement to GE in this case.  Don't you agree?

14          MS. FISKE:  Yes, I do, your Honor.  Most

15  importantly, not only did GE not care whether

16  Fletcher's used or disposed of it, but GE knew or

17  intended that hundreds of drums would be disposed of

18  by Fletcher's.  The United States asks this Court to

19  find GE liable for the cost of cleaning up the

20  hazardous substances found in the scrap Pyranol at the

21  Fletcher's site.

22          As you indicated earlier, the only discussion

23  before you today is whether GE's transfer of the scrap

24  Pyranol to Fletcher's constituted an arrangement for

25  the disposal of hazardous substances within the

1   meaning of section 10783, as you have defined the

2   issue, and for purposes of today the United States

3   will be discussing the evidence to show that by a

4   preponderance of the evidence, the United States

5   easily meets the standard that you have articulated.

6           In terms of the framework for my argument

7   today, my presentation will start with the discussion

8   of the nature of scrap Pyranol itself.  Second, I will

9   review a chronology of the shipment from GE to

10  Fletcher's and what happened to the material at the

11  site.  And then finally, I'll turn to a discussion of

12  the evidence that shows by a preponderance that GE

13  intended or had knowledge that disposal was a certain

14  result of its arrangements for some of the material.

15          In terms of the scrap Pyranol, the reason I

16  start with the discussion of that is because you can't

17  even meaningfully discuss the chronology and the

18  transfers without a foundation and an understanding of

19  what scrap Pyranol was.  In addition, your Honor has

20  noted that what GE knew about the nature of scrap

21  Pyranol has a direct bearing on the credibility of

22  GE's claims that it believed at the time that all of

23  it would be used by Mr. Fletcher.

24          THE COURT:  To me one of the key questions

25  is:  What did GE know was in the drums?  There are

1  several questions that I think you need to ask

2  yourself to try to resolve this.  What was the

3  arrangement with Fletcher?  That is, what were its

4  terms?  What did the parties understand the

5  arrangement to contemplate?  That's one question you

6  need to answer.

7          A second central question is:  What was in

8  the drums?  Because GE knew what was in the drums.  So

9  what was in the drums?

10          A third question you need to ask yourself is:

11  What did GE know about Fletcher?

12          A fourth question you need to ask yourself

13  is:  What did GE know about the potential uses for

14  scrap Pyranol?  And so what did GE, itself, do with

15  scrap Pyranol that did not go to Fletcher and what did

16  it understand it was -- were potential uses for scrap

17  Pyranol?

18          Those questions, to me, seem to be the

19  central questions that one needs to ask in order to be

20  able to answer the question:  Was this an arrangement

21  for disposal?  That's how I ordered my analysis as I'm

22  thinking through the problem.

23          MS. FISKE:  Exactly, and I'll turn to

24  answering your question:  What did GE know about what

25  was in the drums?  That's one of the questions that

1  you've asked.  Scrap Pyranol represented a large

2  volume of waste generated by GE.  The United States

3  acknowledges that some of the drums were pure --

4  virtually pure PCBs.  Mr. Hooper has described that

5  material as being relatively thick, almost like

6  molasses.

7          THE COURT:  Reading the depositions, here's

8  what I understand.  There were some occasions where

9  Pyranol would be -- where they would attempt to refine

10 Pyranol from Aroclor, and for whatever reason they

11 couldn't get it to the standard that they wanted and

12 they would have to scrap the batch.

13         In those cases the result would be a

14 relatively pure Pyranol that simply didn't meet the

15 standards, and when a batch like that has to be

16 scrapped and drummed, there may be a number of drums

17 that are Aroclor -- something relatively close to

18 Aroclor or relatively close to Pyranol with a

19 relatively small number of contaminants in it.  Do you

20 agree with that?

21         MS. FISKE:  I do, your Honor.

22         THE COURT:  So there were occasions where

23 they couldn't get a batch to meet standard.  In that

24 case it hasn't fallen on the floor.  It hasn't mixed

25 with TCE, mineral oil and that kind of stuff.  It

1   hadn't gotten a lot of metal in it.  It simply did not

2   get to the standard they want.  They tried.  They

3   processed it with the fuller's earth.  They can't get

4   it up to spec and they decide to declare it scrap.

5   That would be the kind of drums that would contain

6   stuff that would be pretty close to Aroclor without a

7   lot of other junk in it.

8           MS. FISKE:  Exactly.  There's a possibility

9   in that scenario that it might have been put in a

10  secondhand or used drum that also contained a material

11  of a different sort but I --

12          THE COURT:  Sometimes, yes, but if there were

13  a whole batch, they're going to have more than 55

14  gallons of it.  So you're going to have to fill

15  multiple barrels with it in order to get rid of the

16  batch.  Sometimes they put the batch into the river

17  but sometimes they drum it, and I think it's fair to

18  say that that would happen.

19          MS. FISKE:  I absolutely agree with that.

20          THE COURT:  Although -- let me ask you this.

21  I also understood that there was a scrap Pyranol tank

22  that was sometimes used, and that that would

23  accumulate over time with Pyranol from a variety of

24  sources.  What can you tell me about that?

25          MS. FISKE:  I agree with that also, your

1    Honor, and I think that tank may have also included

2    sometimes mineral oil, which was another dielectric

3    fluid that was sometimes in capacitors.  Sometimes

4    that material could get mixed into that scrap Pyranol

5    tank or possibly TCE used to clean out the tanks might

6    also become mixed with that, and that would be a

7    scenario where you might have a case where Fletcher's

8    chemist -- you heard Mr. Hooper testify that the

9    chemist would open the drum and couldn't even decipher

10   what was in there because there was so little PCB.

11   That material might have come from a scrap Pyranol

12   tank or come from other sources.

13          THE COURT:  All right.  I think there is

14   evidence to suggest that at least some of the Pyranol

15   was contaminated in a way that made it unusable as a

16   dielectric for GE but did not include large quantities

17   of other contaminants, such as mineral oil, TCE, dirt,

18   other -- water -- other matters that would

19   contaminate.

20          MS. FISKE:  I agree with that also, your

21   Honor.

22          In terms of quantities, there was testimony

23   that some of the drums contained as much as 22 percent

24   TCE, and that was demonstrated by Monsanto's testing.

25   You heard Mr. Hooper also --

1           THE COURT:  Let's be clear about this.

2  Everybody knows this, but just for the record, TCE was

3  a commonly used degreaser that was used to clean parts

4  that had been exposed to other kinds of substances

5  during the manufacturing process, and TCE was used

6  extensively in this process to clean the capacitors

7  after they had been infused with Pyranol, and TCE was

8  used in such a way that it would result in being --

9  getting into drip pans, spilling Pyranol with TCE in

10 it, and I think significantly GE did use TCE

11 distillers that took TCE that had been mixed with

12 Pyranol and distilled off TCE, leaving a residue which

13 had to be cleaned out periodically from the TCE

14 distillers that was largely a sludge of Pyranol and

15 whatever other chemicals were in there and whatever

16 TCE didn't get fully recycled.  And so it was vitally

17 important to GE's manufacturing process that there be

18 no TCE in the dielectric fluid that was used in the

19 capacitors so any Pyranol with TCE in it would have to

20 be discarded.

21          MS. FISKE:  Exactly, your Honor.

22          You also heard testimony through deposition

23 transcript of a GE employee --

24          THE COURT:  Can you tell me about -- I read

25 about -- and I'm not sure I fully understand this, but

1   in addition to the use of Pyranol to infuse

2   capacitors, they talked about -- in one deposition --

3   about it being used as a pump fluid.  Can you tell me

4   about that, it being used as pump oil?  It almost

5   sounded like it was in the hydraulic pump that was

6   used during the manufacturing process, and that that

7   would periodically have to drained and cleaned, as is

8   always the case with those kinds of pumping fluids.

9   Do you agree that Pyranol was used for that purpose?

10          MS. FISKE:  Your assumption on that is the

11  same as mine.  Monsanto sold Aroclors as hydraulic

12  fluids, and I assume, as you have, that it was used in

13  pumps.

14          THE COURT:  Well, I'm not assuming.  There

15  was testimony in one of the depositions from a GE

16  employee who talked about it being used in the pumping

17  process.  So that would be another area in which you

18  would have contaminated Pyranol that is not Pyranol

19  that's used in the infusing or impregnating process

20  but is actually used as a hydraulic-type fluid.

21          MS. FISKE:  Exactly, and that is material

22  that was also scrapped and labeled scrap Pyranol on

23  it.

24          THE COURT:  Okay.

25          MS. FISKE:  You also heard testimony from GE

1   employee Stanley Huchro that some of the drums of

2   scrap Pyranol contained as little as 25 to 30 percent

3   PCBs.  As Mr. Hooper testified, you only had to shake

4   the drum to tell that some of them were thin and some

5   of them were extremely thick, and as I mentioned

6   earlier --

7            THE COURT:  What do you understand Hooper to

8   mean when he talks about thin and thick?  Are you

9   talking about viscosity or specific gravity?

10           MS. FISKE:  I think, as you indicated

11  earlier, the witnesses used thin and thick sometimes

12  as a proxy for specific gravity.  They are two

13  different concepts.

14           THE COURT:  See, I think they use thin and

15  thick to refer to differing viscosity and that they

16  used a hydrometer to measure specific gravity, but

17  when they talk about thin and thick Pyranol, they're

18  talking about things with differing viscosity

19  because -- I don't know if you know -- TCE is a

20  substance with very low viscosity.  Aroclor is

21  something, according to the testimony -- I've never

22  seen it -- but that has a heavier viscosity and that's

23  what -- I understood Hooper to be talking about

24  differences in viscosity when he talks about thick or

25  thin because he would talk about heavy or light if he

1  were talking about specific gravity.

2          MS. FISKE:  I agree with you, your Honor.

3          THE COURT:  Okay.

4          MS. FISKE:  We've been discussing the various

5  types of material that could be found in a drum of

6  scrap Pyranol, but there's no evidence in the record

7  that GE made any effort to distinguish between grades

8  of scrap Pyranol.  It was all treated the same.

9  Without distinction, some of it was sent to landfills,

10  some was dumped into the Hudson, some was sent to

11  municipalities for use as dust suppressants, and as we

12  know, some of it was transferred to Fletcher's.

13          THE COURT:  There's some hint in the record

14  that at various times GE explored the possibility of

15  sending Pyranol back to Monsanto to see if it could be

16  reclaimed.  What can you tell me about that?

17          MS. FISKE:  I believe, your Honor, that some

18  of it was, in fact, sent back to Monsanto to be

19  reclaimed, and it was the higher quality material that

20  was sent back -- the type of material that we talked

21  about initially.

22          THE COURT:  Isn't that an effort at sorting

23  then that you say never occurred?

24          MS. FISKE:  Okay.  That's a fair point.  I

25  should say with respect to the material that was

1  transferred to Fletcher's, there was no effort to

2  distinguish between the types of material --

3          THE COURT:  I thought the Monsanto effort was

4  ultimately deemed unproductive because the cost of

5  trying to recycle it was greater than the potential

6  benefit to Monsanto so it didn't end up doing that to

7  any substantial degree.  Have I got that wrong?

8          MS. FISKE:  I would agree with that and there

9  were -- yes, I think you have that right.

10         THE COURT:  All right.

11         MS. FISKE:  The commonly understood use for

12  scrap Pyranol at the time was to apply it to the

13  ground as a dust suppressant, weed killer or

14  insecticide.  Several GE employees knew it was being

15  used for that purpose, including Mr. Abbe.  GE

16  employees also knew there was no market for the

17  material and that except for Fletcher's, no one wanted

18  it; with a possible exception for use as a dust

19  suppressant.

20         THE COURT:  There was testimony that it was

21  used in road oiling -- in effect, dirt road oiling by

22  communities, but that is an arrangement for disposal.

23  Under the statute, road oiling is clearly an

24  arrangement for disposal.  And so the only

25  transactions that I can see that GE engaged in with

1  Pyranol that did not involve -- potentially did not

2  involve disposal was Fletcher.  Everything else that

3  they did with Pyranol was arrangement for disposal,

4  and so leaving arguable whether its transactions with

5  Fletcher were different or whether they were like all

6  of the other arrangements which GE had for scrap

7  Pyranol, which were arrangements for disposal.

8          MS. FISKE:  Exactly, your Honor, and we do

9  acknowledge that Fletcher's used a small amount of

10  scrap Pyranol in a specific type of paint that

11  Fletcher's made.

12          THE COURT:  And there is evidence in the

13  record that GE understood that Fletcher had a use for

14  it that involved its use as a plasticizer in certain

15  kinds of paints.  I think there's evidence to suggest

16  that Clark knew that, Abbe knew that, others knew

17  that.

18          MS. FISKE:  I don't think Mr. Clark had ever

19  heard the term plasticizer before, but we'll get to

20  discussion of that.

21          THE COURT:  Okay.  I may have that wrong.

22          MS. FISKE:  Our paint expert, Richard Benito,

23  who was in the paint industry for over 45 years,

24  thought it would be disastrous to add scrap Pyranol to

25  paint.  The reason for this is because of the

1    inconsistent and variable nature of scrap Pyranol.  It

2    wasn't that one drum of it might theoretically be able

3    to be added to paint if it was all the same, but

4    because of the incredible varying nature, it was like

5    a Russian roulette, what --

6         THE COURT:  Well, but the important point is

7    how risky is it depends upon what's the potential

8    savings per batch to substitute.  And because it

9    comprises less than 5 percent of the batch, the

10   difference in cost versus the cost of the entire batch

11   is such that it would render the transaction highly

12   risky from an economic perspective.

13        If you were going to use 95 percent Aroclor

14   in the application and you substituted 95 percent

15   scrap Pyranol, you might be much more willing to take

16   a risk because if you could save -- since scrap

17   Pyranol was sold to Fletcher at less than 1/50th of

18   the cost of Aroclor, if you could use it as a

19   substitute -- and even if you had to throw out ten

20   batches to get one good batch, it might still be

21   economically viable, but because its use as a

22   plasticizer comprises such a small percentage of the

23   total cost of the batch, it is truly a kind of Russian

24   roulette to put it in there.  Because if you lose one

25   batch, you have to gain a huge savings on all of the

1  other batches to make up for the cost.  That's the

2  problem.

3         MS. FISKE:  That's exactly right, your Honor,

4  and that's probably why -- even though GE was making

5  coatings at the same time in Schenectady, New York

6  that included Aroclors as an ingredient, it's probably

7  why GE never tried to use scrap Pyranol in any of

8  its --

9         THE COURT:  You can draw inferences from

10 several different things.  That GE never used it.

11 That GE never found a person willing to use it or

12 another person never approached GE who was willing to

13 use it, and that the amount that Fletcher paid was so

14 low relative to the cost.  All of those things suggest

15 that what your expert says is likely to be true and

16 you could argue would be understood to be true by GE

17 at the time it was engaging in the relationship

18 because these were all things that were known to GE.

19        GE knew it wasn't using it in its paint

20 operations.  GE knew no other customer had come

21 forward willing to buy scrap Pyranol.  GE knew what it

22 was charging Fletcher for the scrap Pyranol.  GE knew

23 what Aroclor cost GE.  All of those things are

24 knowable to the people at GE who are interested in

25 making a profit and are able to process that

1  information in a reasonable economic way.  So those

2  are the arguments I think you would draw from what GE

3  knew and knew all of those things, and I think that's

4  the way you try to make that argument about what GE's

5  position was at the time.

6        MS. FISKE:  I agree with that, your Honor.

7  In addition, from a layman's perspective, it defies

8  common sense that all this scrap Pyranol could be

9  added to paint.  Some of it was thick.  Some of it was

10  thin.  Some of it was black specks.  Some of it was

11  amber.  Some of it had cigarette butts.  It may be

12  possible to imagine adding nearly pure Pyranol to

13  paint but not the mix that was being sent to

14  Fletcher's, and even Mr. Abbe agreed --

15        THE COURT:  Your expert doesn't say that -- I

16  didn't read your expert to say that TCE, itself, was

17  incompatible with a paint usage.  What I understood

18  him to be saying was unless you know how much TCE is

19  in there, you can't get the formula right because TCE

20  might substitute for another solvent that you're

21  using -- a hydrocarbon solvent you're using, but

22  unless you know how much is in there, the adjustment

23  of your paint formula is not going to be right and you

24  run the risk of it being too thin if there's too much

25  TCE in a given batch.

1          MS. FISKE:  That's exactly right, your Honor,

2    but Mr. Abbe, himself, admitted that he was curious at

3    the time how such a small paint company could have

4    been using these large quantities of scrap Pyranol to

5    make paint and thought they would have wanted it to be

6    clean, and I interpret that to mean, you know, a

7    consistent material.

8          But with that background on scrap Pyranol, I

9    would like to now turn to a timeline that we prepared

10   for you marking out the chronology of the shipments of

11   scrap Pyranol to Fletcher's.  That's Exhibit 78.

12         THE COURT:  What do you need?  You're not

13   seeing it on your screen?

14         MS. FISKE:  I wasn't, but it's on now, your

15   Honor.

16         THE COURT:  Okay.

17         MS. FISKE:  The timeline is helpful to

18   demonstrate that at certain points during the

19   GE/Fletcher's relationship there was no question that

20   GE knew or intended that Fletcher's dispose of some of

21   the scrap Pyranol that GE did not want and that

22   Fletcher's could not use or did not want.

23         Starting at the beginning you heard Mr.

24   Hooper testify that in 1953 free loads of scrap

25   Pyranol arrived at the Fletcher's Milford site from

1  GE.  You heard Mr. --

2          THE COURT:  Couldn't that just be a product

3  sample?  A company that wants to sell a chemical to a

4  company to be used saying, here, let me give some of

5  this to you for free and see if you like it.

6          MS. FISKE:  Exactly, and if that was the

7  beginning and the end of the relationship and those

8  were the only drums that Fletcher's ever received, we

9  might not be here today, but that's how the

10 relationship started.

11         You heard Mr. Fletcher's son explain that Mr.

12 Fletcher was a junk dealer.  He liked to trade in

13 chemicals, and his son even referred to him as a

14 chemical junky.

15         You heard Mr. Hooper testify that he didn't

16 think that Mr. Fletcher bought that material to use to

17 make paint but that he wanted to make a dime on it.

18         So during the intervening years from '53 to

19 '56 Mr. Fletcher starts looking for a customer who

20 might be interested in buying this material from him,

21 and ultimately Mr. Fletcher does find Webtex as a

22 customer.

23         THE COURT:  I think GE could make a little

24 more from Hooper's testimony than that.  I gathered

25 that even before he found Webtex he was getting rid of

1    some of the Pyranol.  He talked about some of it being

2    shipped even before the Webtex relationship, implying

3    that there might be other customers.  I don't think we

4    can rule that out from the Hooper testimony.

5           MS. FISKE:  I agree with that.  There is

6    testimony to that effect.

