# United States Court of Appeals
## For the First Circuit

─────────────

No. 11-1034

UNITED STATES OF AMERICA,

Plaintiff, Appellee,

v.

GENERAL ELECTRIC COMPANY,

Defendant, Appellant.

─────────────

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE
[Hon. Paul J. Barbadoro, U.S. District Judge]

─────────────

Before

Torruella and Thompson, Circuit Judges,
and Saris,* District Judge.

─────────────

Peter A. Biagetti, with whom Colin G. Van Dyke, Jeffrey R.
Porter, Andrew Nathanson, and Mintz, Levin, Cohn, Ferris, Glovsky
and Popeo, P.C., were on brief for appellant.
Robert H. Oakley, U.S. Department of Justice, Environmental &
Natural Resources Division, with whom Robert Dreher, Acting
Assistant Attorney General, Lisa E. Jones, Catherine A. Fiske,
Laura Rowley, and Ruthann Sherman, Senior Enforcement Counsel, U.S.
Environmental Protection Agency, was on brief for appellee.

─────────────

February 29, 2012

─────────────

_____

* Of the District of Massachusetts, sitting by designation.

**TORRUELLA**, **Circuit Judge**.    Defendant-Appellant General
Electric Company ("GE") appeals from a district court judgment
holding it liable under the Comprehensive Environmental Response,
Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a)(3),
for response costs incurred by the United States Environmental
Protection Agency ("EPA") in the unfinished cleanup of the
Fletcher's Paint Works and Storage Facility Superfund Site in
Milford, New Hampshire (the "Fletcher Site" or the "Site").    GE
also appeals the district court's judgment awarding the United
States certain costs incurred in connection with the Fletcher
Site's cleanup pursuant to 42 U.S.C. § 9613(g)(2).    For the reasons
stated herein, we affirm the judgment of the district court on both
issues.

## I. **Background and Procedural History**

"Pyranol" is an insulating material once used extensively
in electric equipment.    Made from polychlorinated biphenyls
("PCBs"), Pyranol was prized for its dielectric properties -- i.e.,
it conducts electricity poorly or not at all -- and was widely used
in the 1950s and 1960s in the manufacture of transformers,
capacitors, and other devices.    Time, however, was not kind to
Pyranol -- as PCBs became associated with serious health risks,[1]

---

[1]    "The chemicals are linked to skin cancer, liver cancer, brain
cancer, intestinal cancer, bladder cancer, leukemia, birth defects
in humans and animals, and other health problems." Church v. Gen.
Elec. Co., 138 F. Supp. 2d 169, 172 (D. Mass. 2001).

-2-

Pyranol and other products containing these chemicals were stringently regulated and their use in manufacture drastically curtailed. See, e.g., 42 U.S.C. § 9601(14); 15 U.S.C. § 2605(e).

For some thirty years, GE manufactured electric capacitors containing Pyranol at its plants located in Hudson Falls and Fort Edward, New York (respectively, "Hudson Falls" and "Fort Edward"). GE met its Pyranol needs by purchasing "virgin" PCBs that the Monsanto Company ("Monsanto") marketed under the name "Aroclors." GE then refined the Aroclors it purchased from Monsanto until the PCBs attained the level of purity necessary for use in electric capacitors. The end result was Pyranol.

To be of use to GE, the processed Pyranol had to meet and retain demanding purity specifications. Pyranol that fell short of these standards was deemed "scrap Pyranol" and was stored away in 55-gallon drums in designated scrap areas.

Over time, GE accumulated a glut of scrap Pyranol, a development that somehow brought GE into contact with Frederic H. "Fred" Fletcher ("Fletcher"), local manufacturer, "chemical scrapper," and businessman.[2] Between 1953 and 1967, Fletcher owned a number of paint manufacturing and storage businesses in Milford, New Hampshire, which varyingly operated under the names Fletcher's Paint Works or Milford Paint Works. Like GE, Fletcher also

---

[2] The record is unclear as to the circumstances surrounding the genesis of GE's association with Fletcher.

routinely purchased Aroclors from Monsanto but used the unrefined PCBs as a "plasticizer" additive for his paints. Seemingly recognizing a mutually-advantageous situation, Fletcher and GE gravitated toward each other and entered into an informal agreement whereby Fletcher purchased scrap Pyranol from GE at bargain prices for his industrial needs.

For approximately ten years ending in 1967, Fletcher regularly purchased 55-gallon drums of scrap Pyranol from GE. GE records indicate that in this period, Fletcher availed himself of over 200,000 gallons of GE's scrap Pyranol. Accordingly, for the better part of a decade, 55-gallon drums full of scrap Pyranol -- about 3,600 worth of them -- routinely traveled by truck from Hudson Falls and Fort Edward to the Fletcher Site. Initially, Fletcher sent one of his employees to either of the GE plants to retrieve scrap Pyranol in 18-barrel increments. However, as transfers increased, Fletcher and GE contracted with third-party cargo services to haul scrap Pyranol barrels between locations in larger trucks.

Of the more than 200,000 gallons of scrap Pyranol that made the journey from GE's plants to the Fletcher Site in this ten-year time frame, almost half did so between early 1966 and November 1967, when Fletcher received the final shipment. The catalyst for this climactic increase in Pyranol transfers is unclear, but the coinciding denouement of the GE-Fletcher relationship is well-

-4-

documented.  GE records show that, beginning in February 1966, Fletcher regularly missed payments on almost-monthly shipments of scrap Pyranol.  By August 1967, when GE notified him by means of a collection letter, Fletcher's account was delinquent in over six thousand dollars for failure to pay for fourteen shipments of scrap Pyranol.  GE delivered three more shipments of scrap Pyranol after sending this collection letter, the last of which Fletcher received on November 10, 1967.

In early 1968, GE account officers communicated with Fletcher in an attempt to collect on his outstanding debt to GE. Fletcher riposted with a letter informing GE that the quality of the scrap Pyranol he received had markedly declined in recent years.  Fletcher's letter stated that many of the scrap Pyranol drums at the Site were unusable, proposed an arrangement whereby GE would retrieve those drums he could not use while he paid for those he could, and refused to receive any additional scrap Pyranol unless GE could ensure it would provide materials of higher quality.  GE did not follow up on Fletcher's proposal.  For all intents and purposes, Fletcher's letter marked the end of his relationship with GE.