7           In 1956 Fletcher starts taking its first

8    trips to GE to pick up scrap Pyranol from the Hudson

9    Falls and Fort Edwards facilities.  When Mr. Hooper

10   first goes there, he meets a man named Mr. Metevier

11   who is in charge of the scrap salvage yard.  During

12   the course of his relationship with Mr. Metevier,

13   Webster complains about the quality of the scrap

14   Pyranol, that it's too thin and junky.  These

15   complaints are conveyed to Mr. Fletcher, who agrees --

16   these complaints are conveyed to Mr. Metevier who

17   agrees that to compensate for the poor, junky, scrap

18   Pyranol he's going to give more of the same scrap

19   Pyranol to Fletcher's, and that was an acceptable

20   arrangement at that time between Fletcher's and GE --

21          THE COURT:  The key fact you're omitting is

22   that none of it would be returned to GE so that if

23   Fletcher is saying, it's too thin, I can't use it, and

24   they say, okay, we'll compensate by giving you some

25   free loads and it isn't returned, what inference does

```
 1  GE draw from what communications it had with Fletcher
 2  about things that could not be used?  Now, I think
 3  GE's argument would be, well, there's testimony about
 4  mixing and that he could mix it together and still get
 5  it to a sufficient quantity.  That's one possible
 6  interpretation, and another is even if he understood
 7  that these -- this scrap Pyranol was not all of
 8  sufficient quantity to be usable by Fletcher --
 9          MS. FISKE:  We favor the latter
10  interpretation and inference.
11          THE COURT:  I thought you would.
12          MS. FISKE:  Somewhere in the 1963-1964 time
13  period Mr. Varnum succeeds Mr. Metevier as foreman of
14  the scrap and salvage yard.  During this era Mr.
15  Varnum no longer agrees to give free loads of scrap
16  Pyranol to Mr. Fletcher to compensate for the poor
17  quality.  As a result, Mr. Fletcher instructs his
18  drivers to come to the site prepared with a hydrometer
19  to test the drums to make sure they achieve a specific
20  gravity that's desirable to Webster.
21          THE COURT:  Have you figured out -- I'm still
22  baffled by the specific gravity analysis because if
23  thin meant light and TCE were the principal
24  contaminant in many of the drums, according to the
25  testimony I saw, TCE has a higher specific gravity
```

1 than Pyranol.  It's thinner, less viscous, but has a

2 higher specific gravity.  So I don't know how you can

3 tell anything meaningful about -- through a hydrometer

4 analysis if the problem is to avoid contaminants.

5          MS. FISKE:  Mineral oil and pump oil I

6 believe --

7          THE COURT:  Do have lower gravities.

8          MS. FISKE:  And water.

9          THE COURT:  As does water, obviously, but I

10 really never really understood how the hydrometer

11 really --

12          MS. FISKE:  I agree with your Honor that it's

13 somewhat of a puzzle, and I was surprised when I first

14 observed that TCE was heavier than water, but I think

15 in the context -- the really important thing is that

16 GE observes that some drums are being rejected and

17 that that's what really matters.  That they see the

18 drums being tested.

19          THE COURT:  That's a good point.  Okay.  So

20 during that period there was rejection.  You argue

21 during the following period there was sending --

22 uncritical sending of samples that resulted in the

23 complaint so GE knew that certain of the drums would

24 not meet Mr. Fletcher's standards but sent them to him

25 anyway.

1        MS. FISKE:  That's exactly right, your Honor,

2   and we'll move to the final time period.  In 1956 Mr.

3   Varnum retires.  Hooper has no recollection of going

4   back to the site after Mr. Varnum has retired.

5        In 1968 Mr. Fletcher writes a letter to GE,

6   that's Exhibit 5, and during this time period he

7   explains that a contract truck has been picking up

8   material.  There's no Fletcher's employee at the GE

9   site to supervise what type of material is put on the

10  truck and, as a result, GE takes the opportunity to

11  indiscriminately load -- and as Mr. Fletcher refers to

12  it as -- everything in God's green earth onto the

13  truck and he complains that the material that he's

14  gotten is badly contaminated.

15       THE COURT:  Your view is that "your man" --

16  Fletcher got it wrong.  It's Fletcher's man hired as

17  an independent rather than GE.

18       MS. FISKE:  My view is that "your man" is a

19  GE scrap and salvage employee who is indiscriminately

20  loading material onto a contract truck --

21       THE COURT:  Put that excerpt back up.  Oh,

22  okay.  Is this from the same letter?

23       MS. FISKE:  Yes, it is, your Honor.

24       THE COURT:  So this is the explanation of the

25  "your man" question I raised during the question?

1          MS. FISKE:  Yes.

2          THE COURT:  And as I understand those two

3    pieces together, your position is that Fletcher stops

4    sending his own men.  Fletcher arranges for a

5    contractor to take it.  Fletcher's contractor got out

6    of business.  GE arranged for a contractor to haul the

7    stuff and "your man" references to Fletcher talking

8    about your contractor who brought the stuff.

9          MS. FISKE:  Right.  Either your contractor or

10   your people in the scrap and salvage area.  Either

11   one.  There's no Fletcher's representative at the GE

12   plants to supervise and test what's going on the

13   trucks.

14         THE COURT:  But your man has been hauling

15   refers to the hauler, not the man on the loading dock.

16         MS. FISKE:  That's correct.

17         THE COURT:  So I think the sensible way to

18   put that together is to say that the chronology was

19   after Fletcher stops sending his own trucker -- he

20   originally had a contract trucker.  That contract

21   trucker went out of business.  GE found another

22   contract trucker for him and started sending stuff,

23   and it was during this period of contract truckers

24   that Fletcher was getting what he decided was

25   insufficient quality Pyranol and he's blaming GE

1   because the men at the loading dock would use that

2   opportunity to foist on them all of the scrap Pyranol

3   they had when they knew, because of rejections during

4   the Varnum era, that only certain Pyranol would be

5   useful to Fletcher.

6          MS. FISKE:  That is exactly right, your

7   Honor.  You heard a -- well, let's now look at the

8   Abbe/Clark memo, which is Exhibit 7.  So this letter

9   comes in and you have Mr. Abbe -- I'm sorry, Mr. Clark

10  authoring a memo analyzing this issue and determining

11  that Mr. Fletcher has a valid claim and it's cited

12  that some of the material contains up to 22 percent

13  TCE and water.

14         THE COURT:  It's your position that the

15  material that was sampled is scrap Pyranol from the GE

16  scrap Pyranol area, not materials that were actually

17  in Fletcher's possession.

18         MS. FISKE:  That's correct, but it's

19  analogous material -- is what I would argue.

20         THE COURT:  Okay.

21         MS. FISKE:  And Mr. Abbe and Mr. Clark

22  discuss this problem and agree -- and from Mr. Abbe's

23  deposition you read not only do they find that

24  Fletcher's had a valid claim and didn't see any reason

25  to dispute any aspect of the letter, but also -- can I

1    see slide one, the quote that you read to me before --

2    they decide that they'll just give him all of the

3    material for free because we hoped he was able to use

4    some of it, and the balance of it he could dispose of

5    it, and that's how the relationship ends, with GE just

6    giving Fletcher's 1,800 drums, many of which he

7    doesn't want and cannot use, and they're transferring

8    the responsibility for disposing it to him, even

9    though in that letter he requests, please, can I pay

10   for this material to come back to you?  I want you to

11   pay the return freight and then I'll pay you for the

12   good stuff that I want, and GE says, no, that's not

13   worth the hassle for us.  You just keep it all.  It's

14   your problem to figure out how to dispose of it, and

15   by that way, as the Clark and Abbe memo memorializes,

16   GE has avoided the cost of its own disposal of this

17   material and put it onto Fletcher's.

18          In terms of wrapping up the chronology of

19   what actually happened at the Fletcher site to the

20   remainder of this material, for many years after

21   1968 -- I should say he loses Webster as a customer

22   sometime in '68, and then from the time period we

23   heard Mr. Hooper testify -- from '68 to sometime in

24   the '80s, when Mr. Kamieniki removes the material,

25   there's no significant customer from Mr. Fletcher for

1  this material; and maybe a few people take it to

2  remove it for dust suppressant, but the majority of it

3  remains on the site.

4        THE COURT:  Well, Fletcher's son says they

5  also used some of it as a dust suppressant at the

6  site.

7        MS. FISKE:  Yes.  Exactly.  To describe that

8  a little more graphically, they would punch a hole in

9  this 55 gallon drum, load it on a forklift and drive

10  it around the site during the summer months to

11  suppress the dust in the yard.

12        We also heard testimony -- there's a

13  stipulation on this -- that during the filter blending

14  process scrap Pyranol spilled on the ground, and of

15  course some of it also spilled on the ground when the

16  trucks were washed out.

17        By 1978 TSCA banned the use of PCBs in

18  anything other than a totally enclosed application,

19  such as a capacitor.  So after that scrap Pyranol had

20  no known legal use.

21        From the day that Fletcher's first received

22  the scrap Pyranol in '53 until 1978, he never used any

23  more than two or three drums of it a year in his own

24  paint manufacturing process, and even then he could

25  only use the thicker, higher quality Pyranol.

1          So now that we've discussed the chronology, I

2    want to turn back to some of the evidence that we

3    believe supports a finding under your legal standard

4    that you've articulated; that GE arranged for the use

5    and disposal of some of this scrap Pyranol at the

6    Fletcher's paint site.

7          Throughout these proceedings your Honor has

8    expressed interest in the evidence that shows what GE

9    knew or intended with respect to this scrap Pyranol

10   that would be disposed of by Fletcher's; and with that

11   question in mind, there are two areas to explore, the

12   first is GE's actions, and in a case like this what GE

13   actually does with the material is more probative than

14   after the fact characterization.  Here you're going to

15   see actions speaking louder than words.

16         The second area to explore is not just what

17   GE did but what GE said it thought at the time and

18   what it knew at the time, but let's start with the

19   first category, action.  What did GE actually do with

20   the material?  You've seen this chart before.  It's

21   Exhibit 69.

22         THE COURT:  Can I ask you, for the benefit of

23   my court reporter, how much longer do you thing you're

24   going to be?

25         MS. FISKE:  Ten minutes.

1          THE COURT:  Okay.  We'll go until you finish

2    and then take a break.

3          MS. FISKE:  What did GE actually do with this

4    material?  Some of it was discharged to the Hudson

5    River, some discarded into various landfills; and this

6    was all during the same time period that the material

7    is being transferred to Fletcher's.  It was also

8    transferred to municipalities for use as a dust

9    suppressant and given to employees for use as a weed

10   killer and removed by scavengers for out of sight, out

11   of mind disposal.

12          Also important in a case like this is the

13   absence of action.  It's also a compelling indicator

14   of what GE really thought about this material.  GE

15   claims that it was selling this as a useful commercial

16   product, but GE never undertook even the most

17   rudimentary QA/QC on the material, such as seeking out

18   floor sweeping.  GE never distributed scrap Pyranol

19   from anyplace other than the scrap yard.  GE did not

20   place scrap Pyranol in clean, new drums or give it a

21   catchy name like plasticizer Pyranol.  At the time no

22   one at GE ever called it anything except scrap or

23   waste Pyranol.

24          THE COURT:  Well, I don't think there's any

25   dispute here that GE considered scrap Pyranol to be a

1  waste.  It did not conceive of scrap Pyranol as being

2  a means by which GE could turn a profit through the

3  sale of it.  That it was able to generate very small

4  amounts of income through the sale of Pyranol to

5  Fletcher was virtually incidental.  Everyone concedes

6  that GE's objective was to be rid of the Pyranol, not

7  to make money through the sale of it.  It simply

8  wouldn't have taken the time to filter it, label it,

9  market it, because it didn't see the scrap Pyranol as

10  being a line of products for GE.  It was a nuisance to

11  be gotten rid of, and I don't think there's any

12  dispute about that.

13         MS. FISKE:  That's exactly right, and the

14  same with respect to the warnings that were provided

15  to certain products, such as capacitors and

16  transformers, but not on the drums of scrap Pyranol

17  that were transferred to Fletcher's.  So you've come

18  to the exact same conclusion that I was advocating

19  with respect to what GE wasn't doing.

20         Turning to the comment you made about how GE

21  didn't see this as a product with any economic

22  value --

23         THE COURT:  It was able to make some money

24  from selling it, but it wasn't something that was a

25  line of business that GE was interested in being in

1  because it couldn't make any kind of profit that

2  mattered from it.  It was an economical way to be rid

3  of what it saw as a waste product; but at the same

4  time it is -- I think the only way to interpret the

5  evidence is to attribute to GE an understanding that

6  at least some of it would be used by Fletcher in a way

7  that justified Fletcher paying for it, and I think

8  there's that evidence and there's evidence that at

9  least some GE employees understood that he was using

10  it as a plasticizer in paint.

11        MS. FISKE:  If I may, I would like to direct

12  your attention to the price that GE was charging for

13  scrap Pyranol.  GE claims that this material was

14  valuable because Fletcher's was willing to pay for it

15  and let's -- I would like to just focus on that for a

16  minute.  When GE didn't simply give it to Fletcher's,

17  GE charged approximately 4 cents per gallon of scrap

18  Pyranol, and that's discounting for the value of the

19  drums that it came in.  That price that Fletcher's

20  paid per --

21        THE COURT:  So you're assuming a drum is

22  worth a buck twenty-five?

23        MS. FISKE:  Correct.

24        THE COURT:  Okay.  So if we assume that, you

25  would get per gallon cost of scrap Pyranol is four

1   cents versus three dollars for virgin Aroclor.

2          MS. FISKE:  Exactly, but even that is an

3   overstatement of the economic value of scrap Pyranol.

4          Can I see Exhibit 79, please?  This exhibit

5   is based on the Siebel affidavit where she summarizes

6   and reconciles GE's accounts of the volume of scrap

7   Pyranol that's sent to the Fletcher's site.

8          The free initial shipment is not included on

9   her affidavit, nor is the free shipments given by

10  Metevier, but the material from '66 to '67 that's

11  ultimately given to Fletcher's for free, that volume

12  is reflected in her affidavit and it's pretty stark.

13         THE COURT:  Where are you getting the number

14  for the free initial shipment and the --

15         MS. FISKE:  Those are based on -- the number

16  for the free initial shipment is based on a

17  conservative estimate that Mr. --

18         THE COURT:  Hooper's number of barrels that

19  came in?

20         MS. FISKE:  Yes.

21         THE COURT:  What's the Metevier adjustment?

22  What's the basis for that number?

23         MS. FISKE:  You will notice that I shaded

24  that slightly different because it is just based on

25  witness testimony and -- this actually comes out of

1  EPA's determination where estimates were based on

2  volumes for a past year compared to the years when

3  Metevier was giving it for free, but it's not really

4  significant.  The real thing that you can focus on

5  here where it's uncontroverted, based on GE's own

6  30(b)(6) affidavit, are the two columns that I've

7  noted where it's documented by GE's own ledgers, and

8  you can see that roughly half -- maybe slightly more

9  than half of the material was simply given to

10 Fletcher's for free.

11         THE COURT:  Okay.

12         MS. FISKE:  The final two years of the

13 relationship are the most significant.  By 1965

14 Fletcher's was on a list of cash in advance only

15 customers.  He was supposed to pay cash in advance,

16 but for two years he obtained scrap Pyranol for no

17 payment at all.  This was extremely unusual to have an

18 accounts receivable spread out for such a long period

19 of time, especially for a cash in advance person --

20         THE COURT:  Again, I don't think there's

21 going to be any dispute about this.  GE was

22 accumulating scrap Pyranol, needed to get rid of it

23 and was glad to have Fletcher take it off its hands.

24 Certainly it wanted to get any money Fletcher could

25 pay for it, but its principal goal was to get that

1  stuff out of there; and if it could get it out of

2  there without cost, it's ahead of the game when

3  compared to the cost it would have to incur to have

4  somebody haul it out of there.  So that's what I -- I

5  don't think there's going to be any real dispute about

6  that.

7          MS. FISKE:  And GE was pleased to simply give

8  the scrap Pyranol to Fletcher's for free because it

9  meant GE didn't have to pay for its disposal.

10          Now I would like to turn to another area to

11  explore, which is what did GE know at the time and

12  what did they say at the time?  Perhaps the most

13  single important factor of the whole case is what GE

14  knew about the nature of scrap Pyranol itself -- the

15  varying nature of the mixture of hazardous substances

16  that it was transferring to Fletcher's.  Some of it

17  could have been relatively pure, but some of it could

18  not be used to make paint.

19          GE knew it made no effort to distinguish

20  between quality and scrap Pyranol.  It gave it all

21  indiscriminately, especially during the last contract

22  truck years.  It was all indiscriminately loaded on

23  the trucks and sent to Fletcher's.  This fact has

24  direct relevance on the credibility of GE's claims

25  that GE intended or knew that all of it was being used

1   by Fletcher's.

2           Both Mr. Clark and Mr. Abbe admit that they

3   thought Fletcher's was a small paint manufacturing

4   company.  Mr. Hooper testified it had four or five

5   full-time employees, maybe more during the summer

6   part-time.  Not one senior level GE employee ever

7   asked Fletcher what he was doing with the material.

8   Moreover, even if Mr. Fletcher had answered, oh, I

9   pour some of it on the ground to keep down the dust in

10  the summer, GE would have continued to have given it

11  to him.

12          Mr. Abbe testified that he didn't care if

13  Fletcher's was using some of it as a dust suppressant,

14  insecticide or weed killer.  In his own words, he

15  didn't care what it was being used for, and I quote

16  again from the excerpt that you read earlier, "We just

17  hoped he was able to use some of it, and the balance

18  of it he could dispose of it.".

19          THE COURT:  You keep suggesting that GE

20  employees knew that Fletcher was using it as a dust

21  suppressant and/or insecticide or herbicide.  I know

22  there was an Abbe statement in a deposition that was

23  later disavowed by Abbe that still is in one of the

24  exhibits that was admitted, the summary that --

25  prepared by and testified about in the Siebel

1  affidavit, but other than that, is there any actual GE

2  testimony from any employee that said, we knew he was

3  using it for that purpose?

4            MS. FISKE:  No, your Honor.

5            THE COURT:  Okay.

6            MS. FISKE:  But Mr. Abbe's description during

7  his deposition and the Abbe/Clark memo make explicit

8  what has been implicit in the relationship between GE

9  and Fletcher's all along, which is that GE would

10  transfer scrap Pyranol to Fletcher's with the fortuity

11  that maybe he could use some of it to make paint,

12  which he didn't really care, and with the

13  understanding that much of it would not be able to be

14  used by Mr. Fletcher.

15            This corporate attitude is best summarized in

16  GE's own words, turning to Exhibit 9.  Here is a 1970

17  survey explaining GE's past disposal practices, and

18  here GE explains that much of the material has been

19  removed by scavengers who dispose of it in an out of

20  sight, out of mind manner.  If you read this entire

21  memo on how GE removed waste Pyranol, nowhere is there

22  any discussion of sales of scrap Pyranol as a useful

23  product to make paint.

24            GE just didn't think of it that way at the

25  time.  GE just thought of it as being removed by

1  scavengers for some unknown purpose that did not

2  matter.  It was out of sight, out of mind.

3          THE COURT:  Well, they knew that people were

4  using it as a dust suppressant so it could be valuable

5  to scavengers as a dust suppressant.  The idea of

6  insecticide is a little harder for me to understand.