In 1987, EPA found hundreds of drums containing scrap Pyranol and other chemicals at the Fletcher Site.  The drums were unmarked and several had leaked.  Subsequent testing detected hazardous substances at the Site, including tricholoroethylene

-5-

("TCE"), trichlorobenzene ("TCB"), and PCBs.  As a result, EPA placed a temporary cap on the Site and, in 1989, added it to its National Priorities, or "Superfund," List.[3]

In 1991, the United States initiated an action against GE to recoup costs associated with the Fletcher Site's cleanup (the "1991 Action").[4]  See 42 U.S.C. § 9607(a)(3).  The United States requested relief for past costs incurred and declaratory judgment establishing that GE would be liable "for all response costs to be incurred" in connection with the Site.  Compl. at 10, United States v. Gen. Elec. Co., No. 91-467-D (D.N.H. Oct. 7, 1991).  In February 1994, the parties resolved this controversy by means of a consent decree stipulating that GE would remunerate EPA for costs incurred through April 30, 1993.  GE did not concede liability and reserved all defenses and possible counterclaims.  The United States' declaratory judgment claim was dismissed without prejudice. Correspondingly, the United States reserved its right to seek additional compensation for future cleanup costs.

In 2006, the government commenced this suit against GE in the District Court for the District of New Hampshire.  Claiming

---

[3]  The EPA places sites on the National Priorities List pursuant to its authority under CERCLA.  See 42 U.S.C. §§ 9601 et seq.  These "'Superfund' sites . . . require priority remedial attention because of the presence, or suspected presence, of a dangerous accumulation of hazardous wastes."  United States v. Cannons Eng'g Corp., 899 F.2d 79, 83 (1st Cir. 1990).

[4]  The complaint in the 1991 Action also named the Windsor-Embassy Corporation, a Fletcher-owned entity, as co-defendant.

that GE had "arranged for disposal" of hazardous substances at the
Fletcher Site in violation of 42 U.S.C. § 9607(a)(3), the United
States sought recovery of cleanup costs incurred since 1993 and
revived its request for declaratory judgment against GE for future
related expenses.  After a four-day bench trial held in November
2008, the district court announced its decision that GE had
arranged to dispose of hazardous substances at the Fletcher Site
and was liable for response costs incurred by EPA.

The district court's bench ruling against GE did not end
the proceedings below.  On May 4, 2009, before the district court
had entered final judgment in this case, the Supreme Court issued
its decision in Burlington Northern & Santa Fe Railway Co. v.
United States, 129 S. Ct. 1870 (2009).  Arguing that Burlington
Northern foreclosed the principal theory of liability upon which
the district court relied in issuing its oral order, GE then filed
a motion for judgment requesting that the court below withdraw its
findings.  The district court denied this motion on October 28,
2009.

The litigants and the district court then focused on the
issue of identifying the response costs for which GE could be held
liable.  The parties stipulated costs related to the Fletcher
Site's cleanup -- $13,103,095 (including interest) through
October 20, 2009 -- but GE argued that the United States' claim
over $1,305,921 of these was barred by CERCLA's statute of

-7-

limitations.  <u>See</u> 42 U.S.C. § 9613(g)(2).  In cross-motions for summary judgment, the parties disputed whether the current litigation constituted a "subsequent action" as defined in § 9613(g)(2), in which case all of the United States' claims for cost recovery would be timely.

On December 3, 2010, the district court granted the United States' cross motion for summary judgment.  <u>United States</u> v. <u>Gen. Elec. Co.</u>, No. 06-cv-354-PB, 2010 WL 4977478 (D.N.H. Dec. 3, 2010).  Final judgment issued on December 6, 2010, and an amended judgment was entered on December 14, 2010.  This appeal followed.

## II.  <u>Discussion</u>

GE appeals the district court's judgment on two grounds. First, GE contends that the district court mistakenly concluded that GE arranged for the disposal of scrap Pyranol in violation of 42 U.S.C. § 9607(a)(3).  Second, GE argues that even if it can be held liable for costs incurred in the Fletcher Site's cleanup, the district court erred by allowing the United States to recover costs associated with two claims that GE reasons are foreclosed by CERCLA's statute of limitations.  We address each of GE's claims in turn.

### A. Arranger Liability

#### 1. CERCLA, Arranger Liability, and <u>Burlington Northern</u>

In passing CERCLA, Congress "'intended that those responsible for problems caused by the disposal of chemical poisons

bear the costs and responsibility for remedying the harmful conditions they created.'" Dedham Water Co. v. Cumberland Farms Dairy, Inc., 805 F.2d 1074, 1081 (1st Cir. 1986) (quoting United States v. Reilly Tar & Chem. Corp., 546 F. Supp. 1100, 1112 (D. Minn. 1982)). CERCLA authorizes the EPA to undertake cleanup activities at designated hazardous sites and then sue to recover costs incurred from certain liable parties. See 42 U.S.C. §§ 9604(a), 9607(a); see also Am. Cyanamid Co. v. Capuano, 381 F.3d 6, 9 (1st Cir. 2004). Specifically, CERCLA "imposes strict liability for the costs of cleanup on a party found to be an owner or operator, past operator, transporter, or arranger." United States v. Davis, 261 F.3d 1, 29 (1st Cir. 2001). It is this last classification, holding liable persons who "arranged for disposal or treatment . . . of hazardous substances," 42 U.S.C. § 9607(a)(3), that is relevant to this case.

Within the CERCLA scheme, arranger liability was intended to deter and, if necessary, to sanction parties seeking to evade liability by "contracting away" responsibility. See Team Enters., LLC v. W. Inv. Real Estate Trust, 647 F.3d 901, 907 (9th Cir. 2011) ("Arranger liability ensures that owners of hazardous substances may not free themselves from liability by selling or otherwise transferring a hazardous substance to another party for the purpose of disposal."). Thus, for example, liability would clearly "attach . . . if an entity were to enter into a transaction for the sole

purpose of discarding a used and no longer useful hazardous substance." Burlington N., 129 S. Ct. at 1878. At the other end of the liability spectrum, an entity that sells a useful product which is later disposed of in an improper manner without the seller's knowledge would not be liable as an arranger under CERCLA.[5] Id. However, because the statute does not define what it means to "arrange for disposal" of a hazardous substance under § 9607(a)(3), there remains a middle ground between these two extremes -- to which we can comfortably say this case belongs -- in which a seller entity will have "some knowledge of [a] buyers' planned disposal or whose motives for the 'sale' . . . are less than clear." Id. at 1879 (emphasis added). In this middle ground, litigation over the intent required to "arrange for disposal" of a hazardous substance has been common, and courts have diverged in their interpretations of the CERCLA statute. Compare United States v. Cello-Foil Prods., Inc., 100 F.3d 1227, 1231 (6th Cir. 1996) (concluding "that the requisite inquiry is whether the party intended to enter into a transaction that included an 'arrangement for' the disposal of hazardous substances"), with United States v. Aceto Agr. Chems. Corp., 872 F.2d 1373, 1380-81 (8th Cir. 1989)

---

[5] The term "disposal" is defined to mean "the discharge, deposit injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3).