7  The idea of an herbicide is easier to understand --

8  you pour oil on the plants and they die -- but the

9  principal use for these kinds of waste oils was to go

10  around -- waste oils and products like waste oils like

11  PCBs -- was to go on roads and put it down on dirt

12  roads because they would get dusty otherwise.  It's

13  called oiling the roads.  That's what they used to do

14  with all of this stuff.  So GE well understood it

15  would be valuable for scavengers for that use because

16  it knew, and it's witnesses testified, that some of it

17  was used for the town in that way in the area.

18          MS. FISKE:  Exactly.  Similarly, I would like

19  to turn to a 1975 survey.  That's Exhibit 19.  You see

20  this one during our opening statement --

21          THE COURT:  Again, significantly, in my view,

22  the way I understand the law, dust suppressant uses

23  are disposals.  So that all of the uses that GE was

24  aware of, other than whatever Fletcher was doing, were

25  disposals.

1            MS. FISKE:  That's exactly right, your Honor.

2   Here you have -- again, as my co-counsel, Mr. Flynn,

3   has indicated, you are the company you keep -- and

4   here you see method and place of disposal throughout

5   that time period as being to landfills and to

6   Fletcher's.  Also in --

7            THE COURT:  Wait, wait.  I couldn't glean

8   that much from it because the chart seems to say where

9   disposed, and then it was modified to say method and

10  place of.

11           MS. FISKE:  That's correct.

12           THE COURT:  And how do I glean from this --

13  what does it tell me about method of disposal?

14           MS. FISKE:  Method, I think, is determined by

15  where it is sent.  I think it's implicit in where it's

16  sent.

17           THE COURT:  One of them is explicit.  It

18  says, disposed of in landfill located on the west side

19  of South Glenn Falls, right?

20           MS. FISKE:  Yes.

21           THE COURT:  And the others are not explicit.

22  Is there evidence to believe that GE understood that

23  Rockland Environmental Service, Chem-Trol, were land

24  fillers of the waste?

25           MS. FISKE:  I believe they're chemical waste

1    disposal companies.

2         THE COURT:  Is there evidence in the record

3    that GE understood that?

4         MS. FISKE:  It depends on your -- I know

5    there was deposition testimony that we have designated

6    on this point.  I don't know whether those were

7    included in the material --

8         THE COURT:  I don't remember.  It might be.

9    I read an awful lot of this stuff.

10        MS. FISKE:  I don't remember myself.  I know

11   it's in the greater record that was filed by the

12   parties, but I'm not sure if it was focused

13   specifically or drawn to your attention.

14        THE COURT:  Okay.

15        MS. FISKE:  Given the various facts and

16   circumstances I've discussed above, including the

17   nature of scrap Pyranol, it's clear that GE intended

18   or knew that it was absolutely certain that at least

19   some of the material would be disposed of.  At the

20   same time we expect GE to assert that its employees

21   believed that all this material would be used to make

22   paint, but, your Honor, the only testimony that GE can

23   submit to support that position is that of Mr. Clark.

24        Mr. Clark is a loyal GE employee who was the

25   only one brought to trial -- and whether you find his

1   testimony credible or whether you find that it was --

2   had an objectively reasonable basis to believe all of

3   this material was used to make paint, he is a

4   tangential figure who has no personal knowledge of all

5   that occurred and he was only at the GE plant for a

6   short period of time; and as you have recognized, he

7   specifically admits that his primary purpose -- what

8   he was concerned about more than anything else was

9   making sure that this material was removed from the GE

10  facilities.

11          So I'm getting close to my closing, and I

12  want to make just a couple of final points again about

13  the last years of the relationship.  The evidence in

14  the record shows that the last two years GE sent

15  Fletcher's scrap Pyranol by contract truck.  Due to

16  the use of the contract truck there was no Fletcher's

17  employee at the time to supervise what material was

18  being loaded on the truck.  By this time GE knew that

19  Fletcher's could not use a portion of the scrap

20  Pyranol being shipped to Fletcher's.  Fletcher's had

21  previously informed Metevier that he didn't want

22  junky, thinned-out versions.  Then under Mr. Varnum's

23  years, GE witnessed Mr. Fletcher refusing to take bad,

24  thinned-out, junky material, and so by 1966, when GE

25  sent Fletcher's material by contract truck, GE

63

1    indiscriminately loaded all of this material onto the

2    truck knowing that Mr. Fletcher was not going to be

3    able to use all of it and would not want all of it to

4    make paint.

5            As Fletcher wrote to GE, GE loaded everything

6    under God's green earth onto the truck and then

7    expected Fletcher's to pay for it, although it didn't

8    even matter if Fletcher's paid for it or not.

9            The United States agrees with your Honor that

10   GE is liable if only one transaction for one drum of

11   scrap Pyranol was an arrangement for disposal.   The

12   evidence here has shown at trial that for at least two

13   years GE sent approximately 1,800 drums of scrap

14   Pyranol to Fletcher's where much of it he did not want

15   and could not use.

16           THE COURT:   Do you think there's any evidence

17   in the record that when GE made this arrangement with

18   Fletcher at any point that any GE employee desired

19   that the scrap Pyranol be discharged, deposited,

20   injected, dumped, spilled, leaked or placed into or on

21   land so that the waste may enter the environment?   Do

22   you think that they desired that?   That there's any

23   evidence that that was, in fact, the objective?   What

24   we want to do is we want to cause Pyranol to be put

25   into the environment?

1          MS. FISKE:  Your Honor, the closest to that

2     testimony is Mr. Abbe's testimony where he said the

3     rest of it Mr. Fletcher could dispose of however he

4     wanted to.

5          THE COURT:  We knew that that would happen,

6     but I'm trying to make this distinction between that

7     which is your objective.  The objective of a

8     conspiracy is to distribute drugs, say.  I don't think

9     that there's any evidence in the record that would

10    suggest that any GE employee involved in this

11    arrangement with Fletcher desired this disposal; and I

12    think if desired disposal were the standard, you would

13    have almost no case in which there would be arranger

14    liability.  It's undisputed that GE's principal

15    objective was to be rid of the scrap Pyranol.  It

16    seems to me the evidence suggests that GE was

17    indifferent as to whether it would be used in a

18    product or released into the environment.

19          The disputed question is was it aware that

20    it -- or substantially certain that it would be

21    disposed of, but I don't see any evidence that anyone

22    at GE desired the release of this hazardous substance

23    into the environment.  Only that it wanted to be rid

24    of it and was indifferent to whether it was disposed;

25    of; and perhaps as you're arguing, that it understood

1  and was aware that disposal would be substantially

2  certain to follow.

3        MS. FISKE:  Your Honor, I think we win our

4  case on constructive intent, as you suggest, and not

5  actual intent.

6        THE COURT:  If you define intent to be

7  equivalent to purpose, that is objective -- that is,

8  this is what I want to happen -- as I said, almost no

9  chemical disposer -- when they put something in a

10  landfill, they're not desiring that it be released

11  into the environment.  They want to be rid of it.

12        Now, you could argue somebody who uses it as

13  a dust suppressant actually desires its release into

14  the environment, but those applications are very

15  limited.  Most people that arrange for disposal do not

16  desire the release of it into the environment.  They

17  desire to be rid of it.

18        The term disposal is commonly understood.

19  It's not the Solid Waste Disposal Act definition.

20  It's to be rid of, and certainly they all desired to

21  be rid of it, but that isn't sufficient.  And so

22  putting those terms together, that's why I reach the

23  conclusion that the only reasonable way to construe

24  arranged for disposal is to see that term as

25  encompassing cases in which -- there isn't evidence

1    that they desired release into the environment but

2    that they understood that released into the

3    environment would inevitably follow from the

4    arrangement that they have made.  Otherwise it becomes

5    almost a meaningless provision and captures almost

6    nobody, and that is inconsistent with the concept of

7    polluter pays.

8            For example, you could have somebody under

9    that definition who takes its hazardous waste and

10   conceals it in the trash that the waste company hauls

11   and still have that person not be guilty as an

12   arranger if they testified, and the fact finder

13   believed them, we didn't care what happened to it.  We

14   just didn't want to have it anymore.  Did you know it

15   would get into the environment?  Yes.  That's not what

16   we desired.  We knew it would happen but -- that has

17   to be an arrangement for disposal, doesn't it?  If

18   somebody goes to the waste company that they know is

19   landfilling the waste and they conceal hazardous waste

20   in with non-hazardous waste knowing that the contract

21   doesn't permit that, but they aren't an arranger

22   because they didn't desire to put it into the ground?

23   They just were indifferent to it and wanted to be rid

24   of it?  That can't be what arranger means.  I think

25   that is why GE has essentially conceded that that kind

1   of very limited definition of arranger liability is

2   incompatible with the language and purpose of CERCLA.

3          MS. FISKE:  I agree with that.  I'm almost --

4   one more page.

5          THE COURT:  Finish up and then we'll break

6   early for lunch.  I don't want to have to interrupt

7   your presentation.  It would be too hard to come back

8   without a lunch break.

9          MS. FISKE:  We're focusing on these last two

10  years where GE has been loading everything under God's

11  green earth onto the contract truck knowing that

12  Fletcher's does not want all of this material and has

13  specifically rejected some of it, and then at the

14  close of this time period Mr. Fletcher writes a letter

15  to GE saying, I want you to -- I'll pay you for this

16  material that you gave me, although I only want some

17  of it.  I only want the good stuff.  I want you to pay

18  for the return of the material I don't want.  You can

19  come check it out.  You can look and see what I have,

20  and you can -- we'll go through it drum by drum and

21  I'm not hiding anything.  There's a lot of this stuff

22  here that is junk.

23          GE analyses this claim and decides that it's

24  valid but that it's not worth the hassle to pursue.

25  So at this point -- the point of this letter -- Mr.

1  Abbe and Mr. Clark confer, and this is a

2  contemporaneous decision about sale and disposal.

3  They decide it's not worth it to collect the money

4  from Mr. Fletcher.  Instead they're just going to give

5  it all to him for free.  They're not going to bother

6  to come get the stuff that he doesn't want and cannot

7  use.  Instead, they're going to leave the problem of

8  how to dispose of it to Mr. Fletcher.

9         THE COURT:  Let me ask a hypothetical

10  question.  If the evidence were such that up until

11  that point it's undisputed that GE thought every bit

12  of Pyranol was going to be used in paint and only

13  discovered for the first time when it got Fletcher's

14  letter that Fletcher couldn't use all of it in paint,

15  does GE's decision to write off the debt count as an

16  arrangement for disposal?  Because it's already

17  transferred title to Fletcher.  It's just a refusal to

18  take it back.  And if that's the first knowledge it

19  had that it was not usable by Fletcher -- suppose

20  Fletcher had written a contract that said I am

21  disposing of every bit of this by putting it into

22  paint and I certify under oath that that's what I've

23  done with every drop up until now, and then he writes

24  this letter and GE does what it does.  Is GE an

25  arranger at that point?

1        MS. FISKE:  That's a harder decision.

2        THE COURT:  Yeah.  That is a more interesting

3   question.  You could argue that if there's a -- if the

4   contract terms are such that you could only deliver

5   Pyranol of a certain quality and you deliver Pyranol

6   of a bad quality, that you have an obligation under

7   the contract to take it back, and your refusal to take

8   it back under circumstances where you know disposal

9   will result makes you an arranger.  You could make

10   that argument, but it seems to me that the point

11   you're making is that this evidence is useful because

12   it is consistent with our view of the case, which is

13   GE knew when it put those barrels on the truck that it

14   would not be usable, that it was going to be disposed

15   of, and this merely confirmed what GE knew from the

16   beginning.  Fletcher is now calling them on it.  The

17   barrels that you knew were garbage when you put them

18   on my truck and knew that they would have to be

19   disposed of, I want you to take back, and they didn't

20   take them back.

21        MS. FISKE:  That's right.  In addition, you

22   heard testimony from both Mr. Clark and Mr. Abbe that

23   even after they had written off this debt, they were

24   both still hoping that Mr. Fletcher would continue the

25   relationship and continue to remove more of this

1   material.

2          THE COURT:  Well, GE says they did continue

3   the relationship and they did remove it.

4          MS. FISKE:  Either way, I'm not sure the

5   evidence actually reflects that, but even if it were

6   true, it seems to me that it helps our argument

7   because right smack in the middle of it then is this

8   contemporaneous decision that, oh, you can have it all

9   for free and I'm not going to bother to come get it.

10  Especially I'm doing this so you promise to come get

11  more of this stuff.  You know, maybe we'll give you

12  more of this stuff that you don't want and cannot use.

13          I think that fact helps us in showing that

14  what has been implicit all along is now explicit.

15  That GE just hopes to remove this stuff and give it to

16  Fletcher's.  Good, if he can use some of it, but if he

17  can't, then he can just figure out how to dispose of

18  it, and that's a win/win situation for GE.

19          GE transferred the problem of disposing of

20  its hazardous waste from GE to Fletcher's.  Here GE's

21  actions and words show GE cared only about removing

22  the material from its facilities, not about selling a

23  useful product.  GE knew that Fletcher could not use

24  and did not want some of the material but gave it to

25  him anyway.  Scrap Pyranol now contaminates the site,

1  and for this period during the contract truck years,

2  GE should be found liable.

3          In closing, when the Court considers all of

4  the evidence underlying the relationship between

5  Fletcher's and GE, the United States has established

6  by a preponderance of the evidence that GE knew that

7  Fletcher's would dispose of some of this scrap

8  Pyranol.

9          It was predictable that Fletcher's would not

10 be able to apply all of the scrap Pyranol to any

11 useful purpose.  GE knew what was in those random

12 drums of mixture of waste material.  Fletcher's also

13 told GE at least three times, once through Mr.

14 Metevier, once through Mr. Varnum and finally in the

15 1968 letter, that he did not want and could not use

16 thin, junky Pyranol but GE gave it to him anyway.  So

17 the inevitable came to pass, and now the United States

18 asks that you find GE responsible for cleaning up its

19 hazardous wastes at the Milford Superfund site --

20 Fletcher's Superfund site.

21          THE COURT:  All right.  It's 11:53 so let's

22 take a lunch break until 1:15, and then GE can make

23 its presentation, and then I'll take a break and I'll

24 give you my ruling.  All right?

25          (Recess)

1         THE COURT:  Okay.  Counsel.  Go ahead.

2         MR. BIAGETTI:  Your Honor, first of all on

3   behalf of me and the trial team, as well as Mr. Hill

4   and Ms. Moreno here from GE, we thank you very much

5   for your time, the extra time over the weekend and

6   most especially for the scrutiny that I know that you

7   have given to the evidence, to the record because I

8   think in this case, in particular, the proven facts

9   proven by a preponderance, are the most important

10  element here, and when your Honor reviews the

11  evidence, it will be clear, we believe, that on the

12  facts proven by a preponderance -- not where evidence

13  is in equipoise and not where it favors GE -- that the

14  inferences you may draw from those facts do not meet

15  the standard that your Honor has set out.

16        There's a case called Ricci, your Honor, in

17  the First Circuit which counseled district court

18  judges that they are not to superimpose their own

19  ideas of likelihood or probability, no matter how

20  reasonable those ideas may be.

21        THE COURT:  What does that mean?

22        MR. BIAGETTI:  It means, your Honor,

23  respectfully, that as you sit here today in 2008 and

24  look at the evidence and make connections between it,

25  that those connections may not be substituted for

1    immediately drawn inferences from the proven facts,

2    and I'll give you a couple of examples.

3           THE COURT:  Well, I think I'm supposed to do

4    the same thing I instruct jurors to do, which is to

5    base your verdict solely on the evidence but to use

6    your common sense in interpreting the evidence.

7    That's part -- both of those things are standard jury

8    instructions.  Base the evidence totally on the

9    testimony of the witnesses, the exhibits, the direct

10   evidence that is produced during the trial and then

11   draw inferences that are reasonable in light of your

12   daily experience and your common sense.  Use both, in

13   other words, direct evidence and circumstantial

14   evidence.

15          When it comes to an issue of intent or a

16   scienter, generally -- almost always that has to be

17   based largely on circumstantial evidence so it seems

18   to, by definition, require making inferences --

19   inferences that are based on the evidence and that are

20   reasonable in light of daily experience and common

21   sense.

22          MR. BIAGETTI:  Of course.

23          THE COURT:  So certainly I wouldn't

24   substitute my own ideas for evidence, but I think that

25   I have to use common sense in trying to interpret the

1    evidence.

2          MR. BIAGETTI:  Of course, and inferences

3    based on facts proven by a preponderance.  Let me give

4    one example.  This small but frankly pivotal --

5    especially after hearing the government's closing --

6    evidence about whether GE sent its man to haul -- can

7    we put up the excerpt from the Fletcher letter?  You

8    remember this one, Judge.  Some trucker, who you

9    evidently called, has been hauling to us, and our

10   office has been paying him $150 per load.  An

11   important fact in the case -- an important piece of

12   evidence because the government says it was after this

13   that GE started sending it everything under God's

14   green earth.  Mr. Fletcher says though -- first of

15   all, you would have to take that statement for the

16   truth that it happened, but it's defied by the record.

17   The proven facts --

18          THE COURT:  Give me the whole exhibit because

19   I didn't gather that until they put up the exhibit.

20   What the government says is that there's a reference

21   earlier on in that letter that makes clear that what

22   Fletcher was saying is, first, I sent my own people.

23   Then I had a contractor of mine who went out of

24   business.  Then you found a contractor and the

25   reference to "your man" is the reference to the

1  contractor that GE supplied.  So that they are not

2  saying that it was a GE truck.  They're saying it was

3  a private contractor that had been found by GE and

4  that that's how to interpret the letter.

5          MR. BIAGETTI:  Yes, they are.

6          THE COURT:  You said that's wrong.  The

7  letter can't be interpreted that way.

8          MR. BIAGETTI:  Not only is that wrong,

9  there's no evidence to support it.

10         THE COURT:  What's the exhibit number?

11         MR. BIAGETTI:  The exhibit is 15.

12         THE COURT:  All right.  I'll have my clerk

13 hand me up the actual physical copy.  It may be in a

14 pile over here, Vinny.  I don't know.  Let me take a

15 moment and reread it.  Okay.  So the government

16 contends that the phrase "your man" in Exhibit 15

17 refers to a contract trucker hired by -- or found by

18 GE but paid for by Fletcher.  You say that that's not

19 true, and make your argument.

20         MR. BIAGETTI:  Defied by the record evidence.

21 Hooper, at page 41, recalled that only he and an

22 independent trucker hired by Fletcher named Ross made

23 any such deliveries.  Whitney recalled that only

24 Hooper -- at page 48, Whitney recalled that only

25 Hooper and an independent trucker named Madsen hired

1  by Fletcher made any --

2          THE COURT:  That's kind of a fine

3  distinction.  In the letter it's clear that Fletcher

4  paid for all of the truckers, whether they were found

5  by GE or not.  So an employee well understood the

6  trucker to be hired by Fletcher.  He just wasn't found

7  by Fletcher.  That's what the "your man" reference is.

8  Why does it even matter?  The important thing is

9  somebody other than a Fletcher employee was up there,

10  and during that time they were loading bad barrels on

11  the truck.