(endorsing "liberal judicial interpretation" of "or otherwise arranged for" statutory language and noting liability could be imposed in the absence of knowledge or intent).

In Burlington Northern, the Supreme Court offered some clarity as to when liability should attach in this more ambiguous type of case.  Ascribing the phrase "arrange for disposal" its ordinary meaning, the Supreme Court reasoned that "an entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance."  129 S. Ct. at 1879 (emphasis added).  Therefore, following Burlington Northern, a discernible element of intent to dispose of a hazardous substance is necessary for an entity to be sanctioned pursuant to § 9607(a)(3).  See id. ("In common parlance, the word 'arrange' implies action directed to a specific purpose.").

In the Burlington Northern litigation, the Court's plain reading of the statute precluded holding Shell Oil Company ("Shell") liable as an arranger for routine leaks that occurred over several decades when common carriers with whom Shell contracted shipped hazardous chemicals (pesticides) to its customers.  Id. at 1875.  Shell knew of these routine leaks but took active measures to reduce them by circulating handling instructions and other materials to its distributors and customers. Id. at 1880.  The Supreme Court held that Shell's knowledge of the routine spillage, in the absence of intent to dispose of those

hazardous substances, did not trigger arranger liability. Id. While an entity's knowledge that a product it sells will be discarded may be a probative factor of its intent to "dispose of" that product, the Court explained that mere knowledge of future disposal will not trigger arranger liability. See id. ("[K]nowledge alone is insufficient to prove that an entity 'planned for' [] disposal, particularly when the disposal occurs as a peripheral result of the legitimate sale of an unused, useful product.").

## 2. GE's Claims as to Arranger Liability Standard

GE argues that the district court applied the wrong legal standard when it concluded that GE "arranged for disposal" of hazardous substances under 42 U.S.C. § 9607(a)(3). This contention implicates the proper interpretation of the CERCLA statutory text. Accordingly, we review GE's claim de novo. Am. Cyanamid, 381 F.3d at 12.

GE's appeal largely hinges on its reading of the Supreme Court's Burlington Northern decision. As GE appears to understand matters,[6] Burlington Northern clarified that § 9607(a)(3) liability

---

[6] GE's briefing on this issue expends much effort outlining (and challenging) the district court's interpretation of the CERCLA statute. We note that "[s]ince our review is de novo, we need not consider whether the specific reasoning set out by the district court contained errors." Euromotion, Inc. v. BMW of N. Am., Inc., 136 F.3d 866, 872 (1st Cir. 1998) (citations omitted). To properly frame our discussion, however, we distill GE's arguments as they pertain to our fresh-eyed interpretation of the statutory text. Because the district court determined the issue of liability

-12-

may only attach in cases where a person or entity has the
distinctly apparent objective of disposing of its hazardous
substances. Further refined, GE's contention is that only an
entity that enters into an arrangement with a transparently evident
desire to have its hazardous substances enter the environment
properly comes into § 9607(a)(3)'s purview.

We do not agree that _Burlington Northern_ so narrowed the
scope of § 9607(a)(3). As explained above, the Supreme Court's
_Burlington Northern_ decision settled the fact that arranger
liability does not accrue in the _absence_ of intent to dispose of a
hazardous substance. In interpreting § 9607(a)(3), the _Burlington
Northern_ Court did not, however, suggest that arranger liability
applies solely to circumstances in which the stated or facially-
evident purpose of an arrangement is to dispose of hazardous
substances. While these "easy" cases may lie at one end of a
spectrum, there necessarily remains a range of cases in which
arranger liability is proper but the parties' intent will not be
obvious. _See_ _Burlington N._, 129 S. Ct. at 1879 ("Less clear is the
liability attaching to the many permutations of 'arrangements' . .
. in which the seller has some knowledge of the buyers' planned

---

against GE prior to the Supreme Court's judgment in _Burlington
Northern_, we further note that we now operate against a changed
legal landscape and look to the high court's decision for guidance.
_See_ _Sheehan_ v. _City of Gloucester_, 321 F.3d 21, 24 (1st Cir. 2003)
("[I]t is axiomatic that 'a court is to apply the law in effect at
the time it renders its decision . . . .'" (quoting _Bradley_ v.
_Richmond Sch. Bd._, 416 U.S. 696, 711-12 (1974))).

disposal or whose motives for the 'sale' of a hazardous substance are less than clear."). In these cases, divining the element of intent necessary to implicate arranger liability remains a "fact-intensive inquiry" which, guided by Congress's intent in enacting CERCLA's strict-liability regime, "looks beyond the parties' characterization of the transaction as a 'disposal' or a 'sale' . . . . " Id. It is to this factual analysis which we now turn.

### 3. Whether GE May be Held Liable as an Arranger Under 42 U.S.C. § 9607(a)(3)

#### a. GE Considered Scrap Pyranol to be a Waste Product

Undertaking the factual inquiry that Burlington Northern requires -- and mindful that "[t]here is no bright line between a sale and a disposal under CERCLA," Burlington N., 129 S. Ct. at 1879 (quoting Pneumo Abex Corp. v. High Point, Thomasville Denton R.R. Co., 142 F.3d 769, 775 (4th Cir. 1998)) (internal quotation marks omitted) -- we reject GE's contention that it may not be properly subject to liability under § 9607(a)(3). In holding that § 9607(a)(3) liability could not be imposed on Shell, the Supreme Court in Burlington Northern endorsed the "useful product doctrine." See Burlington N., 129 S. Ct. at 1878, 1880. As stated in a Second Circuit case upon which the Supreme Court relied, see id. at 1878, this doctrine provides that CERCLA arranger liability does not attach "[i]f a party merely sells a product, without additional evidence that the transaction includes an 'arrangement'

-14-

for the ultimate disposal of a hazardous substance . . . ."
Freeman v. Glaxo Wellcome, Inc., 189 F.3d 160, 164 (2d Cir. 1999)
(alterations in original) (quoting Fla. Power & Light Co. v. Allis
Chalmers Corp., 893 F.2d 1313, 1317 (11th Cir. 1990)); see also
Team Enters., 647 F.3d at 908 (in post-Burlington Northern case,
noting "[t]he useful product doctrine serves as a convenient proxy
for the intent element because of the general presumption that
persons selling useful products do so for legitimate business
purposes").