12          MR. BIAGETTI:  And there's no evidence,

13  Judge.  That, respectfully, is a leap.  There's no

14  evidence that the testing stopped simply because a

15  load or two was picked up by somebody like Madsen or

16  by Ross.  There's no testimony to that effect.  Mr.

17  Hooper --

18          THE COURT:  Where's the evidence that there

19  was testing of any drum that was taken by any contract

20  hauler?  The only evidence I heard of hydrometer

21  testing was by Fletcher employees.

22          MR. BIAGETTI:  Hooper says that he and the

23  crew did the testing at GE, and then that some was

24  done back at Fletcher.  There's no evidence that

25  Hooper --

1          THE COURT:  Yeah, but there's no evidence to

2    suggest that at any point while a contract trucker was

3    used that hydrometer testing was done at the GE dock

4    before they were loaded onto the trucks, and Hooper

5    says that it wasn't done and that's why they have

6    the -- excuse me -- Fletcher says in his letter that

7    it wasn't done and that's why I got garbage Pyranol.

8    So there's no evidence to suggest that that's wrong.

9          MR. BIAGETTI:  There are 17 shipments, Judge,

10   during that time period where Fletcher claims he's

11   paying $150 a load now, in this letter, to haul to his

12   factory.  If you look at the dunning letter that is

13   Exhibit 13, 17 pick-ups are made during this time

14   period, Judge, 70 drums per pick up, and we are

15   supposed to believe that Fletcher paid 150 bucks for

16   every one of those bad loads, accepted every one of

17   those bad loads and never made a peep about their

18   quality until -- not coincidentally -- after he is

19   dunned for payment a couple weeks before this letter

20   by Mr. Clark.  That's the evidence.

21          THE COURT:  All right.  That's a different

22   point.  You want me to say that this letter is -- that

23   Fletcher is making this up to avoid having to pay,

24   right?  That's your interpretation of this.  That

25   there really wasn't a problem with any of the loads.

1  It only comes up after Fletcher is asked to pay and he

2  doesn't want to pay.  All right.  I understand that.

3        The problem with that is that the testing

4  that was done of a similar kind of Pyranol at the

5  scrap Pyranol facility by -- at GE's direction by

6  Monsanto corroborated the claim that a lot of the

7  Pyranol was junk, and your witness so acknowledged in

8  the letter to Mr. Clark.

9        That's some evidence to actually support the

10  idea that this stuff was -- a lot of it was of

11  unacceptable quality, isn't it?

12        MR. BIAGETTI:  The Pyranol that was tested by

13  Monsanto was Pyranol that Fletcher had not selected to

14  take back to Fletcher.  We know that.  It was at GE --

15        THE COURT:  I don't know that because the

16  evidence is that no selecting was going on at that

17  time.  So this was not rejected Pyranol by Fletcher,

18  and indeed, why would GE, in trying to determine

19  whether they should press Fletcher for payment, test

20  barrels that he rejected?  The most logical inference

21  is they tested representative, sample barrels because

22  that's what they're trying to do, confirm or refute

23  the contention that the barrels Fletcher got were

24  junk.  If they were testing barrels that Fletcher

25  rejected, they wouldn't be confirming or refuting the

1   claim that Fletcher was making.  It was only if they

2   took representative samples that would allow them to

3   confirm or refute.

4           How does saying we tested barrels that

5   Fletcher rejected, and it turned out they were

6   correctly rejected.  Therefore, we can infer that

7   Fletcher's claim that he got a lot of junk from us is

8   valid.  That doesn't make any logical sense.

9           MR. BIAGETTI:  There's no evidence, your

10  Honor, that the testing at GE that Mr. Varnum had

11  required ever stopped.  We have evidence that Mr.

12  Varnum retired.  There is not a wit of evidence that

13  any of the testing that Mr. Varnum had required ever

14  stopped.

15          THE COURT:  I don't believe there's any

16  evidence that Mr. Varnum ever required testing.  The

17  evidence is that Fletcher required testing in order to

18  address a problem that Varnum created when, as Hooper

19  testified, he would require Fletcher to pay for every

20  drum that was taken, and Fletcher then concluded we

21  have to test drums before we take it.  Varnum won't

22  make allowances like Metevier had in the past.

23  There's no evidence that Varnum ever required that

24  testing be done.

25          MR. BIAGETTI:  I take your point.  There's no

1  evidence of the circumstances created during the

2  Varnum years changed after that.  None.

3         THE COURT:  I would like to see some evidence

4  that there was any testing done of any Pyranol shipped

5  by a private contractor because there's no evidence in

6  the record that it was ever done.

7         MR. BIAGETTI:  Then we get back to the

8  preponderance, Judge.  At worst that evidence is in

9  equipoise.  You cannot draw an inference that no

10  testing was done after Varnum was hired.

11         THE COURT:  He asserts that no testing was

12  done because he says, I got a lot of junk that I

13  wasn't getting when I was doing testing.

14         MR. BIAGETTI:  And his own employee who

15  picked up all of this stuff, Hooper, says that the

16  quality never changed throughout this time, and Clark

17  says that he never got a complaint from Fletcher until

18  Clark --

19         THE COURT:  That second point I think is

20  something I need to consider.  I understand that

21  argument, and I think it's a valid argument.

22         MR. BIAGETTI:  And he accepted 17 pick-ups

23  during this time, 70 drums each, a savvy businessman,

24  and never makes a peep.  Instead, he pays 150 bucks a

25  load for what he claims is junk.  It makes no sense,

1   respectfully.

2          THE COURT:  If he's getting it for free, 150

3   bucks is great.  If he can get a couple of barrels of

4   good Pyranol, even if he's got a bunch of bad barrels,

5   but if he has to start paying for every barrel, then

6   it becomes a problem.

7          MR. BIAGETTI:  And of course the evidence in

8   the case is that every single one of these barrels --

9   even if you believe that the Monsanto analysis of

10  drums back at GE is reflective of what Mr. Fletcher

11  got, we have the expert testimony unrebutted of

12  Girard.

13         In fact, Mr. Portfolio, the United States'

14  expert, agrees that even Pyranol contaminated with up

15  to 22 percent of TCE, precisely what's described by

16  the Monsanto analysis, is usable for the purpose that

17  Fletcher was selling it, as an extender and roof

18  coating.  It is useful for that purpose --

19         THE COURT:  What evidence is there on the

20  record that GE understood that Fletcher was selling

21  this as an extender and roof coating?

22         MR. BIAGETTI:  There is none that he

23  understood it was being done for that, but when you

24  get to the government's point about the inevitable

25  came to pass, there's no evidence that discard or

1   uselessness ever came to pass.  All of the evidence is

2   to the contrary.

3           THE COURT:  There's one damning piece of

4   evidence of intent, and that's Mr. Abbe's own

5   statement that, we hoped he could use some of it and

6   thought he would dispose of the rest.  That's pretty

7   damning to you, isn't it?

8           MR. BIAGETTI:  That's not the Abbe testimony,

9   respectfully.

10          THE COURT:  Well, let's get out the actual

11  quote.  I've read it, and maybe I wrote it down

12  incorrectly, but put it up there.

13          MR. BIAGETTI:  The balance of it he could

14  dispose of -- Abbe 77 -- he could dispose of.  She

15  then asks him -- she tries to refresh him three times

16  on what he knew on the subject, Judge, and he says at

17  page 54, "The only thing I knew he was doing with it

18  was adding it to paint."  That's what Mr. Abbe tells

19  the government agent back in 1992 in Exhibit 80,

20  Judge.  He says, "The only thing I knew was that he

21  had a use for it."

22          On page 56, "The only thing I knew for sure

23  was that they were adding it to paint."  On page 93,

24  "Do you remember learning from anybody from GE or

25  Fletcher that Fletcher was disposing of some

1  quantity?"  Answer:  "No."

2           Now, when you challenge the government on

3  what evidence there was that GE knew that Fletcher was

4  using it for something else, and Ms. Fiske pointed to

5  Richard Fletcher.  He was using it on dust.  Richard

6  Fletcher, at page 64, says that Fletcher was using

7  Aroclor on dust.  He never says he was using

8  Pyranol --

9           THE COURT:  He wasn't using Aroclor.  That's

10  the most implausible, silly argument I've ever heard.

11  He's going to buy Aroclor at $3 a gallon to use as a

12  dust suppressant when he's got thousands of barrels of

13  Pyranol?  That just strains -- I mean that doesn't

14  pass the straight face test.

15           MR. BIAGETTI:  It's the only evidence of any

16  knowledge of any other use --

17           THE COURT:  I think the argument you should

18  be making, which is a much more potent argument, is

19  that this whole issue of dust suppressant is a red

20  herring because there's no evidence that anyone in GE

21  ever knew that Fletcher was ever using it as a dust

22  suppressant, but to say that Fletcher was using

23  Aroclor as a dust suppressant when he was drowning in

24  contaminated Pyranol is absurd.

25           MR. BIAGETTI:  Judge, we made it clear in the

1  opening.  We showed you a graph and we proved that GE

2  only knew that Fletcher made paint, and he added

3  plasticizer to paint.

4         THE COURT:  There's no evidence to suggest

5  that GE knew that Fletcher was using this as a dust

6  suppressant.

7         MR. BIAGETTI:  None.  It's simply an

8  illustration -- and I will move on -- that you have to

9  look at the evidence and decide whether or not

10  inferences may be drawn from it.

11         THE COURT:  Your example you give is a good

12  one in which a judge cannot throw common sense out the

13  window, okay?  People -- he was referring to Aroclor

14  as the generic name for the scrap Aroclor he was

15  getting from whatever sources, which includes Sprague

16  and other places.

17         MR. BIAGETTI:  Thank you.

18         THE COURT:  He wasn't using it to refer to

19  Aroclor that was bought from Monsanto at $3 a gallon

20  because you don't pour money down the drain when you

21  don't need to.  That's common sense.  Do I have direct

22  evidence?  Is there a witness who said, no, we didn't

23  use Aroclor from Monsanto as a dust suppressant?  I

24  don't need to have somebody testify that, you know,

25  when he's talking about Aroclor, he's talking about

1   scrap Aroclor, which includes Pyranol.  It isn't

2   virgin Aroclor because it's -- I'm entitled to use

3   common sense and say, people don't behave

4   irrationally.  You have free Pyranol you've already

5   got -- whatever you paid for you've got there.  You're

6   going to go to the store and buy $3 a gallon Aroclor

7   to pour on the ground?  No.  That's an example of how

8   a judge can use common sense to understand the

9   evidence.  That's not substituting my own theories for

10  facts.  That's using common sense.

11          MR. BIAGETTI:  I understand, and you made the

12  point, your Honor, that the evidence showed that Mr.

13  Fletcher was also buying used Aroclor from Sprague and

14  Aerovox so that could have been what was going on, as

15  well.

16          THE COURT:  That's correct.

17          MR. BIAGETTI:  The point is the evidence, if

18  it's in equipoise, the fact is not proven.  If the

19  fact is not proven, then an inference may not be drawn

20  reasonably from it.

21          On a bigger issue -- and I think your Honor

22  recognized this in the comments before Ms. Fiske that

23  we had -- you must find that GE knew or must have

24  known of an event that did not, in fact, occur;

25  namely, a disposal, a discarding by Fletcher.

1          THE COURT:  Wait.  I think we're on a

2    completely different understanding.  What the

3    government has to prove is otherwise arranged for

4    disposal.  The government doesn't have to prove

5    disposal to prove they otherwise arranged for

6    disposal.  So to the extent you're suggesting that

7    disposal never happened, the government can't prove

8    that disposal ever happened.  Therefore, it cannot

9    prove that GE otherwise arranged for disposal.  No,

10   that does not logically follow from the other.

11          In fact, you don't have to prove a disposal

12   to prove that GE arranged for disposal.  To ultimately

13   prove liability here, you have to establish that, but

14   you've conceded that part of it and that part is not

15   an issue in this case.  So I don't buy the proposition

16   that you win unless the government has proved here

17   more likely than not that there was a disposal of

18   scrap Pyranol at the Fletcher paint work site.

19          MR. BIAGETTI:  Whether or not there was, in

20   fact, a disposal by Fletcher is probative of what GE

21   knew.

22          THE COURT:  It is probative.  It is not

23   conclusive.  I said that earlier.

24          MR. BIAGETTI:  We agreed but that is another

25   inference that will have to be drawn here.  There is

1    nothing inevitable about discard of what Fletcher had

2    because the experts agree -- can we put up that

3    graphic -- the experts agree that all of the Pyranol

4    that was sold, to the extent we have evidence of

5    descriptions of it, was usable for the purposes to

6    which Fletcher and Webster were putting it, and we

7    point out that even up to 22 percent PCB, what the

8    Monsanto folks report that they found in the drums

9    back at GE, would not have presented a problem in the

10   roof coating, as PCB and TCE are good solvents for

11   asphalt and both faster drying than mineral spirits.

12          We have the testimony of Mr. Hooper that they

13   would add --

14          THE COURT:  I think the roof coating is

15   another complete red herring.  There's no evidence

16   that GE knew about this potential use as an extender.

17   There's no evidence that it was understood in the

18   market that Aroclor was, in fact, used this way.

19   There's no evidence that Fletcher ever told anybody it

20   was being used in this way.  So to suggest that it is

21   theoretically possible that it could be used for an

22   extender says nothing of value in the case.

23          MR. BIAGETTI:  I respectfully disagree.

24   First of all, we just agreed that whether or not

25   Fletcher discarded is probative of whether or not GE

1  knew that.  It is probative that Fletcher never

2  discarded because he had a customer who was buying all

3  the thin stuff.  You have the testimony of Mr. Hooper,

4  for example, your Honor, who said that they

5  deliberately --

6          THE COURT:  Hooper never testified that he

7  bought all of the scrap Pyranol on the Fletcher site,

8  thousands of barrels, they bought it all and used it

9  as extender.  That's fantasy land.  There's no

10  evidence of that.

11          MR. BIAGETTI:  Hooper's testimony is that

12  Webster received a lot of the thin stuff.  A lot.

13  That Kamieniki took a lot of what was left, even after

14  1968, and that of course everything else was either

15  usable by Fletcher as plasticizer or he sold it to

16  several customers.  That was Hooper's testimony.  The

17  good stuff --

18          THE COURT:  I think there was evidence to

19  suggest that it may have been sold to multiple

20  customers early on and there was -- there was evidence

21  to suggest that some -- certainly not all -- was sold

22  to the predecessor, to Webtex, but that vast

23  quantities, the vast bulk of it, remained on the site

24  well past the days when Fletcher was operating it as a

25  viable paint business.  The evidence seems almost

1  undisputed on that point.

2          MR. BIAGETTI:  There's no evidence that it

3  was vast quantities, but to whatever extent --

4          THE COURT:  You stipulated that there were

5  over 3,000 barrels of Pyranol taken to the site from

6  GE.  You stipulated to that.  You stipulated to an

7  amount of Pyranol that produces at least 3,500 barrels

8  more than that -- I'm using a very conservative

9  number -- stipulated to that.  So the idea that there

10  isn't evidence that there were vast quantities brought

11  to the site is silly.  There clearly were.

12          MR. BIAGETTI:  I misheard you, Judge.  Those

13  quantities were brought to the site.  I thought you

14  meant there was evidence that those sat at the site.

15          THE COURT:  And most of the scrap Aroclor

16  that was purchased came from GE, not from the other

17  sources.  And there were thousands of barrels at the

18  site well past the 1970s when there were no further

19  operations.  We saw pictures of it.  Now, some of

20  those could have been other things other than Pyranol,

21  but the witness testified that was in the area where

22  he knew Pyranol was stored because he worked there.

23          MR. BIAGETTI:  And the same witness said that

24  was the area where they piled Aroclor that came from

25  Aerovox.

1            THE COURT:  But the bulk of it came from GE.

2            MR. BIAGETTI:  And was stored along with

3   Aroclor from Sprague and Aerovox, resins, oils,

4   linseed oil, paint, other products that Fletcher was

5   buying.  There was not one witness -- Racicot, Hooper,

6   Whitney -- who was able to say that he could identify

7   any marks of any kind on any of those drums after '68

8   to identify them as GE's.  I mention that there's no

9   chemical evidence that even establishes that there

10  were PCBs in any of those drums, let alone that they

11  were scrap Pyranol, let alone that it was GE's.  No

12  evidence of that.  The evidence is --

13           THE COURT:  Not because they were tested and

14  found not to contain that, right?  Because the barrels

15  were all removed before there was testing, right?  So

16  let's be careful we don't create confusion about the

17  reality.  Nobody tested the barrels and found them not

18  to be PCBs.  The barrels were removed, right, so

19  nobody could test them?

20           MR. BIAGETTI:  The barrels were removed by

21  EPA.

22           THE COURT:  EPA removed the barrels?  You

23  never tested the barrels?

24           MS. FISKE:  Your Honor, Mr. Kamieniki removed

25  many of the barrels in 1983 after TSCA had been

1  passed.  And then in addition, EPA tested the drums

2  that were remaining and removed them.

3          THE COURT:  And none of those were PCB.

4          MS. FISKE:  Some of those did contain PCB.

5          THE COURT:  Well, then what's he saying when

6  they didn't?  Because that's not the phase of the

7  trial we're involved with.  That's not what's being

8  proved today, but don't tell me that there's no

9  evidence that any of the drums contained PCBs if they

10 were sampled and shown to contain PCBs.

11         MR. BIAGETTI:  I said there was no evidence

12 in the record of this case, your Honor.

13         THE COURT:  That's really bad, counsel.

14 Don't do that to me.

15         MR. BIAGETTI:  But here is the more important

16 point --

17         THE COURT:  That's way too tricky.  Do not

18 mislead courts.  That's not a good thing.

19         MR. BIAGETTI:  I'm not trying to mislead you,

20 Judge.  I'm trying to make the point that none of

21 those witnesses -- Racicot, Hooper, Whitney --

22 identified any of the barrels as GE's barrels, okay?

23         THE COURT:  I accept that.

24         MR. BIAGETTI:  Okay, but more importantly, we

25 know that Fletcher, after February of 1968, did not

1  discard a single one of these barrels.  He stored them

2  on pallets.  He cared for them.  Mr. Whitney said we

3  would even go into the pile to check for leakers and

4  fix them.  He sold some to --

5        THE COURT:  I saw the picture of the barrels

6  turned on their side and stacked four and five deep by

7  the hundreds.  I saw the picture.  We were able to

8  date the picture based on the age of the kids that

9  were there.  The guy that took the picture, it was

10 from his yard looking at the piles of barrels that he

11 testified to he was involved in putting there, which

12 included the Pyranol.

13        MR. BIAGETTI:  Judge, not a single barrel

14 discarded.  There's no argument that there was a

15 release here.  That's why we're here.  I'm not trying

16 to be tricky, respectfully.  There was a release.

17 There was not discarding or disposal by Fletcher.

18 There was quite the opposite.  Even in 1974 when he

19 tries to sell it through Hub Fabric, the letter from

20 Hub says he's trying to sell it because of the current

21 plasticizer shortage.  He valued this product as a

22 plasticizer substitute.  He cared for it in that way.