In contrast to Burlington Northern, where Shell's
exposure to liability stemmed from its sale of a legitimate new and
useful product, the record here contains ample evidence that GE
viewed scrap Pyranol as waste material and that any profit it
derived from selling scrap Pyranol to Fletcher was subordinate and
incidental to the immediate benefit of being rid of an overstock of
unusable chemicals. See Team Enters., 647 F.3d at 908 ("[A] person
may be subject to arranger liability 'only if the material in
question constitutes 'waste' rather than a useful product.'"
(quoting Cal. Dep't of Toxic Substances Control v. Alco Pac. Inc.,
508 F.3d 930, 934 (9th Cir. 2007))). GE stored scrap Pyranol, a
byproduct of its capacitor manufacturing operations,[7] in second-

---

[7] The parties' stipulated facts state that during the relevant
time period, "[GE's] capacitor manufacturing process yielded 'scrap
Pyranol' from various points at the GE Plants, including the treat
room, sealing station and degreaser, and from a variety of sources,
including spills, leaks, overflows, clean-up, contamination of

-15-

hand 55-gallon drums -- often labeled "scrap Pyranol," "waste Pyranol," "scrap oil," or otherwise, depending on the manner in which it was collected -- which were then placed in its facilities' salvage areas.  The parties' stipulated facts and other materials in the record show that GE pursued varied arrangements by which to deplete its scrap Pyranol stockpile, for example, by transferring scrap Pyranol to local landfills, selling it to local government entities which could use it as dust suppressant, giving it away to its employees for use as a weed killer, or discharging it into the Hudson River.[8]  Moreover, the unstable nature of the materials GE

------

virgin Pyranol, off-specification virgin Aroclors, fluid drained from booster pumps, and fluid drained from scrapped or reject capacitors -- which was placed in drums and labeled accordingly."

[8]  An internal communication from GE Manager Robert T. Abbe also suggests that during the last two years of the GE-Fletcher relationship -- a period during which, as we explain further infra, shipments of scrap Pyranol to the Fletcher Site increased markedly -- GE had storage space-related difficulties stockpiling scrap Pyranol in its facilities.  In this communication, dated March 13, 1968, Abbe explained to GE Quality Control Manager C.R. Zecchini that "we" -- a plural articulation presumably meant to account for the GE Hudson Falls facility -- "are quietly burying ourselves in drums of scrap Pyranol."  Consistent with GE's other documented efforts to landfill excess scrap Pyranol it could not dispose of in any other manner, the letter then requested "advice and counsel regarding the dangers of disposing of this material into a land filled dump," adding:  "Since P-II has potential health hazards, we should understand the dangers, but at the same time realistically appraise the possibilities of a problem with proper dumping procedures."

In his deposition, Abbe explained that the designation "P-II" referred to "Pyranol II," the second of two classifications of scrap Pyranol that GE handled at the time.  According to Abbe, as of early 1968, GE considered Pyranol II to be "a more difficult material" with "more potential health hazards" than other Pyranol, which was instead designated "Pyranol I."

provided Fletcher, as well as the fact that a significant amount of GE's scrap Pyranol was contaminated with other substances or extraneous objects, betrays the fact that GE subjected these chemicals to minimal or non-existent quality control.[9]   This evidence is inconsistent with the notion that GE ever viewed scrap Pyranol as the archetypal "useful substance [conveyed] for a useful purpose" that has commonly been found to lie outside of § 9607(a)(3)'s reach.   Cello-Foil Prods., 100 F.3d at 1232 (quotation mark omitted).

Also telling in this regard is what the record does not reveal: any attempt by GE to market scrap Pyranol as a viable product to any entity or person other than Fletcher.  Indeed, the record is devoid of evidence suggestive of a general demand for scrap Pyranol other than Fletcher's idiosyncratic interest in procuring the materials with the hope to, as one of his former employees who served as a witness explained, "make a dime and a profit." Although it is clear that Fletcher used an unknown amount of scrap Pyranol as a plasticizer agent in his paint making operations, evidence proffered by the government's expert suggested that the uncertain and inconsistent quality of scrap Pyranol

---

[9]  The scrap Pyranol in the drums that GE at times gave and at others sold to Fletcher contained contaminants and other impurities such as Fuller's Earth, drying compounds, pump oil, drinking soda, and degreaser.  Other scrap Pyranol drums in GE's salvage areas included garbage and objects like discarded gloves and transportation tags.

rendered it a poor choice even for that purpose.  Because each drum

of scrap Pyranol could vary in composition, its use as an additive

could yield a paint product of unpredictable quality -- a risky

undertaking that could render entire batches of paint defective.

Relying on this evidence, the district court reasoned that if use

as a plasticizer ingredient was indeed a practical or sustainable

application for scrap Pyranol, then GE, a sophisticated profit-

seeking entity, would have either used it as an additive in its own

paint making operations or sought to expand the market for its

scrap Pyranol to purchasers other than Fletcher.[10]  We agree with

the district court that the lack of a viable market for scrap

Pyranol during the relevant period supplies further proof that GE

did not view scrap Pyranol as a legitimate and serviceable product.

See Team Enters., 647 F.3d at 908 (noting CERCLA plaintiff "can

overcome the [useful product doctrine] defense by showing that the

substance involved in the transaction 'has the characteristic  of

_____

[10]  Evidence in the record indicates that Fletcher sold an uncertain
amount of the scrap Pyranol it obtained from GE to a local company
called W.F. Webster Cement (also known as "Webtex"), which, in
turn, added the chemicals to roofing products such as roof coatings
and cements.   The record does not suggest, however, that the
amounts of scrap Pyranol that Webtex purchased from Fletcher were
substantial, nor does it suggest, as GE implies, that these sales
indicate there were alternative markets for the chemicals.  In any
case, the parties have stipulated that GE was never aware of
Fletcher's scrap Pyranol transfers to Webtex, a fact that renders
the transfers irrelevant to GE's intent in its dealings with
Fletcher.

-18-

waste at the time it is delivered to another party'" (quoting <u>Alco Pac.</u>, 508 F.3d at 934)).