23 He tried to sell it in that way.  There is no

24 evidence, your Honor, that he tried to discard a drop

25 of it.

1          THE COURT:  Your client is a sophisticated

2   company, right?

3          MR. BIAGETTI:  Yes, sir.

4          THE COURT:  They're in the business to make a

5   profit, right?

6          MR. BIAGETTI:  Of course.

7          THE COURT:  They understand chemicals, right?

8   They had a paint business, didn't they?

9          MR. BIAGETTI:  In another part of the

10  country.

11         THE COURT:  Okay.  If the Aroclor that this

12  product, in your view, is a complete substitute for

13  sold for $3 a gallon, right?  The answer is yes

14  because you stipulated that or it's in the record.

15         MR. BIAGETTI:  Yes.  Stipulated.

16         THE COURT:  GE paid or received from

17  Fletcher, for the stuff he paid for, four cents a

18  gallon.  That's a little less than 1/100th the cost,

19  okay.  If this was a valuable substitute for Aroclor,

20  would a sophisticated company like GE let it get out

21  of its hands for 1/100th of the cost of Aroclor?

22         MR. BIAGETTI:  Yes.  There are several --

23  because there are several leaps there in terms of what

24  was actually happening from '53 to '68.  First of all,

25  you have men in a capacitor department in upstate New

1   York.  They have a product that is of no further use

2   to them for their very demanding purposes.  They find

3   a way -- Abbe called it wonderful, exceptional -- to

4   make a profit on the sale of this stuff.  Why?

5   Because the customer was going to use it.

6           THE COURT:  I'm not buying your expert's

7   theory that this is in its form, right out of the

8   barrel, could be brought to a paint company and pumped

9   into batches of paint as a plasticizer and be used as

10  an Aroclor substitute.

11          MR. BIAGETTI:  Of course that's exactly what

12  Hooper says happened to the '53 batch.

13          THE COURT:  Let's assume that's true.  Your

14  company -- we have to look at what does your company

15  do with its scrap Pyranol.  We know it dumps it into

16  the river.  We know it landfills it.  We know it gives

17  it away for free to local towns to use on roads, and

18  we know he sells it to Fletcher.  All of the uses

19  except selling to Fletcher are disposals for which GE

20  can earn nothing and for some of which it has to pay.

21  What it gives to Fletcher it gives at 1/100th the cost

22  of virgin Aroclor.  If I accept your expert's

23  interpretation as you describe it, that scrap Pyranol

24  can simply be mixed in with batches of paint and serve

25  as an effective substitute for Aroclor, I must assume

1    that GE is one of the least rational, least

2    sophisticated companies in the world because they're

3    just throwing away what they can sell to the paint

4    industry for many, many, many multiples of what it's

5    selling it to Fletcher, and of course compared to what

6    it gives it away for when it dumps it in the river or

7    pays somebody to haul it away for when it landfills

8    it, it just doesn't make any sense.

9              MR. BIAGETTI:  Now, you are, Judge,

10   respectfully, superimposing the 2008 --

11             THE COURT:  That's baloney, okay.  That is

12   complete baloney, and I can tell you the Court of

13   Appeals will not agree with you on that point.  I

14   guarantee that 100 percent.  That's what fact finding

15   is.  To suggest that that is substituting my own views

16   is absurd.

17             MR. BIAGETTI:  Two men in upstate New York in

18   1953 --

19             THE COURT:  That's fact finding.  That is

20   exactly what juries do every day in the United States.

21   They take facts.  What did Fletcher pay for it?  They

22   take facts.  What did GE do with it?  They take facts.

23   What was the price of Aroclor?  And they test it

24   against the reasonableness of an expert's testimony

25   that this could be used as an Aroclor substitute and

1  that it was used widely as an Aroclor substitute, and

2  it says the facts don't support that claim.  That's

3  why that expert's claim is not credible, to the extent

4  he says something that extreme.

5         MR. BIAGETTI:  Your Honor, when GE finds in

6  upstate New York a customer, Fletcher, okay, they are

7  told that he's going to be using it in paint.  Those

8  folks in 1953 in upstate New York are not part of GE's

9  paint business.  They don't know what the conglomerate

10  GE is doing in another part of the country.  All they

11  see is a tremendous opportunity to make -- to solve

12  two problems.

13         THE COURT:  So they don't know that there is

14  any market for -- you're telling me -- any market for

15  scrap Pyranol for use as a plasticizer anywhere in the

16  world except at Fletcher Paint because you're telling

17  me they have no knowledge of the market of paints for

18  plasticizer.  So if I accept that.  I must accept the

19  proposition that the only potential use that they

20  could foresee of this was as a use by Fletcher in his

21  small little paint business of paint as a plasticizer.

22         MR. BIAGETTI:  That is the state of evidence,

23  yes.

24         THE COURT:  Okay.  If that is true, then we

25  know they think Fletcher is a small paint manufacturer

1  that is using a plasticizer, which is a minor

2  ingredient in a certain subset of paints, and to the

3  tune of 3,500 barrels of Pyranol is using that in his

4  little paint business.

5           MR. BIAGETTI:  He keeps coming back for more.

6  Yes, your Honor.  He keeps coming back for more.

7           Now, both Clark and Abbe testified that they

8  had no idea how much plasticizer went into paint or

9  whether or not Fletcher made other paints.  We know

10 from the Fletcher witnesses that he made roof coating,

11 that the pool paint was the same formula card as the

12 rubber based paint so it could well have been used in

13 that; and of course we know that Fletcher is also

14 selling it to Webster.  Why is that important, even if

15 GE doesn't know it?  Because it puts into context what

16 GE was hearing from Fletcher at the time.  An

17 important piece of evidence, Judge, that the United

18 States has seized on that I would ask you to take

19 another close look at, is Hooper at 31.  This is when

20 he's talking about the Metevier deal, such as it is.

21 It's a piece of evidence that the government comes

22 back to again and again.  Now, for circumstantial

23 knowledge of what GE knew.  And what Hooper says is --

24 when he's talking about Metevier -- well, he said that

25 he understood that we were getting drums that were not

1    Pyranol or were so thinned out that it was not usable.

2            Well, first of all, Metevier understood that,

3    from whom?  From Fletcher, of course, and Fletcher is

4    telling a half truth there.  Fletcher is saying it's

5    of no use but he's not --

6            THE COURT:  Wait a second.  Are you trying to

7    display something for me?

8            MR. BIAGETTI:  No.  I was just reading to you

9    from Hooper 31.

10           THE COURT:  Okay.  I just wanted to be sure I

11   wasn't missing something.

12           MR. BIAGETTI:  No.  Hooper 31.  He understood

13   that we were getting drums that were not Pyranol or

14   were so thinned out that it was not usable.  Fletcher

15   is telling this to Metevier.  Fletcher is saying it's

16   not usable.  It wasn't usable to Fletcher.  It was too

17   thin for the use as a plasticizer, but he, of course,

18   is selling all of it at a cheaper price to Webster.

19   He's telling Metevier something to, frankly, play him

20   in the same way that he does with Mr. Clark years

21   later.  He buys all of the Pyranol.

22           We have a stipulation in this case, Judge,

23   that what Fletcher could not use, Fletcher attempted

24   to sell to other customers.  He had a useful purpose

25   for every drop of this Pyranol.

1          THE COURT:  Let's focus for a while on what

2    was actually in the drums.  I have a witness who

3    testified that it was used -- that Pyranol was used as

4    a -- he called it pump oil.  Do you agree with that?

5          MR. BIAGETTI:  Yes.  I believe that that was

6    Mr. Huchro on the fact that oil could get in

7    occasionally with some of the --

8          THE COURT:  Also, Flexon said it about

9    booster pumps as diffusion pump oil.

10          MR. BIAGETTI:  Yes.

11          THE COURT:  That it was used to infuse

12    capacitors.  We know that, right?

13          MR. BIAGETTI:  Yes.

14          THE COURT:  That Aroclor was treated at GE to

15    make Pyranol, right?

16          MR. BIAGETTI:  Aroclor was treated at GE.

17          THE COURT:  To make Pyranol.

18          MR. BIAGETTI:  Yes.

19          THE COURT:  Both filtered and had

20    additives to it.

21          MR. BIAGETTI:  They made a higher standard of

22    purity than Monsanto.

23          THE COURT:  Well, it had additives to it, and

24    depending on the type of Pyranol, the additive could

25    constitute in excess of 25 percent by volume of the

1  whole product, right?

2          MR. BIAGETTI:  Correct.

3          THE COURT:  So at various times, particularly

4  Pyranol 2, there were substantial additives put into

5  the Aroclor by GE.

6          MR. BIAGETTI:  Which had no effect on the

7  purposes for which Fletcher used it, but yes.

8          THE COURT:  For which GE used -- we can talk

9  about Fletcher later on -- we know that there would be

10  mineral oil on these capacitors, right?

11          MR. BIAGETTI:  Yes.

12          THE COURT:  We know that there were drip pans

13  to collect drippings of Pyranol as it was coming off

14  the capacitors that would sit for several days before

15  they were emptied, right?

16          MR. BIAGETTI:  Yes.

17          THE COURT:  We know there were troughs in the

18  floor that collected Pyranol, right?

19          MR. BIAGETTI:  Yes.

20          THE COURT:  We know TCE was applied as a

21  degreaser to degrease the capacitors?

22          MR. BIAGETTI:  Yes.

23          THE COURT:  We know TCE and Pyranol would mix

24  together and collect in these various repositories.

25  One time they called it a pit.  Sometimes they called

1   it a trough.  Sometimes they called it a drip pan,

2   right?  You're nodding your head.  And they also would

3   use -- they would try to reclaim some of the TCE in a

4   still that they would have to periodically clean out

5   and empty the bottom of these stills that would have

6   the residue of Pyranol, mineral oil, metals, other

7   matters that would not be distilled out when the TCE

8   was distilled out, right?

9         MR. BIAGETTI:  Yes.

10        THE COURT:  That when you use Pyranol as a

11  pump oil, pumps break, pumps need to be cleaned, pumps

12  have other kinds of contaminants in them so we know

13  that that Pyranol would have that.  We know that the

14  Pyranol that would be drained out of a defective

15  capacitor would be collected, and that that would

16  contain metals and other substances.  We know that

17  Pyranol would be spilled.  Sometimes it would be

18  cleaned with Speedy Clean.  The Speedy Clean would

19  be -- the liquid would be put into a scrap Pyranol

20  barrel and the Speedy Clean would be put into another

21  barrel, right?

22        MR. BIAGETTI:  Yes.

23        THE COURT:  Okay.  So what we've got is -- we

24  also know there would be certain batches of this that

25  could not be brought up to spec.  That they would try

1  their best when they were making the Pyranol from the

2  Aroclor and they couldn't get it up to spec so they

3  would dump the whole batch.

4          MR. BIAGETTI:  Right.

5          THE COURT:  There was a scrap Pyranol tank in

6  which quantities of scrap Pyranol were accumulated for

7  significant periods, and when full it would be drained

8  into 55 gallon drums, right?

9          MR. BIAGETTI:  500 to a thousand gallon tank,

10 yes.

11         THE COURT:  Okay, and that would contain

12 mixtures of Pyranol from wherever the scrap Pyranol

13 would be collected, and that would be drained into 55

14 gallon drums.  We also know that there would be scrap

15 Pyranol placed directly into 55 gallon drums, and so

16 the scrap Pyranol that was being sold to Fletcher's

17 was Pyranol from all of these sources, right?

18         MR. BIAGETTI:  It could have been, yes.

19 We're going to talk about what was actually picked up

20 at Fletcher in a minute, but go ahead.

21         THE COURT:  That's what we know about where

22 it came from.

23         MR. BIAGETTI:  What it could have contained,

24 yes.

25         THE COURT:  What we know from Hooper and from

1   Fletcher's letter and from Monsanto's testing of the

2   barrels is that, in fact, they varied greatly in terms

3   of what was in them, and substantial amounts of TCE

4   would be in the barrels.  Water would be in the

5   barrels.  Dirt would be in the barrels.  Pyranol would

6   be of different color and different thicknesses from

7   barrel to barrel.  We all know that, right?  Do you

8   disagree with that?

9          MR. BIAGETTI:  Do not disagree.

10          THE COURT:  That's what we know about what

11   was in the barrels, right?

12          MR. BIAGETTI:  That's what we know could be

13   in the barrels as they were created at GE, and if I

14   may for the moment -- if we could talk about the state

15   of the evidence about what Fletcher picked up?

16          THE COURT:  Okay.

17          MR. BIAGETTI:  Just one more point on the

18   Fletcher matter, of course.  He says that prior to

19   this period of hauling by someone that Metevier was

20   very careful to make sure that Fletcher received what

21   he called the right material.  So through the Metevier

22   years from Fletcher's mouth we have --

23          THE COURT:  What I'm getting is that you

24   divided into several periods.  The first period GE

25   just delivered stuff.  The second period Fletcher

1  picked it up from Metevier.  It varied greatly in

2  quality.  When he got a lot of bad barrels, he called

3  Metevier.  Metevier would make an adjustment and give

4  him extra barrels for free.  Then there was a period

5  of Varnum.  Varnum required him to pay for every

6  barrel that went off the site.  So after a while he

7  went into hydrometer testing for specific gravity to

8  take the barrels that he wanted.  That doesn't mean

9  that everything would be usable from it, but he would

10  take the barrels he wanted and leave behind the ones

11  that he would not.  Then there was the post-Varnum

12  period where, as I understand it, Fletcher used

13  contract haulers to haul scrap Pyranol from GE and

14  that these amounted to over a thousand barrels that

15  came during this period and that Fletcher did not pay

16  for these barrels at all, was hounded about payment,

17  responded by saying the barrels contain a lot of junk

18  barrels, garbage, that I don't want and can't use,

19  that GE had some testing done by Monsanto of a

20  representative sample of drums from the scrap Pyranol

21  area, which GE concluded corroborated Fletcher's

22  explanation.  And that all of that, therefore,

23  suggests that there were, throughout this period, a

24  large number of barrels, in the thousands, that were

25  of varying quality.  Many of which were not of

1    acceptable quality to be used even for the uses that

2    Fletcher was trying to put it to.  That's what I'm

3    taking from the evidence about what was actually in

4    the barrels.  What do you see there that I've

5    overlooked?

6          MR. BIAGETTI:  I'm going to get to it in one

7    second because the evidence of the independent hauling

8    is that Hooper recalled that he did it throughout and

9    occasionally Ross may have.  Whitney said that Hooper

10   did it throughout and it was possible that on a couple

11   of occasions Madison did.

12         THE COURT:  Do you think I'm, as a matter of

13   law, precluded from believing what's in Fletcher's

14   statements in this letter?

15         MR. BIAGETTI:  As a matter of law, no, but as

16   a matter of weighing the evidence on whether or not

17   what Fletcher is saying is true, I don't think you can

18   draw the inference that it is.

19         Let me move on to what Fletcher picked up.

20   First of all, what we did on the left hand side here,

21   your Honor, is to summarize, as best we could, the

22   evidence of places where the Pyranol could have come

23   from at GE.  You mentioned a couple of these already.

24   You talked about the TCE, and we know that that was

25   used for cleaning.  We also know that Fletcher knew he

1  was buying Pyranol with TCE.  Hooper recalled they

2  would get some with a degreaser.  Hooper also recalled

3  that they would occasionally add -- Fletcher would add

4  some Tri-Clean D into the thick Pyranol so that it

5  could be tested and used.  So Fletcher knew, yes, some

6  of it had Tri-Clean D, TCE, but Fletcher knew he was

7  getting that and kept buying it.  He bargained with

8  Metevier to get that lower cost on the thin stuff, but

9  he was selling it to Webster and it was usable by

10  Webster for Webster's purpose.  See the government's

11  expert, Portfolio.

12          We know that -- in terms of order of

13  magnitude, Judge, how much of this stuff was coming

14  from those tanks of what we call off-spec Pyranol, the

15  stuff that having been recycled several times through

16  the fuller's earth, no longer met GE's demanding

17  specifications.  They had no use for it.

18          It is Huchro and Murray, the two chemical

19  engineers at Hudson Falls for the entire period in

20  question here, who described that for us.  Murray is

21  the guy that says there were these 500 gallon tanks

22  that would on occasion be drummed up and marked as

23  scrap Pyranol.

24          Huchro says, yes, there was some that was

25  collected from the drip pans.  About four drums a year

1  came from that process.  So we have some sense, too,

2  of order of magnitude of where the scrap Pyranol was

3  coming from that ends up on the dock at GE.  GE

4  admittedly, after finding Fletcher, does not treat

5  this stuff as junk.  GE stores it.  GE puts it in a

6  separate area.  Clark said this.  GE labels it --

7          THE COURT:  But he said we're drowning in

8  Pyranol.  We've got to get rid of this stuff.

9          MR. BIAGETTI:  I know your Honor talked about

10  the dual purpose.  If the only thing that GE wanted to

11  do was solve its space problem, why not dump

12  the contents and sell the drums?  They're worth $1.25

13  each.  The government was talking in their closing

14  arguments about the value of the drums.  Why not dump

15  the Pyranol in the river or whatever and sell the

16  drums for a buck twenty-five?  Why not -- we had the

17  evidence -- the letter about the mobile landfill

18  operations.  In that same letter when Abbe is talking

19  about drowning in Pyranol, he says can he go and use a

20  normal dumpster operation?  Why not resort to a normal

21  dumpster operation?  Because GE had a buyer which it

22  reasonably believed was using and buying more.

23          THE COURT:  GE did landfill scrap Pyranol.

24  Why would it do that?  The Hudson Falls plant -- I

25  don't know the other plant, but I know the location of

1   the Hudson Falls plant because I drove by it two weeks

2   ago, as their witness described to me.  It's right

3   next to the river.  If they wanted to, they could have

4   poured it in.  Why did they pay to landfill it

5   instead?  We don't know the answer to that.  I don't

6   know that I need the answer, but certainly a plausible

7   answer is GE was becoming more environmentally

8   conscious, and by the 70s it's reasonable to assume

9   that GE, because people were starting to complain in

10  the 70s about PCB, didn't want to be seen as a bad

11  neighbor in pouring thousands of gallons of chemicals

12  into the river.  So it stopped doing that but it paid

13  people after that to landfill it and it gave it away

14  to others.  If it had a use for it where it could sell

15  it, it would have sold it.

16          MR. BIAGETTI:  And in the 50s and 60s of

17  course, it did, and you might draw the inference that

18  what it was selling to Fletcher was a Racicot, Hooper,

19  Whitney of a higher quality.  Why?  Because of the

20  second column here, what Fletcher picked up.  This is

21  the evidence of what Fletcher actually picked up and

22  was using or selling.  Hooper, real Pyranol was thick,

23  heavy.  That's the stuff that he says they got in that

24  first shipment.  Remember?  1953 he sold it to several

25  customers, Hooper said.  When they ran out of

1  plasticizer at the factory, Hooper said Fletcher said,

2  go out back, use that stuff, and that's what they did.

3  He used so much of it he wanted to come back for more

4  from GE and he bought from Sprague and Aerovox.