### b. GE's Actions and Targeted Inactions Satisfy CERCLA's Intent Requirement Under 42 U.S.C. § 9607(a)

The fact that GE viewed the scrap Pyranol in its scrap and salvage yards as a waste product does not, by itself, bring GE within the purview of § 9607(a)(3) arranger liability. Our focus now turns to GE's dealings with Fletcher to determine whether GE possessed the element of intent necessary to qualify as an arranger under § 9607(a)(3). <u>See</u> <u>Burlington N.</u>, 129 S. Ct. at 1880 (quoting <u>Cello-Foil Prods.</u>, 100 F.3d at 1231, to acknowledge "indispensable role that state of mind must play in determining whether a party has 'otherwise arranged for disposal . . . [of] hazardous substances'"). Doing so, we must conclude that GE's documented actions and, importantly, calculated <u>in</u>actions in relation to the Fletcher Site, evince sufficient intent to dispose of a hazardous substance to place it squarely within the scope of liability envisioned by CERCLA.

It is necessary to outline what GE understood or knew about Fletcher's intentions regarding the large amounts of scrap Pyranol that GE transferred or sold to Fletcher during the relevant time period. At trial, Albert Clark, a former GE sales representative who dealt with Fletcher, testified that GE understood that Fletcher ran a small paint company based in New

-19-

Hampshire.  As noted above, the record sustains an inference that GE knew or otherwise understood that Fletcher used an unknown amount of the scrap Pyranol he purchased as a plasticizer in his paint manufacturing operations.  At a minimum, GE also likely understood that Fletcher saw <u>some</u> value in the scrap Pyranol because Fletcher paid (or said he would pay) for these materials, at times complained about the quality of the scrap Pyranol, at others tested and rejected scrap Pyranol that was too "thinned out" and, for a time, sent his employees and trucks to GE facilities to retrieve the drums.  Because Fletcher alleged certain drums were unusable to him one can also infer that, from early on, GE understood some drums of scrap Pyranol contained materials of such poor quality so as to not be of any value whatsoever to Fletcher.

However, the record also indicates that the GE-Fletcher relationship was a dynamic one, spanning over a decade, and that the nature of the arrangement between the parties fluctuated from beginning to end.  Though GE was content at first giving Fletcher between 100 and 500 drums of scrap Pyranol at no charge, starting in 1956 GE required payment of $3.50 to $4.00 per 55-gallon drum.  Other changes involved the procedures by which Fletcher could replace drums he considered deficient.  Before 1964, Fletcher was able to replace drums containing scrap Pyranol he claimed to be unusable free of charge; not so between 1964-66, a period during which GE required Fletcher to pay for each drum that Fletcher

-20-

transported from GE facilities to the Site.[11]  Not surprisingly,
during this period, Fletcher's employees tested drums of scrap
Pyranol for quality assurance at GE facilities before loading them
onto Fletcher's truck, rejecting those Fletcher could not use.

The arrangement between Fletcher and GE again shifted at
some point during 1966, and GE's conduct over the following two
years leaves little doubt that GE availed itself of its
relationship with Fletcher to rid itself of the scrap Pyranol in
its inventory.  During this period, GE, not Fletcher, loaded the
trucks that traveled from GE facilities to the Fletcher Site, and
the frequency with which GE sent Fletcher shipments of scrap
Pyranol drastically increased.[12]  There is no indication in the
record that Fletcher solicited or wanted the increase.
Importantly, from February 1966 onwards, Fletcher routinely missed
payments and did not compensate GE for any shipments of scrap

---

[11] These changes in GE's approach to its relationship with Fletcher
appear to track turnover in the GE personnel tasked with handling
the Fletcher account.  Until 1964, Fletcher dealt primarily with
Anthony Metevier, who supervised the scrap and salvage department
at Hudson Falls.  Between 1964-66, however, a GE employee named
Edward Varnum assumed Metevier's previous responsibilities.  The
subsequent shift in the arrangement, discussed infra, corresponded
with Edward Varnum's departure from GE.

[12] The amount of scrap Pyranol GE sent to Fletcher between 1966 and
November 1967 exceeded the volume of all scrap Pyranol Fletcher had
obtained since receiving the initial free shipment from GE.  In
toto, GE sent 102,575 gallons of scrap Pyranol to the Fletcher Site
during this period.

Pyranol.[13]  However, Fletcher's failure to pay for its shipments notwithstanding, GE's scrap Pyranol deliveries continued apace, with Fletcher receiving three more shipments between August and November 10, 1967.

Evidence in the record suggests that during this final stage of the GE-Fletcher relationship, GE largely controlled the flow of scrap Pyranol between GE facilities and the Fletcher Site. A letter from Fletcher to GE account representative Albert C. Clark contemporaneous with this period and dated February 16, 1968 (the "Fletcher Letter"), indicates that once Fletcher ceased using its trucks to make scrap Pyranol pickups, Fletcher employed a contract trucker to "haul a few loads."  When this trucker went out of business, GE then arranged with other third parties to transport the chemicals at Fletcher's expense.

The Fletcher Letter is notable and important to our discussion for other reasons.  In his letter, Fletcher informed GE that the quality of the scrap Pyranol sent to him had markedly declined in the preceding "two or three years."  At that point, Fletcher explained:

> All of a sudden we could not dispose of this Pyronal [sic] as you had apparently added something and we could find nothing to neutralize the additive you were using.

---

[13]  GE memorialized the delinquent status of the Fletcher account in a letter found in the record, dated August 31, 1967, which included a listing of "old past due debit memoes [sic]" for fourteen shipments of scrap Pyranol.

> Secondly you put the Pyronal [sic] in badly
> contaminated drums . . . . [Y]ou have shipped
> drums one quarter and one half full and drums
> of more than half water.
>
> In other words, what we were buying as a
> reasonable scrap product, turned into a large
> percentage of what is known as garbage in the
> Chemical trade.

Fletcher added:

> Unknown to me, this has been going on for some
> time and our paint foreman has been piling the
> drums.    At the present time we have
> approximately 1800 to 2000 drums on
> hand. . . .
>
> . . . .
>
> When our truck was picking up your men were
> careful to give us the right material.  Our
> driver would not have accepted the bad drums.
> Since your man has been hauling to us you
> have, apparently, been loading everything on
> God's green earth on the truck.

In closing, Fletcher proposed that GE's chemists examine the approximately 2,000 drums on the Fletcher Site to determine which of them met the standards of the chemicals received "over the twelve years prior to the last three years," and agreed to pay for those that did.  All others, Fletcher said, he expected to be able to return via GE-provided freight.  Finally, Fletcher refused to receive any additional scrap Pyranol unless GE could ensure it would provide materials of higher quality.