5          THE COURT:  I'm not buying, used so much of

6  it.  It's a 5 to 7 percent additive to a batch of very

7  limited quality of rubberized paints and roof coating

8  that Fletcher made infrequently compared to his other

9  painting businesses, and I don't believe they used

10  much of it.  They used some, but I don't believe the

11  evidence suggests they used much of it at the site.

12          MR. BIAGETTI:  Fair enough.  The undisputed

13  evidence is that he came back for more to GE, and he

14  bought from Sprague and Aerovox at a higher price

15  during that period.

16          THE COURT:  Do we know what they paid Sprague

17  and Aerovox for scrap Aroclor?

18          MR. BIAGETTI:  I don't know exactly.  I

19  thought there might have been -- but it was more.  So

20  that's the heavy thick stuff.  I would submit to you

21  that's the stuff Fletcher is talking about even in his

22  posturing letter about the Metevier years.  That was

23  the right material -- the stuff that he says Metevier

24  was careful that Fletcher got, and to the extent

25  that -- and this is a stipulation, as well, Judge, in

1  the case.  Metevier did not give for free loads.

2  Metevier gave additional amounts, per the stipulation,

3  to make up for the thinner loads.  Again, Fletcher was

4  telling Metevier half truths.  It's too thin for me to

5  use.

6          THE COURT:  When I said free, that's what I

7  meant.

8          MR. BIAGETTI:  Thank you.

9          THE COURT:  He would give free barrels

10 because that's what that is.  When you give extra

11 barrels on a load for which you do not charge, you're

12 giving free barrels to make it up.

13         MR. BIAGETTI:  You heard Clark.  This was a

14 single exceptional valued customer.  They made

15 concessions to cultivate the continued demand by

16 Fletcher.

17         THE COURT:  You're overstating.  I mean GE

18 wouldn't have been in business if this were -- are

19 what they would call one of their prime valued

20 customers.  This was a scrapper who was taking away

21 scrap Pyranol.  GE was a very profitable, very

22 successful capacitor maker on an international scale.

23 To call Fletcher a preferred customer for that kind of

24 business is a big stretch.

25         MR. BIAGETTI:  GE was a profit seeker and it

1   was making pure profit now on something that in the

2   past it had to dispose of.  A pure profit seeking

3   motive, and everything they did was consistent with

4   that.

5            Now we get to the thinner Pyranol that had

6   things mixed in it.  Okay.  So now we're talking

7   about, oh, boy, this is the cigarette butts, the soda

8   cans.  What are we talking about?  Whitney tells us --

9   and I believe it was in response to questions from you

10  about the filtering process -- all of the barrels go

11  into the big tank.  Remember, they cut it in half and

12  they poured it in.  They pump it because it's thick.

13  They pump it through these filters.  I think he said

14  sometimes it took overnight.

15           THE COURT:  They also mixed and pumped.

16           MR. BIAGETTI:  They mixed and pumped.

17           THE COURT:  That's a partial answer to the

18  varying quality because they tried to homogenize the

19  quality by mixing and filtering.

20           MR. BIAGETTI:  Yes, and what comes out?

21  What's left?  Whitney recalled it.  Black specks.

22  That's it.  No gloves.  No shoes.  No soda cans.

23  Black specks.  No evidence any of that was hazardous.

24  That's what came out.  So that's what we know about

25  what Fletcher picked up.

```
 1          THE COURT:  I think the soda cans and gloves
 2   and cigarette butts argument is a little bit strained.
 3   That stuff might have found its way in there.  That
 4   wasn't the problem with the Pyranol.  That could have
 5   been filtered out, I suspect.  The problem is not
 6   that.  The problem is the dirt, the oil residues, the
 7   mineral oil, the TCE, the metal contaminants.  All
 8   those things.  I don't know if you've ever taken apart
 9   a hydraulic pump or seen a TCE still or seen a
10   chemical tank that has to be cleaned out periodically.
11   If you ever did, you would know, it's not like -- I
12   used to do TCE cases in Silicone Valley, and I've been
13   in clean rooms.  It's not like a clean room that
14   they're operating here.  This is a manufacturing
15   operation.  I'm not saying GE did it in any kind of
16   substandard way, but it's a very dirty business but
17   it's not -- the problem is not that there's soda cans
18   floating in the Pyranol.  I agree with you on that.
19          MR. BIAGETTI:  And what Fletcher got, Judge,
20   based on this evidence from the Fletcher employees, is
21   probative of what Fletcher was picking up at GE, which
22   is probative of what GE saw Fletcher picking up, which
23   is probative of GE's knowledge of whether or not it
24   was -- to use Ms. Fiske's word -- inevitable that
25   there would be a disposal by Fletcher.
```

1            Lastly, what Fletcher did with it, okay?  We

2    know that the real heavy stuff he uses that substitute

3    and sold it to several customers.  I mentioned that.

4    The thinner stuff -- we know from Hooper -- he sold as

5    is -- or as Whitney pointed out, after some blending

6    and filtering he sold at a cheaper price but he sold

7    it.  We know that there were these other drums.  He

8    said there was a mixture in a few drums of something

9    that not even the chemists -- not even the paint

10   chemists at Fletcher knew what it was, and those were

11   set aside.

12           They were asked on direct by the government,

13   do you know what happened to those drums, and they

14   answered no.  So no evidence that they were disposed

15   of, but you may infer that since the Fletcher Paint

16   chemists didn't know what it was, it wasn't Pyranol.

17   It wasn't TCE.

18           THE COURT:  Do you have a theory as to why it

19   would be relevant for Fletcher to know the specific

20   gravity of the drum of scrap Pyranol?

21           MR. BIAGETTI:  My theory would be customer

22   satisfaction for Webtex.

23           THE COURT:  If you have something that's a

24   mixture -- some things that are heavier than Pyranol,

25   denser than Pyranol, some things that are less dense

1  than Pyranol and Pyranol -- what does the specific

2  gravity of the drum tell you about the contents?  It

3  doesn't necessarily tell you is this pure Pyranol?  Is

4  this a mixture of Pyranol and TCE and water?  Pyranol,

5  mineral oil, TCE and water?  It doesn't tell you.  No

6  one has been able to answer that question for me, and

7  I wondered if you had one, which is why is he

8  bothering to test this thing for specific gravity?  I

9  guess if he got one that was close to the specific

10  gravity of Pyranol, he's going to draw a beneficial

11  inference that it's probably mostly Pyranol?

12          MR. BIAGETTI:  I don't know the answer.

13  Hooper is no chemist.  All Hooper knows is that he's

14  doing some testing.  There are chemists, Bishop and

15  McNulty, who, as Mr. Racicot testified, are using

16  syringes and doing other kinds of testing, and you may

17  infer that was to please -- first of all, to make sure

18  some of it -- to get to your point about the risk --

19  is this a good enough load for Fletcher to use in his

20  paint, roof coating, pool paint, rubber-based paint,

21  or is it the thinner stuff that he can sell to his

22  customer, Webster?

23          THE COURT:  Let's spend a minute on that

24  because I thought that was an important point.  You

25  don't seem to think much of this, but paints are made

1   from -- it's chemistry.  They're made from formulas,

2   and there was interesting testimony -- I can't recall

3   which of the experts it was about -- about the nature

4   of Aroclor and how it binds with various resins and

5   how it is effective or not.  And so I'm -- but the

6   problem I'm having is paint is made from a recipe,

7   essentially.  Aroclor comprises a small part of the

8   recipe in those paints that call for it, 5 percent or

9   less.  The vast bulk of the formula are other things,

10  the cost to the manufacturer.  If you don't know

11  what's in the Aroclor substitute that you're using,

12  for example if it's half TCE and half Aroclor and you

13  put in the amount called for as if it were full

14  Aroclor, you won't get the quality of the plasticizer

15  effect to the extent you need to.  So that batch will

16  end up being defective simply because half of it is

17  TCE and half of it is Aroclor.

18          If you have other contaminants in there, it

19  might interfere with the ability of the mixture to mix

20  appropriately.  It might affect the drying time for

21  the formula which, depending upon what you're using it

22  for, is very important.

23          You can't deliver a product to specification

24  if you don't know what you're putting in the product.

25  That seems to be problematic when what you're trying

1    to do is save a little on a 5 percent constituent and

2    running at risk the whole load.  What do you have to

3    say about that?

4         MR. BIAGETTI:  First of all, Judge, you're

5    wrestling with all of this why?  The folks at the

6    capacitor crew at GE Hudson Falls don't know a darn

7    thing about paint chemistry.  You're wrestling with it

8    because what Fletcher could do with it is probative of

9    what GE knew about what Fletcher was doing, first of

10   all, and the evidence is quite clear that while

11   Fletcher was using some of the thick stuff, the really

12   thick stuff -- Hooper said he liked that -- as a

13   fairly safe Aroclor substitute -- remember the first

14   thing he does in '53 to '56 is he tries it as an

15   Aroclor substitute, and we may infer it works because

16   he consumes or resells all of it.  So he knows the

17   good stuff is going to work and he's got McNulty and

18   Bishop, his chemists, to confirm that, however they

19   do.  He's got no risk there.

20        All of the rest of it, I submit the evidence

21   shows, he's selling to Webster, and there he's triple

22   dipping.  First he's got somebody who will take the

23   thinner stuff for roof coatings.  Is it usable for

24   that purpose?  The government's expert, Portfolio,

25   tells us, absolutely.  So number one, he's making

1  money on the stuff that he can't use in his own paint.

2  Two, he's going back to Metevier and to Clark and he's

3  telling them, I can't use this.  It's too thin.  They

4  know some of it is thin.  They think he's using it in

5  paint.  They cultivate and provide a price concession.

6  He buys at a lower price and, three, we have the

7  testimony --

8          THE COURT:  You're saying GE thought they

9  could use it all, but they made concessions to him

10  anyways.  They knew that they were being scammed, and

11  yet they just allowed themselves to be scammed.

12          MR. BIAGETTI:  If I said I knew they were

13  being scammed, I didn't mean to.  Quite the opposite.

14          THE COURT:  So GE thought, in fact, when

15  Metevier told them, I've got scrap Pyranol that I

16  can't use, that they understood that he couldn't use

17  it and that's why they made him concessions?

18          MR. BIAGETTI:  When Fletcher gave Metevier

19  the understanding that some of it Fletcher could not

20  use, that may -- first of all, that's hearsay.

21          THE COURT:  Why isn't that an admission that

22  the barrels that were provided by GE to Fletcher

23  were -- at least some of them were being provided for

24  disposal because GE knew that Fletcher couldn't use

25  those barrels?

1          MR. BIAGETTI:  Because Fletcher keeps coming

2    back for more.  He makes 70 trips, Judge, according to

3    the documents.  Not once on the return trip to Hudson

4    does he bring back any that he, in fact, cannot use.

5    Not once.  He's using or selling every drop --

6          THE COURT:  Because GE would never take back

7    these barrels because it was trying to dispose of it.

8          MR. BIAGETTI:  It never came up.

9          THE COURT:  In the simple,

10   commonly-understood sense of, get rid of it, right?

11   They didn't think that these barrels would be valuable

12   to GE.  They wanted to get rid of it to the point that

13   they were willing to forfeit their $1.25 deposit that

14   they would make on barrels of Aroclor that they got

15   from Monsanto.  Because Monsanto would charge them --

16   my understanding is -- a $1.25 deposit per barrel.  GE

17   is willing to ship it out and lose the $1.25 per

18   barrel because it doesn't want this stuff back because

19   they know they can't use it and they don't want the

20   scrap yard to fill up with scrap Pyranol.

21         MR. BIAGETTI:  The evidence is Abbe, Clark,

22   the only thing they knew for sure Fletcher was doing

23   was using it in paint.  They had no idea how much.

24         Metevier says, when you get right down to it,

25   that I understood from Fletcher that some of it was

1   thin, give me some more.  We have a stipulation in the

2   case that that's precisely what GE did, additional

3   loads to make up for it.  And finally, again, we have

4   the testimony of -- I believe it was Racicot or

5   Whitney -- that Fletcher was then taking the Webster

6   paint, the roof coating that was being made with the

7   thinner stuff, slapping a Fletcher Paint label on it

8   and selling it at Fletcher stores.  He's making money

9   three different ways on the thinner stuff.

10          The last thing that we know that Hooper and

11  Whitney recalled that Fletcher got was some barrels

12  that had TCE and he said -- you know, the usual

13  Fletcher, always the entrepreneur.  He sold those.

14  That was valuable stuff, and he sold it.  So when we

15  look at what Fletcher actually picked up --

16          THE COURT:  Where's the reference to that he

17  was selling the barrels of TCE he got from --

18          MR. BIAGETTI:  I'll have it for you in a

19  second, Judge.  I don't have it at my fingertips.

20          THE COURT:  Okay.  It's up now.  Whose

21  testimony is that?

22          MR. BIAGETTI:  That was Hooper, I believe.

23          THE COURT:  Hooper?

24          MR. BIAGETTI:  Correct.  Hooper at 254.

25          THE COURT:  Okay.

1          MR. BIAGETTI:  So that's what was actually

2   happening to the scrap Pyranol that Fletcher was

3   taking and, to a certain extent, reselling.

4          Finally, we had some testimony about some

5   stuff that was set aside -- placed to one side.  And

6   again, they were asked directly on examination whether

7   they knew what was done with that.  They said they did

8   not --

9          THE COURT:  Who is Kamieniki?

10          MR. BIAGETTI:  Kamieniki was a businessman

11   who -- the testimony is from Hooper -- came by

12   sometime later -- sometime after 1968 and took, quote,

13   a lot of those barrels that had been set aside.

14          THE COURT:  Did either of you ever find him,

15   track him down, know what he did with the barrels or

16   anything like that?

17          MS. FISKE:  Your Honor, our investigator

18   located his widow, and there is testimony -- I'm not

19   sure if it's in the record or not.

20          THE COURT:  I won't consider it.  I was just

21   curious about whether you followed up to see what

22   happened to him.

23          MS. FISKE:  He ran various -- a garden shop

24   known as The Junk Man.  He came and picked up the

25   stuff.  There's no evidence in the record that he paid

1  the man, as opposed to maybe Fletcher paying him.  It

2  was sometime in the early 80s.

3          THE COURT:  And no evidence as to what he did

4  with it?

5          MS. FISKE:  We have not been able to

6  determine that from conversations with his widow.

7          THE COURT:  Okay.  There's nothing in the

8  record on that and I don't want to --

9          MR. BIAGETTI:  There was a question asked

10 whether anybody knew -- of one of the witnesses --

11 whether they knew what Kamieniki's business was, and

12 the answer was no.

13          The point is this.  Again, back to no discard

14 by Fletcher.  Fletcher -- once Webster dried up as a

15 customer, Fletcher could have taken the barrels and

16 poured out the contents, sold the empty drums for a

17 buck fifty.  He doesn't do it.  He stacks them on

18 clean pallets.  He checks them for leaks.  He has his

19 crew -- Hooper says, we were supposed to check them.

20 He stores them.  He tries to sell them during the

21 plasticizer shortage of 1974 as a substitute for

22 plasticizer.  He sells some to Kamieniki.

23          THE COURT:  When was it banned for use as a

24 plasticizer?

25          MS. FISKE:  1978.

```
 1              THE COURT:  1978.

 2              MR. BIAGETTI:  That's in the Shifrin report.

 3  But again, in terms of all the evidence of how

 4  Fletcher valued this stuff, he could have poured it

 5  out, sold the drums, did not.  Stored them, stacked

 6  them, fixed them, tried to sell them.  No

 7  preponderance of evidence of any discard by Fletcher.

 8              Was there eventually a release 20 years

 9  later?  Of course.  Is there any evidence that any of

10  that was from drums of GE's Pyranol?  None, your

11  Honor.  We know that Fletcher stacked these along with

12  drums from Aerovox, from Sprague, his own resins, his

13  own linseed oil, et cetera, and there's no evidence

14  that anything that was released was hazardous.

15              THE COURT:  I don't know anything about the

16  site work done here -- and this may not be in the

17  record.  Are there any PCBs in the groundwater?

18              MS. FISKE:  Yes.

19              MR. FLYNN:  Yes.

20              THE COURT:  I assume that's why you're going

21  after these guys, right?

22              MR. FLYNN:  Yes.  There's PCBs in the

23  groundwater, in the soil, and we have a stipulation

24  that shows it's 400, but half of the drums that were

25  tested contain PCBs.  Exhibit 55 of the United States
```

1  exhibit list.

2         MR. BIAGETTI:   Judge, I just want to touch on

3  two more points, if I may, about GE's reason to know

4  what was going on.  First, we have GE's -- what GE saw

5  during what we're going to call the Metevier years,

6  and we tried to put together for you here -- can we

7  move it to the left a little bit -- a timeline where

8  we have the pick-ups beginning -- if we could move to

9  the left a little bit, yeah, there it is.  That first

10 shipment we talk about in 1953, it's more than a

11 hundred drums and it's all either used or sold.  He

12 comes back for more.

13        By '55 the sales to Webster begin, and now

14 the pick-ups by Fletcher begin.  This is what GE sees,

15 a pick-up in '56 of 20 drums; 17 pick-ups in '57; 12,

16 11, 12.  There are complaints during this time,

17 according to Metevier, only about two things.  One,

18 short loads.  You didn't give me enough.  You didn't

19 sell me enough.  Or two, stuff is so thin that I can't

20 use it, and so additional makeup loads are provided.

21 That's our stipulation that you see down here, and so

22 the pick-ups continue throughout the Metevier period.

23 There is never a return of a barrel.  Hooper says that

24 the quality never changed during this period.

25 Fletcher says that this was the period in which GE was

1   careful to give us the right material.

2           And the only other point I believe we have

3   during the Metevier years is the tour, when Metevier

4   goes to Fletcher Paint.  You heard the questioning on

5   that subject.  All Metevier could see at that time was

6   a bustling paint operation.  He couldn't see the

7   stockpile of drums, to the extent it existed, because

8   the walls were too high and he couldn't see it when he

9   was in Mr. Fletcher's office.  But what if he had?

10  What if he had?  He would have simply seen Fletcher

11  storing on pallets his -- maintaining his inventory.

12  He would not have seen discard.  Again, no willful

13  blindness.  To the extent that they did ask, they were

14  told it was being used in paint, we have that

15  testimony.  And even if they had seen, all they would

16  have seen was storage and care, not discard.

17          After the Metevier years -- can we move it

18  over?  That's perfect.  Thank you.  We have Metevier

19  retiring and we have the testimony that Varnum came

20  aboard and said, basically, if you haul it, you bought

21  it, and so the testing at GE begins.

22          What did Hooper say?  They saw the testing --

23  that GE's crew on the dock and Mr. Varnum saw the

24  testing with the beaker and the hydrometer, saw the

25  selection and rejection by Fletcher's crew.  And

1   again, at the risk of bringing it up for the third

2   time --

3          THE COURT:  Doesn't that show that GE

4   understood that not all of the waste Pyranol it

5   produced was of acceptable quality for Fletcher?