    Taken at face value, the Fletcher Letter goes a long way to upend GE's claim, first made at the district court and now renewed on appeal, that throughout its dealings with Fletcher it

-23-

understood that he purchased or accepted thousands of gallons of scrap Pyranol with a view to use these for a useful or legitimate purpose.  At a minimum, the Fletcher Letter put GE on notice that (1) large quantities of the hazardous substances that it had provided were of absolutely no use to Fletcher and were, at that moment, "piled" at the Fletcher Site, (2) Fletcher had not consciously accepted large quantities of the chemicals GE had delivered at the Fletcher Site -- i.e., "[u]nknown to me, this has been going on for some time" -- and (3) importantly, that Fletcher expected GE's cooperation in resolving the matter of the more than 1,800 55-gallon drums of unusable chemicals sitting at the Site.

This third factor points us to what we believe is a crucial distinction between Burlington Northern and the instant case: in Burlington Northern, the Supreme Court underscored the fact that Shell took varied active steps to reduce chemical spillage as evidence supportive of an inference that Shell did not intend the spills to occur in the first place.  See 129 S. Ct. at 1880.  In contrast -- once apprised that Fletcher had no use for large quantities of the scrap chemicals GE had sent to his facilities, aware that Fletcher blamed GE for (either deliberately or negligently) sending contaminated shipments of scrap Pyranol to his attention, and conscious of the fact that Fletcher desired to transfer these chemicals back to GE -- GE took at least three

-24-

well-documented steps the collective effect of which, rather than prevent or reduce the likelihood of disposal, was to ensure it.

First, GE undertook to corroborate Fletcher's claims regarding the poor quality of the scrap Pyranol that he had received from GE. At some point in the summer of 1968, GE asked one of Monsanto's chemists to conduct tests on a sample of the drums of scrap Pyranol that GE had, until recently, routinely sent Fletcher.[14]  The results of these tests were memorialized in an internal GE letter dated August 6, 1968 (the "GE Letter"), in which Senior Buyer Albert C. Clark informed GE Manager of General Accounting D.W. Humphrey of his and other unidentified personnel's collective assessment, "find[ing] that [Fletcher] has a valid claim."  Endorsed by Robert Abbe, Manager at Hudson Falls at the time, the GE Letter went on to explain that the scrap Pyranol Fletcher had received was inconsistent and/or contaminated in nature, noting "[t]he material in question contained anything from water to [TCE] (as much as 22% [TCE] was found)."  In addition, the GE Letter confirmed in clear terms that the scrap Pyranol that GE sent Fletcher during the period at issue did not meet the standards GE's account handlers understood Fletcher to require, stating: "This certainly is not the material that [Fletcher] agreed to buy at $3.75 per drum."

---

[14]  At trial, GE account representative Albert C. Clark testified that GE requested Monsanto's services so as to "attempt to validate or disprove the statements in [the Fletcher Letter]."

Second, once its own testing had confirmed Fletcher's claim that much of the scrap Pyranol it sent Fletcher in recent years was contaminated and/or unusable, GE decided to forgive Fletcher's debt. After endorsing Fletcher's view that much of what had been delivered to him was unstable or contaminated material, the GE Letter explicitly recommended that Fletcher's "outstanding Accounts Receivable in the amount of $6,993.75 be written off." As outlined in the GE Letter, this recommendation reflected a deliberate financial calculus that accounted for the fact that GE viewed scrap Pyranol as a waste product that should have been discarded and the company stood to benefit financially by leaving Fletcher to deal with the issue of disposal.[15]

Third, consistent with this recommendation and cost analysis, GE made no effort, either then or at a later date, to retrieve, cleanup, or otherwise properly dispose of the thousands

_____

[15] Specifically, in reference to the scrap Pyranol at the Fletcher Site the GE Letter stated:

> The material in question should have been disposed of (if we could have found an acceptable method of disposal). The cost would have been at least $.50 per drum plus the loss of the drum valued at $1.25 or a total cost to G.E. of 1856 @ $1.75 = $3,248.00.
>
> It is our recommendation that the outstanding Accounts Receivable in the amount of $6,993.75 be written off. Since [Fletcher] paid the transportation, the only cost to G.E. is the drums at $1.25 ea. or $2,320.00. Giving us a savings of $928.00.

(Emphasis added.)

of drums of scrap Pyranol Fletcher had claimed were unusable to him.  Evidence in the record supports the district court's conclusion that GE's non-action in this regard flowed from a deliberate decision to wash its hands of the issue of the scrap Pyranol's disposal in the belief that GE could benefit by shifting that responsibility to Fletcher.  Most notably, asked what he understood would happen to the drums of scrap Pyranol once GE decided to write off Fletcher's debt, Robert Abbe, former Manager at Hudson Falls declared:  "I don't think that was of any -- any concern.  We just hoped he was able to use some of it, <u>and the balance of it he could dispose of it</u>."  (Emphasis added.)

Standing before this case's voluminous record, we simply cannot reconcile GE's well-documented history of purposeful inaction in relation to the scrap Pyranol left at the Fletcher Site with its vehement claims that it did not harbor the intent necessary to come under § 9607(a)(3)'s scope.  GE argues that the district court committed reversible error when it ruled that GE was an arranger because it acted with the understanding that some disposal of scrap Pyranol was "substantially certain" to occur -- a standard that the district court described as "constructive intent" -- and emphasizes that the district court did not find that GE had an actual intent to dispose of scrap Pyranol.  But the district court's oral findings should not be read in a vacuum.  In written findings issued after the Supreme Court issued its decision

-27-

in <u>Burlington Northern</u>, the district court cleaned up any ambiguity by finding that GE intentionally used Fletcher to rid itself of and dispose of the scrap Pyranol.  This finding of intent is firmly rooted in the record.  To summarize, the record paints a picture in which this much is clear: (1) GE considered scrap Pyranol waste material; (2) because Fletcher, a "chemical scrapper," saw some value in GE's scrap Pyranol, GE, in turn, saw in Fletcher an auspicious and efficient manner in which to rid itself of thousands of gallons of scrap Pyranol; (3) GE understood that not all of its scrap Pyranol would be of use to Fletcher; (4) during the last years of the GE-Fletcher relationship, GE largely controlled the amount and quality of the scrap Pyranol shipped from its facilities to the Fletcher Site; (5) during this same period, scrap Pyranol transfers from GE to the Fletcher Site increased drastically and continued even once Fletcher became delinquent in paying his account; (6) Fletcher eventually complained that GE had sent him considerable amounts of contaminated or otherwise unusable scrap Pyranol -- a claim that GE eventually confirmed through its own testing -- and asked that GE retrieve those drums that were of no use to him; (7) crunching numbers, GE then concluded that writing off Fletcher's debt and unburdening itself of the responsibility to dispose of the scrap Pyranol represented a more financially advantageous option than complying with Fletcher's request; and (8) in accordance with this conclusion, GE took no further action,

leaving Fletcher to dispose of the scrap Pyranol as he best saw
fit.