6   Therefore, in years where barrels were being shipped

7   without hydrometer testing, either before the time

8   when they were doing it or after when they were

9   getting shipments by a contract shipper, that GE well

10  understood that not all of the Pyranol was usable for

11  Fletcher?

12         MR. BIAGETTI:  I don't think so, Judge,

13  because the quality stayed the same, Hooper tells us

14  that, and the pick-ups continue.  If you look at '66

15  and '67, even in the years when, according to Hooper

16  and Whitney, it is possible that there were a couple

17  of independent contractor shipments by a guy hired by

18  Fletcher, that's the state of evidence --

19         THE COURT:  The pick-ups went on during the

20  Metevier years because Metevier gave free barrels in

21  compensation for bad barrels.  They went on in the

22  Varnum years because Fletcher was able to reject

23  on-site the barrels that it didn't want.  And they

24  went on in the contractor years because Fletcher was

25  getting the barrels without paying for them because he

1    just refused to pay the invoices until they started to

2    go after him.  Then he complained and he ended up

3    getting them for free.  So that's why it went on even

4    though during the Metevier and pre-Metevier years they

5    knew they were getting bad barrels, and in the

6    post-Varnum years they knew they had gotten bad

7    barrels because they didn't have to pay for any of

8    them.  That's why -- that's I guess why you and I are

9    seeing this case in very different ways.

10           MR. BIAGETTI:  You are focusing a lot on what

11   ends up being the Fletcher letter.  In the Metevier

12   years we know we have some complaints about short

13   loads, about thin stuff and we have some make-up

14   barrels being shipped.  That, respectfully, Judge,

15   does not equate to evidence that Fletcher was not

16   using what he had.  He was -- we know he was using the

17   thick stuff.  The rest he was reselling.  He wasn't

18   telling GE about the reselling.  GE only knew about

19   the use.

20           THE COURT:  He could have been filtering and

21   blending it and using it all, as you're suggesting.

22   That's one possible argument I understand you to be

23   making on that.  He could have been selling it all as

24   an extender and lying to Metevier and lying to Clark

25   or whoever he wrote the letter to.

1            MR. BIAGETTI:  Clark.

2            THE COURT:  That's another possibility.  Or

3    it could be as he was representing, which is, I can't

4    use a lot of this stuff.  I'm not going to give it

5    back to you.  I'll keep it here even though I can't

6    use it, but I want allowances made for the fact that I

7    can't use it.  Those are the three possibilities.  You

8    discount the last one, but it seemed to focus on the

9    other two.

10            MR. BIAGETTI:  Well, I discount the last one

11   to the extent that all of his behavior after that is

12   inconsistent with this notion that he can't use.  He

13   keeps buying the paint.  During the Metevier years

14   he's buying and paying for.  He's never returning any.

15   During the post-Metevier years the testing is going

16   on.  He's taking what he thinks are good barrels, and

17   then we come to the Clark letter, and so I want to get

18   to that next, if we can.

19            THE COURT:  I've got to give my reporter a

20   rest soon.  Are you getting close to being done?

21            MR. BIAGETTI:  Can I have ten minutes?

22            THE COURT:  Can my reporter go another ten

23   minutes?  She says yes.  Ten minutes, and then we'll

24   take a break.

25            MR. BIAGETTI:  Unless you want to take the

128

1   break now.

2          THE COURT:  No.  I'm fine.

3          MR. BIAGETTI:  First of all, there's things

4   that we know that he even in this letter concedes,

5   we've had good relations with your company.  Metevier

6   used to be careful that the drums that were shipped

7   were reasonably clean.  He took care that he did not

8   receive drums that were only partially filled or had a

9   lot of water.  When our truck was picking up, folks

10  were careful to give us the right material.  We have

11  been through that.  Now we get to his contentions --

12  and, again, remember, Clark's testimony is I had a

13  conversation with him in January.  He never -- and I'm

14  trying to cultivate -- I'm trying to encourage more

15  buying.  I know that he hasn't paid.  I mention that

16  in the call but at the end.  That's in January.

17  Within a couple of weeks for the first time ever

18  during the Clark years there's a complaint, and here's

19  what it is.  The first contention:  About two or three

20  years ago something happened -- or shall we say a

21  variety of things happened.  Well, we know, first of

22  all, Hooper says nothing happened.  Quality stayed the

23  same throughout, and we know that during this period

24  Fletcher made 26 more pick-ups of 2,500 drums without

25  a complaint.  Without a peep.

1          THE COURT:  Go on.

2          MR. BIAGETTI:  Thank you.  You put the

3   Pyranol in badly contaminated drums containing coal

4   tar emulsion.  Well, that's not what Murray or

5   Dashinaw are saying.  They saw the drums and said they

6   were new.  Mumblo said they were new.  Clark recalls

7   that they were new.

8          THE COURT:  I don't know that there's any

9   evidence that coal tar emulsion was ever used.  I had

10  a lot of coal tar cases, too, and it's generally a

11  residue of coal gasification, and it's not something

12  that would be a product or a by-product of a capacitor

13  manufacturer so I don't know what that is.

14         MR. BIAGETTI:  Nor are we.  And remember,

15  Fletcher recognizes in this letter through the whole

16  thing, unknown to me this has been going on for some

17  time.  So he is, at best, guessing and wrong and, at

18  worst, posturing.  One more.  You have shipped drums

19  one-quarter and one-half full.  Well, we know, again,

20  after the Metevier years there was testing that went

21  on at GE and only drums that were selected by Hooper

22  came back.  Clark recalls no previous complaints on

23  this subject either.

24         Next.  And here we have this other trucker.

25  Again, Hooper and Whitney say, it was only Hooper who

1  did the pick-ups or a couple of times Fletcher may

2  have hired Ross or Fletcher may have hired Madsen.  No

3  evidence that there was any hauling by GE.  No

4  evidence that there was any billing of 150 bucks a

5  load by GE or payment by Fletcher of $150 a --

6        THE COURT:  And Fletcher doesn't contend

7  that.  His letter contends he paid for it all.

8        MR. BIAGETTI:  Right.  Yes, he does.  So

9  we have to believe during that time period, when those

10  loads were coming -- again, it was 70 drums a load.

11  They came 17 times in 1966 and 1967.  They were

12  garbage, according to savvy businessman Fletcher, and

13  he accepted every single one of them without a peep.

14        GE reasonably disbelieved this letter.  How

15  do we know?  One, Clark and Abbe say it; but two, they

16  do the Monsanto test.  Why test material if you're

17  laying down -- if your state of mind is, this is

18  garbage, we found this out, that's the end of that.

19  No.  They didn't believe it.  They challenged its

20  validity.  That's why they do -- the very fact of the

21  Monsanto test is evidence of GE's state of mind that

22  they did not believe what Fletcher was saying in this

23  letter, or to use Clark's words, that the stuff was

24  anywhere near as bad as Fletcher said.  We believed he

25  could continue to use it.

1          Abbe and Clark then decide on the write-off.

2    Why?  They don't want to spend GE's money -- GE the

3    profit maximizer -- on sending a chemist for a week.

4    And most importantly, they want to keep Mr. Fletcher

5    happy.  They want to cultivate him.  They want him to

6    resume buying.  Abbe believes that it worked.  His

7    testimony is that he did continue to buy.  Hooper

8    says, I continued to make pick-ups up until my

9    gallbladder operation in 1970.  So that was GE's state

10   of mind.  We don't believe it.  We think he'll

11   continue to buy and use.  Let's cultivate and get him

12   to do it.  And that's what they did.

13          So you don't get to, respectfully, any

14   inference of an intent by GE to arrange for a disposal

15   here unless you make several ambitious inferences.

16   There's no direct evidence of the state of mind of GE

17   knowing that Fletcher was going to dispose.  They

18   thought he was using it in paint.

19          There's no evidence that Fletcher did

20   discard.  He cared for everything.  He put it on

21   pallets.  He tried to sell it.  He never dumped out

22   the contents and sold those drums for a buck and a

23   quarter.  He was storing his inventory because it had

24   value to him.

25          You would have to find, Judge, or infer in

1  order to find circumstances here of intent to arrange

2  for disposal would be at least this:  That the testing

3  did indeed end sometime before November of 1967.  That

4  those 17 loads that came afterwards came without any

5  scrutiny at all, but we know that the quality didn't

6  change at that time.  We know that Hooper continued to

7  make the pick-ups and Hooper was on the stand.  The

8  government never asked him, did you continue to do the

9  testing after?  Because his recollection was that he

10  did continue to make pick-ups, that Varnum continued

11  to work there -- that was Hooper's recollection --

12  that there were no other people that did it and that

13  the testing continued.

14          You would have to find that of those drums

15  that came in those two years of an independent hauler

16  or two, that the quality in them declined

17  dramatically, so dramatically that it was actually

18  below what the Monsanto test reported.  Namely, up to

19  22 percent because we know from the government's

20  expert, Portfolio, and our experts, that anything even

21  as described by Monsanto was usable in roof coating,

22  which Fletcher made, and was usable in the products

23  that Fletcher was selling to Webster.

24          So there would be no stockpiling after that

25  unless the stuff in there had declined in quality so

1  dramatically that it was even worse than what Monsanto

2  had reported.  And again, Fletcher never makes a peep

3  during this time about uselessness.

4          THE COURT:  If you were to tick off the five

5  strongest points to suggest in your view that this

6  arrangement between GE and Fletcher was an arrangement

7  for sale of Pyranol that was to be used rather than

8  disposed of, I think one of them would be Fletcher

9  paid for the product.  Another would be Fletcher told

10  various people at GE that he was using it as a

11  plasticizer in paints.

12          MR. BIAGETTI:  Yes.

13          THE COURT:  Give me the other three points

14  that you think support your interpretation.  Not

15  arguments that they can't prove that, but what

16  evidence do you have that -- affirmative evidence that

17  that is what the arrangement was?

18          MR. BIAGETTI:  What GE saw of Fletcher's

19  conduct at the -- both in doing the testing and

20  selecting and rejecting at the GE dock, and before

21  that seeing that Fletcher was only complaining about

22  short loads, wanting more.  That's consistent with

23  knowledge of putting it to a useful purpose.  The

24  expert --

25          THE COURT:  So that he bought and that he

1   continued to buy over a multi-year period.

2          MR. BIAGETTI:  Yes.

3          THE COURT:  If he were just experimenting and

4   thought he might be able to use it, he might have

5   bought one load, but you wouldn't see him coming back

6   buying more loads.  So I think you would say not only

7   did he pay for it, but that he paid for it on multiple

8   occasions over a multiple-year period suggests use.

9          MR. BIAGETTI:  Yeah, and that he kept

10  bargaining.  He complained when he didn't get enough.

11  That he paid two prices.  He was pushing as hard as he

12  could to drive the best bargain because, he had -- at

13  least in his eyes he had a use.  I would add the

14  unanimity among the experts that this was indeed

15  useful and usable for the purposes that Fletcher was

16  using them for and that Fletcher, in turn, was making

17  money on.  It was not inevitable that there was going

18  to be any discard here because it was all usable.  It

19  was all usable.

20          And finally, I would say the way that GE

21  treated the product, okay?  It segregated it on the

22  dock.  It labeled it.  It held it there.  It didn't

23  dump it into the Hudson River.  It didn't sell the

24  empty drums.  It held it for Fletcher to buy and

25  cultivated Fletcher whenever it could to continue to

1   buy more.

2          Lastly, Judge, to the extent that you decide

3   that there was something more than a release here,

4   that there was a disposal --

5          THE COURT:  I'm not going to decide today

6   whether there was a disposal, okay?  That was not what

7   I was asked to do.  I'm not doing that.

8          MR. BIAGETTI:  But you would have to find

9   that this was something more than a mere abandonment

10  of drums after Fletcher dies in 1983.  Up until that

11  time he cared for them, put them on a pallet, checked

12  them for leaks.  Sometime thereafter there was

13  leaking.  There's no evidence that it's GE's drums

14  that leak, and there's no evidence that Fletcher had

15  that or contemplated that or had it in mind.  The

16  evidence is quite the opposite.

17         So there again, Judge, there's no evidence

18  that either GE or Fletcher was using any of this as,

19  to use the statutory term that your Honor was talking

20  about before, a solid waste.  This stuff was being

21  used, as far as GE knew, in a manufacturing process by

22  its one valued client as to whom it was making a

23  hundred percent profit on, essentially, and that was

24  Fletcher.  There was no discard.  There was no

25  recycling by Fletcher of that product, and there was

1  no knowledge by GE that that's what Fletcher was doing

2  with it.

3        All GE saw was Fletcher buying, bargaining,

4  complaining when he didn't get enough and coming back

5  for more, and we believe that that proof establishes

6  facts from which you must infer that there was no

7  knowledge on GE's part at the time, '53 to '68, that

8  this was being -- that it was substantially certain

9  that Fletcher was going to take this stuff and dispose

10  of it.  May I have one moment?

11        THE COURT:  Yes.

12        MR. BIAGETTI:  Thank you for your time.

13        THE COURT:  Thank you.  I want to commend

14  counsel for both sides.  I think you've --

15  particularly GE has tried to present every single fact

16  that could possibly be presented to support its side

17  of the case, and I respect that.  I think on a couple

18  of occasions in your oral argument today you reached a

19  little further than I would have in trying to ask for

20  further inferences to be drawn, but I do respect the

21  fact that you have zealously represented your client

22  and tried to bring to my attention every single fact

23  that could possibly support your position that the

24  government has not proved that there was an

25  arrangement for disposal here.  I'm going to take a

1  break and then I'll come back and give you a decision

2  in ten or fifteen minutes.

3       (Recess)

4       THE COURT:  The sole issue I'm going to

5  decide today is whether GE "otherwise arranged for

6  disposal" of a hazardous substance when it arranged

7  with Mr. Fletcher to transfer waste Pyranol from GE to

8  Mr. Fletcher and his businesses.

9       As I've previously explained, the government

10 has the burden of proving by a preponderance of the

11 evidence that GE did otherwise arrange for disposal of

12 the scrap Pyranol.  I've also explained that it's my

13 interpretation of the phrase "otherwise arranged for

14 disposal", that the phrase means -- that the phrase

15 means entered into an arrangement in which disposal

16 was the desired outcome; that is, the objective and

17 cases in which the person who arranges for disposal

18 knows that disposal is substantially certain to result

19 from the arrangement.

20      I believe that I should consider the totality

21 of relevant circumstances in making this determination

22 and not treat any one piece of evidence as

23 dispositive.  Using this test I find by a

24 preponderance of the evidence that the government has

25 proved in this case that GE otherwise arranged for the

138

1   disposal of waste Pyranol.  Let me explain my

2   reasoning.

3           I think we need to examine several matters in

4   order to try to resolve this dispute.  We need to ask

5   ourselves:  What was in the drums of waste Pyranol

6   that GE transferred to Mr. Fletcher?  We need to ask

7   ourselves:  What did GE do with the scrap Pyranol that

8   it did not transfer to Mr. Fletcher?

9           We need to ask ourselves:  What did GE

10  understand about Mr. Fletcher's business when it

11  entered into the arrangement with him?  We need to

12  understand what was GE's understanding of the

13  potential uses of waste Pyranol at the time it entered

14  into the arrangement, and we need to understand the

15  precise contours of the arrangement between GE and Mr.

16  Fletcher as it evolved over time.

17          I want to start with asking:  What is it that

18  was in the barrels of scrap Pyranol that were

19  transferred to Fletcher?  I think we know that scrap

20  Pyranol came from several sources within the GE

21  manufacturing process.  GE purchased Aroclors from

22  Monsanto.  It then filtered those Aroclors and added

23  things to them.  What they added changed over time as

24  the composition of the Pyranol changed to meet

25  changing specifications.  GE would filter the Aroclors

1  with fuller's earth and add things to it to make

2  Pyranol.  At one time, for example, as much as 25

3  percent of Pyranol would be comprised of a different

4  compound, PCB, and there were other additives used at

5  different times during the process of producing

6  Pyranol.

7            Pyranol was used by GE primarily to -- I'm

8  going to use the term -- infuse capacitors.  It was

9  used as a dielectric fluid and it was placed inside

10  the capacitors.  During the manufacturing of

11  capacitors, waste Pyranol could be produced in a

12  variety of different ways.  There were occasions in

13  which GE was not able to bring a batch of Pyranol up

14  to specification and would have to declare the entire

15  batch a waste product.  It would regularly be the case

16  that Pyranol would spill during the manufacturing

17  process and have to be recovered sometimes with Speedy

18  Clean being poured on the spill; other times the spill

19  being collected in other ways.  The liquid portions

20  would be treated as scrap Pyranol.

21            Scrap Pyranol would be collected in drip pans

22  that would be placed at various points along the

23  manufacturing process.  Scrap Pyranol would be

24  collected from troughs that were cut into the floor.

25  Scrap Pyranol would be recovered after TCE was

1   distilled for reuse.  TCE is a degreaser that was used

2   to clean the capacitors during the manufacturing

3   process, and frequently you would find TCE mixed with

4   Pyranol.  And when that occurred, the Pyranol would

5   have to be treated as scrap Pyranol.

6           Scrap Pyranol would contain TCE.  It would

7   contain water.  It would contain mineral oil.  It

8   would contain metal.  It would contain dirt and debris

9   that would find its way into the drip pans and the

10  troughs and on the floor when spills would occur.  It

11  was also produced when capacitors were tested and

12  found to be defective.  They would have to be drained

13  and the Pyranol would be treated as scrap Pyranol.

14          Scrap Pyranol was collected in a scrap

15  Pyranol tank in which scrap Pyranol from a variety of

16  sources would be deposited into the tank until it was

17  filled to a sufficient degree that it would be poured

18  off into 55 gallon drums.  On other occasions scrap

19  Pyranol would be placed in the drums directly.  When a

20  sufficient amount of scrap Pyranol was collected in 55

21  gallon drums, it would be removed to a scrap area and

22  it would be labeled as scrap Pyranol.  It would be

23  retained in the scrap area with other kinds of scrap

24  materials.

25          What do we know about the content of that

1   scrap Pyranol?  I believe that it varied dramatically

2   in quality from barrel to barrel.  When barrels were

3   composed primarily of a batch of Pyranol that didn't

4   meet a specification, it would be relatively

5   uncontaminated.  When it came from other sources, it

6   might have much higher degrees of contamination.

7           I forgot to mention another source of scrap

8   Pyranol would be the use in pumps -- they sometimes

9   refer to them as oil pumps -- and those pumps would

10  leak or have to be cleaned and the oil in the pumps

11  would be Pyranol, and that would be scrapped, as well.

12          The 55 gallon drums contained a variety of

13  substances, including Pyranol, and the composition of

14  each barrel would vary from barrel to barrel.  We know

15  this both from -- we know it from Mr. Hooper's

16  testimony.  We know it from Mr. Fletcher's complaints

17  to Mr. Metevier.  We know it from the fact that Mr.

18  Fletcher had to do testing of barrels during the

19  Varnum regime where he was being required to pay for

20  every barrel that he took.  We know it from Mr.

21  Fletcher's complaints to GE when he was asked to pay

22  for drums that he hadn't paid for that had been

23  shipped using a private contractor and for which, in

24  my view, no testing at the loading dock had been done

25  as had been with the Varnum barrels, and we know it

1   from the Monsanto test results from the representative

2   sample of drums from the GE scrap area.