Properly connected, these points establish that GE
purposefully entered into its arrangement with Fletcher with the
desire to be rid of the scrap Pyranol. Though the initial
arrangement (informal as it was) may not have, in express terms,
underline directed Fletcher to dispose of GE's scrap Pyranol, GE certainly
understood this would be the result of its actions and took the
conscious and intentional step of leaving Fletcher to dispose of
the materials. We are mindful of the Supreme Court's instruction
that in carrying out our duty to review the record before us, we
must "look[] beyond the parties' characterization of the
transaction as a 'disposal' or a 'sale' and seek[] to discern
whether the arrangement was one Congress intended to fall within
the scope of CERCLA's strict liability provisions." Burlington N.,
129 S. Ct. at 1879. Here, GE has made every effort to convince us
that its arrangement with Fletcher constituted a proper arms-length
"sale," but its attempts to do so are not borne out by the record.[16]

---

[16]   GE has brought the Ninth Circuit's recent decision in Team
Enterprises, LLC v. Western Investment Real Estate Trust, 647 F.3d
901 (9th Cir. 2011) to our attention. The plaintiff in Team
Enterprises, a dry cleaning store operator, sued manufacturer
defendant R.R. Street & Co., Inc. ("Street") for contribution of
cleanup costs under CERCLA, claiming that Street's dry cleaning
machine equipment made disposal of wastewater containing hazardous
substances inevitable. 647 F.3d at 909. The Ninth Circuit
rejected the plaintiff's claim that Street's design indicated that
the manufacturer "intended the disposal" of hazardous substances.
Id. "At most," the Team Enterprises court explained, "the design

We therefore hold that GE's actions in relation to the Fletcher Site render it liable for arranging for disposal of a hazardous substance pursuant to § 9607(a)(3).

## B. Cost Recovery Claims and CERCLA Statute of Limitations

Having concluded that GE can properly be subjected to liability under 42 U.S.C. § 9607(a)(3), we must now consider GE's remaining claim on appeal.  At issue is whether the United States can recover $1,305,921 in costs incurred in connection with removal actions that EPA conducted at the Fletcher Site in 1993 and 1995 (collectively, the "1993 and 1995 Removal Actions").[17]  As it did unsuccessfully at the district court, GE now argues that recovery

---

indicates that Street was indifferent to the possibility" of disposal.  Id.

GE relies upon Team Enterprises to press the point that indifference is insufficient to establish arranger liability, but this case is not persuasive because, unlike the instant case, Team Enterprises involved a "useful product."  See id.  Moreover, as we have already explained, GE's actions and purposeful or calculated decisions not to act at other times compel us to conclude that it did, in fact, "take[] intentional steps to dispose of a hazardous substance."  Burlington N., 129 S. Ct. at 1879.

[17]  Under 42 U.S.C. § 9601(23), a removal action is defined as:

> [T]he cleanup or removal of released hazardous substances from the environment, such actions  as may be necessary [to take] in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.

of these costs is precluded by the applicable three-year statute of limitations for removal action cost recovery claims under CERCLA. See 42 U.S.C. § 9613(g)(2). This secondary claim again requires us to consider the proper interpretation of the CERCLA statute, a question that we review de novo. United States v. JG-24, Inc., 478 F.3d 28, 32 (1st Cir. 2007). We begin our discussion of this issue by outlining the relevant statutory framework.

In pertinent part, CERCLA provides that "[a]n initial action for recovery of the costs referred to in section 9607 . . . must be commenced . . . for a removal action, within 3 years after completion of the removal action . . . ." 42 U.S.C. § 9613(g)(2) (emphasis added). The statute then provides additional detail, dictating:

> In [an initial action], the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages. A subsequent action or actions under section 9607 of this title for further response costs . . . may be maintained at any time during the response action, but must be commenced no later than 3 years after the date of completion of all response actions . . . .

Id. (emphasis added).

Distilled for our present purposes, the upshot of this statutory language is that the United States may only recoup costs arising from the 1993 and 1995 Removal Actions if, as it argues, the controversy we now consider is a "subsequent action . . . to

-31-

recover further response costs or damages," id., and the 1991 Action is an "initial action." Otherwise, because work undertaken in connection with the 1993 and 1995 Removal Actions culminated in 1994 and 1995, respectively, the three-year statute of limitations would have extinguished these claims in 1997 and 1998.

GE's position is that the instant case presents an "initial action" insofar as it asserts claims for costs incurred in the 1993 and 1995 Removal Actions. GE first looks to the statutory text. Because § 9613(g)(2) provides that in an initial action "the [district] court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions," 42 U.S.C. § 9613(g)(2) (emphasis added), GE posits that for an action to be "initial" under CERCLA, the district court must enter binding declaratory judgment on liability. Put another way, "[u]nless and until a defendant has been subjected to [] a prior, binding judgment on liability, any further cost-recovery action against him will also be 'an initial action' for purposes of the statute of limitations." Brief of GE at 42. From this premise, GE then reasons that since the district court did not enter a declaratory judgment regarding GE's liability in the 1991 Action, the instant suit may not be properly considered "subsequent to" the former as per the CERCLA scheme.

We are not persuaded by GE's position regarding the proper interpretation of § 9613(g)(2). "CERCLA seeks to provide

-32-

EPA with the necessary tools to achieve prompt cleanups[,]" one of which must be "the ability to foster incentives for timely settlements." United Techs. Corp. v. Browning-Ferris Indus., Inc., 33 F.3d 96, 103-04 (1st Cir. 1994) (citation omitted). By creating an incentive for CERCLA plaintiffs to litigate matters to judgment either early or often, instead of seeking resolution through settlement or consent decree, GE's reading of § 9613(g)(2) would all but do away with an essential instrument in the CERCLA tool chest. See Davis, 261 F.3d at 28 (noting CERCLA "paradigm . . . encourages the finality of early settlement"); United States v. DiBiase, 45 F.3d 541, 545 (1st Cir. 1995) (noting "CERCLA's policy of encouraging settlements as opposed to endless court battles").