3          So we know that it would vary dramatically in

4   its composition and would contain, in some cases, more

5   than 20 percent TCE, would contain water, would

6   contain mineral oil, would contain metals, would

7   contain other substances, would contain dirt and

8   debris.  And so we know that the scrap Pyranol was

9   really far, far different from the Aroclor that would

10  be purchased by GE from Monsanto.

11         In fact, although some efforts were made

12  initially or at some point to get Monsanto to reclaim

13  the Pyranol, it was deemed not feasible to do so, and

14  it simply could not in that form have been used as a

15  substitute for Aroclor; certainly as a dielectric

16  fluid or, as I'll explain later, as a plasticizer in

17  paints.

18         What do we know about GE's uses of scrap

19  Pyranol?  I believe it's unquestioned in this case

20  that GE viewed scrap Pyranol as a waste.  It was a

21  by-product of its manufacturing process.  It was

22  something to be gotten rid of by GE.  It was not

23  something that GE saw as a profit center -- a way to

24  make money through the sale of a product.

25         We know this because every other use that GE

1   made of scrap Pyranol unquestionably qualifies as a

2   disposal.  We know GE dumped it into the river.

3   That's an arrangement for disposal.  We know GE

4   landfilled it.  That's an arrangement for disposal.

5   We know GE gave it to local communities for use as a

6   dust suppressant, and we know that that's a disposal.

7   There isn't a single instance of GE entering into an

8   arrangement to use scrap Pyranol for anything other

9   than things that would amount to disposal in this

10  record.  And the only question is:  Did its

11  arrangement with Fletcher amount to something other

12  than an arrangement for disposal?  It is highly

13  relevant that all of the other arrangements that GE

14  made with respect to waste Pyranol were arrangements

15  for disposal.

16          Now, what do we know about GE's understanding

17  about what Fletcher did?  Fletcher was a small paint

18  manufacturer and chemical scrapper, and GE understood

19  him to be such.  A small paint manufacturer and

20  chemical scrapper.

21          I don't believe there's persuasive evidence

22  in the record to suggest that GE knew that Fletcher

23  was using Pyranol, himself, as a dust suppressant,

24  although clearly GE knew that others used scrap

25  Pyranol for that purpose.  I don't believe there's

1  persuasive evidence in the record to suggest that GE

2  knew that Fletcher was using it as -- would use it as

3  an herbicide or insecticide, although GE knew that

4  others were using scrap Pyranol for that purpose.

5        I don't believe that there's any evidence in

6  the record to suggest that GE knew that Fletcher was

7  selling scrap Pyranol to anyone else; and certainly no

8  evidence in the record to suggest that GE was aware of

9  sales of scrap Pyranol to Webtex or its predecessor

10 company.

11       I think it is worth at least noting what, in

12 fact, we know about what Fletcher did with the Pyranol

13 at the site, but to me that's less important than what

14 GE understood when it entered into the arrangement

15 with Fletcher.  There is evidence -- and finally, I

16 think there is evidence to suggest that GE understood

17 that Fletcher was using at least some of it in a paint

18 manufacturing process as a plasticizer.

19       Now, what, in fact, did we know about what

20 Fletcher used the Pyranol for?  Fletcher did use the

21 Pyranol as a plasticizer in a rubber-based pool paint

22 or a cement surface paint and perhaps in some roof

23 coating that he manufactured.  These were very small

24 quantities in comparison to Mr. Fletcher's other paint

25 making operations and so I can't precisely identify

1  how much was used, but a very, very small proportion

2  of the more than 3,500 barrels of Pyranol that --

3  scrap Pyranol that Mr. Fletcher obtained from GE were

4  used for these purposes.

5          Scrap Pyranol was sold by Mr. Fletcher to

6  Webtex's predecessor.  The precise use to which it was

7  being put is not clear to me, although it may have

8  been used in roofing materials, and there is some

9  evidence to suggest that some quantities were also

10 sold by Fletcher to other customers.

11         I am -- it is my judgment, and I believe the

12 government has proved that only a very small

13 proportion of the very large quantity of Pyranol that

14 was received by Mr. Fletcher was ever used for any of

15 these purposes.  The vast majority of it was never

16 used and remained on-site until it was hauled away.

17         What do we know about what Mr. Fletcher

18 actually physically did with the waste Pyranol when it

19 got to his site?  We know that some of it was blended

20 and filtered.  Light Pyranol was mixed with heavier

21 Pyranol.  It was filtered and some of it was used.  We

22 know that early on many of the barrels were stored on

23 their side behind what was the Fletcher paint factory.

24 Later, after some fill was added to that site, barrels

25 were stored on pallets and stacked vertically.  The

1   barrels were also stored at other locations on that

2   site and another site Mr. Fletcher owned.  The other

3   site they were placed on their sides, stacked two,

4   three, four, five on top of each other.

5          Over time -- the quantity of Pyranol at the

6   site would fluctuate somewhat -- but over time it

7   tended to grow rather than diminish, and certainly

8   there were thousands of barrels of waste Pyranol that

9   were at the site.  And we do know that Mr. Fletcher

10  purchased scrap Aroclor from two other companies,

11  Aerovox and Sprague, but these were small in

12  comparison to the numbers of scrap Pyranol barrels

13  that he was purchasing from GE.

14         What do we know about the potential uses for

15  scrap Pyranol?  Again, I think what's most important

16  here to me is what did GE understand at the time, but

17  since the parties have spent significant effort trying

18  to establish what potential uses for this product

19  were, let me comment on that and make certain findings

20  concerning that subject.

21         Aroclor, which was used to make Pyranol, did

22  have recommended uses as a plasticizer in certain

23  kinds of paint products that called for plasticizers.

24  Where it was used, it was a relatively small

25  constituent of the paint product that was being

1  manufactured.  Five percent or less would be the

2  plasticizer.

3          Aroclor was recommended for use as a

4  plasticizer in certain kinds of paint, and there was a

5  market for the use of certain Aroclors as plasticizer

6  in certain kinds of paint.  And it's conceivable that

7  the Aroclors that GE was purchasing could also have

8  been used as a plasticizer in certain kinds of paints,

9  although I need to be clear that Monsanto used Aroclor

10  as a trade name that covered a variety of different

11  kinds of products and not every product would be a

12  substitute for every other kind of Aroclor.

13          Indeed, some Aroclors were not even PCBs, as

14  I understand it, but I do think it's at least

15  conceivable that some of the Aroclors that GE

16  purchased did have a use -- alternative use as a

17  plasticizer in certain kinds of paints.

18          It is theoretically possible that scrap

19  Aroclor, at least some of it, could have been used as

20  plasticizer for certain kinds of paint; and as I've

21  already suggested, I think Mr. Fletcher used it for

22  this purpose.

23          It does not appear to me that there was any

24  market at the time for scrap Pyranol -- market of any

25  size for scrap Pyranol as a plasticizer in paints, and

1  it doesn't make to me any economic sense that there

2  would be such a market for the reasons testified by

3  one of the experts; that because it's such a small

4  constituent part of a batch of paint where a

5  plasticizer is called for and because the quality of

6  the scrap Pyranol varied so radically and because

7  paints have to be produced in accordance with specific

8  formulas, it would be simply too risky given the

9  potential limited cost savings of substituting scrap

10 Pyranol for Aroclor to take the risk of ruining an

11 entire batch of paint with that kind of substitute

12 product.

13        I also don't see any evidence that there was

14 any -- there's no evidence in this record to suggest

15 that anybody anywhere in the world, other than Mr.

16 Fletcher was using scrap Pyranol as a plasticizer in

17 paints or selling it for that purpose.  Certainly GE

18 was not doing that.  There's no evidence that GE did

19 with any of the Aroclor -- scrap Aroclor it had at its

20 facilities.  As I explained, it disposed of it in

21 every other case other than, as we're discussing here,

22 the transfers to Mr. Fletcher.

23        GE was a sophisticated company.  It had paint

24 making operations.  It's reasonable to assume that if

25 scrap Aroclor were a viable substitute for scrap --

1  scrap Pyranol were a viable substitute for Aroclor,

2  that GE would have used it as such or identified a

3  potential market for it as such.

4          Mr. Fletcher was paying such a low price for

5  it that if there were any significant market for the

6  use of scrap Pyranol as a substitute for Aroclor, one

7  would have expected that there would be alternative

8  customers.  There's no evidence in the record here

9  that anyone ever approached GE or GE was ever able to

10  find anyone else who was interested in taking this

11  product for use as a plasticizer.

12          So what do we know about the nature of the

13  arrangement between GE and Mr. Fletcher?  We know the

14  relationship spanned a number of years.  It began in

15  the 50s and continued for a number of years, well into

16  the 60s.  We know that the arrangement was -- although

17  the initial transfers appeared to be no charge

18  transfers, that at some point thereafter Mr. Fletcher

19  entered into an arrangement where he agreed to send

20  his men to the facility to take the scrap Pyranol and

21  to pay for the scrap Pyranol.  There is evidence to

22  suggest that certain GE employees understood or

23  believed that Mr. Fletcher was using it in paint

24  operations, although there's also testimony to suggest

25  that Mr. Fletcher went to some length to conceal from

1  GE what he was using the product for.

2        I don't think there's any evidence in this

3  record to suggest that GE, when it entered into the

4  arrangement, required Mr. Fletcher to dispose of it.

5  There's no evidence to suggest that GE required Mr.

6  Fletcher to use it as plasticizer in paints.  There's

7  no evidence to suggest that GE desired that it be

8  disposed of.  That is, that it was the conscious

9  object to release it into the environment.

10        It is absolutely clear to me that GE -- its

11  objective was to be rid of what it believed was a

12  waste product and to do it in the most economically

13  viable way.  If it could charge for it, it would.  If

14  it could not charge for it, it would find the least

15  expensive acceptable way to dispose of it and it would

16  get rid of it.  And so there's no evidence to suggest,

17  though, that it desired that it be released into the

18  environment.  Rather, it was indifferent to what

19  happened to it after it got to the Fletcher's

20  property.

21        The arrangement did change somewhat over

22  time.  As I suggested initially, it was an

23  arrangement -- excuse me.  The initial shipment was a

24  no charge shipment.  Then at some point after that Mr.

25  Fletcher agreed to pay for the product.  He sent his

1   men to pick up the product or the scrap Pyranol -- I

2   think product is probably a mischaracterization -- to

3   pick up the scrap Pyranol.  He would pick it up in a

4   truck that -- his men would pick it up in a truck that

5   had between 18 and 20 -- could carry between 18 and 20

6   barrels at a time, and he would pick it up and the

7   arrangement was, between GE and Fletcher, when GE had

8   scrap Pyranol that it wanted to get rid of and Mr.

9   Fletcher wanted to take the scrap Pyranol, he could

10  arrange to come to the factory and take it and bring

11  it back to his site and pay a price which, after

12  deducting the cost of the used barrels, about four

13  cents a gallon.

14          The arrangement continued for a number of

15  years.  Over the course of the life of the

16  arrangement, Mr. Fletcher acquired several thousand

17  barrels.  I believe at least 3,500, and probably more

18  than that, based on the parties' stipulation as to the

19  amount of Pyranol that he acquired.  When his men

20  would pick it up initially, they would not test it at

21  the site.  As I mentioned, the Pyranol varied

22  dramatically in quality, and Mr. Fletcher found that

23  certain barrels were not usable for him.  He told Mr.

24  Metevier about that.  Mr. Metevier agreed to adjust

25  the arrangement such that certain barrels would be

1  provided at no cost in compensation for the barrels

2  that Mr. Fletcher could not use.  No barrels were

3  returned.  Mr. Fletcher kept the barrels.  GE

4  understood that Mr. Fletcher did not return the

5  barrels even though they were not usable to him.

6         After Mr. Metevier left, Mr. Varnum assumed

7  his responsibilities and Mr. Varnum had a somewhat

8  different arrangement with Mr. Fletcher.  He required

9  Mr. Fletcher to pay for every barrel that he took.  No

10 more concessions were made.

11        As a result, Mr. Fletcher, because he could

12 not use every barrel of scrap Pyranol -- certainly the

13 barrels were not of sufficient quality to use -- did

14 send his men out at the loading dock to test that, and

15 they took barrels that they thought were useful and

16 rejected barrels they did not find useful, and GE

17 understood that not all of the barrels that it wanted

18 Mr. Fletcher to take were usable by him.  It certainly

19 understood that during the time with Mr. Metevier

20 since Mr. Metevier made adjustments to compensate for

21 unusable barrels.

22        After Mr. Varnum there was a period of time

23 in which Mr. Fletcher had a contractor take barrels --

24 a private contractor take barrels from the GE site to

25 Fletcher.  Apparently -- and I find his letter to be

1  credible on this point.  At some point during the

2  process, the contractor he had found went out of

3  business and GE was able to find a contractor that Mr.

4  Fletcher could retain to transport the barrels.

5       A large number of barrels were transported

6  during this phase of the operation.  Mr. Fletcher did

7  not pay for the barrels, although he was billed for

8  them, he did not pay for them for a substantial period

9  of time, and when he was confronted about this, he

10 made clear in a letter that the barrels were not --

11 many of the barrels were not of sufficient quality to

12 be usable by him.

13      He proposed that the parties negotiate a

14 settlement of what is owed, or that they were willing

15 to go through all of the drums with your chemist

16 present and pay for materials such as we used to

17 receive in our agreement over the 12 years prior to

18 the last three years.  And he said, we shall expect

19 freight from your place to Milford and we shall ask

20 for freight for returning what is necessary to return

21 to you.

22      No barrels were, in fact, returned as a

23 result of this complaint.  GE did not want the barrels

24 back.  GE investigated the matter.  It had samples --

25 representative samples taken of scrap Pyranol from its

1   own scrap Pyranol area.  They were analyzed by

2   Monsanto and that testing tended to substantiate Mr.

3   Fletcher's complaints about the unacceptable quality

4   of the barrels.  GE agreed to write off the debt

5   because in comparison to taking the barrels and

6   disposing of them, it was more profitable for GE to

7   write off the debt than to do that.

8          What are we to glean from the nature of this

9   agreement?  As I have suggested, the agreement was for

10  Mr. Fletcher to take the barrels away.  Take barrels

11  when GE had them and Mr. Fletcher wanted them.  The

12  arrangement did not require Mr. Fletcher to use the

13  barrels of scrap Pyranol in any manufacturing process.

14  They did not prohibit Mr. Fletcher from disposing of

15  the barrels.

16         GE did not -- in entering into the

17  arrangement -- desire that the barrels be disposed of.

18  That was not the objective of the arrangement.  The

19  objective was to be rid of the barrels.  So what does

20  all this evidence tell me about what GE understood

21  when it entered into the arrangement with Mr.

22  Fletcher?  What it tells me is that GE understood that

23  while Mr. Fletcher hoped to make productive use of

24  some of the Pyranol, he clearly could not make

25  productive use of much of it.  That GE understood when

1  it entered into this relationship that the Pyranol

2  varied so much in quality that it could -- much of it

3  was not usable for any purpose, although some of it

4  could be used by mixing it with better quality

5  Pyranol, still there would be much of it that would

6  not be usable and GE understood this from the

7  beginning.

8          This was a waste product.  GE knew it.  GE

9  believed that some of it might be able to be used by

10 Mr. Fletcher, but the vast bulk of it would not have

11 been usable by him and would have to be disposed of.

12         I think Mr. Abbe's statement best captures

13 what GE really understood about this matter -- and I

14 don't have the exact quote in front of me, but I think

15 I have it pretty close.  We just hope that he was able

16 to use some of it, and the balance of it he could

17 dispose of it.  I think that is really what this case

18 is all about, that GE understood from the beginning

19 here, and therefore, in my judgment, GE did otherwise

20 arrange for the disposal of the scrap Pyranol when it

21 entered into its relationship with Mr. Fletcher.  And

22 just to emphasize these key points in my mind, Mr.

23 Metevier knew that GE -- excuse me -- that Fletcher

24 could not use all of the scrap Pyranol because Mr.

25 Fletcher told him and Mr. Metevier made adjustments

1  for it.  After Mr. Varnum was out at the site --

2  excuse me.  During the time Mr. Varnum was in charge,

3  GE knew that Mr. Fletcher could not use all of the

4  scrap Pyranol that it was producing and wanting him to

5  take because it sent out people to test it when they

6  took the samples and they took some and rejected

7  others.

8         And yet in the period that followed GE

9  shipped large quantities of Pyranol that was so

10  severely contaminated that it could not be used even

11  though it understood from the transactions during the

12  Varnum and the Metevier period that not all of this

13  Pyranol was usable by Mr. Fletcher, and I think all of

14  that suggests to me that -- and does prove and --

15  frankly, I don't think it's a particularly difficult

16  case.  The evidence is quite clear to me and proves to

17  me quite strongly that GE understood that this was an

18  arrangement with Mr. Fletcher that would result in Mr.

19  Fletcher disposing of substantial quantities of the

20  scrap Pyranol at the site, and he did so.

21         Does anyone need me to make any additional

22  specific findings or rulings?  I'm happy to spend as

23  much time as anyone wants me to going over the

24  specific requests for findings and rulings, but I

25  believe I've addressed most of them through my oral

157

 1   decision today.

 2           If I have not, though, and people want me to

 3   address anything, speak up now.  I'll be happy to go

 4   through it and tell you what I find or don't find.

 5   Does the government want me to do any of that?

 6           MR. FLYNN:  No, your Honor.

 7           THE COURT:  Does the defendant want me to do

 8   any of that?

 9           MR. BIAGETTI:  No.

10           THE COURT:  Okay.  So I think that ends this

11   phase of the case.  Why don't I suggest that the

12   parties take, say, 30 days and reassess your

13   positions, and if you aren't able to reach a

14   settlement within 30 days, come back to me and propose

15   a schedule for the completion of any issues that need

16   to be completed in the case.  All right?

17           Anything else we need to deal with today?

18   Again, I want to thank the parties.  I know that it

19   can be somewhat brutal trying to deal with me when I

20   go through this process.  I want you to understand

21   that in my view I only push people that I respect.  If

22   I don't respect you, if I don't think you can give me

23   useful information, I just don't talk to you.  So to

24   some extent the more I push you, the more respect I

25   have for you and your views.  And I think this case

158

1   was well presented, and I do feel that every possible

2   argument on either side was developed and fully

3   tested, and that's really what you should do in a

4   trial like this when the parties want me to confront

5   and resolve a question like the one that you've

6   presented to me.  So I think you've all done good

7   work.  I appreciate your work and the help that you've

8   given me.

9           I hope that this decision allows you to move

10  on and find a way to resolve the case, but if you

11  don't, come back and see me in another month and we'll

12  see where we go from there.

13          (Conclusion of hearing at 4:10 p.m.)

14

15              C E R T I F I C A T E

16

17          I, Susan M. Bateman, do hereby certify

18  that the foregoing transcript is a true and accurate

19  transcription of the within proceedings, to the best

20  of my knowledge, skill, ability and belief.

21

22  Submitted: 5-11-09     /s/   Susan M. Bateman
                                SUSAN M. BATEMAN, CSR, RPR, CRR
23

24

25