     As it must, the statutory text guides our analysis. Contrary to GE's assertions, nothing in the text of § 9613(g)(2) requires that declaratory judgment be entered in a prior action for a later-in-time suit to constitute a "subsequent" action under CERCLA. The statute does not plainly define "initial action" as one that culminates in a district court's entering of declaratory judgment; nor does it define a "subsequent action" as one that follows a prior suit in which a court entered declaratory judgment. Instead, as the Seventh Circuit explained in United States v. Navistar International Transportation Corp. where it rejected the same argument that GE now presses in this appeal, "[t]he structure

-33-

of this subsection indicates that the intent of Congress . . . was
to avoid the necessity of relitigating liability questions.   It
provides for the declaratory judgment as a way to manage the
litigation in an efficient manner."[18]   152 F.3d 702, 709 (7th Cir.
1998) (emphasis added).   While a reading of § 9613(g)(2) evinces
Congress's intent to encourage resolution by means of consent
decrees among parties to Section 9607 actions, the statute cannot
be read to foreclose resolution of those suits by other means.
Neither, we believe, can it be read "to indicate that the entry of
such a declaratory judgment is a prerequisite to the prosecution of
a 'subsequent action . . . for further response costs.'"   Id. at
710 (quoting 42 U.S.C. § 9613(g)(2)).

---

[18]  We take additional comfort in the fact that the Eighth Circuit,
the other appellate circuit to directly pass judgment on this
interpretation of the CERCLA statute, has similarly rejected it.
See United States v. Findett, 220 F.3d 842, 846 (8th Cir. 2000)
("[C]ongress did not intend that the 'declaratory judgment'
language be used to define an initial action for purposes of
determining whether a later action against the same party and
pertaining to the same site is subsequent for CERCLA statute of
limitation purposes, when the later action is filed after
resolution by consent decree of the earlier action.").

   The two cases upon which GE relies as support to the contrary
are not apposite.   See New York v. Green, 420 F.3d 99, 111 (2d Cir.
2005); Kelley v. E.I. Dupont de Nemours & Co., 17 F.3d 836, 844
(6th Cir. 1994).   They both stand for the proposition that in cases
where a court does determine liability against a CERCLA defendant,
the court must also submit declaratory judgment as to the same in
order to foreclose relitigation of that issue.   Unlike Navistar and
Findett, neither case touches on whether a court must issue
declaratory judgment on the issue of liability for a suit to
constitute an "initial action."

As we have already suggested, interpreting § 9613(g)(2) to set in place a regime whereby a "subsequent action" could only occur if a prior action has been resolved through declaratory judgment would run counter to Congress's objective in enacting CERCLA to "promote the timely cleanup of hazardous waste sites."[19] Burlington N., 129 S. Ct. at 1874 (internal quotation marks omitted).  CERCLA cleanups are protracted ordeals that usually require a series of removal actions spanning several years.  See Am. Cyanamid, 381 F.3d at 16 (noting environmental cleanups are "done in phases" in order to make them "manageable").  Under GE's interpretation, if the United States opted to settle a cost recovery action, it must then time and time again bring suit before the three-year statute of limitations on each individual later removal action tolled.  We therefore agree with the government that GE's reading of the statute would upset Congress's intent to encourage "settlements [to] reduce excessive litigation expenses

---

[19]  This objective is also evident in § 9613(g)(2)'s legislative history, which presents declaratory judgment as a prudent device through which to channel CERCLA litigation.  See H.R. Rep. No. 99-253, at 21 (1985), reprinted in 1986 U.S.C.C.A.N. 3038, 3044, 1985 WL 25941 ("In the initial cost recovery action, in order to conserve judicial time and resources, the court is to enter a declaratory judgment on liability for response costs . . . ." (emphasis added)); see also Navistar, 152 F.3d at 709 (noting court "understand[s] [§ 9613(g)(2)'s] legislative history . . . to indicate" declaratory judgment is "a way to manage [] litigation in an efficient manner").  Thus, although § 9613(g)(2)'s text and its place in the overarching CERCLA scheme do our heavy lifting today, we note that the legislative history further undercuts GE's claims on this issue.

-35-

and transaction costs, thereby preserving scarce resources for CERCLA's real goal: the expeditious cleanup of hazardous waste sites."  DiBiase, 45 F.3d at 546.

     We hold that the instant suit is a subsequent action under CERCLA and that the 1991 Action was an initial action as per § 9613(g)(2).  GE does not claim -- nor do we believe it reasonably could -- that the 1991 Action was not an "action for recovery of the costs referred to in section 9607 . . . ."  42 U.S.C. § 9613(g)(2).  Although the United States asserted a claim for declaratory judgment regarding GE's liability in the 1991 Action, the parties concluded that resolving the matter via consent decree was to their mutual benefit.  The United States and GE both walked away from the 1991 Action knowing they would likely meet again; GE did not concede liability and the United States reserved its right to pursue additional recovery costs at a later date.[20]  This

---

[20]  The district court aptly summarized the reasons why the manner in which the 1991 Action unfolded is standard CERCLA procedure:

> [W]hen removal cost recovery actions are filed early in the cleanup process, it will often be impossible for a [] defendant to estimate its exposure in the event that it is ultimately determined to be a responsible party. Thus, it is extremely unlikely that it will agree to participate in a consent decree . . . if it is also required to agree to a declaratory judgment on liability that can be used against it in subsequent litigation. Conversely, the government is unlikely to settle a removal cost recovery action without a liability determination if it is thereby barred from claiming the benefit of the extended limitation period that applies to "subsequent actions."

agreement was reached according to routine CERCLA practice and was consistent with the United States' obligation to avoid drawn-out litigation.  <u>See</u> 42 U.S.C. § 9622(a) ("[W]henever practicable and in the public interest . . . the President shall act to facilitate agreements . . . <u>to expedite effective remedial actions and minimize litigation</u>." (emphasis added)).  GE's claims to the contrary are unavailing.

### III. <u>Conclusion</u>

For the above-stated reasons, we affirm the judgment of the district court.

**<u>Affirmed</u>**.

---

<u>United States</u> v. <u>Gen. Elec. Co.</u>, No. 06-cv-354-PB, 2010 WL 4977478, at *3 (D.N.H. Dec. 3, 2010); <u>see also</u> <u>Findett</u>, 220 F.3d at 846 ("It would hinder Congress's objective of providing for the prompt initiation of remediation of hazardous waste sites . . . if the EPA were to be required to forfeit a future claim for response costs as the result of a time-bar because it opted to settle a case . . . .").